No. 24-1442

---

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

DAVISON DESIGN & DEVELOPMENT, INC.,

*Appellant*

v.

MARIO SCORZA,

*Appellee*

---

Appeal from the United States District Court for the Western District of
Pennsylvania, No. 2:23-cv-00644-MJH (Hon. Marilyn J. Horan)

---

**APPENDIX VOL. 2, App. 18 to 623**

---

Justin T. Barron
Barron Law Office LLC
P.O. Box 493
Valencia, PA 16059
(412) 334-6312

*Counsel for Appellant*

# TABLE OF CONTENTS

District Court docket entries ................................................... 18

April 19, 2023 Complaint/Motion to Vacate or Modify
     Arbitration Award ........................................................... 24

August 23, 2023 Motion to Confirm Arbitration Award
     and Response to Motion to Vacate Award ................................... 213

September 6, 2023 Response to Motion to Confirm ............................ 595

September 6, 2023 Reply Brief ............................................... 610

# U.S. District Court
## Western District of Pennsylvania (Pittsburgh)
## CIVIL DOCKET FOR CASE #: 2:23–cv–00644–MJH

DAVISON DESIGN & DEVELOPMENT, INC. v. SCORZA
Assigned to: Judge Marilyn J. Horan
Demand: $75,000
Case in other court:  Third Circuit, 24–01442
                 Third Circuit, 24–01454
Cause: 28:1332 Diversity–Other

Date Filed: 04/19/2023
Date Terminated: 01/03/2024
Jury Demand: None
Nature of Suit: 896 Other Statutes: Arbitration
Jurisdiction: Diversity

**Plaintiff**

**DAVISON DESIGN & DEVELOPMENT, INC.**

represented by **Justin T. Barron**
Barron Law Office LLC
P.O. Box 493
Valencia, PA 16059
412–334–6312
Email: jbarron@justinbarronlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MARIO SCORZA**

represented by **John J. Myers**
Eckert, Seamans, Cherin & Mellott
600 Grant Street
44th Floor
Pittsburgh, PA 15219
566–5900
Email: jmyers@eckertseamans.com
*ATTORNEY TO BE NOTICED*

**Stacey L Barnes**
Kearney McWilliams & Davis
55 Waugh Dr., Ste 150
Houston, TX 77007
832–413–5405
Fax: 832–413–5405
Email: sbarnes@kmd.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vikesh Navnit Patel**
Kearney, McWilliams & Davis, PLLC
55 Waugh #150
Houston, TX 77007
713–936–9620
Email: vpatel@kmd.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William C Yarbrough , III**
Kearney, McWilliams & Davis
55 waugh, Suite 150
Houston
Houston, TX 77007
713–936–9620
Email: wyarbrough@kmd.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

App. 018

| Date Filed | # | Docket Text |
|---|---|---|
| 04/19/2023 | 1 | COMPLAINT against MARIO SCORZA (Filing fee, including Administrative fee, $402, receipt number APAWDC–7647607), filed by DAVISON DESIGN & DEVELOPMENT, INC. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit 1 – July 6, 2021 Claimant's Original Petition, # 3 Exhibit 2 – Feb 2, 2023 Scheduling Order #11, # 4 Exhibit 3 – Feb 15, 2023 Application for Fees and Costs, # 5 Exhibit 4 – March 3, 2023 Claimant's Post–Hearing Brief, # 6 Exhibit 5 – March 3, 2023 Respondent's Post–Hearing Brief, # 7 Exhibit 6 – March 6, 2023 Scheduling Order #12, # 8 Exhibit 7 – March 17, 2023 Award of Arbitrator) (kss) (Entered: 04/20/2023) |
| 04/20/2023 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 1 Complaint. ERROR: Party did not file disclosure statement identifying all parent companies, subsidiaries, and affiliates that have issued shares or debt securities to the public as required pursuant to LR 7.1.A AND identifying citizenship pursuant to FRCvP 7.1(a)(2), which took effect on December 1, 2022. CORRECTION: Attorney advised to file statement within 7 days under Civil > Other Filings > Other Documents > Disclosure Statement (LR 7.1.A and/or FRCvP 7.1(a)(2)). Disclosure Statement due by 4/27/2023. (kss) (Entered: 04/20/2023) |
| 04/20/2023 | 2 | Disclosure Statement identifying None as corporate parent or other affiliate, by DAVISON DESIGN & DEVELOPMENT, INC. (Barron, Justin) (Entered: 04/20/2023) |
| 04/21/2023 | 3 | MOTION for Service by U.S. Marshal re 1 Complaint, by DAVISON DESIGN & DEVELOPMENT, INC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Proposed Order) (Barron, Justin) (Entered: 04/21/2023) |
| 04/21/2023 | 4 | STANDING ORDER AND PROCEDURES ON CIVIL MOTION PRACTICE available Here. Signed by Judge Marilyn J. Horan on 4/21/2023. Text–only entry; no PDF document will issue. This text–only entry constitutes the Order of the Court or Notice on the matter. (bjl) (Entered: 04/21/2023) |
| 04/21/2023 | 5 | ORDER granting 3 Motion for Service by U.S. Marshal. Signed by Judge Marilyn J. Horan on 4/21/2023. (bjl) (Entered: 04/21/2023) |
| 06/13/2023 | 6 | CERTIFICATE OF SERVICE *of Notice of Motion to Vacate or Modify Arbitration Award* by DAVISON DESIGN & DEVELOPMENT, INC. re 1 Complaint. (Attachments: # 1 Exhibit USM–285 Form) (Barron, Justin) Document removed from public view and refiled at 7 . Modified text on 6/14/2023. (kss) (Entered: 06/13/2023) |
| 06/14/2023 | 7 | Return of Service Returned Executed re 1 Complaint by DAVISON DESIGN & DEVELOPMENT, INC. MARIO SCORZA served on 6/8/2023, answer due 6/29/2023. (Attachments: # 1 Exhibit USM–285 Form) (kss) (Entered: 06/14/2023) |
| 06/28/2023 | 8 | ANSWER to 1 Complaint, by MARIO SCORZA. (Myers, John) (Entered: 06/28/2023) |
| 06/29/2023 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 8 Answer to Complaint. ERROR: Party did not file disclosure statement identifying citizenship pursuant to FRCvP 7.1(a)(2), which took effect on December 1, 2022. CORRECTION: Attorney advised to file statement within 7 days under Civil > Other Filings > Other Documents > Disclosure Statement (LR 7.1.A and/or FRCvP 7.1(a)(2)). Disclosure Statement due by 7/6/2023. (kss) (Entered: 06/29/2023) |
| 06/29/2023 | 9 | Disclosure Statement by MARIO SCORZA. (Myers, John) (Entered: 06/29/2023) |
| 06/29/2023 | 10 | INITIAL LOCAL RULE 16.1 SCHEDULING ORDER: Rule 26 Meeting Report due by 7/17/2023; Telephonic Initial Case Management set for 7/24/2023 at 09:00 AM. Signed by Judge Marilyn J. Horan on 6/29/2023. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (bjl) (Entered: 06/29/2023) |
| 06/29/2023 | 11 | MOTION for attorney Vikesh N. Patel to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC–7763817) by MARIO SCORZA. (Attachments: # 1 Affidavit of Vikesh Patel) (Patel, Vikesh) (Entered: 06/29/2023) |

| 06/29/2023 | 12 | MOTION for attorney Stacey L. Barnes to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC–7763998) by MARIO SCORZA. (Attachments: # 1 Affidavit of Stacey L. Barnes) (Barnes, Stacey) (Entered: 06/29/2023) |
|---|---|---|
| 06/30/2023 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 12 Motion to Appear Pro Hac Vice, 11 Motion to Appear Pro Hac Vice. ERROR: Proposed Orders were not attached. CORRECTION: Attorneys are advised to file a proposed order by using the Proposed Order event and linking it to the document in question. (kss) (Entered: 06/30/2023) |
| 06/30/2023 | 13 | Proposed Order re 11 Motion to Appear Pro Hac Vice *by Vikesh N. Patel* by MARIO SCORZA. (Barnes, Stacey) (Entered: 06/30/2023) |
| 06/30/2023 | 14 | Proposed Order re 12 Motion to Appear Pro Hac Vice *by Stacey L. Barnes* by MARIO SCORZA. (Barnes, Stacey) (Entered: 06/30/2023) |
| 06/30/2023 | 15 | ORDER granting 11 Motion for Vikesh N. Patel to Appear Pro Hac Vice. Signed by Judge Marilyn J. Horan on 6/30/2023. (bjl) (Entered: 06/30/2023) |
| 06/30/2023 | 16 | ORDER granting 12 Motion for Stacey L. Barnes to Appear Pro Hac Vice. Signed by Judge Marilyn J. Horan on 6/30/2023. (bjl) (Entered: 06/30/2023) |
| 06/30/2023 | 17 | MOTION for attorney William C. Yarbrough to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC–7766207) by MARIO SCORZA. (Attachments: # 1 Affidavit of William Yarbrough, # 2 Proposed Order) (Yarbrough, William) (Entered: 06/30/2023) |
| 07/06/2023 | 18 | ORDER granting 17 Motion for William Yarbrough to Appear Pro Hac Vice. Signed by Judge Marilyn J. Horan on 7/6/2023. (bjl) (Entered: 07/06/2023) |
| 07/14/2023 | 19 | MOTION to Stay re 10 Initial Local Rule 16.1 Scheduling Order,, Set Hearings, by DAVISON DESIGN & DEVELOPMENT, INC.. (Attachments: # 1 Exhibit 1 – July 2023 emails, # 2 Proposed Order) (Barron, Justin) (Entered: 07/14/2023) |
| 07/14/2023 | 20 | ORDER Upon consideration of Plaintiff's Motion to Stay Discovery and Pretrial Deadlines and to Set a Briefing Schedule, it is hereby ORDERED that the Motion is GRANTED. The deadlines set forth in the Courts Order Setting Initial Case Management Conference (ECF No. 10) are STAYED pending the Courts resolution of Plaintiffs Motion to Vacate or Modify Arbitration Award (ECF No. 1) (the Motion to Vacate).The Court establishes the following briefing schedule for the parties to address the Motion to Vacate: 1.Defendant shall submit a brief in opposition to the Motion to Vacate, not to exceed 20 pages (excluding tables and exhibits), no later than August 23, 2023;2.Plaintiff shall submit a reply brief in support of the Motion to Vacate, not to exceed 15 pages (excluding tables and exhibits), no later than September 6; and 3. No further briefs shall be filed. Signed by Judge Marilyn J. Horan on 7/14/2023. (bjl) (Entered: 07/14/2023) |
| 08/23/2023 | 21 | BRIEF in Opposition to 1 Complaint, filed by MARIO SCORZA. (Attachments: # 1 Exhibit 1 Arb. Award, # 2 Exhibit 2 Pre–Develop Agreement, # 3 Exhibit 3 McBride Report, # 4 Exhibit 4 Lehrer Report, # 5 Exhibit 5 FTC Findings, # 6 Exhibit 6 Pre–Hearing Brief, # 7 Exhibit 7 Post–Hearing Brief, # 8 Exhibit 8 TIDSA Disclosure, # 9 Exhibit 9 Rifkin Corresp., # 10 Exhibit 10 Frison, # 11 Exhibit 11 Barnes Affidavit (Barnes, Stacey) Modified text on 8/24/2023. (kss) (Entered: 08/23/2023) |
| 08/23/2023 | | W/ 21 MOTION to Confirm Arbitration Award by MARIO SCORZA. (kss) (Entered: 08/24/2023) |
| 08/24/2023 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 21 Brief in Opposition. ERROR: Document should have been filed as two separate documents. CORRECTION: Attorney advised in future that documents of that nature are to be filed as separate documents. Clerk of Court docketed Motion to Confirm Arbitration Award. This message is for informational purposes only. CLERK'S OFFICE QUALITY CONTROL MESSAGE re 21 Motion to Confirm Arbitration Award. ERROR: Proposed Order, which is required for all motions in civil cases per Local Rule LCvR7, was not attached. CORRECTION: Attorney is advised to file a proposed order by using the Proposed Order event and linking it to the document in question. (kss) (Entered: 08/24/2023) |

| | | |
|---|---|---|
| 08/28/2023 | 22 | Proposed Order re 21 Motion to Confirm Arbitration Award by MARIO SCORZA. (Barnes, Stacey) Modified text on 8/28/2023. (kss) (Entered: 08/28/2023) |
| 08/30/2023 | 23 | MOTION to Extend Time to Respond to 21 Motion to Confirm Arbitration Award by DAVISON DESIGN & DEVELOPMENT, INC. (Attachments: # 1 Proposed Order) (Barron, Justin) Modified text on 8/30/2023 to add document linkage. (kss) (Entered: 08/30/2023) |
| 08/30/2023 | 24 | ORDER granting 23 Motion to Extend Time. Upon consideration of Plaintiffs Motion to Extend Time to Respond to Motion to Confirm Arbitration Award ("Motion to Confirm"), it is hereby ORDERED that the Motion is GRANTED. Plaintiff shall file its Response to the Motion to Confirm (ECF 21 ) by September 6, 2023. Signed by Judge Marilyn J. Horan on 8/30/2023. (bjl) (Entered: 08/30/2023) |
| 09/06/2023 | 25 | RESPONSE IN OPPOSITION to 21 Motion to Confirm Arbitration Award, filed by DAVISON DESIGN & DEVELOPMENT, INC. (Attachments: # 1 Exhibit 1, # 2 Proposed Order) (Barron, Justin) Modified text on 9/7/2023 to add document linkage. (kss) (Entered: 09/06/2023) |
| 09/06/2023 | 26 | REPLY BRIEF in Support of 1 Complaint/Motion to Vacate or Modify Arbitration Award, filed by DAVISON DESIGN & DEVELOPMENT, INC. (Barron, Justin) Modified text on 9/7/2023. (kss) (Entered: 09/06/2023) |
| 11/03/2023 | 27 | MEMORANDUM OPINION AND ORDER It is hereby ordered that Davison's Motion to Vacate/Modify Arbitration Award is denied. It is further ordered that the Court will schedule a hearing approximately sixty (60) days from now to receive evidence on Mr. Scorza's Motion to Confirm. In the meantime, the parties should confer regarding whether they can reach acompromise on Mr. Scorza's motion. Should a resolution be reached, the parties shall promptly advise the Court. Signed by Judge Marilyn J. Horan on 11/3/2023. (bjl) (Entered: 11/03/2023) |
| 11/06/2023 | 28 | TEXT ORDER Video Evidentiary Hearing on Mr. Scorza's Motion to Confirm is set for 1/2/2024 09:00 AM. Counsel shall receive a link via email. Signed by Judge Marilyn J. Horan on 11/6/2023. Text–only entry; no PDF document will issue. This text–only entry constitutes the Order of the Court or Notice on the matter. (bjl) (Entered: 11/06/2023) |
| 01/01/2024 | 29 | Exhibit List *for Hearing Set for January 2, 2024* by MARIO SCORZA. (Attachments: # 1 Exhibit Exh. 1, Arb. Award, # 2 Exhibit Exh. 2, Pre–Develop Agrmnt., # 3 Exhibit Exh. 3, McBride Report, # 4 Exhibit Exh. 4, Lehrer Report, # 5 Exhibit Exh. 5, FTC Findings, # 6 Exhibit Exh. 6, Pre–Hrng Brief, # 7 Exhibit Exh. 7, Post–Hrng Brief, # 8 Exhibit Exh. 8, TIDSA Disclosure, # 9 Exhibit Exh. 9, Rifkin Corresp., # 10 Exhibit Exh. 10, Atty Fee Affid., # 11 Exhibit Exh. 11, Lehrer Report) (Barnes, Stacey) (Entered: 01/01/2024) |
| 01/03/2024 | 30 | TEXT Minute Entry for proceedings held before Judge Marilyn J. Horan: Evidentiary Hearing on Defendant's Motion to Confirm held on 1/3/2024. Testimony received by defense counsel. Motion taken under advisement. (Court Reporter: Teresa Benson) Text–only entry; no PDF document will issue. This text–only entry constitutes a Minute of the Court or Notice on the matter. (bjl) (Entered: 01/03/2024) |
| 01/03/2024 | 31 | MEMORANDUM OPINION The Court will confirm the March 27, 2023 Arbitration Award and award additional reasonable and necessary attorney fees incurred in defending against Davison's Motion to Vacate and in support of Mr. Scorza's Motion to Confirm. Said necessary and reasonable fees are in the amount of $17,837.83. A separate Judgment will follow consistent with the confirmation award, award of interest, and award of additional attorney fees. Signed by Judge Marilyn J. Horan on 1/3/2024. (bjl) (Entered: 01/03/2024) |
| 01/03/2024 | 32 | JUDGMENT pursuant to Rule 58 entered in favor of Defendant and against Plaintiff. a. $225,078.90 for the primary amount of the March 27, 2023 Arbitration Award; b. $32,564.00 for arbitration fees, as set forth in the March 27, 2023 Arbitration Award; c. Pre– judgment interest on $257,642.90 to be calculated at the rate specified in 41 P.S. § 202, from March 27, 2023, through the date of this Order, until paid in full. d. Post–judgment interest on $257,642.90 to be calculated at the rate specified in 28 U.S.C. § 1961 from the date of this Order until the date of payment. e. Additional attorney fees in the amount of $17,837.83. Signed by Judge Marilyn J. Horan on 1/3/2024. (bjl) (Entered: 01/03/2024) |

| | | |
|---|---|---|
| 01/30/2024 | 33 | MOTION for New Trial, MOTION for Reconsideration of Amount of Judgment re 32 Judgment by MARIO SCORZA. (Attachments: # 1 Exhibit 1, Att. Fee Affidavit) (Barnes, Stacey). Added MOTION for Reconsideration of Amount of Judgment on 1/31/2024 (kss) (Entered: 01/30/2024) |
| 01/31/2024 | 34 | TEXT ORDER Plaintiff shall respond to Defendant's Motion for New Trial and Reconsider Amount of Judgment 33 on or before 2/7/2024. Signed by Judge Marilyn J. Horan on 1/31/2024. Text–only entry; no PDF document will issue. This text–only entry constitutes the Order of the Court or Notice on the matter. (bjl) (Entered: 01/31/2024) |
| 01/31/2024 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 33 Motion for New Trial, Motion for Reconsideration of Amount of Judgment. ERROR: Proposed Order, which is required for all motions in civil cases per Local Rule LCvR7, was not attached. CORRECTION: Attorney is advised to file a proposed order by using the Proposed Order event and linking it to the document in question. CLERK'S OFFICE QUALITY CONTROL MESSAGE. ERROR: MULTIPLE Relief Motion Filed as ONE Relief. CORRECTION: Attorney advised in future that Motions of this nature are to be filed using the Motion Event and clicking on all the reliefs sought in said motion. Clerk of Court added for Reconsideration of Amount of Judgment. This message is for informational purposes only. (kss) (Entered: 01/31/2024) |
| 02/05/2024 | 35 | Proposed Order re 33 Motion for New Trial, Motion for Reconsideration of Amount of Judgment, by MARIO SCORZA. (Barnes, Stacey) Modified text on 2/5/2024. (kss) (Entered: 02/05/2024) |
| 02/07/2024 | 36 | RESPONSE IN OPPOSITION to 33 Motion for New Trial, Motion for Reconsideration of Amount of Judgment , filed by DAVISON DESIGN & DEVELOPMENT, INC. (Barron, Justin) Modified text on 2/7/2024. (kss) (Entered: 02/07/2024) |
| 02/07/2024 | 37 | ORDER Upon consideration of Defendant, Mario Scorza's, Motion for New Trial and to Reconsider Amount of Judgment (ECF No. 33 ) and Plaintiff, Davison Design & Development, Inc.'s, Response in Opposition (ECF No. 36 ), the Court concurs and the adopts the analysis presented in Plaintiffs well–reasoned briefing. Accordingly, Mr. Scorza's Motion is denied.Signed by Judge Marilyn J. Horan on 2/7/2024. (bjl) (Entered: 02/07/2024) |
| 03/08/2024 | 38 | NOTICE OF APPEAL as to 27 Memorandum Opinion, 32 Rule 58 Judgment, Judgment on Attorney Fees, by DAVISON DESIGN & DEVELOPMENT, INC. Filing fee $605, receipt number APAWDC–8152528. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. The Transcript Purchase Order form will NOT be mailed to the parties. The form is available on the Court's internet site. (Barron, Justin) (Entered: 03/08/2024) |
| 03/08/2024 | 39 | MOTION to Stay *Execution of Judgment Pending Appeal* by DAVISON DESIGN & DEVELOPMENT, INC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Proposed Order Order granting stay, # 5 Proposed Order Standard investment order) (Barron, Justin) (Entered: 03/08/2024) |
| 03/08/2024 | 40 | BRIEF in Support re 39 Motion to Stay, filed by DAVISON DESIGN & DEVELOPMENT, INC. (Barron, Justin) (Entered: 03/08/2024) |
| 03/08/2024 | 41 | USCA Case Number 24–1442 for 38 Notice of Appeal, filed by DAVISON DESIGN & DEVELOPMENT, INC.. USCA Case Manager Laurie (DOCUMENT IS RESTRICTED AND CAN ONLY BE VIEWED BY COURT STAFF) (ca3lmr/amr) (Entered: 03/08/2024) |
| 03/08/2024 | 42 | TEXT ORDER Defendant shall file any response to Plaintiff's Motion to Stay 39 on or before March 13, 2024. Signed by Judge Marilyn J. Horan on 3/8/2024. Text–only entry; no PDF document will issue. This text–only entry constitutes the Order of the Court or Notice on the matter. (bjl) (Entered: 03/08/2024) |
| 03/08/2024 | 43 | NOTICE OF CROSS APPEAL as to 37 Order on Motion for New Trial, Order on Motion for Reconsideration, 32 Rule 58 Judgment, Judgment on Attorney Fees, by MARIO SCORZA. Filing fee $ 605, receipt number APAWDC–8154439. Representing Attorney: Stacey L. Barnes. Court Reporter Teresa Benson. The Clerk's |

| | | |
|---|---|---|
| | | Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. The Transcript Purchase Order form will not be mailed to the parties. The form is available on the Court's internet site. (Barnes, Stacey) (Entered: 03/08/2024) |
| 03/11/2024 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 43 Notice of Cross Appeal. ERROR: Attorney signature missing required information (Pennsylvania or other state bar identification number). CORRECTION: Attorney directed to comply with requirements of LCvR 5.2(B) in all future filings. This message is for informational purposes only. (kss) (Entered: 03/11/2024) |
| 03/13/2024 | 44 | USCA Case Number 24−1454 for 43 Notice of Cross Appeal, filed by MARIO SCORZA. USCA Case Manager Laurie (DOCUMENT IS RESTRICTED AND CAN ONLY BE VIEWED BY COURT STAFF) (lr) (Entered: 03/13/2024) |
| 03/13/2024 | 45 | RESPONSE IN OPPOSITION to 39 Motion to Stay Execution of Judgment Pending Appeal, filed by MARIO SCORZA. (Attachments: # 1 Proposed Order) (Barnes, Stacey) Modified text on 3/14/2024 to correct document linkage. (kss) (Entered: 03/13/2024) |
| 03/15/2024 | 46 | ORDER granting 39 Motion to Stay Execution of Judgment Pending Appeal. The Court hereby APPROVES the cash bond in the amount of $294,622.32. Upon Plaintiff depositing the cash bond with the Clerk of Court, execution on the judgment entered on January 3, 2024 (ECF 32 ) shall be stayed. The stay shall thereafter remain in effect until the earlier of any further order of court or until the conclusion of the presently pending appeal. Signed by Judge Marilyn J. Horan on 3/14/2024. (bjl) (Entered: 03/15/2024) |
| 03/15/2024 | 47 | ORDER Pursuant to Rule 67 of the Federal Rules of Civil Procedure and Local Rule 67.2 of this Court, IT IS ORDERED that the Plaintiff in the above captioned matter is permitted to deposit money with the Clerk of Court. IT IS FURTHER ORDERED that the Clerk deposit into the Registry of the Court the amount of $294,622.32, which represents the cash bond the Court has approved pursuant to Rule 62(b) of the Federal Rules of Civil Procedure. As soon as the business of the office allows, the Court will deposit the money into an interest bearing account, the Court Registry Investment System ("CRIS'), administered by the Administrative Office of the United States Courts under 28 U.S.C. § 2045, this shall be the only investment mechanism authorized. The custodian, CRIS, is authorized and directed by this Order to deduct the investment services fee for the management of investments and the registry fee, set by the Judicial Conference, for maintaining accounting deposited with the Court. Signed by Judge Marilyn J. Horan on 3/14/2024. (bjl) (Entered: 03/15/2024) |
| 03/18/2024 | 49 | BOND in the amount of $294,622.32, posted by DAVISON DESIGN & DEVELOPMENT, INC. Funds to be deposited into CRIS per order of court dated March 14, 2024, signed by Judge Horan at document 47 . (jkn) (Entered: 03/25/2024) |
| 03/22/2024 | 48 | TRANSCRIPT REQUEST re 38 Notice of Appeal, by DAVISON DESIGN & DEVELOPMENT, INC. *indicating that transcript is unnecessary for appeal purposes.* (Barron, Justin) (Entered: 03/22/2024) |
| 03/25/2024 | | NOTIFICATION TO THIRD CIRCUIT COURT OF APPEALS re 48 TPO (Transcript Purchase Order Request). Record complete for appeal purposes. (kss) (Entered: 03/25/2024) |
| 04/05/2024 | 50 | TRANSCRIPT REQUEST by MARIO SCORZA for proceedings held on 01/03/2024 before Judge Hon. Marilyn J. Horan from Court Reporter(s): Teresa Benson, RMR. (Patel, Vikesh) (Entered: 04/05/2024) |
| 04/30/2024 | 51 | CERTIFIED ORDER of USCA in lieu of formal MANDATE as to 43 Notice of Cross Appeal, filed by MARIO SCORZA dismissing case, pursuant to F.R.A.P. 3(a) and LAR Misc. 107.2, for failing to file case opening forms Appearance Form, Information Statement, Concise Summary, and Transcript Purchase Order. Case terminated on 04/30/2024. (lr) (Entered: 04/30/2024) |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVISON DESIGN & DEVELOPMENT, INC., | ) ) |
| | ) |
| Plaintiff, | ) ) |
| | ) No. 2:23-cv-644 |
| v. | ) ) |
| MARIO SCORZA, | ) ) |
| Defendant. | ) ) |

**COMPLAINT/MOTION TO VACATE OR MODIFY ARBITRATION AWARD**

Plaintiff Davison Design & Development, Inc. ("Davison") files this Motion to Vacate or Modify Arbitration Award pursuant to 9 U.S.C. §§ 10-11.[1]

**INTRODUCTION**

1. At a bare minimum, a party defending claims asserted against it in a private arbitration proceeding is entitled to notice of those claims, and a full and fair opportunity to mount a defense and respond to them.

2. An arbitrator exceeds his authority by granting relief based on claims or arguments that the parties themselves do not seek or raise in their submissions to the arbitrator.

3. That's because the scope of an arbitrator's authority is limited to the issues the parties actually submit to the arbitrator.

---

[1] "[A]pplications to vacate an arbitration award under FAA Section 10 are . . . to be made as motions," *PG Publ'g, Inc. v. Newspaper Guild of Pittsburgh*, 19 F.4th 308, 313 (3d Cir. 2021), and they "result in summary proceedings that do not require a district court to carry on a formal judicial proceeding," *Jiangsu Beier Decoration Materials Co. v. Angle World LLC*, 52 F.4th 554, 560 (3d Cir. 2022); *see also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581-82 (2008) (recognizing the same as to FAA Section 11, 9 U.S.C. § 11).

4.      Here, Defendant Mario Scorza ("Scorza"), the claimant in the underlying arbitration, expressly and repeatedly stated one—and only one—legal basis for his request for attorneys' fees and costs: the Pennsylvania Unfair Trade Practices and Consumer Protection Act (the "UTPCPL").

5.      Scorza also did not assert any other statutory claims during the nearly 2 years the underlying arbitration was pending.

6.      Nor did he assert any other legal basis for his request for attorneys' fees and costs.

7.      As a result, Davison limited its defenses, arguments, and submissions to the arguments and claims Scorza actually submitted to the Arbitrator, and it limited its submissions on the issue of attorneys' fees and costs to the UTPCPL.

8.      However, without notice to the parties, the Arbitrator's final award granted Scorza's request for attorneys' fees and costs, citing as the legal bases for doing so two statutes under which Scorza had never asserted a claim or argued as the basis for that request, and which Davison thus had not addressed in its submissions to the Arbitrator.

9.      By granting relief to Scorza on the basis of claims and arguments the parties had not submitted to him, the Arbitrator exceeded his powers and awarded upon a matter not submitted to the Arbitrator.

10.     Accordingly, the Arbitrator's final award should be partially vacated pursuant to 9 U.S.C. § 10(a)(4) or, alternatively, modified pursuant to 9 U.S.C. §

App. 025

11(b), by striking that portion of the Final Award granting attorneys' fees and costs to Scorza.

## PARTIES

11.     Plaintiff Davison is a corporation that is duly incorporated and has its headquarters in Pennsylvania at 595 Alpha Drive, Pittsburgh, Pennsylvania 15238.

12.     Defendant Mario Scorza ("Scorza") is an adult resident of the State of Texas who resides at 341 Old Mill Creek Drive, Waco, Texas 76712.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are completely diverse (Davison is a citizen of Pennsylvania because it is headquartered there, and Scorza is a citizen of Texas because he is domiciled there), and the amount in controversy exceeds the sum or value of $75,000.00 (the amount of attorneys' fees and costs erroneously awarded that Davison seeks to vacate is $199,024.05).

14.     Venue is proper in this Court under 9 U.S.C. § 10(a) because the underlying arbitration hearing occurred, and the award was made, in Pittsburgh, Allegheny County, Pennsylvania, which is within this District, 28 U.S.C. § 118(c); and under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this Motion occurred in this District.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Parties' Contracts and Private Arbitration

15.     In 2017 and 2018, the parties entered into four separate agreements in connection with Scorza's "Trava Weigh" invention idea.

App. 026

16.     In July 2021, Scorza commenced an arbitration proceeding before the American Arbitration Association ("AAA") by filing a document entitled "Plaintiff's Original Petition" (the "Demand for Arbitration").[2]

17.     The Demand for Arbitration asserted five causes of action: (i) breach of contract; (ii) "common-law fraud"; (iii) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL"); (iv) "fraud by non-disclosure"; and (iv) negligent misrepresentation.[3]

18.     Scorza's Demand for Arbitration included a request for attorneys' fees, but it did not identify the legal basis for that request.[4]

19.     A three-day arbitration hearing was held on January 18-19 and February 1, 2023 before Mr. Scott D. Livingston, Esq. (the "Arbitrator").

**B.     The Parties Define and Delimit the Claims Submitted to the Arbitrator**

20.     At the conclusion of the third day of hearings, the Arbitrator directed the parties to address two issues in connection with Scorza's request for attorneys' fees and costs: (i) the legal bases for that request; and (ii) the reasonableness of the amounts sought.

21.     On February 2, 2023, the Arbitrator issued Scheduling Order #11 to establish a post-hearing submission schedule.[5]

---

[2] *See* Ex. 1 (Demand for Arbitration).

[3] *Id.*, Sections IV.A-E at 5-9.

[4] *Id.*, Section V at 9-10.

[5] *See* Ex. 2 (Scheduling Order #11).

App. 027

22.     Scheduling Order #11 also directed Scorza to file his "attorneys fee petition . . . on or before February 15, 2023."

23.     On February 15, 2023, Scorza filed his "Application for Fees and Costs" (the "Fee Petition").[6]

24.     Scorza's Fee Petition asserted one—and only one—legal basis for his request for fees and costs: the UTPCPL, a legal cause of action he had alleged in his Demand for Arbitration.[7]

25.     Scorza did not cite any other law or cause of action in his Fee Petition as providing a legal basis for awarding his requested fees and costs.[8]

26.     On March 3, 2023, the parties submitted their Post-Hearing Briefs.[9]

27.     On March 6, 2023, the Arbitrator issued Scheduling Order #12, which confirmed receipt of the parties' Post-Hearing Briefs and declared, "the hearing is now closed for evidentiary purposes."[10]

---

[6] *See* Ex. 3 (Fee Petition).

[7] *Id.* at 1-2; Ex. 1 (Demand for Arbitration) Section IV.C at 6-8.

[8] *See* Ex. 3 (Fee Petition) at 1-2.

[9] *See* Ex. 4 (Scorza's Post-Hearing Brief); Ex. 5 (Davison's Post-Hearing Brief).

[10] *See* Ex. 6 (Scheduling Order #12).

28.     At no time prior to the closing of the hearings did Scorza seek to amend his Demand for Arbitration to assert new claims not previously asserted. *See* AAA Commercial Arb. Rule R-6(b).[11]

29.     As a result, Davison's Post-Hearing Brief addressed only those claims that Scorza had asserted in his Fee Petition and his Demand for Arbitration.[12]

30.     Likewise, Davison's response to Scorza's Fee Request addressed only the UTPCPL because that was the sole legal basis Scorza identified in support of his request for attorneys' fees and costs.[13]

31.     Davison's understanding of the limits of the claims Scorza had actually asserted and the limited legal grounds on which Scorza's Fee Request was based was confirmed by Scorza's Post-Hearing Brief.

32.     Scorza's Post-Hearing Brief asserted (largely)[14] the same causes of action that he had asserted in his Demand for Arbitration: (i) breach of contract; (ii)

---

[11] Rule R-6(b) provides:

> Any new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim, shall be made in writing and filed with the AAA, and a copy shall be provided to the other party, who shall have 14 calendar days from the date of such transmittal within which to file an answer to the proposed change of claim or counterclaim with the AAA. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent.

[12] Ex. 5 (Davison's Post-Hearing Brief) Section II at 8-24.

[13] *Id.*, Section I at 1-8.

[14] Ex. 5 (Scorza's Post-Hearing Brief), Sections IV-V at 15-25.
Davison says "largely" because Scorza did assert a claim for negligence in his Post-Hearing Brief even though he did not assert that claim in his Demand for Arbitration. *Compare* Ex. 1 (Demand for Arbitration) Sections IV.A-E at 5-9, *with* Ex. 5 (Scorza's Post-

common law fraud; (iii) fraud by concealment and non-disclosure/omission; (iv) negligent misrepresentation; (v) fraud in the inducement; (vi) common law negligence; and (vii) UTPCPL.

33.     Significantly, Scorza's Post-Hearing Brief did not purport to assert claims under the American Inventor's Protection Act (the "AIPA") or the Texas Regulation of Invention Development Services Act (the "Texas Act").[15]

34.     As of the close of the hearing, therefore, the issues submitted to the Arbitrator were limited to those set forth in the Fee Petition and the parties' respective Post-Hearing Briefs.

35.     Nowhere in their post-hearing submissions did the parties submit to the Arbitrator or address the issue of Scorza's entitlement to relief, including but not limited to attorneys' fees and costs, under the AIPA, the Texas Act, or any other law under which Scorza had not asserted a claim.

36.     Again, no party asserted a claim or sought relief, including but not limited to attorneys' fees and costs, under the AIPA or the Texas Act.

37.     The parties' post-hearing submissions thus confirmed the parties' understandings of the claims that Scorza had and had not asserted; that Scorza had asserted one, and only one, legal basis for his Fee Petition (the UTPCPL); and that

---

Hearing Brief) Sections IV-V at 15-25. But that's irrelevant for present purposes because even had Scorza prevailed on his newly-asserted negligence claim, he would not have been entitled to attorneys' fees and costs; not even the Arbitrator purported to award fees and costs based on any purported negligence claim. *See* Ex. _ (Final Award) at 1.

[15] Ex. 5 (Scorza's Post-Hearing Brief) at 1 (Table of Contents), Sections IV-V at 15-25.

App. 030

they intended to limit the Arbitrator's authority to decide only those issues submitted to him in their post-hearing submissions.

**C.     The Arbitrator *Sua Sponte* Grants Relief on Claims Scorza Did Not Assert and the Parties Did Not Submit to the Arbitrator**

38.     On March 27, 2023, the Arbitrator issued the "Award of Arbitrator" (the "Final Award").[16]

39.     The Final Award awarded to Scorza "reasonable attorney fees and costs pursuant to the [AIPA] and the Texas Invention Development Services Act in the amount of $199,024.05 . . . ."[17]

40.     As confirmed by Scorza's Fee Petition and his Post-Hearing Brief, not even Scorza argued he had asserted a claim under the AIPA or the Texas Act, and he did not seek to recover fees and costs under either of them.

41.     The Arbitrator had specifically requested the parties to address the legal bases for Scorza's Fee Petition.

42.     In response, Scorza identified one—and only one—legal basis: the UTPCPL.

43.     As a result, Davison addressed that one—and only one—legal basis for the Fee Request: the UTPCPL.

44.     Prior to issuing the Final Award, the Arbitrator did not notify the parties of his intent to consider awarding fees and costs on a basis not raised or argued by the parties.

---

[16] *See* Ex. 7.

[17] *Id.*

8

45.     The Arbitrator did not request supplemental briefing regarding the applicability of those laws, whether Scorza could prevail under those statutes, or whether Davison had affirmative defenses to any claim under those laws (including but not limited to the applicable statute of limitations).

46.     Thus, Davison had no notice prior to the issuance of the Final Award that the AIPA or the Texas Act were at issue, and the Arbitrator deprived Davison of the opportunity to fully and fairly address any issues or defenses with respect to those laws, including but not limited to Scorza's entitlement to attorneys' fees and costs thereunder, in its submissions to the Arbitrator.

## ARGUMENT

47.     By awarding attorneys' fees and costs under the AIPA and the Texas Act], the Arbitrator "exceeded [his] powers," 9 U.S.C. § 10(a)(4), and "awarded upon a matter not submitted to [him]," *id.* § 11(b).

48.     Accordingly, the Final Award should be partially vacated pursuant to 9 U.S.C. § 10(a)(4), and that portion of the Final Award granting attorneys' fees and costs under the AIPA and the Texas Act should be vacated.

49.     Alternatively, the Final Award should be modified pursuant to 9 U.S.C. § 11(b) by striking that portion of the Final Award granting attorneys' fees and costs under the AIPA and the Texas Act.

App. 032

**A.    The Final Award Should Be Partially Vacated Under 9 U.S.C. § 10(a)(4)**

50.    Under 9 U.S.C. § 10(a)(4), the district court "wherein the award was made may make an order vacating the award upon the application of any party to the arbitration[] . . . where the arbitrator[] exceeded [his] powers . . . ."

51.    "An arbitrator . . . subjects his award to judicial vacatur under § 10(a)(4)[] when he decides an issue not submitted to him. . . ." *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219-20 (3d Cir. 2012) (citations omitted), *aff'd*, 569 U.S. 564 (2013).

52.    "The scope of an arbitrator's authority is limited to the issue[s] that the parties submit for him to decide." *Mobil Oil Corp. v. Indep. Oil Workers Union*, 679 F.2d 299, 302 (3d Cir. 1982).

53.    "[A]n arbitrator may not venture beyond the bounds of his or her authority. As is often the case, the authority of the arbitrator is defined not simply by the [parties' contracts], but is determined in large measure by the parties' submissions. In such cases, then, it follows that an arbitrator has the authority to decide ***only*** the issues actually submitted." *Matteson v. Ryder Sys., Inc.*, 99 F.3d 108, 112-13 (3d Cir. 1996) (emphasis added) (citing, *inter alia*, *Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 62 (3d Cir. 1986)).

54.    "The parties' understanding of the scope of the arbitrator['s] authority is set forth in [their submissions] to the arbitration panel." *Sun Ship*, 785 F.2d at 62; *see also, e.g.*, *Emplys. Reins. Corp. v. Admiral Ins. Co.*, No. 90-3147, 1990 WL 169756, at *4 (D.N.J. Oct. 30, 1990) ("*Admiral*").

10

55.     "As in contract law, the touchstone for interpreting a submission must be the intention of the parties. It is the parties, not the arbitrator, who decide the issues submitted[.] . . ." *Matteson*, 99 F.3d at 114 (internal citation omitted).

56.     Section 10(a) is ultimately intended to ensure "the parties received a fair and honest hearing on a matter within the arbitrator['s] authority." *Sun Ship*, 785 F.2d at 59 (citation omitted).

57.     So an arbitrator has a "duty to decide only those issues on which the[ arbitrator] ha[s] held a fair and honest hearing." *Admiral*, 1990 WL 169756, at *5.

58.     It is clear here that the parties' intent and understanding was that Scorza's claims were limited to those set forth in the Demand for Arbitration, which was never amended to include additional claims; that the claims Scorza asserted did not include a claim under the AIPA or the Texas Act; and that Scorza's only request for attorneys' fees and costs was made under the UTPCPL.

59.     It was Scorza's burden to identify and establish the legal basis on which his Fee Request could be granted. *See, e.g.*, *Canter's Deli Las Vegas, LLC v. FreedomPay, Inc.*, 460 F. Supp. 3d 560, 575 (E.D. Pa. 2020) (noting the party seeking fees had the "burden of establishing a legal basis on which an attorneys' fee award could be premised"); *E. Constr. & Elec., Inc. v. Universe Techs., Inc.*, No. 10-1238, 2011 WL 53185, at *6 n.3 (D.N.J. Jan. 6, 2011) (noting the party seeking fees "must provide the [c]ourt with a legal basis for awarding attorneys' fees . . .").

60.     Scorza never asserted a claim under the AIPA or the Texas Act, as confirmed by his Fee Petition and Post-Hearing Brief.

61.     As a result, Davison did not address the AIPA or the Texas Act in any of its submissions to the Arbitrator.

62.     In response to the Arbitrator's specific request that Scorza identify the legal bases for his request for attorneys' fees and costs, he expressly limited that request to the UTPCPL.

63.     As a result, Davison expressly limited its response to the Fee Petition to the UTPCPL.

64.     Nonetheless, the Arbitrator, without notice to the parties or affording them an opportunity to address the issue, unilaterally awarded Scorza attorneys' fees and costs under the AIPA and the Texas Act, despite Scorza never having asserted a claim under either of those statutes, never having cited those laws in support of his Fee Request or in his Post-Hearing Brief, and explicitly limiting his Fee Request to the UTPCPL.

65.     Courts have rejected ***a party's*** attempt to raise new claims and theories at or after an arbitration hearing, noting that the AAA's Commercial Rules, similar to Federal Rule of Civil Procedure 15, require a party to seek to amend his/her claim to assert new claims ***in advance of the hearing*** so that his/her opponent has a full and fair opportunity to address those new claims and is provided the fair and honest hearing mandated by law. *See, e.g.*, *Skjellerup v. Toll Bros., Inc.*, No. 05-80406, 2005 WL 8156060, at *4-6 (S.D. Fla. Oct. 18, 2005).

66.     In private arbitrations, "[t]he purpose of the statement of claim is to provide the defendant with fair notice of the claims that the arbitration will cover. If

App. 035

plaintiffs could freely raise new claims and theories at trial, filing a statement of claim would be a useless exercise." *Id.* at *6.

67.   Here, the Arbitrator acted independently and, without notice to the parties, effectively asserted on Scorza's behalf entirely new claims and theories under the AIPA and the Texas Act, and their respective fee-shifting provisions, after the hearing had closed, despite that Scorza had never sought to amend his statement of claims to include causes of action under those laws.

68.   Again, Scorza did not argue in his Fee Petition or Post-Hearing Brief that he had asserted a claim, or that he was entitled to attorneys' fees and costs, under the two statutes the Arbitrator independently relied upon in awarding fees and costs.

69.   The Arbitrator's award of attorneys' fees and costs was the antithesis of "the truth-seeking function of our adversarial system of justice" under which "[a]t a bare minimum, even i[n] this age of notice pleading, a defendant must be afforded both adequate notice of any claims asserted against him and a meaningful opportunity to mount a defense." *Id.* at *5 (quoting *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1172 (1st Cir. 1995)).

70.   As the Third Circuit has made clear, "[i]t is the parties, ***not the arbitrator***, who decide the issues submitted[.] . . ." *Matteson*, 99 F.3d at 114 (emphasis added).

71.   The Arbitrator ventured beyond the bounds of his authority, as determined by the parties' own submissions, and "effectively dispense[d] with his

own brand of industrial justice," which "exceed[ed] his powers and [rendered] his award . . . unenforceable." *Sutter*, 675 F.3d at 220; *see also Matteson*, 99 F.3d at 114-15; *Sun Ship*, 785 F.2d at 62; *Mobil Oil*, 679 F.2d at 302; *Skjellerup*, 2005 WL 8156060, at *5-6; *Admiral*, 1990 WL 169756, at *4-8, 11.

72.     Partial vacation of an award is permitted under Section 10(a)(4). *See, e.g.*, *Admiral*, 1990 WL 169756, at *11-12; *Lumber Liquidators, Inc. v. Sullivan*, No. 10-11890, 2011 WL 5884252, at *8 (D. Mass. 2011) (collecting cases).

73.     Davison is not challenging the remainder of the Final Award because of the generally deferential standard of review courts apply to the merits of private arbitral awards. *See, e.g.*, *Matteson*, 99 F.3d at 114-15.

74.     But even under that deferential standard, the Final Award must be partially vacated because the Arbitrator exceeded his powers by venturing beyond his authority in awarding Scorza attorneys' fees and costs. *See, e.g.*, *id.*

75.     The same considerations that led the court in *Admiral* to partially vacate the award in that case counsel in favor of partial vacation here: the arbitration has been pending since July 2021, the parties participated in three days of hearings, the defect in the Final Award is a legal issue that does not affect the remainder of the relief granted in the Final Award, so "a vacatur of the proceedings [in toto] would be a tremendous waste of time and resources." *Admiral*, 1990 WL 169756, at *11.

76.     Accordingly, the Final Award should be partially vacated by striking that portion of the Final Award granting attorneys' fees and costs to Scorza.

**B.      The Final Award Should Be Modified Under 9 U.S.C. § 11(b)**

77.      Alternatively, the Final Award should be modified under 9 U.S.C. § 11(b) by striking that portion of the Final Award granting attorneys' fees and costs.

78.      Under 9 U.S.C. § 11(b), the district court "wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration[] . . . [w]here the arbitrator[] ha[s] awarded upon a matter not submitted to [him] . . . ."

79.      For the same reasons set forth above in Argument Part A, and if the Court denies Davison's request for partial vacatur of the Final Award, the Final Award should be modified because the Arbitrator awarded Scorza attorneys' fees and costs under the AIPA and the Texas Act, but that matter was not submitted to the Arbitrator.

80.      The Final Award should be modified by striking that portion of the Final Award granting attorneys' fees and costs to Scorza.

Respectfully submitted,

BARRON LAW OFFICE LLC

Date: April 19, 2023          By:      */s/ Justin T. Barron*
                                       Justin T. Barron (PA I.D. No. 200394)
                                       P.O. Box 493
                                       Valencia, PA 16059
                                       (412) 334-6312
                                       jbarron@justinbarronlaw.com

App. 038

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Davison Design & Development, Inc.

**DEFENDANTS**

Mario Scorza

**(b)** County of Residence of First Listed Plaintiff    Allegheny
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Justin T. Barron, Barron Law Office
P.O. Box 493, Valencia, PA 16059 412-334-6312

Attorneys *(If Known)*

Stacey Barnes, Kearney, McWilliams & Davis, PLLC
55 Waugh Dr., Suite 150, Houston, TX 77007 713-936-9620

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☒ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC Section 1331 (diversity jurisdiction)

Brief description of cause:
Motion to vacate or modify arbitration award pursuant to Federal Arbitration Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.    **DEMAND $** _____    CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| April 19, 2023 | /s/ Justin T. Barron |

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

JS 44A REVISED June, **2009**
IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA
THIS CASE DESIGNATION SHEET MUST BE COMPLETED

**PART A**

This case belongs on the ( ◯ Erie    ◯ Johnstown    ⦿ Pittsburgh) calendar.

1. **ERIE CALENDAR -** If cause of action arose in the counties of Crawford, Elk, Erie,
   Forest, McKean. Venang or Warren, OR **any** plaintiff or defendant resides in one of said
   counties.

2. **JOHNSTOWN CALENDAR -** If cause of action arose in the counties of Bedford, Blair,
   Cambria, Clearfield or Somerset OR any plaintiff or defendant resides in one of
   said counties.

3. Complete if on **ERIE CALENDAR**: I certify that the cause of action arose in_____
   County and that the _____resides in_____County.

4. Complete if on **JOHNSTOWN CALENDAR**:  I certify that the cause of action arose in
   _____County and that the_____resides in _____County.

**PART B** (You are to check ONE of the following)

1. ◯  This case is related to Number_____      . Short Caption_____._____
2. ⊗  This case is not related to a pending or terminated case.

DEFIN1TIONS OF RELATED CASES:
CIVIL:  Civil cases are deemed related when a case filed relates to property included in
another suit or involves the same issues of fact or it grows out of the same transactions
as another suit or involves the validity or infringement of a patent involved in another
suit EMINENT DOMAIN:  Cases in contiguous closely located groups and in common ownership
groups which will lend themselves to consolidation for trial shall be deemed related.
HABEAS CORPUS & CIVIL RIGHTS:  All habeas corpus petitions filed by the same individual
shall be deemed related. All pro se Civil Rights actions by the same individual shall be
deemed related.

**PARTC**

I. CIVIL CATEGORY (Select the applicable category).
   1. ◯  Antitrust and Securities Act Cases
   2. ◯  Labor-Management Relations
   3. ◯  Habeas corpus
   4. ◯  Civil Rights
   5. ◯  Patent, Copyright, and Trademark
   6. ◯  Eminent  Domain
   7. ◯  All  other federal question cases
   8. ◯  All  personal  and property damage tort cases,  including  maritime,  FELA,
         Jones Act, Motor vehicle, products liability, assault, defamation,  malicious
         prosecution, and false arrest
   9. ⊗  Insurance indemnity, contract and other diversity cases.
  10. ◯  Government Collection Cases (shall include HEW Student Loans (Education),
         V A  0verpayment, Overpayment of Social Security, Enlistment
         Overpayment (Army, Navy, etc.),  HUD Loans, GAO Loans (Misc. Types),
         Mortgage Foreclosures, SBA Loans, Civil Penalties and Coal Mine
         Penalty and Reclamation Fees.)

I certify that to the best of my knowledge the entries on this Case Designation
Sheet are true and correct

Date: __April 19, 2023__        /s/ Justin T. Barron
                                _____

                                        ATTORNEY AT LAW

NOTE: ALL SECTIONS OF BOTH FORMS MUST BE COMPLETED BEFORE CASE CAN BE PROCESSED.

App. 040

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVISON DESIGN & | ) | |
| DEVELOPMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. |
| v. | ) | |
| | ) | |
| MARIO SCORZA, | ) | |
| | ) | |
| Defendant. | ) | |

**Exhibit 1**

**July 6, 2021 Plaintiff's Original Petition**

| MARIO SCORZA, | § | |
| *Plaintiff*, | § | |
| | § | **American Arbitration Association** |
| **v.** | § | **Case No. _____** |
| | § | |
| **DAVISON DESIGN &** | § | |
| **DEVELOPMENT, INC.,** | § | |
| *Defendant*. | § | |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW, Mario Scorza ("Plaintiff"), Plaintiff in the above-styled cause of action, and complains of Davison Design & Development, Inc. ("Defendant"). For good cause, and in support of same, Plaintiff would respectfully show this Court as follows:

### I
### PARTIES

1.    Plaintiff Mario Scorza is an individual residing in McLennan County, Texas.

2.    Defendant Davison Design & Development, Inc. (hereafter "Davison" or "DDD") is a Pennsylvania for-profit corporation doing business in McLennan County, Texas, as well as nationwide, and may be served with process through its President and registered agent, Frank Vescio, at its registered business address of 595 Alpha Drive, Pittsburgh, Pennsylvania 15238.

### II
### JURISDICTION AND VENUE

3.    Venue is proper in Allegheny County, Pennsylvania pursuant to the governing arbitration provision contained within the contractual agreement between the Parties on which this case is based.

4.    The applicable arbitration clause states the following:

"6. CHOICE OF LAW; ARBITRATION; CURE

    A. This Agreement shall be governed by the Commonwealth of Pennsylvania and is deemed to be executed, entered into and performed in Pittsburgh, Pennsylvania. For any dispute, the parties agree to seek to resolve the dispute through good faith negotiation. For any disputes not resolved through good faith negotiation, the parties agree that all disputes shall ne resolved through arbitration before the American Arbitration Association ("AAA") in Pittsburgh, Pennsylvania using the Commercial Arbitration Rules in effect on the date that the claim is submitted to the AAA. Client agrees that any claim must be brought in an individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.

    B. No Claim for breach of the Agreement shall be permitted unless Client has given Davison reasonably specific written notice of the alleged breach and has permitted Davison a reasonable opportunity to cure the alleged breach, which shall be no less than thirty days after Client gives his or her assent to the proposed cure."

5.    Jurisdiction is proper as the American Arbitration Association has complete authority and jurisdiction over this case pursuant to the governing arbitration provision contained within the contractual agreement between the Parties on which this case is based.

### III
### FACTUAL BACKGROUND

6.    On or about March 23, 2017, Plaintiff contracted with Defendant through a "New Product Sample Contract" (the "Agreement") for the further development, advertising and marketing of a unique invention designed by Plaintiff.  Pursuant to the Agreement, Plaintiff paid Defendant a total monetary fee of Twenty-Five Thousand Forty-Two and 00/100 dollars ($25,042.00), for which Defendant was to provide (1) "Creative Presentation Materials," consisting of development, troubleshooting, manufacturing, packaging, rendering, and marketing services; (2) "Creati[on of] The Product Sample," consisting of producing computer renderings, production drawings, and professional finishing imaging; (3) "Creati[on of] The Packaging Sample, consisting of supplying renderings and imaging related to product packaging; and (4) "Product Sample Finalization," consisting of creating a usable final sample of both Plaintiff's product and its developed packaging;

App. 043

as well as (5) provide information related to provisional patent applications, marketing quotes and materials to be used in advertising, and a comprehensive summary of all services suggested, performed, and/or developed with regard to Plaintiff's unique invention.

7.      Despite Plaintiff's dutiful payment, delivered upon Defendant's request, the single service provided by Defendant (of the dozens that should have been provided, as contemplated and described above) was a single computer-generated image of the possible final form and appearance of Plaintiff's invention. To date, no "Presentation Materials", no "Product Sample" or prototype, no usable sample, no "Packaging Sample" and no information or assistance related to marketing, advertising or patenting has ever been received by Plaintiff.

8.      Although Plaintiff repeatedly attempted to contact Defendant in order to receive the services and materials Defendant promised to provide, Defendant never produced any further services nor provided any further materials regarding the continued development of Plaintiff's unique invention.  Moreover, Plaintiff was never contacted by a single company or even one individual assisting in the development, advertising, marketing or selling of Plaintiff's invention, contrary to the "hundreds or more" purportedly contracting companies working with and for DDD. Because Defendant kept Plaintiff waiting for years beyond when Defendant should have completed the preparations and assisting services that would have enabled Plaintiff to commercialize Plaintiff's invention, a separate inventor developed a similar product that intercepted and absorbed the marketspace that would have been rightfully filled by Plaintiff had Defendant performed the services that Defendant was contractually obligated to provide. In addition, this extended delay resulted in the loss of *all* rights to any patentable inventions that would not have occurred but for Plaintiff's reliance on Defendant's enticements, promises and directed incentives.

9.      Defendant purposefully induced Plaintiff to contract with Defendant for the purported services and materials contemplated and described herein in order to receive the contractual payments made to Defendant by Plaintiff.   Defendant falsely represented to Plaintiff that Defendant could quickly and competently perform development services that would enable Plaintiff to commercialize Plaintiff's invention, and that Defendant could further help to market, advertise, and even provide potential investors and promoters necessary to tender the costs of any further required development.   Plaintiff had no educational background or training in marketing, advertising, product development or intellectual property protection, so Plaintiff believed and relied on the promises made by Defendant that Defendant would and could help bring Plaintiff's invention to market and provide the contractual services paid for by Plaintiff.

10.     It is Plaintiff's reasonable contention that Defendant fleeced Plaintiff in order to receive Plaintiffs' payments, but then stalled the development of Plaintiff's product or the provision of any of the services Defendant promised to perform on Plaintiff behalf in the hope that Plaintiff would become exasperated and eventually cease any further enforcement of the Agreement.   Moreover, Defendant, knowing Plaintiff's age of 85, hoped to leverage Plaintiff's age against him, advantaging Defendant by drawing out any resolution on this matter past the life of Plaintiff. Ultimately, despite having delivered required legal demand to Defendant prior to the instant filing, as included in the Davison 'New Product Sample Agreement" (pertinent passages recounted in Section II above stating  whereas "Client has given Davison reasonably specific written notice of the alleged breach and has permitted Davison a reasonable opportunity to cure the alleged breach"), Defendant has refused to respond to same or otherwise contact Plaintiff.   Therefore, Plaintiff was forced to bring the instant action to protect the legal rights afforded to Plaintiff both at law and in equity.

# IV
# CAUSES OF ACTION

### A.  Breach of Contract

11.     Plaintiff re-alleges the allegations contained in Paragraphs 1 through 9 of this Petition by reference as if set forth verbatim herein and requests relief for Plaintiff's breach of contract cause of action.

12.     The contract for the provision of Defendant's development services executed between Plaintiff and Defendant represents a valid, enforceable contract.   Plaintiff contracted with Defendant in order to receive the further development services necessary for Plaintiff to commercialize Plaintiff's unique invention in exchange for a certain sum of money.   Pursuant to the Agreement, Plaintiff tendered payment for Defendant's purported services.   However, Defendant wholly failed to provide the services for which Plaintiff contracted and tendered payment such that Plaintiff was unable to <u>ever</u> commercialize Plaintiff's unique invention, resulting in immense damages in lost opportunities, expired rights and profits.

13.     Plaintiff has requested payment of the amount representing Plaintiff's previous contractual payments from Defendants, which is, among other significant damages, currently owed to Plaintiff by same.   To date, Defendant has failed to pay same, or any other of Plaintiff's damages, to Plaintiff.   Defendant's actions constitute breach of contract and entitle Plaintiff to receive its requested relief.

### B.  Common-Law Fraud

14.     Plaintiff re-alleges the allegations contained in the preceding Paragraphs of this Petition by reference as if set forth verbatim herein and requests relief from for Plaintiff's common-law fraud cause of action.

15.     Defendant made material, false representations to Plaintiff that Defendant would and could not only assist Plaintiff with the entire process of developing and finalizing Plaintiff's unique invention for commercialization, but the Defendant had the requisite training, knowledge, and acumen to do so.  At the time Defendant made the false representations to Plaintiff, Defendant either knew the representations were false or recklessly made the positive assertions without knowledge of their truth.  Defendant made the false representations to Plaintiff with the intent that Plaintiff enter into and execute the contract for Defendant's purported services and Plaintiff's lucrative payments to Defendant.  Plaintiff entered into and executed same in reliance on Defendant's false representations and was caused injury thereby.

16.     Plaintiff justifiably relied on Defendant's false representations, and through this reliance allowed Defendant several opportunities to perform Defendant's obligations pursuant to the Agreement.  Plaintiff would not have allowed Defendant the time consumed by these several opportunities had Plaintiff known Defendant's representations were false and that Defendant had no intention of developing and promoting Plaintiff's invention.  Plaintiff was further injured by allowing Defendant time to perform its obligations pursuant to the Agreement, time that Defendant lay idle, all while Plaintiff's market and intellectual property rights withered and expired.  Defendant's actions constitute common-law fraud and entitle Plaintiff to receive Plaintiff's requested relief.

**C.  Pennsylvania Unfair Trade Practices and Consumer Protection Law**

17.     Plaintiff re-alleges the allegations contained in the preceding Paragraphs of this Petition by reference as if set forth verbatim herein and requests relief for Plaintiff's claims for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

18.     Plaintiffs are consumers for the purposes of the UTPCPL because Plaintiff is an individual who sought and acquired goods or services by lease (and the Agreement is governed by Pennsylvania law).  Defendant is a company that has committed unlawful acts pursuant to the UTPCPL and may be sued pursuant to the UTPCPL.  Defendant violated the UTPCPL when Defendant committed the following unlawful actions.

a.   Defendant engaged in "unfair or deceptive acts or practices" that Plaintiff relied on to Plaintiff's detriment.  Specifically, Defendant:

i.   Caused likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

ii.   Represented that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

iii.   Represented that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

iv.   Did not promote goods or services with the intent of enlisting potential or prospective sellers and marketers (i.e., multiple listing corporations (MLCs)) as advertised;

v.   Failed to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made; and

vi.   Engaged in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

19.     Plaintiff gave Defendant notice of Defendant's violation of the Texas Deceptive Trade Practices Act, although such notice serves the same purpose of placing Defendant on notice of having violated the similar tenets of the UTPCPL.  Despite such notice, Defendant has not attempted to contact Plaintiff or resolve the current dispute in any regard.

20.     Defendant's wrongful conduct is the producing cause of Plaintiff's injury, which resulted in damages incurred for the payments made by Plaintiff to Defendant in reliance on Defendant's promises, as well as the lost opportunities, rights and profits that Plaintiff would have realized had Defendant even attempted to perform the services Defendant contractually promised to provide. As such, Plaintiff further seeks recovery of unliquidated damages that are within the jurisdictional limits of this arbitration.

**D.  Fraud by Non-Disclosure**

21.     Plaintiff re-alleges the allegations contained in the preceding Paragraphs of this Petition by reference as if set forth verbatim herein and requests relief for Plaintiff's fraud by nondisclosure cause of action.

22.     Defendant concealed or failed to disclose certain facts from Plaintiff, namely, that Defendant neither intended, nor had the requisite acumen, to provide the services for which Plaintiff contracted and tendered payment to Defendant.  Defendant, as merchants of the purported services advertised and represented by Defendant to Plaintiff, had a duty to disclose these facts to Plaintiff.  The facts were material as Plaintiff specifically inquired into these facts and contracted with Defendant for the specific performance of the services required to further develop and market Plaintiff's unique invention.  Defendant knew that Plaintiff was ignorant of the facts that Defendant neither could, nor would, provide the contractually obligated services contemplated and described within the Agreement.  Defendant was deliberately silent when Defendant had a duty to speak and

App. 049

inform Plaintiff of Defendant's ability and intention to perform the services contracted for by Plaintiff.  By failing to disclose these facts, Defendant intended to induce Plaintiff to enter into and execute the Agreement and tender payment to Defendant.  Plaintiff only executed same due to Plaintiff's reliance on Defendant's non-disclosure, and Plaintiff was greatly injured as a result of acting without knowledge of the facts undisclosed by Defendant.

**E.  Negligent Misrepresentation**

23.    Plaintiff re-alleges the allegations contained in the preceding Paragraphs of this Petition by reference as if set forth verbatim herein and request relief for Plaintiff's negligent misrepresentation cause of action.

24.    Defendant made representations to Plaintiff in the course of Defendants' business, namely, purported development and advertising and/or marketing services, and in a transaction in which Defendant had a pecuniary interest.  Defendant supplied false information for Plaintiff's guidance in the form of false representations that Defendant would perform the services promised by Defendant in order to bring Plaintiff's unique invention to market.  Defendant failed to exercise reasonable care or competence in obtaining or communicating this information to Plaintiff. Plaintiff justifiably relied on Defendant's representations, and Defendant's negligent misrepresentations proximately caused Plaintiff's injury and continues to add injury to Plaintiff.

25.    Plaintiff brings this cause of action alternatively to Plaintiff's fraud-based causes of action, discussed previously herein.  Defendant's actions constitute negligent misrepresentation and entitle Plaintiff to receive the relief requested herein.

**V**
**ATTORNEY'S FEES**

26.    Defendant's wrongful actions have forced Plaintiff to retain the undersigned counsel to file this suit and represent Plaintiff with regard to same.  Plaintiff has presented its claims to Defendant

in writing and demanded payment from Defendant for same.  More than thirty (30) days have elapsed since Plaintiffs sent their written demand for payment.  Plaintiff should be entitled to recover reasonable attorney's fees for prosecuting this action.

## VI
## DAMAGES

27.     Plaintiff seeks the return of all funds previously paid to Defendant by Plaintiff due to Defendant's unlawful refusal to perform the service contracted for by Plaintiff.  Additionally, and alternatively to Plaintiff's claims for damages in association with Plaintiffs' UTPCPL causes of action, Plaintiff asserts that Defendant's unlawful actions are aggravated by that kind of willfulness, wantonness, and malice for which the law allows the imposition of exemplary damages.  The conduct of Defendant was intentional, willful, and wanton, was without justification or excuse, and is offensive to any sense of public justice.  Defendant acted with gross indifference to the rights and interest of Plaintiff.  Therefore, Plaintiff seeks punitive or exemplary damages from Defendant.  An award of exemplary damages will not only deter Defendant from again taking such wrongful actions but would also serve to warn and deter others who might consider such actions in the future.

## VII
## PRAYER

        WHEREFORE, PREMISES CONSIDERED, Plaintiff Mario Scorza respectfully requests that Defendant Davison Design & Development, Inc. be cited to appear and answer, and, upon final hearing, Plaintiff recover from Defendant the several damages discussed within this Petition.

Respectfully submitted,

KEARNEY, MCWILLIAMS & DAVIS, PLLC

*/s/Bradley A. Nevills*
Bradley A. Nevills
TXSBN: 24083561
bnevills@kmd.law
William "Trey" Yarbrough
TXSBN: 24051550
wyarbrough@kmd.law
55 Waugh Drive, Suite 150
Houston, Texas 77007
Tel: (713) 936-9620, ext. 116
Fax: (281) 206-0481
***Attorneys for Plaintiff***



COPY



March 23, 2017

**DAVISON™**

## NEW PRODUCT SAMPL

This agreement ("Agreement") made and entered into th⟩ ⟩pment,
Inc. ("Davison"), a Pennsylvania Corporation, its succ⟩ ⟩595
Alpha Drive, Pittsburgh, Pennsylvania, and the Clien⟩

Name(s)                   Mario Scorza
Address                   612 Highlan⟩
City, State, Zip          West, TX 7⟩

Whereas, the Client has originated, dev
and

Whereas, the Client desires to reta⟩
conditions hereinafter set forth.

NOW, THEREFORE, in con⟩
herein, the Client and Davi⟩

## 1. SERVICES PROVIDED

During the term of the Agreement, D⟩                                          ⟩ome or all of
the following:

### A. Creating Presentation Materials:

i) Development Team Orientation: The Developmen⟩                    ⟩sed features and
functions of the Idea, if any, and the targeted corporatio⟩          ⟩keting capabilities.

ii) Problem Identification: The Development Team will clearly ⟩          ⟩blem solved by the Idea,
thus insuring that the Idea's objective is clearly understood.

iii) The Development Team will review the Idea, the problem to be solved, and the targeted corporation's
manufacturing and marketing capabilities to begin the blending and integrating process. The Development
Team may conduct additional research concerning the Idea and the targeted corporation.

iv) Preliminary Product Design: Development Team "brainstorming" sessions will be held to uncover
product design solutions that blend with the targeted corporation's manufacturing capabilities. The
ergonomics and aesthetics of the product are also taken into consideration. This subjective process often
results in the Development Team making modifications and enhancements, which are sometimes

**A better way to invent**
Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.⟩ ⟩⟩387.1348
App. 053



substantial, to the proposed solution or the preliminary design submitted by Client, particularly if Client's proposed design is not a cost effective solution to solving the problem outlined by the client, does not reflect current manufacturing techniques or may be in conflict with products patented or on the market.

v) Preliminary Package Design: Package Development Team "brainstorming" sessions will be held to uncover package design solutions that resemble the targeted corporation's product line. The package's communication will also be considered to achieve quick product identification.

vi) Integrated Product Rendering: The product design and package design will be brought-to-life to look real in a virtual three dimensional environment. A full color spectrum print that resembles what the product sample will look like will be sent to the Client for approval, which shall not be unreasonably withheld by Client, before creating the physical product sample. Unless requested by a potential licensee, no changes will be made to the product and package designs after Client has approved them.

## B. Creating The Product Sample

i) Product Sample Orientation: The analysis of the project will be applied to create a cost efficient and effective production process. Our exclusive development process will ensure that the product attempts to reflect, as closely as reasonably possible, the targeted corporation's manufacturing methods.

ii) Production Drawings and/or CAD (Computer Aided Drawings) Illustrations: The product's manufacturing specifications will be entered into a computer program, if appropriate for this project. This will be used to generate production drawings for component quoting and/or for the targeted corporation's review. The drawings will be printed for review, analysis and use.

iii) Creation of STL,DXF or G-Code Files (Computer Software Developed): This is a sophisticated computer process that transfers production drawings and/or CAD drawings into a computer code to transfer the data to the code used by the shop's machinery to produce all or parts of the final product sample.

iv) Circuit Design Assembly: If applicable to your particular project, Davison will utilize a proprietary software circuit board design application for schematic capture, circuit simulation, PCB layout and autorouting. High quality software design tools can create more efficient use of limited board space and reduce overall production costs in the final design.

v) Machine Product Sample: This stage of development involves the process of building the product sample. It includes the machine set up, preparation of the raw materials and then machining or fabricating the necessary parts. Pre-manufactured components, known as Original Equipment Manufacturer ("OEM") components, may be purchased and used for a portion or all of the parts utilized in the sample. Davison is not required to produce production drawings, CAD drawings or G-code files for OEM parts.

vi) Parts Preparation/Finishing: The product sample will have a professional appearance with the

**A better way to invent**

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.6100 | Fax 412.387.1348

App. 054



appropriate finishes applied. The finishing shop will address this issue and apply the finishes to the product sample.

vii) Product Sample Assembly: The finished or OEM parts will be assembled to create a complete product sample. The sample is for demonstration purposes and may differ in appearance, size, materials, performance and other characteristics from the type of final licensed product built by a manufacturer in full production.

viii) Photography: For documentation purposes, photographs of the product sample will be taken and securely filed.

## C. Creating The Packaging Sample

As appropriate, the following tasks will be performed for your project. Please note that some tasks may not be necessary.

i) Packaging Team Orientation: This is a team meeting to determine the appropriate packaging style to merchandise the product. There will be an analysis of all known styles and one will be designed that best fits the product.

ii) Package Design & Engineering: The product size, weight and level of fragility will be analyzed. The proper gauge and internal structural components will be designed to best protect the product from damage. The package will also be designed in order to aid a potential manufacturer to palletize the product properly as well as to aid in merchandising the product.

iii) Packaging Production Drawings and\or CAD (Computer Aided Drawings) Illustrations: The package's manufacturing specifications will be entered into a packaging computer program, as appropriate. This will be used to generate packaging production drawings.

iv) Creation of a G-Code files (Computer Software): This is a sophisticated computer process that transfers production drawings into computer code that is programmed into machinery to produce the final packaging sample.

v) Machine Packaging Sample: This stage of development involves the process of cutting, perforating and creasing the packaging material. It includes the machine set up, preparation of the packaging material and then machining and fabricating the necessary parts.

vi) Packaging Preparation Finishing: The machine packaging sample will have a professional appearance with the appropriate images applied. The packaging shop will address this issue and apply the images to the packaging.

vii) Packaging Sample Assembly: The finished package will be assembled to create a complete packaging

**A better way to invent**

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0128 | Fax 412.387.1348

App. 055



sample. The packaging sample is for demonstration purposes and may differ from the type of final packaging built by a corporation in full production.

viii) Photography: For documentation purposes, photographs of the packaging sample will be taken and securely filed.

## D. Product Sample Finalization

i) Product Sample Finalization: The product and package will be placed together to create the final product sample.

ii) Product Sample Integrity Review: The product sample and package are reviewed by a quality assurance team to verify that the final product sample accurately represents the design approved by Client. The product design approved by Client and depicted in the Integrated Product Rendering may differ from the product sample constructed. The sample may have different characteristics intended for ease of demonstration, shipment, display, alteration, disassembly or component viewing by a potential licensee.

iii) Prepare Shipping Container: A shipping container will be obtained or built to protect the Product Sample during shipment.

## E. Production Quotes

Production Quotes: If and/or when the targeted corporation decides to acquire the Idea, Davison will work with the corporation to establish production quotes, if requested by the corporation.

## F. Information for Provisional Patent Application

Davison will develop and provide descriptive information that the Client may find useful in filing a Provisional Patent Application in the United States. This information is provided after the Client approves the virtual reality print of the product sample design and the product sample is constructed. The Client is solely responsible for the sufficiency, completion and submission of any final application, United States Patent & Trademark Office form PTO/SB/16, and any other patent or trademark applications that may be necessary.

## G. Executive Summary

Executive Summary: The Client will be provided with a packet of information that will include a summary of the problem solved by the idea, the product sample's key functional features and the computerized drawings of the components manufactured by Davison. A full color photograph of the sample and its

**A better way to invent**

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.6191 | Fax 412.387.1348

App. 056



packaging is included in the Executive Summary.

### H. Use of Client-Provided Material

Davison may use all or part of any materials submitted to Davison by Client, including a prototype or parts contained in a prototype, as the basis for the design of a product sample or as actual components to the final product sample. Client consents to the disassembly, copying, use, modification, destruction or alteration of any materials submitted by Client to Davison and understands that Davison has no obligation to return such materials or to maintain them in the condition they were in when originally sent to Davison by Client.

## 2. TERM OF THE AGREEMENT

The term of this Agreement shall commence on the date that Davison receives the retainer provided in Section 3A and a complete properly signed Agreement and all other documents requested by Davison. The Agreement will then remain in force until the completion of the product sample.

## 3. RETAINER AND ROYALTY

A. In consideration for all of the services provided by Davison to the Client during the term of this Agreement, the Client agrees to compensate Davison in United States dollars by selecting one of the options below and placing his or her initials next to the chosen option. In the event that Client does not initial a choice, Client agrees to be deemed to have chosen Option 4:

>　_____ Option 1　$165.00 U.S. dollars per hour plus expenses.
>　_____ Option 2　$14,757.25 U.S. dollars
>　_____ Option 3　$12,757.25 U.S. dollars and a 5% royalty assigned to Davison.
>　_____ Option 4　$10,757.25 U.S. dollars and a 10% royalty assigned to Davison.

B. Davison hereby pledges that the selected option in Section 3A will be kept in the strictest confidence from all parties, including the development staff of Davison.

C. The retainer amount selected in Section 3A shall be considered a full retainer for all services described in this Agreement. In further consideration for services rendered by Davison under this Agreement, the Client agrees and understands that Davison shall be entitled to receive the royalty percentage the Client selected in Section 3A on all revenues as defined in Section 3D received by the Client or Davison, whichever is the case, from any individual, corporation or other entity. The royalties described in options 3 and 4 are in addition to royalties granted under any other agreement between the parties.

**A better way to invent**

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

App. 057



D. "Revenues" shall mean the total amount of license fees, royalties, sale proceeds or other forms of consideration received as a result of the sale, license or other commercialization of the Idea. The percentage payable to Davison under this Agreement shall be paid as and when Revenues are paid by licensee or buyer. The royalty assignment to Davison is applicable only to Revenues due to Client in excess of any fees paid by Client to Davison for services under this and any other contract.

E. The royalty obligation selected by the Client and described in Section 3A represents a continuing obligation of the Client to Davison and will survive the termination of this Agreement.

## 4. REPRESENTATION, WARRANTIES & COVENANTS

The Client and Davison, as applicable, represent and warrant to and agree as follows:

A. The Client shall respond in a prompt and complete manner to all reasonable requests for information and assistance made by Davison during the development of the Idea. Client agrees that Davison may set, and inform Client of, deadlines for Client to submit comments on designs prepared by Davison and that in the absence of timely receipt by Davison of Client's comments all designs are deemed accepted and approved by Client.

B. The Client warrants to Davison that the Client, to his/her best knowledge and belief, is the sole owner of the Idea and that no other entity or individual has any rights or interest in the Idea.

C. The Client warrants to Davison that all information provided to Davison is true, complete and accurate to the best of the Client's knowledge.

D. The Client shall not hereafter sell, license, pledge, mortgage, place in trust, transfer, assign, or otherwise convey the Idea or any rights in the Idea, to any entity or individual, without first informing them of the terms of this Agreement and giving Davison prior written notice.

E. The Client warrants to Davison that he/she is of legal age and has the legal capacity to enter into this Agreement.

F. The Client reserves the right to review all materials prepared by Davison in regard to the development of the Idea. The items to be delivered for Client's possession pursuant to this Agreement are the Integrated Product Rendering and the Executive Summary. Client intends that Davison will retain possession of the product and packaging sample, unless Client requests otherwise in writing.

G. It is hereby acknowledged by the Client that Davison's royalty/commission percentage is not, in any form, an ownership interest in the Idea.

H. Davison agrees to accept all reasonable requests of the Client that are consistent with the goal of solving the problem in a simple and cost effective manner. Davison reserves the right to redesign the

**A better way to invent**

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.6100 | Fax 412.387.1348

App. 058



product to take advantage of a cost effective solution to the problem for which the product was intended and to reflect current manufacturing techniques. Client agrees to accept all reasonable design modifications, parts selections and enhancements recommended by Davison.

I. Davison promises to keep all aspects concerning the Client, the Idea and/or the terms of this business relationship in general, and this Agreement in particular, in the highest level of confidentiality. All materials in said connection whether written or oral are subject to the Client's approval prior to the release of any information.

## J. Acknowledgments.

i) Davison has made no representations concerning the likelihood that the Client will receive any financial gain from the development of the Idea.

ii) Client acknowledges that Davison has not and will not evaluate the commercial potential of the Idea and that Davison has not disclosed it to anyone. Thus, there is no way of knowing at this time if the targeted corporation will license, buy or pay royalties for the Idea once it has been developed. Client acknowledges that Davison has made no representations concerning the likelihood of licensing, marketing, royalty payments or profitability. Davison's offer of services for upfront consideration and for a portion of possible royalties is not a representation by Davison that the Idea has merit or that development will result in a license or payments to Client.

iii) Only official government agencies can award a patent, trademark and/or copyright. Davison is not a law firm. Davison is not providing, and Client is not relying upon Davison for, legal advice. Client acknowledges that he/she is responsible for patenting his/her Idea and that Davison has made no representations concerning the patentability of the Idea or its ultimate design. Solely as a courtesy and convenience to Client, Davison provides the following information from the U.S. Patent and Trademark Office concerning provisional patents:

a) The Client should treat his/her Idea as a confidential subject in order to protect his/her legal rights until such time as a Utility Patent, Design Patent, Trademark and/or Copyright is issued.

b) A Provisional Patent Application establishes an official United States patent application filing date for the Idea.

c) A Provisional Patent Application permits one year's authorization to use "patent pending" notice in connection with the Idea.

d) A Provisional Patent Application enables immediate commercial promotion of the Idea.

e) A Provisional Patent Application automatically is abandoned after 12 months if the Client takes no further action.

**A better way to invent**

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0122 | Fax 412.387.1348

App. 059



f) The fee for filing a Provisional Application for Patent is subject to change annually and varies based upon the entity status. Currently, the fee is $260.00 for a 'Large Entity'; $130.00 for a 'Small Entity'; and $65.00 for a 'Micro Entity.'

g) A Provisional Patent Application can NEVER mature into a United States patent. In order for a patent to issue the Provisional Patent Application MUST be replaced by a conventional patent application within one year.

h) A Provisional Patent Application provides a simplified filing with one full year to assess the Idea's commercial potential before committing to the higher cost of filing and prosecuting an additional non-provisional application for a patent.

K. Any Patent Application filing fees, patent filing fees, issue fees, and maintenance fees fall outside the scope of this Agreement if/when they are needed in the future.

L. The Client shall not be responsible for any additional expenses to Davison within the scope and term of this Agreement, with the possible exception being additional services to present the Idea to an additional targeted corporation which may include services to refurbish or repackage the sample, for which Davison currently charges $395.00. Davison's obligations are only those set forth in this Agreement and only directed towards the targeted corporation named on the last page of this Agreement. Davison is not responsible for damage, loss, wear or abuse of the product sample after it leaves Davison's possession.

M. Davison cannot be aware of, and is not responsible for, the existence of every similar product or idea that may already be in the global market, in development by others, or introduced by others at a later time.

N. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE FACE OF THIS AGREEMENT, INCLUDING NO WARRANTY OF MERCHANTABILITY. Because this contract is for the development of a new product sample, Davison cannot guarantee that the product sample will be safe under normal use or if abused, which could occur. The liability of the parties for any and all claims arising from or relating to this Agreement or its formation is limited to direct, actual damages only and is further limited to not exceed the amount actually paid by Client for the services. In no event will Davison be liable to Client for any consequential, exemplary, special, incidental or punitive damages, including lost opportunities or lost profits.

O. Client acknowledges that there have been no representations by Davison that the Idea as conceived and submitted by Client is novel or feasible or that the design to be created by Davison will function in the manner and with the attributes as originally conceived by Client. Davison may develop, but is not required to develop, new technology in the performance of this contract. Enhancements to existing products, or alternative methods to dispense, display or package existing products, if determined by Davison to be appropriate, will be acceptable performance of the obligations under this Agreement. This Agreement does not contain or incorporate any specifications, performance characteristics or other qualities for the design

**A better way to invent**

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

App. 060



**DAVISON**™

or product sample to be produced.

P. Client acknowledges that he/she is contracting for Davison's research, industrial design and development services for the business purpose of developing Client's Idea commercially and not for any personal, family or household purpose.

## 5. ENTIRE AGREEMENT; ORAL REPRESENTATIONS VOID

A. The parties intend this document to be the complete, exclusive, final and fully integrated statement of their agreement. It is binding upon each of them and their respective successors in interest. This Agreement may not be released, discharged, abandoned, changed, or modified in any manner except as provided herein or by separate instrument in writing signed by all parties. The obligations described herein are completely independent from those contained in any other agreement between these parties. If any portion of this Agreement is ruled to be unenforceable, that specific portion shall be severed from the Agreement and all other portions remain enforceable.

B. Neither party is relying upon any oral agreement or representation in entering into this Agreement and all prior oral agreements or representations are hereby considered null and void.

## 6. CHOICE OF LAW; ARBITRATION; CURE

A. This Agreement shall be governed by the law of the Commonwealth of Pennsylvania and is deemed to be executed, entered into and performed in Pittsburgh, Pennsylvania. For any dispute, the parties agree to seek to resolve the dispute through good faith negotiation. For any dispute not resolved through good faith negotiation, the parties agree that all disputes shall be resolved through arbitration before the American Arbitration Association ("AAA") in Pittsburgh, Pennsylvania using the Commercial Arbitration Rules in effect on the date that the claim is submitted to the AAA. Client agrees that any claim must be brought in an individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.

B. No claim for breach of this Agreement shall be permitted unless Client has given Davison reasonably specific written notice of the alleged breach and has permitted Davison a reasonable opportunity to cure the alleged breach, which shall be no less than thirty days after Client gives his or her assent to the proposed cure.

**A better way to invent**

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

App. 061

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVISON DESIGN &                    )
DEVELOPMENT, INC.,                  )
                                    )
              Plaintiff,            )
                                    )  No.
        v.                          )
                                    )
MARIO SCORZA,                       )
                                    )
              Defendant.            )

**Exhibit 2**

**February 2, 2023 Scheduling Order #11**



**Case Number: 01-21-0004-6369**

**Mario Scorza**
**-vs-**
**Davison Design & Development, Inc.**

### <u>Scheduling Order #11</u>

As discussed at the final day of the evidentiary hearing, Claimant's attorneys fees petition and rebuttal evidence shall be filed on or before February 15, 2023.  The parties shall file post-hearing briefs on or before March 3, 2023.  Post-hearing briefs may not exceed 30 pages in length.

Dated: <u> February 2, 2023 </u>      Arbitrator Signature: _____
                                              Scott D. Livingston

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVISON DESIGN & DEVELOPMENT, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. |
| v. | ) ) | |
| MARIO SCORZA, | ) ) | |
| Defendant. | ) | |

**Exhibit 3**

**February 15, 2023 Claimant's Application for Fees and Costs**

# BEFORE THE TRIBUNALS OF
# THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| MARIO SCORZA, | § | |
| *Claimant,* | § | |
| | § | |
| V. | § | CASE NO. 01-21-0004-6369 |
| | § | |
| DAVISON DESIGN AND | § | |
| DEVELOPMENT, INC. | § | |
| *Respondent* | § | |

---

## CLAIMANT'S APPLICATION FOR FEES AND COSTS

---

## I
## Materials Submitted

Claimant, Mario Scorza, (hereafter "Claimant" or "Scorza") submits the following materials in support of this, his Application for Fees and Costs:

- **Exhibit 1** – Affidavit of Stacey L. Barnes

- **Exhibit 2** –Barnes CV

- **Exhibit 3** – Kearney McWilliams & Davis PLLC Invoices

## II
## Statutory Basis for an Award of Fees and Costs

Claimant seeks an award of attorney's fees and costs for prosecution of this arbitration proceeding pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").  The Pennsylvania UTPCPL states:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual

1

damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. **The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.**

72 Pa. Stat. § 201-9.2(a) (emphasis added).

The AAA Commercial Rules specifically allow for the award of attorneys' fees if "it is authorized by law or their [the Parties'] arbitration agreement." AAA Comm. Arb. R. R-47(d)(ii). An award of costs and expenses is similarly provided for by the Rules. *Id*. R-54.

Claimant shall provide to the Tribunal further briefing on the merits of his Pennsylvania UTPCPL claims, as well as his entitlement to an award of trebled damages in his Post-Hearing Brief.

Claimant requests the Tribunal to award him his reasonable and necessary attorneys' fees, costs, and expenses, pursuant to the applicable law and the AAA Rules. Claimant further requests an award of any and all further remedies, either at law or in equity, to which he may show himself justly entitled.

Respectfully Submitted,

*/s/ Stacey L. Barnes*
Stacey L. Barnes
sbarnes@kmd.law
William Yarbrough
wyarbrough@kmd.law
Vikesh Patel
vpatel@kmd.law
KEARNEY, MCWILLIAMS & DAVIS, PLLC
55 Waugh, Suite 150
Houston, Texas 77007
Phone: (713) 936-9620
Fax: (713) 936-9321
*Attorneys for Claimant*

2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 15, 2023, a true and correct copy of the foregoing instrument was served upon the following counsel of record:

Justin T. Barron                                    ***Via E-mail and AAA Filing System***
BARRON LAW OFFICE LLC
P. O. Box 493
Valencia, PA 16059
jbarron@justinbarronlaw.com
***Attorney for Respondent***


                                   */s/ Stacey L. Barnes*
                                   Stacey L. Barnes

App. 067

---

**AMERICAN ARBITRATION ASSOCIATION**

---

| | | |
|---|---|---|
| **MARIO SCORZA,** | § | |
| *Claimant*, | § | |
| | § | |
| **v.** | § | **AAA No.: 01-21-0004-6369** |
| | § | |
| **DAVISON DESIGN AND** | § | |
| **DEVELOPMENT, INC.,** | § | |
| *Respondent*. | § | |

---

**AFFIDAVIT OF STACEY L. BARNES IN SUPPORT OF CLAIMANT'S
PETITION FOR ATTORNEYS' FEES AND COSTS OF THE ARBITRATION**

---

I, Stacey L. Barnes, am an adult citizen of the State of Texas and am competent to testify as to the following matters based upon personal knowledge.

1. My name is Stacey L. Barnes, I am of sound mind, over twenty-one (21) years of age, have never been convicted of a felony or misdemeanor involving moral turpitude, and am personally acquainted with the facts herein stated and they are true and correct. I am a Senior Attorney of Kearney, McWilliams & Davis, PLLC ("the Firm") with office located at 55 Waugh Drive, Houston, Texas 77007. I received my J.D. from the University of Houston in 1998.

2. For the past 24 years, my practice has consisted mainly of civil litigation and business transactions, including arbitration, commercial litigation, intellectual property and technology disputes, international business, as well as other civil trial matters. I am familiar with the types of fees, costs, and expenses incurred in complex, sophisticated matters such as this one.

3. I have been practicing continuously throughout the country in both state and federal courts, as well as before arbitration tribunals since 1998. I also have served as an arbitrator, as a member of AAA, ICDR and FINRA arbitration panels, in arbitrations seated across Texas and in other major cities. I am familiar with the level of practice, as well as the charges and the costs associated with the claims raised, in this and similar arbitration proceeding over this period of time. I am familiar with the rates charged in my locality, as well as in other major legal markets across the United States. As an attorney with over 24 years of experience, and as a Senior Attorney of Kearney, McWilliams & Davis, PLLC, I charge $425.00 an hour for legal services of the nature relating to this matter. Our associate attorneys charge $215.00 - $425.00 an hour for legal services.

4. I serve as lead counsel for Claimant Mario Scorza (hereinafter "Claimant") in the above-captioned arbitration. A true and correct copy of my CV is attached as an exhibit to this Affidavit. **(Exhibit 2)**

5.  This complex, commercial arbitration sought to recover damages related to the loss of profits, and the value of an intention, new intellectual property, as well as loss of patent right.

6.  Respondent denied liability completely and took the position that Claimants should "take nothing," as well as asserting multiple legal and factual defenses. In doing so, Respondents required Claimant to prove each and every material element of their case in this highly complex matter.  Respondent also sought procedural orders excluding expert testimony and strike Claimant's expert witness and his opinions on damages. Respondent also refused to engage in any meaningful settlement negotiations, foreclosing any ability to resolve this matter prior to a Hearing on the Merits.

7.  Attached hereto as **Exhibit 3** are detailed invoices containing the time, work, and description of the work performed on this case by the Firm's attorneys or paralegals. The invoices contain the amount of time and description of the work performed for the actual billing entries created in the normal course of business by the Firm on or about the date of each invoice. The billing entries in the invoices were entered by Firm attorneys or paralegals contemporaneous with the date of entry.

8.  I was assisted by other attorneys with lower billing rates in an effort to minimize fees. The rates of the Firm's attorneys working on the case ranged from $215.00 to $425.00 per hour. The Firm's attorneys and their rates are as follows:

| ATTORNEYS | INITIALS | TIMEFRAME | HOURLY RATE |
|---|---|---|---|
| Stacey L. Barnes | SLB | 01/01/21 – 12/31/21 | $400.00 |
| | | 01/01/22 – 01/31/23 | $425.00 |
| Bradley A. Nevills | BAN | 01/01/21 – 12/31/21 | $300.00 |
| William "Trey" Yarbrough III | WCY | 01/01/21 – 12/31/21 | $400.00 |
| | | 01/01/22 – 01/31/23 | $425.00 |

| LAW CLERKS | INITIALS | TIMEFRAME | HOURLY RATE |
|---|---|---|---|
| Harrison Long | HGL | 01/01/21 – 12/31/21 | $100.00 |
| Vikesh N. Patel | VNP | 01/01/22 – 04/30/22 | $100.00 |
| | | 05/01/22 – 10/31/22 | $125.00 |
| | | 11/01/22 – 01/31/23 | $215.00 |

| PARALEGALS | INITIALS | TIMEFRAME | HOURLY RATE |
|---|---|---|---|
| Marisol Contreras | MC | 10/01/21 – 12/31/21 | $125.00 |
| | | 01/01/22 – 12/31/22 | $140.00 |
| Andrea Cavazos | ADC | 01/01/22 – 02/31/23 | $165.00 |
| Shannon Frizzell | SVF | 12/01/22 – 01/31/23 | $160.00 |

This rate is consistent with the rates regularly charged and collected by the Firm for attorney and paralegal work in other comparable cases.

9. The rates charged reflect: the time, labor, novelty, difficulty, and skill required; the effect of working this case on other Firm employment; the fees charged in both this and other localities; the amount involved and results obtained; applicable time limitations; the nature and length of professional relationship; the experience, reputation, and ability of the lawyers; and the type of fee structure involved.

10. Litigation tasks were distributed according to the experience level of the attorneys, and our paralegal and other staff members were deployed appropriately. Some tasks required more than one attorney due to the complex nature of the legal issues or time constraints. However, Claimant's counsel were careful to avoid duplication.

11. Care was taken to include attorneys with lower billable rates to perform tasks commensurate with their experience such as research assignments, factual and legal investigations, and drafting the first draft of certain pleadings, motions, correspondence, etc.

12. The hourly rates charged by the Firm's attorneys in this litigation are consistent with the rates regularly charged and collected by the Firm's attorneys in other comparable cases, as well as this locality and the locality of the seat of arbitration.

13. I am familiar with the hourly rates for Houston and Pittsburg area law firms comparable to the Firm. The Firm's attorneys are well-qualified, and their hourly rates are comparable to the prevailing market rates of attorneys practicing litigation and technology-related disputes in Houston. Based on my research and analysis of prevailing market rates in the community, the hourly rates charged by the Firm's attorneys and paralegal are moderately economical and less than the range of hourly rates charged by comparable attorneys in comparable cases. Rates at other firms in Houston or Pittsburg for similar staffing are equal to or greater than the rates the Firm charged.

14. In connection with this litigation, the Firm performed all of the tasks reasonably necessary to successfully prosecute Claimant's claims in this matter. The fees, costs, and expenses the Firm billed Claimant in connection with this litigation are consistent with the Firm's ordinary and customary billing practices in similar lawsuits. The fees incurred by the Firm in this litigation are reasonable and are consistent with the fees regularly incurred and collected by the Firm in other comparable cases.

15. Other organizational and logistical matters, including the preparation of paper exhibits, the arrangement of accommodations, and the like were performed primarily by administrative or non-attorney staff.

16. The Firm has billed Claimant for attorney's fees in the amount of $61,008.00 through Dec 2022. Claimant has paid those fees and is expected to pay all future fees. Pending and unbilled charges including January and February and the Hearing on the Merits total $79,440.50. We also project fees for the preparation of this fee application, and for post-Hearing briefing in the amount of $19,450.00. Total attorneys' fees for this matter are thus projected to be $159,898.50.

17. Our expert witness on patent law and procedure is Mr. Scott McBride. Mr. McBride has billed us and been paid in the amount of $1,560.00. Mr. McBride informs us that he will also bill us $14,040.00, for his time in preparation and testifying at the Hearing on the Merits. The Claimant has paid the expert witness for his fees and will be expected to pay for future fees. Total fees for this expert witness will be $15,600.00.

18. Our expert witness on damages and economic modeling is Dr. Kenneth Lehrer. Dr. Lehrer has billed us and been paid in the amount of $17,500.00. Dr. Lehrer informs us that he will also bill us $3,000.00, for his time in preparation and testifying at the Hearing on the Merits. The Claimant has paid the expert witness for his fees and will be expected to pay for future fees. Total fees for this expert witness will be $20,500.00.

19. The Firm seeks an award of arbitration related costs totaling $64,125.55 as follows:

|   |   |   |
|---|---|---|
| a. | AAA Arbitration fees of | $10,090.00 |
| b. | Arbitrator's compensation | $16,090.00 |
|   | *Costs/expenses related to the arbitration* | |
| c. | Techson Re patentability search | $900.00. |
| d. | Peterson ADR, LLC Re full day mediation fee | $1,800.00 |
| e. | Expert Witness J. Scott McBride | $15,600.00 |
| f. | Expert Witness Dr. K. E. Lehrer | $20,500.00 |
| g. | Other expenses | $45.55 |
|   | | **Total: $64,125.55** |

20. The Firm seeks an award of total fees and arbitration related costs totaling **$224,024.05**. All the fees, costs and expenses incurred in this case were reasonable and necessary under the circumstances. The Firm did not mark-up any of the fees, costs, or expenses sought.

I SOLEMNLY SWEAR AND AFFIRM under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.



_____
Stacey L. Barnes

Sworn to and subscribed before me on the 15th day of February, 2023 by Stacey L. Barnes.



_____
Notary Public for the State of Texas

**STACEY L. BARNES**
Kearney, McWilliams & Davis, PLLC
55 Waugh Dr., Suite 150
Houston, Texas 77007
United States of America

Tel.: +1-713-936-9620 x121
Fax: +1-832-413-5405
E-mail: sbarnes@kmd.law

## PROFILE

I am a litigation and transactional attorney, concentrating my practice in the area of international business law, general business representation, corporate law, commercial litigation and arbitration, and intellectual property law. As a transactional attorney, I counsel clients regarding a variety of business transactions, from basic entity formation, and shareholder agreements, to complex cross-border acquisitions or distribution and licensing agreements. As a litigator, I have experience with cases ranging from simple collection matters to patent and trademark infringement cases, international trade secret litigation, and breach of commercial contract cases. I have advised business clients on legal matters involving Canada, Mexico, St. Lucia, Italy, Germany, Great Britain, Ireland, France, Belgium, Netherlands, Luxembourg, Sweden, Malta, Russia, Central African Republic, Republic of the Congo, Ghana, Saudi Arabia, India, Malaysia, Singapore, South Korea and the United States.  I have worked for business law firms in Houston, Texas and Milan, Italy.  I am available for appointment as an arbitrator for commercial, international, securities, and intellectual property cases.

## WORK HISTORY

Kearney, McWilliams & Davis, PLLC, Houston, Texas – Senior Attorney, 2018 - present
University of Debrecen, Hungary – Visiting Professor, 2015 - present

Partner, Lewis & Barnes, Houston, Texas, 2010-2018, Visiting Professor, Lazarski University, Poland, 2022; Visiting Professor, University of Silesia, Poland, 2022 and 2018; Visiting Professor, Jagiellonian University, Poland, 2020; Visiting Professor, University of Pardubice, Czech Republic, 2016;  Adjunct Professor, South Texas College of Law, Houston, Texas, 2008-2014; Partner, Hanszen Laporte, Houston, Texas, 2007-10; Partner, Barnes & Associates, PLLC, Houston, Texas, 2003-07; Associate Attorney, Broemer & Associates, LLC, Houston, Texas, 2001-03; Associate Attorney/Law Clerk, London & Schaeffer, LLP, Houston, Texas, 1997-01; Law Clerk, Dobson & Pinci, Milano, Italy, 1996.

## EDUCATION & ACADEMIC

University of Debrecen, Hungary – Visiting Professor, 2015-present
Courses Taught: International Sales of Goods, International Arbitration

*Exhibit 2*

App. 073

Lazarski University, Poland – Visiting Professor, 2022
Courses Taught: International Business Transactions

University of Silesia, Poland – Visiting Professor, 2022 and 2018
Courses Taught: International Sales of Goods, International Merger, Acquisition, and Joint Venture Arbitrations

Jagiellonian University, Poland – Visiting Professor, 2020
Courses Taught: Use of American Arbitration Rules in Europe

University of Pardubice, Czech Republic – Visiting Professor, 2016
Courses Taught: International Sales of Goods

South Texas College of Law – Distinguished Lecturer/Adjunct Professor, 2008-2014
Courses Taught: International Sales & Arbitration, Arbitration Law
Coach: South Texas College of Law Vis international commercial arbitration team; South Texas College of Law Polish Court of Arbitration international commercial arbitration team; South Texas College of Law securities arbitration team; South Texas College of Law domestic commercial arbitration team

University of Houston Law School - Juris Doctorate (J.D.), *cum laude*, 1998
University of Texas at Austin - Bachelor of Arts (B.A.), National Merit Scholar and NASA Fellowship Scholar, 1990

## BAR ADMISSION

- Supreme Court of Texas
- United States District Courts for the Northern, Western, Eastern and Southern Districts of Texas
- United States Court of International Trade
- United States Court of Appeals for the Fifth Circuit
- United States Court of Appeals for the Federal Circuit
- Appeared *pro hac vice* in state courts in Florida, Michigan and Montana, as well as United States District Courts for the Central District of California, District of Maryland, District of Utah, District of Wyoming, Southern District of Florida, and Eastern District of North Carolina

## ARBITRATOR EXPERIENCE

Member of the AAA Commercial, ICDR, ICC, European Centre for Dispute Resolution, FINRA, and City of Houston arbitration rosters. Served as single arbitrator, wing arbitrator, and chair of commercial arbitration panels. Arbitration subjects included international commercial loan collateralization, international shipping and logistics employee leasing, oilfield stimulation services, employment administrative services, real estate development projects, commercial real estate loans, professional services fees, government contracting, corporate governance, minority shareholder freeze out,

Exhibit 2

App. 074

corporate dissolution, business acquisition fraud, business acquisition representations and warranties, post-acquisition price adjustments, post-acquisition tax liability, commercial loan brokerage agreements, collateralized debt obligations, mutual fund administration, software service agreements, software royalties, breach of contract, breach of fiduciary duty, construction services, covenants not to compete, trade secrets, securities fraud, branch office contracts, and executive compensation cases. Served as chairman of arbitration panel for claims between two large international financial institutions for multiple acts of unfair competition, tortious interference with contract and violation of non-competition covenants. Served as chairman of multiple international arbitration panels for claims involving securities options contracts and commercial loan securitization.

## ARBITRATION ADVOCACY EXPERIENCE

- Represented client in corporate dissolution of real estate company.
- Represented general contractor in multi-party international chemical plant construction arbitration. Obtained favorable confidential settlement for client.
- Represented trademark holder in international trademark licensing arbitration. Obtained emergency arbitrator injunction against international infringement and interference with licensing rights.
- Represented purchaser in medical services post-acquisition price adjustment arbitration. Obtained favorable settlement for client.
- Represented licensee in multi-party international software royalty arbitration proceeding. Obtained settlement with Chinese sub-licensee paying the great majority of amount in dispute.
- Represented Internet communications client in corporate governance and minority shareholder buy-out arbitration. Obtained favorable buy-out terms for client.
- Represented American investor in minority shareholder oppression arbitration proceeding against Canadian shareholder. Obtained favorable award in arbitration and confirmed award in U.S. federal court, pursuant to the New York Convention.
- Successfully represented e-commerce client in unfair competition and Internet trade secret arbitration. Obtained a dismissal of parallel suit in U.S. federal court seeking to enjoin the arbitration.
- Successfully appealed refusal to compel arbitration on behalf of manufactured housing client. Texas state appellate court reversed the trial court and compelled arbitration under the U.S. Federal Arbitration Act.
- Represented financial services client in commercial arbitration proceedings for breach of fiduciary duty and unfair competition claims, including anti-suit injunction proceedings seeking to enjoin parallel lawsuits brought in violation of arbitration clause.

## LITIGATION ADVOCACY EXPERIENCE

- American litigation experience includes a variety of commercial and corporate topics, including breach of contract, stock options, securities fraud, litigation for

Exhibit 2

App. 075

corporate control, minority shareholder oppression, insurance coverage, pipeline services, international petroleum development, unfair competition, securities fraud, international nano-technology development, international trademark licensing, trademark infringement, patent infringement, and trade secrets.

- Represented inventor and seller of lighting equipment in complex trademark and patent infringement suit seeking to shut down sales of client's new flagship product. Obtained a settlement giving client ability to continue sales and a cessation of opposing party's trademark infringement.

- Represented importer of steel mill in federal court litigation regarding environmental import controls. Obtained a TRO against the Department of Homeland Security's order requiring importing ship to return to port of origin. Obtained a settlement giving client opportunity to successfully remedy issue and import the steel mill in question.

- Represented international honey importer in complex, multi-party litigation in federal court, involving over $100 million worth of claims for false designation of origin. Obtained a confidential settlement, with client paying smallest settlement of all defendants.

- Represented client in federal court litigation with formulation co-developer in trade secret, trademark, and international licensing dispute. Obtained a TRO and injunction against international trademark infringement and interference with international licensees. Obtained a settlement giving client ownership of all intellectual property in controversy.

- Represented client in federal court litigation involving trade secrets and copyright of geophysical oil and gas related software. Counter-party sought to enjoin all North American and Chinese licensing of software. Obtained a settlement giving client ownership of all technology at controversy.

- Represented investors in Texas state court litigation regarding Columbian petroleum development project. Obtained a confidential settlement on behalf of clients.

- Represented investor in complex federal receivership proceedings involving hundreds of offshore asset protection entities

- Represented former licensee in a complex trademark dispute in U.S. federal court. Obtained a confidential settlement allowing client to continue using all trademarks at issue.

- Represented client in international relocation employment contract dispute in Texas state court. Obtained jury verdict in favor of client.

- Represented dietary supplement company in biochemical patent and trademark suit in U.S. federal court. Obtained a halt of production of infringing product after a successful appeal to the U.S. Court of Appeals for the Federal Circuit.

- Obtained a dismissal of individual defendants in U.S. federal court litigation involving a beverage distributorship in Saudi Arabia.

- Represented oil services technology company in international trade secret litigation in Texas state court. Obtained a dismissal of foreign patent infringement counterclaims and a confidential settlement in favor of client

**Exhibit 2**

App. 076

- Represented defendant in trademark infringement suit in U.S. federal court. Defeated a proposed injunction which would have halted a national new product rollout, and obtained a favorable settlement for client.
- Represented beverage company in trademark infringement suit in U.S. federal court. Obtained a jury verdict of intentional infringement of client's trademarks and an injunction halting infringement.
- Obtained a dismissal of all claims involving international carriage of goods against a transportation corporate client in Texas state court.

## CORPORATE LAW EXPERIENCE

Transactional and corporate law experience includes negotiating, drafting and implementing a variety of international and domestic transactions, including joint ventures, mergers, asset and share acquisitions, corporate reorganizations, entity conversions, licensing and distribution agreements, branch office agreements, service agreements, finder's fee agreements, shareholder agreements, construction contracts, government contracting, international sales of goods and services, organizing American entities and subsidiaries for foreign businesses, corporate compliance matters for a publicly traded company, general counsel duties, as well as organization and corporate governance for limited liability companies, corporations, partnerships, limited partnerships, limited liability partnerships, professional corporations and professional associations.

## MEMBERSHIPS

- Member - Chartered Institute of Arbitrators (MCIArb)
- Houston Bar Association (Corporate Counsel and International Law sections)
- State Bar of Texas (Business Law and International Law sections)
- American Bar Association (Business Law, International Law and Intellectual Property Law sections)
- Member Advisory Board - South Texas College of Law - Frank Evans Center for Conflict Resolution
- Member Advisory Board - Institute for Transnational Arbitration
- Vis Moot Alumni Association
- Italy-America Chamber of Commerce
- German American Chamber of Commerce
- Turkish American Association for Business
- Houston Young Internationals Group - Former Board Member and President

## SPEAKING ENGAGEMENTS

- Jagiellonian University, Civil Law Academic Society, International Sales of Goods, Krakow, Poland, 2022
- South Texas College of Law, Foundations of Effective Arbitration and Practice Implementation, and Merger & Acquisitions Arbitrations, Houston, Texas, 2022
- Eurojuris International, Use of the ICDR Rules in International Arbitration, 2019

Exhibit 2

App. 077

- HBA International Section, Risk Management & Mitigation in Transnational Contracts, Houston, Texas, 2019
- HBA ADR Section, 10 Pitfalls in International Arbitration, Houston, Texas, 2019
- Texas CLE, Merger and Acquisitions Arbitrations, The Woodlands, Texas, 2018
- U.S.-China International Business Network: Chinese Judiciary Training, Principles of Arbitration in the United States, Houston Texas, 2015
- Tbilisi State University, Intensive International Arbitration Training, Tbilisi, Georgia, 2013
- TSU/NCADR ADR Conference, IBA Rules Regarding Evidence and Conflicts: The Basics, Pros, and Cons of Their Use, Tbilisi, Georgia, 2013
- Houston Bar Association, Contracts for the International Sales of Goods, Houston, Texas, 2013
- EastWest Bank, Mediation, Arbitration, and Commercial Contracts, Houston, Texas, 2013
- International Section HBA, U.N. Convention on Contracts for the International Sales of Goods, Houston, Texas, 2013
- Center for International Legal Studies, Guidelines and Soft Law in International Arbitration, Salzburg, Austria, 2012
- Chartered Institute of Arbitrators YMG Meeting, Trends in International Arbitration - Presentation of Evidence, Dublin, Ireland, 2011
- NAFTA 2022 Meeting, Drafting Multi-Tier ADR Clauses, Houston, Texas, 2010

## LANGUAGES

English (native)
Italian (conversational)
Russian (working knowledge)
Spanish (working knowledge)

Exhibit 2

App. 078

# KEARNEY MCWILLIAMS & DAVIS
## ATTORNEYS AT LAW

Houston: 55 Waugh, Ste. 150, Houston, TX 77007-6033      Denver: 1625 Broadway, Ste. 2950, Denver, CO 80202-4711
Phone: (713) 936-9620  Fax: (713) 936-9621                      Phone: (720) 863-4012  Fax: (720) 863-4012

Mario Scorza                                                                January 31, 2021
2209 W. Bayshore Dr.                                                              25037-1
Palacios, TX 77465-1455
marumberto@aol.com

Re:  Lawsuit
     Mario Scorza

| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 01/26/21 | WCY | Reviewing documents; corresponding with client; gathering information for suit | 1.6 | $640.00 |
| | | Hours: | 1.6 | |
| | | Total fees: | | $640.00 |

Attorney Summary

| WCY | William Yarbrough | 1.6 hours at $400.00 per hour |
|---|---|---|

**Billing Summary**

| Previous balance | $0.00 |
|---|---|
| Payments & adjustments | 0.00 |
| Current fees & expenses | 640.00 |
| **Total now due** | **$640.00** |

**Aged Balance**

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $640.00 | $0.00 | $0.00 | $0.00 | $640.00 |
| Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | $640.00 | $0.00 | $0.00 | $0.00 | $640.00 |

**Exhibit 3**

App. 079

Matter No. 25037-1
Mario Scorza
Lawsuit

January 31, 2021
Page 2

**Charges To Date**

| | |
|---|---|
| Fees | $640.00 |
| Expenses | 0.00 |
| Total | $640.00 |
| Payments | $0.00 |

* Checks are preferred, scanned to admin@kmd.law or mailed to 55 Waugh #150, Houston, TX 77007-6033
* Zelle to Inception Law at 713-936-9620
* ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 111000025; Wire 026009593; SWIFT BOFAUS3N
* Bill.com ID: 0162733714595373, www.bill.com/network/kmdlaw

**Exhibit 3**

App. 080

# KEARNEY McWILLIAMS & DAVIS
## ATTORNEYS AT LAW

Houston: 55 Waugh, Ste. 150, Houston, TX 77007-6033
Phone: (713) 936-9620   Fax: (713) 936-9621

Denver: 1625 Broadway, Ste. 2950, Denver, CO 80202-4711
Phone: (720) 863-4012   Fax: (720) 863-4012

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

February 28, 2021
25037-1

Re:   Lawsuit
      Mario Scorza

| | | Fees: | | Hours | Amount |
|---|---|---|---|---|---|
| 02/09/21 | BAN | Review Client-supplied documents and Consumer Protection Rules promulgated by the American Arbitration Association regarding propounding a demand for arbitration upon Davison pursuant to Client's previous written contract with same | | 1.0 | $300.00 |
| 02/15/21 | WCY | Reviewing arbitration procedure and informing client as to lawsuit alternative | | 0.4 | $160.00 |
| | | | Hours: | 1.4 | |
| | | | Total fees: | | $460.00 |

Attorney Summary

| | | |
|---|---|---|
| WCY | William Yarbrough | 0.4 hours at $400.00 per hour |
| BAN | Bradley Nevills | 1.0 hours at $300.00 per hour |

Exhibit 3

App. 081

Matter No. 25037-1                                    February 28, 2021
Mario Scorza                                                    Page 2
Lawsuit

**Billing Summary**

| | | |
|---|---|---|
| Previous balance | $640.00 | |
| Payments & adjustments | 0.00 | |
| Current fees & expenses | 460.00 | |
| **Total now due** | **$1,100.00** | |

**Aged Balance**

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $1,100.00 | $0.00 | $0.00 | $0.00 | $1,100.00 |
| Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | $1,100.00 | $0.00 | $0.00 | $0.00 | $1,100.00 |

**Charges To Date**

| | |
|---|---|
| Fees | $1,100.00 |
| Expenses | 0.00 |
| Total | $1,100.00 |
| Payments | $0.00 |

* Checks are preferred, scanned to admin@kmd.law or mailed to 55 Waugh #150, Houston, TX 77007-6033
* Zelle to Inception Law at 713-936-9620
* ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 111000025; Wire 026009593; SWIFT BOFAUS3N
* Bill.com ID: 0162733714595373, www.bill.com/network/kmdlaw

**Exhibit 3**

App. 082

# KEARNEY McWILLIAMS & DAVIS
## ATTORNEYS AT LAW

Houston: 55 Waugh, Ste. 150, Houston, TX 77007-6033
Phone: (713) 936-9620   Fax: (713) 936-9621

Denver: 1625 Broadway, Ste. 2950, Denver, CO 80202-4711
Phone: (720) 863-4012   Fax: (720) 863-4012

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

March 31, 2021
25037-1

Re:   Lawsuit
      Mario Scorza

## Billing Summary

| | |
|---|---|
| Previous balance | $1,100.00 |
| Payments & adjustments | 0.00 |
| Current fees & expenses | 0.00 |
| **Total now due** | **$1,100.00** |

## Aged Balance

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $0.00 | $460.00 | $640.00 | $0.00 | $1,100.00 |
| Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $460.00 | $640.00 | $0.00 | $1,100.00 |

## Charges To Date

| | |
|---|---|
| Fees | $1,100.00 |
| Expenses | 0.00 |
| Total | $1,100.00 |
| Payments | $0.00 |

* Checks are preferred, scanned to admin@kmd.law or mailed to 55 Waugh #150, Houston, TX 77007-6033
* Zelle to Inception Law at 713-936-9620
* ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 111000023; Wire 026009593; SWIFT BOFAUS3N
* Bill.com ID: 0162733714595373, www.bill.com/network/kmdlaw

**Exhibit 3**

App. 083

# KEARNEY MCWILLIAMS & DAVIS
## ATTORNEYS AT LAW

Houston: 55 Waugh, Ste. 150, Houston, TX 77007-6033      Denver: 1625 Broadway, Ste. 2950, Denver, CO 80202-4711
Phone: (713) 936-9620  Fax: (713) 936-9621                          Phone: (720) 863-4012  Fax: (720) 863-4012

Mario Scorza                                             April 30, 2021
2209 W. Bayshore Dr.                                          25037-1
Palacios, TX 77465-1455
marumberto@aol.com

Re:   Lawsuit
      Mario Scorza

| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 04/28/21 | BAN | Draft Plaintiff's Original Petition for use with Client's Demand for Arbitration; Review all communications and information received by Client in preparation of same | 3.4 | $1,020.00 |
| 04/28/21 | WCY | Editing complaint | 0.4 | $160.00 |
| 04/30/21 | WCY | Reviewing complaint and sending to client | 0.7 | $280.00 |
| | | Hours: | 4.5 | |
| | | Total fees: | | $1,460.00 |

Attorney Summary

| WCY | William Yarbrough | 1.1 hours at $400.00 per hour |
|---|---|---|
| BAN | Bradley Nevills | 3.4 hours at $300.00 per hour |

**Billing Summary**

| Previous balance | $1,100.00 |
|---|---|
| Payments & adjustments | 0.00 |
| Current fees & expenses | 1,460.00 |
| **Total now due** | **$2,560.00** |

**Exhibit 3**

App. 084

Matter No. 25037-1                                    April 30, 2021
Mario Scorza                                              Page 2
Lawsuit

**Aged Balance**

|          | Current    | 31-60  | 61-90      | Over 90 | Total      |
|----------|-----------|--------|-----------|---------|-----------|
| Fees     | $1,460.00 | $0.00  | $1,100.00 | $0.00   | $2,560.00 |
| Expenses | $0.00     | $0.00  | $0.00     | $0.00   | $0.00     |
| Total    | $1,460.00 | $0.00  | $1,100.00 | $0.00   | $2,560.00 |

**Charges To Date**

| Fees     | $2,560.00 |
|----------|-----------|
| Expenses | 0.00      |
| Total    | $2,560.00 |
| Payments | $0.00     |

* Checks are preferred, scanned to admin@kmd.law or mailed to 55 Waugh #150,
Houston, TX 77007-6033
* Zelle to Inception Law at 713-936-9620 or admin@kmd.law
* ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire
026009593; SWIFT BOFAUS3N
* Bill.com ID: 0162733714595373, www.bill.com/network/kmdlaw

**Exhibit 3**

App. 085

# KEARNEY MCWILLIAMS & DAVIS
## ATTORNEYS AT LAW

Houston: 55 Waugh, Ste. 150, Houston, TX 77007-6033
Phone: (713) 936-9620   Fax: (713) 936-9621

Denver: 1625 Broadway, Ste. 2950, Denver, CO 80202-4711
Phone: (720) 863-4012   Fax: (720) 863-4012

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

May 31, 2021
25037-1

Re:   Lawsuit
      Mario Scorza

**Fees:**

| | | | Hours | Amount |
|---|---|---|---|---|
| 05/12/21 | WCY | Making final edits to complaint | 0.7 | $280.00 |
| 05/24/21 | SB | Review and revise Arbitration Petition; telephone conference regarding same. | 0.4 | $160.00 |
| 05/25/21 | WCY | Making final edits and final review | 0.5 | $200.00 |
| 05/27/21 | SB | Conference regarding arbitration filing, damages, and expert witnesses. | 0.4 | $160.00 |
| 05/28/21 | WCY | Reviewing documents and communicating with client | 0.3 | $120.00 |
| | | Hours: | 2.3 | |
| | | Total fees: | | $920.00 |

Attorney Summary

| | | |
|---|---|---|
| WCY | William Yarbrough | 1.5 hours at $400.00 per hour |
| SB | Stacey L Barnes | 0.8 hours at $400.00 per hour |

**Payments & Adjustments:**

| | | |
|---|---|---|
| 05/28/21 | Check No. 3711 | $1,460.00 CR |

**Exhibit 3**

App. 086

Matter No. 25037-1                                    May 31, 2021
Mario Scorza                                              Page 2
Lawsuit

Total payments & adjustments:                    $1,460.00 CR

---

**Billing Summary**

Previous balance                  $2,560.00
Payments & adjustments             1,460.00 CR
Current fees & expenses              920.00

**Total now due**                 **$2,020.00**

**Aged Balance**

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $2,020.00 | $0.00 | $0.00 | $0.00 | $2,020.00 |
| Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | $2,020.00 | $0.00 | $0.00 | $0.00 | $2,020.00 |

**Charges To Date**

Fees             $3,480.00
Expenses              0.00
Total            $3,480.00
Payments         $1,460.00 CR

*Checks are preferred, scanned to admin@kmd.law or mailed to 55 Waugh #150, Houston, TX 77007-6033*
*Zelle to Inception Law at 713-936-9620 or admin@kmd.law*
*ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N*
*Bill.com ID: 0162733714595373, www.bill.com/network/kmdlaw*

**Exhibit 3**

App. 087

# KEARNEY MCWILLIAMS & DAVIS
## ATTORNEYS AT LAW

www.KMD.law    Denver    Houston    Fort Worth    San Antonio    Wyoming

55 Waugh, Ste. 150, Houston, TX 77007-6033
Phone: (713) 936-9620  Fax: (713) 936-9621
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Checks are preferred, regular mail or scanned to admin@kmd.law
Zelle to Inception Law at 713-936-9620 or admin@kmd.law

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

June 30, 2021
25037-1

Re:   Lawsuit
      Mario Scorza

## Billing Summary

| | |
|---|---|
| Previous balance | $2,020.00 |
| Payments & adjustments | 0.00 |
| Current fees & expenses | 0.00 |
| **Total now due** | **$2,020.00** |

## Aged Balance

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $0.00 | $2,020.00 | $0.00 | $0.00 | $2,020.00 |
| Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $2,020.00 | $0.00 | $0.00 | $2,020.00 |

## Charges To Date

| | |
|---|---|
| Fees | $3,480.00 |
| Expenses | 0.00 |
| Total | $3,480.00 |
| Payments | $1,460.00 CR |

**Exhibit 3**

App. 088

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

www.KMD.law    Denver    Houston    Fort Worth    San Antonio    Wyoming

55 Waugh, Ste. 150, Houston, TX 77007-6033
Phone: (713) 936-9620  Fax: (713) 936-9621
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Checks are preferred, regular mail or scanned to admin@kmd.law
Zelle to Inception Law at 713-936-9620 or admin@kmd.law

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

July 31, 2021
25037-1

Re:  Lawsuit
     Mario Scorza

**Fees:**

| | | | Hours | Amount |
|---|---|---|---|---|
| 07/06/21 | BAN | Finalize and file Plaintiff's Original Petition and Demand for Arbitration with the American Arbitration Association; Draft corresponding letter demand to Davison Design & Development, Inc.; Conference with Attorney Yarbrough regarding same | 1.6 | $480.00 |
| 07/16/21 | WCY | Confirming demand amount and filing status; accessing damages; communicating with client | 0.8 | $320.00 |
| 07/23/21 | WCY | Reviewing AAA schedule and required documents; reviewing emails; confirming conference | 0.4 | $160.00 |
| | | Hours: | 2.8 | |
| | | Total fees: | | $960.00 |

Attorney Summary

| | | |
|---|---|---|
| WCY | William Yarbrough | 1.2 hours at $400.00 per hour |
| BAN | Bradley Nevills | 1.6 hours at $300.00 per hour |

**Exhibit 3**

App. 089

Matter No. 25037-1
Mario Scorza
Lawsuit

July 31, 2021
Page 2

**Expenses:**

| 07/19/21 | BAN | Fee for filing Plaintiff's Original Petition against Davison Design & Development with American Arbitration Association | $1,925.00 |
|---|---|---|---|

Total expenses:                                                   $1,925.00

**Billing Summary**

| Previous balance | $2,020.00 |
|---|---|
| Payments & adjustments | 0.00 |
| Current fees & expenses | 2,885.00 |
| **Total now due** | **$4,905.00** |

**Aged Balance**

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $960.00 | $920.00 | $1,100.00 | $0.00 | $2,980.00 |
| Expenses | $1,925.00 | $0.00 | $0.00 | $0.00 | $1,925.00 |
| Total | $2,885.00 | $920.00 | $1,100.00 | $0.00 | $4,905.00 |

**Charges To Date**

| Fees | $4,440.00 |
|---|---|
| Expenses | 1,925.00 |
| Total | $6,365.00 |
| Payments | $1,460.00 CR |

**Exhibit 3**

App. 090

# KEARNEY McWILLIAMS & DAVIS
## ATTORNEYS AT LAW

www.KMD.law    Denver    Houston    Fort Worth    San Antonio    Wyoming

55 Waugh, Ste. 150, Houston, TX 77007-6033
Phone: (713) 936-9620  Fax: (713) 936-9621
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Checks are preferred, regular mail or scanned to admin@kmd.law
Zelle to Inception Law at 713-936-9620 or admin@kmd.law

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

August 31, 2021
25037-1

Re:   Lawsuit
      Mario Scorza

| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 08/06/21 | WCY | AAA call with Justin Barron, George Crompton and BN | 0.5 | $200.00 |
| 08/06/21 | WCY | Filing conflict check | 0.3 | $120.00 |
| | | Hours: | 0.8 | |
| | | Total fees: | | $320.00 |

Attorney Summary

| WCY | William Yarbrough | 0.8 hours at $400.00 per hour |
|---|---|---|

---

**Billing Summary**

| Previous balance | $4,905.00 |
|---|---|
| Payments & adjustments | 0.00 |
| Current fees & expenses | 320.00 |
| **Total now due** | **$5,225.00** |

Exhibit 3

App. 091

Matter No. 25037-1                                          August 31, 2021
Mario Scorza                                                        Page 2
Lawsuit

**Aged Balance**

|          | Current   | 31-60     | 61-90  | Over 90    | Total      |
|----------|-----------|-----------|--------|------------|------------|
| Fees     | $320.00   | $960.00   | $0.00  | $2,020.00  | $3,300.00  |
| Expenses | $0.00     | $1,925.00 | $0.00  | $0.00      | $1,925.00  |
| Total    | $320.00   | $2,885.00 | $0.00  | $2,020.00  | $5,225.00  |

**Charges To Date**

| Fees     | $4,760.00    |
|----------|--------------|
| Expenses | 1,925.00     |
| Total    | $6,685.00    |
| Payments | $1,460.00 CR |

**Exhibit 3**

App. 092

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

www.KMD.law    Denver    Houston    Fort Worth    San Antonio    Wyoming

55 Waugh, Ste. 150, Houston, TX 77007-6033          Checks are preferred, regular mail or scanned to admin@kmd.law
Phone: (713) 936-9620  Fax: (713) 936-9621                 Zelle to Inception Law at 713-936-9620 or admin@kmd.law
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Mario Scorza                                          September 30, 2021
2209 W. Bayshore Dr.                                          25037-1
Palacios, TX 77465-1455
marumberto@aol.com

Re:   Lawsuit
      Mario Scorza

| **Fees:** | | | Hours | Amount |
|---|---|---|---|---|
| 09/07/21 | WCY | Reviewing potential arbitrators education, experience and background; ranking arbitrators | 0.7 | $280.00 |
| 09/17/21 | WCY | Reviewing arbitrator selection; informing client of selection, AAA invoice and upcoming pre-hearing | 0.4 | $160.00 |
| 09/24/21 | WCY | Scheduling arbitration Preliminary Hearing Conference | 0.3 | $120.00 |
| 09/28/21 | SB | Prepare and forward Arbitrator Rankings; review arbitrator CV's for same; telephone conference regarding same. | 1.2 | $480.00 |
| | | Hours: | 2.6 | |
| | | Total fees: | | $1,040.00 |

Attorney Summary

| WCY | William Yarbrough | 1.4 hours at $400.00 per hour |
|---|---|---|
| SB | Stacey L Barnes | 1.2 hours at $400.00 per hour |

**Exhibit 3**

App. 093

Matter No. 25037-1                                      September 30, 2021
Mario Scorza                                            Page 2
Lawsuit

**Payments & Adjustments:**

| | | |
|---|---|---|
| 09/25/21 | Check No. 3738 | $1,440.00 CR |
| | Total payments & adjustments: | $1,440.00 CR |

**Billing Summary**

| | |
|---|---|
| Previous balance | $5,225.00 |
| Payments & adjustments | 1,440.00 CR |
| Current fees & expenses | 1,040.00 |
| **Total now due** | **$4,825.00** |

**Aged Balance**

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $1,360.00 | $0.00 | $960.00 | $580.00 | $2,900.00 |
| Expenses | $0.00 | $0.00 | $1,925.00 | $0.00 | $1,925.00 |
| Total | $1,360.00 | $0.00 | $2,885.00 | $580.00 | $4,825.00 |

**Charges To Date**

| | |
|---|---|
| Fees | $5,800.00 |
| Expenses | 1,925.00 |
| Total | $7,725.00 |
| Payments | $2,900.00 CR |

**Exhibit 3**

App. 094

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

www.KMD.law     Denver     Houston     Fort Worth     San Antonio     Wyoming

55 Waugh, Ste. 150, Houston, TX 77007-6033
Phone: (713) 936-9620  Fax: (713) 936-9621
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Checks are preferred, regular mail or scanned to admin@kmd.law
Zelle to Inception Law at 713-936-9620 or admin@kmd.law

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

October 31, 2021
25037-1

Re:   Lawsuit
      Mario Scorza

**Fees:**

| | | | Hours | Amount |
|---|---|---|---|---|
| 10/01/21 | WCY | Call with arbitrator and opposing counsel | 0.8 | $320.00 |
| 10/06/21 | WCY | Confirming Davison receipt of settlement; reviewing arbitration documents | 0.4 | $160.00 |
| 10/29/21 | MC | Received Respondent's First Set of Discovery Requests for Production and Answers to Interrogatories, saved to client file and began drafting responses | 0.4 | $50.00 |
| 10/31/21 | MC | Continued to draft responses to First Set of Discovery Requests for Production and Answers to Interrogatories | 0.4 | $50.00 |
| | | Hours: | 2.0 | |
| | | Total fees: | | $580.00 |

Attorney Summary

| WCY | William Yarbrough | 1.2 hours at $400.00 per hour |
|---|---|---|
| MC | Marisol Contreras | 0.8 hours at $125.00 per hour |

**Exhibit 3**

App. 095

Matter No. 25037-1                                    October 31, 2021
Mario Scorza                                                    Page 2
Lawsuit

**Expenses:**

| 10/11/21 | ADC | American Arbitration Association Case #01-21-0004-6369-1-SD | $1,440.00 |
|---|---|---|---|

Total expenses:                                        $1,440.00

---

**Billing Summary**

| | |
|---|---|
| Previous balance | $4,825.00 |
| Payments & adjustments | 0.00 |
| Current fees & expenses | 2,020.00 |
| **Total now due** | **$6,845.00** |

**Aged Balance**

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $1,620.00 | $320.00 | $960.00 | $580.00 | $3,480.00 |
| Expenses | $1,440.00 | $0.00 | $1,925.00 | $0.00 | $3,365.00 |
| Total | $3,060.00 | $320.00 | $2,885.00 | $580.00 | $6,845.00 |

**Charges To Date**

| | |
|---|---|
| Fees | $6,380.00 |
| Expenses | 3,365.00 |
| Total | $9,745.00 |
| Payments | $2,900.00 CR |

**Exhibit 3**

App. 096

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

www.KMD.law   Denver   Houston   Fort Worth   San Antonio   Wyoming

55 Waugh, Ste. 150, Houston, TX 77007-6033
Phone: (713) 936-9620  Fax: (713) 936-9621
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Mailed checks preferred or scanned to admin@kmd.law
Zelle: Inception Law at 7139369620 or admin@kmd.law

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

November 30, 2021
25037-1

Re:   Lawsuit
      Mario Scorza

| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 10/01/21 | SB | Prepare for and attend Initial Hearing; review all materials and filings for same | 1.4 | $560.00 |
| 11/29/21 | MC | Revised discovery responses to requests for document production and interrogatories in preparation for delivery to client; delivered to client via email | 4.5 | $562.50 |
| 11/29/21 | WCY | Providing answers for interrogatories; defining dates and comparable products | 1.0 | $400.00 |
| | | Hours: | 6.9 | |
| | | Total fees: | | $1,522.50 |

Attorney Summary

| | | |
|---|---|---|
| SB | Stacey L Barnes | 1.4 hours at $400.00 per hour |
| WCY | William Yarbrough | 1.0 hours at $400.00 per hour |
| MC | Marisol Contreras | 4.5 hours at $125.00 per hour |

**Exhibit 3**

App. 097

Matter No. 25037-1
Mario Scorza
Lawsuit

November 30, 2021
Page 2

## Billing Summary

| | |
|---|---|
| Previous balance | $6,845.00 |
| Payments & adjustments | 0.00 |
| Current fees & expenses | 1,522.50 |
| **Total now due** | **$8,367.50** |

## Aged Balance

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $1,522.50 | $1,620.00 | $320.00 | $1,540.00 | $5,002.50 |
| Expenses | $0.00 | $1,440.00 | $0.00 | $1,925.00 | $3,365.00 |
| Total | $1,522.50 | $3,060.00 | $320.00 | $3,465.00 | $8,367.50 |

## Charges To Date

| | |
|---|---|
| Fees | $7,902.50 |
| Expenses | 3,365.00 |
| Total | $11,267.50 |
| Payments | $2,900.00 CR |

**Exhibit 3**

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

www.KMD.law   Denver   Houston   Fort Worth   San Antonio   Wyoming

55 Waugh, Ste. 150, Houston, TX 77007-6033
Phone: (713) 936-9620  Fax: (713) 936-9621
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Mailed checks preferred or scanned to admin@kmd.law
Zelle: Inception Law at 7139369620 or admin@kmd.law

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

December 31, 2021
25037-1

Re:   Lawsuit
      Mario Scorza

| **Fees:** | | | Hours | Amount |
|---|---|---|---|---|
| 12/07/21 | MC | Created initial drafts of Requests for Document Production and Interrogatories to be delivered to Scorza; delivered initial draft to attorney Barnes for review and revisions | 1.2 | $150.00 |
| 12/08/21 | MC | Revised answers to Interrogatories in preparation for production | 0.4 | $50.00 |
| 12/13/21 | WCY | Scheduling meeting; verifying answers to interrogatories for completeness and accuracy | 0.5 | $200.00 |
| 12/14/21 | HGL | Drafting discovery interrogatories and requests for production | 2.6 | $260.00 |
| | | Hours: | 4.7 | |
| | | Total fees: | | $660.00 |

## Attorney Summary

| WCY | William Yarbrough | 0.5 hours at $400.00 per hour |
|---|---|---|
| MC | Marisol Contreras | 1.6 hours at $125.00 per hour |
| HGL | Harrison Long | 2.6 hours at $100.00 per hour |

**Exhibit 3**

App. 099

Matter No. 25037-1                                    December 31, 2021
Mario Scorza                                                      Page 2
Lawsuit

---

**Billing Summary**

| | |
|---|---|
| Previous balance | $8,367.50 |
| Payments & adjustments | 0.00 |
| Current fees & expenses | 660.00 |
| | |
| **Total now due** | **$9,027.50** |

**Aged Balance**

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $660.00 | $1,522.50 | $580.00 | $2,900.00 | $5,662.50 |
| Expenses | $0.00 | $0.00 | $1,440.00 | $1,925.00 | $3,365.00 |
| Total | $660.00 | $1,522.50 | $2,020.00 | $4,825.00 | $9,027.50 |

**Charges To Date**

| | |
|---|---|
| Fees | $8,562.50 |
| Expenses | 3,365.00 |
| Total | $11,927.50 |
| Payments | $2,900.00 CR |

**Exhibit 3**

App. 100

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

www.KMD.law   Denver   Fort Worth   Houston   San Antonio   Wyoming

55 Waugh, Suite 150, Houston, TX 77007-6033
Phone: (713) 936-9620  Fax: (713) 936-9621
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Checks preferred, scanned to admin@kmd.law
Zelle: Inception Law at 7139369620 or admin@kmd.law

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

January 31, 2022
25037-1

Re:   Lawsuit
      Mario Scorza

| **Fees:** | | | Hours | Amount |
|---|---|---|---|---|
| 12/13/21 | SB | Prepare for and attend Hearing on status and additional discovery | 1.7 | $722.50 |
| 12/14/21 | SB | Prepare, revise and forward Requests for Production to Defendant; revise and forward Interrogatories | 4.7 | $1,997.50 |
| 01/07/22 | VP | Reach out to consulting experts; email consulting expert company information for conflict check | 0.7 | $70.00 |
| 01/21/22 | WCY | Call discussing expert witness and litigation | 0.5 | $212.50 |
| 01/28/22 | WCY | Call with damages expert witnesses | 1.3 | $552.50 |
| | | Hours: | 8.9 | |
| | | Total fees: | | $3,555.00 |

## Attorney Summary

| | | |
|---|---|---|
| SB | Stacey L Barnes | 6.4 hours at $425.00 per hour |
| WCY | William Yarbrough | 1.8 hours at $425.00 per hour |
| VP | Vikesh Patel | 0.7 hours at $100.00 per hour |

**Exhibit 3**

Matter No. 25037-1
Mario Scorza
Lawsuit

January 31, 2022
Page 2

---

## Billing Summary

| | |
|---|---|
| Previous balance | $9,027.50 |
| Payments & adjustments | 0.00 |
| Current fees & expenses | 3,555.00 |
| **Total now due** | **$12,582.50** |

## Aged Balance

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $4,215.00 | $0.00 | $1,522.50 | $3,480.00 | $9,217.50 |
| Expenses | $0.00 | $0.00 | $0.00 | $3,365.00 | $3,365.00 |
| Total | $4,215.00 | $0.00 | $1,522.50 | $6,845.00 | $12,582.50 |

## Charges To Date

| | |
|---|---|
| Fees | $12,117.50 |
| Expenses | 3,365.00 |
| Total | $15,482.50 |
| Payments | $2,900.00 CR |

**Exhibit 3**

App. 102

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

www.KMD.law   Denver   Fort Worth   Houston   San Antonio   Wyoming

55 Waugh, Suite 150, Houston, TX 77007-6033
Phone: (713) 936-9620  Fax: (713) 936-9621
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Checks preferred, scanned to admin@kmd.law
Zelle: Inception Law at 7139369620 or admin@kmd.law

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

February 28, 2022
25037-1

Re:   Lawsuit
      Mario Scorza

| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 01/06/22 | SB | Correspondence and conference regarding expert witnesses on damages. | 0.9 | $382.50 |
| 01/18/22 | SB | Correspondence and telephone conference regarding damages expert. | 0.5 | $212.50 |
| 02/04/22 | SB | Attention to Scheduling Order; correspondence regarding same; outline prosecution scheduling for case. | 0.4 | $170.00 |
| 02/16/22 | HGL | Searching for discovery responses to see if respondent met deadline | 0.3 | $30.00 |
| 02/16/22 | SB | Telephone conferences with client and counsel regarding ▓▓▓▓▓▓ | 1.2 | $510.00 |
| 02/17/22 | WCY | Reviewing Davison discovery files; analyzing disclosed documents for content; reviewed communications between client and Davison | 1.2 | $510.00 |

**Exhibit 3**

App. 103

Matter No. 25037-1                                     February 28, 2022
Mario Scorza                                                      Page 2
Lawsuit

| 02/21/22 | WCY | Communicating with client; communicating with damages experts and Attorney Barnes as to required information and patent expert witness | 0.4 | $170.00 |
|---|---|---|---|---|
| 02/22/22 | ADC | Prepare Power of Attorneys for U.S. Provisional Patent Application Nos. 62601218 and 62710055; forward same to client for digital signature; archive client file with same | 0.3 | $49.50 |
| 02/25/22 | WCY | Reviewing patentability report; call discussing results with search firm | 0.6 | $255.00 |
| 02/27/22 | WCY | Call with Attorney Barnes; communicating with patent expert; reviewing patentability search; informing client; sending report to patent expert | 0.4 | $170.00 |

|  |  | Hours: | 6.2 |  |
|---|---|---|---|---|
|  |  | Total fees: |  | $2,459.50 |

Attorney Summary

| SB | Stacey L Barnes | 3.0 hours at $425.00 per hour |
|---|---|---|
| WCY | William Yarbrough | 2.6 hours at $425.00 per hour |
| ADC | Andrea Cavazos | 0.3 hours at $165.00 per hour |
| HGL | Harrison Long | 0.3 hours at $100.00 per hour |

**Payments & Adjustments:**

| 03/07/22 | Check No. 1007 | $3,555.00 CR |
|---|---|---|
|  | Total payments & adjustments: | $3,555.00 CR |

**Exhibit 3**

App. 104

Matter No. 25037-1                              February 28, 2022
Mario Scorza                                                Page 3
Lawsuit

**Billing Summary**

| | | |
|---|---|---|
| Previous balance | $12,582.50 | |
| Payments & adjustments | 3,555.00 CR | |
| Current fees & expenses | 2,459.50 | |
| **Total now due** | **$11,487.00** | |

**Aged Balance**

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $2,459.50 | $3,555.00 | $660.00 | $4,812.50 | $11,487.00 |
| Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | $2,459.50 | $3,555.00 | $660.00 | $4,812.50 | $11,487.00 |

**Charges To Date**

| | |
|---|---|
| Fees | $14,577.00 |
| Expenses | 3,365.00 |
| Total | $17,942.00 |
| Payments | $6,455.00 CR |

**Exhibit 3**

App. 105

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

www.KMD.law    Denver    Fort Worth    Houston    San Antonio    Wyoming

55 Waugh, Suite 150, Houston, TX 77007-6033                      Checks preferred, scanned to admin@kmd.law
Phone: (713) 936-9620  Fax: (713) 936-9621          Zelle: Inception Law at 7139369620 or admin@kmd.law
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Mario Scorza                                                    March 31, 2022
2209 W. Bayshore Dr.                                                   25037-1
Palacios, TX 77465-1455
marumberto@aol.com

Re:   Lawsuit
      Mario Scorza

| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 03/01/22 | ADC | Receipt of signed Powers of Attorney for U.S. Patent Application Nos. 62710055 and 62601218 from client; finalize and file same with the USPTO; report same to client; archive client file with same | 0.3 | $49.50 |
| 03/03/22 | ADC | Receipt and review of correspondence received from patentability search firm; forward invoice to accounting for processing; archive client file with same | 0.2 | $33.00 |
| 03/03/22 | VP | Prepare files and send to expert witness | 0.2 | $20.00 |
| 03/04/22 | WCY | Reviewing expert report requirements; communicating with patentability expert witness as to report content | 0.3 | $127.50 |
| 03/07/22 | WCY | Receiving POAs, accessing provisionals and forwarding to SM (patentability expert witness) | 0.3 | $127.50 |

**Exhibit 3**

App. 106

Matter No. 25037-1
Mario Scorza
Lawsuit

March 31, 2022
Page 2

| 03/08/22 | WCY | Reviewing expert report; providing comments and questions | 4.0 | $1,700.00 |
|---|---|---|---|---|
| 03/09/22 | WCY | Contacting Damages Expert, Dr. Lehrer; providing background and documents | 1.1 | $467.50 |
| 03/09/22 | SB | Telephone conference with K. Lehrer regarding Expert Report; correspondence regarding same. | 0.7 | $297.50 |
| 03/11/22 | WCY | Researching opposing counsel supplied documents to provide for patentability search expert, SM, and corresponding documents to damages expert, K. Lehrer | 1.2 | $510.00 |
| 03/11/22 | SB | Conference with K. Lehrer regarding Expert Report. | 0.6 | $255.00 |
| 03/13/22 | WCY | Researching scales manufacturers and market figures; call with damages expert KL | 0.4 | $170.00 |
| 03/14/22 | WCY | Reviewing patent expert report for completeness, inclusion and content; corresponding with patentability expert SM | 0.3 | $127.50 |
| 03/14/22 | WCY | Reviewing expert damages report, communicating comments, providing supporting information | 0.3 | $127.50 |
| 03/14/22 | VP | Research on portable scale market; ███████████████ | 1.0 | $100.00 |
| 03/15/22 | VP | ██████████████████ ████████████████ ████, preparation of exhibits and finalize ████ send out report to arbitrator | 2.1 | $210.00 |

**Exhibit 3**

App. 107

Matter No. 25037-1                                       March 31, 2022
Mario Scorza                                                   Page 3
Lawsuit

| 03/15/22 | WCY | Analyzing expert report; designating exhibits; providing comments | 1.0 | $425.00 |
| 03/15/22 | SB | Review McBride Patent Expert Report; correspondence regarding same; finalize and file Expert Reports | 0.7 | $297.50 |
| 03/23/22 | MC | Received retainer correspondence from Lehrer Financial, saved to client file and emailed attorney Barnes | 0.1 | $14.00 |

|  | Hours: | 14.8 |  |
|  | Total fees: |  | $5,059.00 |

Attorney Summary

| WCY | William Yarbrough | 8.9 hours at $425.00 per hour |
| SB | Stacey L Barnes | 2.0 hours at $425.00 per hour |
| ADC | Andrea Cavazos | 0.5 hours at $165.00 per hour |
| MC | Marisol Contreras | 0.1 hours at $140.00 per hour |
| VP | Vikesh Patel | 3.3 hours at $100.00 per hour |

**Expenses:**

| 03/03/22 | ADC | Techson IP, LLC Invoice No. 2386 | $900.00 |
|  |  | Total expenses: | $900.00 |

**Payments & Adjustments:**

| 04/07/22 | Check 1082 |  | $2,459.50 CR |
|  | Total payments & adjustments: |  | $2,459.50 CR |

**Exhibit 3**

App. 108

Matter No. 25037-1
Mario Scorza
Lawsuit

March 31, 2022
Page 4

**Billing Summary**

| | |
|---|---|
| Previous balance | $11,487.00 |
| Payments & adjustments | 2,459.50 CR |
| Current fees & expenses | 5,959.00 |

| | |
|---|---|
| **Total now due** | **$14,986.50** |

**Aged Balance**

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $7,518.50 | $0.00 | $4,215.00 | $2,353.00 | $14,086.50 |
| Expenses | $900.00 | $0.00 | $0.00 | $0.00 | $900.00 |
| Total | $8,418.50 | $0.00 | $4,215.00 | $2,353.00 | $14,986.50 |

**Charges To Date**

| | |
|---|---|
| Fees | $19,636.00 |
| Expenses | 4,265.00 |
| Total | $23,901.00 |
| Payments | $8,914.50 CR |

**Exhibit 3**

App. 109

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

www.KMD.law   Denver   Fort Worth   Houston   San Antonio   Wyoming

55 Waugh, Suite 150, Houston, TX 77007-6033
Phone: (713) 936-9620  Fax: (713) 936-9621
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Checks preferred, scanned to admin@kmd.law
Zelle: Inception Law at 7139369620 or admin@kmd.law

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

April 30, 2022
25037-1

Re:   Lawsuit
      Mario Scorza

| Fees: | | | | Hours | Amount |
|---|---|---|---|---|---|
| 04/01/22 | ADC | Receipt and review of letter received from Dr. Kenneth Eugene Lehrer regarding retainer invoice; forward same to accounting for processing; archive client file with same | | 0.1 | $16.50 |
| 04/15/22 | WCY | Confirming revised date and expert depositions date | | 0.2 | $85.00 |
| 04/20/22 | VP | Research into various valuation methods of patent for damages; identifying market comparable for valuation and projecting possible earnings | | 2.1 | $210.00 |
| 04/22/22 | WCY | Call with damages expert discussing scale manufactures and valuation | | 0.4 | $170.00 |
| 04/22/22 | WCY | Reviewing weight scale report | | 0.2 | $85.00 |
| 04/23/22 | WCY | Reviewing industry report in terms of revenue, market share, potential growth and historical revenues | | 0.6 | $255.00 |

**Exhibit 3**

App. 110

Matter No. 25037-1                                          April 30, 2022
Mario Scorza                                                       Page 2
Lawsuit

| 04/25/22 | WCY | Call with Ken Lehrer discussing valuation | 0.5 | $212.50 |
|---|---|---|---|---|
| | | Hours: | 4.1 | |
| | | Total fees: | | $1,034.00 |

**Attorney Summary**

| WCY | William Yarbrough | 1.9 hours at $425.00 per hour |
|---|---|---|
| ADC | Andrea Cavazos | 0.1 hours at $165.00 per hour |
| VP | Vikesh Patel | 2.1 hours at $100.00 per hour |

**Expenses:**

| 04/01/22 | ADC | Dr. Kenneth Eugene Lehrer - Lehrer Financial and Economic Advisory Services - Retainer Invoice | $5,000.00 |
|---|---|---|---|
| 04/13/22 | ADC | J. Scott McBride Invoice No. KMD04052022 | $1,560.00 |
| | | Total expenses: | $6,560.00 |

**Payments & Adjustments:**

| 05/05/22 | Wire Confirmation #: 3723062108 | $5,000.00 CR |
|---|---|---|
| | Total payments & adjustments: | $5,000.00 CR |

**Billing Summary**

| Previous balance | $14,986.50 |
|---|---|
| Payments & adjustments | 5,000.00 CR |
| Current fees & expenses | 7,594.00 |
| **Total now due** | **$17,580.50** |

Exhibit 3

App. 111

Matter No. 25037-1                                          April 30, 2022
Mario Scorza                                                     Page 3
Lawsuit

**Aged Balance**

|  | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $6,093.00 | $2,459.50 | $1,568.00 | $0.00 | $10,120.50 |
| Expenses | $7,460.00 | $0.00 | $0.00 | $0.00 | $7,460.00 |
| Total | $13,553.00 | $2,459.50 | $1,568.00 | $0.00 | $17,580.50 |

**Charges To Date**

| | |
|---|---|
| Fees | $20,670.00 |
| Expenses | 10,825.00 |
| Total | $31,495.00 |
| Payments | $13,914.50 CR |

Exhibit 3

App. 112

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

www.KMD.law   Denver   Fort Worth   Houston   San Antonio   Wyoming

55 Waugh, Suite 150, Houston, TX 77007-6033
Phone: (713) 936-9620  Fax: (713) 936-9621
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw
ACH/Wire $USD to Inception Law: Acct 586016183532; Routing 113000023; Wire 026009593; SWIFT BOFAUS3N

Checks preferred, scanned to admin@kmd.law
Zelle: Inception Law at 7139369620 or admin@kmd.law

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

May 31, 2022
25037-1

Re:   Lawsuit
      Mario Scorza

| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 04/18/22 | SB | Conferences regarding mediation, damages, damage expert report; correspondence regarding same | 0.4 | $170.00 |
| 04/20/22 | SB | Telephone conference regarding valuation methods | 0.3 | $127.50 |
| 04/23/22 | SB | Correspondence and review of Industry Report for valuation issues | 0.4 | $170.00 |
| 04/25/22 | SB | Telephone conference regarding Expert valuation of damages | 0.5 | $212.50 |
| 05/10/22 | WCY | Call with damages expert discussing damages determination model, timeline to construct and proposed content; discussed upcoming hearing and potential for abatement | 1.0 | $425.00 |
| 05/10/22 | SB | Extended conference with damages expert witness and counsel regarding damages model and case preparation | 1.8 | $765.00 |

**Exhibit 3**

App. 113

Matter No. 25037-1                                              May 31, 2022
Mario Scorza                                                       Page 2
Lawsuit

| 05/12/22 | VP | Letter of deficiency; review opposing counsel's answers to discovery questions | 1.4 | $175.00 |
|---|---|---|---|---|
| 05/12/22 | SB | Revise correspondence regarding discovery deficiencies | 0.7 | $297.50 |
| 05/16/22 | VP | Corporate representative subpoena | 0.4 | $50.00 |
| 05/16/22 | WCY | Reviewing Respondent's Hearing Brief for content and arguments | 0.4 | $170.00 |
| 05/16/22 | SB | Correspondence regarding corporate representative deposition and designation; conference regarding subpoena request; file Request for Extension of Time for Pre-Hearing Brief | 1.4 | $595.00 |
| 05/17/22 | VP | Revise deficiency letter and send | 0.1 | $12.50 |
| 05/17/22 | WCY | Call with client; reviewing additional FTC case from 2008 for fine reduction in addition to the 2006 case and several resolved and co-pending cases | 0.3 | $127.50 |
| 05/17/22 | SB | Finalize and forward correspondence regarding discovery deficiencies | 0.2 | $85.00 |
| 05/18/22 | VP | FTC case summary write up; research into unenforceability of no liability clauses | 1.7 | $212.50 |
| 05/18/22 | SB | Prepare and file Response to Opposition to Extension of Time; research rules and case law regarding same | 2.4 | $1,020.00 |
| 05/19/22 | VP | Research of the elements for the | 1.2 | $150.00 |

**Exhibit 3**

App. 114

Matter No. 25037-1                                              May 31, 2022
Mario Scorza                                                       Page 3
Lawsuit

|          |     | causes of actions for brief                                                                                                       |     |            |
|----------|-----|-----------------------------------------------------------------------------------------------------------------------------------|-----|------------|
| 05/20/22 | WCY | Constructing Hearing Brief; editing content; confirming and delineating timeline; reviewing interrogatories and production for email and phone record content | 5.0 | $2,125.00  |
| 05/20/22 | SB  | Prepare and file Witness List Designation; outline Pre-Hearing Brief                                                              | 1.7 | $722.50    |
| 05/21/22 | WCY | Constructing Hearing Brief; researching legal arguments; combining and correlating facts with elements of legal causes of action  | 4.9 | $2,082.50  |
| 05/21/22 | SB  | Prepare Claimant's Pre-Hearing Brief; review factual background materials; conference regarding same                              | 2.2 | $935.00    |
| 05/22/22 | WCY | Final review of Hearing Brief                                                                                                     | 0.3 | $127.50    |
| 05/22/22 | WCY | Finally reviewing Pre-Hearing Brief Review with additional arguments and content                                                  | 0.7 | $297.50    |
| 05/23/22 | VP  | Upload and save files from arbitrator to client folder; revise and edit pre-brief - prepare exhibits and citations                | 2.8 | $350.00    |
| 05/23/22 | SB  | Prepare, revise, and file Claimant's Pre-Hearing Brief; legal research regarding exculpatory clause and enforceability issues     | 4.4 | $1,870.00  |
| 05/24/22 | VP  | Review client documents and opposing counsel submission of                                                                        | 2.0 | $250.00    |

**Exhibit 3**

App. 115

Matter No. 25037-1                                     May 31, 2022
Mario Scorza                                              Page 4
Lawsuit

|            |     | evidence; preparation of exhibit list; prepare and label exhibits; send exhibit list to arbitrator; upload and send exhibits to opposing counsel; download and save opposing counsel exhibits | | |
|------------|-----|------------------------------------------------------------------------------|------|-----------|
| 05/24/22   | WCY | Final Pre-Brief Hearing review                                               | 0.9  | $382.50   |
| 05/24/22   | SB  | Prepare and revise Exhibit List; review documents and conference regarding same | 2.7  | $1,147.50 |

|  | Hours: | 42.2 | |
|--|--------|------|--|
|  | Total fees: | | $15,055.00 |

Attorney Summary

| SB  | Stacey L Barnes      | 19.1 hours at $425.00 per hour |
|-----|----------------------|--------------------------------|
| WCY | William Yarbrough    | 13.5 hours at $425.00 per hour |
| VP  | Vikesh Patel         | 9.6 hours at $125.00 per hour  |

**Retainer:**

| 06/01/22 | Check 1090 | $32,086.00 |
|----------|------------|------------|
|          | Retainer received: | $32,086.00 |

**Billing Summary**

| Previous balance        | $17,580.50    |
|-------------------------|---------------|
| Payments & adjustments  | 0.00          |
| Current fees & expenses | 15,055.00     |
| Retainer applied        | 17,580.50 CR  |
| **Total now due**       | **$15,055.00** |
| Retainer balance        | $14,505.50    |

**Exhibit 3**

App. 116

Matter No. 25037-1
Mario Scorza
Lawsuit

May 31, 2022
Page 5

**Aged Balance**

|  | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $15,055.00 | $0.00 | $0.00 | $0.00 | $15,055.00 |
| Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | $15,055.00 | $0.00 | $0.00 | $0.00 | $15,055.00 |

**Charges To Date**

| Fees | $35,725.00 |
|---|---|
| Expenses | 10,825.00 |
| Total | $46,550.00 |
| Payments | $31,495.00 CR |

**Exhibit 3**

App. 117

# KEARNEY MCWILLIAMS & DAVIS
## ATTORNEYS AT LAW

www.KMD.law   Denver   Fort Worth   Houston   San Antonio   Sheridan
Phone: (713) 936-9620     Fax: (713) 936-9621     Mail to: 55 Waugh, Suite 150, Houston, TX 77007-6033

Domestic ACH: Acct 586016183532; ABA Routing 113000023                    Checks preferred, scanned to admin@kmd.law
Intl. Wire in $USD to Inception Law: Wire 026009593; SWIFT BOFAUS3N;     Zelle: Inception Law at 7139369620 or admin@kmd.law
Bank of America, 222 Broadway, NYC, NY 10038                             Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

Mario Scorza                                              June 30, 2022
2209 W. Bayshore Dr.                                         25037-1
Palacios, TX 77465-1455
marumberto@aol.com

Re:  Lawsuit
     Mario Scorza


| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 06/03/22 | SB | Multiple correspondence regarding res-setting date. | 0.3 | $127.50 |
| 06/17/22 | WCY | Reviewing hearing date setting and acceptance of hybrid format for Nov. 3 and 4 9:30A | 0.3 | $127.50 |
| | | Hours: | 0.6 | |
| | | Total fees: | | $255.00 |

Attorney Summary

| SB | Stacey L Barnes | 0.3 hours at $425.00 per hour |
|---|---|---|
| WCY | William Yarbrough | 0.3 hours at $425.00 per hour |

---

**Billing Summary**

| Previous balance | $15,055.00 |
|---|---|
| Payments & adjustments | 0.00 |
| Current fees & expenses | 255.00 |
| Retainer applied | 14,505.50 CR |
| **Total now due** | **$804.50** |
| Retainer balance | $0.00 |

Exhibit 3

App. 118

Matter No. 25037-1                                        June 30, 2022
Mario Scorza                                                      Page 2
Lawsuit

**Aged Balance**

|         | Current  | 31-60    | 61-90  | Over 90 | Total    |
|---------|----------|----------|--------|---------|----------|
| Fees    | $255.00  | $549.50  | $0.00  | $0.00   | $804.50  |
| Expenses| $0.00    | $0.00    | $0.00  | $0.00   | $0.00    |
| Total   | $255.00  | $549.50  | $0.00  | $0.00   | $804.50  |

**Charges To Date**

| Fees     | $35,980.00    |
|----------|---------------|
| Expenses | 10,825.00     |
| Total    | $46,805.00    |
| Payments | $46,000.50 CR |

Checks preferred, scanned to admin@kmd.law
Mail to: 55 Waugh, Suite 150, Houston, TX 77007-6033
Domestic ACH: Acct 586016183532; ABA Routing 113000023
Intl. Wire in $USD to Inception Law: Wire 026009593; SWIFT BOFAUS3N; Bank of
America, 222 Broadway, NYC, NY 10038
Zelle: Inception Law at 7139369620 or admin@kmd.law
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

**Exhibit 3**

# KEARNEY McWILLIAMS & DAVIS
## ATTORNEYS AT LAW

www.KMD.law    Denver    Fort Worth    Houston    San Antonio    Sheridan
Phone: (713) 936-9620    Fax: (713) 936-9621    Mail to: 55 Waugh, Suite 150, Houston, TX 77007-6033

Domestic ACH: Acct 586016183532; ABA Routing 113000023          Checks preferred, scanned to admin@kmd.law
Intl. Wire in $USD to Inception Law: Wire 026009593; SWIFT BOFAUS3N;    Zelle: Inception Law at 7139369620 or admin@kmd.law
Bank of America, 222 Broadway, NYC, NY 10038          Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

Mario Scorza                                          July 31, 2022
2209 W. Bayshore Dr.                                  25037-1
Palacios, TX 77465-1455
marumberto@aol.com

Re:   Lawsuit
      Mario Scorza

**Fees:**

| | | | Hours | Amount |
|---|---|---|---|---|
| 07/11/22 | ADC | Receipt and review of AAA correspondence regarding Claimant's Deposit covering Neutral's Compensation; forward invoice to accounting for processing; archive client file with same | 0.3 | $49.50 |
| 07/28/22 | WCY | Accessing payment history; communicating with AAA; confirming payment | 0.2 | $85.00 |
| | | Hours: | 0.5 | |
| | | Total fees: | | $134.50 |

Attorney Summary

| | | |
|---|---|---|
| WCY | William Yarbrough | 0.2 hours at $425.00 per hour |
| ADC | Andrea Cavazos | 0.3 hours at $165.00 per hour |

**Expenses:**

| | | | |
|---|---|---|---|
| 07/11/22 | ADC | AAA (Claimant's Deposit for Neutral's Compensation) | $9,600.00 |
| 07/31/22 | ADC | AAA Final Fee (Bill Line #13258788) | $1,375.00 |

**Exhibit 3**

App. 120

Matter No. 25037-1                                          July 31, 2022
Mario Scorza                                                      Page 2
Lawsuit

                        Total expenses:                    $10,975.00

**Billing Summary**

Previous balance                        $804.50
Payments & adjustments                      0.00
Current fees & expenses                11,109.50

**Total now due**                      **$11,914.00**

**Aged Balance**

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $389.50 | $0.00 | $549.50 | $0.00 | $939.00 |
| Expenses | $10,975.00 | $0.00 | $0.00 | $0.00 | $10,975.00 |
| Total | $11,364.50 | $0.00 | $549.50 | $0.00 | $11,914.00 |

**Charges To Date**

Fees                        $36,114.50
Expenses                     21,800.00
Total                       $57,914.50
Payments                    $46,000.50 CR

Checks preferred, scanned to admin@kmd.law
Mail to: 55 Waugh, Suite 150, Houston, TX 77007-6033
Domestic ACH: Acct 586016183532; ABA Routing 113000023
Intl. Wire in $USD to Inception Law: Wire 026009593; SWIFT BOFAUS3N; Bank of
America, 222 Broadway, NYC, NY 10038
Zelle: Inception Law at 7139369620 or admin@kmd.law
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

**Exhibit 3**

App. 121

# KEARNEY MCWILLIAMS & DAVIS
## ATTORNEYS AT LAW

www.KMD.law   Denver   Fort Worth   Houston   San Antonio   Sheridan
Phone: (713) 936-9620      Fax: (713) 936-9621      Mail to: 55 Waugh, Suite 150, Houston, TX 77007-6033

Domestic ACH: Acct 586016183532; ABA Routing 113000023                    Checks preferred, scanned to admin@kmd.law
Intl. Wire in $USD to Inception Law: Wire 026009593; SWIFT BOFAUS3N;      Zelle: Inception Law at 7139369620 or admin@kmd.law
Bank of America, 222 Broadway, NYC, NY 10038                             Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

Mario Scorza                                                  August 31, 2022
2209 W. Bayshore Dr.                                               25037-1
Palacios, TX 77465-1455
marumberto@aol.com

Re:   Lawsuit
      Mario Scorza

---

## Billing Summary

| | |
|---|---|
| Previous balance | $11,914.00 |
| Payments & adjustments | 0.00 |
| Current fees & expenses | 0.00 |
| **Total now due** | **$11,914.00** |

## Aged Balance

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $0.00 | $134.50 | $255.00 | $549.50 | $939.00 |
| Expenses | $0.00 | $10,975.00 | $0.00 | $0.00 | $10,975.00 |
| Total | $0.00 | $11,109.50 | $255.00 | $549.50 | $11,914.00 |

## Charges To Date

| | |
|---|---|
| Fees | $36,114.50 |
| Expenses | 21,800.00 |
| Total | $57,914.50 |
| Payments | $46,000.50 CR |

Checks preferred, scanned to admin@kmd.law
Mail to: 55 Waugh, Suite 150, Houston, TX 77007-6033
Domestic ACH: Acct 586016183532; ABA Routing 113000023
Intl. Wire in $USD to Inception Law: Wire 026009593; SWIFT BOFAUS3N; Bank of
America, 222 Broadway, NYC, NY 10038
Zelle: Inception Law at 7139369620 or admin@kmd.law
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

**Exhibit 3**

App. 122

# KEARNEY MCWILLIAMS & DAVIS
## ATTORNEYS AT LAW

www.KMD.law   Denver   Fort Worth   Houston   San Antonio   Sheridan
Phone: (713) 936-9620   Fax: (713) 936-9621   Mail to: 55 Waugh, Suite 150, Houston, TX 77007-6033

Domestic ACH: Acct 586016183532; ABA Routing 113000023          Checks preferred, scanned to admin@kmd.law
Intl. Wire in $USD to Inception Law: Wire 026009593; SWIFT BOFAUS3N;   Zelle: Inception Law at 7139369620 or admin@kmd.law
Bank of America, 222 Broadway, NYC, NY 10038          Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

Mario Scorza                                         September 30, 2022
2209 W. Bayshore Dr.                                          25037-1
Palacios, TX 77465-1455
marumberto@aol.com

Re:   Lawsuit
      Mario Scorza

## Payments & Adjustments:

| | | |
|---|---|---|
| 10/19/22 | 1ST NATL BANK DES:PAYMENT ID: INDN:INCEPTION LAW CO ID:1741296016 PPD PMT INFO:FROM: FIRST NATIONAL BANK MARIO UMBERTO SCORZA | $12,500.00 CR |
| 10/21/22 | Check 1042 | $11,000.00 CR |
| | Total payments & adjustments: | $23,500.00 CR |

## Billing Summary

| | | |
|---|---|---|
| Previous balance | $11,914.00 | |
| Payments & adjustments | 23,500.00 CR | |
| Current fees & expenses | 0.00 | |
| **Credit balance** | **$11,586.00 CR** | |

## Charges To Date

| | |
|---|---|
| Fees | $36,114.50 |
| Expenses | 21,800.00 |
| Total | $57,914.50 |
| Payments | $69,500.50 CR |

Checks preferred, scanned to admin@kmd.law

## Exhibit 3

App. 123

Matter No. 25037-1                                    September 30, 2022
Mario Scorza                                                      Page 2
Lawsuit


Mail to: 55 Waugh, Suite 150, Houston, TX 77007-6033
Domestic ACH: Acct 586016183532; ABA Routing 113000023
Intl. Wire in $USD to Inception Law: Wire 026009593; SWIFT BOFAUS3N; Bank of
America, 222 Broadway, NYC, NY 10038
Zelle: Inception Law at 7139369620 or admin@kmd.law
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

Exhibit 3

App. 124

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

Denver   Fort Worth   Houston   San Antonio   Sheridan
Ph: (713) 936-9620   www.KMD.law   Fax: (713) 936-9621

Checks preferred, scanned to admin@kmd.law or text/fax (713) 936-9622
Mail: 55 Waugh, Suite 150, Houston, TX 77007-6033
Zelle: Inception Law at payments@kmd.law
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

Wire/ACH to "Inception Law" in USD$
Acct 586016183532; Routing 113000023; Wire 026009593
SWIFT BOFAUS3N, Bank of America, 222 Broadway, NYC, NY 10038

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

October 31, 2022
25037-1

Re:   Lawsuit
      Mario Scorza

| Fees: | | | Hours | Amount |
|-------|---|---|-------|--------|
| 10/03/22 | VNP | Meeting with expert witness and client to discuss case and obtain information for report | 1.2 | $150.00 |
| 10/07/22 | VNP | Review client provided information regarding ██████████ ████████████████; Email client for more information | 0.3 | $37.50 |
| 10/09/22 | VNP | Call with expert witness regarding details of report; Send over client files to expert witness | 0.4 | $50.00 |
| 10/10/22 | WCY | Verifying diagrams; reviewing for manufacturing specs; reviewing client information in terms of CAD drawings, descriptive elements and capacities | 0.7 | $297.50 |
| 10/10/22 | VNP | Call with attorney to strategize damages model pricing | 0.3 | $37.50 |
| 10/14/22 | VNP | Scan and upload documents from client into client file; Review files | 0.6 | $75.00 |
| 10/16/22 | VNP | Conduct market research on scale | 1.8 | $225.00 |

**Exhibit 3**

App. 125

Matter No. 25037-1                                    October 31, 2022
Mario Scorza                                                   Page 2
Lawsuit

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  | pricing and damages; Provide to supervising attorney for review |  |  |
| 10/17/22 | VNP | | Meeting with supervising attorney about strategy and next steps with client, damages expert, and opposing party | 0.5 | $62.50 |
| 10/18/22 | WCY | | Communicating with OC; responding to OC; acknowledging extension | 0.5 | $212.50 |
| 10/18/22 | VNP | | Meeting with supervising attorney regarding strategy and next steps to reschedule arbitration; Communicate with damages expert change of arbitration date and provide research on market | 0.7 | $87.50 |
| 10/27/22 | VNP | | Reach out to opposing counsel to reschedule arbitration hearing date; Respond to opposing counsel's communication about meditation dates and suggested mediators; Confer with supervising attorney on mediator selection; Research suggested mediators | 0.5 | $62.50 |
| 10/27/22 | WCY | | Receiving new arbitration dates; reviewing mediators and mediation dates | 0.6 | $255.00 |

|  |  |  |
|---|---|---|
| Hours: | 8.1 |  |
| Total fees: |  | $1,552.50 |

Attorney Summary

| WCY | William Yarbrough | 1.8 hours at $425.00 per hour |
|---|---|---|
| VNP | Vikesh Patel | 6.3 hours at $125.00 per hour |

**Exhibit 3**

App. 126

Matter No. 25037-1                                       October 31, 2022
Mario Scorza                                                      Page 3
Lawsuit

**Expenses:**

| 10/24/22 | VNP | Expert witness report, first half of fee | $6,200.00 |
|---|---|---|---|
| | | Total expenses: | $6,200.00 |

**Billing Summary**

| Previous balance | $11,586.00 CR |
|---|---|
| Payments & adjustments | 0.00 |
| Current fees & expenses | 7,752.50 |
| **Credit balance** | **$3,833.50 CR** |

**Charges To Date**

| Fees | $37,667.00 |
|---|---|
| Expenses | 28,000.00 |
| Total | $65,667.00 |
| Payments | $69,500.50 CR |

**Exhibit 3**

App. 127

# KEARNEY MCWILLIAMS & DAVIS

## ATTORNEYS AT LAW

Denver   Fort Worth   Houston   San Antonio   Sheridan
Ph: (713) 936-9620   www.KMD.law   Fax: (713) 936-9621

Checks preferred, scanned to admin@kmd.law or text/fax (713) 936-9622
Mail: 55 Waugh, Suite 150, Houston, TX 77007-6033
Zelle: Inception Law at payments@kmd.law
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

Wire/ACH to "Inception Law" in USD$
Acct 586016183532; Routing 113000023; Wire 026009593
SWIFT BOFAUS3N, Bank of America, 222 Broadway, NYC, NY 10038

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

November 30, 2022
25037-1

Re:   Lawsuit
Mario Scorza

| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 10/16/22 | SLB | Multiple correspondence regarding economic damages expert | 0.7 | $297.50 |
| 10/18/22 | SLB | Multiple correspondence regarding continuance, mediation, and settlement issues | 0.4 | $170.00 |
| 11/01/22 | VNP | Call with expert witness to discuss expert report; Update on current report; Discuss intricacy of Daubert | 0.4 | $86.00 |
| 11/01/22 | WCY | Coordinating mediation and arbitration dates and availabilities | 0.6 | $255.00 |
| 11/01/22 | SLB | Telephone conference with economic Expert regarding report and Daubert concerns; correspondence regarding same. | 0.5 | $212.50 |
| 11/10/22 | SLB | Telephone conference with opposing counsel regarding Mediation. | 0.4 | $170.00 |
| 11/11/22 | SLB | Correspondence to arbitrator | 0.3 | $127.50 |

**Exhibit 3**

App. 128

Matter No. 25037-1                                          November 30, 2022
Mario Scorza                                                          Page 2
Lawsuit

| | | | | |
|---|---|---|---|---|
| | | regarding scheduling and Hearing on the Merits | | |
| 11/13/22 | VNP | Review correspondence from expert witness; Research on methods to evaluate a company with no company comparable - Net Asset Methods, Berkus Method, Comparable industries, Amazon sales model; Search Harvard Business School and Kellogg case studies; Phone call with expert witness to discuss evaluating methods | 1.7 | $365.50 |
| 11/13/22 | SLB | Multiple correspondence regarding evaluation and damages models; telephone conference regarding same and evaluation methods. | 1.6 | $680.00 |
| 11/21/22 | WCY | Reviewing report layout from KL | 2.1 | $892.50 |
| 11/23/22 | VNP | Coordinate mediation scheduling; Set the arbitration hearing date; Inform client, expert witness, and opposing counsel of dates; Read and review expert witness report | 2.4 | $516.00 |
| 11/23/22 | SLB | Telephone conference and correspondence regarding Hearing on the Merits scheduling and mediation. | 0.4 | $170.00 |
| 11/30/22 | WCY | Reviewing and communicating with expert; responding to KL | 0.5 | $212.50 |
| | | Hours: | 12.0 | |
| | | Total fees: | | $4,155.00 |

Attorney Summary

**Exhibit 3**

App. 129

Matter No. 25037-1                                November 30, 2022
Mario Scorza                                                  Page 3
Lawsuit

| SLB | Stacey L Barnes | 4.3 hours at $425.00 per hour |
| WCY | William Yarbrough | 3.2 hours at $425.00 per hour |
| VNP | Vikesh Patel | 4.5 hours at $215.00 per hour |

## Billing Summary

| | |
|---|---|
| Previous balance | $3,833.50 CR |
| Payments & adjustments | 0.00 |
| Current fees & expenses | 4,155.00 |
| **Total now due** | **$321.50** |

## Aged Balance

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $321.50 | $0.00 | $0.00 | $0.00 | $321.50 |
| Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | $321.50 | $0.00 | $0.00 | $0.00 | $321.50 |

## Charges To Date

| | |
|---|---|
| Fees | $41,822.00 |
| Expenses | 28,000.00 |
| Total | $69,822.00 |
| Payments | $69,500.50 CR |

Exhibit 3

App. 130

# KEARNEY MCWILLIAMS & DAVIS
## ATTORNEYS AT LAW

Denver   Fort Worth   Houston   San Antonio   Sheridan
Ph: (713) 936-9620   www.KMD.law   Fax: (713) 936-9621

Checks preferred, scanned to admin@kmd.law or text/fax (713) 936-9622
Mail: 55 Waugh, Suite 150, Houston, TX 77007-6033
Zelle: Inception Law at payments@kmd.law
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

Wire/ACH to "Inception Law" in USD$
Acct 586016183532; Routing 113000023; Wire 026009593
SWIFT BOFAUS3N, Bank of America, 222 Broadway, NYC, NY 10038

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

December 31, 2022
25037-1

Re:   Lawsuit
      Mario Scorza

| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 12/07/22 | WCY | Meeting with damages expert to discuss damages model, amounts in question, derivation of 'Monte Carlo' model 3 damages amounts based on variations in percent of market share; communicating with SB and VP to ████████████ ████████████████████ ████████████████████ ████████████████ ██████████████ | 2.5 | $1,062.50 |
| 12/07/22 | VNP | Prepare for meeting with expert witness; Meet with expert witness and discuss report; Strategize with team for mediation | 2.0 | $430.00 |
| 12/07/22 | SLB | Meeting with Dr. K. Lehrer; extended conferences regarding models, international trade attorney consultation, and mediation issues | 1.8 | $765.00 |
| 12/11/22 | WCY | Reviewing 'Monte Carlo' methodology, figures and Amazon | 0.3 | $127.50 |

**Exhibit 3**

App. 131

Matter No. 25037-1                                    December 31, 2022
Mario Scorza                                                      Page 2
Lawsuit

|         |     | pricing; conferring with co-counsel |     |          |
|---------|-----|-------------------------------------|-----|----------|
| 12/13/22 | VNP | Meeting with expert witness; Calculation and review of numbers; Prepare mediation payment and forms | 3.8 | $817.00 |
| 12/13/22 | WCY | Generating numbers and corresponding model for settlement | 1.0 | $425.00 |
| 12/16/22 | WCY | Final review of damages expert report | 0.5 | $212.50 |
| 12/17/22 | WCY | Reviewing economic analysis for accuracy, consistency and content | 2.5 | $1,062.50 |
| 12/17/22 | VNP | Review expert report; Prepare documents to send to mediator and opposing counsel | 1.4 | $301.00 |
| 12/17/22 | SLB | Correspondence to Mediator regarding case and mediation; select and forward materials for same. | 0.5 | $212.50 |
| 12/17/22 | SLB | Review draft Expert Report; multiple correspondence and telephone conferences regarding same; serve and file same | 1.7 | $722.50 |
| 12/19/22 | SLB | Multiple correspondence and telephone conferences regarding Expert Witness, Lehrer, preparation for Mediation, and Mediation Memorandum; outline and revise same. | 1.8 | $765.00 |
| 12/19/22 | VNP | Contact mediator and supply payment and gather details for mediations; Prepare mediation | 1.0 | $215.00 |

**Exhibit 3**

App. 132

Matter No. 25037-1                                      December 31, 2022
Mario Scorza                                                      Page 3
Lawsuit

|         |     |                                                                                                                   |     |            |
|---------|-----|-------------------------------------------------------------------------------------------------------------------|-----|------------|
|         |     | memo                                                                                                              |     |            |
| 12/20/22 | WCY | Meeting with client; reviewing hearing brief                                                                     | 2.8 | $1,190.00  |
| 12/20/22 | VNP | [NO CHARGE 1.7] Premediation conference; Prepare and print material for mediation; Review case files for mediation | 0.0 | No charge  |
| 12/20/22 | SLB | Prepare for Mediation; meeting with client regarding same.                                                        | 3.2 | $1,360.00  |
| 12/21/22 | WCY | Reviewing fees paid, 4 contracts, Davison's Disclosure, Davison mandated disclosure, OC Prehearing brief, Our Prehearing brief, FTC judgment and related materials | 2.5 | $1,062.50  |
| 12/21/22 | WCY | Mediation                                                                                                         | 7.5 | $3,187.50  |
| 12/21/22 | VNP | Full day mediation [8am-5pm]; Transport Client to mediation; Conduct research and assist with legal analysis during mediation | 7.0 | $1,505.00  |
| 12/21/22 | SVF | Prepare mediation notebook                                                                                        | 2.8 | $448.00    |
| 12/21/22 | SLB | Prepare for and attend Mediation.                                                                                 | 7.8 | $3,315.00  |
|         |     | Hours:                                                                                                            | 54.4 |            |
|         |     | Total fees:                                                                                                       |     | $19,186.00 |

Attorney Summary

| | | |
|---|---|---|
| WCY | William Yarbrough | 19.6 hours at $425.00 per hour |
| SLB | Stacey L Barnes | 16.8 hours at $425.00 per hour |
| VNP | Vikesh Patel | 15.2 hours at $215.00 per hour |
| SVF | Shannon V Frizzell | 2.8 hours at $160.00 per hour |

**Exhibit 3**

App. 133

Matter No. 25037-1                                          December 31, 2022
Mario Scorza                                                           Page 4
Lawsuit

**Expenses:**

| 12/19/22 | SC | Mediation Invoice 20221363 | $1,800.00 |
|---|---|---|---|
| | | Total expenses: | $1,800.00 |

**Billing Summary**

| | |
|---|---|
| Previous balance | $321.50 |
| Payments & adjustments | 0.00 |
| Current fees & expenses | 20,986.00 |
| **Total now due** | **$21,307.50** |

**Aged Balance**

| | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $19,507.50 | $0.00 | $0.00 | $0.00 | $19,507.50 |
| Expenses | $1,800.00 | $0.00 | $0.00 | $0.00 | $1,800.00 |
| Total | $21,307.50 | $0.00 | $0.00 | $0.00 | $21,307.50 |

**Charges To Date**

| | |
|---|---|
| Fees | $61,008.00 |
| Expenses | 29,800.00 |
| Total | $90,808.00 |
| Payments | $69,500.50 CR |

**Exhibit 3**

App. 134

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVISON DESIGN           )
DEVELOPMENT, INC.,       )
                         )
        Plaintiff,       )
                         )  No.
      v.                 )
                         )
MARIO SCORZA,          )
                         )
        Defendant.    )

**Exhibit 4**

**March 3, 2023 Claimant's Post-Hearing Brief**

# BEFORE THE TRIBUNALS OF

# THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| MARIO SCORZA, | § | |
| *Claimant,* | § | |
| | § | |
| V. | § | NO. 01-21-0004-6369 |
| | § | |
| DAVISON DESIGN AND | § | |
| DEVELOPMENT, INC. | § | |
| *Respondent* | § | |

## CLAIMANT'S POST-HEARING BRIEF

## Table of Contents

I.  FACTS ........................................................................................................... 2

II.  CONTRACTUAL DUTY ............................................................................. 10

III.  DUTY OF CARE IN TORT ......................................................................... 11

IV.  CAUSES OF ACTION ................................................................................ 15

   A.  Breach of Contract ................................................................................. 15

   B.  Common Law Fraud ............................................................................... 15

   C.  Fraud By Concealment and Non-Disclosure/Omission ......................... 16

   D.  Negligent Misrepresentation ................................................................. 17

   E.  Fraud in the Inducement ........................................................................ 18

   F.  Common Law Negligence ...................................................................... 19

V.  PENNSYLVANIA UTPACPL ...................................................................... 20

   A.  Applicability .......................................................................................... 20

   B.  Violations ............................................................................................... 21

   C.  Strict Liability ........................................................................................ 22

   D.  Damages & Trebled Damages ............................................................... 24

VI.  CONTRACTUAL DISCLAIMERS OF LIABILITY ................................... 25

VII.  DAMAGES ................................................................................................ 28

VIII.  CONCLUSION ......................................................................................... 30

Claimant, Mario Scorza, (hereafter "Scorza") contracted with Davison Development and Design, Inc. (hereafter "Davison") for services related to invention development, wherein several sequential agreements were entered into as to facilitate Claimant's introduction into the weight scale market between January 2017 and December 2020. Parties held an Arbitration Hearing on the Merits in January and February of 2023 and submit this post-hearing brief for consideration:

## I.    FACTS

At the conclusion of three (3) days of evidentiary hearings spanning over several weeks, including testimony from Mr. Scorza's patent expert, damages expert, and himself, as well as Davison's representatives, Davison remains recalcitrant and refuses to admit that even one of its willful, wonton, or negligent actions leads to even a modicum of liability producing not even an ounce of obligation to Mr. Scorza. In fact, despite an onslaught of overwhelming evidence, Davison is confident in its deftly "contracted for" impunity and bolsters itself through its documents of adhesion, which Davison believes absolves it of all past indiscretions and future transgressions. Simply, Davison has an unfounded belief that it can contract away from absolutely every possibility wherein Davison is culpable or has any responsibility to its clients – a departure from reality from which Davison has been handsomely rewarded.  Yet, the evidence provided, in addition to the documents Davison conveniently *cannot* provide, i.e., the nondisclosure agreements, undeniably proves that Davison's "products and services" are just smoke and mirrors.

Based on the factual evidence the following is clear:

1. Davison authored, and irrefutably argues that its contracts that are iron clad and absolve Davison of all liabilities.

2. Scorza entered into the following agreements:

   a. "Pre-Development and Representation Agreement" ("Pre-Development Agreement") signed on or around January 12, 2017, for $795. Respondent

Hearing Exhibit (*hereinafter* "R") 3; Claimant Hearing Exhibit (*hereinafter* "Cl.") 48.

b. "New Product Sample Agreement" ("NPSA") signed on or around March 29, 2017, for $14,757. R. 7; Cl. 11.

c. "Multi Company Campaign Agreement" ("MCC") signed on or around December 14, 2018, for $3,995. R. 16; Cl. 49.

d. "Inventomercial Presentation Agreement" ("IPA") signed on or around December 19, 2018, for $1,495. R. 17; Cl. 44.

3. Davison had a contractual duty to Scorza to aid and instruct his inventive endeavors.

4. Davison emphasized the importance of obtaining patent rights by means of a provisional patent application in the Pre-Development Agreement and without a provisional patent application, Davison would not engage with potential target companies. R. 3.

5. Davison attempted to file the provisional applications twice, but *failed* to competently file Scorza's Provisional Patent Applications as follows:

a. First attempt was an application signed by Scorza on February 22, 2017, whereafter Scorza mailed an application to Davison for filing to the United States Patent and Trademark Office ("USPTO"); however, Davison **failed** to include the necessary parts as evidenced by the Office Action for Notice of Incomplete Provisional Application. Cl. 5 (First Provisional and Notice).

b. Second attempt was an application signed by Scorza on February 5, 2018, whereafter Scorza mailed the application to Davison for filing to the USPTO; however, Davison **failed** to include proper payment amount as evidenced by the Office Action for Notice to File Missing Parts of Provisional Application, a difference of **only** Five Dollars ($5). Cl. 6 (Second Provisional and Notice).

c. According to the USPTO Manual of Patent Examining Procedure (MPEP) § 601 (a)(4), "[T]he filing date of an application shall be the date on which a *specification*, with or without claims, is received in the United States Patent and Trademark Office." 35 U.S.C. 111 (b)). Here it is the case that Davison classifies and stores the

3

first attempt as "PATENT & FILING RECEIPT" and the second attempt as "CLIENT PATENT," but no official filing receipt was ever issued by the USPTO and a filing date was never afforded or granted to Scorza. Cl. 43, p. Davison_000073.

6. Davison's witness Frank Vescio ("Vescio") testified that Davison undertook the duty to file all provisional patent applications by submitting the application to the USPTO, along with a check for the necessary filing fee, on behalf of its clients.

7. Scorza testifies that he submitted all requested paperwork and payments to Davison and was informed by Larry Rifkin ("Rifkin") that his idea was a "Green Flag" and Mr. Rifkin commented that "there was nothing like it" and Scorza's idea was "good to go" unlike lots of other ideas which are deemed "red flags," meaning they do not go "very far." Cl. 30, p. Scorza_00061.

8. Through the testimony of patent expert Scott McBride ("Mr. McBride"), Mr. Scorza's patent rights were irreparably lost due to Davison's negligent mishandling of each patent filing and based on the actions of Davison, Davison was undoubtedly practicing patent law by mailing provisional patent applications to the USPTO with the filing fee; even if the application was incomplete, the actions by Davison to mail in the application constitutes practicing patent law. Furthermore, despite being given *actual* notice on multiple occasions by Scorza of the filing deficiencies, Davison failed to take any measures to correct the deficient and incomplete filings and protect Scorza's patent rights. Cl. 5, 6 & 12; R. 23.

9. Davison further emphasized the importance of confidentiality in the Pre-Development Agreement and other subsequent agreements, in the sense that Scorza should not communicate with any other parties regarding his invention the "Trava-Weigh." Cl. 45. Veciso Arb. Test., Feb. 1, 2023.

10. Davison held the exclusive right to communicate with target companies and divulged confidential invention information regarding the Trave-Weigh to multiple entities. Cl. 41, p. Davison_000042; R. 6; R. 23, p. Davison_000042.

11.  Davison marked the product sample renderings with the language "Patent Pending," with actual knowledge of its falsity. R. 8; Cl. 13.

12.  Davison is unable to proffer to Scorza a single Non-Disclosure Agreement ("NDA") protecting the confidentiality of Scorza's invention to even one company in which "Video Reality Product Presentations" ("VRPP") were made and "Video Ideation Sketch" ("VIS") sent to. *See* Cl. 41, Davison_000042 & Davison_000048 (companies VRPP was made to: Sonashi, Cuisinart, Globe Food Equipment Company, Sumdex, Exceptional Products, Inc., Riverstone Industries, HAD Trading Corp and Delsey Luggage, Inc; and companies VIS were sent to: Delsey Luggage, Inc., HDS Trading Corp., Riverstone Industries, Exceptional Products, Inc., and Sumdex). Davison attempts to deceive this Tribunal into believing that NDA's were sent out to the above companies. It references unsigned form NDA agreements.  **Absolutely no signed NDA's were ever offered into evidence, or even produced in response to Scorza's discovery requests. They do not exist.**  Like the patent applications, NDA's simply were not relevant to Davison's way of making money.

13.  Through the testimony of patent expert Mr. McBride, Mr. Scorza's patent rights were barred by both (1) public disclosure and (2) an offer to sell, under Section 2152 of the MPEP defining 35 USC Section 102 requirements. Further, under USPTO mandated guidelines, *reduction to practice* started the one-year clock for filing a patent application, and failure to observe this resulted in Scorza losing his patent rights.

14.  Through the testimony of damages expert, Dr. Kenneth Lehrer ("Dr. Lehrer"), the loss of the rights to the patent resulted in a loss of value to Mr. Scorza of about $3.45 million dollars over 10 years. In order to calculate the damages, Dr. Lehrer set the stage testifying that the best way to value a lost patent is through a model business enterprise producing and selling the invention.  Cl. 38, p. 4, 8-10.

It is clear from the factual evidence and testimony from Davison's own representative, Mr. Vescio that the negligence of Davison to observe its own self-directed and drafted clauses to competently and correctly file Claimant's Provisional Patent Application, on two (2) distinct

occasions; to correct Davison's negligent mishandling of patent filings; as well as disclosing confidential invention information to multiple target companies are the direct and immediate cause of Mario Scorza's economic and irreparable injury.

It is of upmost importance to make note that this is not the first time that Davison has committed this conduct. In fact, this is an established pattern, a well-oiled machine, a scam, that Davison has been maliciously practicing since 1989 and were prosecuted for by the Federal Trade Commission ("FTC") in Western District of Pennsylvania under "Project Mousetrap." The Judge issued a $26 million dollar judgment against Davison along with a finding of fact and conclusions. *See* Cl 17. Vescio during his testimony *wholeheartedly denies* all findings of fact and conclusions of law – stating that the Judge was "dead wrong" – and that none of the following actions, during his twenty plus years, carried out by Davison are true:

1. Reasonably Good Chance of Financial Gain - Based on the overall, common sense, net impression on a reasonable consumer, Davison falsely represent, both directly and by implication, that consumers who buy their services stand a reasonably good chance of realizing financial gain by: (a) representing that they are selective as to whom they offer services based on the quality, value, and/or originality of a consumer's idea; (b) representing that they have a genuine stake in the consumer's invention through royalties, when in fact, fees charged, and not royalties collected, are the main source of defendants' income; and (c) misrepresenting their track record.

2. Misrepresentation of Track Record - The overall, common sense, net impression on a reasonable consumer of Davison's track record overstates the reasonable possibility of financial gain.

3. Many Products are Profitable - Regardless of how Davison inflates its track record, there is no reasonable implication from Davison's overall marketing and sales materials that "many" consumers have made a profit as a result of using their services.

4. Profitability of Certain Products - While it is true that defendants never use the term "profitable" in reference to these particular products, based on the overall, common

sense, net impression, a reasonable consumer would equate such specific statements of successful sales and marketing with profit.

5. <u>Special Access to Corporations</u> - Based on the overall, common sense, net impression on a reasonable consumer Davison falsely represent that they have a vast network of corporations with whom they have ongoing, special relationships, and with whom they regularly negotiate successful licensing agreements. Pre-Complaint, Davison told consumers explicitly that they worked directly with manufacturers, had close personal contacts, and cut through the "red tape" and the "old boys' network" to obtain licenses for their clients. Although this may be technically true of a handful of smaller companies, Davison implied that they had such relationships with hundreds of *large*, nationally known companies, which they did not.

6. <u>Close Working Relationship</u> - Through the corporate montage, Davison implies relationships with companies that have not even registered with Davison as being willing to accept new product ideas from them.

7. <u>Necessity of Services</u> - Based on the overall, common sense, net impression on a reasonable consumer, Davison misrepresent that its invention marketing services are necessary for consumers to license their invention ideas to corporations. Davison explicitly states that its virtual reality/prototype product presentation portfolios will get the consumer's idea "taken seriously" and are a "necessity" when working with large corporations. Although a reasonable consumer expects a salesperson to portray his products in the best light possible and to try to convince the consumer that he is selling something that the consumer must have, Davison claims to have expertise and experience in licensing products to large corporations and uses this perceived position of superior knowledge over the consumer to convince the consumer that when a salesperson says that something is needed in order to proceed, it is.

8. <u>Executive Summary</u> - Based on the overall, common sense, net impression on a reasonable consumer Davison misrepresents that it prepares objective and expert analyses of the marketability of consumers' invention ideas.

7

Undoubtedly, the FTC ruling has not enjoined Davison's abhorrent activity but rather instructed Davison to artfully choose and finesse its words, hone its skills and more closely observe the demarcated path defined by the FTC to adhere to the strict letter of the FTC ruling, while entirely eviscerating the FTC's intent. Davison, along with the hefty fine of $26 million, was required to provide an Affirmative Disclosure Statement in a clear and conspicuous manner, but this statement does not evade the fact that Davison continues to play on the fine line drawn by the FTC. Cl. 16; Cl. 17. To date, Davison continues to create a situation of peril where Davison ultimately ends up bamboozling customers for money.

On the other hand, Dr. Lehrer provides an analysis of what Mr. Scorza's money would have gotten him if Davison adhered to its contracts, duty of care, filed the patent applications competently, instead of deceiving Mr. Scorza.

1. Dr. Lehrer refers to the enterprise model also as "The Theory of the Firm." Cl. 38, p. 8-10. "The value of the firm is the present value of the firm's expected future net cash flows," and there is no need to account for inflation, because the present value analysis was not discounted. *Id.*, p. 9. Dr. Lehrer Arb. Test., Jan. 19, 2023.

2. Dr. Lehrer unveiled that the personal scales market is a growing market in the United States and is currently valued at $670 million per year. Typical conservative market captures for new products in the consumer goods market would run in the 0.08% to 0.12% of the market. A price per unit in the $20-25 range would be appropriate for the new product, based on similar competitive products. Dr. Lehrer Arb. Test., Jan. 19, 2023.

3. Twenty-five years ago, the most appropriate business enterprise model for a patent or invention would be a firm that sold the product in a retail brick and mortar establishments. However, due to the internet retail revolution, the most typical business enterprise model today for a consumer good is to produce the good in China or a similar low-cost location and to sell them through an online retail platform, such as Amazon. Dr. Lehrer Arb. Test., Jan. 19, 2023.

4. Dr. Lehrer testified a future or hypothetical business is valued by means of a sensitivity analysis, also known as a Monte Carlo analysis - a sensitivity analysis based on a variation of a set of scenarios or the process of varying model input parameters over a reasonable range (range of uncertainty in values of the model's parameters) and observing the relative change in the model's response. Dr. Lehrer further testified that this method is often used for merger or acquisition fairness opinions when target companies feature a new product.  It is also used and found reliable in SEC filings, particularly those featuring forward looking statements; and Dr. Lehrer testified that he has previously performed Monte Carlo analyses that have been in used in merger and acquisition fairness opinions and SEC filings.

5. Dr. Lehrer consulted with Amazon Co. and a customs broker and import-export attorney to appropriately model costs and expenses for his business enterprise model. He accounted for: cost of goods sold, manufacturing fees, an Amazon 10 year Retailer Plan; Amazon's commission per unit sold; container costs for import; harbor maintenance fees; tariffs; warehouse transport costs; Customs goods examination costs; customs brokerage fees; yearly import bond; demurrage; inspection fees; insurance; and miscellaneous costs.  Applying these expenses, Dr. Lehrer found the cost of goods sold in the 15% range, and the costs and expenses in the 30-33% of revenues, resulting in profits in the 47-50% of revenue range. Dr. Lehrer Arb. Test., Jan. 19, 2023.

6. Dr. Lehrer's testimony proposed market capture numbers leads to a patent valuation of around $3.45 million dollars over 10 years based on an average of the provided scenarios:

   a. A low range capture of 0.08% of the $670 million per year market would lead to revenues of $536,000/year or around $2.5 million of lost profits in 10 years.

   b. A mid-range capture of 0.10% of the $670 million per year market would lead to revenues of $670,000/year or around $3.7 million of lost profits in 10 years.

   c. A high-range capture of 0.12% of the $670 million per year market would lead to revenues of $840,000/year or around $4.1 million of lost profits in 10 years.

9

## II.    CONTRACTUAL DUTY

Under Pennsylvania law, a party to a contract has two duties: (1) a contractual duty and (2) a legal duty to act without negligence toward both the other party to the contract and third parties. *Weiser v. Bethlehem Steel Corp.*, 508 A.2d 1241, 1245 (Pa. Super. 1986).

First and foremost, in the Pre-Development Agreement, Davison established its own contractual obligation to file a Provisional Patent Application on behalf of Mr. Scorza. (Cl. 48, Davison_000332). Having taken this obligation upon itself, Davison has the additional responsibility to competently observe and accomplish the dictates of the "essential terms", in essence to conform to meet that duty, by substantially performing the agreed-upon task. This substantial performance is defined where: [I]n Pennsylvania, the equitable doctrine of substantial performance protects "those who have faithfully and honestly endeavored to perform their contracts in all material and substantial particulars, so that their right to compensation may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects." *Mort Co. v. Paul*, 76 A.2d 445, 447 (Pa. Super. Ct. 1950). Here, it is undoubtedly the case that no filing was ever granted, no rights were preserved, and no rights are retrievable, thus Mr. Scorza is forever damaged.

According to Davison's NPSA, Davison was contractually obligated to provide, both, a final product (with packaging) and to accept "all reasonable requests" which "are consistent with the goal of solving the problem in a simple and cost-effective manner." Cl. 22, SCORZA0002-0004. Neither was accomplished. Mr. Scorza, was never provided with any sort of product sample. Mr. Scorza only received computerized renderings, contrary to Davison's contractual obligation to develop and provide a physical product sample. Scorza Arb. Test., Feb. 18, 2023.

Further, and most telling, Davison failed to produce even an iota of assistance, even after multiple documented implorations and pleas, to attempt any remediation of Mr. Scorza's increasingly dire position. Cl. 12; R. 23.  Davison's breach of its contracts, combined with a failure to remedy, has undoubtedly caused direct harm to Mr. Scorza, including, but is not limited to, the complete annihilation of any possibility Mr. Scorza had of receiving patent rights due to Davison's deficient patent applications and wonton disregard for Mr. Scorzas perilous

position. Davison's inability to achieve the most rudimentary status of "Patent Pending" on either of Mr. Scorza's Provisional Patent Applications, as detailed in our Patent Expert Report, is just two examples of Respondent's ineptitude and callous disregard reflected in Davison's numerous exponentially consequential contractual breaches. Cl. 5 & 6.

### III.    DUTY OF CARE IN TORT

The primary element in a negligence cause of action is that the defendant owes a duty of care to the plaintiff. *See Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 280 (2005). The concept of duty in a tort setting can be intertwined with contractual notions of privity, as is the case here, where the task is to determine whether the relationship between the parties gives rise to a duty. *Id*. at 281.

The Supreme Court of Pennsylvania has held that the "determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (2000). This traditional approach to duty in tort can be used to show that Davison owed a duty to Mr. Scorza, which Davison subsequently breached, and failed to cure, despite Mr. Scorza's pleas for remediation and therefore caused immense damage over the course of several years – damage which continues to be wrought to this day.

First, as previously stated, Scorza contracted with Davison for services related to invention development, wherein several sequential agreements were entered into as to facilitate Mr. Scorza's introduction into the weight scale market between January 2017 and December 2020. These agreements and correlated communications that were based on Davison's negligently misleading and mischaracterized assertions unbeknownst to Mr. Scorza, clearly indicate a relationship existed between the two parties. Further, Mr. Scorza invested in and relied upon Davison's intentional misrepresentations of material facts germane to the parties' relationship, resulting in damages.

Second, on the question of the social utility of the conduct at issue, obviously patent research and development services play an important role in promoting the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive *right* to their respective writings and discoveries. U.S. Const. art. I, § 8, cl. 8. Purposively, this is the only use of the word "right" used by our Founding Fathers throughout the U.S. Constitution wherein the importance of such a right form the undergirding of our country's entire basis.  But, by the same token, given the important reliance placed upon such services, there is no reason to exempt such parties who take on a positive, contractual duty upon themselves to *attempt* to practice law and engage in successful patent filing services, successfully or otherwise, from the tort consequences of a negligent failure to perform those services in a competent fashion.

Third, Davison was aware that it put Mr. Scorza at risk of potential harm. Davison repeatedly informed Mr. Scorza of the importance of obtaining such patent rights and the need to keep his invention confidential. Cl. 45; Cl. 41, p. Davison_000042; R. 6; R. 23, p. Davison_000042. The risk to Mr. Scorza's patent rights was known to Davison and the loss and consequences of that loss were entirely foreseeable by Davison, where Davison was the harbinger of the ill and the custodian of Mr. Scorza's jeopardy. As evidenced by every argument and direct testimony made in these proceedings, Mr. Scorza earnestly believed that Davison was acting as a fiduciary who was going to aid him in achieving his longtime hopes and dreams. But unfortunately, Mr. Scorza was sorely mistaken because Davison led Mr. Scorza to believe it was acting in his interest, instead of advancing Mr. Scorza's objective of taking his invention to market.

Fourth, the consequence of imposing such a duty upon Davison to file a U.S. Provisional Patent Application c*ompetently and successfully* is neither unreasonable nor unduly burdensome where Davison itself contractually adopted not only the duty to file the application but undertook the corresponding obligation to accomplish that duty proficiently and correctly. While Davison could have just as easily placed the onus to file upon Mr. Scorza across its plethora of agreements' many sections of consents, mutual understandings and commitments, it did not. The present action seeks to merely hold Davison to its own self-imposed duty.

12

Finally, finding that an affirmative duty undoubtedly exists, and Davison is in breach thereof, serves the overall public interest by discouraging negligence among operators in the "invention help" space. Generally, by directly focusing on the actions of Davison and Davison's malfeasance, specifically, while not requiring any more of them than what was contractual bargained for or that which is required of the reasonable concern faced with foreseeability of harm in a tort paradigm applicable to all. Moreover, the unfair harm of taking one's hard-earned dollars, over twenty thousand of Mr. Scorza's dollars, with no results and no intention of ever satisfying Davison's contractual obligations screams that a solution be implemented to protect the overall public interest to ensure that society is not being robbed of their hard earnings or ingenuity.

The Supreme Court of Pennsylvania has observed that "[i]n scenarios involving an actor's affirmative conduct, he is generally 'under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act." *Seebold v. Prison Health Services, Inc.*, 57 A.3d 1232, 1246 (2012) (quoting Section 302 cmt. A of the Restatement (Second) of Torts). The Court explained that "[t]his duty appropriately undergirds the vast expanse of tort claims in which a defendant's affirmative, risk-causing conduct is in issue." *Id.* Generally, there is no duty to protect or rescue someone who is at risk on account of circumstances the defendant had no role in creating. However, when Davison's affirmative conduct of entering into a contract to file a provisional patent application and taking the action to mail said application to the USPTO it created the risk of financial and property loss for Mr. Scorza, a duty to protect and rescue was created. *Dittman v. UPMC*, 196 A.3d 1036, 1046 (2018) (holding that UPMC owed Employees a duty to exercise reasonable care to protect them against an unreasonable risk of harm arising out of an act UMPC required as a condition of employment). Here it is the case that Davison enriched themselves by exciting Mr. Scorza's hopes and dreams with false and inducing words. Further, Davison was derelict in its duty to Mr. Scorza, mishandling documents of great legal consequence and importance to Mr. Scorza which placed Mr. Scorza in a legal jeopardy affecting his patent rights completely and indefinitely and subsequently failed to rescue Mr. Scorza from the peril that Davison created (with actual notice

thereof). Ultimately, Davison induced Mr. Scorza to spend thousands of dollars out of the funds intended to be invested in his grandson's education and to sustain the life of his medically disabled daughter, leaving Mr. Scorza in a worse shape and condition. Scorza Arb. Test., Feb. 18, 2023.

Having established the primary element of a negligence claim, that Davison owed Scorza a duty, it can now be established that Davison breached its duty to correctly file a provisional patent by failing to include the most basic product description with its first provisional patent filing, and then failing to write a mere five dollar check to the USPTO to ensure acceptance of the second provisional patent filed on Mr. Scorza's behalf. *But for* Davison's incomplete provisional patent filings and its failure to remedy any errors therein, Mr. Scorza would have been able to obtain a provisional patent on his invention and subsequent USPTO bestowed patent rights, per Scott McBride. Cl. 5 & 6.

Davison also breached its duty to keep Mr. Scorza's information confidential by disclosing details of Mr. Scorza's invention to third parties under the guise that the invention was "patent pending". R. 8; Cl. 13. *But for* Davison's disclosure of Mr. Scorza's information to third parties, Mr. Scorza's information would have remained confidential and would have remained in patentable condition. Cl. 41, Davison_000042 & Davison_000048.

Mr. Scorza's damages resulting from Davison's complete disregard for Mr. Scorza's most basic requirements of confidentiality, inquiries and pleas for assistance, which Davison chose to ignore while continuing to entice and cajole Mr. Scorza for his continued financial input, include a complete squandering of Mr. Scorza's ideas, as evidenced by the testimony of Scott McBride. The years and days and hours that Mr. Scorza spent developing his idea was all for naught, as Davison's failure to observe contractual duties has murdered Scorza's ability to <u>ever</u> regain those patent rights or earn $3.4 million over a 10-year period, as Dr. Lehrer testified to. Lehrer Arb. Test., Feb. 19, 2023. Davison has so carelessly and brazenly allowed Scorza's intellectual property rights, as well as his dreams, to inexplicably and inexcusably die, all in the name of greed and profit.

## IV.   CAUSES OF ACTION

### A.  Breach of Contract

Breach of Contract is established when there is: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and, (3) resultant damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 635 Pa. 427, 445, 137 A.3d 1247, 1258 (2016). Davison failed in its duty to uphold key sections of contracts drafted by Davison and entered into between Davison and Mr. Scorza.

Davison created its own contractual obligations to Mr. Scorza in the Pre-Development Agreement, as well as in the NPSA. (Cl. 48, Cl. 22). Davison's contractual obligation to file a Provisional Patent Application on behalf of Mr. Scorza was breached when it failed to use any due care to competently and correctly file Scorza's provisional patent on two separate occasions. Cl. 5 & 6. Likewise, Davison's contractual obligation to provide a physical prototype of Mr. Scorza's invention, along with packaging, was breached when Davison failed to deliver on its promises – which were essential terms of the NPSA. R. 7. After pocketing Mr. Scorza's money, Davison could not successfully file a provisional patent and only provided Scorza with a mere computerized rendering of the Trava-Weigh. Cl. 13. The breached promises are essential terms of each respective contract, the breach thereof resulting in irreparable damage to Mr. Scorza's intellectual property rights. McBride Arb. Test., Feb. 18, 2023.

### B.  Common Law Fraud

Common Law Fraud requires (1) a misrepresentation; (2) a fraudulent utterance of it; (3) the maker's intent that the recipient be induced thereby to act; (4) the recipient's justifiable reliance on the misrepresentation; and (5) damage to the recipient proximately caused. *Lokay v. Lehigh Valley Co-op. Farmers, Inc.*, 342 Pa.Super. 89, 96, 492 A.2d 405, 408 (1985).

Davison made material and false representations to Mr. Scorza that Davison *could* and *would* assist Mr. Scorza with the entire process of developing and finalizing Scorza's unique invention for commercialization, and that Davison had the requisite training, knowledge, and acumen to do so. For example, Davison represented it would file the patent application with the fee, but could

15

not even observe its own deficiency in filing the first application, or observe its promise to simply pay the micro entity filing fee to the USPTO for Scorza's second provisional patent filing. R. 7; Cl. 48, Davison_000332; Cl. 6.  Davison made fraudulent misrepresentations with actual knowledge of these misrepresentations with the intent of inducing Mr. Scorza to pay Davison over several years. Relying on Davison's false promises to help develop and sell Mr. Scorza's idea, Mr. Scorza made numerous payments that ultimately were systematically collected solely for the gain of Davison and for very little to no benefit to Mr. Scorza. Davison acted on the lucrative incentive to misinform Mr. Scorza, consciously engaging in profitable nonaction, benefiting directly from purposefully ignoring Mr. Scorza, knowing that Mr. Scorza would rely upon these actions (and nonactions) which Mr. Scorza did trust - to his detriment. Resulting in Mr. Scorza losing his patent rights and profits from the sale of the Trava-Weigh. McBride Arb. Test., Feb. 18, 2023; Lehrer Arb. Test., Feb. 19, 2023.

Disturbingly, Scorza is not the only, or the first, victim of Davison's schemes. In 2006 the FTC, in conjunction with the Pennsylvania Attorney General's Office under the FTC's Telemarketing Sales Rule, obtained a ruling ordering Davison to pay $26 million dollars for exploiting inventors hoping to "build a better mousetrap" or in other words, improving the world with new technology. Cl. 20. However, these punitive measures were not enough to deter Davison from undertaking more and more predatory contractual relationships with hopeful inventors and dreamers by honing its deceitful practices. Unfortunately, these dreamers who are induced by Davison end up with ideas, which were once potentially profitable, now bereft of <u>any</u> worth.

### C.  Fraud By Concealment and Non-Disclosure/Omission

Under Pennsylvania law, a plaintiff may assert a fraudulent concealment claim when the defendant concealed or intentionally prevented the plaintiff from discovering material information. *LEM 2Q, LLC v. Guar. Nat. Title Co.*, 144 A.3d 174, 181 n. 10 (Pa. Super. 2016); *Woodward v. Dietrich¸* 548 A.2d at 311-16.

Davison, upon discovery of its deficit provisional patent filings, failed to disclose any information to Mr. Scorza. When Scorza reached out to Davison with questions regarding notices from the USPTO detailing the deficit patent filings, Davison intentionally avoided acknowledging Scorza's questions and instead pitched new contractual agreements to further ensnare Mr. Scorza in its money grabs. Cl. 5, 6, and & 12; R. 23; Scorz Arb. Test., Feb. 18, 2023. Mr. Scorza was therefore deprived of facts – or otherwise fed intentionally vague, obfuscated, and vainglorious information – which would have been required to make an informed decision. Davison, in willfully defrauding Scorza, did not qualify any of its incomplete representations, did not observe the contractual duty owed to Mr. Scorza, and failed to disclose facts basic to its transactions on at least four occasions—January 12, 2017, March 29, 2017, December 14, 2018, and December 19, 2018. Cl. 3, 7, 16, and 17.

### D.  Negligent Misrepresentation

Under Pennsylvania law, a claim of negligent misrepresentation requires proof of the following elements: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon,* 729 A.2d 555, 561 (Pa. 1999).

Davison negligently misrepresented that it would file a provisional patent application on Mr. Scorza's behalf. *See* Cl. 48, Davison_000332). This misrepresentation was material to the transaction at hand because Davison *required* a provisional application to be filed prior to communication with potential companies for licensing purposes. *Id*. This misrepresentation was made falsely with recklessness as to its truth because Davison knew of the importance of having a patent application on file with the USPTO, as evidenced by the requirement to obtain one prior to moving forward with its services. Davison had the requisite intent to mislead Scorza into relying on the misrepresentation because it required Scorza to adhere to this provision, otherwise Davison would not proceed. Scorza justifiably relied on Davison's misrepresentation, as evidenced by Mr. Scorza's adherence to the agreements through payments, because he wanted

17

his idea to succeed. Scorza was injured by this misrepresentation through the irreparable loss of his intellectual property rights.

Davison made further negligent misrepresentations that it would keep Mr. Scorza's information confidential. This misrepresentation was material to the transaction at hand because Scorza's information was disclosed to another party, which completely invalidated Scorza's patent rights. Davison had assured Scorza that his information would be confidential, proving that the misrepresentation was made with knowledge of recklessness as to its truth and with the intent to mislead Scorza into relying on it because otherwise Scorza would not have contracted with Davison. Mr. Scorza justifiably relied on the misrepresentation because he entered into the relationship with Davison on the belief that Davison would confidentially maintain his invention rights and keep them from entering the public domain. Once again, Scorza was injured by this misrepresentation through the irreparable loss of his intellectual property rights.

### E.  Fraud in the Inducement

Under Pennsylvania law, plaintiffs are required to prove the following elements in a claim for fraud in the inducement: (1) a representation; (2) material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to its truth; (4) with intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury. *Broederdorf v. Bachelor*, 129 F.Supp.3d 182, 198 (E.D. Pa. 2015). Successfully pled, such contracts are voidable. *Giannone v. Ayne Institute*, 290 F.Supp.2d 553, 564 (E.D. Pa. 2003).

In terms of the material misrepresentations contained in the facts above, Davison did present material misrepresentations as to: (1) the quality of Davison's services, (2) Davison's licensing acumen, (3) Davison's understanding of Patents, (4) Davison's ability to competently and successfully file a US Provisional Patent Application, twice, (5) Davison's inability to discern the proper use of "Patent Pending", (6) Davison's understanding of confidentiality, (7) Davison's ability to hold confidential information confidential, (8) Davison's ability to procure and evidence a Non-Disclosure Agreement, (9) Davison's selectivity as to whom it offers

services, (10) Davison's genuine stake in the outcome of the invention and that royalties are a source of income, (11) Davison's fees being 99.999% tied to fees charged and not royalties, (12) Davison's track record, (13) Davison's success rate, (14) Davison-assisted products are many, (15) Davison-assisted products are profitable, (16) Davison has special company access, (17) Davison's ability to cut through "the red tape" and the "old boys' network, (18) Davison's "close working relationship" with companies, (19) the Executive Summary offering objectivity and "expert analysis" of the marketability of a product, (20) Davison not commenting on the potential success of a product through "red flag" and "green flag" language, and, most appropriate, (21) the necessity of Davison's services - all made falsely with actual knowledge of its falsity or recklessness as to its truth that intended to mislead Mr. Scorza, who justifiably relied upon such misrepresentations to his great disadvantage and irreparable harm, a loss of his patent rights and proposed market capture of around $3.45 million dollars over 10 years.

### F.  Common Law Negligence

The elements of a cause of action in negligence are as follows: (1) a duty recognized by law, requiring the actor to conform to a certain standard with respect to the injured party; (2) a failure of the actor to conform to that standard; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage to the interests of another. *Felli v. Com., Dep't of Transp.*, 666 A.2d 775, 777 (Pa. Commw. Ct. 1995).

Davison owed Scorza a duty to correctly file a provisional patent and keep Mr. Scorza's information confidential. These duties were breached when Davison failed to properly file provisional patent application on behalf of Mr. Scorza on two occasions and disclosed Scorza's confidential information to third parties during the VRPPs and VISs. *See* Cl. 41, Davison_000042 & Davison_000048. *But for* Davison's breach, Mr. Scorza would have been able to obtain an allowed U.S. patent and his information would have remained confidential until this point. Mr. Scorza's damages resulting from Davison's breach include a complete squandering of Mr. Scorza's ideas, as evidenced by the testimony of Mr. McBride and Dr. Lehrer.

19

### V.   PENNSYLVANIA UTPACPL

The legislative intent in enacting the Pennsylvania Unfair Trade Practices & Consumer Protection Law ("UTPCPL") was to enhance the protection of the public from unfair or deceptive business practices.  *Gabriel v. O'Hara*, 368 Pa.Super. 383, 388 & n.6, 534 A.2d 488, 491 & n.6 (1987).  The principle enhancements of pre-existing common law protections included the codification of a list of practices designated as "unfair or deceptive" and therefore "unlawful" (73 Pa .Stat. §§ 201–2, 201–3), authorization of the Pennsylvania Attorney General to take several specific types of action to protect the citizenry from such practices (73 Pa. Stat. §§ 201– 3.1 to 201–9.1), and authorizing a private cause of action by private parties for treble damages in certain circumstances (73 Pa. Stat. § 201–9.2).  The central underlying intent was fraud prevention, and the act must be construed liberally to effectuate that remedial intent.  *See Commonwealth v. Monumental Properties*, 459 Pa. 450, 329 A.2d 812, 815–17 (1974); *Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 393 Pa.Super. 339, 346, 574 A.2d 641, 644 (1990); *Gabriel v. O'Hara*, 534 A.2d at 491; *Culbreth v. Lawrence Miller, Inc.*, 328 Pa.Super. 374, 477 A.2d 491 (1984).

### A.  Applicability

The UTPCPL states that:

> Any person who purchases or leases goods or services **primarily for personal**, family or household **purposes** and thereby suffers any ascertainable loss of money or property, real or person, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act…

has standing to sue under the Act.  73 Pa. Stat. § 201-9.2(a) (emphasis added).  The list of applicable purposes is a disjunctive one ("personal, family **or** household purposes"), indicating that the statute applies to all personal purchases, all family purchases, and all household purchases.  Even a residential condominium association has been held to be a "person" under the statute, as it represents the individual owners.  *Valley Forge Towers*, 393 Pa.Super. 339, 347-48, 574 A.2d 641, 645.  For determination of "household purpose" applicability of the statute, the purpose of the purchase is the correct direction of analysis.  In that case, if the "sole motivation"

20

of the purchase is non-household, the purchase is non-household in nature.  *Waldo v. N. Am. Van Lines, Inc.*, 669 F.Supp. 722, 726 (W.D. Pa. 1987).

All four contracts were entered into by Mario Scorza, individually.  *See* R.3, 7, 16, & 17. None of the contracts were entered into by an entity, or even by Mario Scorza on behalf of, or for the benefit of, an entity.  That the "services" were provided for Mario Scorza individually is simply not even in factual dispute.  Furthermore, the applicant on both patent applications was Mario Scorza individually, not an entity.  Cl. 5 & 6.  The services were obtained for an individual, Mario Scorza, who individually contracted with Davison.

Davison has argued that its contract states that the services are not for personal use, and that boilerplate recitation in a consumer contract of adhesion insulates them for any liability under the UTPCPL.  This is unsurprising, as it is essentially Davison's repeat argument, that its contracts protect them from all liability, no matter what they have done wrong. However, it is contrary to fact and unenforceable, as discussed in section VI, *infra*.

### B.  Violations

The statute presents a list prohibited conduct:

> "Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:..
>
> (v)  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;…
>
> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;…
>
> (xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;…
>
> (xxi) *Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.*

73 Pa. Stat. § 201-2(4)(*emphasis* on the catchall clause of the statute).

21

The various misrepresentations that were routinely made by Davison were discussed at length in the *FTC* ruling.  Cl. 18.  Scorza confirmed that many of the same misrepresentations were made to him as well, albeit in slightly altered terms.  Scorza Testimony, Jan. 18, 2023.

However, Davison made several contractual misrepresentations and omissions that were ultimately fatal to Scorza's patent rights and account for the overwhelming majority of his damages: 1) it represented that it would "mail the [patent] application to the USPTO along with the micro entity filing fee, which is currently $65.00" Cl. 48, para. 6; 2) it failed to notify him that both his patent applications were in mortal danger, due it its own mistakes and malfeasance; 3) it represented that it would keep Scorza's valuable invention confidential, when it was actually sending out his invention details without signed non-disclosure agreements, resulting in the loss of all of his patent rights. These misrepresentations and complete malfeasance doomed Scorza's patent.

## C.  Strict Liability

Violations of the UTPCPL do *not* require intent to deceive, or even negligence, for liability to attach.  As the Pennsylvania Supreme Court has made abundantly clear, the UTPCPL is a strict liability statute.

> "A plain language analysis of the relevant statutory provision leads inexorably to the conclusion that deceptive conduct under the CPL [UTPCPL] is not dependent in any respect upon proof of the actor's state of mind. The Superior Court's holding is consistent not only with the plain language of the CPL [UTPCPL], but also with our precedent holding that the CPL [UTPCPL] is a remedial statute that should be construed broadly in order to comport with the legislative will to eradicate unscrupulous business practices."

*Gregg v. Ameriprise Finan., Inc.*, 245 A.3d 637, 641, 2021 WL 607486 (Pa. Feb. 17, 2021), *citing Commonwealth by Creamer v. Monumental Props., Inc.*, 459 Pa. 450, 329 A.2d 812, 817 (1974).

The Pennsylvania Supreme Court held:

> "[A]ny deceptive conduct, "which creates a likelihood of confusion or of misunderstanding," is actionable under 73 P.S. § 201-2(4)(xxi), whether committed intentionally (as in a fraudulent misrepresentation), carelessly (as in a negligent misrepresentation), or with the utmost care (as in strict liability).

22

Whether a vendor's "conduct has the tendency or capacity to deceive ... is a lesser, more relaxed standard than that for fraud or negligent misrepresentation." *TAP*, 36 A.3d at 1253. The only thing more relaxed than negligence—regarding a consumer's burden of proof—is strict liability."

*Gregg*, 195 A.3d at 939 [the Superior Court opinion].

"Like other strict liability offenses, liability for deceptive conduct under the CPL cannot be excused if consumers rely upon that conduct to their financial detriment. Representations made in the consumer context are within the exclusive control of the vendor:

[A commercial transaction] occurs in a designed setting entirely of the vendor's own creation via preplanned marketing schemes. Thus, vendors place themselves, by choosing where, when, and how they enter the market, in a much stronger position to comply fully with the [CPL] before soliciting or interacting with consumers. Vendors not only elect whether to enter a market, but, because "the market" is a fictional place, they have full volitional control over their conduct when in it.

The [CPL] is for consumer protection. It undoes the ills of sharp business dealings by vendors, who, as here, may be counseling consumers in very private, highly technical concerns. Like the Greggs, those consumers may be especially reliant upon a vendor's specialized skill, training, and experience in matters with which consumers have little or no expertise. Therefore, the legislature has placed the duty of [CPL] compliance squarely and solely on vendors; they are not to engage in deceitful conduct and have no legally cognizable excuse, if they do."

*Id*. at 939-40.   It is the vendor—not the consumer—that is charged with complying with the CPL, as the vendor is in a better position to determine whether the representation might be deceptive. Strict liability for such violations is consistent with the legislative mandate to eradicate the use of unfair and deceptive conduct in consumer transactions.  *Monumental*, at 815-16.

*Gregg v. Ameriprise Finan., Inc.*, 245 A.3d 637, 650 (the Pa. Supreme Court Opinion), *citing Commonwealth v. TAP Pharm. Products, Inc.*, 36 A.3d 1197 (Pa. Cmwlth. 2011), *rev'd on other grounds*, 626 Pa. 1, 94 A.3d 350 (2014); *Gregg v. Ameriprise Finan.*, 195 A.3d 930, 936 (Pa. Super. 2018)(the Superior Court Opinion); *Commonwealth by Creamer v. Monumental Props., Inc.*, 459 Pa. 450, 329 A.2d 812, 817 (1974).

Davison will argue that it intended to correctly file the patent application.  It failed to file the first application correctly, resulting is loss of original filing date. It fumbled the ball yet another time by including the wrong fee (the fee had increased recently), and failing to ever send

23

in the additional $5.00 that could have saved the application.  Davison might argue that its state of mind was merely negligent during this sorry comedy of errors.  However, it does not matter.  Davison may have meant well, may have done it intentionally, or had no state of mind whatsoever, because it was so painfully clueless.  **However, it simply does not matter. Davison is liable as a matter of law under the statute.**

### D.  Damages & Trebled Damages

The UTPCPL permits plaintiffs to recover for "any ascertainable loss of money or property, real or personal."  73 Pa. Stat. § 201-9.2.

The Court found, as a matter of statutory construction, that a trial court's discretion to award treble damages under the UTPCPL should not be closely constrained by the common law requirements for punitive damages.  *Schwartz v. Rockey*, 593 Pa. 536, 557, 932 A.2d 885, 898 (Pa 2007).  A "consumer protection statute requiring awards of treble damages for violations is, in effect, a hybrid, with both punitive and remedial aspects, and therefore,…" "common-law requirements governing the award of punitive damages should not control."  *Schwartz*, 593 Pa. at 557, *citing Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397, 402 (1981).  The Pennsylvania Supreme Court holds that treble damages in UTPCPL cases should be awarded *more generously* than punitive damages.  A trial court may consider intentional or reckless wrongful conduct for which an award of treble damages would be remedial in nature when deciding whether to award treble damages.  *Schwartz*, 593 Pa. at 557.  No finding of outrageous conduct is needed for an award of trebled damages.  *Gadley v. Ellis*, Civ. No. 3:13-17, 2016 WL 1090654, at *3, 2016 U.S. Dist. LEXIS 35252 (W.D. Pa. Mar. 18, 2016)(*citing Schwartz v. Rockey*, 932 A.2d at 898; *see also Lindsley v. Am. Honda Motor Co.*, Civ. No. 16-941, 2017 WL 2930962, at *9-10 (E.D. Pa. Jul. 7, 2017)).  Under the UTPCPL, rather than punitive damages, the trial court has purely discretionary authority to award treble damages.  *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 401 (3d Cir. 2004). Here, the Tribunal has full authority and discretion to award treble damages to punish, as a matter of public policy, Davison's intentional and reckless wrongful conduct and is requested to do so.

24

Davison argues that Scorza's claims are barred under the "gist of the action" doctrine, that contractual duties cannot serve as the base for a tort claim, and that any tort claim is subsumed within a breach of contract claim.   *See* Respondent Pre-Hearing Brief, p. 5-6. However, the Pennsylvania Supreme Court held that the economic loss doctrine does not apply to UTPCPL claims.   Pennsylvania does not apply the economic loss doctrine where there is a "'statutory [as opposed to common law] basis to impose liability for economic losses." *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 604 Pa. 50, 985 A.2d 840, 842-43 (2009); *see also Earl v. NVR, Inc.*, 990 F.3d 310, 313 (3rd Cir. 2021); *Knight v. Springfield Hyundai*, 81 A.3d 940, 952 (Pa. Super. Ct. 2013).   "The UTPCPL does just that. It permits plaintiffs to recover for 'any ascertainable loss of money *or* property, real or personal.'   73 Pa. Cons. Stat. § 201-9.2 (emphasis added)."   *Earl*, 990 F.3d at 313 (citations and emphasis in original).   The damages for Scorza's loss of all his patent rights are fully recoverable under the UTPCPL.

## VI.    CONTRACTUAL DISCLAIMERS OF LIABILITY

Davison attempts to rely upon a boiler plate contractual provision to escape all potential liability whatsoever.   Davison argues that the clause in question is a "limitation of damages" clause, citing no authority and making no legal arguments.   However, clauses that purport to contractually limit damages are exculpatory clauses by definition.   The legal test applies to any "exculpatory language."   *Tayar v. Camelback Ski Corp., Inc.*, 616 Pa. 385, 47 A.3d 1190, 1196 (2012); *Topp Copy Products, Inc. v. Singletary*, 533 Pa. 468, 471, 626 A.2d 98, 99 (Pa. 1993). The clause simply states that "In no event will Davison be liable to Client for any consequential, exemplary, incidental or punitive damages, including lost opportunities or lost profits."   The clause purports to exculpate Davison for any consequential or incidental damages, including lost profits.   It also purports to exculpate against exemplary and punitive damages.

This begs the question, what other damages would there be flowing out of a contract of this nature?   The breach of a contract to develop an invention would only involve consequential or incidental damages, and possibly lost profits.   There are no other kinds of damages, other than those which have been purportedly disclaimed.   The clause is clearly an exculpatory clause and is disfavored at law.

25

"Those clauses are disfavored and must meet certain conditions to be enforceable. First, the clause must not contravene public policy. Second, the contract must relate solely to the private affairs of the contracting parties and not include a matter of public interest. Third, each party must be a free bargaining agent. In addition, an exculpatory or indemnity clause will still not be enforced unless it is clear that the beneficiary of the clause is being relieved of liability only for his/her own acts of negligence. The clause must be construed strictly and the contract must state the intention of the parties with the greatest particularity. Furthermore, any ambiguity must be construed against the party seeking immunity, and that party also has the burden of proving each of the prerequisites to enforcement."

*Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195 (3rd Cir. 1995), *citing Topp Copy*, 626 A.2d at 99. Furthermore, the burden of establishing immunity is upon the party invoking protection under such a clause. *Tayar*, 47 A.3d at 1196.

The law "abhors forfeitures and penalties and enforces them with the greatest reluctance when a proper case is presented." *Acme Markets, Inc. v. Federal Armored Exp., Inc.*, 437 Pa.Super. 41, 48, 648 A.2d 1218, 1221 (1994), *quoting Fogel Refrigerator Co. v. Oteri*, 391 Pa. 188, 195, 137 A.2d 225, 231 (1958).

As Davison readily concedes, and indeed affirmatively argues, the clause purports to exculpate Davison from any liability whatsoever. However, clauses that exculpate liability for gross negligence and higher levels of fault are void and against Pennsylvania public policy. *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 20-21 (Pa. 2019), *citing Tayar*, 47 A.3d at 1203. By Davison 's own arguments, the clause is void as against public policy. The clause is unenforceable.

The clause also involves a matter of public interest. As discussed, *supra*, the Texas Invention Development Services Act requires specific disclosures as to the success rate of the development services. The disclosures were false and conflicted with those made on Davison's website. As discussed, Davison's success in developing inventions was vanishingly small. Davison's failure to make statutory disclosures involved a matter of public interest. Furthermore, Pennsylvania has expressed public interest through the passage and recent

26

expansion of the UTPCPL into a strict liability standard.  Accordingly, the exculpatory clauses are unenforceable.

The clause fails to address and does not explicitly disclaim any liability flowing out of its own negligence, gross negligence, recklessness, or intentional acts.   To be enforceable, "the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties," that is to say, the clause must specifically establish which conduct is being disclaimed from liability.  *Tayar*, 47 A.3d at 1196; *Topp Copy*, 626 A.2d at 99.  The clause simply states the "The liability of the parties for any and all claims…" is limited.  The clause fails to specify which levels of fault and what kinds of behavior are being disclaimed.  The text of the language lacks any semblance of "greatest particularity," puts nothing "beyond doubt by express stipulation," and contains absolutely nothing but "words of general import."  As such, the clause fails to meet the test for enforceability under Pennsylvania law.  The clause is unenforceable.

Finally, Davison carries the burden of proof to establish that the exculpatory language is enforceable under Pennsylvania law, a burden that Davison does not and cannot meet.  The clauses are simply unenforceable.

In Pennsylvania, exculpatory clauses are invalid under three conditions: "First, the clause must not contravene public policy.  Secondly, the contract must be between persons relating entirely to their own private affairs and thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion." *Topp Copy*, 626 S.2d 98,99 (Pa. 1993).

"An adhesion contact is defined as a standard form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms."  *Lytle v. CitiFinancial Servs., Inc.*, 810 A.2d 643, 658 (Pa. Super. 2002).  When a party has no knowledge of the applicable industry, no chance to negotiate the terms of the contract, and no choice but to accept the terms and conditions, the terms become unenforceable terms of exculpatory adhesion.  *Id*.

In addition to terms being unlawful exculpatory clauses, the terms are also unconscionable and void.  In Pennsylvania, "a contract or term is unconscionable, and therefore

27

avoidable, where there is a lack of meaningful choice in the acceptance of the challenged provision [procedural unconscionability], and the provision unreasonably favors the party asserting it [substantive unconscionability].   *Salley v. Option One Mortgage Corp.*, 925 A.2d 115 (2007).  The highly vaunted contractual disclaimers of liability are also unconscionable and void.

## VII.   DAMAGES

Davison's breach of contract, torts, and violations of the UTPACPL led to the loss of Scorza's most valuable asset, his eminently patentable invention.  His damages are the value of the botched patent that can never be recovered, $3.4 million over a 10-year period.

Dr. Kenneth Lehrer, in his oral testimony and in his Initial Expert Report, testified that the best way to value lost patent rights is through a model business enterprise, producing and selling the invention.  Cl. 38, p. 4, 8-10.  Dr. Lehrer refers to the enterprise model also as "The Theory of the Firm."  *Id.*, p. 8-10.  "The value of the firm is the present value of the firm's expected future net cash flows."  *Id.*, p. 9.

Dr. Lehrer testified that, twenty-five (25) years ago, the most appropriate business enterprise model for a patent or invention would be a firm that sold the product in retail brick and mortar establishments.  However, due to the internet retail revolution, the most typical business enterprise model today for a consumer good is to produce the good in China, or a similar low-cost location, and to sell them through an online retail platform, such as Amazon.

Typically, a future or hypothetical business is valued by means of a sensitivity analysis, also known as a Monte Carlo analysis.  A sensitivity analysis is a variation on a set of scenarios or the process of varying model input parameters over a reasonable range (range of uncertainty in values of the model's parameters) and observing the relative change in the model's response. Typically, a business would be simulated by comparing several market share captures, typical for new businesses in the industry, and the size of the market for the industry.  Dr. Lehrer testified that this method is often used for merger or acquisition fairness opinions when target companies feature a new product.  It is also used and found reliable in SEC filings, particularly those featuring forward-looking statements.  Dr. Lehrer testified that he has previously performed

Monte Carlo analyses that have been in use in merger and acquisition fairness opinions and SEC filings. Monte Carlo analyses are admissible under the Federal Rules of Evidence and have been found to satisfy the *Daubert* test. *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 293-94 (5th Cir. 2010).

Dr. Lehrer testified that the personal scales market is a growing market in the United States and is currently valued at $670 million per year. Typical conservative market captures for new products in the consumer goods market would run in the 0.08% to 0.12% of the market. A price per unit in the $20-25 range would be appropriate for the new product, based on similar competitive products.

Dr. Lehrer testified that he consulted with Amazon Co., as well as with a customs broker and import-export attorney to appropriately model costs and expenses for his business enterprise model. He accounted for: cost of goods sold, manufacturing fees, an Amazon 10 year Retailer Plan; Amazon's commission per unit sold; container costs for import; harbor maintenance fees; tariffs; warehouse transport costs; Customs goods examination costs, customs brokerage fees; yearly import bond; demurrage; inspection fees; insurance; and miscellaneous costs. Applying these expenses, Dr. Lehrer found the cost of goods sold in the 15% range, and the costs and expenses in the 30-33% of revenues, resulting in profits in the 47-50% of revenue range.

Simply applying Dr. Lehrer's proposed market capture numbers lead to some proposed scenarios. A low range capture of 0.08% of the $670 million per year market would lead to revenues of $536,000/year. Over a 10-year product life cycle this would represent around $2.5 million in lost profits. As Dr. Lehrer testified, he would not account for inflation, so as to not necessitate a discount to present value analysis.

Similarly, a mid-range number of market capture of 0.10% would lead to yearly revenues of $670,000, and total lost profits around $3.7 million. A high range market capture of 0.12% would lead to yearly revenues of $804,000, and total lost profits of around $4.1 million. Averaging these values leads to a patent valuation of around $3.45 million. Weighted averages could also be calculated.

Scorza also seeks a return of the money that he paid to Davison in the amount of $21,042.25.  *See* Cl. 48, Idea Submission Agreement ($795.00); Cl. 11, New Product Sample Agreement ($14,757.25); Cl. 44, Inventomercial Agreement ($1495.00); Cl. 49, MCC Agreement ($3,995.00).

## VIII.   CONCLUSION

Davison deceived a man in his late 70's, relentlessly selling him useless contracts, sucking dry his life savings, which were intended to benefit his grandson's college education and his disabled daughter.  Ultimately, even worse for him, they were utterly incompetent at even the relatively minimal tasks that they did set out to do.  Davison botched his first patent application by failing to include the fee or the supporting documents.  They then failed to include the proper fee with the second application.  The application could have been saved by means of forwarding a simple $5.00 check to the USPTO in order to correct the monumental error.  Davison simply never bothered

However, Davison was never really in the business of obtaining patent right or royalties for their inventors.  Davison is in the business of selling contracts, from which it derives essentially all of its revenue.  When Scorza repeatedly begged Davison's help for what to do in response to repeated notices from the USPTO, Frank Vescio, whose motto was clearly "always be closing," ignored his requests and sold him two more useless contracts, sucking a few more thousand dollars from the hapless Scorza.  Meanwhile Scorza's patent application, and all his rights, died at the USPTO due to Davison's reckless disregard and utter malfeasance.

Claimant requests this Tribunal to restore the value of Scorza's lost patent rights.  Claimant requests any and all other relief, either at law or in equity, to which he may show himself justly entitled.

## <u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on the following parties and/or counsel pursuant to the applicable procedure on this 3rd day of March, 2023.

Scott D. Livingston
Sharon Durkin
George Crompton
Justin T. Barron


*/s/ Stacey L. Barnes*
Stacey L. Barnes

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVISON DESIGN &                    )
DEVELOPMENT, INC.,                  )
                                    )
                    Plaintiff,      )
                                    )   No.
            v.                      )
                                    )
MARIO SCORZA,                       )
                                    )
                    Defendant.      )

**Exhibit 5**

**March 3, 2023 Respondent's Response to
Claimant's Fee Petition and Post-Hearing Brief**

IN THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| MARIO SCORZA, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | No. 01-21-0004-6369 |
| | ) | |
| DAVISON DESIGN AND | ) | |
| DEVELOPMENT, INC., | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONDENT'S RESPONSE TO CLAIMANT'S**
**FEE PETITION AND POST-HEARING BRIEF**

Respondent Davison Design and Development, Inc. ("Davison") submits this Response to Claimant Mario Scorza's ("Scorza") Fee Petition and Post-Hearing Brief.

## I.      RESPONSE TO FEE PETITION

In his February 15, 2023 Application for Fees and Costs (the "Fee Request"), Scorza identifies the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") as the sole legal basis for his fee request. Fee Request at 1-2. Scorza seeks fees and costs totaling $224,024.05, which consists of a "projected" $159,898.50 in attorneys' fees and $64,125.55 in "arbitration related costs." *Id.*, Ex. 1 ¶¶ 16-20 (Affidavit of Stacey L. Barnes, Esq.).

There is no legal basis under the UTPCPL to award Scorza any of his attorneys' fees and costs; and even if there were any legal basis, the fees and costs Scorza seeks are unreasonable. Accordingly, Scorza's Fee Request should be denied.

## A.      There Is No Legal Basis to Award Scorza Attorneys' Fees and Costs

Scorza cannot assert a claim under the UTPCPL because he purchased services from Davison for business purposes, not "primarily for personal, family, or household purposes." *See* 73 P.S. § 201-9.2(a); Parts III-IV of Davison's May 16, 2022 Pre-Hearing Brief (attached

hereto as Exhibit 1); *Niiaryee v. Davison Design & Dev., Inc.*, No. 17-1225, 2018 WL 1072439, at \*4 (W.D. Pa. Feb. 27, 2018) (dismissing UTPCPL claim on this basis because "Plaintiff allege[d] that he purchased Defendant's services in order to bring his invention to the market[,]" and because the parties' agreements said his purchase was for business purposes, as Scorza acknowledged in his agreements); *Travis v. State Auto Mut. Ins. Co.*, No. 21-5395, 2023 WL 2163975, at \*5 (E.D. Pa. Feb. 22, 2023) (dismissing UTPCPL claim on this basis, relying on same cases cited in Davison's Pre-Hearing Brief for the commercial/investment vs. personal purpose distinction). Because he cannot prevail on his UTPCPL claim, Scorza's claim for attorneys' fees and costs fails. *See* 73 P.S. § 201-9.2(a).

The evidence adduced at the hearing confirms that Scorza purchased services from Davison for business/commercial reasons. Mr. Scorza's contemporaneous communications with Davison,[1] the contracts he signed,[2] and his testimony at the hearing show he wanted to commercialize his idea and to see his product on shelves at stores like Bed Bath & Beyond. Because Scorza purchased services from Davison for business/investment/commercial purposes, he cannot assert a UTPCPL claim, and any claim for attorneys' fees thereunder also fails. *See* 73 P.S. § 201-9.2(a); *Niiaryee*, 2018 WL 1072439, at \*4.

Scorza's cites AAA Rules R-47(d)(ii) and R-54,[3] but those Rules provide no basis to award him the fees and costs he seeks. The former Rule applies only where, as relevant

---

[1] Ex. R-2 (ISA) at Davison_68 ("There are NO scales on the market . . . ."); Ex. C-30 at Scorza40 (Mar. 12, 2019 email), Scorza44 (June 15, 2018 email), Scorza 57 (Nov. 11, 2018 email), Scorza55 (Mar. 14, 2019 email), Scorza56 (Apr. 1, 2019 email), Scorza61 (Aug. 19, 2020 email).

[2] Ex. R-3 (Pre-Development and Representation Agreement) § III.F; Ex. R-7 (New Product Sample Agreement) § 4.P; Ex. R-16 (Multiple Company Campaign Agreement) § C.4.d; Ex. R-17 (Inventomercial Presentation Agreement) § C.iv.

[3] The AAA's Commercial Rules were amended effective September 1, 2022. Scorza cites the pre-amendment Rules. The post-amendment Rules, which are the same in all relevant respects as the pre-amendment Rules, are Rules R-49(d)(ii) and R-56, respectively.

here, "an award of attorneys' fees . . . is authorized by law or the parties' arbitration agreement." As just demonstrated, attorneys' fees are not "authorized by law" or "the parties' arbitration agreement[s]." The latter Rules concerns "expenses of the arbitration," which does not include the fees or costs Scorza seeks here.

Because there is no "express statutory authorization, a clear agreement of the parties[,] or some other established exception[]" to the American Rule, that Rule prevails, and Scorza's claim for attorneys' fees and costs therefore fails as a matter of law. *See McMullen v. Kutz*, 985 A.2d 769, 775-76 (Pa. 2009).

**B.    The Requested Fees Are Unreasonable**

Putting aside the absence of any legal basis to award fees and costs, the amount of fees and costs that Scorza seeks is unreasonable. *See* 73 P.S. § 201-9.2(a) (allowing court an award of "costs and reasonable attorney fees"). There are several problems with Scorza's Fee Request, each establishing its unreasonableness.

**1.    Scorza's Fee Request Is Disproportionate to Any Damages Amount**

Under the UTPCPL, "there must be a sense of proportionality between an award of damages and an award of attorney's fees." *Skurnowicz v. Lucci*, 798 A.2d 788, 796 (Pa. Super. 2002), *superseded by statute on other grounds, as recognized in Milliken v. Jacono*, 60 A.3d 133 (Pa. Super. 2012); *McCauslin v. Reliance Fin. Co.*, 751 A.2d 683, 686 (Pa. Super. 2000). "[T]here is no indication th[e fee-shifting provision] was intended to provide a claimant, or his attorney, with a windfall or bonanza should he or she be successful." *McCauslin*, 751 A.2d at 686.

"Where the court awards attorney fees that exceed twice the amount of damages, a question is certainly raised whether the fee award was reasonable or not." *Skurnowicz*, 798 A.2d at 796; *see McCauslin*, 751 A.2d at 686.

3

Here, as argued in Part II.B below, the only evidence Scorza presented regarding his "damages" is the $20,042.25 he paid to Davison pursuant to the parties' four agreements.[4] It is simply not reasonable and proportionate for Scorza's counsel to seek $224,024.05 in fees and costs when Scorza paid only $20,042.25 for Davison's services, and the parties' agreements expressly limited damages to the amount Scorza paid to Davison.[5] *See Skurnowicz*, 798 A.2d at 796; *McCauslin*, 751 A.2d at 686.

**2.     Scorza Failed to Properly Support His Fee Request**

Scorza "has the burden to prove that [his fee] request is reasonable." *Clemens v. N.Y. Cent. Mut. Fire Ins. Co.*, 903 F.3d 396, 400 (3d Cir. 2018).[6] "To meet [his] burden, the fee petitioner must submit evidence supporting the rates claimed, consisting of satisfactory evidence, ***in addition to the attorney's own affidavits***, that the requested hourly rates meet the[ applicable] standard." *Borrell v. Bloomsburg Univ.*, 207 F. Supp. 3d 454, 506-07 (M.D. Pa. 2016) (emphasis added) (citations omitted). "An attorney's showing of reasonable-ness must rest on evidence ***other than the attorney's own affidavits***." *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 595 (3d Cir. 2000) (emphasis added) (citing *Blum v. Stenson*, 465 U.S. 886, 895-96 n.11 (1984)); *see Clemens*, 903 F.3d at 402. Where "billing attorneys d[o] not even submit their own affidavits identifying their usual billing rates or

---

[4] Davison is not conceding that Scorza proved any of his causes of action, that he suffered any compensable damages, or that the $20,042.25 he paid to Davison is a proper measure of damages. The point here is only that the $224,024.05 in fees and costs Scorza seeks is out of all proportion to the only conceivable potential damages amount presented at the hearing.

[5] Ex. R-7 (New Product Sample Agreement) § 4.N; Ex. R-16 (Multiple Company Campaign Agreement) § C.4.b; Ex. R-17 (Inventomercial Presentation Agreement) § C.ii.

[6] Pennsylvania state and federal courts construing Pennsylvania fee-shifting statutes rely upon federal decisions construing federal fee-shifting statutes. *See, e.g.*, *Clemens*, 903 F.3d at 399-400 & n.4 (noting that "decisions involving similar federal statutes are germane to our analysis[]" of the Pennsylvania bad-faith fee-shifting statute); *Birth Ctr. v. St. Paul Cos.*, 727 A.2d 1144, 1160-61 (looking to federal decisions in construing the same bad-faith statute at issue in *Clemens*). Davison will do the same.

4

describing their levels of experience," it is "within the court's discretion" to "disallow any hours billed by those [] lawyers" because they "provided no information whatsoever on which [the court] could make a determination as to whether the requested hourly rate was reasonable." *Clemens*, 903 F.3d at 402.

The Fee Request suffers from these same defects. ***First***, there is nothing "other than [one] attorney's own affidavit[]" attached to the Fee Request.[7] *See Clemens*, 903 F.3d at 402. It is supported only by Mr. Barnes' Affidavit—nothing more, such as affidavits from other attorneys in the community or other documents supporting the claimed "reasonable" rates they seek. *See, e.g., Borrell*, 207 F. Supp. 3d at 506-07.

***Second***, only Mr. Barnes submitted an affidavit in support of the Fee Request,[8] and only Mr. Barnes' CV is attached to the Fee Request[9]— despite that the Fee Request seeks to recover fees charged by three additional attorneys (William Yarbrough, Bradley Nevills, and Vikesh Patel) and four non-attorneys (Marisol Contreras, Harrison Long, Andrea Cavazos, Shannon V. Frizzell, and Vikesh Patel).[10] So aside from Mr. Barnes' unsupported assertion that their claimed rates are "comparable to the prevailing market rates" in both "Houston and Pittsburg [sic]" and so allegedly reasonable,[11] there is simply nothing in the record to sustain Scorza's burden that the rates requested are reasonable. *See Clemens*, 903 F.3d at 402; *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 131 (3d Cir. 1999) ("A district

---

[7] Fee Request at 1, Part I (Materials Submitted); *id.*, Ex. 1 (Mr. Barnes' 5-page Affidavit); *id.*, Ex. 2 (Mr. Barnes' 6-page CV); *id.*, Ex. 3 (invoices).

[8] Fee Request at 1, Part I (Materials Submitted); *id.*, Ex. 1.

[9] Fee Request at 1, Part I (Materials Submitted); *id.*, Ex. 2.

[10] Through April 2022, Mr. Patel's time was billed at $100 per hour. Between May 2022 and October 2022, his time was billed at $125 per hour. In November-December 2022, his time was billed at $215 per hour.

[11] Fee Request, Ex. 1, ¶ 13.

court may not set attorneys' fees based upon a generalized sense of what is customary and proper, but rather *must* rely upon the record.") (emphasis in original) (citation omitted).

     ***Third***, Scorza did not submit ***any*** invoices/timesheets for the "[p]ending and unbilled charges including January and February and the [h]earing on the [m]erits"—yet he seeks $79,440.50 in fees for those two months of work, which represents almost one-half of the total $159,898.50 in fees requested.[12] The same is true with respect to the "project[ed] fees for the preparation of th[e] fee application, and for post-[h]earing briefing," for which Scorza seeks $19,450.00.[13] There is simply no support or record evidence whatsoever for Davison to challenge, or for the Arbitrator to determine, the reasonableness of those fees. *See Evans v. Port Authority of N.Y. & N.J.*, 273 F.3d 346, 361 (3d Cir. 2001) (noting "attorneys seeking fees must document the hours for which payment is sought with sufficient specificity to allow the [d]istrict [c]ourt to determine whether the hours claims are unreasonable for the work performed") (citing and quoting *Washington v. Phila. Cnty. Ct. of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir. 1996)); *see also, e.g., Clemens*, 903 F.3d at 402.

### 3.    Scorza's Fee Request Includes Redundant and Excessive Time

     "When a party submits a fee petition, it is not the opening bid in the quest for an award. Rather, it is the duty of the requesting party to make a good faith effort to exclude hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Clemens*, 903 F.3d at 403 (cleaned up).

     Scorza's counsel over-staffed this case with two lawyers (Messrs. William Yarbrough and Stacey Barnes) who charged the same rates ($400/hour through December 2021 and

---

[12] Fee Request, Ex. 1, ¶ 16.

[13] Fee Request, Ex. 1, ¶ 16.

$425/hour through December 2022) for the same tasks. In fact, beginning in December 2022, they staffed this case with *three* lawyers (Messrs. Yarbrough and Barnes, and Mr. Vikesh Patel), two of whom continued to bill at the same rate for the same tasks.

Below are the most obvious examples of Messrs. Yarbrough and Barnes duplicating tasks and billing their time at the same $400/$425 hourly rate:

- In September 2021, both Mr. Yarbrough and Mr. Barnes billed for reviewing the list of arbitrators and preparing a ranked list of arbitrators.

- Both participated in and billed similar amounts of time (0.8 and 1.4 hours) for an October 1, 2021 preliminary hearing call with the Arbitrator.

- Both participated in and billed similar amounts of time (0.5 and 1.1 hours) for a December 13, 2021 status conference call with the Arbitrator.

- Both billed similar amounts of time for the same tasks on March 9 and 15, 2022 regarding an expert report.

- Both billed similar amounts of time for the same tasks on April 23, April 25, and May 10, 2022 regarding an expert report.

- Both billed similar amounts of time for the same tasks on May 20, May 21, May 23, and May 24, 2022 regarding Scorza's Pre-Hearing Brief.

- Both billed similar amounts of time for the same tasks on December 7, December 16, and December 17, 2022 regarding an expert report.

- Both billed similar amounts of time for the same tasks on December 20 and 21, 2022 regarding mediation.

Mr. Patel had similar billing entries on December 7, 17, 20, and 21, 2022, so at those times, there were *three* attorneys billing for the same tasks on this one case. The unreasonableness of their staffing decisions and their resultant excessive billings are most evident from the December 20-21, 2022 entries regarding the mediation session—they billed Mr. Scorza 30.8 hours, totaling $11,620.00, for those two days alone.

Given Mr. Barnes' "professed expertise, it would not have been unreasonable to expect that [he] would have been able to handle most aspects of this matter, *including* the

7

trial alone or with the help of an associate." *Evans*, 273 F.3d at 362 (emphasis in original) (cleaned up) (quoting *Lanni v. New Jersey*, 259 F.3d 146, 151 (3d Cir. 2001)). Instead, Scorza's counsel staffed this case in which Scorza paid Davison less than $25,000 with two senior attorneys who billed at the same hourly rate for performing largely the same tasks. That is simply not reasonable. *See id.*; *McCauslin*, 751 A.2d at 686 (noting the UTPCPL fee-shifting provision is not intended to be a "windfall or bonanza" for plaintiffs or attorneys).

In sum, because Scorza has no viable UTPCPL claim, he cannot recover any fees and costs thereunder, which is his only asserted basis for recovering fees and costs. That legal impediment aside, the fees and costs Scorza seeks are unreasonable and so should be rejected for the numerous reasons set forth above.

## II.     POST-HEARING BRIEF

### A.     Scorza's "Lost Patent Rights" Theory of Liability Fails

Scorza's theory of liability is based upon the faulty premise that his patent rights in his Trava Weigh invention are "irremediabl[y] los[t]."[14] Mr. McBride's report did not state the reasons underlying this conclusion. At the hearing, however, Mr. McBride opined that Scorza's patent rights were gone/lost by operation of the "on-sale" bar codified in Section 102 of the Patent Act, 35 U.S.C. § 102. Mr. McBride testified at the hearing that Davison seeking a licensee for Scorza's invention was an "offer of sale" that started the one-year on-sale time-bar clock running or, alternatively, that clock started running when Davison created drawings for the manufacture of the invention, which in his opinion constituted a "reduction to practice."

Mr. McBride's opinions are contrary to the law and the facts and, thus, do not support liability on this theory.

---

[14] Ex. C-1 (McBride Report) at 6 (unnumbered).

"The on-sale bar prohibits the patenting of an invention that has been the subject of an offer for sale before [the] critical date in § 102(b). In applying the statutory on-sale bar, th[e Federal Circuit] follows the test set forth in *Pfaff* [*v. Wells Elecs., Inc.*, 525 U.S. 55 (1998)]. The *Pfaff* test requires that (1) the invention be the subject of a ***commercial sale or offer for sale***[,] and (2) the invention be 'ready for patenting' at the time of the offer or sale." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 996 (Fed. Cir. 2007) (emphasis added) (citations omitted). So "[t]he on-sale bar applies when [these] two conditions are satisfied before the critical date[.] . . ." *Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 726 F.3d 1370, 1374-75 (Fed. Cir. 2013).

Under the first prong of the *Pfaff* test,[15] "[a]n actual sale is not required for the activity to be an invalidating commercial offer for sale. An attempt to sell is sufficient so long as it is sufficiently definite that another party could make a binding contract by simple acceptance." *Hamilton Beach*, 726 F.3d at 1374-75. "[W]hen no actual sale is present, only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), triggers the on-sale bar." *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1365 (Fed. Cir. 2016).

"It is well-settled that mere preparations for commercial sales are not themselves 'commercial sales' or 'commercial offers for sale' under the on-sale bar." *Id.* at 1377-78. "Indeed, [the Federal Circuit] ha[s] held that an inventor that has publicized that a product will soon be placed on sale has not created an offer that another party could make binding by simple acceptance." *Id.*

---

[15] The Patent Act, including Section 102, was amended in 2011 by the America Invents Act. *See Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 139 S. Ct. 628, 630 (2019). The Supreme Court has held that the AIA did not alter the well-established meaning of the on-sale bar, and that case law construing the pre-AIA on-sale bar, including *Pfaff*, continues to apply post-AIA. *See id.* at 630, 633-34.

9

The Federal Circuit has also "held that merely granting a license to an invention, without more, does not trigger the on-sale bar of § 102(b)." *In re Kollar*, 286 F.3d 1326, 1330-31 (Fed. Cir. 2002) (citing *Mas-Hamilton Group v. LeGard, Inc.*, 156 F.3d 1206, 1217 (Fed. Cir. 1998), and *Moleculon Res. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1267 (Fed. Cir. 1986)). "[T]he offer of a license under a patent and a description of the invention, without more, does not fall within the on-sale bar of § 102(b)." *Id.* at 1332; *see also, e.g.*, *Elan Corp. v. Andrx Pharms., Inc.*, 366 F.3d 1336, 1341 (Fed. Cir. 2004) ("An offer to enter into a license under a patent for future sale of the invention covered by the patent when and if it has been developed[] . . . is not an offer to sell the patented invention that constitutes an on-sale bar.") (citing *Kollar*, 286 F.3d at 1331).

Thus, "an assignment or sale of the rights in the invention and potential patent rights is not a sale of the invention within the meaning of section 102(b)." *Moleculon*, 792 F.2d at 1267; *Kollar*, 286 F.3d at 1330-31 & n.3 (distinguishing licenses which trigger the on-sale bar (*e.g.*, standard computer software license wherein the product is just as immediately transferred to the licensee as if it were sold) from licenses that "merely grant[] rights" to an invention, which "cannot *per se* trigger the application of the on-sale bar").

The "reduction to practice" analysis applies only to the second prong of the *Pfaff* test (the invention is "ready for patenting"), and it is one of two ways that prong can be met. *See Honeywell*, 488 F.3d at 997. If there has been no commercial sale or offer for sale, the first prong of the disjunctive *Pfaff* test has not been met, and there is no need to consider the second prong. *See id.*; *Hamilton Beach*, 726 F.3d at 1374-75.

There was clearly no commercial sale or offer for sale here, so the first *Pfaff* prong was never met, and the on-sale bar was never triggered. There was never a commercial sale of Scorza's invention. Indeed, Mr. McBride couched his testimony in terms of Davison's acts

10

constituting an "offer for sale." However, as the above well-established case law holds, Davison's acts in presenting Scorza's invention to third parties to evaluate for potential licensing does ***not*** constitute a commercial offer for sale as a matter of law. *See Kollar*, 286 F.3d at 1330-31 & n.3; *Elan Corp.*, 366 F.3d at 1341; *Moleculon*, 792 F.2d at 1267.

Under the Multiple Company Campaign Agreement,[16] Davison agreed to submit Scorza's "Invention for licensing consideration" to up to 45 corporate targets, which included registered target companies (those "that have previously agreed to review product ideas confidentially from Davison") and non-registered target companies (those "that have not previously agreed to confidentially review product ideas from Davison"). Registered companies were those that had signed the "We Mass-Produce New Product Development" form at page 2 of Ex. R-19, R-20, and R-21. By signing that form, registered target companies indicated their interest in "review[ing] product design literature or samples," agreed to treat that information "as confidential and proprietary information[,]" and understood that "before [they] may use the design information, [they] will negotiate with us and enter into a license agreement." No terms of any potential license were included in the registration form.[17]

As for non-registered target companies, Davison sent a cover letter including the "teaser paragraph" describing Scorza's invention and a blank registration form. The cover letter stated, among other things, that in order to release confidential information regarding Scorza's invention, the non-registered target company had to return the

---

[16] Ex. R-16 at Davison_323, § A.1-4.

[17] Ex. R-19 at 2 (language below signature lines); Ex. R-20 at 2 (same); Ex. R-21 at 2 (same).

11

registration form. No terms of any potential license agreement were included in the cover letter or the attached blank registration form.[18]

Davison therefore did not make a definite offer for sale of Scorza's invention. Davison did not set forth any terms, let alone definite terms, of a potential future license agreement regarding Scorza's invention, so there was not even an offer of a license of Scorza's invention idea. In any event, an offer to license an idea or a patent does not trigger the first *Pfaff* prong of the on-sale bar as a matter of law. *See Kollar*, 286 F.3d at 1330-31 & n.3; *Elan Corp.*, 366 F.3d at 1341; *Moleculon*, 792 F.2d at 1267. It thus follows that Davison's actions preceding and preparatory to any such potential license cannot trigger that prong. *See id.* Davison's "mere preparations for [potential] commercial sales" do not constitute offers for sale under Section 102(b). *Medicines Co.*, 827 F.3d at 1377-78.

Scorza's patent rights were and are not barred by the on-sale bar because there has been no commercial sale or offer for sale, so the on-sale bar was never triggered. *See* 35 U.S.C. § 102(b); *Kollar*, 286 F.3d at 1330-31 & n.3; *Elan Corp.*, 366 F.3d at 1341; *Moleculon*, 792 F.2d at 1267. Mr. McBride's opinion that Davison's acts triggered the on-sale bar such that Scorza's patent rights in his idea are "irremediabl[y] los[t]" is contrary to well-established law and the facts of record. His opinions are unreliable and so should be rejected.[19] Scorza's theory of liability on his alleged lost profits rights therefore fails.

---

[18] Ex. R-19 at 1-2; Ex. R-20 at 1-2; Ex. R-21 at 1-2.

[19] Mr. McBride's testimony that one of Davison's renderings created legal liability for "false marking" is a spurious red herring and should also be rejected as unreliable.

The false marking statute, 35 U.S.C. § 292, requires that false marking be made "for the purpose of deceiving the public[,]" so it applies only where the article on which the mark was made was marketed to the public. *See* 35 U.S.C. § 292(a); *Sukumar v. Nautilus, Inc.*, 785 F.3d 1396, 1399-1401 & n.4 (Fed. Cir. 2015); *Forest Group, Inc. v. Bon Tool Co.*, 590 F.3d 1295, 1302-03 (Fed. Cir. 2009) ("The marking and false marking statutes exist to give **the public** notice of patent rights. Congress intended **the public** to rely on marking as a ready means of discerning the status of intellectual property embodied in an article of

**B.      Scorza Presented No Evidence of Any Amount of Monetary Damages Stemming from His Alleged Lost Patent Rights**

There is another fatal defect in Scorza's theory premised on his alleged "lost" patent rights: he presented no evidence establishing the amount of monetary damages he purportedly suffered due to those alleged lost rights.

Scorza has the burden to prove the amount of damages he allegedly suffered. "To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.' At a minimum, reasonable certainty embraces a rough calculation that it not 'too speculative, vague or contingent' upon some unknown factor." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 226 (3d Cir. 2003) (citations omitted). "[S]ufficient facts must be introduced so that the court can arrive at an intelligent estimate without conjecture." *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1257-58 (Pa. Super. 1983) (citations omitted). A "fact-finder may not render a verdict based on sheer conjecture or guesswork[.] . . ." *Discover Bank v. Booker*, 259 A.3d 493, 497 (Pa. Super. 2021) (quoting *Judge Tech. Servs., Inc. v. Clancy*, 813 A.2d 879, 885 (Pa. Super. 2002)).

Scorza offered no evidence from which the claimed damages stemming from his alleged lost patent rights can be calculated to any reasonable certainty. Scorza himself testified that he is not familiar with or an expert in patent rights or issues. Mr. McBride,

---

manufacture or design. Acts of false making deter innovation and stifle competition ***in the marketplace***. If an article that is ***within the public domain*** is falsely marked, potential competitors may be dissuaded from entering the same market.") (emphases added). Neither the Davison rendering Mr. McBride pointed to, nor any other article on which "patent pending" appeared, was marketed to the public, within the public domain, or in the marketplace, so the false marking statute does not apply.

Mr. McBride's testimony that anyone (including the "false market trolls" he referenced) can bring suit for false marketing is also incorrect. Congress addressed and closed that loophole in 2011 so that only competitors who suffer competitive injury as a result of a statutory violation can sue under the statute. *See Sukumar*, 785 F.3d at 1400-01 & nn.3-4 (discussing legislative history of 2011 amendments to § 292).

13

Scorza's expert on patent law issues, was not qualified to opine on, and thus did not opine on, any damages issues.

Dr. Kenneth Lehrer, Scorza's damages expert, did not provide an opinion on any actual damages Scorza allegedly sustained due to his lost patent rights. The most Dr. Lehrer did in his March 2022 report and his testimony at the hearing was to provide the following basic economic concept: "The value of the firm is the present value of the firm's expected future net cash flows. If cash flows are equated to profits for simplicity, the value of the firm today, or its present value[,] is the value of expected profits or cash flows, discounted back to the present at an appropriate interest rate."[20] But nowhere in his March 2022 report or in his hearing testimony did Dr. Lehrer provide any quantification of the amount of damages Scorza allegedly suffered because of his alleged lost patent rights. *See id.* at 1-16; *see also* Jan. 17, 2023 Preliminary Hearing & Scheduling Order #8 (noting "Dr. Lehrer's original report did not include any estimated damages figures").

In the absence of any evidence quantifying the alleged lost patent rights damages figure, it would be "sheer conjecture or guesswork" to award Scorza such damages. *See Delahanty*, 464 A.2d at 1257-58; *Discover Bank*, 259 A.3d at 497; *Ware*, 322 F.3d at 226. Scorza has failed to carry his burden of proof as to damages, so his claims fail.

## C.     Scorza Failed to Prove a Breach of Contract

Scorza's first claim for breach of contract fails. *See* Demand for Arb. Part IV.A. Scorza's theory at the hearing was that Davison breached the contracts by failing to do more to ensure his patent applications were completed correctly, such as by advising him to consult a patent practitioner. That cannot be and is not a breach of the parties' contracts given their express terms.

---

[20] Ex. C-2 (Dr. Lehrer's March 2022 report) at 8.

Scorza had the burden to establish by the following: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Discover Bank*, 259 A.3d at 495 (cleaned up). Scorza cannot establish elements (2) or (3). (Scorza's failure to prove element (3) is addressed above in Part II.B and will not be addressed further herein.)

"It is old, settled law that persons may alter by express agreement the legal relationship they would normally have had by operation of law." *Ress v. Barent*, 548 A.2d 1259, 1265 (Pa. Super. 1988) (citation omitted). "[W]here the parties have chosen to address a particular aspect of their relationship by contract, it is the writing itself that is to determine the rights and liabilities of the parties." *Id.* (citation omitted).

"[P]arties have the right to make their own contract, and it is not the function of [a c]ourt to re-write it, or to give it a construction in conflict with the accepted and plain meaning of the language used." *Gamesa Energy USA, LLC v. Ten Penn Ctr. Assocs., L.P.*, 217 A.3d 1227, 1238 (Pa. 2019) (citing *Amoco Oil Co. v. Snyder*, 478 A.2d 795, 798 (Pa. 1984)). "Pennsylvania affords parties broad latitude in fashioning their agreements. As part of that flexibility, a voluntarily-agreed-to contract term is enforceable unless a statute or the common law specifically prevents enforcement of that term." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 219-20 (3d Cir. 2022) (citations omitted). "It is not the province of the court to alter by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly." *Amoco Oil*, 478 A.2d at 798.

As part of the Pre-Development and Representation Agreement packet, Davison advised Scorza: "YOU ARE ENCOURAGED TO CONSULT WITH A QUALIFIED ATTORNEY BEFORE SIGNING THIS CONTRACT. BY PROCEEDING WITHOUT THE

15

ADVICE OF A QUALIFIED ATTORNEY, YOU COULD LOSE ANY RIGHTS YOU MIGHT HAVE IN YOUR IDEA OR INVENTION."[21] In Section I.B.6 of that Agreement, the parties agreed that "[Scorza] is solely responsible for the sufficiency and complete-ness of any [provisional patent] application and supporting documents[,]" and that "Davison will not perform any review or correction of any documents provided by [Scorza]."[22] Section III.D of that Agreement stated: "Except as described in paragraph I.B.6, Davison is not responsible for applying for, assisting with, or obtaining any intellectual property protections on the Product or Design, including but not limited to patents, trademarks and trade names."[23] Scorza e-signed this Agreement on January 12, 2017,[24] and he paid the $795 consideration by February 17, 2017.[25]

Similar language appeared in the parties' New Product Sample Agreement.[26] Davison "provide[d] descriptive information that [Scorza] may find useful in filing a" provisional patent application. Scorza acknowledged he was "solely responsible for the sufficiency, completion and submission of any final application, [USPTO] form PTO/SB/16, or any other patent or trademark applications that may be necessary."[27] Scorza also acknowledged that:

> [o]nly official government agencies can award a patent, trademark and/or copyright. Davison is not a law firm. Davison is not providing, and [Scorza] is not relying upon Davison for, legal advice. [Scorza] acknowledged that he/she

---

[21] Ex. R-3 at Davison_330.

[22] Ex. R-3 at Davison_332, § I.B.6 (Provisional Application for Patent Filing Payment).

[23] Ex. R-3 at Davison_334, § III.D (Disclaimers).

[24] Ex. R-3 at Davison_339.

[25] Ex. R-24 at Davison_70, 75; Ex. C-27 at Scorza24-25; Ex. C-28 at Scorza26.

[26] Ex. R-7.

[27] Ex. R-7 at Davison_21, § 1.F (Information for Provisional Patent Application).

16

is responsible for patenting his/her Idea and that Davison has made no representations concerning the patentability of the Idea or its ultimate design.[28]

Through these contract provisions, Davison did advise Scorza several times to seek legal counsel regarding any intellectual property rights he may have in his invention idea, including but not limited to any patent rights. The parties also agreed that Scorza was solely responsible for ensuring that his provisional patent paperwork was sufficient and complete. The parties expressly and repeatedly agreed that Davison would provide Scorza forms and information for use in connection with a provisional patent application. But they also agreed that Davison assumed no duties with respect to the sufficiency or completeness of any provisional patent application; those duties were Scorza's responsibility alone. Given the above case law, the contrary testimony and statements from Scorza, his counsel, or Mr. McBride cannot change the clear terms and effects of the parties' agreements that limited the scope of Davison's duties with respect to any provisional patent application Scorza chose to submit. *See, e.g.*, *Gamesa Energy*, 217 A.3d at 1238; *Ress*, 548 A.2d at 1265.

Scorza did not prove that there was a duty imposed by the contracts for Davison to advise him about patent matters or to refer him to patent counsel. The contracts say quite the opposite. Scorza is attempting to create a duty out of thin air and force it upon Davison in contradiction to the express, written, and agreed-upon terms. Thus, Scorza cannot establish that Davison "breach[ed] a duty imposed the contract[s]," nor can he establish any "resultant damages. As a result, his breach of contract claim fails. *See, e.g.*, *Discover Bank*, 259 A.3d at 495.

---

[28] Ex. R-7 at Davison_24, § 4.J.iii (Acknowledgments); *see also* Ex. R-5 at Davison_159 (cover letter to provisional patent application).

17

**D.** **Scorza Failed to Prove Fraud and Negligent Misrepresentation**

Scorza's fraud and negligent misrepresentation claims also fail. *See* Demand for Arb. Part IV.B-E. Scorza did not prove that Davison made a false representation, that he justifiably relied on any of the alleged representations he contrived at the hearing, or that he suffered any resultant damages. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (stating elements of fraudulent and negligent misrepresentation claims); *Kirwin v. Sussman Auto.*, 149 A.3d 333, 336 (Pa. Super. 2016) ("[A]t common law, both fraud and negligent misrepresentation require proof of justifiable reliance.") (citing *Bortz*, 729 A.2d at 560-61).

Scorza's "burden of proof to prove [his] fraud claim[s] is [by] clear and convincing evidence. Clear and convincing evidence is the highest burden in our civil law and requires the fact-finder to be able to come to a clear conviction, without hesitancy, of the truth of the precise fact in issue." *Weissberger v. Myers*, 90 A.3d 730, 735 (Pa. Super. 2014) (citations omitted). "Fraud must be proved by clear, precise, and indubitable evidence. This means that the witnesses must be credible, distinctly remember the facts to which they testify, and narrate the details exactly." *Edelstein v. Carole House Apartments, Inc.*, 286 A.2d 658, 661 (Pa. Super. 1971); *Mancini v. Morrow*, 458 A.2d 580, 584 (Pa. Super. 1983).

Scorza does not come close to meeting this high burden. From the very outset, Davison made truthful representations to Scorza about its services. Frank Vescio and Ahmed Arafat testified that in order to comply with the AIPA[29] and the 2008 Consent Order,[30] Davison designed its online idea submission process so that it was impossible for Scorza to submit his idea to Davison through that process, as he did, without

---

[29] 35 U.S.C. § 297(a).

[30] Ex. C-20.

acknowledging having received and read the Affirmative Disclosure Statement[31] and the AIPA disclosure statement.[32]

The Affirmative Disclosure Statement included the information required by Section II of the 2008 Consent Order,[33] including: "The total number of consumers in the last five years who made more money in royalties than they paid, in total, under any and all agreements with Davison, is six (6). The percentage of Davison's income that came from royalties paid on licenses of consumers' products in .001%."[34]

The AIPA disclosure statement included the information required by 35 U.S.C. § 297(a), including: "The number of customers who received a net financial profit as a direct result of the company's services over the company's history, since 1989, is thirty five (35). Since 1989, the total number of customers known by Davison to have received license agreements for their product ideas as a direct result of Davison's services is eight hundred twenty one (821)."[35] It also stated that "[i]t is Davison's normal practice to seek more than one contract in connection with a submitted idea[,]" and it included a description of those contracts and their costs.[36]

The parties' contracts and several other documents Davison provided to Scorza were replete with similar statements that Davison was not evaluating the commercial potential

---

[31] Ex. R-35; Ex. R-2 at Davison_69.

[32] Ex. R-36; Ex. R-2 at Davison_69.

[33] Ex. C-20 at 3-6, § II (Affirmative Disclosure Statement).

[34] Ex. R-35.

[35] Ex. R-36.

[36] Ex. R-36.

of Scorza's idea, and that it was "not ma[king] any representations concerning the potential of [Scorza]'s Product to be marketed, licensed, patented or to make a profit for [Scorza]."[37]

Scorza's disputed testimony that he was told Davison had given his idea a "green flag" proves nothing. As Mr. Vescio testified, the purported "green flag/red flag" verbiage simply does not exist at Davison. Mr. Vescio's testimony is consistent with the just-reviewed numerous statements in the contracts Scorza signed and Davison's repeated communications to Scorza that Davison was not evaluating the commercial potential of his idea. Scorza testified that he was told a "green flag" meant that an idea had a better chance of being developed. But again, consistent with Mr. Vescio's testimony, Davison continued to tell Scorza that simply because an idea was being developed, Davison was not making any representations regarding the idea's potential to be marketed, licensed, patented, or to make a profit for him.[38]

In light of these numerous truthful statements from Davison and in the parties' agreements, Scorza simply could not have justifiably relied on any alleged and disputed statements that his idea had been given a "green flag" such that his idea had a good or better chance of being successful. "[T]he case law clearly holds that a party cannot justifiably rely upon prior oral representations yet sign a contract denying the existence of

---

[37] Ex. R-3 (Pre-Development & Representation Agreement) at Davison_334, § I.D. (Disclaimers); *see also* Ex. R-4 at Davison_193 (Dec. 20, 2016 Idea Security Agreement); Ex. C-29 at Scorza_30-31 (Jan. 9 and 23, 2017 emails: "A typical client invention is not licensed, sold in stores or profitable. Davison offers fee-based services."); Ex. R-4 (Idea to Product Portfolio) at Davison_195, § 1.b; *id.* at Davison_205, § 6; Ex. R-7 (New Product Sample Agreement); at Davison_24, § 4.J.i-iii; Ex. R-16 (Multiple Company Campaign Agreement) at Davison_325, § C.4.a; Ex. R-17 (Inventomercial Presentation Agreement) at Davison_13, § C.iv.

[38] See the documents cited in footnote 37 above.

those representations." *Youndt v. First Nat'l Bank of Port Allegany*, 868 A.2d 539, 546 (Pa. Super. 2005) (quoting *Blumenstock v. Gibson*, 811 A.2d 1029, 1036 (Pa. Super. 2002)).

Indeed, Scorza himself acknowledged in April 2020 that "I am not blaming Davison for my pessimism because it was still a matter of 'buyer beware!' My main disappointment is that after all these years we have <u>not had a single hit</u> on this pretty unique idea."[39] So Scorza acknowledged and understood Davison's numerous statements that there was no guarantee his idea would be marketed or make a profit, and he proceeded anyway. There was nothing fraudulent about Davison's statements to Scorza throughout their relationship.

Scorza's tactic of relying on select allegations, findings, and conclusions from Judge Lancaster's Findings of Fact and Conclusions of Law in the *FTC v. Davison Associates, Inc.* case[40] also proves nothing. Aside from those findings and conclusions being stale and irrelevant, Scorza's counsel merely read certain findings and conclusions of Judge Lancaster's March, and then asked Scorza whether those findings and conclusions sounded "familiar" to Scorza based on his interactions with Davison. In response to many of these questions, Scorza stated that the statements read were not exactly what Davison allegedly told him. Legally, such imprecise testimony is insufficient to establish a fraud claim. *Edelstein*, 286 A.2d at 661. And factually, as discussed at length above, the parties' agreements and the other communications from Davison to Scorza completely undermine Scorza's attempt to rely on Ex. C-17.

In sum, Scorza's fraud and negligent misrepresentation claims fail for multiple reasons: Davison made truthful representations to Scorza about its services; Davison did

---

[39] Ex. C-33 at Scorza33 (Apr. 8, 2020 email) (emphasis in original).

[40] Ex. C-17.

not conceal material facts from Scorza; Scorza cannot establish justifiable reliance on any alleged (mis)representations in light of the contrary documentary evidence of record; and Scorza cannot establish any resultant damages (as argued in Part II.B above).

### E.    Scorza Is Not Entitled to Punitive Damages

Scorza's request for punitive damages fails for several reasons. *See* Demand for Arb. Part VI.

***First***, because all of Scorza's pled claims fail, he cannot recover punitive damages. *See Reading Radio, Inc. v. Fink*, 833 A.2d 199, 213-14 (Pa. Super. 2003) ("If no cause of action exists, then no independent action exists for a claim of punitive damages since punitive damages is only an element of damages.") (citation omitted).

***Second***, assuming *arguendo* the breach of contract claim survives the legal and factual impediments outlined above and in Davison's Pre-Hearing Brief, "[u]nder Pennsylvania law, punitive damages are not recoverable in a breach of contract claim." *Greenwald Caterers Inc. v. Lancaster Host, LLC*, 599 F. Supp. 3d 235, 249 (E.D. Pa. 2022) (citing, *inter alia*, *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 932 (Pa. Super. 1984)). So even if Scorza somehow prevails on his breach of contract claim, he cannot recover punitive damages.

***Third***, as argued at length in Part V of Davison's Pre-Hearing Brief, any claim Scorza makes for punitive damages (or any other damage amount exceeding the $20,042.25 he paid to Davison) is barred by the contracts' valid and enforceable limitation of liability provisions that expressly disclaim punitive damages.[41]

---

[41] Ex. R-7 (New Product Sample Agreement) § 4.N; Ex. R-16 (Multiple Company Campaign Agreement) § A.4.b; Ex. R-17 (Inventomercial Presentation Agreement) § C.ii.

*Fourth*, this case does not rise to the level of "only the most exceptional matter[]" where the "extreme remedy" of punitive damages is warranted. *Phillips v. Cricket Lighters*, 883 A.2d 439, 445-46 (Pa. 2005). "Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others." *Id.* (citations omitted). "[W]hen assessing the propriety of the imposition of punitive damages, the state of mind of the actor is vital. The act, or failure to act, must be intentional, reckless or malicious." *Hutchinson ex rel. Hutchinson v. Luddy*, 870 A.2d 766, 770-71 (Pa. 2005) (citations omitted). "Thus, in Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed[,] and that he (2) acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.* at 772.

Moreover, "when fraud is the basis of compensatory damages, the same fraudulent conduct is not sufficient to base an award of punitive damages without more. To justify the award of punitive damages, there must be acts of malice, vindictiveness and a wholly wanton disregard of the rights of others." *Pittsburgh Live, Inc. v. Servov*, 615 A.2d 438, 442 (Pa. Super. 1992); *see SodexoMAGIC*, 24 F.4th at 206.

As noted at length above, there is no evidence that Davison intentionally or negligently defrauded Scorza, let alone any additional acts of malice, vindictiveness, and a wholly wanton disregard of his rights needed to award punitive damages. *See id.* Scorza's patent rights are not lost, *see supra* Part II.A, and Davison truthfully represented the scope and limitations of its services, *see supra* Parts II.D. Finally, the evidence is uncontradicted

that Davison performed all the contracted-for services to Scorza's express, written satisfaction.[42] There is simply no basis for an award of punitive damages here.

## III.    CONCLUSION

Accordingly, an award should be entered in Davison's favor as to all of Scorza's claims, and his requests for attorneys' fees, costs, and punitive damages should be denied. A proposed award is attached hereto as Exhibit 2.

Respectfully submitted,

BARRON LAW OFFICE LLC

Date:  March 3, 2023          By: _____

Justin T. Barron (PA I.D. No. 200394)
P.O. Box 493
Valencia, PA 16059
(412) 334-6312
jbarron@justinbarronlaw.com

---

[42] Ex. R-10 (Scorza's signed Integrated Product Rendering Presentation questionnaire); Ex. R-11 (Scorza's signed product design); Ex. R-12 (Scorza's signed Executive Briefing questionnaire); Ex. R-13 (Scorza's signed Shipping Procedure Agreement)

IN THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| MARIO SCORZA, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | No. 01-21-0004-6369 |
| | ) | |
| DAVISON DESIGN AND | ) | |
| DEVELOPMENT, INC., | ) | |
| | ) | |
| Respondent. | ) | |

# **Exhibit 1**

IN THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| MARIO SCORZA, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | )   No. 01-21-0004-6369 |
| | ) |
| DAVISON DESIGN AND | ) |
| DEVELOPMENT, INC., | ) |
| | ) |
| Respondent. | ) |

**RESPONDENT'S PRE-HEARING BRIEF**

Respondent Davison Design & Development, Inc. ("Davison"), by its attorneys,

submits its Pre-Hearing Brief.[1]

## INTRODUCTION

Between January 2017 and December 2018, Claimant Mario Scorza's ("Scorza")

entered into four separate contracts with Davison to provide services in connection with

Scorza's invention idea. Each time, Davison was clear and explicit that by providing these

services, Davison was in no way representing that Scorza's idea was a good or marketable

one, or that it would result in a third-party license or profits. Despite Davison so advising

him and otherwise performing its contractual (and other) obligations, Scorza's idea did not

pique the interest of a licensee. Scorza himself acknowledged these risks and Davison's

representations, stating as late as April 2020 that he was not blaming Davison because he

proceeded as a "matter of 'buyer beware!'"

Scorza has now completely changed his tune, seeking to hold Davison liable for the

failure of his idea to result in the profits he apparently convinced himself would be

---

[1] Because a full factual record has not been, and will not be, developed until the upcoming
evidentiary hearing, this Pre-Hearing Brief will focus on legal defects in Mr. Scorza's claims
and legal defenses. Davison's Post-Hearing Brief will address the evidence introduced at
the hearing.

forthcoming, despite what Davison told him. Scorza's Demand for Arbitration is rife with inaccuracies regarding what Davison purportedly did and did not do for him, *see, e.g.*, Demand for Arb. ¶¶ 7-9, and what Davison did and did not tell him both before and during the course of performance, *see, e.g.*, *id.* ¶¶ 9-10.

Davison performed its contractual obligations, and it did not misrepresent facts to or omit facts from Scorza. Scorza's claims also suffer from numerous legal defects. Accordingly, an award should be entered in Davison's favor on all of Scorza's claims.

## I.  Scorza's Breach of Contract Claim Fails Because Davison Performed Its Contractual Obligations

Scorza first asserts a claim for breach of contract. Demand for Arb. at 5. In addition to wrongly stating that there is only one contract between the parties (there are four), *see id.* ¶¶ 6, 12, Scorza wrongly claims that Davison breached the contracts.

The four contracts at issue are:

1.  a Pre-Development and Representation Agreement dated January 12, 2017 (the "PD Agreement");

2.  a New Product Sample Agreement dated March 29, 2017 (the "NPSA");

3.  a Multiple Company Campaign Agreement dated December 14, 2018 (the "MCCA"); and

4.  an Inventomercial Presentation Agreement dated December 19, 2018 (the IPA").

Davison performed its obligations under each of these contracts. Under the PD Agreement, Davison: (1) identified a Licensee/target company and submitted Scorza's idea to that Licensee;[2] (2) provided Scorza with the "Idea to Product Portfolio" containing the

---

[2] The initial Licensee/target company was EB Brands Holding Inc., but it was later changed, at Scorza's request, to Conair Corp. Davison submitted Scorza's idea to Conair in

results of Davison's pre-development services; and (3) provided Scorza with the provisional patent application paperwork.

Under the NPSA, Davison: (1) provided Scorza with an "Integrated Product Rendering" setting forth the presentation materials for Scorza's idea; (2) provided Scorza with an "Executive Summary" including, among other things, computerized drawings of the components Davison had manufactured; and (3) created a product sample. Notably, Scorza approved Davison's work, without which Davison would not have proceeded.

Under the MCCA, Davison (1) prepared three lists of target companies to which a presentation of Scorza's idea would be submitted for licensing consideration; (2) obtained Scorza's input and approval of those lists, as well as "teaser" language to submit to the targets who had not previously agreed to keep product ideas from Davison customers confidential; and (3) submitted presentations of his idea to those target companies who had already agreed to keep it confidential, and "teasers" to those target companies who had not to see if they were interested in executing a confidentiality agreement to review the product idea.

Under the IPA, Davison prepared and provided to Scorza a demo video clearly communicating the functions and characteristics of Scorza's product. That video was submitted to the target companies/potential licensees as part of Davison's presentation of Scorza's idea for licensing consideration.

None of the companies Davison contacted as potential licensees expressed an interest in pursuing Scorza's idea. But that is not a breach because Davison had no obligation, contractual or otherwise, to guarantee or obtain such a result. Each of the

---

June of 2018, which was within 6 months after Scorza and Davison agreed on the final design of the product.

parties' agreements included clear and unambiguous disclaimers telling Scorza, in no uncertain terms, that "Davison has made no claim or warranty that Davison will be able to consummate a License Agreement, or find a Licensee willing to compensate [Scorza] for his or her Product and/or Design," and that "Davison has not made any representations concerning the potential of [Scorza]'s Product to be marketed, licensed, patented or to make a profit for [him]."

Mr. Scorza knew of these risks in pursuing his invention idea, and that Davison was not guaranteeing Scorza's success, saying in an April 2020 email: "I am not blaming Davison for my pessimism because it was still a matter of 'buyer beware!' My main disappointment is that after all these years we have not had a single hit on this pretty unique idea." Davison performed its contractual (and all other) obligations, and it is not liable for his disappointment or the failure of his product to be licensed or to make a profit.

## II.     Scorza's Fraud Claims Suffer from Several Fatal Defects

Scorza asserts claims of "common-law fraud," "fraud by non-disclosure," and "negligent misrepresentation." Demand for Arb. ¶¶ 14-16, 21-22, 23-25. There are several fatal legal defects to those claims.[3]

### A.     The Parol Evidence Rule Bars Scorza's Fraud Claims

As the Third Circuit has recently explained, "[w]hen an integrated contract includes a fraud-insulating term—to form what may be called an 'integration-plus' contract— . . . the parol evidence rule prevents the use of extrinsic evidence to vary the fraud-insulating term. And without such evidence, it is virtually impossible to establish the justifiable-reliance element needed for a fraud claim." *SodexoMAGIC LLC v. Drexel Univ.*, 24 F.4th 183, 214

---

[3] In addition, and putting aside these legal defects, Scorza cannot establish each element of his fraud claim by the requisite clear and convincing evidence. *See Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991).

(3d Cir. 2022). "Left undisturbed by extrinsic evidence, a no-reliance clause, through which a party disclaims reliance on any prior representations, makes it ***legally impossible*** for a party to establish that it justifiably relied on a precontractual representation. Thus, through the operation of the parol evidence rule, a no-reliance clause in an integrated contract precludes fraudulent inducement claims that depend on a precontractual misrepresentation." *Id.* (emphasis added) (citations omitted).

The parties' Agreements are integrated and contain a no-reliance clause.[4] It is thus "legally impossible" for Scorza to establish that he justifiably relied on any pre-contractual representations, thus "preclud[ing]" Scorza's attempt to base his fraud claims on a pre-contractual representation. *See id.*; *see also Youndt v. First Nat'l Bank of Port Allegany*, 868 A.2d 539, 546 (Pa. Super. 2005) (same).

### B.    The Gist of the Action Doctrine Bars Scorza's Fraud Claims

To the extent Scorza claims that Davison committed fraud by failing to give him the benefit of the bargain set forth in, or made misrepresentations regarding its duties under, the parties' Agreements, *see* Demand for Arb. ¶¶ 14-16, 21-22, 23-25, that is barred by the gist of the action doctrine.

"Under Pennsylvania law, the gist of the action doctrine prevents a purely contractual duty from serving as the basis for a tort claim." *SodexoMAGIC*, 24 F.4th at 216 (citing *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 65 (Pa. 2014)). "Where a duty is created by

---

[4] The Agreements include the following or substantially similar language:

> The parties intend this document to be the complete, exclusive, final and fully integrated statement of their agreement. Neither party is relying upon any oral agreement or representation in entering into this Agreement and all prior oral agreements or representations are hereby considered null and void.

contract, the gist of the action doctrine requires that a claim for a breach of that duty be brought in contract, not tort." *Id.* (citing *Bruno*, 106 A.3d at 68).

Where "the [alleged] fraudulent misrepresentations are based in the performance of the [parties'] contract[, such as where the p]laintiff alleges that [d]efendant did not give him the benefit of his bargain," and bases the fraud claim on alleged "fraudulent misrepresentation allegations that allegedly ensued in the middle of the performance of the" contract, that claim is precluded by the gist of the action doctrine because it is "clearly intertwined [with] and fully based upon the failure of performance under the alleged contract and do[es] not relate to some broader social duty." *Clark v. Applied Cardiac Sys., Inc.*, No. 21-cv-1123, 2022 WL 798370, at *9-10 (W.D. Pa. Mar. 16, 2022) (Schwab, J.).

Scorza cannot transform contract-based duties and alleged breaches of the parties' Agreements into fraud claims under the gist of the action doctrine, so his fraud claims fail on this basis as well. *See id.*; *SodexoMAGIC*, 24 F.4th at 216.

## III.   Scorza's UTPCPL Claim Fails Because His Purchase of Goods or Services from Davison Was Not "Primarily for Personal, Family, or Household Purposes"

Scorza's asserted claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") fails because his purchase of services from Davison was for investment, business, and commercial purposes—not "primarily for personal, family, or household purposes," as the statute requires. 73 P.S. § 201-9.2(a).

The UTPCPL provision creating a private cause of action states, in relevant part, that "[a]ny person who purchases or leases goods or services ***primarily for personal, family or household purposes*** and thereby suffers any ascertainable loss of money or property[] . . . may bring a private action . . . ." *Id.* (emphasis added).

6

"In construing claims under the [UTP]CPL, Pennsylvania courts have distinguished purchases made for business reasons, which are ***not*** actionable, from those made for 'personal, family or household use[,]'" which are actionable. *Balderston v. Medtronic Sofamor Danek, Inc.*, 285 F.3d 238, 242 (3d Cir. 2002) (citations omitted). Whether a purchase is primarily for personal, family or household purposes depends on the "***purpose*** of the purchase, not the ***type of product*** purchased." *Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 644 (Pa. Super. 1990) (emphasis in original).

So if a person purchased goods or services "for commercial purposes only," or "primarily as an investment" in which the plaintiff "intend[ed] to make money from" third-party sales, those claims fail as a matter of law under the UTPCPL because they are not "primarily for personal, family or household purposes." *See, e.g.*, *Growall v. Maietta*, 931 A.2d 667, 675-76 (Pa. Super. 2007) (affirming dismissal where plaintiff "purchased the [real] property primarily as an investment rather than to live in, intending to make money from the property by leasing the apartments to tenants"); *Lal v. Ameriprise Mortg. Co.*, 858 A.2d 119, 124-25 (Pa. Super. 2004) (affirming dismissal where plaintiff "did not purchase the property for personal, family or household purposes[, instead t]hey purchased it as an investment property"); *Trackers Raceway, Inc. v. Comstock Agency, Inc.*, 583 A.2d 1193, 1197 (Pa. Super. 1990) (en banc) (affirming dismissal because the insurance policy purchased "was purchased for commercial purposes only[]" and plaintiff sought "damages arising from the interruption of its business operations").

Scorza clearly purchased services from Davison for business, commercial, and investment purposes—not primarily for personal, family, or household purposes. Each of

the parties' four agreements expressly stated as much.[5] The purpose of Scorza's purchase of Davison's services was so that he could develop his idea into a product he could sell to third parties on the market. Moreover, he did not intend to use the product primarily for his own personal use. Indeed, Scorza has sought expert testimony to pursue his claim of "lost profits" damages arising from his alleged inability to market and sell the product and to make money from third-party sales. *See* Demand for Arb. ¶¶ 8-9, 12. That his idea was a scale that could be used for personal, family, or household purposes is irrelevant—the purchase of services from Davison was for Scorza's business, investment, and commercial purposes, and the type of product at issue is irrelevant. *See Valley Forge*, 574 A.2d at 644.

Scorza's UTPCPL claim therefore fails as a matter of law. *See* 73 P.S. § 201-9.2(a); *Growall*, 931 A.2d at 675-76; *Lal*, 858 A.2d at 124-25; *Trackers Raceway*, 585 A.2d at 1197.

## IV.    Scorza's Claim for Attorneys' Fees Fails as a Matter of Law

The failure of Scorza's UPTCPL claim means that his claim for attorneys' fees also fails. *See* Demand for Arb. ¶ 26. There is no other applicable fee-shifting statute; there is no contractual fee-shifting provision in the parties' contracts; and there is no fee-shifting in fraud cases.[6] *See McMullen v. Kutz*, 985 A.2d 769, 776 (Pa. 2009) (noting Pennsylvania's prevailing American rule regarding attorneys' fees where, as here, there is no contractual fee-shifting provision); *Koffman v. Smith*, 682 A.2d 1282, 1285 (Pa. Super. 1996) (no fee-

---

[5] Each of the agreements included a provision containing the following, or substantially similar, language: "[Scorza] acknowledges that he/she is contracting for Davison's services for the business purpose of developing [Scorza]'s idea commercially and not for any personal, household or family purpose."

[6] Davison is not conceding Scorza's fraud claim has merit. As noted above, it does not. However, even assuming *arguendo* his fraud claim did not fail as a matter of law, he still could not recover attorneys' fees as to that claim.

shifting in fraud cases). Because Scorza's UTPCPL claim fails, there is no viable basis for him to recover his attorneys' fees.

**V.      Scorza Cannot Recover Lost Profits or Punitive/Exemplary Damages**

Scorza's claim for lost profits and punitive damages fails given the contracts' limitation of liability provisions that disclaim precisely such damages. *See* Demand for Arb. ¶ 27; Scorza's Expert Disclosures (identifying purported lost profit damages report).

The parties' agreements contain clear limitation of damages language (emphasis added):

> The liability of the parties for any and all claims arising from or relating to this Agreement or its formation is limited to direct, actual damages only and is further limited to not exceed the amount actually paid by Client for the services. ***In no event will Davison be liable to Client for any consequential, exemplary, incidental or punitive damages, including lost opportunities or lost profits***.

This is a limitation of liability clause, which places a limit on Davison's liability, not an exculpatory clause, which would insulate Davison from ***all*** liability. "The difference between the two clauses 'is a real one.'" *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 202 (3d Cir. 1995) (cleaned up) (quoting *Posttape Assocs. v. Eastman Kodak Co.*, 537 F.2d 751, 755 (3d Cir. 1976)); *see also, e.g.*, *id.* at 202-03; *Marsulex Envtl. Techs. v. Selip S.P.A.*, 247 F. Supp. 3d 504, 510-13 (M.D. Pa. 2017); *Great N. Ins. Co. v. ADT Servs., Inc.*, 517 F. Supp. 2d 723, 749 (W.D. Pa. 2007). Because of this difference, "those cases which involve the enforcement of exculpatory clauses are simply inapposite here[, where a limitation of liability clause is at issue]." *Great N. Ins.*, 517 F. Supp. 2d at 749 (citation omitted). So Scorza is wrong to the extent he relies on case law construing and applying tests applicable to exculpatory clauses.

"Pennsylvania common law . . . makes clear that said limitation [of liability clauses] [are] valid and enforceable." *Id.* (citing cases); *see also, e.g.*, *Valhal*, 44 F.3d at 203-04. These

9

App. 201

provisions are enforceable regardless of whether the party against which the provision is to be enforced is allegedly "unsophisticated," or there is an alleged disparity in bargaining power between the parties. Both *Valhal* and *Great Norther Insurance* cite Pennsylvania case law enforcing such limitation of liability clauses against consumer plaintiffs. *See Valhal*, 44 F.3d at 203 (citing *LoBianco v. Prop. Protection, Inc.*, 437 A.2d 417 (Pa. Super. 1985), *Magar v. Lifetime*, 144 A.2d 747 (Pa. Super. 1958), *Shafer v. Reo Motors*, 205 F.2d 685 (3d Cir. 1953), and *Bash v. Bell Tel. Co. of Pa.*, 601 A.2d 825 (Pa. Super. 1992)); *Great N. Ins.*, 517 F. Supp. 2d at 749 (same); *Greenspan v. ADT Sec. Servs. inc.*, 444 Fed. Appx. 566 (3d Cir. 2011) (affirming summary judgment against consumer plaintiff). Scorza cannot avoid the effect of the limitation of liability clauses by claiming he is an "unsophisticated consumer." *See id.*

Nor can Scorza avoid those effects by arguing that the agreements are "contracts of adhesion." "[M]erely because a contract is one of adhesion does not render it unconscionable or unenforceable as a matter of law." *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007); *Bayne v. Smith*, 925 A.2d 265, 270 (Pa. Super. 2009). Labeling the Agreements as "adhesion contracts" does nothing to avoid the effectiveness or enforceability of the Agreements' limitation of liability provisions.[7]

The Agreements were not unconscionable, either, as Scorza was "a free agent who c[ould have] simply walk[ed] away without signing the [Agreements] and participating in the activity [set forth therein], . . . thus the [Agreements] signed under such circumstances

---

[7] Davison is not conceding that any or all of the Agreements at issue are, in fact, adhesion contracts. Scorza was able to negotiate certain provisions of the Agreements, most notably the price terms. So the Agreements were not adhesion contracts. *See, e.g., Chepkevich v. Hidden Valley Resort, LP*, 2 A.3d 1174, 1190 (Pa. 2010) (defining "adhesion contract[s]"). But even if they were found to be adhesion contracts, that does not render them or their limitation of liability provisions unenforceable, as noted in the text above.

10

[were] not unconscionable."[8] *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1191 (Pa. 2010).

"In commercial settings, a limitation of damages clause will rarely be found [to be] unconscionable." *Borden, Inc. v. Advent Ink Co.*, 701 A.2d 255, 264 (Pa. Super. 1997). As noted above, Scorza repeatedly acknowledged the commercial setting in which the Agreements arose, as evidenced by the commercial purpose and intent to market his product to third parties. *See supra* Part III.

Likewise, "it is settled law that mere unequal bargaining power between the parties to a contract does not render the contract, or a provision thereof, unconscionable." *Borden*, 701 A.2d at 264; *Quilloin v. Tenet Health Sys. Phila., Inc.*, 673 F.3d 221, 235 (3d Cir. 2012). Again, Scorza cannot avoid the limitation of liability clauses here simply by claiming he was an "unsophisticated consumer," as that is contrary to the commercial nature of the parties' Agreements, and insufficient as a matter of law in any event.

Notably, courts regularly determine the enforceability of and enforce limitation of liability provisions at the pleadings or summary judgment stage—*i.e.*, without the need for a full-blown evidentiary hearing. *See, e.g.*, *Marsulex*, 247 F. Supp. 3d at 510-13 (motion to dismiss); *Valhal*, 44 F.3d at 202-03 (summary judgment); *Great N. Ins.*, 517 F. Supp. 2d at 746-50 (same); *Greenspan*, 444 Fed. Appx. at 568-70 (same); *Borden*, 701 A.2d at 262-64 (same).

There are no factual issues relating to the enforcement of the limitation of liability provisions in the parties' Agreements against Scorza such that Scorza should be permitted to introduce evidence of his alleged lost/punitive damages at the hearing, including but not

---

[8] Scorza has the burden of proving unconscionability, which "is as a question of law for a court." *Todd Heller, Inc. v. United Parcel Serv., Inc.*, 754 A.2d 689, 700 (Pa. Super. 2000); *Centric Bank v. Sciore*, 263 A.3d 31, 39 (Pa. Super. 2021).

limited to his purported expert report on lost profits. Consistent with longstanding Pennsylvania law, the Agreements' limitation of liability provisions are enforceable against Scorza as a matter of law in this setting, so there is no basis for him to recover any indirect damages expressly prohibited by those provisions, including the lost profits damages he would introduce at the hearing. Given the validity, enforceability, and effect of the limitation of liability provisions, Scorza cannot recover lost profits/lost opportunities damages, so his lost profits expert testimony is not relevant and would do nothing to promote the efficient resolution of this matter, and it should not be introduced at the hearing.

### CONCLUSION

For these reasons, and the reasons to be developed at the evidentiary hearing and advocated in Davison's Post-Hearing Briefs, an award should be entered in Davison's favor as to each of Scorza's claims.

Respectfully submitted,

BARRON LAW OFFICE LLC

Date:  May 16, 2022          By:  _____

Justin T. Barron (PA I.D. No. 200394)
P.O. Box 493
Valencia, PA 16059
(412) 334-6312
jbarron@justinbarronlaw.com

12

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served

via email this 16th day of May, 2022 upon the following counsel of record:

Bradley A. Nevills, Esquire
bnevills@kmd.law
William Yarbrough, Esquire
wyarbrough@kmd.law
Stacey L. Barnes, Esquire
sbarnes@kmd.law
Kearney, McWilliams & Davis, PLLC
55 Waugh Drive, Suite 150
Houston, TX 77007

_____
Justin T. Barron

IN THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| MARIO SCORZA, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | No. 01-21-0004-6369 |
| | ) | |
| DAVISON DESIGN AND | ) | |
| DEVELOPMENT, INC., | ) | |
| | ) | |
| Respondent. | ) | |

# **Exhibit 2**

IN THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| MARIO SCORZA, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | No. 01-21-0004-6369 |
| | ) | |
| DAVISON DESIGN AND | ) | |
| DEVELOPMENT, INC., | ) | |
| | ) | |
| Respondent. | ) | |

## [PROPOSED] AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreements entered into between the above-named parties and dated January 12, 2017, March 29, 2017, December 14, 2018, and December 19, 2018, and having been duly sworn, and having duly heard the proofs and allegations of the Claimant, represented by Stacey L. Barnes and William Yarbrough, and Respondent, represented by Justin T. Barron and George Crompton, hereby FIND and AWARD as follows:

In favor of Respondent, Davison Design and Development, Inc., and against Claimant, Mario Scorza, as to all of Claimant's claims. I award no damages to Claimant.

The administrative fees of the American Arbitration Association and the compensation of the arbitrator are to be borne as incurred.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

I, Scott D. Livingston, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____          _____
Date                                                          Scott D. Livingston

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served

via email this 3rd day of March, 2023 upon the following counsel of record:

Bradley A. Nevills, Esquire
bnevills@kmd.law
William Yarbrough, Esquire
wyarbrough@kmd.law
Stacey L. Barnes, Esquire
sbarnes@kmd.law
Kearney, McWilliams & Davis, PLLC
55 Waugh Drive, Suite 150
Houston, TX 77007

_____
Justin T. Barron

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVISON DESIGN & DEVELOPMENT, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. |
| v. | ) ) | |
| MARIO SCORZA, | ) ) | |
| Defendant. | ) | |

**Exhibit 6**

**March 6, 2023 Scheduling Order #12**



**Case Number: 01-21-0004-6369**

**Mario Scorza**
**-vs-**
**Davison Design & Development, Inc.**

### <u>Scheduling Order #12</u>

    The Arbitrator received the parties' post-hearing briefs on Friday, March 3, 2023 and, accordingly, the hearing is now closed for evidentiary purposes.  The Arbitrator shall issue an award on or before April 3, 2023.


Dated: <u> March 6, 2023 </u>      Arbitrator Signature: _____

                                       Scott D. Livingston

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVISON DESIGN & DEVELOPMENT, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. |
| v. | ) ) | |
| MARIO SCORZA, | ) ) | |
| Defendant. | ) | |

**Exhibit 7**

**March 17, 2023 Award of Arbitrator**

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

In the Matter of the Arbitration between

Case Number: 01-21-0004-6369

Mario Scorza  ("Claimant")
-vs-
Davison Design & Development, Inc.  ("Respondent")

**AWARD OF ARBITRATOR**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated March 23, 2017, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, with Claimant represented by Stacey Barnes of Kearney, McWilliams & Davis, PLLC, and Respondent represented by Justin Barron of Barron Law Office LLC, hereby AWARD as follows:

> For Claimant, Mario Scorza, and against Respondent, Davison Design & Development, Inc., in the principal amount of $20,042.25 with $6,012.60 in interest plus an award of reasonable attorney fees and costs pursuant to the American Inventors Protection Act and the Texas Invention Development Services Act in the amount of $199,024.05 for a total award of $225,078.90.

In addition to the above award, the administrative fees of the American Arbitration Association totaling $18,425.00 shall be borne exclusively by Respondent, and the compensation of the Arbitrator totaling $30,528.00 shall be borne exclusively by Respondent. Therefore, Respondent shall reimburse to Claimant the sum of $32,564.00, representing that portion of said fees in excess of the apportioned costs previously incurred by Claimant.

The above sums are to be paid on or before 20 days from the date of this Award.

Except as indicated above, all of Claimant's other requests for relief, including his request for treble damages, are denied.

This Award is in full settlement of all claims and counterclaims submitted in this Arbitration. All claims not expressly granted herein are hereby, denied.

3/27/2023
_____
Date

_____
Scott David Livingston, Arbitrator

I, Scott David Livingston, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

3/27/2023
_____
Date

_____
Scott David Livingston

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Ca No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA** | ) | |
| | ) | |
| **Defendant** | ) | |

**DEFENDANT, MARIO SCORZA'S**
**MOTION TO CONFIRM ARBITRATION AWARD AND**
**RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO VACATE AWARD**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant, Mario Scorza ("Scorza") in the above styled and numbered cause of action, and files this, his Motion to Confirm Arbitration Award and Response in Opposition to Motion to Vacate Award, and, in support of same, would respectfully show the Court the following:

**I**
**FACTUAL BACKGROUND**

1.     This action arises out of an arbitration proceeding (the "Arbitration"), in which Scorza prevailed against Plaintiff, Davison Design & Development, Inc. ("Davison"), and was awarded damages of $20,042.25 and attorney's fees in the amount of $199,024.05.   *See* Exhibit 1, Arbitration Award (the "Award").   The Arbitration was conducted according to the arbitration clause contained in one of Davison's standard contracts of adhesion, drafted by Davison. See Exhibit 2, Davison Pre-Development and Representation Agreement.   Upon losing the arbitration proceeding, Davison sought to vacate the Award, or alternately sought this Court to modify the Award, by removing all attorney's fees awarded.

1

2.      However, this is not the first time that Davison has sought to vacate an unfavorable arbitration award, arising out of its own arbitration clause.  Davison previously litigated the exact issue at bar in this proceeding in *Frison,* in this District Court.  *Davison Design & Dev., Inc. v. Frison*, 2018 WL 6324996, 2:17-cv-01468 (W.D. Pa. Dec. 4, 2018).[1]  In *Frison*, Davison lost an arbitration award.  The plaintiff was awarded damages and attorney's fees by the arbitrator.  Davison sought to vacate the award of attorney's fees, arguing that the arbitrator exceeded his powers in awarding same.  Davison was unsuccessful.  *Id.*  The decision was reviewed in the Court of Appeals.  Predictably, the Court of Appeals declined to overturn the judgment of the district court.  *Davison Design & Dev., Inc. v. Frison*, 815 Fed.Appx. 659 (3rd Cir. 2020).  Ignoring the dictates of legal precedence and common sense, Davison is once again asking this District Court to vacate an adverse arbitration award, second guess the arbitrator, and remove the award of attorney's fees from the Arbitration Award.  Davison's actions are made in bad faith, vexatiously, wantonly, and for oppressive reasons.

3.      Scorza invented a folding travel scale, a device that has since, subsequent to the destruction of Scorza's patent rights, seen success in the retail market. Davison made a number of problematic representations to Scorza, including his reasonably good chance of realizing financial gain, their own track record, that many products they produced became profitable, that Davison had special access to manufacturing and consumer companies, their close working relationships to such companies, the necessity of their services, and its ability to prepare objective and expert analyses of the marketability of products.  Exhibit 6, Scorza Pre-Hearing Brief, p. 1-13; Exhibit 7, Scorza Post-Hearing Brief, p. 3-6, 12-14, 17-18; *see also* Exhibit 5, *FTC* Findings of Fact & Conclusions of Law, p. 8-9.

---

[1] The district court's opinion in *Frison* is attached hereto as Exhibit 10.

App. 214

4.      However, through a series of astounding incidents of incompetence, Davison managed to twice file flawed patent applications for Scorza, fail to attach supporting documents, fail to pay the correct fee to the Patent and Trademark Office ("USPTO"), as required by contract, disclose the unprotected invention, and eventually destroy any ability for Scorza to obtain any patent rights whatsoever, rights which prior to Davison's missteps could have been readily obtained. *See* Exhibit 3, McBride Expert Report; Exhibit 6, Scorza Pre-Hearing Brief, p. 2-8; Exhibit 7, Scorza Post-Hearing Brief, p. 2-7. Due to Davison's failure to perform under its own contract, Scorza began receiving notices from the USPTO. Scorza forwarded the notices to Davison, pleading for information and assistance.[2] Davison ignored Scorza, except to demand more money from him. Exhibit 6, Scorza Pre-Hearing Brief, p. 3-8; Exhibit 9, Correspondence to Rifkin ("For: Larry Rifkin What is this???" p. 7).

5.      Scorza submitted expert testimony regarding causation on the loss of his patent rights and substantial damages. Exhibit 3, McBride Expert Report; Exhibit 4, Lehrer Expert Report.[3]

6.      Testimony was presented that Davison is no stranger to misleading and deceiving its customers, as evidenced in a Federal Trade Commission action resulting in a $26 million judgment against Davison. *See FTC. v. Davison Associates, Inc.*, 431 F. Supp. 2d 548 (W.D. Pa. 2006); Exhibit 5, *FTC* Findings of Fact and Conclusions of Law. Scorza's representative at the Arbitration vigorously disputed that any of the complained of acts were fraudulent, asserting that the judge in the FTC case was "dead wrong." Exhibit 7, Scorza Post-Hearing Brief, p. 6. Scorza further testified that Davison representatives made similar representations to him as they had been found to constitute fraud in the *FTC* action, simply changing the names of some of their

---

[2] It is worth pondering that, at one point, Davison could have saved Scorza's patent application by merely forwarding a check for $5.00 to the USPTO, the amount of the shortfall existing due to Davison's error in cutting a check to the USPTO. Davison simply ignored Scorza. *See* Exhibit 7, Scorza Post-Hearing Brief, p. 3, 23-24.

[3] Davison may argue that the Lehrer Report was not entered into evidence. However, it was filed in the Arbitration Proceeding. Furthermore, Lehrer's testimony summarized his conclusion in the report establishing the value of Scorza's patent in the $2.5 to 4.1 million range. Exhibit 4, Lehrer Expert Report, p. 76-90.

"products," reports and enticements that they peddle to their customers.  Exhibit 5, *FTC* Findings

of Fact and Conclusions of Law; Exhibit 7, Scorza Post-Hearing Brief, p. 6-8. Finally, it was

revealed that a laughable 0.001% of Davison's income is actually derived from royalties paid on

licenses through successful inventors.   Conversely, 99.999% of Davison's income is derived

from fleecing consumers via fruitless consumer enticements and wholly one-sided consumer

contracts.  Virtually none of Davison's inventors make money.  Davison gets rich off fleecing its

investors for contract fees.  Exhibit 6, Scorza Pre-Hearing Brief, p. 6.

7.     Upon receiving an adverse award and being ordered to pay the awarded sum within

twenty days, Davison simply refused to pay Scorza and sought to vacate the Arbitration Award.

*See* Exhibit 1, Award.  Davison refused to even pay the amount of the Award which it does not

dispute.

## II
### STANDARD

8.     Petitions to confirm or vacate arbitration awards are "'summary proceeding[s]' that 'do[ ]

not [require] the district court to carry on a formal judicial proceeding,' *Teamsters Loc. 177 v.

United Parcel Serv.*, 966 F.3d 245, 255 (3d Cir. 2020), and furthers the FAA's 'national policy

favoring arbitration with just the limited review needed to maintain arbitration's essential virtue

of resolving disputes straightaway.'"  *CPR Mgmt., S.A. v. Devon Park Bioventures, L.P.*, 19

F.4th 236, 244 (3d Cir. 2021)(quotes and brackets in original), *citing Hall St. Assocs., LLC v.

Mattel, Inc.*, 552 U.S. 576, 588, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008) ;  *Booth v. Hume Pub.,

Inc.*, 902 F.2d 925, 933 (11th Cir. 1990) ("To allow a respondent to assert counterclaims that are

beyond the scope of the defenses enumerated in the [FAA] would change the nature of the

confirmation   proceedings   and   would   defeat   the   purpose   of   the   [FAA]."); *Ottley   v.

4

App. 216

*Schwartzberg*, 819 F.2d 373, 377 (2d Cir. 1987) ("Actions to confirm arbitration awards ... are straightforward proceedings in which no other claims are to be adjudicated.").

9.    Because of "the strong federal policy in favor of commercial arbitration, [district courts] begin with the presumption that the award is enforceable" and enforce the award "absent a reason to doubt the authority or integrity of the arbitral forum." *CPR Mgmt.*, 19 F.4th at 244, n.8; *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012), *as amended* (Apr. 4, 2012), *aff'd*, 569 U.S. 564, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013). "The *sine qua non* of judicial review of an arbitration award is a heavy degree of deference to the arbitrator." *Akers Nat'l Roll Co. v. United Steel*, 712 F.3d 155, 164–65 (3d Cir. 2013). "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569, 133 S.Ct. 2064, 2068, 186 L. Ed. 2d 113 (2013), *citing Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000); *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

10.    Therefore, so long as the decision of the Arbitrator has *any* conceivable, rational underpinning, the decision of the Arbitrator must stand. *See Ario v. Underwriting Members of Syndicate 53 at Lloyds for the 1998 Year of Account,* 618 F.3d 277, 295–96 (3rd Cir.2010) (citing *Mut. Fire, Marine & Inland Ins. Co. v. Norad Reins. Co.,* 868 F.2d 52, 56 (3rd Cir.1989); *see also Robbins v. Day*, 954 F.2d 679, 684 (11th Cir. 1992) (*Robbins* stating "[T]he party seeking to vacate the arbitration award has the burden of refuting "every rational basis upon which the arbitrator could have relied."); *see also CPR Mgmt., S.A. v. Devon Park Bioventures,*

*L.P.*, 19 F.4th 236, 246 (3rd Cir. 2021); *see also Bayside Construction LLC v. Smith*, No. 21-2716, 2022 WL 2593303 (3rd Cir. July 8, 2022). To rule otherwise defies settled law, brings into question the authority of the Arbitrator, and goes against established public policy and settled law, thereby opening the door for every unhappy and disgruntled party to plea to the courts for vacatur whenever they lose an arbitration.

11.     Davison provides an intentionally incomplete, truncated, and misleading recitation of the criteria for judicial vacatur under *Sutter v. Oxford Health Plans LLC* where the motion to vacate was denied by the District Court, the decision was affirmed by the Third Circuit, and upheld by the United States Supreme Court.   Plaintiff misstates the standard by inserting ellipses.   A complete recitation of the citation is as follows:

> "An arbitrator oversteps these limits, and subjects his award to judicial vacatur under § 10(a)(4), when he decides an issue not submitted to him, grants relief in a form that cannot be rationally derived from the parties' agreement and submissions, or issues an award that is so completely irrational that it lacks support altogether. *Ario v. Underwriting Members of Syndicate 53 at Lloyds for the 1998 Year of Account,* 618 F.3d 277, 295–96 (3d Cir.2010) (citing *Mut. Fire, Marine & Inland Ins. Co. v. Norad Reins. Co.,* 868 F.2d 52, 56 (3d Cir.1989)). In other words, the task of an arbitrator is to interpret and enforce a contract. When he makes a good faith attempt to do so, even serious errors of law or fact will not subject his award to vacatur. *See Brentwood Med. Assocs. v. United Mine Workers of Am.,* 396 F.3d 237, 243 (3d Cir.2005)"

*Sutter*, at 219-220.

12.     Additionally, the opinion of the Circuit Court in *Sutter* states "[W]e are satisfied that the arbitrator endeavored to interpret the parties' agreement within the bounds of the law, and we cannot say that his interpretation was totally irrational. Nothing more is required under § 10(a)(4) of the Federal Arbitration Act." *Sutter* at 224-225.

13.     FAA § 10(a) provides four limited bases, which have been described as "grudgingly narrow" for vacating an arbitral award.   *Eljer Mfg., Inc. v. Kowin Dev. Corp*., 14 F.3d 1250,

1253 (7th Cir. 1994).  These bases are: (1) the award was procured by corruption, fraud or undue means; (2) there was evident partiality or corruption by the arbitrators; (3) there was arbitral misconduct, such as refusal to hear material evidence; or (4) the arbitrators exceeded their powers, or so imperfectly executed their powers that they failed to render a mutual, final and definite award.  9 U.S.C. §10(a).

## II
## SECTION 10(A)(4) OF THE FEDERAL ARBITRATION ACT

14.     Davison seeks to vacate the arbitration award under section 10(a)(4) of the Federal Arbitration Act ("FAA").  A court may vacate an award "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4).  A party seeking relief under §10(a)(4) of the Federal Arbitration Act "bears a heavy burden.  'It is not enough . . . to show that the [arbitrator] committed an error — or even a serious error." *Oxford Health Plans*, 569 U.S. at 569, 133 S.Ct. at 2068 (brackets in original), *citing Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010).

15.     Courts have vacated arbitral awards under the "exceeded powers" standard only where the arbitrator's decision addressed issues not submitted to arbitration, involved parties or transactions outside the scope of the arbitration clause, or awarded remedies barred by the agreement.  *See Roadway Package Sys. Inc. v. Kayser*, 257 F.3d 287, 300-01 (3rd Cir. 2001); *see also Eljer Mfg.*, 14 F.3d at 1256-57; *Coast Trading Co. Inc. v. Pacific Molasses Co*., 681 F.2d 1195, 1198 (9th Cir. 1982).  This standard is based on the fundamental principle that the FAA ensures enforcement of the terms of the parties' agreement to arbitrate.  *See, e.g., Mastrobuono v. Shearson Lehman Hutton Inc*., 514 U.S. 52, 57 (1995); *Volt Info. Sciences Inc. v. Board of Trustees*, 489 U.S. 468, 476, 478-79 (1989).

16.    "Courts should avoid "exploiting 'an ambiguity' in an arbitrator's decision to support 'an inference' that he or she exceeded his or her authority." *Roadway Package Sys.*, 257 F.3d at 301; *NFM Corp. v. United Steelworkers of Am.,* 524 F.2d 756, 759 (3rd Cir. 1975).

17.    Davison complains of the arbitrator awarding attorney's fees in the underlying Arbitration.  Davison's complaint involves none of the exceptions under §10(a)(4) of the FAA. The award of attorney's fees does not comprise an issue not submitted to arbitration.  A request for an award of attorney's fees was the subject of the arbitrator's scheduling order and a separate filing.  The award of attorney's fees does not involve parties or transactions outside the scope of the arbitration clause.  All litigated issues in the Arbitration fell within the scope of the arbitration clause.  The award of attorney's fees does not constitute a remedy barred by the agreement.  It is undisputed that various statutes involved provide for an award to attorney's fees.  Davison simply takes issue with which statutes that the arbitrator mentions in the Award.

18.    Vacatur for excess of power requires that the award be "completely irrational and entirely unsupported by the record." *Sherrock Bros., Inc. v. DaimlerChrysler Motors Co.*, 260 F. App'x 497, 501 (3d Cir. 2008); *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir. 1993); *Popkave v. John Hancock Distributors LLC*, 768 F. Supp. 2d 785, 789 (E.D. Pa. 2011); *Franko v. Ameriprise Fin. Servs.*, No. 09-09, 2009 U.S. Dist. LEXIS 48907 *10 (E.D. Pa. June 11, 2009); *Southco, Inc. v. Reell Precision Mfg. Corp.*, 556 F. Supp. 2d 505, 511 (E.D. Pa. 2008).  To be "completely irrational," the arbitrators' decision must "escape[] the bounds of rationality" and be entirely unsupported by the record. *Exxon Shipping Co.*, 993 F.2d at 360 (3d Cir. 1993); *Popkave*, 768 F.Supp.2d at 789; *Franko*, 2009 U.S. Dist. LEXIS 48907, at *10; *Southco*, 556 F.Supp.2d at 511.

App. 220

19.     If an arbitration award is consistent with applicable law, the arbitrator did not exceed his powers.  Any award that is rationally derived from the parties' arbitration agreement and submissions must be confirmed.  *CPR Mgmt., S.A. v. Devon Park Bioventures, L.P.*, 19 F.4th 236, 246 (3rd Cir. 2021); *see also Bayside Construction LLC v. Smith*, No. 21-2716, 2022 WL 2593303 (3rd Cir. July 8, 2022).

20.     The award of attorney's fees award neither completely irrational nor entirely unsupported by the record.  It is undisputed that an award of attorney's fees is supported pursuant to the Pennsylvania Unfair Trade Practices & Consumer Protection Law, the American Inventor Protection Act, and the Texas Invention Development Services Act ("TIDSA").  73 Pa. Stat. § 201-9.2; 35 U.S.C. § 297; Tex. Bus. & Comm. Code §§ 52.001, *et seq*.  It is undisputed that the arbitrator requested a submission on attorney's fees and that Scorza submitted same.  *See* Docket Entries 1-3 and 1-4.  Furthermore, application of the TIDSA is acknowledged by Davison's own contract and legally mandated disclosure documents.  See Exhibit 2, Davison Pre-Development and Representation Agreement, p. 5, §III(G)[4]; Exhibit 8, Texas Invention Development Services Act Disclosure.[5]  These documents were entered into evidence and discussed during the Arbitration.  Scorza also argued the applications of TIDSA in his Pre-Hearing Brief and Post-Hearing Brief.  Exhibit 6, Scorza Pre-Hearing Brief, p. 11-13; Exhibit 7, Scorza Post-Hearing Brief, p. 26-27.

21.     Further, under TIDSA Section 52.151(b) awards attorney's fees and court costs for those who contract with an invention development service and are is injured by the same.  The Arbitrator rightfully applied TIDSA because Scorza made a claim for breach of contract which

---

[4] "…certain contractual provisions required by Texas law are observed as a courtesy to Client. Those provisions are incorporated herein."
[5] "THIS CONTRACT BETWEEN YOU AND AN INVENTION DEVELOPER IS REGULATED BY THE STATE OF TEXAS' REGULATION OF INVENTION DEVELOPMENT SERVICES ACT." [capitals in original].

App. 221

cited TIDSA. Here, Scorza should be awarded attorneys fees and court costs because the Arbitrator found that Scorza was injured under TIDSA.

22.     As the award of attorney's fees could have been legally supported by any or all of the cited statutes, it is consistent with applicable law.  Thus, as a matter of law, the arbitrator did not exceed his powers.  The Court should deny Davison's motion to vacate, and confirm the Arbitration Award.

### III
### MANIFEST DISREGARD OF LAW

23.     Davison's complaints regarding the Arbitration Award do not sound in exceeding powers under §10(a)(4) of the FAA.  Davison complains that the arbitrator relied on incorrect law to support his award of attorney's fees.  Davison's arguments sound in the doctrine of manifest disregard of law, rather than exceeding powers.  However, the complained of award does not even rise to the standard of manifest disregard of law.

24.     In the wake of Supreme Court decisions on the subject, it is doubtful whether the doctrine of manifest disregard of law still even exists.  *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Milnes*, No. 11-260, 2014 WL 1386321, at *4-5 (E.D. Pa. April 8, 2014).  "To the extent that 'manifest disregard of law' survives, it applies only in 'exceptional cases.' Id. at *5 (citing *Popkave,* 768 F. Supp. 2d at 789-90).

25.     To vacate an arbitration award for manifest disregard of law, "there must be some showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it."  *Montes v. Shearson Lehman Bros., Inc.*, 128 F.3d 1456 (11th Cir. 1997); *Advest, Inc. v. McCarthy*, 914 F.2d 6, 10 (1st Cir. 1990); *O.R. Securities, Inc. v. Professional Planning Assoc., Inc.,* 857 F.2d 742, 747 (11th Cir. 1988); *Popkave*, 768 F. Supp. 2d at 790 (E.D. Pa. 2011) (citing *O.R. Securities*, 857 F.2d 742).  "In this context, then,

'disregard' implies that the arbitrators appreciated the existence of a governing legal rule but willfully decided not to apply it." *Advest*, 914 F.2d at 10; *Merrill Lynch, Pierce, Fenner Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986). If an award is not explicitly explained on the point in question, it is extremely difficult to satisfy the exacting criteria for invocation of the doctrine. *O.R. Securities,* 857 F.2d at 747 n. 4.

26.     "The 'manifest disregard of the law' doctrine is a judicially-created one that is to be used 'only [in] those exceedingly rare circumstances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the [vacatur] provisions of the [Federal Arbitration Act] apply.'" *Black Box Corp. v. Markham*, 127 F. App'x 22, 25 (3d Cir. 2005); *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003); *Popkave*, 768 F.Supp.2d at 789-90. As long as there is a "barely colorable" justification for the arbitrators' decision, it must be upheld. *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 13 (2d Cir. 1997); *Popkave*, 768 F. Supp. 2d at 790; *Forest Elec. Corp. v. HCB Contractors*, No. 91-1732, 1995 U.S. Dist. LEXIS 1135 *29 (E.D. Pa. Jan. 30, 1995).

27.     If an arbitration award is consistent with applicable law, the arbitrator did not manifestly disregard the law or the parties' Agreement. *Monongahela Valley Hosp. Inc. v. United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union*, 946 F.3d 195, 199 (3d Cir. 2019); *see also Bayside Construction*, 2022 WL 2593303.

28.     Pursuant to applicable law, an award of attorney's fees would only meet the manifest disregard standard if the arbitrator appreciated the existence of a governing legal rule but willfully decided not to apply it. In other words, if the arbitrator knew that the American Inventor Protection Act and TIDSA did not apply, yet expressly applied them, Davison might have a colorable argument for manifest disregard. However, nothing like the foregoing actually

occurred. It is undenied that the award of attorney's fees could have been legally supported by any or all of the three above-cited statutes. Thus the Arbitration Award is consistent with applicable law.  Accordingly, as a matter of law, manifest disregard of law does not apply.  The Court should deny Davison's motion to vacate, and confirm the Arbitration Award.

## IV
## DAVISON'S ATTEMPT TO GAME THE SYSTEM

29.     The FAA is designed to enable parties to obtain a quick resolution and finality to disputes *without* incurring the costs, enduring prolonged schedules, and inviting public scrutiny of litigation. Yet this 'laudatory goal' is only achievable where "arbitration is an alternative to litigation, not an additional layer in a protracted contest."  *B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905, 907 (8th Cir. 2006).  "If we permit parties who lose in arbitration to freely relitigate their cases in court, arbitration will do nothing to reduce congestion in the judicial system; dispute resolution will be slower instead of faster; and reaching a final decision will cost more instead of less. This case is a good example of the poor loser problem and it provides us with an opportunity to discuss a potential solution."  *Id*.  Where, as here, when arbitration losers are allowed, or worse, emboldened, to contest an arbitrator's award, every advantage of arbitration is lost wherein judicial congestion is increased, dispute resolution is prolonged, and final judgments are more expensive.

30.     In light of the above, the FAA 'presumes the confirmation of arbitration awards' and gives great deference to the arbitrator.  *Davis v. Prudential Securities, Inc.*, 59 F.3d 1186 (11th Cir. 1995). In fact, only in extremely narrow cases is an award overturned for the judicially created doctrines of exceeding an arbitrator's authority and/or "manifest disregard of the law." *See Montes v. Shearson Lehman Bros., Inc.*, 128 F.3d 1456, 1461 (11th Cir. 1997).  However,

Davison seeks to apply a crowbar to this non-statutory and *extremely narrow* exception, and further misconstrue and misapply the facts of the case to the law.

31.     However, Davison drafted the arbitration clause at issue and compels arbitration for plaintiffs that sue them, forcing plaintiffs to pay arbitration fees out of pocket.  Once a plaintiff obtains a favorable award, Davison files to vacate the arbitration award, asking a court to vacate the award of attorney's fees., making a successful prosecution of claims in arbitration a net financial loss for the plaintiff.

32.     Davison, whenever dissatisfied with the result of its own contractually agreed upon means of dispute resolution, and with superior knowledge of the justice system, seeks to use this Court as a weapon to vindictively inflict hardship on Scorza by adding insult to injury, through the infliction of additional time and fees to fight the vacatur action, which it will in turn argue are not recoverable.  The cost of defending the vacatur action will quickly destroy any recovery. This is exactly what could happen in this instant action as failure to award Scorza his fees and costs in this vacatur action would wipe out his actual recovery of just over $20,000 pursuant to the Award.

33.     Thus, as infrequent as vacatur actions occur, where successful motions are even more exotic and exceedingly rare, Davison utilizes this tactic and has inflicted this same method of abuse on its former customers who dare to sue regarding its fraudulent activities.  *See Davison Design & Dev., Inc. v. Frison*, 2:17-cv-01468.  It is therefore Scorza's request that, where Davison has availed itself of the public oversight through the District Court, this Court would penalize Davison through the only language they will understand – monetary sanctions. This pecuniary rebuke, only if substantial, stands to disabuse the aggrieved Mr. Scorza, the public, and the judicial system of Davison's manipulative treatment.

## V
### ATTORNEY'S FEES

34.     Davison wrongfully asserts that Scorza failed to request for attorney's fees throughout the arbitration proceedings. Despite such, the Arbitrator clearly states in the Award that Scorza receives "reasonable attorney fees and costs pursuant to the American Inventor Protection Act and the Texas Invention Development Services Act…."  Exhibit 1, Arbitration Award; *see also Davison Design & Dev., Inc. v. Frison*, No. 2:17-CV-01468, 2019 WL 1745787, at *1 (W.D. Pa. Apr. 18, 2019), aff'd, 815 F. App'x 659 (3d Cir. 2020) (where the court affirmed the arbitrator's decision to award attorneys' fees under the American Inventor Protection Act).

35.     Undeniably, Scorza's award for attorney's fees for the arbitration must stand, as the Third Circuit has confirmed in a similar action with Davison where on appeal Davison attempted to vacate attorneys' fees where the arbitrator awarded attorneys' fees to a party under the 35 U.S.C. § 297, the American Inventor Protection Act. *See Davison Design & Dev., Inc. v. Frison*, No. 2:17-CV-01468, 2019 WL 1745787, at *1 (W.D. Pa. Apr. 18, 2019), *aff'd*, 815 F. App'x 659 (3d Cir. 2020).

36.     Here, after the confirmation of the Arbitrator's attorneys' fees, the main concern is ensuring that Scorza is awarded the additional attorneys' fees for enforcing the award that come about through the answer to the Motion to Vacate, which was filed in bad faith, vexatiously, wantonly, and for oppressive reasons. Failure to do so would result in turning Scorza's arbitration victory into a net financial loss for an elderly claimant in his 80's who was cheated out of his life savings meant to provide for his daughter and grandson..

37.     Accordingly, Scorza respectfully requests the Court award him attorney's fees involved in opposing this vacatur action and to enforce the Arbitration Award.  Scorza requests the Court to award him reasonable and necessary attorney's fees and costs for this instant action in the

amount of $36,385.50.  See Exhibit 11, Affidavit of Stacey L. Barnes.  Failure to do so will result in Scorza's recovery in the Arbitration to result in a net financial loss for him.

      A.    **Statutes**

38.    Scorza's award for attorney's fees must be upheld under 35 U.S.C. § 297(b), the American Inventor Protection Act ("AIPA") and the Texas Invention Development Services Act ("TIDSA").  *See* 35 U.S.C. § 297; Tex. Bus. & Comm. Code §§ 52.001, *et seq*.  Moreover, as the relationship is governed by Pennsylvania law, under Title 42 Section 7321.26(c), Scorza should be further awarded the attorney fees and costs relating to the Motion to Vacate the Award, or similar, under Sections 7321.23, 7321.24, and 7321.25.  42 Pa. Stat. § 7321.23, *et seq*.

39.    In a similar proceeding, Davison attempted to vacate the arbitration award for attorney's fees given by the arbitrator, however, the Western District of Pennsylvania and the Third Circuit confirmed the arbitrator's decision to give attorneys fees under the AIPA.  *Davison Design & Dev., Inc. v. Frison*, No. 2:17-CV-01468, 2019 WL 1745787, at *1 (W.D. Pa. Apr. 18, 2019), *aff'd*, 815 F. App'x 659 (3d Cir. 2020). Under the FAA, the Arbitrator had the right to apply the AIPA because Scorza made a claim for breach of contract which cited the AIPA.  Here, the facts of the case are the same as *Frison*, where the Arbitrator has awarded attorneys fees under the AIPA within his means, and therefore, the award under 35 U.S.C. § 297(b) must be upheld.

*40.*    Finally, while "[t]he FAA does not typically provide for an award of attorneys' fees to a party who is successful in confirming an arbitration award,' Pennsylvania statute specifically allows for such.  42 Pa. Stat. § 7321.26; *Pacilli v. Philips Appel & Walden, Inc.*, No. MISC. A. 90-0263, 1991 WL 193507, at *7 (E.D. Pa. Sept. 24, 1991). Here, Pennsylvania statute clearly outline that Scorza should be awarded the attorney fees and costs related to answering and defending against the Motion to Vacate the award.  *See Menke v. Monchecourt*, 17 F.3d 1007,

1009 (7th Cir.1994) (The Court that a party was entitled to the attorney's fees incurred in the confirmation proceeds, such as a vacatur, because the state law under which the party stated its legal claims authorized an award of attorney's fees).

41.    In conclusion, the attorney's fees awarded by the Arbitrator must be upheld and attorney's fees and costs for answering and defending against the Motion to Vacate the award must be given. The Arbitrator was well within his means to award attorney's fees under the theories of AIPA and TIDA, both of which are included in Davison's contracts with Scorza, and Pennsylvania statute clearly provides attorney's fees and costs.

42.    Finally, under breach of contract actions, where the damages are liquidated and certain, contract rate or, if none, the interest rate is six percent (6%), and post judgement rate is also six percent (6%).  42 Pa. Stat. § 8101; *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572 (Pa. Super. Ct. 2003).  Therefore, the Court should rule that theamount awarded bear pre- and post-judgment interest at the lawful rate, six percent (6%), from the date of the award, March 27, 2023, going forward.

### B.    Frivolous Vacatur Action

43.    Under the Federal Arbitration Act, a court may vacate an arbitration award only on the following grounds: corruption, fraud, or undue means; evident partiality or corruption in the arbitrators; misconduct in refusing to postpone the hearing or hear evidence; or the arbitrators exceeded their powers.  9 U.S.C. § 10(a). The Third Circuit has held that an arbitration award may also be vacated where the award "evidence[s] a manifest disregard for the law rather than an erroneous interpretation of the law." *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3rd Cir. 2003), (alteration in original) (*quoting Local 863 Int'l Bhd. of Teamsters v. Jersey Coast Egg*

*Producers, Inc.*, 773 F.2d 530, 534 (3rd Cir. 1985)). As discussed, *supra*, this doctrine likely no longer exists.

44.     Here, none of these exceptions apply for vacating the award.  Nothing has shown that the Arbitrator has exceeded their power in any sense whatsoever. Rather, the Arbitrator was well within his bounds to award attorneys' fees. Finally, there is nothing even colorably suggesting that the Arbitrator's award evidences a manifest disregard for the law.  This Court and the Third Court has found in similar actions with Davison that an award of fees such is allowable.

45.     Rather, in fact, the court should award attorneys' fees to Scorza in the "exercise of ... [its] equitable powers" because Davison has acted "in bad faith, vexatiously, wantonly, [and] for oppressive reasons." *Hall v. Cole*, 412 U.S. 1, 5 (1973); Fed. R. Civ. P. 11(c).

### C.     Policy Reasons for Discretionary Award for Fees and Costs

46.     "Courts cannot prevent parties from trying to convert arbitration losses into court victories, but it may be that we can and should insist that if a party on the short end of an arbitration award attacks that award in court without any real legal basis for doing so, that party should pay sanctions. A realistic threat of sanctions may discourage baseless litigation over arbitration awards and help fulfill the purposes of the pro-arbitration policy contained in the FAA." *B.L. Harbert*, 441 F.3d at 913-14.  Scorza requests the Court to assess sanctions for this frivolous vacatur action in the amount of Scorza's fees and costs needed to oppose and confirm the award.

## V
## PRAYER

WHEREFORE, Defendant prays that Defendant's motion to vacate or modify be denied in its entirety.  Defendant further prays that the Award be confirmed and entered as the judgment of the Court, that additional attorney's fees be awarded be awarded to Scorza for defending this

action and moving to confirm the Arbitration Award, and that the Court award pre- and post-judgment interest from the date of the Award.  Defendant prays for all other relief, either at law or in equity, to which he may show himself justly entitled.


Respectfully submitted,


/s/ *Stacey L. Barnes*
Stacey L. Barnes
sbarnes@kmd.law
William Yarbrough
wyarbrough@kmd.law
Vikesh Patel
vpatel@kmd.law
KEARNEY, MCWILLIAMS & DAVIS, PLLC
55 Waugh, Suite 150
Houston, Texas 77007
Phone: (713) 936-9620
Fax: (713) 936-9321
**Attorneys for Defendant**


John J. Myers
JMyers@eckertseamans.com
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219
Phone: 412-566-5900
Fax: 412-566-6099

App. 230

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 23rd day of August, 2023, a true and correct copy of the foregoing instrument has been forwarded to all counsel of record and/or pro se parties, by means of the Court's electronic filing system, in accordance with the Rules of Civil Procedure.

Justin T. Barron
Barron Law Office LLC
P.O. Box 493
Valencia, PA 16059
(412) 334-6312
jbarron@justinbarronlaw.com

_/s/Stacey L. Barnes_____
  Stacey L. Barnes

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

## Table of Defendant's Exhibits

| Exhibit 1 | Arbitration Award, 03/27/23 |
|---|---|
| Exhibit 2 | Pre-Development and Representation Agreement |
| Exhibit 3 | Preliminary Expert Report of Scott McBride |
| Exhibit 4 | Preliminary Expert Report of Dr. Kenneth Lehrer |
| Exhibit 5 | *FTC v. Davison Associates*, Civil Action No. 97-1278, Findings of Fact and Conclusions of Law |
| Exhibit 6 | Scorza's Pre-Hearing Brief |
| Exhibit 7 | Scorza's Post-Hearing Brief |
| Exhibit 8 | Texas Invention Development Services Act Disclosure |
| Exhibit 9 | Correspondence sent to Larry Rifkin |
| Exhibit 10 | *Davison Design & Dev., Inc. v. Frison*, 2018 WL 6324996, 2:17-cv-01468 (W.D. Pa. Dec. 4, 2018) |
| Exhibit 11 | Attorney's Fee Affidavit of Stacey L. Barnes |

App. 232

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

---

## Defendant's Exhibit 1

---

Defendant's Exhibit 1

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

In the Matter of the Arbitration between

Case Number: 01-21-0004-6369

Mario Scorza  ("Claimant")
-vs-
Davison Design & Development, Inc.  ("Respondent")

### AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated March 23, 2017, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, with Claimant represented by Stacey Barnes of Kearney, McWilliams & Davis, PLLC, and Respondent represented by Justin Barron of Barron Law Office LLC, hereby AWARD as follows:

> For Claimant, Mario Scorza, and against Respondent, Davison Design & Development, Inc., in the principal amount of $20,042.25 with $6,012.60 in interest plus an award of reasonable attorney fees and costs pursuant to the American Inventors Protection Act and the Texas Invention Development Services Act in the amount of $199,024.05 for a total award of $225,078.90.

In addition to the above award, the administrative fees of the American Arbitration Association totaling $18,425.00 shall be borne exclusively by Respondent, and the compensation of the Arbitrator totaling $30,528.00 shall be borne exclusively by Respondent. Therefore, Respondent shall reimburse to Claimant the sum of $32,564.00, representing that portion of said fees in excess of the apportioned costs previously incurred by Claimant.

The above sums are to be paid on or before 20 days from the date of this Award.

Except as indicated above, all of Claimant's other requests for relief, including his request for treble damages, are denied.

This Award is in full settlement of all claims and counterclaims submitted in this Arbitration. All claims not expressly granted herein are hereby, denied.

3/27/2023
_____
Date

_____
Scott David Livingston, Arbitrator

I, Scott David Livingston, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

3/27/2023
_____
Date

_____
Scott David Livingston

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

## Defendant's Exhibit 2



Defendant's Exhibit 2

## PRE-DEVELOPMENT AND REPRESENTATION

**BY AND BETWEEN Mario Scorza, an adult individual residing at, 612 Highland St West, TX 76691 hereinafter referred to as "Client" and Davison Design & Development, Inc., a Pennsylvania Corporation having its principal place of business at 595 Alpha Drive, Pittsburgh, Pennsylvania 15238.**

### I.  Davison's Obligations

**A. Representation Services. Davison will submit Client's Product to a Licensee, the identity of which shall be agreed upon between Client and Davison, with the intention of entering into a License Agreement. Davison will not communicate with a Licensee concerning details of Client's Product, nor may such communication be required, until Client and Davison agree upon the final design of the product.**
Davison's obligations under this paragraph expire six months after the execution of this agreement by Client. However, if Client contracts with Davison for design and product sample preparation services, which are not covered by this Agreement, Davison's obligations under this paragraph will expire six months after Davison and Client agree on the final design of the product.
**Davison is exclusively responsible for the costs associated with presenting the Product to a Licensee, which costs do not include designing, building or refurbishing a product sample.**

Davison, in its sole discretion, will determine the method of communication with a Licensee concerning Client's Product, which depends largely upon the practices and preferences of the Licensee. Typically, presentation first involves emailed or mailed design images and communication is conducted primarily via telephone. A sample is shipped only upon request of a Licensee. Unless a Licensee proposes a License Agreement or wants to discuss possible changes to the product, few Licensees provide written feedback or responses to a licensing presentation.

### B. Pre-Development Services

**1. Product Related Data:**
**Davison will perform an industry product review.**
 This information illustrates how corporations are advertising, packaging and marketing their products. Although extensive, this may not reveal every product for sale or under development world-wide.

**2. Patent Review:**
**Davison will conduct a patent review for use during brainstorming, design and product planning sessions. This is not a search to determine patentability.**

**3. Corporation Review:**
**Davison will identify a corporation for you to consider as a target for presentation.**
This information will be provided and discussed separately from the other Pre-Development materials.

4. Product Planning Sessions:
A New Product Director assigned to this project will continue discussions of "TRAVA-WEIGH" with Client

Davison_000331

**A better way to invent**

App. 236

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

Defendant's Exhibit 2



brainstorming, development options and corporate contact information.

5.  Portfolio:
The Pre-Development Services will take approximately four to six weeks to complete. Once finished, the product related data and patent review data will be assembled and delivered to Client in an Idea to Product Portfolio. The Portfolio data may be delivered to Client in hard copy, CD, DVD or email format, at Davison's option.

6.  Provisional Application for Patent Filing Payment:
Within three days from the date of Davison's receipt of client's execution of this Agreement and full payment, Davison will provide to Client a USPTO Provisional Application for Patent Coversheet (USPTO Form PTO/SB/16) and a Certification of Micro Entity Status (USPTO Form PTO/SB/15A). If Client completes a Provisional Application for Patent and provides to Davison the completed application, including all supporting documents, Davison will mail the application to the USPTO along with the micro entity filing fee, which is currently $65.00. If Client does not provide a Certification of Micro Entity Status, Davison will cover only the amount of the filing fee that would apply to a micro entity and Client must pay the balance of the filing fee to Davison before the application will be mailed. Client is solely responsible for the sufficiency and completeness of any application and supporting documents. Davison will not perform any review or correction of any documents provided by Client. The USPTO describes a Provisional Application for Patent as having the following features:

a. Provides simplified filing with 12 months to assess the invention's commercial potential.
b. Establishes official United States patent application filing date for the invention.
c. Permits authorized use of "Patent Pending" notice for 12 months in connection with the description of the invention.
d. Enables immediate commercial promotion of invention with greater security against having the invention stolen.

II. Client's Obligations

**A. Consideration**
The fee is $795.00. Client shall select one of the following three Options. Under any Option, Client must pay in full prior to the performance of any services by Davison. In the event that Client does not indicate a choice of option, Client agrees to be deemed to have chosen Option 3.

___ Option 1: **$745.00** (includes $50.00 savings) shall be paid within 15 days of the contract date.
___ Option 2: **$100.00** retainer. The remaining $670.00 (after $25.00 savings) paid within 30 days of contract date.
___ Option 3: **$_____.____** retainer. The remaining balance to be paid in future payments at Client's pace.

If Client exceeds 15 days to pay in Option 1 or 30 days in Option 2, they will automatically default to the next descending Option. In addition to Option 1, 2 or 3, Client grants Davison ten percent of Client's interest

Davison_000332

**A better way to invent**

App. 237

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348



in any payments realized by Client as a result of the sale or license of the Product to a Licensee. Payment of the ten percent interest to Davison is due when consideration is due to Client as a result of Davison's direct or indirect contact and efforts with a Licensee. Davison's ten percent interest in payments due to Client is applicable only to payments to Client in excess of any fees paid by Client to Davison for services under this and any other contract. Davison is authorized by Client to require a Licensee to pay directly to Davison the ten percent interest granted to Davison under this Agreement. Nothing in this agreement changes legal title to the product or design. "Contract Date" is the date appearing next to the signature of Davison's representative on this Agreement.

**B. Product Samples; Approvals. Client is responsible for obtaining a product sample, packaging and relevant information about the product in a professional format for presentation to a Licensee, at Client's sole expense.**
Davison, at its option, will offer to provide further development services, under a separate contract for a separate fee, to assist in obtaining or creating the sample, packaging and presentation material for the targeted Licensee. Client is aware that he or she is free to obtain such materials elsewhere or not to obtain them at all. However, materials obtained elsewhere or made by Client are subject to Davison's approval prior to submission to a Licensee by Davison. If Davison does not approve the materials made by Client or obtained elsewhere by Client, and Client is unwilling to make such changes to the materials as required by Davison, or if Client does not make or obtain presentation materials, packaging and a sample acceptable to Davison, this Agreement will be terminated without refund of any amount paid by Client. Davison is not responsible for applying for or obtaining any intellectual property protections on the Product or Design, including but not limited to patents, trademarks and trade names.

### III. Other Terms

**A. Definitions.**
For this agreement, the terms defined below have the following meanings: a) "Design" shall mean the plans, processes and methods for manufacture and/or utilization of the Product. b) "Product" shall mean that item or items named above originally brought to Davison by Client, which are the subject of this and other possible agreements by and between Davison and Client. The term includes both Client's initial concept and all intermediate and final designs. c) "License Agreement" shall mean a separate agreement between Client (or Client and Davison) as one party and a Licensee as the other party. d) "Contract Term" shall be in perpetuity so long as the "License Agreement" was entered into as a result of Davison's direct or indirect contact and efforts with a Licensee. e) "Licensee" shall mean any individual, corporation, partnership or other entity to which Client's Product is offered for license or sale.

**B. Complete Agreement; Choice of Law.**
This Agreement shall be governed by the law of the Commonwealth of Pennsylvania and is deemed to be executed, entered into and performed in Pittsburgh, Pennsylvania. This agreement contains the entire agreement between the parties, particularly as it pertains to the attempt to have the Product or Design

**A better way to invent**

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

Defendant's Exhibit 2



licensed or sold to a Licensee. This agreement may not be released, discharged, abandoned, changed, or modified in any manner except as provided herein or by separate instrument in writing signed by all parties.

**C. Disputes; Arbitration.**
For any dispute, the parties agree to seek to resolve the dispute through good faith negotiation. For any dispute not resolved through good faith negotiation, the parties agree that all disputes shall be resolved through arbitration before the American Arbitration Association ("AAA") in Pittsburgh, Pennsylvania using the Commercial Arbitration Rules in effect on the date that the claim is submitted to the AAA. A decision of the arbitrator may be entered as a judgment in any court having appropriate jurisdiction. Client agrees that any claim must be brought in an individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.

**D. Disclaimers.**
Client acknowledges that Davison has made no claim or warranty that Davison will be able to consummate a License Agreement, or find a Licensee willing to compensate Client for his or her Product and/or Design. Client acknowledges that Davison has not made any representations concerning the potential of Client's Product to be marketed, licensed, patented or to make a profit for Client. Davison has not evaluated the Product; thus, its agreement to accept an interest in future potential payments due to Client is not a representation by Davison that the development of the Product will yield payments to Client. Davison is not responsible for any lost or damaged product samples, prototypes or any other materials submitted to Davison by Client. Except as described in paragraph I.B.6., Davison is not responsible for applying for, assisting with, or obtaining any intellectual property protections on the Product or Design, including but not limited to patents, trademarks and trade names.

**E. Client Materials.**
Davison is not responsible for the loss, maintenance or return of prototypes, drawings or any other materials submitted by Client to Davison.

**F. Commercial Purpose.**
Client acknowledges that he/she is contracting for Davison's representation and Pre-Development services for the business purpose of developing Client's idea commercially and not for any personal, household or family purpose.

Davison_000334

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348



**G.  Texas law.**

Although Pennsylvania law applies to this contract, certain contractual provisions required by Texas law are observed as a courtesy to Client. Those provisions are incorporated herein. Such provisions are to be read and construed to not contradict the provisions set forth above. However, if there is a direct conflict, then the provisions of the terms required by Texas law take precedence, but only to the extent of such direct conflict and all other provisions not in direct conflict remain in effect.

**1. Client is to pay Davison the sum of $795.00 no earlier than four business days after receiving an executed copy of this agreement. In addition, Davison is entitled to the ten percent commission it is otherwise entitled to herein.**

**Until the payment for invention development services is made, the parties to a contract for invention development services have the option to terminate the contract. The Client may exercise the option by refraining from making payment to Davison. Davison may exercise the option to terminate by giving to the Client a written notice of its exercise of the option. The written notice becomes effective on its receipt by the customer.**

**2. Davison has no obligation hereunder to construct, sell, or distribute one or more prototypes, models, or devices embodying the Client's invention.**

**3. Davison may subcontract the performance of some of the services hereunder to Inventionland, LLC.**

**4. There have been no oral or written representations of estimated or projected client earnings.**

**5. The complete corporate name of Davison is Davison Design and Development, Inc. George Crompton, Esq., Davison's General Counsel, 595 Alpha Drive, Pittsburgh, PA 15238, or his designee, shall be the custodian of all records and correspondence pertaining to the services for which the contract is made.**

**6. Davison is required to maintain all records and correspondence relating to performance of the services for Client until the second anniversary of the date of the expiration of the contract for services. On seven days written notice Davison will make the service records and correspondence available to Client or Client's representative for review and copying at Client's reasonable expense on Davison's premises during normal business hours.**

Davison_000335

**A better way to invent**

App. 240

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348



**7. Davison will complete its minimum services hereunder within six months after the execution of this agreement. However, this does not contradict the form contract into which this is incorporated. Davison is entitled to receive its contingent fee for License Agreements and\or sale of product idea or design even where such occurs more than six months following the execution of this agreement.**

The revocation provision of this Agreement is the only means of cancelling this Agreement and obtaining a refund. If the Agreement is cancelled, revoked or terminated after the three business day period, there will be no refund of any amount paid towards the contract fee.

**The four working day period during which you may cancel this contract for any reason by mailing or delivering written notice to the invention developer will expire on the fourth working day after you sign this Agreement. If you choose to mail your notice, it must be placed in the United States mail addressed to Davison Design & Development, Inc., at 595 Alpha Drive, Pittsburgh, Pennsylvania 15238 with first class postage prepaid before midnight of this date. If you choose to personally deliver your notice to the invention developer, it must be delivered by the end of the developer's normal business day on this date.**

---

Mario Scorza
612 Highland St
West, TX 76691
TRAVA-WEIGH

Date

Check #

Credit/Debit Card #

Security Code        Expiration Date

VISA ☐               Master Card ☐
Discover ☐           American Express ☐

Name as it appears on card

---

Larry Rifkin
Director of New Products
For Davison

Date: January 12, 2017

Cardholder's billing address

Cardholder's Signature

Davison_000336

**A better way to invent**

App. 241

Defendant's Exhibit 2



## ART. 9020 SEC.5(b) NOTICE - TEXAS

It is Davison's normal practice to seek more than one contract in connection with an invention, or to seek to perform services in connection with an invention in more than one phase with the performance of each phase covered in one or more subsequent contracts. They are:

a. "Pre-Development and Representation" - Please refer to the attached pages wherein the services are described in full. In summary, Davison will: (a) provide to Client information on products and patents relevant to the development of Client.s product idea; (b) attempt to locate a licensee for Client.s product idea after it is fully developed. Davison normally charges a flat fee of $795.00 plus a ten percent commission of all royalties or other fees paid by a corporation pursuant to a License Agreement or ten percent of any fee paid by a corporation for the purchase of a product and\or its design.

b. Types of Second Phase Agreements- Depending upon the degree of client preparation and the difficulty of the concept, Davison typically offers either (a) "New Product Sample Agreement"- Davison offers to professionally design and construct a product sample, graphics, packaging and presentation materials; (b) "Integrated Product Rendering Agreement" - Davison offers to prepare design images and graphics suitable for presentation of the idea; or (c) "New Application Service Agreement" - Davison offers to develop a mobile application for submission to a publisher of applications of for use in conjunction with a developed product; (d) "Custom Agreement" - Davison offers to perform services in one or more areas of video, design work, graphics or package preparation. While the fees for these services are individually quoted based upon the complexity, type and anticipated design work and materials to be used in designing and constructing the invention, the fees typically range from eight thousand dollars ($8,000) to fifteen thousand dollars ($15,000).

c. "Inventomercial" - Davison may offer to prepare a video demonstration of the product sample or concept for two-thousand four hundred and ninety-five dollars ($2,495).

d. "Additional Presentation/Repackaging/Refurbishment" - Davison offers to present the product idea to additional potential licensees, this service includes the creation of an additional set of graphics and, if necessary, refurbish/repair the product sample and packaging. The fee for this service is normally $395.00.

e. "Representation Agreement" - Clients who have quantities of professionally manufactured products and are looking for licensing or distribution channels may be offered this service in lieu of all other services. The service includes targeting potential corporations, presenting the product to potential licensees or distributors, as requested, and attempting to negotiate agreements for the license or distribution of the manufactured product. The fee is typically five thousand, nine hundred and fifty dollars ($5,950) plus a ten percent commission on all money received by the client on the sale or license of the product.

Davison_000337

**A better way to invent**

App. 242

Defendant's Exhibit 2



### <u>Necessity of Pre-Development Services</u>

Davison views Pre-Development to be integral to our exclusive process. It is our opinion that

Pre-Development is necessary before proceeding to the step of product sample design and development and

attempting to obtain a license agreement with a corporation. It is Davison's policy to require that

Pre-Development be performed prior to moving forward toward licensing. Should you not wish to purchase

Pre-Development, you may still be able to secure a license, either on your own or with the assistance of

another party, but Davison will refuse to work with you to develop your product idea.

Thank you and please call your Director of New Products as soon as you receive this information.

Sincerely,

*G. Davison*

G. Davison
Founder and CEO

Davison_000338

**A better way to invent**

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

## Defendant's Exhibit 3

Defendant's Exhibit 3

**IN THE AMERICAN ARBITRATION
ASSOCIATION**

Mario Scorza,

*Claimant*,

v.

Davison Design and
Development, INC.,

*Respondent*.

Case Number: 01-21-0004-6369

**PRELIMINARY EXPERT REPORT OF J. SCOTT MCBRIDE**

March 15, 2022

Defendant's Exhibit 3

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 3
II.    PROFESSIONAL AND EDUCATIONAL BACKGROUND............................ 4
III.   SUMMARY OF OPINIONS ............................................................................... 6
IV.    BACKGROUND ................................................................................................. 7
   A.    Parties .......................................................................................................... 7
       1.   Mario Scorza ...................................................................................... 7
       2.   Davison Design and Development, Inc ............................................... 7
   B.    Overview of the Litigation ......................................................................... 7
   C.    Patentability ................................................................................................ 8
   D.    Provisional Patent 62/601, 218 ................................................................ 11
   E.    Provisional Patent 62/710,055 .................................................................. 11
   F.    Requests for Assistance ............................................................................. 12
   G.    Loss of Rights ............................................................................................ 13
   H.    "Inventomercial" Presentation Agreement ............................................... 13
V.     Conclusion ....................................................................................................... 14

Confidential – Attorneys' Eyes Only

## I.   INTRODUCTION

Defendant's Exhibit 3

I have been retained by Kearney, McWilliams & Davis, PLLC (hereafter "KMD"), Claimant's counsel, on behalf of Mario Scorza ("Mr. Scorza") in the above-captioned arbitration as an expert witness in the present matter wherein my qualifications and experience allow me to opine on the subjects of patents and patentability.[1] I understand that Mr. Scorza is the inventor of the "Trava-Weigh" portable scale. Mr. Scorza contends that Respondent, Davison Design and Development, Inc. ("Davison"), did involve itself with false and misleading representations which sought to induce Mr. Scorza into a financial relationship which did adversely affect Mr. Scorza fiscally. Specifically, Mr. Scorza alleges that Respondent misled Mr. Scorza into believing Respondent would develop Mr. Scorza's invention, create a prototype of his invention, and perform marketing services, all of which were never undertaken. Among other causes of action (discussed later in my report), Mr. Scorza asserts breach of contract, false and negligent representations, deceptive and unfair trade practices, inducement, and both common law fraud and fraud by non-disclosure on the part of Respondent.

Claimant's counsel has asked me to (a) assess the prior art field of portable travel scales at the time of Mr. Scorza's submission to Davison; (b) evaluate the condition of Mr. Scorza's provisional patent applications; (c) address the patentability of Mr. Scorza's invention at the time of submission; (d) determine the likelihood of an allowable patent application; and (e) appraise Davison's duty and culpability in allowing Mr. Scorza's patents to lapse, as well as  degree of absence of reasonable care owed Mr. Scorza. As part of these analyses, I examined various data, documents, and filings proffered by Claimant's counsel and Respondent's counsel. In order to conduct my analysis, I have assumed Mr. Scorza's claims of wrongdoing on the part of

---

[1] Exhibit 1, CV of JS McBride, expert witness.

Confidential – Attorneys' Eyes Only

Respondent, including negligence, deceptive practices, misrepresentation, and fraud are correct.

Defendant's Exhibit 3

To form my opinions, I have considered the documents listed in Exhibit 2 and referenced in the text, footnotes, and attached exhibits of this report.[2] I have also relied on my education, professional judgment, and expertise gathered from many years of engineering, prosecuting patents, and developing legal opinions in a myriad of intellectual property matters. The following report summarizes my current opinions. The information in this report is based upon discovery to date and the information that is currently available. To the extent additional information is produced or relied upon, I may supplement this report, if warranted, based on additional discovery.

## II.   PROFESSIONAL AND EDUCATIONAL BACKGROUND

I am an engineer, engineering project manager, consultant, advisor, licensed Texas attorney since 2005, and licensed patent practitioner authorized to practice patent law at the United States Patent and Trademark Office since 2007.

Over the course of my career, I have served as an engineering manager, project manager, business developer, mechanical engineer, and attorney to a wide variety of clients on matters involving product development and design, contract development, patent and trademark prosecution, as well as management of large-scale technology portfolios. I have also served as a consultant in a wide range of patent and technology matters, including patent portfolio management and administration, patent prosecution, and trademark prosecution. While the context and content of management, administration, and prosecution had varied from technology to technology and on a project-to-project basis, most included an analysis and evaluation of company-specific and industry-wide data for the purpose of determining the metes and bounds of

---

[2] Exhibit 2, Please see Documents Considered submitted prior

Confidential – Attorneys' Eyes Only

intellectual property protection. As part of these analyses, I have often examined novelty, non-

obviousness, the likelihood of patentability of an invention or set of inventions, the potential

allowability of a patent or patents, the field in which technology exists, the degree to which new

technology may exist in an identified field, the commercial applicability of products, and the

probability of success of a technology or device in a market or markets. I am also well versed on

the many substantive and procedural requirements of the USPTO required to obtain patent rights.

Defendant's Exhibit 3

I received my Doctor of Jurisprudence (J.D.) degree from South Texas College of Law,

Houston, Texas. I received a Bachelor of Science degree in Civil Engineering from Texas A&M

University, College Station, Texas. I am a licensed mechanical engineer (Mechanical P.E., Texas)

and a licensed attorney in the state of Texas.

My curriculum vitae is attached hereto as Exhibit 1. I am being compensated on a rate

times hours basis for the work I perform. My current rate is $400 per hour. My compensation

does not depend in any way on the outcome of this matter.

5

## III.   SUMMARY OF OPINIONS

Defendant's Exhibit 3

Based upon my review of the relevant data and documents, it is my opinion that Respondent's conduct has resulted in an irremediable loss of patent rights for Mr. Scorza and rendered an otherwise patentable invention unpatentable. And, but for the negligent misrepresentations, unfair trade practices, fraud and negligence by Davison, Mr. Scorza would have received an issued patent along with all rights such an allowed patent would naturally receive.

Mr. Scorza is seeking lost profits due to Davison's negligence and inaction as well as disgorgement, reimbursement of Claimant's fees to Respondent associated with the alleged wrongful conduct, and punitive damages. I understand that the Respondent has not produced relevant exculpatory information, for example, evidence showing the production of any prototype, agreed upon marketing materials or business contacts or agreements in furtherance of bringing Mr. Scorza's product to market at any point in the preceding more than five (5) years. Moreover, it is my understanding that when Mr. Scorza repeatedly asked for assistance or sought guidance with his patent filings, Davison neither provided comment or assistance nor did they advise Mr. Scorza to, at a minimum, seek legal counsel to address even his most basic USPTO requests for additional information and fees. As a result, I reserve the right to provide an opinion regarding Respondent's negligence and culpability in Mr. Scorza's loss of rights should additional data be provided. Based upon the limited data produced by Respondent, Respondent's gross negligence combined with Claimant's lack of intellectual property acumen and advanced age, can only lead to the conclusion that, but for Davison's deficient handling of Claimant's invention, failure to provide even a modicum of guidance, Mr. Scorza would have received a patent. However, I reserve the right to update my analysis as additional information is produced.

## IV.   BACKGROUND

Defendant's Exhibit 3

### A.   Parties

#### 1.   Mario Scorza

Mr. Scorza is an octogenarian resident of Waco, Texas and is the inventor of the subject matter of this cause of action, the "Trava-Weight" portable scale. The novel features of this invention include a flat, lightweight scale which is packaged for transportation, thus allowing consumers to travel with a means to monitor their body weight. No such scale existed as of the time of Mr. Scorza's first attempt at patenting (March 2017).

#### 2.   Davison Design and Development, Inc

Operating since 1989 and based in Pennsylvania,[3] Davison Design and Development, Inc. is a research, development and presentation services provider based on an "upfront," fixed-fee and contingent fee basis (based on potential royalties).[4] Davison Design and Development, Inc. currently operates in two locations, Pennsylvania and Florida, and engages in business primarily online and via email and telephone.[5]

### B.   Overview of the Litigation

It is my understanding that Mr. Scorza was propositioned by Davison on at least December 20, 2016[6] wherein Davison encouraged Mr. Scorza to file a provisional patent and additionally offered to provide Mr. Scorza with "documents that you may find helpful

---

[3] DEPARTMENT OF STATE, https://www.corporations.pa.gov/search/corpsearch (searching "Davison Design and Development" in the Business Entity Name/ID search field).

[4] *Get started today!*, DAVISON, https://idea.davison.com/index.php?source_id=1802&campaign_name=index_page_top; DAVISON, https://www.davison.com/.

[5] *Our Story & Mission Statement,* DAVISON, https://www.davison.com/our-experience/about-davison/.

[6] Davison_000193

for filing a Provisional Application for Patent with the United States Patent and Trademark office" (sic).[7, 8] On March 29, 2017,[9] Davison and Mr. Scorza did enter into a 'New Product Sample Agreement' which was duly signed by Larry Rifkin on March 23, 2017 and Mr. Scorza March 29, 2017.[10]  At this time a check was provided by Mr. Scorza in the amount of $14,757.25.[11] As part of this agreement, Davison was retained to "develop the idea into a product sample," which is described as a "physical product sample," as well as other promotional material along with various business contacts as stipulated in the body of the agreement.[12, 13] However, Mr. Scorza advances that the Respondent never produced said sample or prototype, produced very limited promotional materials, and that Mr. Scorza did not receive a single business interest in his product.

During the time that Mr. Scorza was engaged with Respondent, Mr. Scorza did make two (2) attempts to submit a Provisional Patent to the USPTO, the first attempt was March 16, 2017 (Provisional Patent No. 62/601, 218) and the second was February 8, 2018 (Provisional Patent No. 62/710, 055). Each application received a deficiency notice and each subsequently abandoned

## C.  Patentability

Reviewing both the Davison supplied prior art information, made available to inventor as an "Executive Summary," KMD supplied patentability search conducted on

---

[7] Davison_000040

[8] Davison_000159 to Davison_000164

[9] Davison_000018

[10] Davison_000027

[11] Davison_000027

[12] Davison_000019

[13] Davison_000205

Defendant's Exhibit 3

February 25, 2022, together with inventor and Davison supplied materials, it is my

conclusion that, at the time of submission of the original provisional application there

existed: (1) sufficiently detailed information from which to construct a viable patent

application; and  (2) there existed no prior art of record that would have provided a basis for

rejection of Mr. Scorza's application based on anticipation (lack of novelty) or obviousness.

Defendant's Exhibit 3

To determine the status of the prior art at the time of filing of the provisional patent,

KMD requested a prior art search from the firm Techson Intelligent Property (hereafter

"Techson"), an Austin Texas-based research firm. The prior art search was conducted for all

prior art relevant to the "Trava-Weigh" patent prior to the date of filing in March of 2017.

The search results found three (3) highly relevant pieces of prior art, two (2) medium relevant

pieces of prior art, and two (2) low relevance pieces of prior art. In my opinion, none of these

pieces of prior art would have anticipated the "Trava-Weigh" application to the level required

to reject the application with a 102 (lack of novelty) rejection. Further, in my opinion, the

combination of these pieces of prior art would not have rendered the "Trava-Weigh" obvious,

thus triggering a 103 rejection by the USPTO.

Manifestly, the three (3) pieces of highly relevant prior art in the Techson search is

not sufficient for a rejection of Mr. Scorza's patent as is assessed below. To reject a patent

application based on anticipation (102), the prior art must have each and every of the claimed

elements of the patent in question. The first piece of highly relevant prior art is French patent

FR2930411 TRANSPORTABLE WEIGHING TOILET CASE FOR TRANSPORTING

E.G. TOILETRY PRODUCTS. FR2930411 does not include all of the features that could

have been claimed by Mr. Scorza had he had advice from a Patent attorney or agent. For

example, the "Trava-weigh" as shown in the filed provisional patents has four flaps and a

single scale that is removable from the case. FR2930411 does not have these defining

features, and therefore does not anticipate inventor's invention the "Trava-Weigh" invention.

Defendant's Exhibit 3

The next piece of highly relevant prior art is US4765421 FOLDING SCALE. US4765421 is a US patent issued for a scale having two halves that fold together to form a case for carrying. However, US4765421 does not include the four flaps and a single scale that is removable from the case as shown in Mr. Scorza's '055 filed provisional patent. Therefore, US4765421 does not anticipate the "Trava-Weigh" invention.

The final piece of highly relevant prior art is US7047827 FOLDING DIGITAL SCALE. US7047827 is a US patent issued for a portable scale, hard sided case folds open and closes for transport. The scale is foldable and not a solid scale as depicted in Mr. Scorza's application. Further this patent does not include the four flap features shown in Mr. Scorza's application. Therefore, US7047827 does not exhibit each and every feature of Mr. Scorza's invention and does not anticipate the "Trava-Weigh" invention.

The remaining prior art found in the prior art search was of less (medium to low) relevance than the three (3) (high relevance) patents listed above. They will therefore not be analyzed in detail; however, as a result of their lower relevance due in part to even fewer identifiable similar features, none of them anticipate Mr. Scorza's application sufficient to result in a 102 (anticipation) rejection. Further, none of these pieces of prior art would have made Mr. Scorza's application obvious where features, although not found in a single reference, may nonetheless serve to reflect features existing in the art at the time of patenting.

As a result of this inability to designate or discern Claimant inventor's invention key features existing in the prior art at the time of patenting, it is more likely than not that a competent patent practitioner would have been able to secure patent rights in Mr. Scorza's "Trava-Weigh" invention. Based on these sets of facts, it is my opinion that had Respondent

directed Mr. Scorza to use, or even query or consult, a qualified patent practitioner for his

application he would now have a patent and full patent rights thereby in the U.S.

*Defendant's Exhibit 3*

### D.   Provisional Patent 62/601, 218

Provisional Application No. 62/601,218 was submitted March 16, 2017. The

application itself consisted of simply a USPTO form providing a title: "Weighing Scale That is

Portable even in Suitcase" with no other necessary application parts.[14] The USPTO issued a

'Notice of Incomplete Application' March 31, 2017, due to an insufficient filing fee and absence

of a specification.[15] No response was recorded in the USPTO and the application was never

afforded a filing status. The '218 patent subsequently went abandoned.

### E.   Provisional Patent 62/710,055

Provisional Application No. 62/710,055 was submitted February 8, 2018.[16] The

application was titled: "This is a small portable hand-held scale that one can stand on to measure

their weight, can be used to take on cruise or anywhere from home" consisting of a description,

diagrams and CAD drawings supplied by Davison.[17] This application was accepted as meeting

the required application parts but received a Notice to File Missing Parts wherein was detailed

insufficient filing fees which incurred a surcharge.[18] While Claimant's second attempt secured

a successful USPTO filing status, no response was recorded in reply to the Notice to File

Missing Parts in the USPTO and the '055 application, like the '218 application, subsequently

abandoned.

---

[14] Exhibit 3

[15] Exhibit 4

[16] Exhibit 5

[17] Exhibit 5

[18] Exhibit 6

Of Note, the condition of provisional patent 62/710,055 *was* sufficient for a patent

Defendant's Exhibit 3

practitioner to convert the '055 application into a utility non-provisional application by filing a non-provisional patent within a year anniversary of the provisional application in order to secure Mr. Scorza's patent rights. Therefore, had Davidson instructed or even offered a suggestion for Mr. Scorza to use a Patent Practitioner, it is my opinion that he would have readily and easily passed this administrative hurdle, paid his missing fee(s), and filed a timely non-provisional patent with all the necessary parts. Based on the prior art at the time of filing and information that Mr. Scorza included in at least the '055 provisional application, it is my opinion that a patent practitioner would have secured patent rights to the "Trava-Weigh" invention had Mr. Scorza been directed, at an absolute minimum, to seek advice and counsel from a practitioner.

## F.   Requests for Assistance

Pointedly, Mr. Scorza made several attempts to gain assistance and an understanding of the official responses from the USPTO. Mr. Scorza marked application no. 62/710,055 as "FOR LARRY RIF"[19] and "Larry – From USPTO shows they accepted payment – Mario,"[20] dated June 13, 2017, and application number 62/601,218 as "FOR: LARRY RIFKIN, WHAT IS THIS???."[21] In addition, Mr. Scorza made several pleas to Davison, as evidenced by Davison's records on July 13, 2017,[22] November 12, 2018, and December 3, 2018.[23] Mr. Scorza nevertheless received no acknowledgement, guidance, or suggestion to seek legal counsel as to

---

[19] Davison_000004

[20] Davison_000003

[21] Davison_000029

[22] Davison_000051, Davison_000044

[23] Davison_000046, Davison_000053

adequately remedy simply filing requests from the USPTO. As a result of Davison's clear lack

Defendant's Exhibit 3

of guidance, or even a basic recognition of Mr. Scorza's request or suggestion to seek legal

counsel, both applications abandoned in due course. Consequently, it is my opinion that had

Davison advised or suggested that Mr. Scorza seek legal counsel, Mr. Scorza would have

obtained a patent on the "Trava-Weigh."

**G.   Loss of Rights**

Mr. Scorza possessed adequate and sufficient information to address the USPTO's

requests in the filed 62/601,218 and 62/710,055 provisional patents, if only Mr. Scorza had

received even a hint of guidance. If included, a specification with the key features of his invention

was sufficient to convert the '218 application into a non-provisional patent and secure full patent

rights. Likewise, had Mr. Scorza received any instruction on the '055 application, this application

as well would have resulted in a non-provisional patent application. Moreover, each non-

provisional application was likely to receive positive treatment form the USPTO resulting in an

issuance. But for Davison's negligence in (absence of) responding to Mr. Scorza's pleas for help,

Mr. Scorza could have sought counsel from a patent practitioner who would have expended little

effort to remediate the above identified deficiencies. Practically any patent practitioner would

have provided the necessary guidance resulting in the securing of Mr. Scorza's patent rights on

the "Trava-Weigh" invention. Yet, Davison's failure to follow its own agreement, repeated

negligence, deceptive practices, and fraud, resulted in no patent rights. Consequently, it is my

opinion that Mr. Scorza is entitled to the full extent of damages related to the loss of his patent

rights.

**H.   "Inventomercial" Presentation Agreement**

Finally, although Mr. Scorza had not reached any resolution in terms of acceptance of his

applications, Mr. Scorza was enticed to again sign another agreement December 19, 2018, purportedly for $2,495.[24] Yet, that figured had ballooned to $3,995 as of the date of signing on April 30, 2018.[25] This inducement to enter into an additional contract, and provide further payments, was achieved in the face of Davison's actual knowledge of Plaintiff's advanced age of eighty-three (83)[26] and use of his grandson's college fund.[27] This actual knowledge is combined with Respondent's knowledge that Claimant had, to that date, no prototype nor viable patent applications.

Defendant's Exhibit 3

## V.    Conclusion

In conclusion, it is my opinion that but for the actions, expressly *inactions*, of Respondent, that Mr. Scorza, benefitting from <u>any</u> assistance or information from Respondent, would have received a United States patent or patents, and potentially patents in other jurisdictions, as the basis of his invention is both subject matter eligible and not otherwise precluded by inventions described in the prior art presented in terms of novelty or obviousness.

Respectfully submitted:

_____

J. Scott McBride, J.D. PE
March 15, 2022

---

[24] Davison_000010, Davison_000337

[25] Davison_000324

[26] Davison_000046

[27] Davison_000045

# Exhibit 1

J. Scott McBride
406 Byrne St.
Houston TX, 77009
Jsmcbride23@gmail.com
(713)-501-8552.

*Defendant's Exhibit 3*

## SUMMARY OF QUALIFICATIONS

Over twenty years' experience in the petrochemical industry as an Engineering Manager, Project Manager, Business Developer, Project Engineer, Mechanical Engineer and an Attorney. Experienced Leader with excellent written and oral communication skills. General Experience includes heading up diverse teams, driving change, and driving improvements in quality, cost, lead times and team unity. Engineering experience includes front-end development to complete facility construction inspection. Legal experience includes assisting multiple engineering design teams with product development and design in addition to contract development, contract negotiation, patent prosecution, trademark prosecution, and management of technology portfolios. Experience areas include chemical plants piping systems, liquid and gas pipelines, tank farms, bio-fuels plants, metering stations, sour gas production facilities, drilling systems, vent and flare systems, drilling tools, compressor systems, pumping stations, coker units, production systems, pressure control systems, utility systems, utility plants, and refinery piping systems.

## Professional Experience

Audubon Engineering Company, Houston, TX    2017 – Present
*Engineering Manager/Manager of Projects/Project Manager*

Manager of Projects. Duties Include:

- Responsible for all project managers and successful execution of projects in the office. Oversee execution procedures and project budgets for all projects. Successfully decreased write offs and efficiency of execution of project at Audubon down stream.

Project Director/Engineering Manager responsible for multiple brownfield projects. Duties include:

- Working with clients to develop project objectives and documentation, scope of work, proposals, engineering status, project progress, labor, cost, schedule and developing and maintaining client, vendor and subcontractor relationships.
- Account Manager for several clients.

W.S. Nelson, Houston, TX        2011 – 2017
*Project Manager*

Project Manager for multiple on and offshore brownfield and greenfield projects. Duties included:

- Worked with clients to develop project objectives and documentation, scope of work, proposals, engineering status, project progress, labor, cost, schedule and developing and maintaining client, vendor and subcontractor relationships.

*Mechanical Engineer/Pipe Stress Department Head*

Mechanical engineer responsible for multiple topsides skid packages for offshore platforms in Gulf of Mexico. Duties included:

- Working with clients to develop project objectives and documentation, managing change, reviewing vendor procedures and documentation during engineering and construction of the skid packages, and tracking progress.
- Pipe Stress Engineer responsible for analyzing piping systems, pipelines, pumping stations for multiple upstream, midstream and downstream projects.

*Shell Client Representative*

App. 260

J. Scott McBride
406 Byrne St.
Houston TX, 77009
Jsmcbride23@gmail.com
(713)-501-8552.

Defendant's Exhibit 3

Project Engineer/Mechanical Engineer for topsides of Shell Stones FPSO in the Gulf of Mexico. Duties included:

- Responsible for coordinating with engineering contractor and vendors to develop project objectives.
- Reviewed engineering procedures, reviewed procurement packages, ensured engineering contractor and vendors comply with Shell specifications, ensured compliance with U.S. Regulations, inspections, and reviewed topside design.

Mark Oathout Law Firm, Houston, TX          2010 – 2011
*Attorney*

- Responsible for patent and trademark preparation and prosecution

J.L. Salazar Law Firm, PLLC, Houston, TX          2009 – 2010
*Consultant*

Outside technology development consultant for several upstream and downstream oil companies and service providers. Clients included Shell, Schlumberger, NOV and Amkin. Oilfield Technologies included drilling tools, logging tools, blowout preventers, expandable tubing, whipstocks, downhole pumps, downhole motors, top drives, directional drilling tools, coiled tubing delivery systems, pumps, processes, catalyst extraction, welding technology, and other upstream and downstream technology.

- Consulted with in-house attorneys to develop technology and patent strategies.
- Managed technology portfolios.
- Developed and maintained client relationships.
- Worked closely with design engineers developing new oil field technology and improvements to existing technologies.
- Managed other attorneys.
- Drafted legal opinions regarding competitor patents and technology.

Fluor (Plant Engineering), Deer Park, TX          2008 – 2010
*Project Manager/Project Engineer*

- Responsible for managing multiple small to mid-capital projects at Shell Deer Park Refinery and Chemical Plant.
- Maintained client relationships, developed project objectives, drafted proposals, developed scope of work, prepared estimates, maintained schedule and budget, managed engineering disciplines and managed project progress.

*Pipe Stress Department Head*

- Responsible for managing all pipe stress and piping design issues at Plant Engineering Deer Park. Managed pipe stress budgets, estimates, workflow and quality.

The McBride Law Firm, P.C., Houston, TX          2007 – 2010

Solo practitioner handling patent preparation, prosecution and opinion work (and other IP matters) for international software and oilfield clients.

Patterson & Sheridan L.L.P., Houston, TX          2004 – 2007
*Patent Attorney*

Responsible for patent preparation, prosecution and legal opinions for international clients, such as Weatherford Int., Air Liquide and Applied Materials.

- **Oilfield Technology** – prepared and prosecuted patents relating to mechanical, electromechanical and

App. 261

J. Scott McBride
406 Byrne St.
Houston TX, 77009
Jsmcbride23@gmail.com
(713)-501-8552.

Defendant's Exhibit 3

software technologies.
- **Computer Science** – prepared and prosecuted electromechanical, computer hardware and software cases relating to online security, calendaring applications, transportation systems, and oilfield technology.
- **Other Technology** – prepared and prosecuted additional patent cases relating to hand tools, household goods, fiber optic sensors, semiconductors and other technologies.
- **Other Legal Matters** – handles trademark preparation and prosecution, IP agreements, contract drafting and other legal matters.

Fluor and Foster Wheeler, Houston, TX and Calgary Canada    1996 – 2002
*Pipe Stress Engineer*

- Designed piping systems for oil refineries and chemical plants, such as Exxon's Baytown Olefins plant, Shell Deer Park, Solvay, Valero, Clark, Shell Canada, Dupont, BP and others.
- Managed piping group for several coker units, designing piping systems, training new engineers, maintaining piping specs, consulting with clients on piping needs, estimating pipe stress man hours and budget.

Jacob's Engineering Group, Houston, TX          1995 – 1996
*Structural Engineer*

Designed pipe racks and foundations for a chemical plant.


# Education

South Texas College of Law, Houston, TX, 2005
Doctor of Jurisprudence

- Dean's List
- AmJur Award for Constitutional Law
- Construction Law Journal
- Construction Law Scholarship


Texas A&M University, College Station, TX, 1994
B.S. Civil Engineering


# Licenses

- Mechanical P.E. (Texas)
- Licensed to Practice before the US Patent & Trademark Office
- Texas State Bar Licensed to Practice in Texas.

Defendant's Exhibit 3

# Exhibit 2

Defendant's Exhibit 3

**List of Documents Considered in this Paper**

- File wrapper contents of Provisional Patent 62/601, 218;

- File wrapper contents of Provisional Patent 62/710,055;

- Claimant's Request for Production;

- Claimant's Interrogatories;

- Respondent's Objections and Response to Claimant's Request for Production;

- Respondent's Objects and Answers to Claimant's First Set of Interrogatories;

- Respondent's "8981309_firstlist_1575040231_0" document;

- Patentability search conducted February 25, 2022;

- Respondent's Licensing Calls;

- Respondent's "vr_1502782620" document;

- Respondent's "idsketch";

- **Respondent's Part 1 Submission** (Davison_000001 to Davison_000080);

- **Respondent's Part 2 Submission** ((Davison_000081 to Davison_000147);

- **Respondent's Part 3 Submission** (Davison_000148 to Davison_000367);

- Respondent's "video_1549552669-5135" video document;

- Respondent's "vrnologo_1502947858" and "vrsignoff_1502947861" documents;

App. 264

Defendant's Exhibit 3

- Claimant provided New Product Sample Agreement;

- Original Demand Letter;

- Demand for Arbitration; and

- Claimant's Original Petition

Defendant's Exhibit 3

# Exhibit 3

U.S. PTO
62/601218
03/16/2017

02194  U.S. PTO

031617

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Defendant Exhibit 3

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 1 of 2

This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. _____

### INVENTOR(S)

| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
|---|---|---|
| MARIO U. (SCORZA) | SCORZA | 612 W. Highland West, TX 76691 |
| | | |
| | | |
| | | |

Additional inventors are being named on the ___None___ separately numbered sheets attached hereto.

### TITLE OF THE INVENTION (500 characters max):

weighing scale that is portable even in suitcase.

Direct all correspondence to:

☒ The address corresponding to Customer Number:

OR

☐ Firm or Individual Name

**CORRESPONDENCE ADDRESS**

Mr Mario Scorza
612 W Highland St
West, TX 76691

| Address | | |
|---|---|---|
| City | State | Zip |
| Country | Telephone | Email |

### ENCLOSED APPLICATION PARTS (check all that apply)

☐ Application Data Sheet. See 37 CFR 1.76.
☐ Drawing(s) *Number of Sheets* _____
☐ Specification (e.g., description of the invention) *Number of Pages* _____

☐ CD(s), Number of CDs _____
☐ Other (specify) _____

**Fees Due:** Filing Fee of $260 ($130 for small entity) ($65 for micro entity). If the specification and drawings exceed 100 sheets of paper, an application size fee is also due, which is $400 ($200 for small entity) ($100 for micro entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

### METHOD OF PAYMENT OF THE FILING FEE AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT

☐ Applicant asserts small entity status. See 37 CFR 1.27.
☐ Applicant certifies micro entity status. See 37 CFR 1.29. Applicant must attach form PTO/SB/15A or B or equivalent.
☐ A check or money order made payable to the *Director of the United States Patent and Trademark Office* is enclosed to cover the filing fee and application size fee (if applicable).
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit Account Number: _____

**TOTAL FEE AMOUNT ($)**

### USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 10 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Defendant's Exhibit 3

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 2 of 2

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

☑ No.

☐ Yes, the invention was made by an agency of the U.S. Government. The U.S. Government agency name is: _____

_____

☐ Yes, the invention was made under a contract with an agency of the U.S. Government. The name of the U.S. Government agency and Government contract number are: _____

_____

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

SIGNATURE _Marca Scorza_   DATE _2.22-17_

TYPED OR PRINTED NAME _MARIO SCORZA_   REGISTRATION NO. _____
(*if appropriate*)

TELEPHONE _254-715.0243_   DOCKET NUMBER _____

App. 268

Privacy Act Statement                    Defendant's Exhibit 3

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.   Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Defendant's Exhibit 3

PATENT APPLICATION SERIAL NO._____

### U.S. DEPARTMENT OF COMMERCE
### PATENT AND TRADEMARK OFFICE
### <u>FEE RECORD SHEET</u>

03/17/2017 CCHAU1    00000009 62601218
01 FC:3005                        65.00 OP

PTO-1556
(5/87)

'U.S. Government Printing Office: 2002- 489-267/69033

App. 270

Defendant's Exhibit 3

# Exhibit 4

 UNITED STATES PATENT AND TRADEMARK OFFICE

**Defendant's Exhibit 3**

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/601,218 | 03/16/2017 | Mario U. Scorza | |

Mario Scorza
612 W. Highland St.
West, TX 76691

**CONFIRMATION NO. 6744**
**FORMALITIES LETTER**


*OC000000090337833*

Date Mailed: 03/31/2017

## NOTICE OF INCOMPLETE PROVISIONAL APPLICATION

### FILED UNDER 37 CFR 1.53(c)

A filing date has NOT been accorded to the above-identified PROVISIONAL APPLICATION papers for the following reason(s) indicated below.

All of the items noted below **must** be submitted within **TWO MONTHS** of the date of this Notice, unless otherwise indicated, or the proceedings on the application will be terminated (37 CFR 1.53(e)). **Extensions of time under 37 CFR 1.136 are NOT available.**

The filing date will be the date of receipt of all items required below, unless otherwise indicated. Any assertions that the items required were submitted, or are not necessary for a filing date, must be by way of petition directed to the attention of the Office of Petitions accompanied by the petition fee set forth in 37 CFR 1.17(f). If the petition states that the application is entitled to a filing date, a request for a refund of the petition fee may be included in the petition.

- The specification is missing.
  *A complete specification as prescribed by 35 U.S.C. 112 is required.*

The required items noted below SHOULD be filed along with any items required above. The filing date of this provisional application will be the date of receipt of the items required above. If the basic filing fee or due amount is filed after the filing date accorded the application, the surcharge set forth in 37 CFR 1.16(g) is also required.

- The statutory basic filing fee is insufficient.

Applicant is cautioned that correction of the above items may cause the specification and drawings page count to exceed 100 pages. If the specification and drawings exceed 100 pages, applicant will need to submit the required application size fee.

### SUMMARY OF FEES DUE:

The fee(s) required within **TWO MONTHS** from the date of this Notice to avoid abandonment is/are itemized below. No entity status discount is in effect. If applicant is qualified for small entity status, a written assertion of small entity status must be submitted to establish small entity status. (See 37 CFR 1.27). If applicant is qualified for micro entity status, an acceptable Certification of Micro Entity Status must be submitted to establish micro entity status. (See 37 CFR 1.29 and forms PTO/SB/15A and 15B.)

Defendant's Exhibit 3

- $ **260** basic filing fee.
- $( **65**) previous unapplied payment amount.
- $ **260** TOTAL FEE BALANCE DUE.

**Items Required To Avoid Processing Delays:**

Applicant is notified that the above-identified application contains the deficiencies noted below. No period for reply is set forth in this notice for correction of these deficiencies. However, if a deficiency relates to the inventor's oath or declaration, the applicant must file an oath or declaration in compliance with 37 CFR 1.63, or a substitute statement in compliance with 37 CFR 1.64, executed by or with respect to each actual inventor no later than the expiration of the time period set in the "Notice of Allowability" to avoid abandonment. See 37 CFR 1.53(f).

**This application, which was filed with an indication of micro entity status, fails to meet the requirements for establishing micro entity status because:**

- Certification of micro entity status is missing. (See 37 CFR 1.29 and forms PTO/SB/15A and 15B.)

If micro entity status is established in reply to this notice by filing an acceptable Certification of Micro Entity Status, the fees itemized in the SUMMARY OF FEES DUE section of this Notice will be reduced to reflect the 75% micro entity discount, and any previous payment amount may be applied to the discounted fees.

If applicant is not entitled to micro entity status under 37 CFR 1.29, applicant may still qualify for a 50% reduction of fees if small entity status can be established under 37 CFR 1.27.

Replies should be mailed to:

Mail Stop Missing Parts
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

Registered users of EFS-Web may alternatively submit their reply to this notice via EFS-Web, including a copy of this Notice and selecting the document description "Applicant response to Pre-Exam Formalities Notice". https://sportal.uspto.gov/authenticate/AuthenticateUserLocalEPF.html

For more information about EFS-Web please call the USPTO Electronic Business Center at 1-866-217-9197 or visit our website at http://www.uspto.gov/ebc.

If you are not using EFS-Web to submit your reply, you must include a copy of this notice.

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/awebb/

Defendant's Exhibit 3

# Exhibit 5

02205   U.S. PTO
020818

PTO/SB/16 (01-14)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

Defendant's Exhibit 3

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 1 of 2
This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. _____

| INVENTOR(S) | | |
|---|---|---|
| Given Name (first and middle (if any)) | Family Name or Surname | Residence (City and either State or Foreign Country) |
| MARIO U. SCORZA | SCORZA | 341 OLD MILL CREEK DR, WOODWAY, TX (WACO) 76712 |

Additional inventors are being named on the _____ separately numbered sheets attached hereto.

### TITLE OF THE INVENTION (500 characters max):

THIS IS A SMALL PORTABLE HAND-HELD SCALE THAT ONE CAN STAND ON TO MEASURE THEIR WEIGHT. CAN BE USED TO TAKE ON CRUISE OR ANYWHERE FROM HOME.

Direct all correspondence to:    **CORRESPONDENCE ADDRESS**

[ ] The address corresponding to Customer Number: _____    SAME AS ABOVE

OR

[ ] Firm or

Address    Mr Mario Scorza
341 Old Mill Creek Dr
Waco, TX 76712-6448    254-715-0243 CELL

City    State    Zip

Country    Telephone    Email

### ENCLOSED APPLICATION PARTS (check all that apply)

[ ] Application Data Sheet. See 37 CFR 1.76.    [ ] CD(s), Number of CDs _____
[X] Drawing(s) Number of Sheets ___8___    [ ] Other (specify) _____
[X] Specification (e.g., description of the invention) Number of Pages ___8___

**Fees Due:** Filing Fee of $260 ($130 for small entity) ($65 for micro entity). If the specification and drawings exceed 100 sheets of paper, an application size fee is also due, which is $400 ($200 for small entity) ($100 for micro entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

### METHOD OF PAYMENT OF THE FILING FEE AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT

[X] Applicant asserts small entity status. See 37 CFR 1.27.
[X] Applicant certifies micro entity status. See 37 CFR 1.29.
Applicant must attach form PTO/SB/15A or B or equivalent.
[X] A check or money order made payable to the *Director of the United States Patent and Trademark Office* is enclosed to cover the filing fee and application size fee (if applicable).    $65.00    **TOTAL FEE AMOUNT ($)**
[ ] Payment by credit card. Form PTO-2038 is attached.
[ ] The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit Account Number: _____

### USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 10 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Defendant Exhibit 3

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 2 of 2

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

[X] No.

[ ] Yes, the invention was made by an agency of the U.S. Government. The U.S. Government agency name is: _____

_____

[ ] Yes, the invention was made under a contract with an agency of the U.S. Government. The name of the U.S. Government agency and Government contract number are: _____

_____

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

SIGNATURE _Marco Scorza_ DATE 2-5-18

TYPED OR PRINTED NAME  MARIO  SCORZA  REGISTRATION NO. _____ ?
(if appropriate)

TELEPHONE 254-715-0243  DOCKET NUMBER _____ ?

IN THE EVENT OF MY BECOMING MENTALLY DEFICIENT OR DEATH MY DAUGHTER VALERIE ANN SALDANA WILL BE MY HEIR TO THE TRAVA-WEIGH.

VALERIE ANN SALDANA
LEAGUE CITY, TEXAS
832-407-0839

SIGNED _____

Defendant's Exhibit 3



Photo of Actual Prototype Product Sample

# TRAVA-WEIGH ™

## Portable Scale

### New Discovery!

Are you trying to keep track of your weight? It can be difficult to check your weight when traveling because hotels often do not have scales. Trava-Weigh™ is the scale you need wherever you go! It is a portable bathroom scale with a custom carrying bag. Great for home or travel! Easily transport this scale anywhere! This scale is portable, compact and lightweight. It can fit into luggage or carried separately. The scale has an easy to read LCD display and shows weight in pounds or kilograms. Trava-Weigh™- the best way to keep track of your weight wherever you go!

### How Is It Made?

Through many hours of design strategy implementation, we have accomplished our goal: a cost-effective and easy to manufacture product.  It has a cut-and-sewn cordura cover, a cut-and-sewn hook and loop closure, a stamped styrene stiffener, and a cut-and-sewn nylon webbing handle.
  A prototype product sample has been built, and Pro-E technical drawings are available.

Defendant's Exhibit 3





Defendant's Exhibit 3

| INDEX | PART NAME | QTY |
|-------|-----------|-----|
| 1 | STIFFENER-1 | 2 |
| 2 | STIFFENER-4 | 2 |
| 3 | STIFFENER-3 | 2 |
| 4 | STIFFENER-2 | 2 |
| 5 | HOOK | 4 |
| 6 | LOOP | 4 |
| 7 | HANDLE | 1 |
| 8 | COVER | 2 |

DRAWN BY: SS

SCALE: 0.1000

WALL THICKNESS (in.):

APPROX. WEIGHT (g):

COLOR:

QUANTITY:

MFG. PROCESS:

MATERIAL:

TITLE: TRAVA-WEIGH

SHEET SIZE: A    REVISION: 21-Jul-17

FOR QUOTATION ONLY
Pro/ENGINEER

PAGE #:

Defendant's Exhibit 3



FOR QUOTATION ONLY
Pro/ENGINEER

PAGE #: 1/8

5.25

11.38

| TITLE: | STIFFENER-1 | MFG. PROCESS: | STAMPED | WALL THICKNESS (in.): | 0.04 | COLOR: | WHITE | DRAWN BY: | SS |
| REVISION: | 21-Jul-17 | MATERIAL: | STYRENE | APPROX. WEIGHT (g): | | QUANTITY: | 2 | SCALE: | 0.2000 |
| SHEET SIZE: | A | | | | | | | | |

Defendant's Exhibit 3



Defendant's Exhibit 3



FOR QUOTATION ONLY
Pro/ENGINEER

PAGE #: 3/8

DRAWN BY: SS
SCALE: 0.300

COLOR: WHITE
QUANTITY: 2

WALL THICKNESS (in.): 0.04
APPROX. WEIGHT (g):

MFG. PROCESS: STAMPED
MATERIAL: STYRENE

TITLE: STIFFENER-3
REVISION: 21-Jul-17
SHEET SIZE: A

4.75
11.13

App. 282

Defendant's Exhibit 3

1.00

11.13

FOR QUOTATION ONLY
Pro/ENGINEER

| TITLE: STIFFENER-2 | MFG. PROCESS: STAMPED | WALL THICKNESS (in.): 0.04 | COLOR: WHITE | PAGE #: 4/8 |
| | | | DRAWN BY: SS |
| SHEET SIZE: A | REVISION: 21-Jul-17 | MATERIAL: STYRENE | APPROX. WEIGHT (g): | QUANTITY: 2 | SCALE: 0.300 |

Defendant's Exhibit 3



FOR QUOTATION ONLY
Pro/ENGINEER

PAGE #: 5/8

TITLE: HOOK

SHEET SIZE: A

REVISION: 21-Jul-17

MFG. PROCESS:

MATERIAL:

WALL THICKNESS (in.):

APPROX. WEIGHT (g):

COLOR: BLACK

QUANTITY: 4

DRAWN BY: SS

SCALE: 2.0000

.75

.75

Defendant's Exhibit 3

PAGE #: 6/8

DRAWN BY: SS

SCALE: 2.0000

COLOR: BLACK

QUANTITY: 4

WALL THICKNESS (in.):

APPROX. WEIGHT (g):

.75

.75

MFG. PROCESS:

MATERIAL:

TITLE: LOOP

REVISION: 21-Jul-17

SHEET SIZE: A

Defendant's Exhibit 3



Defendant's Exhibit 3



Doc Code: MES.GIB
Document Description: Certification of Micro Entity Status (Gross Income Basis)

PTO/SB/15A (03-13)

# CERTIFICATION OF MICRO ENTITY STATUS
## (GROSS INCOME BASIS)

Defendant's Exhibit 3

| Application Number or Control Number (if applicable): | Patent Number (if applicable): |
|---|---|
| | |

| First Named Inventor: MARIO SCORZA | Title of Invention: TRAVA - Weigh |
|---|---|

The applicant hereby certifies the following—

(1) **SMALL ENTITY REQUIREMENT** - The applicant qualifies as a small entity as defined in 37 CFR 1.27.

(2) **APPLICATION FILING LIMIT** - Neither the applicant nor the inventor nor a joint inventor has been named as the inventor or a joint inventor on more than four previously filed U.S. patent applications, excluding provisional applications and international applications under the Patent Cooperation Treaty (PCT) for which the basic national fee under 37 CFR 1.492(a) was not paid, and also excluding patent applications for which the applicant has assigned all ownership rights or is obligated to assign all ownership rights as a result of the applicant's previous employment.

(3) **GROSS INCOME LIMIT ON APPLICANTS AND INVENTORS** - Neither the applicant nor the inventor nor a joint inventor, in the calendar year preceding the calendar year in which the applicable fee is being paid, had a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986 (26 U.S.C. 61(a)), exceeding the "Maximum Qualifying Gross Income" reported on the USPTO website at http://www.uspto.gov/patents/law/micro_entity.jsp which is equal to three times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census.

(4) **GROSS INCOME LIMIT ON PARTIES WITH AN "OWNERSHIP INTEREST"** - Neither the applicant nor the inventor nor a joint inventor has assigned, granted, or conveyed, nor is under an obligation by contract or law to assign, grant, or convey, a license or other ownership interest in the application concerned to an entity that, in the calendar year preceding the calendar year in which the applicable fee is being paid, had a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986, exceeding the "Maximum Qualifying Gross Income" reported on the USPTO website at http://www.uspto.gov/patents/law/micro_entity.jsp which is equal to three times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census.

| SIGNATURE by a party set forth in 37 CFR 1.33(b) | | |
|---|---|---|
| Signature | *Mario Scorza* | |
| Name | TRAVA - Weigh | |
| Date 2-5-18 | Telephone 254-715-0243 | Registration No. |

☑ There is more than one inventor and I am one of the inventors who are jointly identified as the applicant. Additional certification form(s) signed by the other joint inventor(s) are included with this form.

020818

App. 288

Defendant's Exhibit 3

PATENT APPLICATION SERIAL NO._____

## U.S. DEPARTMENT OF COMMERCE
## PATENT AND TRADEMARK OFFICE
## <u>FEE RECORD SHEET</u>

02/09/2018 ZJUHAR1 00000012 62710055

01 FC:3005                    65.00 OP

PTO-1556
(5/87)

'U.S. Government Printing Office: 2002- 489-267/69033

Document Code:  IMIS

## Notice of Fee Due

<span style="color:blue">Defendant's Exhibit 3</span>

Application Number:  62710055\_\_\_\_\_   Date:          2/8/2018\_\_\_\_\_

Fees are due for the application or document dated 02/8/2018_____.  The payment was not collectable for the reason indicated below.

**Note: If the fee due is for any of the filing fees, the surcharge for late payment of the filing fees is now due as well.**

☑ Insufficient payment by check or money order.

☑ No authorization to charge a deposit account.

☐ Invalid deposit account number.

☐ User name not listed in deposit account _____ at \_\_\_\_:_____ (time).

☐ Insufficient funds in deposit account _____ at \_\_\_\_:_____ (time).

☐ Insufficient payment by credit card.

☐ Declined credit card \_\_\_\_\_:_____ (time).

| Fee code(s) to be applied: | 3005 | $70 |
| | 3005 | $ 65 - |
| | | |
| | | |
| Amount in holding fee code: | | $ |
| | 1622/2622 | $ |
| | 1206/2206 | $ |
| | 1999 | $ |
| Total remaining due from applicant: | | $5 |

RAM Operator\_\_\_\_ZJ_____

Rev. 04/10/2013

App. 290

Defendant's Exhibit 3

# Exhibit 6

 UNITED STATES PATENT AND TRADEMARK OFFICE

**Defendant's Exhibit 3**

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/710,055 | 02/08/2018 | Mario U. Scorza | |

Mario Scorza
341 Old Mill Creek Dr.
Waco, TX 76712-6448

**CONFIRMATION NO. 4515**
**FORMALITIES LETTER**

*OC000000097544479*

Date Mailed: 02/21/2018

# NOTICE TO FILE MISSING PARTS OF PROVISIONAL APPLICATION

## FILED UNDER 37 CFR 1.53(c)

### *Filing Date Granted*

An application number and filing date have been accorded to this provisional application. The items indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items and pay any fees required below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

- The statutory basic filing fee is insufficient.
- Surcharge as set forth in 37 CFR 1.16(g) must be submitted.
  The surcharge is due for late submission of filing fee or cover sheet.

## SUMMARY OF FEES DUE:

The fee(s) required within **TWO MONTHS** from the date of this Notice to avoid abandonment is/are itemized below. Small entity discount is in effect. If applicant is qualified for micro entity status, an acceptable Certification of Micro Entity Status must be submitted to establish micro entity status. (See 37 CFR 1.29 and forms PTO/SB/15A and 15B.)

- $ **140** basic filing fee.
- $ **30** surcharge.
- $( **65**) previous unapplied payment amount.
- $ **105** TOTAL FEE BALANCE DUE.

## Items Required To Avoid Processing Delays:

Applicant is notified that the above-identified application contains the deficiencies noted below. No period for reply is set forth in this notice for correction of these deficiencies. However, if a deficiency relates to the inventor's oath or declaration, the applicant must file an oath or declaration in compliance with 37 CFR 1.63, or a substitute statement in compliance with 37 CFR 1.64, executed by or with respect to each actual inventor no later than the expiration of the time period set in the "Notice of Allowability" to avoid abandonment. See 37 CFR 1.53(f).

## This application, which was filed with an indication of micro entity status, fails to meet the requirements for establishing micro entity status because:

- The certification of micro entity status is unsigned. A certification of micro entity status must be signed by an authorized party under 37 CFR 1.33(b). (Authorized parties include a registered attorney or agent, the sole

Defendant's Exhibit 3

inventor identified as the applicant, or all the joint inventors identified as the applicant except that one joint inventor applicant may sign if appointed to prosecute the application by all the other joint inventors.)

If micro entity status is established in reply to this notice by filing an acceptable Certification of Micro Entity Status, the fees itemized in the SUMMARY OF FEES DUE section of this Notice will be reduced to reflect the 75% micro entity discount, and any previous payment amount may be applied to the discounted fees.

If applicant is not entitled to micro entity status under 37 CFR 1.29, applicant may still qualify for a 50% reduction of fees if small entity status can be established under 37 CFR 1.27.

Replies must be received in the USPTO within the set time period or must include a proper Certificate of Mailing or Transmission under 37 CFR 1.8 with a mailing or transmission date within the set time period. For more information and a suggested format, see Form PTO/SB/92 and MPEP 512.

Replies should be mailed to:

Mail Stop Missing Parts
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

Registered users of EFS-Web may alternatively submit their reply to this notice via EFS-Web, including a copy of this Notice and selecting the document description "Applicant response to Pre-Exam Formalities Notice". https://sportal.uspto.gov/authenticate/AuthenticateUserLocalEPF.html

For more information about EFS-Web please call the USPTO Electronic Business Center at 1-866-217-9197 or visit our website at http://www.uspto.gov/ebc.

If you are not using EFS-Web to submit your reply, you must include a copy of this notice.

Questions about the contents of this notice and the requirements it sets forth should be directed to the Office of Data Management, Application Assistance Unit, at **(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/ttran/
_____



UNITED STATES PATENT AND TRADEMARK OFFICE

**Defendant's Exhibit 3**

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 62/710,055 | 02/08/2018 | | 65 | | | |

**CONFIRMATION NO. 4515**

**FILING RECEIPT**

Mario Scorza
341 Old Mill Creek Dr.
Waco, TX 76712-6448



OC000000097544478

Date Mailed: 02/21/2018

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**

Mario U. Scorza, Waco, TX;

**Applicant(s)**

Mario U. Scorza, Waco, TX;

**Power of Attorney:** None

**Permission to Access Application via Priority Document Exchange:** No

**Permission to Access Search Results:** No

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

**If Required, Foreign Filing License Granted:** 02/21/2018

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 62/710,055**

**Projected Publication Date:** None, application is not eligible for pre-grant publication

**Non-Publication Request:** No

**Early Publication Request:** No
**** SMALL ENTITY ****

App. 294

Defendant's Exhibit 3

**Title**

> This is a small portable hand-held scale that one can stand on to measure their weigh, can be used to take on cruise or anywhere from home

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

## LICENSE FOR FOREIGN FILING UNDER

### Title 35, United States Code, Section 184

### Title 37, Code of Federal Regulations, 5.11 & 5.15

**<u>GRANTED</u>**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as

Defendant's Exhibit 3

set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign Assets Control, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

App. 296

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

# Defendant's Exhibit 4

Defendant's Exhibit 4

# MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.; AMERICAN ARBITRATION ASSOCIATION, CASE NO. 01 21 0004 6369, HOUSTON, HARRIS COUNTY, TEXAS.

## VARIABLE ECONOMIC DAMAGE ANALYSIS

Dr. Kenneth Eugene Lehrer
Lehrer Financial and Economic Advisory Services
5555 Del Monte Drive - Suite 802
Houston, Texas 77056

STACEY L. BARNES, ESQ.
KEARNEY, MCWILLIAMS & DAVIS
55 WAUGH DRIVE - SUITE 150
HOUSTON, TEXAS 77007

WILLIAM "TREY" C. YARBROUGH, III., ESQ.
KEARNEY, MCWILLIAMS & DAVIS
55 WAUGH DRIVE - SUITE 150
HOUSTON, TEXAS 77007

VIKESH N. PATEL, J.D.
KEARNEY, MCWILLIAMS & DAVIS
55 WAUGH DRIVE - SUITE 150
HOUSTON, TEXAS 77007

December, 2022

# LEHRER FINANCIAL AND ECONOMIC ADVISORY SERVICES

Real Estate Consulting - Economic Studies - Due Diligence Analysis - Litigation Support Services - Fairness Opinions / ESOP - Business Valuations

Defendant's Exhibit 4

December 15, 2022

Stacey L. Barnes, Esq.
Kearney, McWilliams & Davis
55 Waugh Drive - Suite 150
Houston, Texas   77007

William "Trey" C. Yarbrough, III., Esq.
Kearney, McWilliams & Davis
55 Waugh Drive - Suite 150
Houston, Texas   77007

Vikesh N. Patel, J.D.
Kearney, McWilliams & Davis
55 Waugh Drive - Suite 150
Houston, Texas   77007

**RE: Mario Scorza vs. Davison Design & Development, Inc.;
American Arbitration Association, Case No. 01 21 0004 6369**

To Whom It May Concern:

Please accept this document as my initial corporate economic damage report analysis as based upon accumulated documentation obtained within a specific recent timeframe. This document will serve as my corporate economic damage and financial analysis in regards to the overall inter-relationship of two (2) organizations - Mario Scorza and Davison Design & Development, Inc. in and during the period of March 2017 through the present time (late 2022). Further, this report will denote how one organization sought to purchase and utilize the services of the second, paid their requested funds, but did not receive any services or tangible output over a rather long period of time. Without **any** services, output, documents or feedback from an integral party, it makes the creation of a solid / supported economic / financial / corporate damage report a difficult assignment.

In the direct matter at hand, there were no receipt of goods, services or data from the supplying party (even though they were paid for), upon which the purchasing party can seek to rely in the collection and utilization of appropriate economic / financial supporting scholastic data. With no direct data it is more difficult to further, enhance, and merchandize Mr. Scorza's invention into a viable commercial product and organization to determine fully supported economic / financial / corporate stigma damages. *However*, after a solid amount of investigation, analysis, due diligence and financial / economic exploration, it has been determined that a corporate loss of *$3,448,300* (before appropriate corporate taxes) over a ten (10) year period is an applicable amount of damages to the Scorza Organization. The following report is supplied in calculation and support of this stated amount.

Office Address:
   1775 St. James Place - Suite 110
   Houston, Texas 77056
   Phone (713) 972-7912
   Fax  (713) 964-0444

e-mail: DRKEN@LEHECOSERV.com
web site: www.LEHECOSERV.com

Mailing Address:
   5555 Del Monte Drive
   Suite 802
   Houston, Texas  77056-4117
   Evening Phone (713) 626-8184

App. 299

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 2.                                          Defendant's Exhibit 4

## GENERAL INTRODUCTION

The interrelationship of corporate functions and their effect on the overall economics of organizations; either proposed, in the start–up phase or have been in business for many years, even decades on a continuous basis, because of an "incident" that occurred or an "incident" that is presently in progress, is generally based upon the nature or inter-relationship of the individual organizations and the probable course of their business future. The measure of the inter-relationship and the effects one company can have upon the other, is determined by the organization's structure, operational format and the organization's relationship to one another in the "incident" that occurred. In the matter at hand, the undersigned has sought to determine and measure an overall general economic / financial / corporate analysis of how an "incident" based upon the lack of appropriate and timely responses and actions created an economic / finance / corporate set of damages to the Scorza Organization.

Such lack of actions and progressive steps towards creating a viable producing organization, can easily create a set of both short term and longer term negative economic effects on an organization in the start-up phase and its ability to produce a stream of corporate income and other similar type issues stemming from the "incident." An organization that has suffered an income-earning setback based upon an "incident" may also incur certain obstacles in relation to their ability to function in the overall open marketplace as other have progressed while their product remained unmarketable. An adjustment must be made for the overall marketplace resistance in light of these restrictions. These adjustments reflect the marketplace's resistance to engage and / or accept the organization when other similar organizations with significant backgrounds and without any history of incidents, defectiveness or litigation are also available in the marketplace. This is especially true in the instance of attempts to attract new clients with no past attachment or relationship to a specific firm.

The undersigned, in his role as an Economist, for which Davison Design and Development, Inc. was to provide creative presentation materials determined that it is relevant to explain how certain segments of the overall stream of business and commerce have evolved and presently operate to provide an overall corporate structural analysis. In trying to fulfill this task in sufficient detail, the undersigned has researched a variety of data and sources in the "scales" sector of our national economy. Based upon this research, the undersigned has relied upon and drawn from a number of published sources that he deems reliable, some of which are utilized in whole or in part and included in this report, to comply with the decisions and directions of the courts, especially noted in the cases of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *General Electric Company v. Robert K. Joiner*, 522 U.S.136 (1997); and *Kumho Tire Co. v. Carmichael*, 572 U.S. 137 (1999).

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 300

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 3.                                                    Defendant's Exhibit 4

## EXECUTIVE SUMMARY

This document was prepared based on the review and analysis of a variety of documents obtained and researched in whole or part by the undersigned Economist.  The underlying concept was for the undersigned Economist to review documentation in regard to an agreement on or about March 23, 2017, where Mario Scorza contracted with Davison Design and Development, Inc. through a "New Product Sample Contract" for the further development, advertising and marketing of a unique "scale" invention designed by Mario Scorza.  Pursuant to an agreement, Mr. Scorza paid Davison Design and Development, Inc. approximately $25,000 for which Davison Design and Development was to provide  -  1) Creative Presentation Materials, consisting of development, troubleshooting, manufacturing, packing, rendering, and marketing services;  2) "Creation" of the product sample, consisting of producing computer renderings, production drawings, and professional finishing imaging; 3) "Creation of" packing sample consisting of supplying renderings and imaging related to product packing;  4) "Product Sample Finalization," consisting of creating a usable final sample of both Mr. Scorza's product and its developed packaging; as well as 5) Provide information related to provisional patent applications, marketing quotes and materials to be utilized in advertising and a comprehensive summary of all services suggested, performed, and / or developed with regard to Mr. Scorza's unique invention.

Despite Mr. Scorza's dutiful payments, delivered upon Davison Design & Development, Inc.'s request, the single service provided by the company (of the dozens that should have been provided, as contemplated and described herein) was a single computer-generated image of the *possible* final form and appearance of Mario Scorza's "scales" invention.  To date, no "Presentation Materials", no "Product Sample" or prototype, no usable sample, no "Packaging Sample" and no information or assistance related to marketing, advertising or patenting has ever been received by Mario Scorza or his organization.

Although Mr. Scorza repeatedly attempted to contact Davison Design & Development, Inc. in order to receive the services and materials they were paid to provide, Davison Design & Development, Inc. never produced any further services nor provided any further materials regarding the continued development of Mr. Scorza's unique invention.  Moreover, Mario Scorza was never contacted by a single company or even one individual assisting in the development, advertising, marketing or selling of Mr. Scorza's invention, contrary to the "hundreds or more" purportedly contracting companies working with and for Davidson Design & Development. Because Davison Design & Development, Inc. kept Mr. Scorza waiting for years beyond when Davison Design & Development, Inc. should have completed the preparations and assisting services that would have enabled Mr. Scorza to commercialize his invention, a separate companies developed similar products that intercepted and absorbed the marketspace that should

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 301

RE: Mario Scorza vs. Davison Design & Development, Inc.
Continued.

Page 4.                                        Defendant's Exhibit 4

have been rightfully fulfilled by Mario Scorza had Davison Design & Development, Inc. performed the services that they were contractually obligated to provide. In addition, this extended delay resulted in the loss of all rights to any patentable inventions that would not have occurred, but for Mario Scorza's total reliance on Davison Design & Development, Inc.'s enticements, promises and directed incentives.

Davison Design & Development, Inc. purposefully induced Mario Scorza to contract with their company for the purported services and materials contemplated and described herein in order to receive the contractual payments Mr. Scorza made to Davison Design & Development, Inc. Davison Design & Development, Inc. falsely represented to Mario Scorza that the company could quickly and competently perform development services that would enable Mario Scorza to commercialize his invention, and that Davison Design & Development, Inc. could further help to market, advertise, and even provide potential investors and promoters necessary to cover the costs of any further required development. Mario Scorza has no educational background or training in marketing, advertising, product development or intellectual property protection and associated concepts, so he believed and relied on the promises made by Davison Design & Development, Inc. that the company would and could help bring his invention to market and provide the contractual services for which he personally paid.

It is Mario Scorza's reasonable contention that Davison Design & Development, Inc. fleeced Mr. Scorza in order to receive his payments, but then stalled the development of Mr. Scorza's product or the provision of any of the services Davison Design & Development, Inc. promised to perform on Mario Scorza's behalf in the hope he would become exasperated and eventually cease any further enforcement of the Agreement. Moreover, Davison Design & Development, Inc., knowing Mario Scorza's advanced age of eighty-five (85), hoped to leverage his age against him, advantaging Davison Design & Development, Inc. by drawing out any resolution on this matter past the life span of Mr. Scorza. Ultimately, despite having delivered required legal demand to Davison Design & Development, Inc. prior to this litigation, Davison Design & Development, Inc. has refused to respond to same or otherwise contact Mario Scorza. Therefore, Mario Scorza was forced to bring this legal proceeding to protect the legal rights afforded to him both at law and in equity.

To track and trace the actions or inactions of the parties in order to create a solid economic / finance report and the improper actions of Davison Design & Development a series of documents needs to be collected, arranged in a logical business manner, analyzed and a conclusion / decision reached in regard to their effect, input and circumstances of the enterprise under analysis. To support these types of independent analyses, those charged with concluding the analyses must normally undertake additional independent investigation, namely how the matter at hand fits into the overall economics and finances of a specific industry. In the present

Lehrer Financial Economic Advisory Services / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 302

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 5.                                        Defendant's Exhibit 4

instance, an overall independent investigation and analysis was made into a variety of supporting
circumstances, including - the potential operational structure of an organization to be created by
Mr. Scorza, the benefits Mr. Scorza was to receive from the proper coordination of the various
sections and segments promised by Davison Design & Development, Inc. and how these sections
should have operated together for maximum rewards and efficient output.

Note is made that the undersigned has personally been involved in preparing a significant
number of economic / financial / corporate reports, including damage analysis over the past four
(4) decades.  As such, the undersigned has been involved, on a first hand basis, with the
correlation of corporate operations as a practicing Economist involved in finance, economics,
management and overall business operational procedures as a former Banker.

In the course of the investigation and analysis, especially in the "scales" sector, data of a
corporate, economic, semi-legal nature was reviewed from sources deemed reliable in regard to
the specific enterprise and operational areas under analysis.  The data, as best possible, was
especially collected over a spectrum of time as opposed to a specific date or point of reference, in
order for the analysis to reflect trends and changes in the various sectors of economics, finance,
corporate operations and managerial sectors.  Further, specific information regarding the
interaction of senior corporate management and how this interaction affects the name, standing,
business reputation and future income of an enterprise and the potential of the organization, was
collected and analyzed to form a sustained conclusion as the basis of this report.

Based upon the data collected and the analysis undertaken, it is the corporate / financial /
economic conclusion of the undersigned that a properly structured and operating "scales"
enterprise will clearly benefit from interaction amongst and between the various corporate
segments, divisions and locations of the business venture.  Firms with well-structured sectors and
lines of communication could easily be economically and financially harmed by the actions of
others and such harm or financial injury will usually not rapidly fade from the scene.  Hence, the
improper actions of Davidson Design & Development, Inc., regardless of the proposed and
projected properly functioning structure for the Scorza organization could cause economic /
financial damages for a significant number of years out into the future.  Hence, in addition to
initial damages, such organizations could suffer "stigma" damages out into the longer mid-term
future.

The results of this investigation, analysis and findings are contained in this initial and
preliminary report and are based upon a step-by-step analysis of the background and operations
of a creative / start up organization and similar organizations as outlined, researched and relied
upon in the materials research referenced by the undersigned in his long standing scholastic

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 303

RE: Mario Scorza vs. Davison Design & Development, Inc.
Continued.

Page 6.                                        Defendant's Exhibit 4

career and for this report.  As any business, including an established manufacturing organization, the company contains many parts and subsectors and this report has tried to analyze and denote its findings on a sector-by-sector basis in order for a reader to fully understand the background, nature, efforts and components of the proposed enterprise and their functional interrelationships.

As noted in the conclusion, each component of an organization, especially in a well-established, large and broad standing manufacturing sector, such as the scale sector, has an important impact on the final results.  Each individual category is supported by an explanation as to how that category is an integral part of the overall business and future earnings process and what factors and forces were included to reach or obtain a specific category's conclusions.  In many instances, due to the significant lack of information not supplied to Mr. Scorza, exact financial amounts are not fully known, nor could they be calculated, thus general economic, banking, financial and corporate procedures were utilized.

The report denotes the operations of a scale manufacturing organization in the premium private label products sector for the consumer, retail and institutional markets is an appropriate business undertaking.  Based upon, for the most part, unnecessary / improper outside interference, such an organization would profit and most probably not have become damaged / diminished for the longer-term future.  Hence, with interference, there could be a significant degree of - economic / financial / organizational losses to the enterprise.  Factors such as levels of interest rates and the general overall economic fiber of the United States, are factors and forces that are well beyond the control of any individual or Economist.  Since these forces can come into play in a variety of combinations and can thereby affect the best set of economic data, and or projections, it is most reasonable to denote that a growing manufacturing organization would need to acquire new and profitable clients, if not for the unnecessary outside interference of others.

**DATA RELIED UPON**

In order to compile this economic / corporate report, the undersigned read, reviewed, utilized and relied upon the following information, in whole or part:

> *1)*  Plaintiff's Original Petition;

> *2)*     Responses to Requests for Production of Documents;

Lehrer Financial Economic Advisory Services / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 304

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 7.                                                    Defendant's Exhibit 4

3)  Answers to Interrogatories;

4)  Claimant's Request for Production to Davidson Design and Development, Inc;

5)  Claimant's First Set of Interrogatories to Respondent Davison Design and Development, Inc;

6)  Respondent's First Set of Discovery Requests;

7)  Correspondence of Barron Law Office, LLC – dated October 6, 2021;

8)  New Product Sample Contract - dated March 23, 2017, with supporting documentation;

9)  Independent Research on Weighing Machines Market Size, Share and Trends 2020 - 2027;

10)  The credentials ("CV") of Mario Scorza;

11)  A variety of data and information on how to "sell on Amazon" and its related costs;

12)  Bibliography specifically including data that was researched for this report that is included at the end of the report as opposed to being duplicated in this section;

13)  A variety of data, information and costs that was researched in regards to the fees and methods of shipping and importing finished goods (especially

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 305

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 8.                                    Defendant's Exhibit 4

scales) into the United States, including tariff rates and regulations, especially goods from China;

*14)*  Specific information in regards to the costs of shipping containers from overseas, their costs, prices, rates and freight concepts;

*15)*  Specific information in regards to the costs of manufacturing of scales mass-produced in China, their manufacturers, suppliers and prices;

*16)*  Reviewed and analyzed general Financial and Economic data, such as, but not limited to, interest rates analysis that affect the overall ability of an organization to function and operate in the United States; and

*17)*  Analyzed and reviewed such other studies, analyses, inquiries and investigations, most of which are too small to enumerate, as we deemed appropriate for the purpose of the creation of this Corporate Economic Damage Analysis Report.

## THE THEORY OF THE FIRM

A business enterprise represents a series of contractual relationships that specify the rights and responsibilities of various parties that affect and are related to each other. Those directly involved include - stockholders, customers, management, employees and suppliers. Society is also involved because businesses use scarce resources, pay taxes, provide employment opportunities and produce much of society's material and services output. Firms are a useful device for producing and distributing goods and services as they are economic entities and are best analyzed in the context of an economic model, such as the start-up of Mr. Scorza.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 306

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 9.                                                    Defendant's Exhibit 4


The model of business is called "The Theory of the Firm."  In its simplest version, the firm is thought to have profit maximization as its primary goal.  The firm's owner-manager is assumed to be working to maximize the firm's short-run profits.  Today, the emphasis on profits has been broadened to encompass uncertainty and the time value of money.  In a more complete model, the primary goal of the firm is long-term expected value maximization.  The value of the firm is the present value of the firm's expected future net cash flows.  If cash flows are equated to profits for simplicity, the value of the firm today, or its present value is the value of expected profits or cash flows, discounted back to the present at an appropriate interest rate.


Managerial decisions are often made in light of constraints imposed by technology, resource scarcity, contractual obligations, laws, and regulations.  To make decisions that maximize value, managers must consider how external constraints affect their ability to achieve organization objectives.


Organizations frequently face limited availability of essential inputs such as skilled labor, raw materials, energy, specialized machinery, and warehouse space.  Managers often face limitations on the amount of investment funds available for a particular project or activity.  Decisions can also be constrained by contractual requirements.  For example, labor contracts limit flexibility in worker scheduling and job assignments.  Contracts sometimes require that a minimum level of output be produced to meet delivery requirements.  In most instances, output must also meet quality requirements.  Some common examples of output quality constraints are nutritional requirements for feed mixtures, audience exposure requirements for marketing promotions, reliability requirements for electronic products, and customer service requirements for minimum satisfaction levels. Legal restrictions, which affect both production and marketing activities, can also play an important role in managerial decisions.  Laws that define minimum wages, health and safety standards, pollution emission standards, fuel efficiency requirements, and fair pricing and marketing practices all limit managerial flexibility.  The role that constraints play in managerial decisions makes the topic of constrained optimization a basic element of managerial economics.  One must also consider important economic implications of self-imposed and social constraints.  This analysis is important because value maximization and allocative efficiency in society depend on the efficient use of scarce economic resources.


Firms exist because they are useful.  Firms survive by public consent to serve social needs.  If social welfare could be measured, business firms might be expected to operate in a manner that would maximize some index of social well-being.  Maximization of social welfare requires answering the following important questions:   What combination of goods and services (including negative by-products, such as pollution) should be produced?  How should goods and services be provided?  How should goods and services be distributed?  These are the most vital questions faced in a free enterprise system, and they are key issues in microeconomics.


LEHRER  FINANCIAL  ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 307

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 10.                                              Defendant's Exhibit 4

Although the process of market-determined production and allocation of goods and services is highly efficient, there are potential difficulties in an unconstrained market economy. Society has developed a variety of methods for alleviating these problems through the political system. One possible difficulty with an unconstrained market economy is that certain groups could gain excessive economic power. To illustrate, the economics of producing and distributing electric power are such that only one firm can efficiently serve a given community. Furthermore, there are no good substitutes for electric lighting. As a result, electric companies are in a position to exploit consumers; they could charge high prices and earn excessive profits. Society's solution to this potential exploitation is regulation. Prices charged by electric companies and other utilities are held to a level that is thought to be just sufficient to provide a fair rate of return on investment. In theory, the regulatory process is simple; in practice, it is costly, difficult to implement, and in many ways arbitrary. It is a poor, but sometimes necessary, substitute for competition.

An additional problem can occur when, because of economies of scale or other barriers to entry, a limited number of firms serve a given market. If firms compete fairly with each other, no difficulty arises. However, if they conspire with one another in setting prices, they may be able to restrict output, obtain excessive profits, and reduce social welfare. Antitrust laws are designed to prevent such collusion. Like direct regulation, antitrust laws contain arbitrary elements and are costly to administer, but they too are necessary if economic justice, as defined by society, is to be served.

Based upon the above general outline, and discussion of a business enterprise, often referred to as "a firm", the undersigned will now explore the overall potential and viability of the invention of Mario Scorza, its industry, namely manufacturing of one or more "new" and "creative" weighing machines and how the projected organization could be structured and how different sectors affect and are directly related to each other for maximum output and financial rewards.

## CREDENTIALS OF MARIO SCORZA

Mario Scorza graduated high school in 1952. He joined the United States Armed Forces and was stationed in Alaska and Pearl Harbor, both on top secret missions and was tasked with keeping nuclear bombers airworthy. The Alaska Mission involved an issue with Russia that prompted the President of Russia, Nikita Khrushchev to pound his shoe on the podium in his message to then President Dwight D. Eisenhower regarding violating Russian air space with our aircraft.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 308

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 11.                                      Defendant's Exhibit 4

In 1958 he was discharged from service to attend college to obtain a Bachelor of Science degree. He then joined the United States Air Force Reserves out of Ellington Air Force Base in Houston, Texas.  There, he was a Flight engineer and worked on the Mercury Project and was assigned to the squadron responsible for the work of airlifting space capsules for NASA to drop them off in parachutes for impact studies.

In the 1960s, he began working for the Texas Department of Corrections in Huntsville, Texas as a correctional officer, spending twenty-five (25) years in this field.  He worked at the facility that was exclusively women after a promotion to a higher state service as counselor with the Texas Rehabilitation Commission.  During his work between the penitentiary and college courses in police science, he served an internship with a police department as reserve officer.

After service to the Department of Corrections, he went into private practice as a Licensed Professional Counselor with the State of Texas for five (5) years.  He also worked at Veterans Medical Hospital in Waco, Texas, as a Biofeedback Assistant in a PTSD clinic.

Mr. Scorza's work history shows a large assortment of Certificates of Achievement and degrees. His college work included many courses in Psychology, Psychiatry, Criminal Justice/Criminology and Penology.

**SCALE AND BALANCE MANUFACTURING – INDUSTRY OVERVIEW**

The Scale and Balance Manufacturing industry comprises companies that manufacture scales and balances for use in industrial, commercial, scientific and consumer markets.  This industry manufactures scales and balances for use in households, businesses and municipal organizations. Scales and balances are used to measure the weight of objects or people.  Over the five (5) years to 2022, industry revenue has fluctuated, but has grown overall due to improved construction and manufacturing performance.  However, the appreciation of the United States dollar has reduced the industry's cost competitiveness, and thus, has stifled revenue; imports have satisfied a larger share of domestic demand while exports have declined as a share of revenue.

Overall, industry revenue has increased at an annualized rate of 0.4% to $1.2 billion over the five (5) years to 2022, including an increase of 3.8% in 2022 alone.  In 2020, the COVID-19 (coronavirus) pandemic caused an economic recession, resulting in overall decreased production. Declining industrial productivity has reduced demand from the industrial market, which accounts

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 309

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 12.                                                    Defendant's Exhibit 4

for most of industry revenue.  In 2020, industry revenue decreased 15.5%, hindering revenue growth over the current period, primary due to the overall economic slowdown experienced domestically and abroad.

Weight measurement tools are crucial for almost every business, as they are used in a variety of business processes including maintaining inventory, quantifying purchases and sales and assessing overall efficiency.  As a result, industry performance is largely tied to the performance of downstream markets.  The industrial production index, which measures output from key downstream industries, such as mining and manufacturing, has increased over the past (5) five years.  However, imports have increased during the period, partly due to an appreciating United States dollar, which makes foreign-produced products more affordable relative to domestically produced ones.  At the same time, exports have declined as domestic goods have become more expensive on foreign markets.  Combined with increased price-based competition, these trends have hindered industry profit over the past five years.

Over the (5) five years to 2027, industry revenue is forecast to increase at an annualized rate of 1.2% to $1.2 billion.  Rising manufacturing activity and freight volumes are expected to continue to drive demand for industry products.  Moreover, demand from key markets, such as laboratories and weight stations, is anticipated to climb.  The trade-weighted index, which measures the value of the United States dollar, is forecast to decline, alleviating some import penetration and supporting export growth.

As the United States dollar appreciated over the period, imported goods became more affordable relative to domestically produced ones.  Thus, the value of imports has increased at an annualized rate of 2.8% to $1.0 billion over the (5) five years to 2022.  China has accounted for the highest proportion of penetration, satisfying 37.3% of industry imports in 2022.  Germany, Japan and Mexico have also been significant sources of imports over the past five years.  Imports from China are especially competitive because Chinese manufacturers can produce balances and scales of a comparable quality to United States industry products, but at a lower overhead cost than domestic operators.  Manufacturers in Japan and Germany are global leaders in the production of technologically advanced tools, such as balances and scales, while Mexico's proximity to the United States makes it a favorable trading partner.  Industry operators that are skilled manufacturers of high-tech products can more easily compete with imports.

The value of exports has decreased at an annualized rate of 1.9% to $352.9 million over the five years to 2022.  This decline can be partly attributed to the appreciation of the United States dollar, which has made United States produced goods less affordable on foreign markets.  Canada is the largest export market for industry products, accounting for an estimated 33.3% of

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 310

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 13.                                                    Defendant's Exhibit 4

total exports in 2022. The value of exports has fluctuated significantly during the period, falling as much as 16.1% in 2020 and rising as much as 7.6% in 2018. The global economic slowdown as a result of the coronavirus pandemic reduced global demand for industry products in 2020. As industry operators have contended with price-based competition from imports, some companies have chosen to reduce their workforce in attempts to control costs.

Industry employment is estimated to decrease at an annualized of 0.7% to 3,586 workers over the five years to 2022. Similarly, some operators have elected to exit the industry. The number of enterprises is expected to decrease at an annualized rate of 1.4% to 68 operators over the same period. Manufacturers also contend with volatile profit, since they must absorb the changing costs of commodities. In 2022, profit, measured as earnings before interest and taxes, is estimated to account for 6.1% of industry revenue, up from 4.4% in 2017.

**THE OUTLOOK**

Over the (5) five years to 2027, the Scale and Balance Manufacturing industry is expected to expand as the global economy expands following recovery from the COVID-19 (coronavirus) pandemic. Additionally, laboratories and weigh stations are likely to continue exhibiting strong demand for high-precision scales and balances. A future depreciating United States dollar is also expected to drive demand for industry exports over the outlook period. Industry demand is also expected to be bolstered by increased industrial production over the outlook period. Over the (5) five years to 2027, the industrial production index is forecast to increase at an annualized rate of 1.2%.

Overall, industry revenue is forecast to increase at an annualized rate of 1.2% to $1.2 billion over the (5) five years to 2027. Industry revenue is expected to reach new highs over the next (5) five years as industry expands rapidly, accelerated by government spending. Industry profit is expected to remain stable over the outlook period as revenue growth is expected to outpace wage growth.

**Industrial Trends and Downstream Markets**

The industrial production index, which measures output from mining, manufacturing, electric and gas industries, is forecast to increase over the (5) five years to 2027. This growth is expected

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 311

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 14.                                                    Defendant's Exhibit 4

to be concentrated among manufacturers that focus on higher value-added products and services. Their performance will likely benefit industry operators that manufacture highly technical balances and scales, since lower value-added imports will not likely be able to compete with such products on the basis of quality.

Demand for scientific balances and scales is likely to continue growing over the next (5) five years as research and development (R&D) expenditures increase. Consumers in this downstream market demand high-end precision scales that can measure highly accurate weights; balances used in laboratories can weigh up to one ten-millionth of a gram. Moreover, as quality control regulations become stricter, demand for laboratory testing services is forecast to increase, benefiting demand for balances and scales.

**Retail, Commercial and Household Scales and Balances**

The retail, commercial and household scales and balances segment comprises all scales and balances used for retail, commercial or personal purposes. Such scales are typically lightweight and digitized; for example, retail scales often have a digital interface for customers. Retail and commercial scales are used in grocery stores, meat markets and delicatessens, among other shops, to weigh foods. They are also used at mailing centers to weigh letters and parcels. Household scales are mostly purchased by customers to weigh themselves but may also be used to weigh luggage or other objects.

This segment also includes laboratory scales and balances. Laboratory scales have very high precision because they are required to measure and detect minuscule amounts of chemicals or other ingredients. For example, some of Mettler Toledo International Inc.'s lab scales have the capability to weigh and detect up to one ten-millionth of a gram. Since lab scales involve high-end technology and compete on the basis of quality, they are typically expensive and earn their manufacturer high profit. In addition, they experience the least amount of import competition, with United States manufacturers generally retaining the upper hand in high-tech manufacturing. This segment is anticipated to generate 23.4% of industry revenue in 2022. This segment has grown over the (5) five years to 2022, alongside increased consumer spending.

A variety of factors determine domestic demand for products made by the Scale and Balance Manufacturing industry. These include the level of industrial activity, research and development spending and consumer disposable income. Higher industrial activity, especially in the automotive and construction sectors, spurs demand for heavy-duty scales that can weigh up to

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 312

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 15.                                              Defendant's Exhibit 4

thousands of kilograms.  Research and development, especially within the pharmaceutical and medical sectors, necessitate purchases of laboratory scales and other high-precision weighing machines.  Moreover, companies in the transportation sector use industry products to weigh cargo.  For example, freight may be weighed at ports and warehouses.  Finally, high disposable income invigorates the retail and commercial sectors and raises demand for scales accordingly.  The COVID-19 (coronavirus) pandemic and economic downturn has reduced corporate profitability and has resulted in weakened demand from industrial buyers.


Global demand for scales is influenced by these same factors and the trade-weighted index (TWI), which compares the value of traded currencies.  For United States producers, as the TWI falls, their products become less expensive in global markets, boosting revenue from exports.  Furthermore, global demand for industry products declined due to the worldwide economic slowdown in 2020 but has since recovered.  Importantly, domestic demand may not translate into demand for industry products, depending on the level of import penetration.  High-precision scales are relatively more immune from import penetration than generic retail, commercial and consumer scales.  The latter category competes primarily on the basis of price, giving cost-efficient manufacturers in China and elsewhere a competitive advantage


The Scale and Balance Manufacturing industry has a low level of capital intensity.  In 2022, for every $1.00 spent on labor, industry players will likely allocate $0.09 toward capital.  While the initial costs of acquiring facilities, production equipment and tools may be high, capital costs can be depreciated over a long time.  Conversely, some of the industry's more sophisticated industrial and lab products require skilled manufacturing labor, with wages accounting for 20.6% of industry revenue in 2022.  Over the (5) five years to 2022, capital intensity has decreased as operators have increased labor costs.  The industry is experiencing a low level of both the rate of new patents and the concentration of patents in the industry.  This creates an environment where the threat of new technologies driving disruption is low.  Industry operators are exposed to a low rate of new entrants and a moderate level of entry barriers.  This combination of factors creates an environment where entry trends are not a key threat of disruption.  Major market segments for industry operators are relatively diversified.  The spread of market segments suggests that there are limited entry points other than those already served by incumbent operators.


The Scale and Balance Manufacturing industry has not been disrupted by technological advancements.  Automation updated software and inventory control systems have benefited the industry by cutting down costs and time for completion.  However, developments have not changed the landscape of the industry since the manufacturing process has remained largely the same.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 313

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 16.                                                     Defendant's Exhibit 4

Different technology goes into the production of different types of scales made in the Scale and Balance Manufacturing industry. For example, laboratory scales may employ microbalance instruments, which are capable of making precise estimations to the order of a millionth of a gram. Other digitized scales, such as those at supermarkets, are less sophisticated, using electrical resistance and calibration to weigh objects. Meanwhile, other scales are not digitized and are mechanical altogether. For example, a spring scale weighs objects by measuring the distance that a spring deflects under a load: the greater the deflection, the greater the load. Spring scales are generally used to weigh trucks and other heavy material.

The majority of technological change in this industry has been geared at improving precision and load resistance. In turn, improving precision involves reducing sources of error, such as miscalibration over time, and reducing the effect of magnetic fields or airborne dust. Within the less high-precision segment, technology over the (5) five years to 2020 has focused on improving digital interface and other commercial aspects of the product. Furthermore, organizational steps, such as consolidation, have helped the industry contain costs and keep profit high. IBISWorld expects technological change, both in terms of production and organization, to remain moderate over the (5) five years to 2027.

The Scale and Balance Manufacturing industry exhibits a high level of revenue volatility. The Industry has grown as much as 8.3% in 2019 and has declined as much as 15.5% in 2020 due to COVID-19 (coronavirus) pandemic and the subsequent economic downturn. Revenue is largely tied to the industrial and transportation sectors, which are affected by volatile drivers, such as the world price of crude oil. Over the (5) five years to 2022, revenue volatility, which measured the absolute change of year-over-year revenue, averaged 11.6%.

There is a moderate level of regulation that operators in the Scale and Balance Manufacturing industry must comply with. The Office of Weights and Measures promotes uniformity in United States weight laws and monitors weighting inspections. There is also an increasing trend toward the harmonization of weighting standards across the European Union, to which industry operators export and must conform. Electrical components in scales are also subject to electrical safety standards and must be ensured to function efficiently in the presence of other electrical and chemical components.

The manufacture of specific scales, depending on the end market, is subject to extra regulation. For example, laboratory scales must enable customers to comply with Good Laboratory Practices regulation. Meanwhile, scales used in the pharmaceutical industry must not interfere with United States Food and Drug Administration regulation. Scales used in hazardous requirements may be subject to additional regulation as well. IBISWorld expects regulation to remain

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 314

RE: Mario Scorza vs. Davison Design & Development, Inc.
Continued.

Page 17.                                    Defendant's Exhibit 4

moderate over the (5) five years to 2027.  Widespread stay-at-home orders amid the COVID-19 (coronavirus) pandemic weakened the global economy in 2020.  This resulted in sizable declines in demand from key market segments.  Furthermore, industry operators were not immune to temporary closures in the case of an outbreak among employees.

The Scale and Balance Manufacturing industry receives some assistance in the form of tariffs on imports, though not on all products.  Scales categorized as "other" are subject to a tariff of 2.9%, but almost all types of scales and balances are free to enter the United States tariff-free.  This reinforces the price advantage of foreign manufacturers and helps them penetrate the domestic market.

The industry receives some assistance from associations such as the Scale Manufacturers Association (SMA).  The SMA was established in 1945 and works to promote the collective benefit of scale manufacturers, to conduct surveys pertaining to the industry's landscape and to develop standards relating to loading cells, electrical components, the environment and other issues.  IBISWorld expects overall industry assistance to remain low over the five years to 2027. Additionally, the Coronavirus Aid, Relief, and Economic Security (CARES) Act permitted industry operators to receive loans through the Paycheck Protection Program (PPP) amid the COVID-19 (coronavirus) pandemic.  Loan amounts totaled the cost of labor within a company for 2.5 months.

**Bathroom Scales Market**

In the changed post COVID-19 business landscape, the global market for Bathroom Scales estimated at United States $2.4 Billion in the year 2020 / 2021, is projected to reach a revised size of United States $3.0 billion by 2027, growing at a CAGR of 3.4% over the analysis period 2020 - 2027.

The United States Market is estimated at $644.3 Million, while China is forecast to grow at 5.3% CAGR.  The Bathroom Scales market in the United States is estimated at United States $644.3 Million in the year 2020.  China, the world's second largest economy, is forecast to reach a projected market size of US$572 Million by the year 2027 trailing a CAGR of 5.3% over the analysis period 2020 to 2027.  Among the other noteworthy geographic markets are Japan and Canada, each forecast to grow at 2.1% and 2.8% respectively over the 2020 - 2027 period. Within Europe, Germany is forecast to grow at approximately 2.6% CAGR.

Lehrer Financial Economic Advisory Services / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 315

Defendant's Exhibit 4

**Bathroom Scales - Global Market**

Bathroom Scales market worldwide is projected to grow by United States $744.9 Million, driven by a compounded growth of 4.0% over the next 5 -7 years. Bathroom Scales, display the potential to grow at over 4.0% over this same period. The shifting dynamics supporting this growth makes it critical for businesses in this space to keep abreast of the changing pulse of the market. Poised to reach over United States $3.1 Billion by the year 2025, Bathroom Scales will bring in healthy gains adding significant momentum to global growth. Representing the developed world, the United States will maintain a 3.1% growth momentum in the immediate future. Within Europe, which continues to remain an important element in the world economy, Germany will add over the United States $27 Million to the region's size and clout in the next 5 to 6 years. Over United States $21.8 Million worth of projected demand in the region will come from rest of Europe markets. In Japan, Bathroom Scales will reach a market size of United States $189.7 Million by the close of the analysis period.

As the world's second largest economy and the new game changer in global markets, China exhibits the potential to grow at 6.2% over the next couple (3 – 5) of years and add approximately United States $210 Million in terms of addressable opportunity for the picking by aspiring businesses and their astute leaders. Presented in visually rich graphics are these and many more need-to-know quantitative data important in ensuring quality of strategy decisions, be it entry into new markets or allocation of resources within a portfolio. Several macroeconomic factors and internal market forces will shape growth and development of demand patterns in emerging countries in Asia-Pacific, Latin America and the Middle East. The global bathroom scales market is stimulated by the increasing prominence laid by health-conscious consumers to remain fit. Increasing awareness that body fat proportion is a superior and a more accurate indicator of health than weight is helping drive the demand for bathroom scales geared towards this type of measurement.

The subsequent rise in demand for body fat analyzers is one of the key factors likely to drive the bathroom scales market over the forecast period. Dieters and exercisers are also showing special interest in fat scale analyzers which enable body fat measurement and help to distinguish between fat loss and weight loss. Rapid growth in the aging population is likely to lead to augmented sales in the bathroom scales market. Growing awareness about health implication of obesity such as hypertension, diabetes, and cardiovascular (heart) disease is fostering the adoption of advanced weight management strategies among consumers. Increasing health concerns among the female population is enhancing the growth of the bathroom scales market.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 316

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 19.                                                      Defendant's Exhibit 4

Some of the other drivers of the bathroom scales market are heightened involvement in fitness routines and growing desire to stay fit and active among the aging population.  Initiation of Bluetooth enabled and Wi-Fi aided scales made compatible with smart phones and tablets also leads to demand for bathroom scales.   Introduction of innovative products such as multifunctional bathroom scales and electronic bathroom scales is expected to create opportunities in the bathroom scales market.   Advancement in technology and continuous improvement of products is expected to drive the bathroom scales market over the forecast period.

On the basis of geography, the bathroom scales market is segmented by North America, Europe, Asia Pacific, Middle-East and Africa, and Latin America.  Europe was the most dominant market in 2015 and is expected to remain so over the forecast period.  Increasing health awareness among consumers and the urge to lead a healthy life is driving the bathroom scales market in this region.    Introduction of innovative products such as electronic bathroom scales and multifunctional bathroom scales is fueling growth of the bathroom scales market in this region. The United Kingdom has the dominant share in the bathroom scales market in Europe.  North America has a matured market for bathroom scales due to the introduction of newer products and advancements of technology in the bathroom scales market.  Asia Pacific was the fast growing region in 2015 and it is likely to remain so over the estimated period.

Growing health issues due to unhealthy, inactive lifestyles owing to higher intake of carbohydrates and calorie rich foods and increasing trends to combat obesity is driving the bathroom scales market in this region.  Increasing desire to lead a healthy and fit lifestyle among the aged population is one of the key drivers for the bathroom scales market in Asia Pacific. China is one of the largest markets in this region owing to the advancements in technology. Middle East & Africa has a considerable market share in the bathroom scales market owing to the rising trend of health management among consumers.  Saudi Arabia and Qatar are some of the prominent market shareholders in the bathroom scales market.  With advancements in technology and innovation of products, Latin America is emerging as a prospective market over the estimated period.  Brazil is one of the large markets in Latin America.  Brazil accounts for one of the major markets in the bathroom scales market in this region.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 317

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 20.                                                    Defendant's Exhibit 4


### Electronic Weighing Machines Market Report Scope


| Report Attribute | Details |
|---|---|
| Market size value in 2020 | $3.7 billion |
| Revenue forecast in 2027 | $4.8 billion |
| Growth rate | CAGR of 3.1% from 2020 to 2027 |
| Base year for estimation | 2019 |
| Historical data | 2016 – 2018 |
| Forecast period | 2020 – 2027 |
| Quantitative units | Revenue in $Million and CAGR from 2020-2027 |
| Report coverage | Revenue forecast, company ranking, competitive landscape, growth factors, trends |
| Segments covered | Type, distribution channel, region |
| Regional Scope | North America, Europe, Asia Pacific, Central & South America, MEA |
| Country scope | The United States, Germany, France, The UK, China, India, Brazil |
| Key companies profiled | A&D Company, Ltd, Mettler-Toledo International, Inc., Doran Scales, Inc. Essae-Teraoka Pvt. Ltd, Fairbanks Scales, Inc., Kern & Sohn GmbH, BONSO Electronics International, Inc., Smimadzu Corporation, Sartorius Group, Avery Weigh Tronix, LLC |
| Customization scope | Free report customization (equivalent up to 8 analysts working days) with purchase. Addition or alteration to country, regional & segment scope. |
| Pricing and purchase options | Customized purchase options to meet exact research needs. |

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 318

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 21.                                              Defendant's Exhibit 4

*A History of Scales*

Scales have been in existence for thousands of years.  The oldest variety of the scale is the balance scale, artifacts of which are found in the Indus River Valley (close to Pakistan) dating back from between 2400 BC and 1800 BC.  They were important tools used by tradespeople, who calculated how much a good was worth by weighing it against a set of stones or polished cubes.  Each stone represented a certain mass; when a scale became balanced, the tradesman would know that the goods equaled the mass of the stones.  By 1878 BC, but likely long before then, the Egyptians were similarly using balance scales to implement a system of gold mass measurement.  The oldest archaeological evidence of scales found so far in China comes from sometime between the 3rd and 4th centuries BC.  It was found in a tomb near Changsha, Hunan, along with masses of bronze that we assume they used for measurement.  Early Chinese scales were of the balance variety.

From then until the Italian Renaissance, while some people did try to make new scale varieties, the most accurate remained balance scales.  During the Renaissance, people such as Galileo and Da Vinci spent a lot of time studying measurement and the scale.  A friend of Galileo, a man from Venice named Santorio Santorio (a.k.a. Sanctorius Sanctorius), invented the first successful non-balance scale.  His invention was a weighing chair, which, as its name implies, weighed anything or anyone that sat in it.  To make the chair work, Santorio placed it on top of a large balance platform.  He used it for many years to track his weight before and after meals.

Towards the end of the 17th century, tradespeople began weighing goods with standardized weights.  They did so in order to increase accuracy and transparency in their trading endeavors.  This change led to the development of a number of new scale varieties.  One of the most significant scale varieties to come out of this time period was the Roberval balance, invented in 1699 by a French mathematician named Gilles Personne de Roberval.  The big selling point of the Roberval balance was that it measured products' weight accurately no matter where the user placed a weight inside the pans.  Next, in 1770, a British person named Richard Salter invented the first spring scale to work without a counterweight.  His spring scales featured a spring that measured the pressure or tension created by a load when placed on the spring.  His invention proved so useful that they are still used today in many post offices.

The next big thing in the measurement industry came in 1843, when Sir Charles Wheatstone modified an electrical circuit that measures electrical pressure or resistance, originally invented by Samuel Hunter Christie.  This circuit, now called the Wheatstone bridge circuit, is the building block that later engineers used to design all load cells, which are in turn one of the building blocks of digital scales.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 319

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 22.                                                 Defendant's Exhibit 4

While Wheatstone perfected his circuit in 1843, it was not until a century later in 1943 that inventors figured out how to use it effectively. It was then that engineers began mass producing the bonded strain gauge, which is an important element of load cells. Then, nearly forty years after that, Americans Richard Loshbough and Edward Pryor patented the first American-built digital scale in 1980.

Since then, scientists and engineers have striven to make measuring technology more accurate and more versatile. For example, only four years ago, manufacturers built the first hybrid scale featuring flexible arms instead of rigid ones. It is called the elastically deformable arm scale, and it allows users to support and weigh heavy loads sitting on edges without tipping over. This is just one of the many ways that industrial scale manufacturers are seeking to improve measurement products. In the future, no doubt they will be more accurate and useful than ever before.

Scales are used in a wide variety of consumer, industrial, and commercial settings, including doctors' offices and hospitals, laboratories, roadside truck stops and weigh stations, restaurants, and manufacturing plants alike. They are a wonderful resource in a number of industries, including aerospace, agriculture, automotive, construction, engineering, hospitality, marine, medicine, shipping, and more.

**History of the Bathroom Scale**

A century ago, few Americans had any idea how much they weighed. Here's why that changed so dramatically. In 1922, the Commissioner of Health for Chicago had a scale installed in the lobby of City Hall. Any and all passersby were invited to come in, step on, and find out what they weighed. City residents soon flocked to the building and lined up all day long to check their weight. The scale was the hottest ticket in town. Thirty years earlier, most Americans had no idea what they weighed — nor did their physicians. Doctors and hospitals had had scales since the 1870s; they just weren't a part of standard health evaluations. Certainly, there were sociocultural attitudes and biases about body size and shape, but weight was a subjective concept. It wasn't until the turn of the century when a confluence of events gave rise to both a massive interest in quantifying weight and the tools to do so — one tool in particular: the bathroom scale.

In the beginning, scales were a novelty. As historian Hillel Schwartz, PhD, writes in Never Satisfied (his oft-cited and expansive text on American diet culture), the first penny scale was

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 320

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 23.                                                      Defendant's Exhibit 4

imported from Germany in 1885.  It was a mechanical marvel: put in a penny, find out your weight.  Seeing an opportunity, American manufacturers began producing their own, and by the 1890s, penny scales were popping up in movie theaters, groceries, train stations, drug stores — anywhere you might find vending machines.  In essence, that's what they were at this point: huge and decorative, they came with clanging bells or internal phonographs that would play a tune while weighing you.  These early scales were less like medical devices and more like fairground amusements.

Within a few years, they'd evolved into slot machines: drop in a penny, guess your weight, and if you were exactly right you'd get your money back.  But most of these machines were rigged one way or another.  If you guessed wrong (which you almost certainly would), all you got was a ticket with your weight printed on it, along with your fortune.  As all gamblers know, the house always wins — and that was no exception here.  Penny scales were enormous moneymakers for both the growing scale-distribution companies and the shopkeepers or operators who maintained them.  "Penny Scales Make Millions," the New York Times declared in 1927, reporting that 40,000 penny scales had profited $5 million the previous year.  Americans had stepped onto the scales 500 million times, the paper stated.  But those were just the public ones.

The first so-called bathroom scale went on sale in 1913 (again, imported from Germany), and somehow managed to sell, despite the fact that the vast majority of Americans didn't even have flush toilets.  The advent of WWI brought an end to German imports, but not the scale fad.  The first American-made bathroom scale came out in 1917, quickly followed by a handful of others as enterprising engineers and investors seized on the ever-rising demand for this product.  The Detecto Scale Company formed in 1921, and by 1925 claimed their scale alone was used by over 1 million people.  It wasn't that penny scales were any less popular, but that self-weighing in general was more popular than ever.  In 1928 the Los Angeles Times ran a story about a Mrs. F.C. Roberts, the wife of a penny-scale distributor, who'd recently gone to a car dealership and paid for her new Nash with 30,000 pennies, delivered in sacks.  While Mrs. Roberts' pile of change might have made for good headlines (and a photo, no less), her wealth was not surprising.  After all, as the Times noted, "the American public spends over $80,000,000 annually" to weigh themselves both in private and public.

A lot was going on, all at once: industrialization, rapid advancements in public health and science, modern media, modern war — just to name a few.  Americans had both brand-new concepts of health and longevity, and very old biases about weight and morality.  The scale — this ingenious, fortune-telling, technological wonder — seemed somehow capable of measuring them all at once.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 321

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 24.                                        Defendant's Exhibit 4

It wasn't until this curious turning point in the early 20th century that the general public and the medical community — in that order — began to treat weight as a health factor, and eventually a health panic.  Unlike other paradigm shifts in public health (the campaign against cigarette smoking, the use of seat belts), this one did not originate with any major scientific research. People were watching and worrying about weight before their doctors were.  For starters, "health" was a whole new thing.  Massive medical breakthroughs and societal advancements meant people were living much longer, and dying from very different illnesses than they used to. Modern sanitation systems, vaccination programs, penicillin, pasteurization, epidemiology, the discovery of the vitamin, and the promotion of basic hygiene — all these great leaps forward resulted in a significant rise in life expectancy, a huge drop in infant mortality, and a great reduction of contagious illnesses.

In 1900, infectious diseases — tuberculosis, pneumonia — were the leading causes of death, as had been the case for most of early modern history.  By 1930, degenerative diseases — cancer, cardiovascular disease — had supplanted them.  Certainly, heart disease had always been around, but drew little attention compared to horrors like TB and diphtheria, which descended and destroyed like an evil spell.  No one had worried as much about chronic illness previously, because up until this point, sickness and longevity seemed completely out of our hands.  If you encountered some "bad air" and got cholera, that was that.

There was a general fixation at this time with the concept of a quantified, perfected human body (and human population).  Pseudo-sciences like phrenology garnered renewed interest, and states enacted forced sterilization programs.  Parents entered their infants into "Better Baby" contests, where they would be measured and examined against other babies to determine which was "best." The eugenics theory became the eugenics movement, and soon enough, eugenics laws. The conflation of physical attributes with health, and health with human value had been validated by none less than the United States government.  Was it any wonder that Americans were standing in lines and shelling out millions to see that number on the scale? That number could tell them not just what their bodies weighed, but what they themselves were worth.  It was knowledge — or at least, it was information.

Enter the Metropolitan Life Insurance Company.  Life insurance companies gave Americans the tools to figure out the meaning of the results of what these scales were saying.  The life insurance industry had begun using height and weight tables (a concept created by Belgian mathematician Adolphe Quetelet, also the inventor of the BMI) in the mid-1800s as a tool to assess mortality risk.  These early tables were meant to reflect the average height and weight of American men and women — but there was no industry standard on these numbers, nor enough data to create one.  Each company had its own version of "average," and for the most part were concerned with those who fell below it.  "They often rejected the young and underweights, because a little extra

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 25.                                      Defendant's Exhibit 4

fat on your bones was considered a benefit," particularly when it came to surviving infectious illness, says Czerniawski.  It also meant you could afford to eat well, and likely had some money in the bank.

But like everything else, that changed at the turn of the century.  Weight tables were first standardized, not by a medical body, but by George R. Shepherd, the medical director of the Connecticut Mutual Life Insurance Company.  Shepherd came up with his figures using data from 700,000 policyholders, and his numbers became the first weight "standards." Anything 20% above or below these average weights Shepherd declared risky.  The weight tables were continuously tinkered with, and there was always controversy within the industry over the thresholds of risk.  But at that time, they were also originally just internal tools and generally only based on men.  Yet public interest in weight and health, and control of both, only grew larger and more fraught.  During World War I, being fat was deemed both unhealthy and unpatriotic.  "Food Will Win the War," declared the newly formed United States Food Administration, which launched a massive propaganda campaign promoting food conservation.  American soldiers needed sugar for energy on the front.  Our allies would starve without American meat.  Our amber waves of grain would save us from the looming threat of Bolshevism, "the handmaiden of hunger." To be lean was to embody, "the spirit of self-denial and self-sacrifice" of a true American.  But fatness was seen as a sign of treasonous indulgence.

The insurance industry jumped on board, launching welfare campaigns about the threat of fat.  Many of these health campaigns were directed at women specifically, because they were the ones in control of domestic affairs.  Women shopped for the household.  Meanwhile, insurance table-makers began slowly but surely lowering the weights printed on their tables, inching away from "average" weights and toward those they deemed preferable.  The WWI concept of patriotic thinness was soon reaffirmed during WWII — when more and more women were not just in charge of buying the bacon, but bringing it home.  More women than ever had joined the workforce, gotten college educations, and suddenly had an unprecedented level of financial independence.  It was during this war that the Metropolitan Life Insurance Company did something unprecedented as well: the company made the bold decision to publicly publish one of their weight tables, specifically, a table of "ideal" weights for women.

Half a century after first stepping on the scale, Americans now had the numbers to compare their own against.  The insurance tables made a perfect companion to the bathroom scale, now a fixture in homes throughout the country.  MetLife's "ideal weights for women" was so well received that the company produced their list of ideal weights for men the following year.  MetLife remained the authoritative voice on American weight (eventually swapping out "ideal weights" for "desirable" ones), until the Body Mass Index (BMI) took precedence in the 1980s.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 323

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 26.                                                    Defendant's Exhibit 4

The weight tables were very problematic but they were much less harsh, really, than the BMI. The tables did account for things like gender, age, and frame (though this "metric" again was designed by MetLife).  BMI is just a math equation; it does not measure nor account for things like muscle mass, insulin sensitivity, genetic history, or other factors contributing to health and size.

The BMI was widely adopted in 1985 — 100 years after that first penny scale arrived in the United States, with all those bells and whistles.  And just like the scale itself, the BMI boils us down to a tidy number, giving us a little information if not much useful knowledge.  Yet, both the BMI and the bathroom scale remain fixtures in our lives.  Despite countless competitors, some of the very first scale companies, including Detecto, are still in business today, and projections estimate the market for bathroom scales will surpass $2.8 billion by next year. There's no current data on just how many Americans have them in their homes today, but it is an easy assumption that a majority do.

### Design and Engineering of Scales

When designing or selecting an industrial scale for a product, suppliers must consider application specifications such as the setting in which a customer plans to use it, the type of materials it must weigh, the minimum and maximum weight it must discern, and its required accuracy.  Scales suppliers typically carry a stock of standard scale designs, but they can also customize scales per customer requirements.  For example, they can design scales with a wide range of weighing capacities spanning from just a few grams to upwards of 80,000 pounds.  Also, they can design scales to weigh anything from truck loads to gaseous materials in a laboratory.

Of course, a scale that can weigh several thousand pounds is of no use if it cannot produce an accurate readout.  Unfortunately, this is sometimes the case with larger scales, which may round as far off as the nearest half pound.  For example, many truck scales measure to the nearest tonnage, instead of weighing it exactly.  Many small scales, on the other hand, can weigh material correctly down to the milligram.  This is why it is important that you communicate just how accurately you need your scale to work.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 324

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 27.                                        Defendant's Exhibit 4

*Features*

Scales feature a means to measure the weight of a load, and a way to read that measurement. Any given scale may use springs, load cells, balance, hydraulics, or a combination therein to determine weight.  To display the weight, scales feature either analogue or digital readouts. Analogue displays show measurements taken on a turning dial, while digital displays show measurements as digital numbers on a small screen.

*Types*

To serve a diverse set of applications, scale manufacturers produce many types of industrial scales.  One of the numerous ways that industrial scales can be categorized is by the mechanism or technique they use to weigh a load.  Some of the most common industrial scale types categorized this way include hanging scales, crane scales, platform scales, and balance scales.

Hanging scales, also known as hang scales, vary in size from pocket-sized luggage scales to crane scales.  A type of spring scale, hanging scales suspend the load they are weighing from a hook or chain, while sensors above the load take measurements.

Crane scales can be categorized as hanging scales, but commonly, instead of using a spring, or along with a spring, they work using hydraulic power.  In addition, as crane scales, which can also be used to weigh luggage and determine the weight of caught fish, become available in smaller sizes, the hanging aspect becomes less prevalent.

Platform scales consist of a scale pan or surface upon which items are placed and a system of springs, load cells, or levers, which are organized underneath the surface, calculate the weight of the items set on it.  Some platform scales have only one surface, or platform, as is the case with bench scales and floor scales, while other platform scales have multiple platforms.

Balance scales, also sometimes known simply as "balances," measure units of mass. Technically, they are a type of platform scale.  In a traditional configuration, they do so with the assistance of two weighted pans and a beam, or a pivoted, horizontal lever with arms of equal length, from which they are suspended on either side.  To determine mass, a technician place the item in one pan, while in the other they place standard masses of known weight, until the beam comes as close to a balance, or equilibrium, as possible.  Variations on the traditional balance

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 325

RE: Mario Scorza vs. Davison Design & Development, Inc.
Continued.

Page 28.                                    Defendant's Exhibit 4

scale include the microbalance, the pendulum balance scale, the analytical balance, the electronic analytical balance, and the Roberval balance as well as other types and variations as denoted below:

> Other scales that customers can choose from include bench scales, counting scales (count scales), digital scales, electronic scales, portable scales, medical scales, pet scales, and kitchen scales.

> Bench scales are lightweight scales small enough to be placed on a table, counter, or bench. They can be used to weigh pills at a pharmacy or groceries in a checkout line.

> Counting scales are designed to count coins, other currency or specific products. To do so accurately, they use an artificial memory, stored with information about the weight of each individual item (nickel weight, quarter weight, etc.). Also, they can record the number of those individual items they have weighed.

> Digital scales display load weights on a digital display. They are much easier to read quickly than scales with analogue readouts and are often more accurate.

> Electronic scales, or electronic weigh scales, calculate loads using electrical signals, currents, and charges. Also, they use an electric motor. Virtually any scale can be an electronic scale.

> Portable scales are scales that users can move from one location to another. They are assets in areas where objects are too heavy to move far.

> Medical scales are scales that doctors, nurses, researchers, and the like use to weigh people or specimens.

> Pet scales are weighing scales that veterinarians use to weigh animals.

RE: Mario Scorza vs. Davison Design & Development, Inc. Continued.

Page 29.                                        Defendant's Exhibit 4

Kitchen scales are weighing scales that chefs in both commercial settings and home settings use to weigh the amount of food or drink they're using before they add it to their dish.

*Accessories*

Examples of industrial scale accessories that might be of use include remote indicators, tables, stands, cables, power adaptors, printers, barcode scanners, and foundations.

*Proper Care*

To keep industrial scales working accurately for a long time to come, they need to be stored up off the ground and away from the elements.  Also, if and when moved, it should be with care. Watch out for potential sources of error, such as air gusts, friction, settling dust, miscalibration, condensation, evaporation or convection, vibration, misalignment of mechanical parts, and buoyancy.

*Standards*

No matter the application or style, one thing all United States made scales are guaranteed to have in common is their adherence to the accuracy and worker safety standards laid out by the National Institute of Standards and Technology.  If buying from scales manufacturers that follow the guidelines of NIST, there is confidence in the machine's ability to reduce both machine and worker overload.

The global health and wellness market has reached a market evaluation of $1.5 trillion and growing at a rate of 5.0% - 10.0% per year, according to a recent McKinsey survey.  Consumers are increasingly concerned with their physical and mental health in the wake of the pandemic and the current market suggests they're willing to pay for the products and services they believe in.

The health and wellness market has also changed by definition over the years.  These days, health and wellness blankets roughly six categories including health (vitamins, over-the-counter

Lehrer Financial Economic Advisory Services / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 327

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 30.                                        Defendant's Exhibit 4

products, etc.), fitness, wellness-oriented nutrition, wellness-oriented appearance, sleep, and mindfulness.

The specifics of these categories differ from country to country, but the trajectories of each remain positive on both regional and global scales.  Further, we can expect a greater shift towards services including personal training, nutritionists, and counseling that addresses physical and mental health in 2022.

But that's not all, as consumers expect more personalized, digital services that span across numerous categories.  The future of this $1.5 trillion market is still to be determined but identifying consumer trends and behaviors should give retailers the confidence to adopt new practices in 2022.

## Personalized Treatments and Services

Of the health and wellness trends, personalization has caught the attention of the global consumer market.  What's surprising, however, is that consumers are increasingly willing to give away their personal information to receive personalized treatments and services.

Consumers are also prioritizing personalization now more than they did just a few years ago.  Consumers in China and Brazil are most willing to trade privacy for personalization, but the percentage of consumers in the United States, United Kingdom, and Germany who've reported that they prioritize personalization stands at 88.0%.

For retailers, learning how to scale personalized content will make the difference between growing quickly and stalling out.  Striking that balance is difficult, but a clear road map that includes both hyper and semi-personalized offerings, target demographics, and product variation is a good place to start.

## Wellness Services

Whether it is personal trainers, counseling services, or nutritionists, wellness services are growing in popularity across consumer demographics.  As the needs of consumers' mental and

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 328

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 31.                                                    Defendant's Exhibit 4

physical health adapt to the current climate, we can expect these services to provide a well-needed enhancement to the overall wellness space.

One of the most well-known subscription services in the wellness space is Peloton, which expanded its service offerings to include virtual classes, in-person studios, and a fitness app. Peloton's sales soared in light of the pandemic, but the trend towards at-home workouts has continued well into the later stages of COVID-19 as well.

Crucially, competing fitness brands will need to follow in innovative brand Peloton's footsteps by engaging with customers using digitally native services.  Beyond gyms and exercise equipment, fitness brands can reach larger audiences by banding customers with virtual communities and connected devices.

**A Competitive Market**

Chopped up into (6) six categories including health, fitness, wellness-oriented nutrition, wellness-oriented appearance, sleep, and mindfulness, the health and wellness industry is exceedingly prominent in our day-to-day life.  The global market looks more diverse, agile, and personalized every day.  At the same time, there's more competition and brands will need to be purposeful about their offerings in 2022 and beyond.

Consumer trends and behaviors are shifting, but the pandemic left a significant imprint on today's most prevailing trends.  Instead of falling back on old practices, brands should act with confidence knowing that consumers want more from their personalized products and services.

**Market Analysis**

The global electronic weighing machines market size was valued at United States $3.7 billion in 2019 and is expected to grow at a compound annual growth rate (CAGR) of 3.1% from 2020 to 2027.  Demand for electronic weighing machines is increasing in the commercial and residential sectors owing to increasing economic activities, technological advancements in laboratory balances and scales, and growing need to maintain precision in process.  Reliability, accuracy, durability, portability, ease of calibration, and extra features are acting as major factors for increasing adoption and penetration of electric weighing machines.  Moreover, these weighing machines have multiple units of measure so that units can be measured and converted into

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 329

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 32.                                          Defendant's Exhibit 4

different units, such as grams and ounces.  This aforementioned factor is shifting consumers'
preference from traditional to digital/electronic weighing machines.

Increasing commercial activities is also fueling the growth of the market over the forecast period.
While purchasing products, consumers prefer products with various certificates, such as the
National Institute of Standards and Technology (NIST) certificate, National Conference on
Weights and Measures (NCWM), and National Type Evaluation Program (NTEP).

Companies in the market are increasingly focusing on the introduction of compact and portable
products in order to gain market share.  Companies are focusing on the integration of advanced
technology to achieve higher precision.  For instance, in April 2019, Truweigh LLC launched a
water resistance digital pocket scale.  The product also comes with an IP65 rating, making it
dust-proof.  The pocket weighing scale comes with a white backlit LCD and black titanium
chrome platform.  Home-based business owners are the major consumers of portable weighing
machines owing to the space-saving option, ease of portability, and similar accuracy.

However, one of the major factors acting as a restraint for the electronic weighing scale market
growth is the requirement of electricity for the operation of the product and without electricity;
the usage of the electronic weighing machines is not possible.  This factor is influencing
consumers to opt for a manual or spring weighing machine.  Hence, developing countries facing
a shortage of electricity may not have a higher adoption rate of the product.  High maintenance
costs, electricity bills, and high prices, when compared to the traditional and manual weighing
machines, are acting as major challenges for the market in developing countries.

**Type Insights**

In terms of revenue, the retail scale segment dominated the market with a share of 33.1% in
2019.  Increasing urbanization and a growing number of retail stores are acting as major factors
for the growth of the segment.  According to Census Bureau data, 2018 saw a net increase in
retail stores in the United States.  There were almost 3,100 more stores during the 4th quarter of
2018 compared to the 4th quarter of 2017.  Similarly, stores with fewer than five employees
witnessed an increase of 4,569 stores as of the 1st quarter of 2018 compared with the 1st quarter
of 2017.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 330

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 33.                                                    Defendant's Exhibit 4

## Distribution Channel Insights

The offline segment dominated the market with a share of 94.5% in 2019. Brick and mortar retail stores, including distributors, specialty stores, hypermarkets, and supermarkets, are the most preferred distribution channels. Most consumers prefer buying an electronic weighing machine from offline stores as they can check the quality and functionality of the products before buying them. In addition, offline stores offer after-sales support pertaining to issues related to products. Moreover, it is easier to communicate to these stores for claiming guarantees or warranties. Thus, the abovementioned factors attract consumers to purchase products from offline retail outlets.

In terms of revenue, the online segment is expected to expand at the fastest CAGR of 3.8% from 2020 to 2027. Online channels are hosted by businesses that are into e-commerce as well as by manufacturers that have realized the potential of these channels, and thus have hosted their websites to better cater to the customer needs. The availability of a wide range of products with an option to compare them based on features and prices, coupled with swift product delivery and easy returns policies, is anticipated to drive the segment. Consumers can often prefer multi-brand online retailers to save time.

North America is expected to expand at a CAGR of 3.2% from 2020 to 2027. Increasing automation across the region is driving demand for electronic weighing machines. The United States holds a major share in the region owing to the vast pharmaceutical sector, strong retail channel, and growing demand from households in order to keep track of health. This aforementioned factor is acting as a major driver for the market in the region.

## Key Companies and Market Share Insights

The global market is characterized by high competition. Companies are focusing on increasing product launches in order to gain market share. For instance, in 2018, Kern & Sohn GmbH launched a premium analytical balance with single-cell generation for rapid and stable weighing results. The device also comprises a bright OLED display with a large viewing angle and USB interfaces for the transfer of weighing data to external devices. Some of the prominent players in the electronic weighing machines market include:

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 331

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 34.                                        Defendant's Exhibit 4


A&D Company, Ltd.

Mettler-Toledo International, Inc.

Doran Scales, Inc.

Essae-Teraoka Pvt. Ltd.

Fairbanks Scales Inc.

Kern & Sohn GmbH

BONSO Electronics International Inc.

Shimadzu Corporation

Sartorius Group

Avery Weigh-Tronix, LLC.


## Obesity

People who are overweight or have obesity face a lot of health complications, negative consequences, and concerns. In fact, being overweight or having obesity increases a person's risk for many diseases and health conditions. Unfortunately, obesity rates in the United States are rising. With that statistic comes some staggering costs.

In the United States, 36.5% of adults have obesity. Another 32.5% of American adults are overweight. In all, more than two-thirds of adults in the United States are overweight or have obesity. Around 17.0% of American children ages 2 to 19 have obesity. That's more than 12.7 million American children. One in 8 preschoolers has obesity. The good news is obesity rates among preschool children have been falling in recent years.

If you are overweight or have obesity, your risk for dozens of diseases and conditions is higher. These include type 2 diabetes, heart disease, stroke, cancer, and many other diseases. Children who are overweight or have obesity are five times more likely to have obesity or be overweight

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 332

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 35.                                          Defendant's Exhibit 4

adults than children of normal weight.  This can increase their risk for many chronic diseases and health complications.

Researchers found that men with waist circumferences in the highest 10.0% of measurements were 20 times more likely to develop type 2 diabetes than men whose waist circumferences fell in the lowest 10.0%.  Also, waist measurements may help predict which people with a low or normal weight are more likely to develop diabetes.

Globally, obesity is one of the top five leading causes of death. It causes more than 2.8 million deaths each year.  The other four (4) leading causes are high blood pressure, tobacco use, high blood glucose, and physical inactivity.

Obesity costs Americans $147 billion each year.  People who have obesity pay more out of pocket than people who are not.  In fact, the medical costs for people with obesity are $1,429 higher each year than those of people with a normal weight.

Adults between the ages of 40 and 59 are more likely to have obesity. In fact, more than 40.0% of adults between these ages have obesity.  Another one-third of adults age 60 and over have obesity, and another one-third (32.3%) of adults age 20 to 39 have obesity.

Men are more likely to be overweight than women, but 40.4% of American women have obesity. Meanwhile, 35.0% of American men have obesity.  As of 2017, all 50 states have an obesity rate over 20.0%.  Just two decades ago, no state had a rate above 15.0%.  Five states have an obesity rate over 35.0%.   West Virginia leads the group with 37.7% of adults having obesity. Mississippi comes in second with 37.3%.  Alabama and Arkansas are close in the alphabet and tied for obesity percentages (35.7%).  Louisiana rounds out the top five (5) with 35.5%. Colorado has the lowest rate of obesity as just 22.3% of people who live in the state have obesity. Washington, D.C., is a close second with 22.6%.  Massachusetts, Hawaii, and California all have a population with obesity at or below 25.0%.

Today, Americans eat 23.0% more calories than we did in 1970.  That can really add up.  One of the leading causes of overweight and obesity is an imbalance of calories.  When you eat more than you burn, your body stores the extra energy as fat.  Over time, the pounds can begin to pile on.  People who are overweight or have obesity miss about 56.0% more workdays than people of normal weight.   While normal-weight employees miss an average of three days per year, overweight individuals and individuals with obesity miss approximately two additional days.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 333

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 36.                                             Defendant's Exhibit 4


The good news is obesity is largely preventable.  A healthy diet and regular exercise can go a long way to help you reach and maintain a healthy weight.  Otherwise, the realities of carrying around excess weight can start to creep up on you and take their toll.


**Overweight and Obesity - Statistics  2022**


Obesity is a medical condition characterized by having too much body fat, which can cause health problems and complications.  Learning more about obesity is a helpful first step toward managing the condition and living a healthier life.  Let's take a look at some obesity statistics, ways to treat obesity, and how to help prevent it.


Obesity is a medical condition that happens when someone has an excessive amount of body fat. Having too much body fat can increase the risk of getting additional health problems, and it can cause health problems of its own.


Healthcare providers can diagnose obesity based on body mass index (BMI), waist circumference measurements, and other symptoms.  BMI factors in someone's height, body weight, age group, and sex.  A BMI of 30 or higher often indicates obesity.  Moreover, a waist measurement of over 35 inches for women and 40 inches for men may also indicate obesity. Additionally, here are some common symptoms of obesity: Being overweight; Tiredness; Joint or back pain; Low self-esteem/low confidence; Snoring and Increased sweating.  Treatment for obesity often involves exercise, new eating habits, nutritional supplementation, medication, and in some cases, surgery.


On average, one out of every three adults is obese, which is about 36.0% of the population.  The age-adjusted prevalence of obesity in adults from 2017-18 was 42.4%.  By 2030, an estimated 20.0% of the world's population will be obese.  About 18.5% of children ages 2 to 19 are considered obese in the United States.


One out of every 3 United States adults is obese.  Non-Hispanic black women experience the highest rates of obesity in America at 59.0%.  Obesity rates are higher for Hispanic, Mexican American, and non-Hispanic black populations than they are for Caucasians.  The South and the Midwest have the highest obesity prevalence.  All United States and territories have an obesity rate of at least 20.0%.  Overall, adult obesity rates are higher for women.  Four (4) out of (5) African-American women are overweight or obese.  Obesity rates for men are highest for

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 334

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 37.                                                        Defendant's Exhibit 4

middle-income groups.  Obesity rates for non-Hispanic white, non-Hispanic Asian, and Hispanic women are highest for lowest-income groups.

In the United States obesity is more prevalent among adults than youths.  Childhood obesity is rising globally, with 43 million overweight and obese children under the age of 5.  One in 6 children ages 2 to 19 are obese.  Obesity is more prevalent among 6- to 19-year-olds than in 2- to 5-year-olds.

## Overall Health and Obesity

Being obese can hinder someone's quality of life and have serious health consequences like developing heart disease, strokes, Type 2 diabetes, cancer, high cholesterol, high blood pressure, joint problems, and sleep apnea.  There are more than 2.8 million hospital stays every year in the United States, where obesity is a cause or contributing factor.  Approximately 300,000 people die from obesity in America every year.

## The Costs of Obesity

The medical care costs of obesity are almost $150 billion per year in the United States.  Obese individuals spend about $1,500 more on medical care for themselves than people of healthy weight.  Obesity-related medical costs could rise by $48 to $66 billion per year by 2030.

## Causes of Obesity

Obesity is thought to be caused by a combination of physical, psychological, environmental, and/or genetic risk factors.  Some diseases and medical conditions can also cause or contribute to obesity.  Here are some of the leading causes of obesity:

> Lifestyle choices, including eating unhealthy, processed, and fried foods; physical inactivity; and smoking can lead to obesity.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 335

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 38.                                          Defendant's Exhibit 4

A family history of obesity could mean a person stores fat differently and metabolizes food slowly.  Both of these factors can contribute to obesity.

Social and economic problems shape our health habits.  For example, kids who aren't taught to eat healthily or exercise are more likely to become obese.  Some studies show that having a low income can contribute more to obesity because of a lack of resources to buy healthier foods.

Underlying medical conditions, like polycystic ovary syndrome or Cushing's disease, can contribute to weight gain and obesity

Preventing obesity involves a combination of many changes, such as:

Physical activity

Eating healthy foods

Reducing stress

Limiting screen time

Avoiding processed foods

Consuming plenty of fiber

Having strong support and social group interaction

A person whose weight is higher than what is considered to be a normal weight for a given height is described as being overweight or having obesity.  According to 2017 – 2018 data from the National Health and Nutrition Examination Survey, nearly 1 in 3 adults (30.7%) are overweight, more than 2 in 5 adults (42.4%) have obesity and about 1 in 11 adults (9.2%) have severe obesity.

As well, about 1 in 6 children and adolescents ages 2 to 19 (16.1%) are overweight.  Almost 1 in 5 children and adolescents ages 2 to 19 (19.3%) have obesity and an estimated 1 in 16 children and adolescents ages 2 to 19 (6.1%) have severe obesity.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 336

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 39.                                                    Defendant's Exhibit 4


Body Mass Index (BMI) is a tool used to estimate and screen for overweight and obesity in adults and children.  BMI is defined as weight in kilograms divided by height in meters squared. BMI is related to the amount of fat in the body.  A high amount of fat can raise the risk of many health problems.  A health care professional can determine if a person's health may be at risk because of his or her weight.  The table below shows BMI ranges for overweight and obesity in adults aged 20 and older.


| BMI | Classification |
|---|---|
| 18.5 to 24.9 | Normal / healthy weight |
| 25 to 29.9 | Overweight |
| 30+ | Obesity (including severe obesity) |
| 40+ | Severe Obesity |


**Children and Teens**


A child's body composition changes during growth from infancy into adulthood, and it differs by sex.  Therefore, a young person's weight status is calculated based on a comparison with other same-age and same-sex children or teens using CDC's age- and sex-specific growth charts.  The comparison results in a percentile placement.  For example, a boy whose weight in relation to his height is greater than 75.0% of other same-aged boys places in the 75th percentile for BMI and is considered to be of normal or healthy weight.


Children grow at different rates at different times, so it is not always easy to tell if a child is overweight.  A child's health care professional should evaluate the child's BMI, growth, and potential health risks due to excess body weight.


| Weight Status Category | Percentile Range |
|---|---|
| Underweight | Less than 5th percentile |
| Normal/Healthy weight | 5th percentile to less than 85th percentile |


LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 337

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 40.                                                      Defendant's Exhibit 4

| | |
|---|---|
| Overweight | 85th to less than 95th percentile |
| Obesity | 95th percentile or greater |
| Severe Obesity | 120% of the 95th percentile |

**Prevalence of Overweight and Obesity**

### Age-adjusted Percentage of United States Adults Overweight, Obesity and Severe Obesity by Sex

### 2017 - 2018

| | All (men / women) | Men | Women |
|---|---|---|---|
| Overweight | 30.7 | 34.1 | 27.5 |
| Obesity (including severe obesity) | 42.4 | 43.0 | 41.9 |
| Severe obesity | 9.2 | 6.9 | 11.5 |

As shown in the above table, nearly 1 in 3 adults (30.7%) are overweight. More than 1 in 3 men (34.1%) and more than 1 in 4 women (27.5%) are overweight. More than 2 in 5 adults (42.4%) have obesity (including severe obesity) and about 1 in 11 adults (9.2%) have severe obesity.

The percentage of men who are overweight (34.1%) is higher than the percentage of women who are overweight (27.5%). The percentage of women who have severe obesity (11.5%) is higher than the percentage of men who have severe obesity (6.9%).

Trends in obesity among children and adolescents ages 2 to 19 years also shows a trend upward, as represented in additional data from National Center for Health Statistics. The prevalence of obesity among children and adolescents ages 2 to 19 years roughly doubled between 1988 – 1994 and 2017 – 2018. Among children ages 2 to 5, the prevalence of obesity increased between 1988 – 1994 and 2003 – 2004, decreased between 2003 – 2004 and 2011 – 2012, and then increased again.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 338

RE: Mario Scorza vs. Davison Design & Development, Inc.
Continued.

Page 41.                                        Defendant's Exhibit 4

Among children ages 6 to 11, the prevalence of obesity increased between 1988 and 1994 and again in 2003 to 2004, fluctuated over the next several years, and most recently (2013 – 2014 to 2017 – 2018) increased.   Among adolescents, ages 12 to 19, the prevalence of obesity has increased between 1988 – 1994 and 2017 – 2018.

**Affordability and Features of Home Scales for Self-Weighing**

Individuals with overweight or obesity have increased risk of cardiovascular disease, type 2 diabetes and several forms of cancer.  Sustained weight loss of as little as 3.0% – 5.0% can produce clinically meaningful reductions in cardio-metabolic risk factors and reduces the risk of developing type 2 diabetes.   In most of these behavioral weight-loss interventions, the intervention includes three major components—dietary modification, increased physical activity, and behavioral strategies to promote and sustain lifestyle change.

Self-monitoring is an evidence-based behavioral weight-loss strategy grounded in behavior change theory, which includes tracking weight.  Self-weighing promotes weight loss by helping individuals catch gains in weight and alert them to alter behaviors before the weight gain becomes significant.  Self-weighing is more effective for weight loss than self-monitoring energy intake or activity among adults, and adherence with self-weighing is generally higher than for monitoring these other components.   More frequent self-weighing, such as daily weighing, results in better weight loss and weight loss maintenance.

Having a scale in the home may increase feasibility of daily weighing.  Industry standards for accuracy exist for home scale manufacturers and prior research has shown that digital home scales are generally accurate.  To identify accurate scales, patients may rely upon assessments from consumer associations—some reports are freely available, while others may charge a fee to access.  A recent study showed that most primary care patients are willing to self-weigh and to own a scale.

Home scales may facilitate the primary care clinician's ability to support patients between clinic visits—whether self-weighing is indicated for weight loss to treat obesity or for routine monitoring as part of heart failure management.   However, buying a scale can be financially challenging for patients, particularly for low-income individuals.  No broad insurance coverage currently exists to cover home scales as durable medical equipment; therefore, patients incur all costs.  To date, no studies have described the typical costs to buy a home scale—an essential component for clinicians to discuss when counselling patients.

Lehrer Financial Economic Advisory Services / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 339

Defendant's Exhibit 4

The COVID-19 pandemic has demonstrated another role of home scales for primary care delivered via telemedicine—patients self-weighing to provide a vital sign. In this setting, digital connectivity technologies (e.g., Wi-Fi®, Bluetooth®) to transmit weights to the clinic can be invaluable for clinical care. However, patients would have to purchase a scale with such technology. Another important scale feature for clinical care is the weight maximum, as patients need to ensure that the scale can accommodate their weight. Other accessibility features such as a wall-mount display or audio function may help patients use scales who have disabilities (e.g., visual impairment). To date, no studies have determined the prevalence of scales with these features and whether such features are associated with increased scale costs.

For clinicians to effectively counsel patients on self-weighing as part of clinical care, they need to be aware of the costs and features available in typical home scales to help problem-solve with their patients. Therefore, the objectives are to describe the cost and features of best-selling home scales available online, and to understand the relationship between features and costs. The presence of digital connectivity and higher maximum weight would be associated with higher costs as compared to scales without these features.

Overall, mean selling price (cost to consumer) was $28.99, and costs ranged from range $7.20 to $139.95. Distribution of scale costs—24.7% cost between $15 and $20, which was the most common price range. The distribution of costs was right skewed with expensive outliers.

The average selling price (i.e., cost to consumers) of best-selling home scales was approximately $29. Most scales did not offer digital connectivity technologies. In addition, few scales could accommodate patients over 400 lbs. and very few offered features like audio function that can be key for patients with certain disabilities. Patients who need these features have limited options from which to choose. In contrast, features like body fat analysis and BMI calculation were available in over 25.0% of scales. The utility of these measures as part of self-weighing is unclear, and assessments of body composition through bioelectrical impedance analysis (BIA) may be subject to measurement error.

Scales with features such as digital connectivity, body fat analysis, BMI calculation, and ability to accommodate greater body weights were more expensive. Given that prior research has identified cost as a common barrier for low-income patients in accessing scales, these patients who would like to participate in telemedicine using digital connectivity or who have higher body weights may have difficulties finding a scale that they can afford with the features that they need. In contrast, clinicians could advise patients that they do not need to pay more for a scale that has

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 340

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 43.                                                          Defendant's Exhibit 4

body fat analysis and BMI calculation, as these estimates do not have a clear role in self-weighing.

Since self-weighing is an evidence-based and effective weight management strategy, identifying and testing strategies that could address the financial barriers to obtaining a scale are needed. One promising solution could be insurance coverage for scales, as buying a scale can be economically challenging for patients. There is precedence for insurance coverage of durable medical equipment, such as blood pressure cuffs, glucometers, continuous positive airway pressure devices, nebulizers, wheelchairs, and oxygen equipment. Clinicians could apply this existing infrastructure for prescribing durable medical equipment to scales, so that these devices could be delivered to patients' homes or available at pharmacies.

Previously, the Centers for Medicare & Medicaid Services (CMS) extended Medicare coverage of ambulatory blood pressure monitoring devices in response to a formal request for widened coverage determination from medical organizations including the American Heart Association and American Medical Association. The results of this study may contribute to the evidence to support future efforts by organizations such as The Obesity Society or the American Board of Obesity Medicine to lobby CMS to extend this coverage to Medicare beneficiaries. Given the current COVID-19 pandemic, organizations outside the obesity field might also join such an effort in order to improve remote telemedicine care delivery by having a home scale available to capture patient weight.

Stating maximum weight capacity was not required by the online retailer, as 5.2% of scales' webpages did not contain this information. Failure to provide this information could make identifying an appropriate scale challenging for patients, particularly patients with class 3 obesity. Second, very few scales offered features adapted to disabled populations—audio function so patients with visual impairment can hear their weight or a wall mounted display to make accurately reading the output for patients with physical challenges or mobility issues. Lack of these adaptive designs may impair these populations engagement in weight management and comprehensive telemedicine services.

Scales with advanced features, such as digital connectivity, body fat analysis, and BMI calculation, were more expensive. Scales that can accommodate higher weight were also more expensive, which may limit options for patients with class 3 obesity. In the future, insurance coverage for home scales could be a strategy explored to reduce cost as a barrier to scale access.

Self-weighing is an evidence-based weight management strategy, which requires patients to have a home scale. For clinicians to effectively counsel patients on self-weighing, they should be

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 341

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 44.                                                    Defendant's Exhibit 4

aware of the costs and features available in typical home scales.  Individuals with overweight or obesity have increased risk of cardiovascular disease, type 2 diabetes and several forms of cancer.

Sustained weight loss of as little as 3.0% – 5.0% can produce clinically meaningful reductions in cardio / metabolic risk factors and reduces the risk of developing type 2 diabetes.  In most of these behavioral weight-loss interventions, the intervention includes three major components—dietary modification, increased physical activity, and behavioral strategies to promote and sustain lifestyle change.

## Recent Trends – Adult Obesity Rate

| | |
|---|---|
| 2017-2022 Compound Growth: | 1.8% |
| Forecast Value for 2027: | 35.4 people per 100 individuals |
| 2022-2027 Compound Growth: | 1.4% |

This driver measures the percentage of United States citizens aged 18 and older who are considered obese based on their body mass index (BMI).  Data is sourced from the Centers for Disease Control and Prevention (CDC).

The obesity rate in the United States among adults has consistently increased.  The most common causes of obesity are overeating and physical inactivity.  However, obesity may also be influenced by genetics, metabolism, environment, behavior and culture.  According to the CDC, additional contributing factors relating to United States society include food and physical activity environment, education and skills, and food marketing and promotion.  Obesity is associated with poorer mental health outcomes, reduced quality of life, and the leading cause of death, diabetes, heart disease, stroke and some types of cancer.

Over the five years to 2022, the obesity rate among adults aged 18 and older has increased an annualized 1.8% to 33.0 people per 100 individuals.  There are a multitude of factors influencing this increase during the period, as well as over the long-term.  Our modern work environment, which has become increasingly less physical, has drastically increased inactivity.  The COVID-19 pandemic has further introduced a sedentary lifestyle through mandated stay at home orders

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 342

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 45.                                                  Defendant's Exhibit 4

and business closures.  Individuals reported weight gain during the first year of the pandemic, likely due to stress surrounding the virus coupled with lack of access to recreational activities and food insecurity.  Compounding this effect, individuals are not offsetting this with increased exercise during their leisure time.  A study by Harvard University found that heavy-duty TV watchers ate fewer fruits and vegetables, had larger waistlines and higher levels of blood pressure, blood sugar, and triglycerides.  In addition, food marketing and an emphasis on consumption has driven an attitude around eating that favors large portion sizes and excess.

## Adult Obesity Rate

| Total (2022) | Annualized Growth 2017 - 2022 |
| --- | --- |
| 33.0% | +1.8% |

**Bathroom Scales / Availability of Choices**

The sheer number of options available for bathroom scales is staggering.  A scale with all of the bells and whistles can be great for serious weight loss efforts, but some people are simply looking for a scale to occasionally track their weight.  Determining which type of scale will work best for an individual is simply a matter of evaluating their needs and matching the results to the appropriate scale.  Here are 4 factors to consider when choosing the best bathroom scale

Scales have a limited weight capacity, with most standard scales having a maximum weight of 300 pounds.  However, older models tend to be less accurate for people who weigh over 250 pounds.  There are some scales that are specifically made for larger individuals.  These scales have an expanded weight capacity to ensure that you'll get an accurate reading every time.  Scales are available with maximum weights of up to 650 pounds.

Modern digital scales typically come with an automatic calibration feature, meaning that your scale will automatically zero out when you step off for more accurate readings.  Keep in mind that not all scales on the market have this feature - you will have to manually zero the scale each time you step off of it.  Analog scales must be manually calibrated, and manual calibration allows for adjustments that do not accurately reflect a person's weight.  You may be tempted to calibrate your scale to weigh light if you opt for an analog scale.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 343

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 46.                                         Defendant's Exhibit 4

Some digital scales come with a body fat measurement feature.  These scales have a metal surface that allows for calculating a user's body fat percentage.  You can use this information to evaluate your diet or exercise plans.  This feature is recommended for people who are interested with improving their overall fitness and health.  Body fat measurements can also be referenced during appointments with your medical provider to determine whether you will need to lower this measurement.  Overall health is not always determined by your weight, and the makeup of your body weight is an important component of your health.

Analog scales are as precise as your eyesight.  You can try to determine whether you are in between pounds, but there is no way to know for sure if you have lost a fraction of a pound. Digital scales offer detailed measurements that can weigh down to one-tenth of a pound. However, some digital scales only offer one-half of a pound as the most precise measurement. Opt for a model that offers precise measurements if you worry about small losses.  Discovering that you have lost as little as one-tenth of a pound can be more encouraging than believing that you haven't lost anything because of an imprecise measurement.  All in all, there are a variety of scales available to fit your lifestyle without compromising your budget.  Finding the right scale for your needs simply takes a little time and research.

A sampling was taken at two (2) major stores that sell an abundance of these types of consumer bathroom scales, at both Target and Bed Bath and Beyond.   At this time, Target had approximately (80) eighty scales listed for sale on their website ranging from $12.99 for an analog scale to $349 for a digital smart scale, with an average listed price of $44.27.  Bed Bath and Beyond has a listing of approximately (40) forty scales on their website, ranging from $10 for some analog versions up to $173 for digital scales, with an average listed price of $46.27. There were a total of (68) sixty-eight scales under $50 at Target and 45 scales under $50 at Bed Bath and Beyond.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 344

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 47.                                                    Defendant's Exhibit 4

## Bathroom Scales Manufacturers

There are many different types of bathroom scales on the market, but not all of them are made in the United States.   If you're looking for a bathroom scale that's made in America, there are a few things to keep in mind.  First, look for a scale that's been certified by the National Scale Manufacturers Association (NSMA).  This certification ensures that the scale meets certain standards for accuracy and durability.  Second, check the label to see where the scale was manufactured.  Many scales that are sold in the United States are actually made in China or other countries.

A consumer considers their budget and chooses a scale that fits their needs.  There are basic models available for around $20, or you can opt for more advanced features like Bluetooth connectivity and body composition analysis for a higher price tag.  No matter what your budget is, you should be able to find an American-made bathroom scale that meets your needs.

When it comes to finding the best United States made bathroom scale, you want to make sure that you find one that is accurate and reliable.  There are a few different factors that you will want to consider when making your decision.  First, you want to consider the size of the scale.  You will need to determine how much weight you need it to accommodate.  If you have a smaller bathroom, then you may not need a large scale.  However, if you have a larger bathroom, then you may want to consider getting a scale that can accommodate more weight.  Second, you will want to think about the accuracy of the scale.  You should make sure that the scale is accurate within a few pounds.  Third, you should consider the price of the scale.  You do not want to spend more than necessary on your new bathroom scale.  Finally, you will want to read reviews of different brands and models before making your final decision.  This will help ensure that you are getting a quality product.

There are a few companies that manufacture them, and they range in price and quality.  Some of the more popular brands include American Weigh Scales, Ohaus, and Adam Equipment.  These scales are generally accurate and durable, making them a good choice for those who need a reliable scale.  Detecto scales are made in the United States.  The company was founded in 1900 and is headquartered in Webb City, Missouri.  Its products are sold in over 130 countries around the world.

In addition, Health-o-Meter® scales are made by a company called Sunbeam Products, Inc.  They have been in business for over 100 years and are one of the leading manufacturers of health and wellness products.  Their products are available in over 50 countries around the world.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 345

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 48.                                                    Defendant's Exhibit 4

Health-o-Meter® is a United States based company that manufactures bathroom scales (among other things).  Their products tend to be on the more expensive side, but they're also very well-made.

Eat Smart Precision GetFit Digital Body Fat Scale.  This United States made body fat scale is perfect for anyone wanting to monitor their health and fitness progress.  It uses bioelectrical impedance analysis (BIA) to provide accurate readings of body fat %, water weight, muscle mass, and bone density.

American Weigh Scales makes a wide variety of digital and analog scales, including bathroom scales.  Their products are generally very accurate and reasonably priced.

Taylor Precision Products®: Taylor Precision Products® is yet another United States based manufacturer of bathroom scales (as well as other types of precision instruments).  Like Health-o-Meter®, their products are higher-priced but also very well-made and supported by great customer service.

Other options include some foreign made scales as noted below:

Nicewell® is a Chinese company that specializes in the production of scales and other weighing devices.  The company was founded in 2003 and has since grown to become one of the leading scale manufacturers in China.  All of Nicewell's® products are designed and manufactured in-house, from start to finish.  This allows the company to maintain a high level of quality control throughout the production process.  In terms of materials, Nicewell® uses a variety of different metals and plastics in its products.  The specific materials used will vary depending on the type of scale being produced.  For example, bathroom scales will typically use stainless steel or aluminum for the main body, while kitchen scales may use plastic or glass for the platform.

The assembly process for Nicewell® scales is also done entirely in-house.  This helps to ensure that each scale is put together correctly and meets all quality standards.  Once assembled, each scale undergoes rigorous testing before it is shipped out to customers.  This testing includes both accuracy checks and durability tests to make sure that the scale can handle regular use without issue.  So, if you're looking for a well-made set of bathroom scales, Nicewell's® offerings is a viable choice.  With their high level of quality control, you can be confident that you're getting a product that will be durable with longevity.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 346

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 49.                                              Defendant's Exhibit 4


**Air Travel with Scales**


When traveling, you have to check what you can and cannot bring.  The restrictions on carrying certain items change from airline to airline.  Some airlines will allow you to carry electronic devices, while others will prohibit you.  Before confirming the tickets, make sure you read the policies of the plane and check the list of items you can bring.  Some airlines can give you a soft corner if you are trying to bring in a small item, but for more oversized items like a weighing scale, you have to keep in mind the airline's policies.


The first item on the list of items you can't bring on a plane is weighing scales.  If you want to bring the lightweight digital weighing scale, you would first have to inform the airline.  Although some airlines do accept electronic devices after taking out the batteries, it could still be dangerous.  Many airlines don't even allow bigger-sized laptops because they tend to explode due to air pressure.  If the airline allows you to keep the weighing scale, make sure you take out the batteries and keep the device somewhere safe so that it doesn't get damaged during the process of loading off luggage.


Although some airlines might allow carrying a weighing scale, it isn't recommended.  If you want to carry a weighing scale for an important purpose, then we suggest you buy a scale that is lightweight so that the weight of the luggage doesn't exceed.  Many weighing scales come in portable shapes and sizes.  You can buy those to free yourself from the hassle of carrying more luggage.  You can also buy small weighing scales that are used to weigh items by simply clipping them with a wire.


When packing, you must make sure your luggage stays within the range of what is acceptable at the airport.  Keep the weighing scale in between some clothes so that it doesn't get damaged when the bag is handled by airport security.  Also recommend is weighing your luggage beforehand, so you know what to pack and how much to carry.  You can also carry a handheld weighing scale for ease.


If the plane doesn't allow you to carry a hefty weighing scale, you can also opt for cargo delivery.  They will pack the items in front of you before boarding, and the items will be carried around by another cargo plane.  This would keep the item safe, and once you get off, you can easily check the cargo and take out your items.  The airline will make sure that your item arrives safely without any damage.  Although you would have to pay a little extra for the cargo plane, it is a much better choice than handling a weighing scale on your own.  If the weighing scale is of a

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 347

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 50.                                                Defendant's Exhibit 4

smaller size, personal luggage will make do, but for bigger items, the cargo plane is the only option.

Although most airlines have different policies on what to bring when it comes to small-sized items, every airline has strict policies that remain the same no matter where the plane is going. These policies are to make sure that individuals aren't bringing in harmful items that could be used to pose a threat to the passengers or that have a high tendency to explode. Those items should be avoided at all costs. These items include:

> Drills
>
> Ice skating shoes
>
> Fireworks since they tend to explode
>
> Perfume
>
> Because glass can shatter under pressure, alcohol bottles should be avoided
>
> Crochet needles
>
> Batteries
>
> Electronic devices
>
> Cables
>
> Stun guns or martial arts equipment that could pose harm to people

Before packing, make sure you read the airlines' policies and pack accordingly to avoid any delays.

**Outline of Travel Scales**

Having a scale to take with you while traveling is a convenience that would be appreciated by many travelers. With airlines having limitations and restrictions on digital devices carried or packed on their planes, there have been extremely limited options for such devices. New technology has created a mini travel bathroom scale with a slip-on carry case to allow it to be scanned without removing the battery at airports.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 348

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 51.                                                    Defendant's Exhibit 4

The NewlineNY® mini bathroom scale is a new design featuring light weight and an attractive appearance. It is portable to monitor your weight when traveling or anywhere you go. The scale is small (9.25" x 5.25") but would not reduce the weighting function and accuracy. It's not only perfect for toddlers, but excellent for teens or adults. This scale also comes with the latest auto-step-on technology. There is no need to tap, consumer simply steps on the scale to get a reading with 5 a second automatic shut-off function to preserve battery. The scale features a wide platform and a large LCD display. The NewlineNY® ultra slim scale comes in a choice of colors: Black, Green, Red-Orange, White or Trendy Wave.

This company has also developed a smaller version for easier packing. Whether you are a dieter, athlete, chef, health conscious or anyone who needs to have a scale with them all the time, this is the perfect travel companion. You can check your weight daily or as needed. NewlineNY's® super mini series travel scale is very compact ("8.5 x 5.5"), thin (0.6"), lightweight (20 oz.) and comes in various colors and designs to match your taste. It has the features of a full-size scale: large display, switchable unit options (lb, kg or st), auto "Step-on" & "Auto-off" technology, and non-slip footing. It fits neatly into even small luggage and comes with a soft neoprene sleeve for premium protection. It is a space saver to use at home or office when not traveling and can fit in most vanity drawers.

**The Electronic Weighing Machine**
**Market Size, Share, Trends and Segment Forecast for 2020 - 2027**

The global electronic weighing machines market size was valued at USD 3.7 billion in 2019 and is expected to grow at a compound annual growth rate (CAGR) of 3.1% from 2020 to 2027. Demand for electronic weighing machines is increasing in the commercial and residential sectors owing to increasing economic activities, technological advancements in laboratory balances and scales, and growing need to maintain precision in process. Reliability, accuracy, durability, portability, ease of calibration, and extra features are acting as major factors for increasing adoption and penetration of electric weighing machine. Moreover, these weighing machines have multiple units of measure so that units can be measured and converted into different units, such as grams and ounces. This aforementioned factor is shifting consumers' preference from traditional to digital/electronic weighing machines.

Increasing commercial activities is also fueling the growth of the market over the forecast period. While purchasing products, consumers prefer products with various certificates, such as the National Institute of Standards and Technology (NIST) certificate, National Conference on Weights and Measures (NCWM), and National Type Evaluation Program (NTEP).

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 52.                                                    Defendant's Exhibit 4


Companies in the market are increasingly focusing on the introduction of compact and portable products in order to gain market share. Companies are focusing on integration of advanced technology to achieve higher precision. For instance, in April 2019, Truweigh® LLC launched a water-resistant digital pocket scale. The product also comes with an IP65 rating, making it dust-proof. The pocket weighing scale comes with a white backlit LCD and black titanium chrome platform. Home-based business owners are the major consumers of portable weighing machines owing to the space-saving option, ease of portability, and similar accuracy.


However, one of the major factors acting as a restraint for the electronic weighing scale market growth is the requirement of electricity for the operation of the product and without electricity, the usage of the electronic weighing machines is not possible, where AC adapters are the sole power source. This factor is influencing consumers to opt for a manual or spring weighing machine. Hence, developing countries facing a shortage of electricity may not have a higher adoption rate of the product. High maintenance costs, electricity bills, and high prices, when compared to the traditional and manual weighing machines, are acting as major challenges for the market in developing countries. The availability of battery operation or hybrid (AC adpter and battery operation) may alleviate some challenges to ownership


**Type Insights**


In terms of revenue, the retail scale segment dominated the market with a share of 33.1% in 2019. Increasing urbanization and a growing number of retail stores are acting as major factors for the growth of the segment. According to Census Bureau data, 2018 saw a net increase in retail stores in the United States. There were almost 3,100 more stores during the 4th quarter of 2018 compared to the 4th quarter of 2017. Similarly, stores with fewer than five employees witnessed an increase of 4,569 stores as of the 1st quarter of 2018 compared with the 1st quarter of 2017.


The laboratory-scale category is expected to expand at the fastest CAGR of 3.6% from 2020 to 2027. The segment is majorly driven by technological advancements in lab scales and growing research projects in the pharmaceutical and biotech companies. In June 2019, RADWAG Balances and Scales launched 4Y PLUS laboratory balances with a reflex level system and radwag connect in order to gain remote control of the balance.


LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 350

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 53.                                          Defendant's Exhibit 4

**Distribution Channel Insights**

The offline segment dominated the market with a share of 94.5% in 2019. Brick and mortar retail stores, including distributors, specialty stores, hypermarkets, and supermarkets, are the most preferred distribution channels. Most consumers prefer buying an electronic weighing machine from offline stores as they can check the quality and functionality of the products before buying them. In addition, offline stores offer after-sales support pertaining to issues related to products. Moreover, it is easier to communicate to these stores for claiming guarantees or warranties. Thus, the abovementioned factors attract consumers to purchase products from offline retail outlets.

In terms of revenue, the online segment is expected to expand at the fastest CAGR of 3.8% from 2020 to 2027. Online channels are hosted by businesses that are into e-commerce as well as by manufacturers that have realized the potential of these channels, and thus have hosted their websites to better cater to the customer needs. The availability of a wide range of products with an option to compare them based on features and prices, coupled with swift product delivery and easy returns policies, is anticipated to drive the segment. Consumers prefer multi-brand online retailers to save time.

**Regional Insights**

Asia Pacific dominated the market for an electronic weighing machine with a share of 35.7% in 2019. The strong presence of regional players is acting as a major factor for market growth. A high number of retail stores and laboratories and growing health awareness among consumers are driving demand for the electronic weighing machines in the region. China and India are the major shareholders and contributors to regional market growth. The low cost of the product in the region owing to the presence of regional players is a major reason behind higher penetration and the strong dominance of regional players in the region.

North America is expected to expand at a CAGR of 3.2% from 2020 to 2027. Increasing automation across the region is driving demand for electronic weighing machines. The U.S. holds a major share in the region owing to the vast pharmaceutical sector, strong retail channel, and growing demand from households in order to keep track of health. This aforementioned factor is acting as a major driver for the market in the region.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 351

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 54.                                           Defendant's Exhibit 4

## Key Companies and Market Share Insights

The global market is characterized by high competition.  Companies are focusing on increasing product launches in order to gain market share.  For instance, in 2018, Kern & Sohn GmbH launched a premium analytical balance with single-cell generation for rapid and stable weighing results.  The device also comprises a bright OLED display with a large viewing angle and USB interfaces for the transfer of weighing data to external devices. Some of the prominent players in the electronic weighing machines market include:

A&D Company, Ltd.

Mettler-Toledo International, Inc.

Doran Scales, Inc.

Essae-Teraoka Pvt. Ltd.

Fairbanks Scales Inc.

Kern & Sohn GmbH

BONSO Electronics International Inc.

Shimadzu Corporation

Sartorius Group

Avery Weigh-Tronix, LLC.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 352

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 55.                                                    Defendant's Exhibit 4

### Electronic Weighing Machines Market Report Scope

| Report Attribute | Details |
|---|---|
| Market size value in 2020 | $3.7 billion |
| Revenue forecast in 2027 | $4.8 billion |
| Growth Rate | CAGR of 3.1% from 2020 to 2027 |
| Base year for estimation | 2019 |
| Historical data | 2016 – 2018 |
| Forecast period | 2020 – 2027 |
| Quantitative units | Revenue in $Million and CAGR from 2020-2027 |
| Regional Scope | North America, Europe, Asia Pacific, Central & South America, MEA |
| Country Scope | The US, Germany, France, The UK, China, India, Brazil |
| Key companies profiled | A&D Company, Ltd, Mettler-Toledo International, Inc., Doran Scales, Inc. Essae-Teraoka Pvt. Ltd, Fairbanks Scales, Inc., Kern & Sohn GmbH, BONSO Electronics International, Inc., Smimadzu Corporation, Sartorius Group, Avery Weigh Tronix, LLC |

## Industry Segments

### *Type Outlook (Revenue, USD Million, 2016 - 2027)*

Laboratory Scale
Gem and Jewelry Scale
Retail Scale
Health Scale
Kitchen Scale
Others

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 353

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 56.                                                     Defendant's Exhibit 4

### *Distribution Channel Outlook (Revenue, USD Million, 2016 - 2027)*

Online
Offline

### *Regional Outlook (Revenue, USD Million, 2016 - 2027)*

North America
The United States

Europe
Germany
France
The United Kingdom

Asia Pacific
China
India

Central and South America
Brazil

The Middle East and Africa

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 354

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 57.                                        Defendant's Exhibit 4

### SELLING VIA AMAZON - AN OUTLINE

[Background - Details  - Operations Guideline]

In order for the Scorza Company / Scale product to reach the widest possible consumer purchasing audience, without having to raise significant additional capital and include supplementary partners and / or financial backers that would most probably require dilution of his ownership, sales of the scale product via the Amazon® Online System as selected as an initial step.  Such initial step does **not** preclude, at a later time, sales of the scale product via traditional retail stores, such as Target®, Dillard's® or Neiman-Marcus®, but as an initial undertaking, on a cost efficient basis, the Amazon® System was selected.

A general / basic outline of the Amazon® System and its operations for and with a business such as Scorza Scales is outlined below.  Note is made that a full and complete description of the Amazon® System and its wide ranging operational approach would be voluminous in nature and outside of the operational approach of this report.  As such just an overall outline is included for a reader's ready reference and understanding.

Amazon® customers want a trusted destination where they can purchase a wide variety of goods —which is what makes sellers so important.  Amazon® is always looking for ways to add value for their customers and be Earth's most customer-centric company.  Amazon® sellers take part in offering customers better selection, better prices, and a top-notch experience.  When a seller starts selling on Amazon®, they become part of a retail destination that is home to sellers of all kinds, from Fortune 500 organizations to artisan vendors who make handcrafted goods.  They all sell here to reach the hundreds of millions of customers who visit the Amazon® platform to shop.

Amazon® is attractive for business via combination that the largest household brands sell on Amazon®, as well as emerging brands that will pop on the radar soon.  Small and medium-sized businesses thrive here, and they account for more than half the units sold in Amazon® stores worldwide.  Whatever the business is and whatever size it is, it has the ability to grow on Amazon®.  Ecommerce business is a business model where buyers and sellers exchange goods and services with consumers over the internet.  Two common types are Business to Business (B2B) and Business to Consumer (B2C) ecommerce.  B2B sellers focus on selling products that other businesses may need, while B2C focuses on selling products to shoppers (or the end customer).

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 355

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 58.                                        Defendant's Exhibit 4

**Amazon Seller's Benefits**

Amazon® is focused on creating a trustworthy shopping experience each and every day.  Today, Amazon® and their millions of selling partners, the vast majority of which are small and medium-sized businesses, serve hundreds of millions of customers worldwide.  These customers expect that when they purchase an item in the Amazon® store, sold either by Amazon® or by one of their third-party selling partners, they will receive an authentic product.

In 2021, Amazon® invested more than $900 million and employed more than 12,000 people – including machine learning scientists, software developers, and expert investigators – who were dedicated to protecting customers, brands, selling partners, and the store from counterfeit, fraud, and other forms of abuse.  The team has delivered incredible results – in partnership with rights owners, law enforcement, and others – to ensure the Amazon® store is one where customers can continue to shop with confidence.   The Protection Report details a wide range of exciting progress.  They remain focused on the same three key areas of strategy that were the focus last year: powerful and highly effective proactive efforts to protect the store, industry-leading tools enabling rights owners to partner with Amazon to better protect their brands and holding bad actors accountable.  A few highlights include:

1. Robust seller and product vetting coupled with efforts to hold bad actors accountable are deterring bad actors from even attempting to enter the Amazon® store.  In 2021, they stopped over 2.5 million attempts to create new selling accounts, preventing these bad actors from publishing even a single product for sale.  This is down from over 6 million attempts the prior year.

2. Amazon® saw continued growth in the adoption and efficacy of their automated brand protection tools, which continue to reduce the number of issues that brands are able to find and report.  In 2021, Brand Registry grew to include over 700,000 active brands, an increase of 40.0% from the prior year.  At the same time, the average number of valid notices of infringement submitted by a brand in Brand Registry decreased by 25.0% from the prior year.

3. Amazon® continues to focus on ensuring counterfeiters are held accountable – stopping them from abusing the store and those of other retailers across the industry.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 356

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 59.                                        Defendant's Exhibit 4

• Amazon's® Counterfeit Crimes Unit (CCU) sued or referred for investigation over 600 criminals in the United States, United Kingdom, EU, and China, an increase of 300% from the previous year.

• Building on their learning and progress in protecting the Amazon® store, a blueprint was published for public and private sector partnership to stop counterfeiters.  This included the importance of information exchanges in the private sector to stop counterfeiters across retailers, partnering with customs to protect the borders, and the need for increasing resources for law enforcement to prosecute counterfeiters.  While it is still early in this journey, the blueprint has definitely helped spark productive dialogue with others and that the company is engaging in multiple data sharing pilots and seeing some early legislative wins.

Several new efforts were launched that educate consumers on why they should only purchase authentic products.  They also continue to invest in how to proactively and reactively address issues.  If something goes wrong, customers can be confident they will always be taken care of.

Since opening the doors in 1995, trust has been at the foundation of everything Amazon® does.  Nearly 27 years later, they are more effective than ever at protecting customers, brands, selling partners, and the store.  While the progress made so far has been impressive, they continue to work to drive counterfeits to zero in the store and will continue to invest and innovate until that goal is reached.  The growing industry-wide partnership and collaboration in the fight against counterfeit is also valuable in working together to hold bad actors accountable and ensure the entire industry is rid of counterfeits.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 357

PAGE 60.                                             Defendant's Exhibit 4

**Seller Verification**

In 2021, Amazon® made it even harder for a bad actor to register a selling account.  A key part of the account verification process that helped make this possible is in-person verification program, which requires prospective sellers to have one-on-one conversations with one of Amazon's® team members to verify their identity and documentation.  This process is further enhanced through verification of the seller's physical location and payment instruments.  Machine learning models are also leveraged that use hundreds of data points about the prospective account to detect risk, including relations to previously enforced bad actors.

**Continuous Monitoring**

Amazon® is constantly monitoring the store for potential infringement.  From the moment a seller lists a product for sale in the store, their advanced technology continually scans for potential counterfeit, fraud, and abuse – including as future changes are submitted for the product.  When they need to take a closer look at a possible issue, listings are sidelined for detailed review by expert investigators.  And when an issue is identified, quick action is taken to protect customers and brands, including removing the problematic content or listing, blocking accounts, withholding funds, and referring bad actors to law enforcement.

**Information Exchange with the USPTO**

Amazon® supports the goals of the United States Patent and Trademark Office (USPTO) to prevent fraud and abuse in the trademark system.  High-quality trademark applications ultimately benefit all businesses, large and small, by quickly getting registrations into the hands of creators and innovators.

In 2021, Amazon® enhanced its communication and support with the USPTO.  Amazon® now directly ingests information from the USPTO regarding registration status and parties that have been subject to USPTO sanctions, including colluding attorneys, to ensure that fraudulent trademark applications and registrations are not used to enroll in Brand Registry.  Additionally, they leverage this information to surface signs of potential abuse within their stores.  Similarly, Amazon® shares information regarding abusive behaviors and trends within our stores with the USPTO to support their investigation of potential fraud by their applicants and registrants.  The channel of communication is a win-win – the USPTO is able to improve the quality of its information and Amazon® is able to improve the accuracy of Brand Registry.  In 2021, this

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 358

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 61.                                                  Defendant's Exhibit 4


deepening level of dialog allowed them to stop 2,000 attempts to use a fraudulent USPTO
trademark to register in Brand Registry.


**Key Steps to launch an Ecommerce Business**


Ecommerce businesses are booming.  In 2020, more than 200,000 selling partners from around
the world began selling in Amazon® stores in the United States.  This represents a 45.0%
increase over the previous year.   Here are key steps when starting from scratch.


Research your business idea to come up with a product that
will meet a customer needs;

Validate your product idea by talking to potential customers;

Consider how you will sell and ship your product to online
customers;

Source products by procuring inventory or manufacturing your
own;

Select online selling channels, which may include Amazon,
your own website, or both;

Build your online storefront and add products;

Prepare an ecommerce fulfillment strategy to deliver orders to
customers; and

Attract customers with ecommerce marketing and promotions,
and other ways to grow your business.


LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 359

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 62.                                              Defendant's Exhibit 4


### Small Businesses Earning over $100,000 in Sales on Amazon

| | |
|---|---|
| 2020 - 2021* | 250,000 |
| 2019 | 225,000 |
| 2018 | 200,000 |
| 2017 | 140,000 |
| 2016 | 100,000 |

*Global Seller Data – April 1, 2020 – March 31, 2021


*Researching Your Business Ideas*


Before you start building a store, research your business plan to help make choices quickly and efficiently.  There are several ways sellers decide what products to sell or build.  Here are some common decisions to make when trying to start your ecommerce business.


Find a pain point or challenge worth solving


Finding a problem to solve for a specific audience is crucial for successful ventures.  Some ideas—however innovative—can fail when they don't have customers to support them.


What problem or challenge are you seeking to solve? Who feels that pain point the most? Who would be most excited about solving this challenge?


For example, do you seek to make high quality kitchen utensils? Then people who enjoy cooking meals might be loyal customers.  Are you selling thicker and more durable yoga mats? Then yoga practitioners and instructors might be your best advocates and fans.


LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 360

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 63.                                          Defendant's Exhibit 4

Think of the challenge your product may meet.  Identify the users who will truly appreciate what you're trying to create, and keep them top-of-mind.  This will guide your priorities; and

Be observant to find great product ideas.

## Questions to Ask When Looking for Product Ideas

The easiest place to start researching your business idea is within your immediate surroundings. Find out the goals, aspirations, or challenges of people around you, then find products to help them.  By being observant, you can come up with ideas for your business that you can then research online.

## Keyword Research Tools to Spot Trends and Opportunities

When it comes to selling online, you need to figure out whether customers want the product. Use online tools like Google® Trends to research trending products, look up questions customers may have, and determine what their current solutions are.

## How to Find Product Ideas

The product already exists, now what? If your idea or product is already on the market, don't worry: You have a couple of options.  Namely, you might be able to offer the same product at a more competitive price point or provide a better alternative product.  Plus, the fact that the product is already out there is validation of market potential.

## Validating your product idea

The more time you put into validating the product, the better your chances of succeeding.  Once you've pinpointed your business idea, research how similar products perform and what potential customers might be looking for.

LEHRER  FINANCIAL  ECONOMIC  ADVISORY  SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 361

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 64.                                             Defendant's Exhibit 4

## Talk to Potential Customers to Validate Ideas

One of the easiest and most cost-effective ways to figure out whether an idea is worth pursuing is to talk to people.  Once you've identified a problem worth solving, talk to people who feel the pain point or frustration the most.  Although you can sell almost anything in Amazon stores, a good place for an aspiring ecommerce store owner to start is with products that:

Are easy to package and ship

Have branding potential

Are affordable for customers

Have a long shelf life

Products that may be difficult for a new entrepreneur to sell are:

Food and perishables

Products with a low profit margin

Heavy or bulky items, or products that are expensive to ship

Highly competitive products (check the amount of customer reviews)

Complex items or electronic products

## The Amazon Brand Registry

Prevent the unauthorized use of your brand through Amazon® Brand Registry.  This program is built for entrepreneurs who have an existing trademark or patent.  It includes access to tools that enable you to better represent a brand and find and report violations.

In 2017, Amazon® Brand Registry was launched – a free service for brand owners regardless of whether they sell in our store – giving brands the ability to manage and protect their brand and intellectual property rights on Amazon®.  Through the Report a Violation tool, brand owners can search for, identify, and report infringements and subsequently track their submissions within a

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 65.                                        Defendant's Exhibit 4

dedicated dashboard.  Brand Registry also allows Amazon® to more effectively safeguard brands through automated protections that leverage machine learning and the data provided in Brand Registry.  The automated protections continuously scan Amazon's® stores to surface potentially infringing products.

In 2021: Brand Registry had over 700,000 brands enrolled, compared to over 500,000 in 2020, a 40.0% increase.  Through continued improvements in automated protections, brands found fewer infringing products in Amazon's® store.  The average number of valid notices of infringement submitted by a brand in Brand Registry decreased by 25.0% from 2020.

Amazon® IP Accelerator helps businesses more efficiently obtain intellectual property rights, which helps brands protect their IP in every store, everywhere, not just on Amazon®.  These businesses can also register for Brand Registry, even with a pending trademark, allowing them to utilize and benefit from some of Amazon's® tools to protect their brand.  IP Accelerator connects businesses with a curated network of trusted IP law firms, which provide high-quality trademark registration services at competitive rates.

In 2021: Amazon® connected more than 5,900 small and medium-sized businesses (SMBs) to their network of trusted law firms through IP Accelerator.  Since the program's original launch in 2019, over 12,000 brands have enrolled in Brand Registry through IP Accelerator.  They also launched IP Accelerator in five additional countries: Australia, Brazil, Canada, Mexico, and Singapore, building on prior availability in the United States, Europe, India, Japan, and the United Kingdom.

**Project Zero**

Project Zero combines Amazon's® advanced technology with the sophisticated knowledge that brands have of their own intellectual property and how best to detect counterfeits of their brands.  This happens through powerful brand protection tools, including the unprecedented ability brands are given to directly remove listings from the store.

In 2021: Project Zero enrolled an additional 2,000 brands, increasing the total number of brands enrolled in Project Zero to over 20,000.  Among brands in Project Zero, for every one listing removed by a brand, Amazon's® automated protections proactively removed more than 1,000 suspected infringements.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 363

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 66.                                           Defendant's Exhibit 4

## Amazon's Counterfeit Crimes Unit

In order to increase litigation efforts and collaboration with law enforcement around the world, Amazon® established the Amazon® Counterfeit Crimes Unit (CCU) in 2020.  Amazon's® CCU team is made up of former federal prosecutors, FBI agents, experienced investigators, and data analysts.  CCU, customs agencies, and law enforcement share information to track down counterfeiters, shut down bad actors' accounts, seize counterfeit inventory, and prosecute those involved.  CCU has disrupted counterfeiters and their networks through civil suits, along with joint enforcement actions and seizures with law enforcement worldwide, including against suppliers, logistics providers, social media influencers, and fake invoice providers.  Selling – or the attempt to sell – counterfeits is a crime and Amazon® wants to stop it at the source, which requires broad coordination with their many partners in this space.  The public and private sectors, as well as the retail industry and government bodies, must work together to stop counterfeiters and protect consumers, rights owners, and store operators from these criminals. In October 2021, Amazon® launched the blueprint for public and private sector partnership to stop counterfeits.  The blueprint prompted a dialogue among Amazon® and policymakers about industry and government cooperation, particularly around information sharing on counterfeiting criminal networks, as well as the attempted importation of counterfeit products.

## Removing Counterfeits from Across the Supply Chain

The fight against counterfeit is a global issue, across all retail channels.  Amazon® wants to ensure that when they find a counterfeit, it is appropriately disposed of so that it cannot be resold anywhere in the supply chain.  This ensures customers purchase genuine products, whether shopping on Amazon® stores or elsewhere, and it also serves as an important deterrent in preventing counterfeiters from being able to profit off those products elsewhere.

## Transparency

Transparency is a product serialization service that prevents counterfeits from reaching customers around the world.  Brands label every single unit of a selected product with a unique code, which can be scanned to verify the unit's authenticity throughout the supply chain.  While any retailer can choose to verify these codes, for products enrolled in Transparency, Amazon® verifies 100% of these product units.  Items without a valid code are identified and stopped, so only genuine products reach customers.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 364

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 67.                                     Defendant's Exhibit 4

In 2021: Transparency enrolled more than 23,000 brands globally, an increase of 35% compared to 2020.  Transparency enabled the protection of more than 750 million product units, a 50% increase compared to 2020.

In 2021, Amazon® launched Transparency's track and trace service that allows brands to trace products in their distribution channels and to access enhanced analytics on customer returns. This service helps brands visualize trends in product defects at a factory or manufacturing lot level and fix root causes.

Amazon® Patent Evaluation Express Amazon® launched the Amazon® Patent Evaluation Express (APEX) pilot in 2018 to give utility patent owners a forum to more effectively resolve patent infringement disputes and to significantly reduce the cost burden on both parties.  In 2021, APEX was officially launched as a feature within Brand Registry's Report a Violation tool, enabling brands to request evaluations for disputes of utility patents through the tool and track the decision process.

## Sourcing Products for Sale

Once you've figured out what you will sell, and who the products will serve, the next step is to find the right source for the products.  Good products will help your new online business thrive. The key is not only choosing the right product, but also the right source for products.

## Create or Build Products

Building products gives you control over quality and design.  However, this method may be hard to scale up.  Some sellers prefer to create small batches of handmade products.  This helps keep operations manageable.  Given the perceived higher quality of handmade products, this option also allows sellers to price products at a premium.

## Work with Manufacturers

Working directly with a manufacturer to build products can give you higher potential for growth, but it's also the hardest path for a new seller to take.  It will take time and funding to find the right manufacturer, work with them to build prototypes to your specifications, and eventually

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 365

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 68.                                    Defendant's Exhibit 4

make your first order.  Once you've built a new product, you will have the potential to create a distinctive brand that will help you stand out from the competition.

### *Choosing an online selling channel*

You have many options for selling products online.  Set up a website and host a branded ecommerce store on your own domain name or sell products on an existing ecommerce website like Amazon®—or choose to do both!

### Setting up your own domain and ecommerce website

Efforts like search engine optimization, social media marketing, or online advertising can help drive traffic, but will require time and resources.  You'll also need a process for handling orders and fulfillment once orders start coming in.  This can be challenging to take on while trying to run your business.

### Selling on an existing ecommerce website

Using an existing selling website that already has traffic can help you start successfully selling online sooner.  Plus, this strategy gives you a chance to learn about what works for sellers, get reviews, and generate revenue before investing in your own website.

Selling on an existing website also eliminates the risk in investing too much time and money on a product before you've built a customer base.  Existing ecommerce websites will typically have brand or market awareness and initiatives to drive traffic.

### Selling in Amazon® stores

Amazon® is a powerful channel in terms of reach, with over 300 million customers worldwide.  Amazon's® suite of tools can help new and existing business owners reach those customers with its product-focused infrastructure.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 366

RE: Mario Scorza vs. Davison Design & Development, Inc.
Continued.

Page 69.                                              Defendant's Exhibit 4

Benefits of selling on Amazon® for new and existing ecommerce businesses include:

Speed: Get a store up and running quickly thanks to the minimal work involved in setting up the store.

Scalability and efficiency: Selling in Amazon® stores frees you up to create and sell great products—you don't have to solve every business problem.  Use Amazon's® infrastructure, tools, and customer reach to grow your business.

Reach: A listing in Amazon® stores has the potential to reach more than 300 million active customer accounts.

Use Amazon's® tools for processing payments, collecting reviews, running promotions.

Community: Learn how to succeed in online selling through Seller University, a free online tutorial, and plug into a community of driven entrepreneurs through Seller Forums, an online discussion board for Amazon® sellers.  These resources can be a valuable source of information for troubleshooting and support for your business.

Built-in SEO: Amazon® product pages are built to serve search engines the right content and show up competitively in search results.  When you launch products in Amazon® stores with well-written product pages, you'll be primed to rank competitively for the keywords and product searches relevant to your brand.

Market awareness: Customers come to Amazon® to shop for products.  If you're new to ecommerce, you may want to start small and scale up.  Selling on your own domain might allow you to customize your entire website and online experience, but this takes work and you'll have to compete on the internet to get customers to your store.  If you already have an ecommerce store but want to drive more traffic, selling in Amazon's® store can help you get products in front of even more potential customers, expanding your brand visibility and reach.  You can choose to start selling in Amazon stores and add another ecommerce channel after you grow your business. Amazon® is a piece of many online business strategies, but it doesn't have to be the only piece.

Lehrer Financial Economic Advisory Services / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 367

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 70.                                        Defendant's Exhibit 4

*Setting up your online store*

Once you've figured out what to sell and who you'll sell to it is time to get your business up and running.

*Choosing a business name*

Your business name will represent your brand, so choose something memorable and simple for customers to type and recall.  If you have a clear idea of what you're going to sell, brainstorm names by looking at other brands in your industry.  Or a name might pop into your mind immediately.  While it may work for rock stars, it's best to avoid numbers and complicated symbols.  Keep the brand name simple and easy to pronounce.  Branding will help an ecommerce store stand out in the market.  It's important to create a memorable impression that will attract repeat customers.  You don't want the product to get lost in a sea of competitors without distinct characteristics.

**Building An Online Storefront**

A great way to validate your business idea is to start taking orders.  Product descriptions are what customers will read to decide if the product will fit their needs.  Write a thorough description and include everything the potential buyer needs to know to make an informed decision.  Incomplete or inaccurate descriptions may lead to complaints, increase returns, and hurt your reputation, so be thorough, clear and upfront.  However, descriptions don't have to be dry.  Put yourself in customers' shoes and come up with fun and engaging descriptions of how they can use the products.

Once you've set up an online store, it's time to take care of running your business.  You can create a good online experience in a number of ways.  Having accurate product descriptions, a fast checkout experience, timely delivery, and an easy returns process is a great start.  A good amount of reviews from other shoppers will go far, too.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 368

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 71.                                                 Defendant's Exhibit 4

## Ecommerce Fulfillment:  Storing, Shipping and Returns

How will you store, ship, and handle returns for products? When you start building your online business, create a process for handling shipping and returns.  To keep things simple, it might be best to find a space that is accessible and cost-effective to store and ship products.  Some sellers use a place in their home (such as a garage) to store products.  As your business grows, you may consider using third-party fulfillment to help you store, package, and ship products.

Amazon's® Fulfillment by Amazon service allows sellers to store products in Amazon's warehouse and enjoy the benefits of offering Prime members fast, convenient delivery options. As one example, third-party sellers sold more than 700 million items in Amazon's United States store that shipped with Prime Free One-Day Delivery or faster in 2019.

## Capture and Show Reviews

Reviews can be a powerful ecommerce tool.  Ideally, try to display reviews so they'll be visible to search engines like Google®, as well as customers who are shopping for products like the ones you offer.  Amazon® automatically requests customer reviews on behalf of online sellers because reviews can have a positive impact on future sales.  Brand owners selling in Amazon® stores can also use a tool like Amazon Vine to get feedback on new products through a pool of Amazon® Vine reviewers.   Vine reviewers are Amazon® customers with a reputation (according to other shoppers) for leaving helpful product reviews.  Through the Vine program, vendors send a free product to a selection of Vine reviewers in exchange for a review.  When you're starting a new branded product, these reviews can help drive initial sales.  This in turn can help future customers make informed buying decisions.

## Track Business Performance with Ecommerce Analytics

Analytics lets you see how website visitors are interacting with a store and products. Commonly, online selling channels have ecommerce analytics built into a dashboard or have an option to install a third-party analytics program.

No matter what solution you choose, check ecommerce analytics periodically to manage inventory.  Analytics is also where you can evaluate account performance by tracking orders, assessing customer service and returns, running promotions and advertising, and beyond.

LEHRER  FINANCIAL  ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 369

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 72.                                              Defendant's Exhibit 4

Once you get familiar with a store's analytics, you'll be able to understand how visitors interact with a store.  Looking at a store's analytics reports will also give you great information on how to diagnose and troubleshoot issues in the online shopping experience.

If you're a registered brand owner selling in Amazon® stores, Brand Analytics gives you access to advanced reporting such as: Products winning the most clicks and conversions on strategic search terms; Products or brands that customers are reordering; Top products most commonly purchased alongside specific products; and breakdowns of customers by age, income, education, gender, and marital status.

**Ecommerce Marketing and Product Promotion**

Ecommerce marketing is vital to helping you start and grow your business.  Running marketing and promotional campaigns will help you reach a broader audience no matter which selling channel you use.

Online store owners are able to run advertising campaigns in Amazon® stores to get in front of the right shoppers.  The following options all help to get the product in front of as many people as possible:

Sponsored products show up within Amazon® product listing pages and can give new products a boost in visibility to Amazon's® 300 million shoppers.

Sponsored brands (available to brand owners) show a headline, logo, and up to three products at the top of a product search results page.  Lightning deals and coupons drive immediate sales and boost viability, especially when you're trying to boost awareness of your brand.  Advertising can turbocharge product sales by encouraging reviews and driving sales from interested shoppers.

**Optimizing User Experience With A/B Testing**

What will appeal to customers? What titles or descriptions will catch the attention of buyers? A/B testing allows you to try out different value propositions and offers to find the best combination for products.  For registered brand owners, Amazon's® new A/B testing capabilities in the Manage Your Experiments tool allows you to run experiments on product pages to find out

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 370

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 73.                                        Defendant's Exhibit 4

what content will drive the most sales.  This can help you figure out the right combinations of titles, images, descriptions, and bullet points to help convert customers quickly.

**Social Media Marketing**

Given the vast amount of consumers who frequent social media websites, adding one or two social media channels to promotions and outreach can help drive brand and product awareness. To make the most of your time and effort, build a social media strategy for how you will promote your business, engage with social media users, court social influencers, and post content.  Start with a plan to set yourself up for success.

**Launch an Ecommerce Business in Amazon Stores**

Since 2000, independent sellers and brand owners have used Amazon® to help their business grow.  Amazon® is powered through individuals and small businesses that take advantage of the scale and diversity of the audience Amazon® stores attract.  The Selling Central Partner Network is built to help individual sellers give customers the widest shopping selection possible.

**Costs to Sell on Amazon**

The cost to sell on Amazon® depends on the selected selling plan, product category, fulfillment strategy, and other variables.  The options are flexible, so you can find the combo that works best for you and your goals.

**Selling Plan**

The Individual plan costs $0.99 per unit sold, and the Professional plan costs $39.99 per month no matter how many units you sell.

LEHRER  FINANCIAL  ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 371

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 74.                                    Defendant's Exhibit 4

### Referral Fees

Amazon® charges a referral fee for each item sold.  The amount depends on the product category. Most referral fees are between 8.0% and 15.0%.  For every item sold, sellers pay Amazon® a percentage of the total price—including item price, shipping cost, and any gift-wrapping charges—or a minimum amount, whichever is greater.  Referral fees are in addition to selling plan fees.

### Fulfillment Fees

The cost to ship your orders depends on whether you fulfill your own orders or use Fulfillment by Amazon® (FBA).

### Other Costs

Some sellers may incur additional fees (such as long-term storage fees) or pay for optional programs like advertising or premium account services.  The *Individual Plan* allows new products to be added to the Amazon® catalog and lets sellers grow business with Fulfillment by Amazon®.  This plan might be right:

- Sell fewer than 40 units a month

- Still deciding what to sell

- Don't plan to advertise or use advanced selling tools

The *Professional Plan* allows new products to be added to the Amazon® catalog and lets sellers grow business with Fulfillment by Amazon®, as well as adding products to sell in additional categories, great bulk listings and manage inventory with feeds, spreadsheets and reports.  This plan might be right:

- Sell more than 40 units a month

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 372

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 75.                                    Defendant's Exhibit 4

- Want to advertise your products

- Want to qualify for top placement on product detail pages

- Want to use advanced selling tools, like APIs and reports

- Want to sell products in restricted categories


In addition, the Professional Plan allows sellers to qualify for top placement on product detail pages, increase selling efficiency with API integration, set their own shipping fees for non-media products, attract shoppers with on-site advertising tools, run promotions and free shipping and add multiple users to the account.


**Major Sources of Data:**

The Amazon Corporation – Publications, Securities and Exchange Commission ("SEC") Data and Corporate Website.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 373

PAGE 76.                                                    Defendant's Exhibit 4

**A CORPORATE LOSS ANALYSIS**

Based upon the above researched corporate and market analysis data and the total lack of any real corporate / financial / economic or market data from the Davison Design and Development Organization over a sustained period of time (2017 onwards), the undersigned has limited "direct" data upon which to rely.  Without such data, the only generally useable and reliable approach upon with an Economist / Financial Analyst can rely to reach a "most probable" economic conclusion is the overall Market Sensitivity and Monte Carlo approaches.  These approaches are included and explained below with the acquired data incorporated after the explanation to determine the overall "most probable" economic / financial / corporate / stigma damages suffered by the Scorza Organization over a ten (10) year period of time.

The selected future time period (2022 – 2032) does <u>not</u> include the prior years (2017 – 2021 / 2022) wherein the Scorza Organization and the Davison Design and Development Organization were supposedly working together via their joint abilities and varied contributions in order to fully to create / patent / trademark / develop / market / sell / improve and further increase the salability / marketability of the Scorza Scales.

# A SENSITIVITY ANALYSIS OUTLINE

A sensitivity analysis is a variation on a set of scenarios or the process of varying model input parameters over a reasonable range (range of uncertainty in values of the model's parameters) and observing the relative change in the model's response.  The basic idea with a sensitivity analysis is to vary one of the variables, usually one at a time, and then observe how sensitive the results change or respond to that one variable.  Typically, the purpose of a sensitivity analysis is to demonstrate the variable nature of the model to simulations of uncertainty in values of the model's input over time.  By use of this technique, a sensitivity analysis is useful in pinpointing those variables that deserve the most attention and / or that have the most impact on the model and its outcome, most often (in business and commerce not academia or government) the number of units of an item that can be sold and the most probable price or set of prices for these ongoing sales.

Sensitivity Analyses are also beneficial in determining the direction of future data collection activities.  Data for which the model is relatively sensitive would require future characterization, as opposed to data for which the model is relatively insensitive.  If certain data are determined to be insensitive to variations in model input parameters, the model might need to be examined for

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 77.                                                  Defendant's Exhibit 4

possible reasons for this insensitivity. Basically, in a sensitivity analysis, decision makers possess a tool that allows them to explore the importance of each individual assumption, holding other (or some other) assumptions fixed with regard to the specific project or model under analysis.  To conduct a sensitivity analysis, one usually establishes a "base" set of assumptions for a particular project and calculates the return or income based upon those assumptions.  Then, those conducting the analysis allow one variable to change and recalculate the income or cash flow based upon this new criteria.  By repeating this process for all of the major unknown or future variables, decision makers can both observe the changes in the assumptions and calculate / project the most probable or reasonable financial possibility / projection.

While sensitivity analysis portrays the effects of changes in a single variable, a scenario analysis is just a more complex variation of sensitivity analysis. Rather than just adjusting one assumption, analysts can conduct scenario analysis by calculating a whole set of assumption changes via changes in several key variables.  Developing realistic scenarios, an analyst has to consider the interrelationships between the different income / cash flow assumptions. Analysts ponder questions regarding market rates of growth, absorption, sales prices, costs of production, competition and the overall level of economic activity.

An even more sophisticated variation on the scenario analysis is the Monte Carlo simulation.  In a general simulation, analysts specify a range or a distribution of potential outcomes for each of the model's assumptions.  Analysts in Monte Carlo simulations develop probability distributions of each variable and computer-generated "draws" are made from each distribution to determine a targeted "bottom line".  For example, if a rate of return is being simulated, distribution of such items as rents, income and operating expenses are developed and a "draw" is made from each distribution, resulting in a single estimate.  This process is repeated many times, thereby creating a probability distribution of a rate of return or most likely outcome.  The use of Monte Carlo simulations for real estate (the original utilization) was popularized in 1973 by Steve Pyhrr in the American Real Estate and Urban Economic Association Journal article entitled "A Computer Simulation Model to Measure the Risk in Real Estate Investment" (June, 1973).  A further outline of the Monte Carlo simulation approach is outlined below.

## AN OVERALL MONTE CARLO OUTLINE

Monte Carlo Analysis is usually a computer-based method of analysis developed in the 1940's that uses statistical sampling techniques in obtaining a probabilistic approximation to the solution of a mathematical equation or model.  It is one of the best-known solution approaches for probabilistic financial problems.  Since its adoption by the Corporate Financial / Economic sectors its use for stress testing and other problems has occurred rapidly.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 375

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 78.                                     Defendant's Exhibit 4

The word simulation refers to any analytical method meant to imitate a real-life system, especially when other analyses are too mathematically complex or too difficult to reproduce. Without the aid of simulation, a spreadsheet model will only reveal a single outcome, generally the most likely or average scenario. Spreadsheet risk analysis uses both a spreadsheet model and simulation to automatically analyze the effect of varying inputs on outputs of the modeled system.

One type of spreadsheet is called the Monte Carlo simulation, which randomly generates values for uncertain variables over and over to simulate a model. The Monte Carlo simulation was named for Monte Carlo, Monaco, where the primary attractions are casinos containing games of chance. Games of chance such as roulette wheels, dice and slot machines exhibit random behavior. The random behavior in games of chance is similar to how Monte Carlo simulation selects variable values at random to simulate a model. Just as a rolled dice may come up with any number between 1 and 6, it is unknown which number until the dice stops, the variables that have a known range of values, but an uncertain value for any particular time or event (interest rates, staffing needs, stock prices, inventory, etc.).

Solutions to probabilistic problems are generally moments of random variables which can be expressed as integrals. Integrals may then be solved either analytically or numerically. Since the solutions generally represent estimates, numerical solutions should be used when the exact analytical solutions are either very difficult or impossible to derive. Monte Carlo is one of several reasonable approaches to numerical integration. When using Monte Carlo software, the user should be aware of the number of simulations, the convergence rates, and error estimates. Since the problem is clearly important, one should not be satisfied with generic statements.

A large number of computations are required to do a Monte Carlo simulation. The numerical accuracy of large summations is not guaranteed because of the extensive rounding involved, which may add up to large errors. Statistical or mathematical software should be considered, as it is optimized for numerical accuracy and speed. Calculating Monte Carlo simulations using a spreadsheet may not be very accurate in solving probabilistic problems such as those of retirement planning, since the batch size is limited by the worksheet.

Convergence speed is not the same for all problems. Doubling the batch size does not necessarily cut the variance of the result in half. Therefore, it is necessary that, when testing a problem one tries a number of scenarios and batches, repeating the same simulation over and over with different realizations of the pseudo-random numbers. The quality of the random number generator should be investigated. If repeating the simulation results in the exact same result, the

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 79.                                                    Defendant's Exhibit 4

program may be using the same set of random numbers over and over, causing the testing
accuracy to fall short.

Generally, Monte Carlo methods give, at best, a statistical error estimate, in contrast to various
other numerical methods. A Monte Carlo calculation is typically of the following structure:
carry out the same procedure many times, take into account all the individual results, and
summarize them into an overall approximation to the problem in question. Once the method
shows a convergence to the accurate result after an infinite amount of calculation time, interest
shifts to the convergence behavior or, more specifically, its convergence speed.

Data Simulation Methods

Just as there are many ways in which one could obtain different variances in the original data,
there are different methods and rules that can be applied to re-generate a new error distribution
that most closely resembles the error in the original data. In cases where there is an uneven
distribution of errors because of instrumental limits, as are present in absorbance optical systems,
the noise synthesized for the Monte Carlo iteration should ideally reflect this property.

To conduct a Monte Carlo analysis simulation, several principles of good practice may be
applied. The capabilities of current desktop computers allow for a number of "what if" scenarios
to be examined to provide insight into the effects on the analysis of selecting a particular model,
including or excluding specific exposure pathways, and making certain assumptions with respect
to model input parameters. The output of an analysis may be sensitive to the structure of the
exposure model. Alternative plausible models should be examined to determine if structural
differences have important effects on the output distribution.

Numerical experiments or sensitivity analysis also should be used to identify exposure pathways
that contribute significantly to or even dominate total exposure. Resources might be saved by
excluding unimportant exposure pathways (that do not contribute appreciably to the total
exposure) from full probabilistic analyses or from further analyses altogether. For important
pathways, the model input parameters that contribute the most to overall variability and
uncertainty should be identified. Again, unimportant parameters may be excluded from full
probabilistic treatment. For important parameters, empirical distributions or parametric
distributions may be used. Once again, numerical experiments should be conducted to determine
the sensitivity of the output to different assumptions with respect to the distributional forms of
the input parameters. Identifying important pathways and parameters where assumptions about

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 377

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 80.                                          Defendant's Exhibit 4

distributional form contribute significantly to overall uncertainty may aid in focusing data gathering efforts.

Dependencies or correlations between model parameters also may have a significant influence on the outcome of the analysis.  The sensitivity of the analysis to various assumptions about known or suspected dependencies should be examined.  Those dependencies or correlations identified as having a significant effect must be accounted for in later analyses.

Although specifying distributions for all or most variables in a Monte Carlo analysis is useful for exploring and characterizing the full range of variability and uncertainty, it is often unnecessary and not cost effective.  If a systematic preliminary sensitivity analysis was undertaken and documented, and exposure pathways and parameters that contribute little to the assessment endpoint and its overall uncertainty and variability were identified, the risk assessor may simplify the Monte Carlo analysis by focusing on those pathways and parameters identified as significant.

When data for an important parameter are limited, it may be useful to define plausible alternative scenarios to incorporate some information on the impact of that variable in the overall assessment.  The risk assessor should select the widest distributional family consistent with the state of knowledge and test the sensitivity of the findings and conclusions to changes in distributional shape.  Variability represents diversity inherent in a well-characterized population. It can therefore not be reduced through further study.  Uncertainty represents a lack of knowledge about the population, which can be reduced through further study.  Separating variability and uncertainty during the analysis is necessary to identify parameters for which additional data are needed.

Numerical stability refers to observed numerical changes in the characteristics of the Monte Carlo simulation output distribution as the number of simulations increases.  Ideally, Monte Carlo simulations should be repeated using several non-overlapping subsequences to check for stability and repeatability.  Random number seeds should always be recorded.  Accounting for important sources of uncertainty should be a key objective in Monte Carlo analysis.  It is not possible to characterize all the uncertainties associated with the models and data.  Qualitative evaluations of uncertainty including relative ranking of sources of uncertainty may be an acceptable approach to uncertainty evaluation, especially when an objective quantitative measure is not available.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 378

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 81.                                                Defendant's Exhibit 4

In the specific matter at hand, such is to fully utilize the acquired, accumulated and generally relied upon data, including data and procedures subscribed to and widely implemented by the Amazon® Corporation.  Such implementation is to determine the "most likely" amount of "lost profits" to the Scorza Scales Organization due to their total inability to have created / developed / marketed / sold and improved the Scorza Scales (over time) based upon the total lack of action on the part of the Davison Design & Development Organization.  In this matter, a very large-scale mass computer style / type analysis is not required due to the lack of major significant variable data, the number of variations on the singular Scorza Scale Product, size of the marketplace and the monolithic nature of the product.

As such the undersigned utilized and relied upon a Sensitivity Analysis / Monte Carlo **style** approach, with only a limited amount of market and variable data to consider in order to reach an overall conclusion without engaging a vast and costly computer analysis for a rather contained marketplace for a singular product.  In several studies, the implementation of a larger or massive study did not enhance or improve the quality of the economic / financial output and the final reports were of a similar variable mode.  Massive computer simulations and smaller limited variable analysis were of a similar quality.  This is of a solid value for the interests for the nature of this report for a somewhat small, singular use product over a contained period of time.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 379

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 82.                                                    Defendant's Exhibit 4

## Scorza Scales Product – Lost Profits Variable Analysis

## Table A (Low Analysis Projections)

This table utilizes, as its' base, 0.08 of the total market value ($670 million) of scales sold to weigh individuals in the United States in a recent given year ($670 million x 0.08 = $536,000).  It also incorporates a variable market consumer price (Average price of $30 per scale from data obtained; $536,000 / $30 = approx. 17,000 scales for Scorza Market share) to formulate and determine the number of scales sold ("market share") that Scorza Scales [All manufactured in China at prevailing China costs and importation costs / fees for the larger amounts are individually noted] would have sold, per year, over a ten (10) year period (2022 - 2032).  This scenario allows time to create, develop, refine and formulate a marketing plan / strategy for the scales commencing in 2017.  All sales in this scenario are made via Amazon® to be at least initially most cost effective for this start-up organization.

|                                             | PROJECTION A 1 | PROJECTION A 2 |
|---------------------------------------------|---------------:|---------------:|
| Units Sold (10 years no inflated price)     | 170,000        | 150,000        |
| Retail Sales Price, Per Unit                | $20            | $25            |
| Gross Income from Sales                     | $3,400,000     | $3,750,000     |

Costs of Conducting Sales:

|                                             | PROJECTION A 1 | PROJECTION A 2 |
|---------------------------------------------|---------------:|---------------:|
| Amazon 10 yr Plan ($40 per mo.)             | 4,800          | 4,800          |
| Amazon's Cut per Unit Sold - $3.00          | 510,000        | 450,000        |
| Units Imported Per Container (23,000)       |                |                |
| Container Costs ($4,500 each)               | 36,000         | 31,500         |
| Containers Required                         | 8              | 7              |
| Manufacturing Costs ($3.00)                 | 510,000        | 450,000        |
| Merchandise Process Fee (0.35%)             | 538            | 538            |

LEHRER  FINANCIAL  ECONOMIC  ADVISORY  SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 380

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 83.                                                      Defendant's Exhibit 4

| | | |
|---|---|---|
| Harbor Maintenance Fee (0.13%) | 4,250 | 4,688 |
| Tariff (s) | None | None |
| Warehouse Transport | 2,400 | 2,100 |
| Goods Examination Costs | 40,000 | 35,000 |
| Brokerage Fees | 1,600 | 1,400 |
| Yearly Import Bond | 1,000 | 1,000 |

Smaller Amounts Not Itemized
    Demurrage
    Inspection Fee(s)
    Insurance Costs
    Miscellaneous Costs

| | | |
|---|---|---|
| Net Income Before Taxes (10-year period) | *$2,289,400* | *$2,768,900* |

*Average Lost - 10 Year - Net Income – Based Upon Low Analysis Set of Projections*

**$2,529,100**

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 381

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 84.                                         <span style="color:blue">Defendant's Exhibit 4</span>

## Scorza Scales Product – Lost Profits Variable Analysis

## Table B (Mid Analysis Projections)

This table utilizes, as its' base, 0.1 of the total market value ($670 million) of scales sold to weigh individuals in the United States in a recent given year ($670 million x 0.1 = $670,000). It also incorporates a variable market consumer price (Average price of $30 per scale from data obtained; $670,000 / $30 = approx. 22,000 scales for the Scorza Market share) to determine the number of scales sold ("market share") that Scorza Scales [All manufactured in China at prevailing China costs and importation costs / fees for the larger amounts are individually noted] would have sold over a ten (10) year period (2022 - 2032). This scenario allows time to create, develop, refine and formulate a marketing plan / strategy for the scales commencing in 2017. All sales in this scenario are made via Amazon® to be initially cost effective for this start-up organization.

|  | PROJECTION B 1 | PROJECTION B 2 |
|---|---|---|
| Units Sold (10 years no inflated price) | 220,000 | 190,000 |
| Retail Sales Price, Per Unit | $20 | $30 |
| Gross Income from Sales | $4,400,000 | $5,700,000 |
| Costs of Conducting Sales: | | |
| Amazon 10 yr Plan ($40 per mo.) | 4,800 | 4,800 |
| Amazon's Cut per Unit Sold - $3.00 | 660,000 | 570,000 |
| Units Imported Per Container (23,000) | | |
| Container Costs ($4,500 each) | 45,000 | 40,500 |
| Containers Required | 10 | 9 |
| Manufacturing Costs ($3.00) | 660,000 | 570,000 |
| Merchandise Process Fee (0.35%) | 538 | 538 |

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 382

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 85.                                                    Defendant's Exhibit 4

| | | |
|---|---|---|
| Harbor Maintenance Fee (0.13%) | 5,500 | 7,125 |
| Tariff (s) | None | None |
| Warehouse Transport | 3,000 | 2,700 |
| Goods Examination Costs | 50,000 | 45,000 |
| Brokerage Fees | 2,000 | 1,800 |
| Yearly Import Bond | 1,000 | 1,000 |

Smaller Amounts Not Itemized
    Demurrage
    Inspection Fee(s)
    Insurance Costs
    Miscellaneous Costs

| | | |
|---|---|---|
| Net Income Before Taxes (10-year period) | **$2,968,200** | **$4,456,600** |

*Average Lost - 10 Year - Net Income – Based Upon Mid Analysis Set of Projections*

**$3,712,400**

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 383

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 86.                                        Defendant's Exhibit 4


### Scorza Scales Product – Lost Profits Variable Analysis


## Table C (High Analysis Projections)


This table utilizes, as its' base, 0.12 of the total market value ($670 million) of scales sold to weigh individuals in the United States in a recent given year ($670 million x 0.12 = $804,000).  It also incorporates a variable market consumer price (Average price of $30 per scale from data obtained; $804,000 / $30 – approx. 26,800 scales for the Scorza Market share) to determine the number of scales sold ("market share") that Scorza Scales [All manufactured in China at prevailing China costs and importation costs / fees for the larger amounts are individually noted] would have sold over a ten (10) year period (2022 - 2032).  This scenario allows time to create, develop, refine and formulate a marketing plan / strategy for the scales commencing in 2017.  All sales in this scenario are made via Amazon to be initially cost effective for this start-up organization.


|  | PROJECTION C 1 | PROJECTION C 2 |
|---|---|---|
| Units Sold (10 years no inflated price) | 268,000 | 248,000 |
| Retail Sales Price, Per Unit | $20 | $25 |
| Gross Income from Sales | $5,360,000 | $6,200,000 |
| Costs of Conducting Sales: | | |
| Amazon 10 yr Plan ($40 per mo.) | 4,800 | 4,800 |
| Amazon's Cut per Unit Sold - $3.00 | 804,000 | 744,000 |
| Units Imported Per Container (23,000) | | |
| Container Costs ($4,500 each) | 54,000 | 49,500 |
| Containers Required | 12 | 11 |
| Manufacturing Costs ($3.00) | 804,000 | 744,000 |
| Merchandise Process Fee (0.35%) | 538 | 538 |

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 384

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 87.                                                    Defendant's Exhibit 4

| | | |
|---|---|---|
| Harbor Maintenance Fee (0.13%) | 6,700 | 7,750 |
| Tariff (s) | None | None |
| Warehouse Transport | 3,600 | 3,300 |
| Goods Examination Costs | 60,000 | 55,000 |
| Brokerage Fees | 2,400 | 2,200 |
| Yearly Import Bond | 1,000 | 1,000 |

Smaller Amounts Not Itemized
    Demurrage
    Inspection Fee(s)
    Insurance Costs
    Miscellaneous Costs

| | | |
|---|---|---|
| Net Income Before Taxes | *$3,618,900* | *$4,587,900* |
|   (10 year period) | | |

*Average Lost - 10 Year  -  Net Income  –  Based Upon High Analysis Set of Projections*

**$4,103,400**

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 385

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 88.                                    Defendant's Exhibit 4

## CORPORATE  SALES  SUMMARY  OUTLINE

| SCENARIO | AVERAGE TEN (10) YEAR NET INCOME |
|----------|----------------------------------|
| Scenario A | $2,529,200 |
| Scenario B | $3,712,400 |
| Scenario C | $4,103,400 |

*Most Probable Average Net Income Over a Ten (10) Year Selling Period*
[Before payment of Federal and State Income Taxes - As Appropriate)

*$3,448,300*

LEHRER  FINANCIAL  ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 386

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 89.                                               Defendant's Exhibit 4

## CORPROATE / ECONOMIC / FINANCIAL / SCHOLASTIC CONCLUSIONS

Based upon the data collected and analyzed, including the wanton actions of the Davison Design and Development, Inc. organization, comprising their total lack of progressive actions as contractually agreed to in March, 2017, certain financial / economic conclusions can be reached and laid out as a foundation for other equally as important findings aside from and in addition to the calculated / projected ten (10) year corporate loss of *$3,448,300* as explained and included above, herein:

a) The Davison Design & Development, Inc. organization has supplied evidence that they felt the unique invention of Mr. Scorza had a high potential for success in terms of protectability and marketability. This is documented in both writing and in the fact they accepted funds from Mr. Scorza to undertake the established string of events necessary to both additionally create, patent, package, market and sell the unique concept of Mr. Scorza;

b) If for some reason the Davison organization did not have a very solid feeling for the abilities of the Scorza concept, then they clearly fraudulently accepted his funds over a sustained prolonged period of time for no real economic / financial or corporate value received by Mr. Scorza;

c) The relationship between Mr. Scorza and the Davison organization was one of total reliance. The Davison organization knew full well that Mr. Scorza did not have any other opportunities or abilities to move his new "scales" concept forward and by totally failing to produce any form of output or results they placed Mr. Scorza in a very unfortunate, undesirable and limiting position;

d) Since Mr. Scorza was approximately 85 years of age, it is more than reasonable to conclude that time was of the essence and by not seeking every opportunity to fulfill their agreement and produce their agreed upon output, they were clearly taking undue advantage of an aging individual with limited patent and product skills or prior experiences;

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 387

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 90.                                                    Defendant's Exhibit 4

e) With the Davison Organization not acting to fulfill their pledge, they have totally eliminated Mr. Scorza from the marketplace and thus eliminated his capabilities to both earn an income from his potential patent, leave an income to others such as his heirs and sell the product and / or his patent upon his passing for capital gains to his estate.  Mr. Scorza was directly hurt in more than one direct fashion, including the costs, time and efforts of the current litigation;

f) In spite of the fact that the Davison organization did not act to fulfill its obligations, they failed to produce any types or forms of output, thereby making the creation of an economic damage model more difficult than usual as there is a limited basis upon which to measure costs and / or losses – a burden that should not be borne by Mr. Scorza;

g) The lack of Mr. Scorza to obtain any type of valuable output, further hinders and limits his abilities to progress into the overall stream of business and commerce and create additional inventions or adaptions of his first patent and participate in other creative adaptations; and

h) Lastly, the lack of any real rate of return on both the funds Mr. Scorza agreed to give Davison Design & Development and their inability to use the Scorza funds as represented, doubly hurts, harms and hinders Mr. Scorza and his investments out into his somewhat limited remaining career future.

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 388

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 91.                                                    Defendant's Exhibit 4

# CORPORATE AND RESEARCHED SCALES BIBLIOGRPAHY

**Bathroom Scales Manufacturers and Suppliers in the USA**; Thomasnet; 2022.

Brown, Douglas; **6 trends that define the future of health and wellness**; World Economic Forum; February 15, 2022.

Davis, John; **What Bathroom Scales Are Made in the USA;** Living Scented; August 21, 2022.

Finlay, Fritz; **The Rise of Health and Wellness Market Trends in 2022;** RETHINK Retail; March 3, 2022.

Fitzgerald, Alissa; **Best Bathroom Scales of 2022 - How to Weigh Yourself;** Sports Illustrated; August 8, 2022.

Holland, Kimberly; **Obesity Facts in America**; Medically Reviewed by Daniel Bubnis, MS, NASM-CPT, NASE Level II-CSS; January 18, 2022.

Hurley, Dave; **American Made Bathroom Scales List**; October 2015.

M. Yaqub; **18 Fascinating Health Conscious Consumer Statistics 2022**; Renolon; October 4, 2022.

Miller, Kelsey; **The Completely Bonkers History of the Bathroom Scale**; Elemental; February 15, 2021.

O'Malley, Matt; **Scale - Balance Manufacturing Industry Report OD5721**; IBISWorld; August 2022

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 389

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED .

PAGE 92.                                                    Defendant's Exhibit 4

**Overweight and Obesity Statistics 2022**; Medically Reviewed by Karen Berger, Pharm.D.; SingleCare Team; February 15, 2022.

**Overweight and Obesity Statistics**; National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK); Updated September 2021.

Park, Ji Seok; Carolyn Bramante, Rachit Vakil, Grace Lee, Kimberly Gudzune; **Affordability and Features of Home Scales for Self-weighing**;

Redd, Nancy, Shannon Palus and Melanie Pinola; **The 25 Best Bathroom Scales of 2022**; Wirecutter; April 11, 2022.

**Weighing the Options - How to Choose a Bathroom Scale**; Precor; 2022.

### Compiled / Researched

AUGUST / DECEMBER; 2022

LEHRER FINANCIAL ECONOMIC ADVISORY SERVICES / 5555 Del Monte Dr. – St. 802 / Houston, Tx. 77056 / (713) 972-7912; FAX (713) 964-0444

App. 390

RE: MARIO SCORZA VS. DAVISON DESIGN & DEVELOPMENT, INC.
CONTINUED.

PAGE 93.                                    Defendant's Exhibit 4

All opinions stated are supplied to a reasonable degree of professional certainty and in accordance with accepted economic standards and principles. The undersigned hopes this brief overall economic analysis will serve as a guide in your discussions with the appropriate parties and Court of Law. If you require any additional assistance, please feel free to call upon the undersigned at any time.

Respectfully submitted,

*Dr. Kenneth Eugene Lehrer*
LEHRER FINANCIAL AND ECONOMIC ADVISORY SERVICES

KEL:lm
Attachments (CV of the Writer with Supporting Documentation).

Defendant's Exhibit 4

# APPENDIX

# DR. KENNETH EUGENE LEHRER

(Consulting / Forensic Economist)

Defendant's Exhibit 4

**DR. KENNETH E. LEHRER** has been operating an Economic and Financial Services Consulting company since 1982. He holds four (4) degrees from New York University: Bachelor of Science (Finance), Master of Business Administration (Banking), Master of Arts (Economics) and a Doctorate in Urban Economics. After a career on the corporate staff of Bankers Trust Company (New York), Dr. Lehrer became a Manager for the Greek Shipper, Costas Lemos [dec'd]. Here, he assisted on projects in New York, Houston, Denver, Guam and in Europe. Dr. Lehrer relocated to Houston in 1977.

The organization, formed in 1982, is experienced in many areas of - Economics, Finance, Economic Damage Analysis (including Business and Technology Losses), Banking, Business, ESOP and Non Public Business Valuations, Securities, Healthcare, Fairness and Advisory Opinions, Intellectual Property Valuations, Real Estate and Corporate Finance. The company both prepares institutional economic / finance reports, feasibility analysis, corporate business plans and provides litigation support (having been qualified in both State and Federal Courts) in the areas of - economics, real estate, banking, corporate and IP valuations, class actions and finance. Dr. Lehrer, served for approximately twenty (20) years (1984 – 2002) as an Adjunct Professor of Finance at the University of Houston, Graduate School of Business Administration and (2005 - 2014) an Adjunct Professor of Finance and Economics at the University of Phoenix (Houston Division). Dr. Lehrer is also a speaker at business, economic and real estate seminars.

Dr. Lehrer has served as Chairman of the Board of Directors for the Federal Home Loan Bank of Dallas as agent for the Federal Savings and Loan Insurance Corporation of - Acadia Savings and Loan Association, French Market Homestead Savings, Twin City Savings, First Savings of Louisiana. Dr. Lehrer also served (2005 – 2017) as the Senior Economist and a Director of Aztec Oil and Gas, a former publicly traded corporation.

On a professional basis, Dr. Lehrer is a Texas State Certified General Real Estate Appraiser (License TX-1337797-G) and is recognized by the National Association of Real Estate Appraisers. With his firm, he is a member of - National Association of Business Economists, American Academy of Economic and Financial Experts, American Law and Economics Association, Houston Business Economists, National Forensic Center, National Association of Forensic Economists, American Economic Association, North American Economics and Finance Association, Southern Economic Association, Western Economic Association and the Finance Club and Money Marketeers, both affiliated with New York University.

Dr. Lehrer is registered with the Securities and Exchange Commission as an Investment Advisor under the Investment Advisors Act of 1940 and has held the Full Registration / General Securities (Series 7) and Texas Securities (Series 63) Licenses. He is listed in all editions of "Who's Who In America" since the 45th edition.

- - -

Office Phone (713) 972-7912     FAX (713) 964-0444     E-Mail   drken@lehecoserv.com

Web Site   www.LEHECOSERV.com

LEHRER FINANCIAL AND ECONOMIC ADVISORY SERVICES     5555 DEL MONTE DRIVE - SUITE 802 - HOUSTON, TEXAS  77056 - 4117

Defendant's Exhibit 4



# New York University

## Certificate of Distinction

New York University is proud to present this certificate of distinction to Kenneth E. Lehrer, an outstanding alumnus of four divisions of the University. A student of unusual dedication and rare academic ability, Mr. Lehrer earned a B.S. degree from the College of Business and Public Administration in 1967, an M.B.A. in economics and finance from the Graduate School of Business Administration in 1969, a master's degree in economics from the Graduate School of Arts and Science in 1972, and a doctoral degree from the Graduate School of Public Administration in 1980.

An effective and articulate advocate of the University's mission, Mr. Lehrer has maintained an active involvement with New York University despite the demands of his studies and business career and despite the great distance that separates him from his alma mater. Illustrative of his loyalty and tireless activism on behalf of the University is the major role he has played in organizing the University's alumni in Houston, Texas.

It is with great pleasure that the University acknowledges Kenneth E. Lehrer's impressive scholarly achievements and his invaluable contributions to the well-being of this institution.

September 18, 1980

Ivan L. Bennett, Jr., M.D.
Acting President

App. 394

Defendant's Exhibit 4



# UNIVERSITY of HOUSTON
## COLLEGE of BUSINESS ADMINISTRATION

presents
this certificate to

# Kenneth E. Lehrer

in appreciation
for
loyalty and excellence
in academic service
to the

## Department of Finance

in its mission to develop
business leadership through education

**Nine Years**          **May 1993**

_____          _____
Dean                                              Chair
College of Business Administration          Department of Finance

Defendant's Exhibit 4



# Member of Faculty

### University of Phoenix presents with honor to

## Kenneth Lehrer

as an honored member of the faculty body.

University of Phoenix faculty candidates complete a comprehensive selection program and fulfill the requirements necessary to become a faculty member. Having successfully completed these requirements, the bearer of this certificate is recognized as a certified University of Phoenix faculty member.

FACULTY MEMBER SINCE
2002

PRESENTED BY

Timothy P. Slottow, President

Dr. Meredith Curley, Interim Provost

University of Phoenix•

App. 396

Defendant's Exhibit 4

UNITED STATES OF AMERICA

Before the

U. S. SECURITIES AND EXCHANGE COMMISSION

December 12, 1985

IN THE MATTER OF:
Dr. Kenneth Eugene Lehrer dba
Lehrer Development and Investments
5555 Del Monte Drive, Suite 802
Houston, Texas  77056-4105

FILE NO. 801- 25934

ORDER GRANTING REGISTRATION
PURSUANT TO SECTION 203 OF
THE INVESTMENT ADVISERS ACT
OF 1940

_____Lehrer Development and Investments_____, hereinafter referred

to as the Applicant, having made application with the Commission for registration as

an investment adviser pursuant to Section 203 of the Investment Advisers Act of

1940 on _____October 28, 1985_____ ; and

The Commission having found that Applicant has satisfied the requirements

of such Section;

IT IS ORDERED, that the Applicant's registration be and hereby is granted,

this _____12th_____ day of _____December_____ 19 85.

FOR THE COMMISSION, by the Office of Applications and Reports Services

pursuant to delegated authority.

John Wheeler
Secretary

SEC 1420 (12-84)

App. 397

Defendant's Exhibit 4

DR. KENNETH EUGENE LEHRER
LEHRER FINANCIAL & ECONOMIC ADVISORY SERVICES
5555 DEL MONTE DRIVE – SUITE 802
HOUSTON, TEXAS 77056

PHONE (713) 972-7912

FAX (713) 964-0444

E-MAIL DRKEN@LEHECOSERV.COM

WEB SITE WWW.LEHECOSERV.COM

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

## Defendant's Exhibit  5

Defendant's Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION,      )
          Plaintiff,           )
                               )
     v.                        )   Civil Action No. 97-1278
                               )
DAVISON ASSOCIATES, INC.,      )
et al.,                        )
          Defendants.          )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is an action under section 13(b) of the Federal Trade
Commission Act, 15 U.S.C.A. § 53(b).  The Federal Trade
Commission (the "Commission") alleges that defendants Davison
Associates, Inc., Manufacturer's Support Services, Inc., George
M. Davison, III, Gordon Davison, and Barbara Miele-Davison, have
engaged in deceptive practices in connection with their invention
promotion business in violation of section 5 of the Federal Trade
Commission Act.    15 U.S.C.A. § 45(a).    Plaintiff seeks a
permanent injunction and ancillary equitable relief.

A bench trial began on June 20, 2005.  After three weeks of
testimony, the parties filed proposed findings of fact and
conclusions of law for the court's consideration.  The parties
have made all submissions and the court is prepared to set forth
its findings of fact and conclusions of law pursuant to Rule 52
of the Federal Rules of Civil Procedure, and render its judgment.

Defendant's Exhibit 5

I.     FINDINGS OF FACT

      The following facts were not in dispute:

1.     The court has subject matter jurisdiction over plaintiff's claims pursuant to 28 U.S.C. A. §§ 1331, 1337(a), and 1345, and 15 U.S.C.A. §§ 45(a) and 53(b).

2.     Venue is proper under 28 U.S.C.A. §§ 1391(b) and (c) and 15 U.S.C.A. § 53(b).

3.     Defendants' course of trade is in or affecting commerce, within the meaning of Section 4 of the Federal Trade Commission Act, 15 U.S.C.A. § 44.

4.     The Commission brought this case against two corporate and four individual defendants on July 15, 1997.

5.     The two corporate defendants are: (1) Davison & Associates, Inc., now known as Davison Design and Development, Inc. ("Davison"); and (2) Manufacturer's Support Services, Inc. ("MSSI").

6.     The four individual defendants are: (1) George M. Davison III (President and CEO of Davison); (2) Thomas Dowler (who is no longer involved in this matter); (3) Gordon M. Davison (an employee of Davison and officer of MSSI); and (4) Barbara Miele-Davison (an employee of Davison until 2002).

2

7.   A finding of liability against Davison will result in the three remaining individual defendants, and MSSI, being found individually liable under the Federal Trade Commission Act.

8.   On July 15, 1997 this court entered a Temporary Restraining Order ("TRO"), which was extended by stipulations of the parties dated July 18, 1997, July 23, 1997, and July 30, 1997.

9.   Pursuant to the TRO, Davison was forced to make certain changes to its sales and marketing materials, and to the general way that it did business. Davison was specifically prohibited from making the misrepresentations alleged in the Amended Complaint.

10.  Since 1989 Davison has been in the business of selling services to amateur inventors.

11.  Defendants advertise their services in the classified section of magazines, and on-line.   After a consumer contacts defendants, defendants send an initial form on which the consumer gives a general description of his invention.

12.  Both Pre-Complaint and Post-Complaint, defendants offer services to about 66% of the consumers sending in an initial form.

3

Defendant's Exhibit 5

13.   Defendants' services have always been sold in two phases.

14.   Pre-Complaint, the first phase consisted of a Research Agreement.  Under the Research Agreement, defendants would prepare a portfolio that included a patent search, an engineer's review of feasibility, a conceptual drawing, industry related data, and a search of competing products. The cost of this service was less than $800.00.

15.   Pre-Complaint, defendants also offered expanded first-phase services, which included a color rendering Virtual Reality Presentation.  This expanded service cost more than $3,500.

16.   Pre-Complaint, more than half of the time defendants would conclude at the end of the first phase that the consumer should move forward with commercialization of his product idea.   Defendants   stopped   using   the   "should   be commercialized" recommendation after the Commission filed its Complaint.

17.   Pre-Complaint, phase two of defendants' services consisted of   a   Product   Representation   Agreement   under   which defendants attempted to locate a corporation interested in licensing the consumer's product idea.  This agreement had a term of two years.  The agreement could be purchased on an hourly basis, or by paying a flat fee, ranging from $8,000.00 to $12,000.00, plus a percentage of royalties.

4

Defendant's Exhibit 5

The cost of creating production drawings or a prototype for submission to corporations was included in this agreement. The Agreement contained an express acknowledgment that the consumer had not been promised financial gain or profits.

18.    Post-Complaint, phase one of defendants' services consist of two agreements: a Pre-Inventegration Services Agreement at a cost of approximately $700.00, and a Contingency Agreement, at a cost of 10% of future licensing royalties.

19.    The Pre-Inventegration Agreement results in a portfolio containing product research, a patent design search, and a provisional patent application. This portfolio is similar to the one provided under the Research Agreement, Pre-Complaint. The Pre-Inventegration Agreement states that there are no guarantees of financial gain and that the purpose of the research is not to evaluate market potential or patentability.

20.    The Contingency Agreement is the agreement under which defendants attempt to obtain a license for the consumer's product with a corporation. The Contingency Agreement states that the consumer will be responsible for obtaining a virtual reality presentation and/or prototype of his idea for submission to corporations. The agreement states that the consumer can obtain these items either from defendants

5

Defendant's Exhibit 5

or another source, subject to defendants' approval. This agreement also contained a statement that no license is guaranteed and that the majority of products are not successfully licensed.

21.  Post-Complaint, phase two of defendants' services consist of a Production Sample Presentation Agreement under which defendants agree to produce a virtual reality model and/or prototype of the consumer's idea for presentation to corporations. This agreement can be purchased at an hourly rate, or for a flat fee, ranging from $8,000.00 to $14,000.00, plus a percentage of future royalties. This phase two agreement is offered once a corporate match is found for the consumer's product idea, which happens about 80% of the time. This agreement contains statements that there are no guarantees of financial success.

22.  Less than one percent of defendants' revenues come from royalty income.

23.  Both Pre-Complaint and Post-Complaint contracts contain integration clauses stating that the agreement constitutes the entire agreement between the parties and that any verbal agreements are null and void.

24.  The American Inventor's Protection Act, 35 U.S.C.A. § 297 ("AIPA"), requires invention-promotion firms to make the

6

Defendant's Exhibit 5

following disclosures before selling their services: (1) total number of inventions evaluated for commercial potential in the past 5 years, as well as the number of these inventions that received positive evaluations, and the number that received negative evaluations; (2) the total number of customers who have contracted with the invention promoter in the past 5 years, not including customers who have purchased, among other things, research or other non-marketing services; (3) the total number of customers known by the invention promoter to have received net financial profit as a direct result of the invention promotion services; (4) the total number of customers to have received licensing agreements as a direct result of the invention promotion services; and (5) the names and addresses of all previous invention promotion companies with which the invention promoter or its officers have been affiliated in the previous 10 years.

25.    In 2002, defendants' AIPA disclosure stated:

> Client acknowledges that Davison has assisted eight hundred and seventeen clients wanting licensing services in the last five years. Because Contingency Agreements last for six months, Davison is unable to determine if a Client has licensed or marketed his/her product idea or received financial gain after the expiration of the Contingency Agreement. However,

7

> Davison is aware of thirty projects that
> have been licensed and ten that have
> resulted in financial gain to the
> project owner since 1990. Davison is
> also aware that one hundred twenty
> projects are under corporate licensing
> review.

26.  In the first half of 2005, defendants received 40,516
     idea submissions from consumers. From these,
     defendants offered phase one Pre-Inventegration
     Services Agreements to 26,309, 4,371 of whom purchased
     the phase one services. Defendants then offered phase
     two Production Sample Presentation Agreements to 3,455
     of the 4,371 phase one clients, 920 of whom purchased
     and fully paid for the phase two services.

27.  In its Amended Complaint, the Commission alleged that
     defendants made the following six false and misleading
     representations, either expressly or by implication, in
     connection with the sale of their services:

     (a)  Consumers who buy defendants' invention-
     promotion services stand a reasonably good chance
     of realizing financial gain.

     (b) Defendants' invention-promotion services helped
     many of their customers' invention ideas become
     profitable products.

8

App. 407

(c) Defendants' invention-promotion services helped some or more of the following invention ideas become profitable products: Bark Buddies, the Spot-Lite, the Snag-Buster, the Puzzle Sorter, and the EnviroGolf.

(d) Defendants have a vast network of corporations with whom they have ongoing relationships and regularly negotiate successful licensing agreements.

(e) Defendants' invention marketing services are necessary for consumers to license their invention ideas.

(f) Defendants prepare objective and expert analyses of the patentability and marketability of consumers' invention ideas.

9

Defendant's Exhibit 5

The following facts were in dispute, and the court finds, by a preponderance of the evidence, as follows:

A.     Reasonably Good Chance of Financial Gain

28.    Based on the overall, common sense, net impression on a reasonable consumer, defendants falsely represent, both directly and by implication, that consumers who buy their services stand a reasonably good chance of realizing financial gain by:

> (A) representing that they are selective as to whom they offer services based on the quality, value, and/or originality of a consumer's idea;
>
> (B) representing that they have a genuine stake in the consumer's invention through royalties, when in fact, fees charged, and not royalties collected, are the main source of defendants' income; and
>
> (C) misrepresenting their track record.

29.    Both Pre-Complaint and Post-Complaint, defendants make express and implied statements that create the overall, common sense, net impression on a reasonable consumer that they are selective about those to whom they offer services. In fact, defendants offer phase one research services to 66% of the consumers submitting ideas. Pre-Complaint, more than 50% of consumers purchasing

10

Defendant's Exhibit 5

phase one services were offered phase two services. Post-Complaint, approximately 80% of consumers purchasing phase one services are offered phase two services.

30. Defendants' numerous statements, both Pre-Complaint and Post-Complaint, regarding the value, desirability, or originality of, or excitement surrounding a consumer's idea create the overall, common sense, net impression in a reasonable consumer that defendants have selected this consumer's particular idea, to the exclusion of many others. This, in turn, creates the overall, common sense, net impression in a reasonable consumer that there is some reasonable chance of financial success for those ideas that are specially selected. It is reasonable for a consumer to assume that an idea that has been evaluated and selected for further work to the exclusion of other ideas must have some possibility of success.

31. While defendants have curtailed their sales language regarding their enthusiasm for, or the originality of an idea, and no longer refer to an idea as having passed "review board" scrutiny, defendants still try to convince consumers that they select a limited number of

11

ideas for further work, when the vast majority of consumers are offered further services. In fact, Post-Complaint, defendants offer phase two services to 30% more consumers than they did Pre-Complaint.

32.   Both Pre-Complaint, and Post-Complaint, defendants create the overall, common sense, net impression of a reasonably good chance of financial gain through contingency arrangements.   Although contingency arrangements are not per se illegal, defendants' sales techniques regarding the contingency arrangement create the overall, common sense, net impression on a reasonable consumer that defendants have a shared interest in the consumer's idea.

33.   For example, Post-Complaint, a reasonable consumer would conclude that a company is only going to take a shared interest in an idea, and "work for free" under the Contingency Agreement, if an idea has some reasonable possibility of financial success.   In reality, and unbeknownst to the consumer, there is no real shared interest, because royalty payments from consumer licenses are a minuscule portion of defendants' revenues.   Defendant's greatest source of income is the fees charged for prototyping and virtual

12

reality services, which, in practice, must be purchased
in order to proceed to the licensing stage.

34.     Both   Pre-Complaint   and   Post-Complaint, defendants
misrepresent their track record.  The overall, common
sense,  net  impression  on  a  reasonable  consumer  of
defendants' track  record  overstates  the  reasonable
possibility of financial gain.  In particular:

>      (a) Defendants misrepresent their track record in
>      their AIPA disclosure by hiding the information in
>      a paragraph about how notices are to be sent and by
>      including extraneous information, such as projects
>      "under  corporate  licensing  review".   They  also
>      create  the  impression  of  greater  success  by not
>      reporting  the  total  number  of  phase one customers
>      buying a Pre-Inventegration portfolio, which is in
>      the thousands.  Although research is excepted from
>      AIPA  reporting  requirements,  as  defendants  have
>      structured  their  business  Post-Complaint,  this
>      initial  report  is an integral  part  of defendants'
>      licensing   services.     From   defendants'   first
>      contacts  with  consumers,  the  phase  one  Pre-
>      Inventegration Services Agreement is characterized
>      as the first step in negotiating with corporations

13

Defendant's Exhibit 5

for a license. For example, the research conducted under the Agreement is described as "needed" in order to proceed to licensing. A sales script says that defendants need to get the research "out of the way" so they can start "sourcing corporations" for licensing. Another sales script to be used before the work under the Pre-Inventegration Services Agreement has even been completed states there is good news for the consumer about "target corporations". Under these circumstances, research is inseparable from the licensing part of defendants' business. Therefore, defendants' failure to disclose that thousands of people are provided with Pre-Inventegration portfolios, yet, at best, only dozens obtain licenses, significantly misrepresents their track record. Although defendants have not been charged with violating the AIPA, and it is unclear how the research exception of the AIPA is to be interpreted, the above is evidence of how defendants shew their track record in order to imply a reasonably good chance of financial gain.

14

(b) Defendants also misrepresent their track record by contending that the Contingency Agreement and Production Sample Presentation Agreement are unrelated. As a result, defendants conclude that any consumer who made $1.00 in royalties realized a profit because the Contingency Agreement is "free". However, these two agreements are closely intertwined and the significant cost of the Production Sample Presentation Agreement must be factored into profitability in order to give consumers truthful information regarding defendants' track record. Defendants' current Operations Manual characterizes prototyping services as "necessary" to the overall licensing services provided by defendants. In addition, the Inventegration "flow chart" included with defendants' introductory marketing materials includes the purchase of prototyping services as a step on the path to obtaining a corporate license. The consumer must buy the Production Sample Presentation Agreement to fulfill the Contingency Agreement and proceed to the only possible money-making step of defendants' services - licensing.

15

Defendant's Exhibit 5

> The two agreements are intertwined. Although, when
> correctly considered in determining profitability,
> this would cause only a slight change in the number
> of consumers who realized a profit this is further
> evidence of defendants' attempts, even Post-
> Complaint, to falsify their track record.
>
> (c) Pre-Complaint, defendants misrepresented their
> track record in the "numbers letter" by using the
> above, and other techniques, such as including
> licenses obtained by people affiliated with
> defendants.

35. The disclaimers used by defendants, both in written and
oral form, to the effect that there are no guarantees
of financial success or of a license are not
sufficiently prominent and unambiguous and do not
clearly, conspicuously, and directly address the
misrepresentations made regarding defendants' track
record, and are, therefore, ineffective.


B.   Many Products Are Profitable

36. Based on the overall, common sense, net impression on
a   reasonable   consumer   defendants   do   not   falsely
represent that their invention-promotion services have

16

—

Defendant's Exhibit 5

helped "many" of their customers' invention ideas become profitable products. Regardless of how defendants inflate their track record, there is no reasonable implication from defendants' overall marketing and sales materials that "many" consumers have made a profit as a result of using their services.

37. It is always clear to the reasonable consumer that success and profitability are the exception, rather than the rule. While defendants may use unlawful techniques to convince consumers that they have the rare idea that falls into the exception category, they do not state or imply that "many" people make a profit. Rather, their sales techniques rely on convincing the consumer that the opposite is true.

C. Profitability of Specific Products

38. Based on the overall, common sense, net impression on a reasonable consumer defendants misrepresented that their invention-promotion services helped some, or more, of the following invention ideas become profitable products: Bark Buddies, the Spot-Lite, the Snag-Buster, the Puzzle Sorter, and the EnviroGolf. A reasonable consumer would conclude that "success story"

17

Defendant's Exhibit 5

products specifically featured by defendants as having been advertised on MTV, sold "all over the world", and purchased by "thousands of parents" have some level of financial success. While it is true that defendants never use the term "profitable" in reference to these particular products, based on the overall, common sense, net impression, a reasonable consumer would equate such specific statements of successful sales and marketing with profit.

39. Furthermore, the statements that defendants make about at least some of these products are blatantly false. For example, while defendants claim that the Puzzle Sorter has been sold worldwide, defendants' records reflect no actual sales of this product in the United States, or elsewhere.

40. Even though defendants have stopped referring specifically to Bark Buddies, the Spot-Lite, the Snag-Buster, the Puzzle Sorter, and the EnviroGolf, defendants still perpetuate consumers' misunderstandings regarding the profitability of specific products. For instance, defendants refuse, to this day, to answer consumer inquires regarding the exact profitability or success of specific products.

18

Defendant's Exhibit 5

Post-Complaint sales scripts instruct staff members to refuse to answer such questions on the basis of confidentiality concerns.

D.    Special Access to Corporations

41.    Based on the overall, common sense, net impression on a reasonable consumer defendants falsely represent that they have a vast network of corporations with whom they have ongoing, special relationships, and with whom they regularly negotiate successful licensing agreements. Pre-Complaint, defendants told consumers explicitly that they worked directly with manufacturers, had close personal contacts, and cut through the "red tape" and the "old boys' network" to obtain licenses for their clients. Although this may be technically true of a handful of smaller companies, defendants implied that they had such relationships with hundreds of large, nationally known companies, which they did not.

42.    Even Post-Complaint defendants state, in a sales script used early in the consumer's relationship with defendants, that because defendants develop products for companies on an ongoing basis they have the ability to present outside concepts where the average person

19

App. 418

Defendant's Exhibit 5

would not. Again, although this may be literally true of a handful of companies, the overall, common sense, net impression on a reasonable consumer of defendants' marketing techniques, still today, is that they are selling special access to hundreds of companies, when in fact there is little, if any, special access.

43.   Defendants claim to have close working relationships with specific companies when defendants' submission procedures do not even meet the company's requirements for the submission of unsolicited ideas.

44.   Defendants create the impression of special access by stating that they meet, regularly, with numerous corporations to present new ideas to them. Even Post-Complaint, in the Inventegration "flow chart", defendants imply that presentations and meetings occur in person. The evidence at trial showed that this rarely happens.

45.   Defendants' misrepresentations regarding special access are exacerbated by false claims of confidentiality. Even Post-Complaint, when consumers ask for details regarding a company's interest in their idea before agreeing to purchase the Production Sample Presentation Agreement, defendants refuse, citing confidentiality

20

concerns. Such confidentiality claims are suspect because all defendants have done at that point is pull the name of a company that makes the same type of products as the consumer's invention from their computer database.

46. Even Post-Complaint, through the corporate montage, defendants imply relationships with companies that have not even registered with defendants as being willing to accept new product ideas from them.

E. Necessity of Services

47. Based on the overall, common sense, net impression on a reasonable consumer defendants misrepresent that their invention marketing services are necessary for consumers to license their invention ideas to corporations. Both Pre-Complaint and Post-Complaint, defendants explicitly state that their virtual reality/prototype product presentation portfolios will get the consumer's idea "taken seriously" and are a "necessity" when working with large corporations.

48. Although a reasonable consumer expects a salesperson to portray his products in the best light possible and to try to convince the consumer that he is selling

21

Defendant's Exhibit 5

something that the consumer must have, defendants claim
to have expertise and experience in licensing products
to large corporations. They use this perceived
position of superior knowledge over the consumer to
convince the consumer that when a salesperson says that
something is needed in order to proceed, it is.

F.    Patentability and Marketability Analysis

49.   Based on the overall, common sense, net impression on
      a reasonable consumer we find that, Pre-Complaint,
      defendants misrepresented that they prepared objective
      and expert analyses of the patentability of consumers'
      invention ideas.

50.   Pre-Complaint, defendants stated that a patent search
      was conducted in order to "understand the viability of
      your new product ideas". Following this statement,
      defendants stated that their registered patent agent
      conducted the search and that "only a registered patent
      attorney or patent agent can advise you whether
      protection of your idea or invention is available under
      the patent...laws." The report went on to summarize
      various forms of intellectual property protection and
      to warn the consumer of certain actions that could

22

Defendant's Exhibit 5

jeopardize those rights. The overall, common sense, net impression of this presentation of the patent search on a reasonable consumer is that defendants' patent agent is qualified to determine patentability, and did so in this case. Any attempted disclaimers were ineffective.

51. Based on the overall, common sense, net impression on a reasonable consumer we find that, both Pre-Complaint and Post-Complaint, defendants misrepresent that they prepare objective and expert analyses of the marketability of consumers' invention ideas.

52. Both Pre-Complaint and Post-Complaint, defendants include a section in their research report regarding the presence of competing, or conflicting, products currently on the market. Defendants explain that "[i]t is imperative that our firm allocate a substantial amount of time to discover similar or competing products in the marketplace" in order to assist in "making decisions in the future." Sales calls also address the presence of similar products in the marketplace, and/or the uniqueness of the consumer's product. These statements create the overall, common sense, net impression on a reasonable consumer that

23

Defendant's Exhibit 5

defendants are studying the market in order to arm themselves, and the consumer, with information needed to assess the potential market for a product.

53. Although defendants state that no one can predict how a product will actually sell until it is for sale in the marketplace, that is not an effective disclaimer. Defendants are not accused of guaranteeing sales, but of providing consumers with purported objective and expert analysis of marketability. The purported disclaimer does not dispel the overall impression that defendants are gathering data about the market in order to assist defendants and the consumer in making an educated guess as to the possible market potential of a product.

54. Based on the overall, common sense, net impression on a reasonable consumer we find that, Post-Complaint, defendants do not misrepresent that they prepare objective and expert analyses of the patentability of consumers' invention ideas. Rather, defendants now explicitly state that they are not performing this service. Because defendants now clearly, conspicuously, and directly disclaim that they give patentability assessments, and because the disclaimer

24

Defendant's Exhibit 5

is prominent, unambiguous and presented at the same time that the patent search is presented, the overall impression of the communication becomes non-deceptive, and the disclaimer is effective.

II.   CONCLUSIONS OF LAW

1.   The Federal Trade Commission Act prohibits deceptive acts or practices in or affecting commerce. 15 U.S.C.A. § 45(a)(1).

2.   Whether a particular practice has a tendency to deceive or mislead is an impressionistic determination more closely akin to a finding of fact than to a conclusion of law. See Beneficial Corp. v. F.T.C., 542 F.2d 611, 617 (3d Cir. 1976).

3.   To establish liability under section 5 of the Federal Trade Commission Act, the Commission must establish that there was a material representation which was likely to mislead consumers acting reasonably under the circumstances. See F.T.C. v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003).

4.   To be actionable a misrepresentation or practice need not be made with an intent to deceive. See Beneficial Corp., 542 F.2d at 617.

25

App. 424

Defendant's Exhibit 5

5.  A practice or statement is material if it contains information that is important to a consumer's purchasing decision such as information relating to the economic viability of a transaction or the central character of the product or service. F.T.C. v. Five-Star Auto Club, Inc., 97 F.Supp.2d 502, 529 (S.D.N.Y. 2000) (citing cases).

6.  In determining whether a practice is likely to mislead, the fact finder must consider the overall, common sense, net-impression of the practice on a reasonable consumer. Beneficial Corp., 542 F.2d at 617; Am. Home Prod. Corp. v. F.T.C., 695 F.2d 681, 687 (3d Cir. 1982). The practice must be viewed as a whole without emphasizing isolated words or phrases. Beneficial Corp., 542 F.2d at 617.

7.  Disclaimers or curative language must be "sufficiently prominent and unambiguous" such that the overall net-impression of the communication becomes non-deceptive. Removatron. Int'l Corp. v. F.T.C., 884 F.2d 1489, 1497 (1st Cir. 1989).

8.  The Commission has found that integration clauses do not shield defendants where their misrepresentations

26

Defendant's Exhibit 5

have resulted in consumer injury. <u>In re Amrep Corp.</u>, 102 F.T.C. 1362, 1667-68 (1983).

9.    Under section 13(b) of the Federal Trade Commission Act, a court may grant permanent injunctive relief where the violation is ongoing or there is a cognizable danger of recurrent violation. <u>United States v. W.T. Grant Co.</u>, 345 U.S. 629, 633 (1953). In determining whether there is a danger of recurrence, a court may consider the bona fides of the expressed intent to comply, the effectiveness of the discontinuance, and, in some cases, the character of past violations. <u>Id</u>.

10.    The authority to grant a permanent injunction includes the authority to order any other ancillary equitable relief necessary to effectuate the exercise of the powers granted under section 13(b). <u>F.T.C. v. Febre</u>, 128 F.3d 530, 534 (7th Cir. 1997); <u>F.T.C. v. Gem Merch. Corp.</u>, 87 F.3d 466, 468-69 (11th Cir. 1996); <u>F.T.C. v. Amy Travel Service, Inc.</u>, 875 F.2d 564, 571 (7th Cir. 1989).

11.    Ancillary equitable relief may take the form of disgorgement of the full amount lost by customers, without regard to defendant's profits. <u>Commodity Futures Trading Comm'n v. Am. Metals Exchange Corp.</u>,

App. 426

Defendant's Exhibit 5

991 F.2d 71, 77 (3d Cir. 1993); Febre, 128 F.3d at 537;
F.T.C. v. Medicor LLC, 217 F.Supp.2d 1048, 1057-58
(C.D. Cal. 2002).

12.  We find that defendants' practice of stating or
implying that consumers have a reasonably good chance
of realizing financial gain is material to a consumer's
purchasing decision and is likely to mislead consumers
acting reasonably under the circumstances based on the
overall, common sense, net impression of the practice.

13.  We find that defendants' practice of stating or
implying that defendants' services helped particular
products become profitable is material to a consumer's
purchasing decision and is likely to mislead consumers
acting reasonably under the circumstances based on the
overall, common sense, net impression of the practice.

14.  We find that defendants' practice of stating or
implying that they have a vast network of corporations
with whom they have special relationships is material
to a consumer's purchasing decision and is likely to
mislead consumers acting reasonably under the
circumstances based on the overall, common sense, net
impression of the practice.

28

Defendant's Exhibit 5

15. We find that defendants' practice of stating or implying that their invention marketing services are necessary for consumers to license their invention ideas to companies is material to a consumer's purchasing decision and is likely to mislead consumers acting reasonably under the circumstances based on the overall, common sense, net impression of the practice.

16. We find that defendants' practice of stating or implying that they prepare objective and expert analyses of the marketability of a consumer's invention idea is material to a consumer's purchasing decision and is likely to mislead consumers acting reasonably under the circumstances based on the overall, common sense, net impression of the practice.

17. We find that defendants' Pre-Complaint practice of stating or implying that they prepare objective and expert analyses of the patentability of a consumer's invention idea is material to a consumer's purchasing decision and is likely to mislead consumers acting reasonably under the circumstances based on the overall, common sense, net impression of the practice.

18. We find that the integration clauses in defendants' contracts do not shield them from liability because

29

Defendant's Exhibit 5

this case is not controlled by state contract law, and because consumer injury resulted from defendants' misrepresentations.

19.  Permanent injunctive relief is appropriate in this case because there are ongoing violations and there is a cognizable danger of recurrent violation. Even after the court issued a Temporary Restraining Order, which was later extended by stipulation, defendants continued to engage in deceptive practices, albeit in slightly different forms.  Based on this past pattern of conduct, there is a very real danger that defendants will alter their business again, yet continue to engage in wrongdoing.

20.  In order to effectuate the exercise of granted powers, we order other ancillary equitable relief in the form of consumer redress in the amount of $26 million. This amount represents revenues earned by defendants Pre-Complaint in the amount of $8 million. This amount also represents the $18 million that Mr. Davison testified defendants earned in 2004. Plaintiffs presented insufficient evidence to establish defendants' earnings in other years. Even though discovery was not available regarding those years,

30

App. 429

Defendant's Exhibit 5

plaintiffs could have presented some evidence regarding earnings through defendants' officers or agents, or otherwise. The court has no evidentiary basis to make a finding of any revenues or income in the years since the Complaint was filed, other than in 2004. Regardless, being an equitable remedy, we find that this amount is appropriate to provide consumers with some form of financial recovery, while not exacting a penalty on defendants.

An Order for a Final Judgment and a Permanent Injunction follow.

BY THE COURT:

s/Gary L. Lancaster , J.
The Honorable Gary L. Lancaster,
United States District Judge

Dated: March 17, 2006

cc: All counsel of record

31

App. 430

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

---

# Defendant's Exhibit 6

---

Defendant's Exhibit 6

# IN THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| MARIO SCORZA, | § | |
| *Claimant,* | § | |
| | § | |
| V. | § | NO. 01-21-0004-6369 |
| | § | |
| DAVISON DESIGN AND | § | |
| DEVELOPMENT, INC. | § | |
| *Respondent* | § | |

---

## CLAIMANT'S PRE-HEARING BRIEF

---

## I
## INTRODUCTION

Claimant, Mario Scorza, (hereafter "Scorza") contracted with Davison Development and Design, Inc. (hereafter "Davison") for services related to invention development, wherein several sequential agreements were entered into as to facilitate Claimant's introduction into the weight scale market between January 2017 and December 2020.

Scorza, proffers that Respondent, through its agents, simultaneously made assertions known to Davison to be both negligently misleading and mischaracterized, in the best light, and knowingly omitted and willfully conducted to induce Claimant into fee agreements, in a more negative light, carrying practically zero chances, 0.001% chance to be exact, of generating even a modicum of succuss by any measure Davison would like to proffer. As per the Respondent's website, Affirmative Disclosure Statement stating, in part, "[T]he The number of consumers who obtained a written license with a company that is not affiliated with Davison is fifteen (15). **The total number of consumers in the last five years who made more money in royalties or sales proceeds than they paid to Davison, in total, under any and all agreements with Davison, is six (6). This number includes people who first made a profit more than 5 years ago, if they continued to make additional profit during the past five years. The percentage of Davison's income that came from**

**royalties paid on licenses of consumers' products is .001%.** These affronts were further compounded by Davison's inability to produce even a semblance of assistance to attempt any remediation of Mr. Scorza's increasingly dire position.

In sum, Davison (1) failed to honor the agreements entered into between parties,' (2) intentionally misrepresented material facts germane to the parties contractual relationship and Claimant's understanding; (3) withheld key facts and figures from Claimant; (4) negligently misrepresented those facts which Respondent *did* disclose (and which Claimant relied upon); (5) utilized those misrepresentation to induce Claimant to make payments to Respondent; (6) failed to observe even a basic common law duty of due care; and (7) caused irreparable harm, through the loss of all patent rights, to Claimant by Respondent's intentional concealments, misrepresentations, and omissions as detailed below.

As early as January 12, 2017, Davison and Mr. Scorza entered into a 'Pre-Development and Representation Agreement' with Davison. According to this Agreement, this agreement,[1] Davison was contractually obligated to both provide a final product (with packaging)[2] and to accept "all reasonable requests" which "are consistent with the goal of solving the problem in a simple and cost effective manner."[3] Neither was accomplished. Now, five years has passed and Davison is close to the age of ninety years old.

Claimant was not provided any sort of product sample and only received renderings which, by all accounts, appear to be only computerized renderings – contrary to Davison's contractual obligation. Moreover, no sample or detailed product packaging was provided to

---

[1] *See* Exhibit 1 Davison_000018-000027

[2] *See* Exhibit 1 Davison_000021, 000205 (1. Services Provided - Section D., Product Sample Finalization, i "Product Sample Finalization: The product and package will be placed together to create the final product sample.")

[3] *See* Exhibit 1 Davison_000023] (4. REPRESENTATIONS, WARRENTIES & COVENANTS - H. Davison agrees to accept all reasonable requests of the Client that are consistent with the goal of solving the problem in a simple and cost effective manner.")

Claimant. Only representations of the exterior were ever presented to claimant.[4] Further, and demonstrably more significant, Davison marked the rendering with the words "Patent Pending."[5] This false designation constitutes "False Marking," as Davison has provided such marking "with the intent of counterfeiting or imitating the mark of the patentee, or of deceiving the public and inducing them to believe that the thing was made, offered for sale, sold, or imported into the United States by or with the consent of the patentee." 35 U.S. Code § 292.

In addition, Davison, not only did *not* accept Mr. Scorza's "reasonable requests" for assistance, but also managed to completely ignore each and every plea from Claimant on all requests.

This is patently evident in Davison's letter expressing the requisite importance of a Provisional Patent Application[6] and absolute necessity going forward with communications to potentially interested parties together with actual knowledge of the plainly deficient document,[7] said Provisional Patent Application was nonetheless entirely defective for this purpose. Pointedly, after viewing Mr. Scorza's deficient initial filing of his first provisional patent application submission on March, 16 2017,[8] consisting of only a title and cover sheet, Davison, through Larry Rifkin, ignored Mr. Scorza's original submission deficiencies and request for assistance evidenced on June 30, 2017, with the document and "For: Larry Rifkin What is this???" emblazoned across the top of Mr. Scorza's Notice of Abandonment.[9]

This original appeal for assistance was, *at an absolute bare minimum*, exemplified by Mr. Scorza's simply trying to understand what the USPTO request signified. At this juncture, in light

---

[4] Exhibit 1 Davison_000034
[5] Exhibit 1 Davison_000034, Davison_000094, Davison_000109, Davison_000128, Davison_000144
[6] Exhibit 1 Davison_000040 (Per Davison's own admission, the importance of which is duly acknowledged, "communication with the targeted company will not begin until a copy of the Provisional Application for Patent is on file with the United States patent and Trademark office for your protection[.]")
[7] *See* Exhibit 1 Davison_000050 and Davison_000060 ("Provisional Application Opened" via Davisonlink System via rifkin.larry@davison.com)
[8] *See* Exhibit 2 - '218 application (Filing) consisting of only the invention cover sheet with title, "weighing scale that is portable even in suitcase" dated February 22, 2017.
[9] Exhibit 1 Davison_000029

of the fact that Mr. Scorza had already paid a significant amount of money, Davison could have simply acknowledged receipt and suggested Mr. Scorza contact *any* competent attorney – which they did not. This communication, ignored by Davison, was followed by two ever increasingly desperate voicemails, on July 13, 2017, and August 11, 2017, recounted below:

July 13, 2017 dictated voicemail:

"Jul 13, 2017 Nancy Heintz sent to Jason Zerbach's voicemail & emailed: sent to your voicemail. Upset recd [sic] *something from gov't regarding patent. Has been calling & emailing Larry no return responses* told him he has been sick. *He wants someone to call him*"[10]

August 11, 2017 dictated voicemail:
Larry, I have not heard from you are [sic] Davison in way too long. I am going to have to insist that I be better informed of the progress of the Trava-Weigh. *Last I heard was from patent in a letter saying my patent had been rejected. If this was you would you not be alarmed???? If I do not hear from someone soon am going to have to seek remedy. The patent rejection alone is cause for great alarm.*[11]

Claimant, not receiving even an acknowledgement of his previous requests, attempted to refile a second provisional application on February 8, 2018. The USPTO responded with a 'Notice to File Missing Parts' dated February 21, 2018. Mr. Scorza documented the USPTO's payment receipt[12] and then transmitted same to Larry Rifkin with the title: "FOR LARRY RIF.*" on March 12, 2018.[13]

Mr. Scorza then, again, on April 17, 2018, November 12, 2018 and December 2, 2018, sent consecutive emails recounting his concerns, frustrations and misgivings as described in the following emails:

April 17, 2018
From: Mario Scorza [mailto:marumberto@aol.com]
Sent: Tuesday, April 17, 2018 5:44 PM
To: Larry Rifkin

---

[10] Exhibit 1 Davison_000044 (*emphasis added*)

[11] Exhibit 1 Davison_000077 (*emphasis added*)
[12] Exhibit 1 Davison_000003

[13] Exhibit 1 Davison_000003-000008

Subject: Re: Project Files

LARRY,
I HAVE BEEN SEARCHING FOR INFORMATION ABOUT DAVISON BUSINESS PRACTICES AND AM NOT FEELING WELL FROM WHAT I AM SEEING. IT HAS BEEN A VERY LONG TIME SINCE I SENT LOTS OF MONEY TO DAVISON FOR MY IDEA! ALL I HAVE GOTTEN IS THAT EVERYTHING IS ON SCHEDULE AND IS NOW GOING TO LICENSING!

LARRY, I HAVE TO TELL YOU IF I DO NOT GET SOME FACTUAL INFORMATION ABOUT WHERE TRAVA-WEIGH IS AM GOING TO HAVE TO SEEK MEANS OF OBTAINING IT! I HAVE TRUSTED YOU FROM THE START AND STILL WANT TO, BUT THIS HAS GONE ON MUCH TOO LONG! I AM SEEING CASE HISTORIES OF OTHERS WHO HAVE GONE THE SAME ROUTE I HAVE AND IT ENDED UP BADLY FOR THEM. SOME SAY DAVISON EVEN TAKES THE IDEA AND PUTS IT UNDER NEW NAME AND THEN PRODUCES IT LEAVING OUT THE ORIGINAL OWNER OF THE PRODUCT.

LARRY, I NEED TO HAVE AN END DATE ON THE TRAVA-WEIGH IMMEDIATELY AS CANNOT GO ANY LONGER ON "IT IS HERE AND IT IS THERE." IF THIS WAS YOU WRITING THIS MAYBE YOU COULD KNOW HOW WE ARE FEELING WAITING ALL THIS TIME. I USED NEARLY 16K OUT OF A FUND FOR MY GRANDSON'S EDUCATION AS HE WILL BE GOING TO COLLEGE NEXT YEAR.

OK, AM WAITING FOR YOUR RESPONSE! YOU MAY HAVE SENT SOMETHING POSITIVE IN YOUR EMAIL LAST BUT COULD NOT OPEN IT.

MARIO[14]

November 12, 2018
"Larry, I have received a document from patent office about "Missing Parts."
"Larry, the patent notice is titled: Notice To File Missing Parts of Provisional Application. If you wish to refer this letter to Frank that is ok, *just need to know something*. I am 83 and guess you can see why I have such concerns."[15]

December 3, 2018

From: Mario Scorza [mailto:marumberto@aol.com]
Sent: Sunday, December 2, 2018 11:16 AM

---

[14] Exhibit 1 Davison_000044-000045

[15] Exhibit 1 Davison_000045-000046 (*emphasis added*)

> To: Vescio, Frank
> Subject:
> Hello Frank!
> Just wanted to ask again about the statement I keep getting from the Patent Office about the Status of the Application. *When I get these over the past two years I contact Larry, and now you, to determine if there is anything significant about this*. Seems is not important so I do no [sic] pursue it any further. *I have to assume from my inquiry Davison would advise if there was a need to take some action accordingly*.
>
> Best
> Mario[16]

Despite Mr. Scorza's implorations to the company with which he contracted to "develop his ideas," none of the previous voicemails or emails were ever answered or addressed, or even mentioned, by Davison. However, Davison did immediately supply the below email, bereft of any mention of Mr. Scorza's patent entreaties, inviting and enticing Mr. Scorza to enter into yet two additional agreements, a Multiple Company Campaign Agreement and an Inventomercial agreement, in addition to the original Pre-Development and Representation agreement and New product Sample Agreement. This telling email is Frank Vescio's reply to Mr. Scorza's December 2, 2018, email below in which Davison conveniently supplies appended, prepopulated credit card information:

> From: Vescio, Frank
> Sent: Thursday, December 13, 2018 6:12 AM
> To: Mario Scorza
> Subject: What's your Plan B?
>
> Hi Mario,
> As a follow-up to our call, we discussed an Inventomercial (IM). It's great to have a commercial of the product to accompany a presentation to targeted companies for them to review and also forward to their customers (retailers) for feedback because the IM commercial describes both the problem and solution (like those As Seen on TV commercials).
>
> I've attached a link to an example of an IM commercial. The Inventomercial of the Meatballer The commercial is an example of the format a typical Inventomercial follows.

---

[16] Exhibit 1 Davison_000046 (*emphasis added*)

We also discussed a Multiple Company Campaign [MCC] service by where we contact up to 45 companies (over a 1 year period) with a confidential teaser about your idea and communicate (and disclose) information to only those companies that sign a Confidential Registration Form to hear more about an idea and see presentation material. We would provide you with any interested party responses (and offers) for your review. Our current fee to present an idea individually to 1 company at a time is $395.00. So, up to 45 companies could represent a total fee of over $17,000.00 doing it 1 company at a time.

If you decide to move forward with both the Inventomerical (IM) and the MCCA services, I can reduce the price of the IM by $500.00 to $1,995.00 (normally that fee is $2,495.00) and can reduce the price of the MCC service by $3,000.00 to $3,995.00 (normally that fee is $6,995.00). I'll forward you a proposal that outlines each service in detail.

Those that need to buy themselves some time with funding; put down a small $100.00 refundable retainer to lock in the savings and keep the file active in our system. You can do this on the Trava-Weigh - portable scale idea.

To take advantage of this offer, you can mail a check, wire the funds or complete the credit card information below when you reply to this email.
CARD TYPE (VISA, MasterCard or AMEX):
CARD NUMBER:
EXPIRATION DATE:
3 DIGIT CODE (on back of card):
CARD HOLDER NAME (as it appears on the card):
AMOUNT:

It's your decision. I'm ok either way, just let me know by December 18th, 2018 as the project will not qualify for this savings offer after that date.
I'll call you on December 14th at 11:30PM (your time) to discuss your Plan B.

It is therefore evident, among other causes of actions (detailed below), that Respondent Davison failed in their duty to uphold key sections of the several contracts that they themselves developed, did breach said contracts and caused direct harm to Mr. Scorza. Breach of Contract is defined where there is established (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 635 Pa. 427, 445, 137 A.3d 1247, 1258 (2016). This harm includes, but is not limited to, the complete preclusion from Mr. Scorza's pathway toward receiving any

patent rights, where each application failed to achieve even "Patent Pending" status due to their many deficiencies[17] as is outlined and detailed in our Patent Expert Report. This injury to Mr. Scorza was further compounded where, despite his best efforts and interrogatories, no help was forthcoming and fees were continuously cajoled and enticed from Mr. Scorza's fixed income and savings.

## II.
## CAUSES OF ACTION

### A.    Common Law Fraud

Common Law Fraud requires (1) a misrepresentation; (2) a fraudulent utterance of it; (3) the maker's intent that the recipient be induced thereby to act; (4) the recipient's justifiable reliance on the misrepresentation; and (5) damage to the recipient proximately caused. *Lokay v. Lehigh Valley Co-op. Farmers, Inc*., 342 Pa.Super. 89, 96, 492 A.2d 405, 408 (1985).

Davison holds itself out as a "Product Development Company," but this is, on its face, a fraudulent and false misrepresentation of the "business" that Davison conducts. Davison, in fact, is primarily in the business of preying upon a discrete class of "garage" and "one-time" unsophisticated inventor/consumers, fraudulently depicting their enterprise as a means to develop inventor ideas into inventions and thereby allow those consumers with novel ideas and inventions to see their ideas and inventions come to fruition. Yet, nothing could be further from the truth. By Davison's own admission, a laughable 0.001% of Davison's income is actually derived from royalties paid on licenses.[18] Conversely, 99.999% of Davison's income *is* derived from fleecing consumers via fruitless consumer enticements and wholly one-sided "consumer" contracts.

This evidentiary information, required to be supplied by Davison through a settlement with the Federal Trade Commission, was ultimately mandated in conjunction with "Project

---

[17] *See* Exhibit 3 Patent App 62/601,218 and Patent App 62/710,055

[18] https://www.davison.com/legal/ads/ (Affirmative Disclosure Statement)

Mousetrap"—conducted by the FTC in conjunction with the Pennsylvania Attorney General's Office under the FTC's Telemarketing Sales Rule. The case specifically targeted Davison for exploiting those inventors hoping to "build a better mousetrap."[19] Ultimately, while the FTC ordered Davison to pay twenty-six million dollars for their unscrupulous practices,[20] their key demographic affords a steady churn of consumers enticeable to supply thousands of dollars with no obligation to show any results. Without question Davison remains undeterred in its highly profitable modus operandi wherein hundreds of thousands of consumers' fees are collected up front, no items are produced, negligible royalties contracts ever materialize, and consumers leave with the same items they entered into their relationship with–an idea, hope, and a dream.  The only difference is the idea, hope, and dream–after an unfortunate relationship with Davison–is now bereft of <u>any</u> worth.

      While Davison would have you believe that they are in the business of developing products and assisting inventors, that is not the business model. Davison, in fact and ironically, the model of assisting inventors is disincentivized where the consumer itself is the product. Due to Davison's fraudulent misrepresentations, numerous funds paid by Mr. Scorza were systematically collected and basic assistance was not provided. Therefore, Davison was enriched.

      Davison indeed made fraudulent misrepresentations with actual knowledge of these misrepresentations with the intent of inducing Mr. Scorza to pay Davison over several years. Davison acted on the lucrative incentive to omit, obfuscate, and misinform Mr. Scorza, did consciously engage in profitable nonaction, knew that Mr. Scorza would rely upon these actions (and nonactions) which Mr. Scorza trusted to his detriment.

---

[19] https://www.ftc.gov/news-events/news/press-releases/1997/07/ftcstate-project-mousetrap-snares-invention-promotion-industry

[20] https://www.ftc.gov/news-events/news/press-releases/2006/04/court-halts-bogus-invention-promotion-claims

**B.** **Pennsylvania Unfair Trade Practices and Consumer Protection**

Fraud and deceptive conduct are alternative ways to establish a violation of the catch-all provision of Pennsylvania's Unfair Trade Practices and Consumer Protection Law. 73 Pa. Stat. Ann. § 201-2(4)(xxi). The test for deceptive conduct under the catchall provision of Pennsylvania's Unfair Trade Practices and Consumer Protection Law is whether the conduct has the tendency or capacity to deceive; this test is a lesser, more relaxed standard than that for fraudulent or negligent misrepresentation. 73 Pa. Stat. Ann. § 201-2(4)(xxi). The catchall provision of Pennsylvania's Unfair Trade Practices and Consumer Protection Law imposes liability on commercial vendors who engage in conduct that has the potential to deceive and which creates a likelihood of confusion or misunderstanding; neither carelessness nor intent is required when a cause of action is premised upon deceptive conduct. 73 Pa. Stat. Ann. § 201-2(4)(xxi). Under the catchall provision of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, deceptive conduct during a consumer transaction that creates a likelihood of confusion or misunderstanding and upon which the consumer relies to his or her financial detriment does not depend upon the actor's state of mind. 73 Pa. Stat. Ann. § 201-2(4)(xxi). In *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637 (Pa. 2021) the Pennsylvania Supreme Court, upheld the ruling of the Superior Court and decided that the catchall provision of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) imposes strict liability on businesses, so the consumer need not establish that the business was negligent or acted intentionally.

Here due to Davison's fraud, Pennsylvania's Unfair Trade Practices and Consumer Protection Law applies because it is a lesser standard of care as per the test required, a more relaxed standard than that for fraudulent or negligent misrepresentation. As a result, the Pennsylvania Supreme Court would impose strict liability and find that the business was negligent and acted intentionally. Davison provided a service to Scorza, the conduct that Davison, a commercial vendor, engages in is deceiving and creates a likelihood of confusion or

10

misunderstanding. Moreover, Pennsylvania Law does not consider the Davison's intention or state of mind when confusing the a consumer, like Scorza, who relied on services to help take an idea to market.

C.      **Fraud By Concealment and Non-Disclosure/Omission**

Davison, by means of pushing meaningful information down to the furthest depth of their website, actively seeks to bury the above information from potential and current consumers wherein even a detailed analysis and review of Davison's website fails to inform even the most discriminating consumer of Davison's true business model and means of generating income. Moreover, had Davison not been ensnared by the FTC sting operation, Claimant would have little to no means to discern Davison's despicable reputation, ongoing nefarious activity or past (and current) discretions.

Under Pennsylvania law, a plaintiff may assert a fraudulent concealment claim when the defendant concealed or intentionally prevented the plaintiff from discovering material information. *LEM 2Q, LLC v. Guar. Nat. Title Co.*, 144 A.3d 174, 181 n. 10 (Pa. Super. 2016); *Woodward v. Dietrich*¸548 A.2d at 311-16. Davison, in its attempts to conceal information and omit material facts did fail to disclose or clarify facts that Mr. Scorza required to make an informed decision, did not qualify any of their incomplete representations, did not observe the contractual duty owed to Mr. Scorza, and failed to disclose facts basic to their transactions on at least four occasions—January 12, 2017, March 29, 2017, December 14, 2018, and December 19, 2018.

D.      **Negligent Misrepresentation and the Texas Invention Development Services Act**

Davison, through its addendum to its Pre-Development and Representation Agreement dated January 12, 2017, did provide the Texas 'Invention Development Services Act' required disclosure and its mandatory inclusions.[21] *See* Texas Invention Development Services Act Business and Commerce Code Title 4; Business Opportunities and Agreements Chapter 52.

---

[21] *See* Exhibit 1 Davison_000330 and Davison_000342

11

Invention Development Services Subchapter A. In this disclosure Davison did positive recite that, since 1989, a total of "**ONE HUNDRED FIFTY THOUSAND NINE HUNDRED FOURTEEN (150,914). THE TOTAL NUMBER OF CUSTOMERS KNOWN BY THIS INVENTION DEVELOPER TO HAVE RECEIVED, BY VIRTUE OF THIS INVENTION DEVELOPER'S PERFORMANCE AN AMOUNT OF MONEY IN EXCESS OF THE AMOUNT PAID BY THE CUSTOMER TO THIS INVENTION DEVELOPER IS THIRTY-FIVE."**[22] Yet, by Davison's own admission, as per the Affirmative Disclosure Statement dated April 11, 2022, those numbers supplied by the above do not conform to those figures available from Davison's own AFFIRMATIVE DISCLOSURE STATEMENT. In this document Davison states the following:

> "The total number of consumers who submitted new product ideas to Davison during the past five years is five hundred ninety one thousand eight hundred fifty eight (591,858) Davison does not provide evaluation of commercial potential; thus, it has provided no positive or negative evaluation of this or any other product idea in the last five years. The total number of consumers who were offered a Pre-Development agreement (or similar contract for research services) is two hundred twenty four thousand seven hundred sixty two (224,762). The total number of consumers who were offered a Contingency Agreement (or other contract for licensing representation) is two hundred twenty four thousand seven hundred sixty two (224,762). The total number of consumers who purchased a Pre-Development Agreement or similar contract for research services is forty one thousand seven hundred sixty four (41,764). The total number of consumers who signed a Contingency Agreement or other licensing representation agreement is forty one thousand seven hundred sixty four (41,764). The total number of consumers who were offered a New Product Sample Agreement (or any other contract for design services for a virtual or a product sample) is thirty six thousand four hundred twenty six (36,426). The number of consumers who signed a New Product Sample Agreement or similar agreement is eighteen thousand one hundred ninteen (sic) (18,119). The number of consumers who obtained a written license with a company that is not affiliated with Davison is fifteen (15). The total number of consumers in the last five years who made more money in royalties or sales proceeds than they paid to Davison, in total, under any and all agreements with Davison, is six (6). This number includes people who first made a profit more than 5 years ago, if they continued to make additional profit during the past five years. The percentage of Davison's

---

[22] *See* Exhibit 1 Davison_000330

12

income that came from royalties paid on licenses of consumers' products
is .001%.

Therefore, as of January 12, 2017, Davison would have Claimant believe that Davison, even taking the lesser "Pre-Development agreement (or similar contract for research services) is two hundred twenty-four thousand seven hundred sixty-two (224,762)" figure, over the previous five years, identical to those offered Contingency Agreements, was greater than the 150,914 figure in the previous <u>thirty-three years</u> (1989-2017) of operation of 150,914. This is absurd on its face. This greatly discounted figure, used to calculate those individuals receiving monies in excess of their input, is therefore a negligent misrepresentation, at its best, and intentionally misleading, at its worst in determining the success of consumers. If the opposite is true, and a larger number of consumers were contracted in the thirty-three years before Claimant entered into his initial contract in 2017, the percentage of successful consumers would be diluted and diminished greatly. In either case, if the representation *was* negligent, Davison ought to have known its falsity, Claimant relied upon this falsity and direct injury resulted. Alternatively, if this misinformation *is* intentional, this is a direct violation of the Texas Invention Development Services Act which results in a Voidable Contract, a Private Cause of Action, Deceptive Trade Practices, and a Presumption of Injury. Tex. Bus. & Com. Code §§ 52.151-3, and 52.155.

### E.       Fraud in the Inducement

Under Pennsylvania law, plaintiffs are required to prove the following elements in a claim for fraud in the inducement: (1) a representation; (2) material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to its truth; (4) with intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury. *Broederdorf v. Bachelor*, 129 F.Supp.3d 182, 198 (E.D. Pa. 2015). Successfully pled, such contracts are voidable. *Giannone v. Ayne Institute*, 290 F.Supp.2d 553, 564 (E.D. Pa. 2003).

13

In terms of the material misrepresentations above, Davison did present material misrepresentations that were made falsely with knowledge of its falsity or recklessness as to its truth that intended to mislead Mr. Scorza, who justifiably relied upon such misrepresentations to his great disadvantage and harm.

### F.    Common Law Negligence

The elements of a cause of action in negligence are as follows: (1) a duty recognized by law, requiring the actor to conform to a certain standard with respect to the injured party; (2) a failure of the actor to conform to that standard; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage to the interests of another.  *Felli v. Com., Dep't of Transp.*, 666 A.2d 775, 777 (Pa. Commw. Ct. 1995).

Ultimately, Davison owed a basic duty to Mr. Scorza—a duty they failed several times on many occasions to both observe and fulfill. Due to Davison's complete disregard for Mr. Scorza's most basic inquiries and petitions for help, specifically included in Davison's several agreements, in the face of Davison's contractual duties to observe same, Davison chose to ignore and not assist Mr. Scorza, while continuing to entice and cajole his continued financial input. This has resulted in a complete squandering of Mr. Scorza's ideas in addition to the absolute inability for Mr. Scorza to <u>ever</u> regain those rights which Davison has so carelessly and brazenly allowed to inexplicably and inexcusably dissipate, all in the name of profit.

### III.
### EXCULPATORY CLAUSE

Respondent attempts to rely upon a boiler plate contractual provision to escape all potential liability whatsoever.  Respondent argues that the clause in question is a "limitation of damages" clause, citing no authority and making no legal arguments.  However, clauses that purport to contractually limit damages are exculpatory clauses by definition.  The legal test applies to any "exculpatory language." *Tayar v. Camelback Ski Corp., Inc.*, 616 Pa. 385, 47 A.3d 1190, 1196 (2012); *Topp Copy Products, Inc. v. Singletary*, 533 Pa. 468, 471, 626 A.2d 98,

99 (Pa. 1993).  The clause simply states that "In no event will Davison be liable to Client for any consequential, exemplary, incidental or punitive damages, including lost opportunities or lost profits."  The clause purports to exculpate Davison for any consequential or incidental damages, including lost profits.  It also purports to exculpate against exemplary and punitive damages. This begs the question, what other damages would there be flowing out of a contract of this nature?  The breach of a contract to develop an invention would only involve consequential or incidental damages, and possibly lost profits.  There are no other kinds of damages, other than those which have been purportedly disclaimed.  The clause is clearly an exculpatory clause and is disfavored at law.

"Those clauses are disfavored and must meet certain conditions to be enforceable. First, the clause must not contravene public policy. Second, the contract must relate solely to the private affairs of the contracting parties and not include a matter of public interest. Third, each party must be a free bargaining agent. In addition, an exculpatory or indemnity clause will still not be enforced unless it is clear that the beneficiary of the clause is being relieved of liability only for his/her own acts of negligence. The clause must be construed strictly and the contract must state the intention of the parties with the greatest particularity. Furthermore, any ambiguity must be construed against the party seeking immunity, and that party also has the burden of proving each of the prerequisites to enforcement." *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195 (3rd Cir. 1995), *citing Topp Copy*, 626 A.2d at 99.   Furthermore, the burden of establishing immunity is upon the party invoking protection under such a clause.  *Tayar*, 47 A.3d at 1196.

As Respondent readily concedes, and indeed affirmatively argues, the clause purports to exculpate Respondent from any liability whatsoever.  However, clauses that exculpate liability for gross negligence and higher levels of fault are void and against Pennsylvania public policy. *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 20-21 (Pa. 2019), *citing Tayar*, 47 A.3d at 1203.  By

Respondent's own arguments, the clause is void as against public policy.  The clause is unenforceable.

The clause also involves a matter of public interest.  As discussed, *supra*, the Texas Invention Development Services Act requires specific disclosures as to the success rate of the development services.  The disclosures were false and conflicted with those made on Respondents' website.  As discussed, Davison's success in developing inventions was vanishingly small.  Respondents' failure to make statutory disclosures involved a matter of public interest.  Accordingly, the exculpatory clause is unenforceable.

The clause fails to address and does not explicitly disclaim any liability flowing out of its own negligence, gross negligence, recklessness, or intentional acts.  To be enforceable, "the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties," that is to say, the clause must specifically establish which conduct is being disclaimed from liability.  *Tayar*, 47 A.3d at 1196; *Topp Copy*, 626 A.2d at 99.  The clause simply states the "The liability of the parties for any and all claims…" is limited.  The clause fails to specify which levels of fault and what kinds of behavior are being disclaimed.  The text of the language lacks any semblance of "greatest particularity," puts nothing "beyond doubt by express stipulation," and contains absolutely nothing but "words of general import."  As such, the clause fails to meet the test for enforceability under Pennsylvania law.  The clause is unenforceable.

Finally, Respondent carries the burden of proof to establish that the exculpatory language is enforceable under Pennsylvania law, a burden that respondent does not and cannot meet.  The clause is simply unenforceable.

16

Respectfully Submitted,

*/s/ Stacey L. Barnes*
Stacey L. Barnes
sbarnes@lewisbarnes.com
Bradley A. Nevills
bnevills@kmd.law
William Yarbrough
wyarbrough@kmd.law
KEARNEY, MCWILLIAMS & DAVIS, PLLC
55 Waugh, Suite 150
Houston, Texas 77007
Phone: (713) 936-9620
Fax: (713) 936-9321
**Attorneys for Claimant**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 23, 2022, a true and correct copy of the foregoing instrument was served upon the following counsel of record:

Justin T. Barron                                    ***Via E-mail and AAA Filing System***
BARRON LAW OFFICE LLC
P. O. Box 493
Valencia, PA 16059
jbarron@justinbarronlaw.com
**Attorney for Respondent**

*/s/ Stacey L. Barnes*
Stacey L. Barnes

17

FOR LARRY RICHY

3-12

EXHIBIT 1

Defendant's Exhibit 6



| | | | |
|---|---|---|---|
| 02/12/2018 | Check #3254: Check | | |
| 02/12/2018 | USPTO PAYMENT 3250 | $65.00 | $4,880.09 |
| 02/12/2018 | Direct Purchase 02/09 16:54 0214 WAL #2411 PHIL | $57.63 | $4,945.09 |
| 02/12/2018 | | $42.22 | $5,002.72 |
| 02/12/2018 | | $19.97 | $5,044.94 |

Have a question? Check our FAQs    |    We value your opinion. Make a suggestion



FDIC (https://www.fdic.gov/)   (http://portal.hud.gov/hudportal/HUD)

Sorry —
Frank — USPTO shows
they accepted payment.
Maureé

App. 449

EXHIBIT 1

Defendant's Exhibit 6



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/710,055 | 02/08/2018 | Mario U. Scorza | |

**CONFIRMATION NO. 4515**

Mario Scorza
341 Old Mill Creek Dr.
Waco, TX 76712-6448

**FORMALITIES LETTER**

*OC000000097544479*

Date Mailed: 02/21/2018

## NOTICE TO FILE MISSING PARTS OF PROVISIONAL APPLICATION

### FILED UNDER 37 CFR 1.53(c)

#### *Filing Date Granted*

An application number and filing date have been accorded to this provisional application. The items indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items and pay any fees required below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

• The statutory basic filing fee is insufficient.
• Surcharge as set forth in 37 CFR 1.16(g) must be submitted.
  The surcharge is due for late submission of filing fee or cover sheet.

### SUMMARY OF FEES DUE:

The fee(s) required within **TWO MONTHS** from the date of this Notice to avoid abandonment is/are itemized below. Small entity discount is in effect. If applicant is qualified for micro entity status, an acceptable Certification of Micro Entity Status must be submitted to establish micro entity status. (See 37 CFR 1.29 and forms PTO/SB/15A and 15B.)

• $ **140** basic filing fee.
• $ **30** surcharge.
• $( **65**) previous unapplied payment amount.
• $ **105** TOTAL FEE BALANCE DUE.

### Items Required To Avoid Processing Delays:

Applicant is notified that the above-identified application contains the deficiencies noted below. No period for reply is set forth in this notice for correction of these deficiencies. However, if a deficiency relates to the inventor's oath or declaration, the applicant must file an oath or declaration in compliance with 37 CFR 1.63, or a substitute statement in compliance with 37 CFR 1.64, executed by or with respect to each actual inventor no later than the expiration of the time period set in the "Notice of Allowability" to avoid abandonment. See 37 CFR 1.53(f).

### This application, which was filed with an indication of micro entity status, fails to meet the requirements for establishing micro entity status because:

• The certification of micro entity status is unsigned. A certification of micro entity status must be signed by an authorized party under 37 CFR 1.33(b). (Authorized parties include a registered attorney or agent, the sole

App. 450

inventor identified as the applicant, or all the joint inventors identified as the applicant except that one joint inventor applicant may sign if appointed to prosecute the application by all the other joint inventors.)

If micro entity status is established in reply to this notice by filing an acceptable Certification of Micro Entity Status, the fees itemized in the SUMMARY OF FEES DUE section of this Notice will be reduced to reflect the 75% micro entity discount, and any previous payment amount may be applied to the discounted fees.

If applicant is not entitled to micro entity status under 37 CFR 1.29, applicant may still qualify for a 50% reduction of fees if small entity status can be established under 37 CFR 1.27.

Replies must be received in the USPTO within the set time period or must include a proper Certificate of Mailing or Transmission under 37 CFR 1.8 with a mailing or transmission date within the set time period. For more information and a suggested format, see Form PTO/SB/92 and MPEP 512.

Replies should be mailed to:

Mail Stop Missing Parts
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

Registered users of EFS-Web may alternatively submit their reply to this notice via EFS-Web, including a copy of this Notice and selecting the document description "Applicant response to Pre-Exam Formalities Notice". https://sportal.uspto.gov/authenticate/AuthenticateUserLocalEPF.html

For more information about EFS-Web please call the USPTO Electronic Business Center at 1-866-217-9197 or visit our website at http://www.uspto.gov/ebc.

If you are not using EFS-Web to submit your reply, you must include a copy of this notice.

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000 or (571) 272-4200 or 1-888-786-0101.**

/ttran/

**EXHIBIT 1**
Defendant's Exhibit 6

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 62/710,055 | 02/08/2018 | | 65 | | | |

Mario Scorza
341 Old Mill Creek Dr.
Waco, TX 76712-6448

**CONFIRMATION NO. 4515**
**FILING RECEIPT**

OC000000097944478

Date Mailed: 02/21/2018

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**

Mario U. Scorza, Waco, TX;

**Applicant(s)**

Mario U. Scorza, Waco, TX;

**Power of Attorney:** None

**Permission to Access Application via Priority Document Exchange:** No

**Permission to Access Search Results:** No

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

**If Required, Foreign Filing License Granted:** 02/21/2018

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 62/710,055**

**Projected Publication Date:** None, application is not eligible for pre-grant publication

**Non-Publication Request:** No

**Early Publication Request:** No
**\*\* SMALL ENTITY \*\***

App. 452

**Title**

> This is a small portable hand-held scale that one can stand on to measure their weigh, can be used to take on cruise or anywhere from home

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

## LICENSE FOR FOREIGN FILING UNDER

### Title 35, United States Code, Section 184

### Title 37, Code of Federal Regulations, 5.11 & 5.15

#### GRANTED

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as

App. 453

set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

## NOT GRANTED

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

App. 454

EXHIBIT 1
Defendant's Exhibit 6
RECEIVED  MAY 1 6 2017

March 23, 2017

**DAVISON**™

## NEW PRODUCT SAMPLE AGREEMENT

This agreement ("Agreement") made and entered into this by and between Davison Design & Development, Inc. ("Davison"), a Pennsylvania Corporation, its successors and/or assigns, having its principal office at 595 Alpha Drive, Pittsburgh, Pennsylvania, and the Client ("Client") identified below:

| | |
|---|---|
| Name(s) | Mario Scorza |
| Address | 612 Highland St |
| City, State, Zip | West, TX 76691 |

Whereas, the Client has originated, developed, or owns the idea or product known as "trava-weigh" ("Idea"); and

Whereas, the Client desires to retain Davison to develop the idea into a product sample upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual and dependent covenants and agreements contained herein, the Client and Davison agree as follows:

## 1. SERVICES PROVIDED

During the term of the Agreement, Davison's professional development services will include some or all of the following:

### A. Creating Presentation Materials:

i) Development Team Orientation: The Development Team will examine the proposed features and functions of the Idea, if any, and the targeted corporation's manufacturing and marketing capabilities.

ii) Problem Identification: The Development Team will clearly identify the problem solved by the Idea, thus insuring that the Idea's objective is clearly understood.

iii) The Development Team will review the Idea, the problem to be solved, and the targeted corporation's manufacturing and marketing capabilities to begin the blending and integrating process. The Development Team may conduct additional research concerning the Idea and the targeted corporation.

iv) Preliminary Product Design: Development Team "brainstorming" sessions will be held to uncover product design solutions that blend with the targeted corporation's manufacturing capabilities. The ergonomics and aesthetics of the product are also taken into consideration. This subjective process often results in the Development Team making modifications and enhancements, which are sometimes

pd Debit

**A better way to invent**
Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348
App. 455

EXHIBIT 1
Defendant's Exhibit 6



**DAVISON**™

substantial, to the proposed solution or the preliminary design submitted by Client, particularly if Client's proposed design is not a cost effective solution to solving the problem outlined by the client, does not reflect current manufacturing techniques or may be in conflict with products patented or on the market.

v) Preliminary Package Design: Package Development Team "brainstorming" sessions will be held to uncover package design solutions that resemble the targeted corporation's product line. The package's communication will also be considered to achieve quick product identification.

vi) Integrated Product Rendering: The product design and package design will be brought-to-life to look real in a virtual three dimensional environment. A full color spectrum print that resembles what the product sample will look like will be sent to the Client for approval, which shall not be unreasonably withheld by Client, before creating the physical product sample. Unless requested by a potential licensee, no changes will be made to the product and package designs after Client has approved them.

## B. Creating The Product Sample

i) Product Sample Orientation: The analysis of the project will be applied to create a cost efficient and effective production process. Our exclusive development process will ensure that the product attempts to reflect, as closely as reasonably possible, the targeted corporation's manufacturing methods.

ii) Production Drawings and/or CAD (Computer Aided Drawings) Illustrations: The product's manufacturing specifications will be entered into a computer program, if appropriate for this project. This will be used to generate production drawings for component quoting and/or for the targeted corporation's review. The drawings will be printed for review, analysis and use.

iii) Creation of STL,DXF or G-Code Files (Computer Software Developed): This is a sophisticated computer process that transfers production drawings and/or CAD drawings into a computer code to transfer the data to the code used by the shop's machinery to produce all or parts of the final product sample.

iv) Circuit Design Assembly: If applicable to your particular project, Davison will utilize a proprietary software circuit board design application for schematic capture, circuit simulation, PCB layout and autorouting. High quality software design tools can create more efficient use of limited board space and reduce overall production costs in the final design.

v) Machine Product Sample: This stage of development involves the process of building the product sample. It includes the machine set up, preparation of the raw materials and then machining or fabricating the necessary parts. Pre-manufactured components, known as Original Equipment Manufacturer ("OEM") components, may be purchased and used for a portion or all of the parts utilized in the sample. Davison is not required to produce production drawings, CAD drawings or G-code files for OEM parts.

vi) Parts Preparation/Finishing: The product sample will have a professional appearance with the

A better way to invent
App. 456
Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

EXHIBIT 1
Defendant's Exhibit 6



appropriate finishes applied. The finishing shop will address this issue and apply the finishes to the product sample.

vii) Product Sample Assembly: The finished or OEM parts will be assembled to create a complete product sample. The sample is for demonstration purposes and may differ in appearance, size, materials, performance and other characteristics from the type of final licensed product built by a manufacturer in full production.

viii) Photography: For documentation purposes, photographs of the product sample will be taken and securely filed.

## C. Creating The Packaging Sample

As appropriate, the following tasks will be performed for your project. Please note that some tasks may not be necessary.

i) Packaging Team Orientation: This is a team meeting to determine the appropriate packaging style to merchandise the product. There will be an analysis of all known styles and one will be designed that best fits the product.

ii) Package Design & Engineering: The product size, weight and level of fragility will be analyzed. The proper gauge and internal structural components will be designed to best protect the product from damage. The package will also be designed in order to aid a potential manufacturer to palletize the product properly as well as to aid in merchandising the product.

iii) Packaging Production Drawings and\or CAD (Computer Aided Drawings) Illustrations: The package's manufacturing specifications will be entered into a packaging computer program, as appropriate. This will be used to generate packaging production drawings.

iv) Creation of a G-Code files (Computer Software): This is a sophisticated computer process that transfers production drawings into computer code that is programmed into machinery to produce the final packaging sample.

v) Machine Packaging Sample: This stage of development involves the process of cutting, perforating and creasing the packaging material. It includes the machine set up, preparation of the packaging material and then machining and fabricating the necessary parts.

vi) Packaging Preparation Finishing: The machine packaging sample will have a professional appearance with the appropriate images applied. The packaging shop will address this issue and apply the images to the packaging.

vii) Packaging Sample Assembly: The finished package will be assembled to create a complete packaging

A better way to invent

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

App. 457

**EXHIBIT 1**
Defendant's Exhibit 6



**DAVISON**™

sample. The packaging sample is for demonstration purposes and may differ from the type of final packaging built by a corporation in full production.

viii) Photography: For documentation purposes, photographs of the packaging sample will be taken and securely filed.

## D. Product Sample Finalization

i) Product Sample Finalization: The product and package will be placed together to create the final product sample.

ii) Product Sample Integrity Review: The product sample and package are reviewed by a quality assurance team to verify that the final product sample accurately represents the design approved by Client. The product design approved by Client and depicted in the Integrated Product Rendering may differ from the product sample constructed. The sample may have different characteristics intended for ease of demonstration, shipment, display, alteration, disassembly or component viewing by a potential licensee.

iii) Prepare Shipping Container: A shipping container will be obtained or built to protect the Product Sample during shipment.

## E. Production Quotes

Production Quotes: If and/or when the targeted corporation decides to acquire the Idea, Davison will work with the corporation to establish production quotes, if requested by the corporation.

## F. Information for Provisional Patent Application

Davison will develop and provide descriptive information that the Client may find useful in filing a Provisional Patent Application in the United States. This information is provided after the Client approves the virtual reality print of the product sample design and the product sample is constructed. The Client is solely responsible for the sufficiency, completion and submission of any final application, United States Patent & Trademark Office form PTO/SB/16, and any other patent or trademark applications that may be necessary.

## G. Executive Summary

Executive Summary: The Client will be provided with a packet of information that will include a summary of the problem solved by the idea, the product sample's key functional features and the computerized drawings of the components manufactured by Davison. A full color photograph of the sample and its

**A better way to invent**
App. 458
Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

**EXHIBIT 1**
Defendant's Exhibit 6



packaging is included in the Executive Summary.

### H. Use of Client-Provided Material

Davison may use all or part of any materials submitted to Davison by Client, including a prototype or parts contained in a prototype, as the basis for the design of a product sample or as actual components to the final product sample. Client consents to the disassembly, copying, use, modification, destruction or alteration of any materials submitted by Client to Davison and understands that Davison has no obligation to return such materials or to maintain them in the condition they were in when originally sent to Davison by Client.

### 2. TERM OF THE AGREEMENT

The term of this Agreement shall commence on the date that Davison receives the retainer provided in Section 3A and a complete properly signed Agreement and all other documents requested by Davison. The Agreement will then remain in force until the completion of the product sample.

### 3. RETAINER AND ROYALTY

A. In consideration for all of the services provided by Davison to the Client during the term of this Agreement, the Client agrees to compensate Davison in United States dollars by selecting one of the options below and placing his or her initials next to the chosen option. In the event that Client does not initial a choice, Client agrees to be deemed to have chosen Option 4:

         Option 1  $165.00 U.S. dollars per hour plus expenses.
         Option 2  $14,757.25 U.S. dollars
         Option 3  $12,757.25 U.S. dollars and a 5% royalty assigned to Davison.
         Option 4  $10,757.25 U.S. dollars and a 10% royalty assigned to Davison.

B. Davison hereby pledges that the selected option in Section 3A will be kept in the strictest confidence from all parties, including the development staff of Davison.

C. The retainer amount selected in Section 3A shall be considered a full retainer for all services described in this Agreement. In further consideration for services rendered by Davison under this Agreement, the Client agrees and understands that Davison shall be entitled to receive the royalty percentage the Client selected in Section 3D on all revenues as defined in Section 3D received by the Client or Davison, whichever is the case, from any individual, corporation or other entity. The royalties described in options 3 and 4 are in addition to royalties granted under any other agreement between the parties.

A better way to invent

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

App. 459

EXHIBIT 1
Defendant's Exhibit 6



**DAVISON**™

D. "Revenues" shall mean the total amount of license fees, royalties, sale proceeds or other forms of consideration received as a result of the sale, license or other commercialization of the Idea. The percentage payable to Davison under this Agreement shall be paid as and when Revenues are paid by licensee or buyer. The royalty assignment to Davison is applicable only to Revenues due to Client in excess of any fees paid by Client to Davison for services under this and any other contract.

E. The royalty obligation selected by the Client and described in Section 3A represents a continuing obligation of the Client to Davison and will survive the termination of this Agreement.

## 4. REPRESENTATION, WARRANTIES & COVENANTS

The Client and Davison, as applicable, represent and warrant to and agree as follows:

A. The Client shall respond in a prompt and complete manner to all reasonable requests for information and assistance made by Davison during the development of the Idea. Client agrees that Davison may set, and inform Client of, deadlines for Client to submit comments on designs prepared by Davison and that in the absence of timely receipt by Davison of Client's comments all designs are deemed accepted and approved by Client.

B. The Client warrants to Davison that the Client, to his/her best knowledge and belief, is the sole owner of the Idea and that no other entity or individual has any rights or interest in the Idea.

C. The Client warrants to Davison that all information provided to Davison is true, complete and accurate to the best of the Client's knowledge.

D. The Client shall not hereafter sell, license, pledge, mortgage, place in trust, transfer, assign, or otherwise convey the Idea or any rights in the Idea, to any entity or individual, without first informing them of the terms of this Agreement and giving Davison prior written notice.

E. The Client warrants to Davison that he/she is of legal age and has the legal capacity to enter into this Agreement.

F. The Client reserves the right to review all materials prepared by Davison in regard to the development of the Idea. The items to be delivered for Client's possession pursuant to this Agreement are the Integrated Product Rendering and the Executive Summary. Client intends that Davison will retain possession of the product and packaging sample, unless Client requests otherwise in writing.

G. It is hereby acknowledged by the Client that Davison's royalty/commission percentage is not, in any form, an ownership interest in the Idea.

H. Davison agrees to accept all reasonable requests of the Client that are consistent with the goal of solving the problem in a simple and cost effective manner. Davison reserves the right to redesign the

A better way to invent

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

App. 460

EXHIBIT 1
Defendant's Exhibit 6



product to take advantage of a cost effective solution to the problem for which the product was intended and to reflect current manufacturing techniques. Client agrees to accept all reasonable design modifications, parts selections and enhancements recommended by Davison.

I. Davison promises to keep all aspects concerning the Client, the Idea and/or the terms of this business relationship in general, and this Agreement in particular, in the highest level of confidentiality. All materials in said connection whether written or oral are subject to the Client's approval prior to the release of any information.

## J. Acknowledgments.

i) Davison has made no representations concerning the likelihood that the Client will receive any financial gain from the development of the Idea.

ii) Client acknowledges that Davison has not and will not evaluate the commercial potential of the Idea and that Davison has not disclosed it to anyone. Thus, there is no way of knowing at this time if the targeted corporation will license, buy or pay royalties for the Idea once it has been developed. Client acknowledges that Davison has made no representations concerning the likelihood of licensing, marketing, royalty payments or profitability. Davison's offer of services for upfront consideration and for a portion of possible royalties is not a representation by Davison that the Idea has merit or that development will result in a license or payments to Client.

iii) Only official government agencies can award a patent, trademark and/or copyright. Davison is not a law firm. Davison is not providing, and Client is not relying upon Davison for, legal advice. Client acknowledges that he/she is responsible for patenting his/her Idea and that Davison has made no representations concerning the patentability of the Idea or its ultimate design. Solely as a courtesy and convenience to Client, Davison provides the following information from the U.S. Patent and Trademark Office concerning provisional patents:

a) The Client should treat his/her Idea as a confidential subject in order to protect his/her legal rights until such time as a Utility Patent, Design Patent, Trademark and/or Copyright is issued.

b) A Provisional Patent Application establishes an official United States patent application filing date for the Idea.

c) A Provisional Patent Application permits one year's authorization to use "patent pending" notice in connection with the Idea.

d) A Provisional Patent Application enables immediate commercial promotion of the Idea.

e) A Provisional Patent Application automatically is abandoned after 12 months if the Client takes no further action.

A better way to invent

App. 461

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1-800-540-5490 | International 412.967.0124 | Fax 412.387.1348

**EXHIBIT 1**
Defendant's Exhibit 6



**DAVISON**™

f) The fee for filing a Provisional Application for Patent is subject to change annually and varies based upon the entity status. Currently, the fee is $260.00 for a 'Large Entity'; $130.00 for a 'Small Entity'; and $65.00 for a 'Micro Entity.'

g) A Provisional Patent Application can NEVER mature into a United States patent. In order for a patent to issue the Provisional Patent Application MUST be replaced by a conventional patent application within one year.

h) A Provisional Patent Application provides a simplified filing with one full year to assess the Idea's commercial potential before committing to the higher cost of filing and prosecuting an additional non-provisional application for a patent.

K. Any Patent Application filing fees, patent filing fees, issue fees, and maintenance fees fall outside the scope of this Agreement if/when they are needed in the future.

L. The Client shall not be responsible for any additional expenses to Davison within the scope and term of this Agreement, with the possible exception being additional services to present the Idea to an additional targeted corporation which may include services to refurbish or repackage the sample, for which Davison currently charges $395.00. Davison's obligations are only those set forth in this Agreement and only directed towards the targeted corporation named on the last page of this Agreement. Davison is not responsible for damage, loss, wear or abuse of the product sample after it leaves Davison's possession.

M. Davison cannot be aware of, and is not responsible for, the existence of every similar product or idea that may already be in the global market, in development by others, or introduced by others at a later time.

N. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE FACE OF THIS AGREEMENT, INCLUDING NO WARRANTY OF MERCHANTABILITY. Because this contract is for the development of a new product sample, Davison cannot guarantee that the product sample will be safe under normal use or if abused, which could occur. The liability of the parties for any and all claims arising from or relating to this Agreement or its formation is limited to direct, actual damages only and is further limited to not exceed the amount actually paid by Client for the services. In no event will Davison be liable to Client for any consequential, exemplary, special, incidental or punitive damages, including lost opportunities or lost profits.

O. Client acknowledges that there have been no representations by Davison that the Idea as conceived and submitted by Client is novel or feasible or that the design to be created by Davison will function in the manner and with the attributes as originally conceived by Client. Davison may develop, but is not required to develop, new technology in the performance of this contract. Enhancements to existing products, or alternative methods to dispense, display or package existing products, if determined by Davison to be appropriate, will be acceptable performance of the obligations under this Agreement. This Agreement does not contain or incorporate any specifications, performance characteristics or other qualities for the design

A better way to invent

App. 462

Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

EXHIBIT 1
Defendant's Exhibit 6



**DAVISON**™

or product sample to be produced.

P. Client acknowledges that he/she is contracting for Davison's research, industrial design and development services for the business purpose of developing Client's Idea commercially and not for any personal, family or household purpose.

## 5. ENTIRE AGREEMENT; ORAL REPRESENTATIONS VOID

A. The parties intend this document to be the complete, exclusive, final and fully integrated statement of their agreement. It is binding upon each of them and their respective successors in interest. This Agreement may not be released, discharged, abandoned, changed, or modified in any manner except as provided herein or by separate instrument in writing signed by all parties. The obligations described herein are completely independent from those contained in any other agreement between these parties. If any portion of this Agreement is ruled to be unenforceable, that specific portion shall be severed from the Agreement and all other portions remain enforceable.

B. Neither party is relying upon any oral agreement or representation in entering into this Agreement and all prior oral agreements or representations are hereby considered null and void.

## 6. CHOICE OF LAW; ARBITRATION; CURE

A. This Agreement shall be governed by the law of the Commonwealth of Pennsylvania and is deemed to be executed, entered into and performed in Pittsburgh, Pennsylvania. For any dispute, the parties agree to seek to resolve the dispute through good faith negotiation. For any dispute not resolved through good faith negotiation, the parties agree that all disputes shall be resolved through arbitration before the American Arbitration Association ("AAA") in Pittsburgh, Pennsylvania using the Commercial Arbitration Rules in effect on the date that the claim is submitted to the AAA. Client agrees that any claim must be brought in an individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.

B. No claim for breach of this Agreement shall be permitted unless Client has given Davison reasonably specific written notice of the alleged breach and has permitted Davison a reasonable opportunity to cure the alleged breach, which shall be no less than thirty days after Client gives his or her assent to the proposed cure.

A better way to invent
App. 463
Davison | 595 Alpha Drive | Pittsburgh | PA 15238-2911 | www.Davison.com | Tel 1-800-544-3327 | Fax 1.800.540.5490 | International 412.967.0124 | Fax 412.387.1348

EXHIBIT 1
Defendant's Exhibit 6



DAVISON™

## 7. REVOCATION

Either the Client or Davison may revoke by written notice this Agreement within seven (7) business days from the day the Agreement was signed by both. Written notice of revocation is effective upon the date of postmarking, if mailed, or upon receipt. If either party exercises this right of cancellation, all payments made to Davison in connection with this specific Agreement will be refunded to the Client. The revocation provision of this Agreement is the only means of cancelling this Agreement and obtaining a refund. If the Agreement is cancelled, revoked or terminated after the seven business day period, there will be no refund of any amount paid towards the contract fee.

_Mario Scorza_                3-29-17                 # 3143

Mario Scorza                  Date                    Check #
612 Highland St
West, TX 76691                                        _____
                                                     Credit/Debit Card #
trava-weigh
                                                     Security Code   Expiration Date

                                                     VISA ☐          Master Card ☐
                                                     Discover ☐      American Express ☐

EB Brands Holding Inc.
Corporation to Target                                Name as it appears on card

_Larry Rifkin_               March 23, 2017
Larry Rifkin                 Date
Director of Ne
For Davison

MARIO H. SCORZA                                      48-60/1119            3143
612 W HIGHLAND ST.
WEST, TX 76691-1122                                  DATE  3-29-17

PAY TO   DAVISON  VOID                              $ 14,757.25
THE ORDER OF

Fourteen Thousand seven fifty seven DOLLARS

**American Bank**
A Locally Owned Independent National Banking Association
Post Office Box 154068 • Waco, Texas 76715-4068

MEMO  DAVA-weigh                 _Mario Scorza_

REDACTED

App. 464

Davison | 595 Alpha Driv

**EXHIBIT 1**

*Defendant's Exhibit 6*

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY DOCKET NO./TITLE |
|---|---|---|---|
| 62/601,218 | | Mario U. Scorza | |

*FOR*
*LARRY RIFKIN*
*WHAT IS THIS ???*

CONFIRMATION NO. 6744

ABANDONMENT/TERMINATION
LETTER

Mario Scorza
612 W. Highland St.
West, TX 76691

CC00000092489935

Date Mailed: 06/30/2017

## NOTICE OF TERMINATION OF PROCEEDINGS UNDER 37 CFR 1.53(e)

Proceedings on the above-identified application number are **TERMINATED**.

The application did not meet the requirements of 37 CFR 1.53(b), (c), or (d) to be entitled to a filing date, and the filing error(s) specified in the Notice mailed on 03/31/2017 were not timely corrected (37 CFR 1.53(e)).

Any application filing fees paid in excess of $130.00 (handling fee) will be refunded or credited to your deposit account.

If a complete reply to the notice was previously filed by applicant within the time period set forth in the notice, applicant may request for reconsideration of the termination within 2 months from the mailing of this notice of termination by filing a petition accompanied by a true copy of the originally filed reply and the item(s) identified in one of the following:

1. A properly itemized date-stamped postcard receipt (see MPEP § 503); or

2. If the reply was filed via "Express Mail", (now "Priority Mail Express"), a submission satisfying the requirements of 37 CFR 1.10(e) including, for example, a copy of the mailing label showing the "date-in" (or "date accepted") (see MPEP § 513).

Any request for reconsideration should be directed to OPAP.

A copy of this notice <u>MUST</u> be returned with the reply.

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000 or (571) 272-4200 or 1-888-786-0101.**

/ylueng/

page 1 of 1

App. 465

**EXHIBIT 1**
Defendant's Exhibit 6





Trava™ Weigh

• Great for home and travel!
• Ultra thin scale easily stores in custom carrying case for portability
• Easy to read LCD display shows weight in lb or kg



Design Approved By
Print Name _Mario Y Scor_
Signature _Mario scor_

EXHIBIT 1
Defendant's Exhibit 6

March 15, 2017

**DAVISON**

Mario Scorza
612 Highland St
West, TX 76691

Dear Mario,

As a novice inventor, I experienced first-hand the setbacks people face when they try to get their ideas off the ground. I realized the average person is at a huge disadvantage because in most cases they lack the experience and resources major companies have at their disposal. I came to the conclusion that there had to be a better way, if everyday people were ever going to have a chance at seeing their ideas on the market.

I studied how large companies introduce new products and compared it to the critical mistakes inventors make time and time again. I've taken everything I've learned and created the Davison® *A Better Way to Invent*™ method. My way builds a product sample of your idea, targeted for a specific company. If the company licenses the idea, and it sells in stores, you get a royalty for every product the store sells. And the best thing is that the idea always belongs to you.

Our corporate targeting team is proposing **EB Brands Holding Inc.** as the initial target company. This particular company has previously replied to have product ideas presented to it in a professional format. We have made 34 presentations and have secured 0 licensing agreement(s) with this company.

Although the company has replied to Davison to review new products, Davison has not provided to it any information concerning your idea at this stage. Companies are contacted by many unprepared people; they do not want to be bothered unless the person is serious about pursuing their idea and has taken the steps to present it properly. Companies will not waste their time with casual consumers looking for the easy road from idea to market.

As part of my method, we will also provide you with the documents that you may find helpful for filing a Provisional Application for Patent with the United States Patent and Trademark office. These documents will be forwarded to you upon completion of your product sample. Additionally, communication with the targeted company will not begin until a copy of the Provisional Application for Patent is on file with the United States Patent and Trademark office for your protection.

You've heard about it, now watch it in action! By visiting www.Davison.com/Inventionland you can watch the 1 hour special that aired on HISTORY® about *Inventionland*™, the creative design facility where **Davison®** client ideas come to life. This will help you understand why the *A Better Way to Invent*™ method has led to so many products having sold in stores. Enjoy the Show!

*Creatively yours,*

*G. Davison*
*Founder and CEO*

**A better way to invent**

App. 467

EXHIBIT 1
Defendant's Exhibit

| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Sep 29, 2017 11:46:14 AM | 00:03:14 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Oct 16, 2017 02:32:53 PM | 00:04:53 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Dec 19, 2017 04:22:22 PM | 00:00:02 | NO ANSWER | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Jan 10, 2018 02:29:36 PM | 00:03:49 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Jan 29, 2018 01:59:46 PM | 00:18:54 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Feb 5, 2018 12:15:22 PM | 00:16:26 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Feb 5, 2018 04:10:31 PM | 00:12:03 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Feb 6, 2018 09:52:48 AM | 00:06:22 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Feb 13, 2018 01:01:17 PM | 00:05:06 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Mar 12, 2018 10:25:12 AM | 00:02:01 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Mar 12, 2018 02:49:35 PM | 00:19:53 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Apr 12, 2018 02:55:45 PM | 00:03:41 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Inbound | 12547150243 | Apr 12, 2018 04:00:49 PM | 00:00:20 | NO ANSWER | PROCESSING |
| 3143863 | Rifkin, Larry | Inbound | 12547150243 | Apr 12, 2018 04:01:09 PM | 00:00:01 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Apr 18, 2018 02:19:37 PM | 00:10:34 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | May 22, 2018 09:51:08 AM | 00:08:24 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Jun 14, 2018 10:13:40 AM | 00:15:33 | ANSWERED | PROCESSING |
| 3143863 | Rifkin, Larry | Outbound | (254) 715-0243 | Jun 29, 2018 03:17:47 PM | 00:08:33 | ANSWERED | PROCESSING |

| DATE | ISA | TYPE | NOTES | CALLER |
|---|---|---|---|---|
| DEC 10, 2015 | 2807313 | ISA CONF | *Left Message - Machine* | Lindsey Bergmann |
| | | *Verified call* | | |
| DEC 11, 2015 | 2807313 | ISA CONF | *Left Message - Machine* | Lindsey Bergmann |
| | | *Verified call* | 1st attempt sounds like a fax machine, second attempt goes to vm | |
| DEC 11, 2015 | 2807313 | ISA CONF | *No Answer* | Lindsey Bergmann |
| | | *Verified call* | | |
| DEC 14, 2015 | 2807313 | ISA CONF | *Left Message - Machine* | Lindsey Bergmann |
| | | *Verified call* | | |
| DEC 15, 2015 | 2807313 | ISA CONF | *Not Interested - Scheduling Conflict* | Lindsey Bergmann |
| | | *Verified call* | left vm no response, emails unopened | |
| JAN 4, 2016 | 2807313 | 30 DAY TOUCH | *Not Interested - Scheduling Conflict* | Lindsey Bergmann |
| | | *Verified call* | fax | |
| JAN 11, 2016 | 2807313 | ISA CONF | *Disconnected* | Diane Devore |
| | | *Verified call* | | |
| JAN 12, 2016 | 2807313 | ISA CONF | *Not Interested - Scheduling Conflict* | Diane Devore |
| | | *Verified call* | fax | |
| FEB 2, 2016 | 2807313 | 60 DAY TOUCH | *Not Interested - Scheduling Conflict* | Diane Devore |
| | | *Verified call* | | |
| JUN 14, 2018 | 2807313 | ISA CONF | *Working on Different Idea* | Larry Rifkin |
| | | *Non-System Call* | TRAVA WEIGHT OPEN and waiting to go into licensing | |
| | | | The following ISA 2807313 - DEAD CLOSED | |

| DATE | AUTHOR | COMMENT |
|---|---|---|
| Feb 28, 2017 | Debra Altmare | tracking # for mailing dvd box 9114 9014 9645 0970 0769 69 |
| Jul 13, 2017 | Nancy Heintz | sent to Jason Zerbach's voicemail & emailed: sent to your voicemail. upset recd something from gov't regarding patent. has been calling & emailing Larry no return responses told him he has been sick. he wants someone to call him |
| Jan 10, 2018 | Nancy Heintz | emailed Larry to call |
| Apr 10, 2018 | Beth Hamilton | corp letter company EB Brands Holding Inc. 34 pres 0 lic sent 03/15/2017 |
| Apr 11, 2018 | Lynn Linderman | Royal Consumer would work for a new company. |
| Apr 11, 2018 | Beth Hamilton | corp change letter for Royal consumer Information 100 pres 0 lic sent 04/11/2018 |
| Apr 18, 2018 | Lynn Linderman | From: Mario Scorza [mailto:marumberto@aol.com]<br>Sent: Tuesday, April 17, 2018 5:44 PM<br>To: Larry Rifkin<br>Subject: Re: Project Files |

LARRY,

I HAVE BEEN SEARCHING FOR INFORMATION ABOUT DAVISON BUSINESS PRACTICES AND AM NOT FEELING WELL FROM WHAT I AM SEEING. IT HAS BEEN A VERY LONG TIME SINCE I SENT LOTS OF MONEY TO DAVISON FOR MY IDEA! ALL I HAVE GOTTEN IS THAT EVERYTHING IS ON SCHEDULE AND IS NOW GOING TO LICENSING!

LARRY, I HAVE TO TELL YOU IF I DO NOT GET SOME FACTUAL INFORMATION ABOUT WHERE TRAVA-WEIGH IS AM GOING TO HAVE TO SEEK MEANS OF OBTAINING IT! I HAVE TRUSTED YOU FROM THE START AND STILL WANT TO, BUT THIS HAS GONE ON MUCH TOO LONG! I AM SEEING CASE HISTORIES OF OTHERS WHO HAVE GONE THE SAME ROUTE I HAVE AND IT ENDED UP BADLY FOR THEM. SOME SAY DAVISON EVEN TAKES THE IDEA AND PUTS IT UNDER A NEW NAME AND

EXHIBIT 1

Defendant's Exhibit 6

THEN PRODUCES IT LEAVING OUT THE ORIGINAL OWNER OF THE PRODUCT.

LARRY, I NEED TO HAVE AN END DATE ON THE TRAVA-WEIGH IMMEDIATELY AS CANNOT GO ANY LONGER ON "IT IS HERE AND IT IS THERE." IF THIS WAS YOU WRITING THIS MAYBE YOU COULD KNOW HOW WE ARE FEELING WAITING ALL THIS TIME. I USED NEARLY 16K OUT OF A FUND FOR MY GRANDSON'S EDUCATION AS HE WILL BE GOING TO COLLEGE NEXT YEAR.

OK, AM WAITING FOR YOUR RESPONSE! YOU MAY HAVE SENT SOMETHING POSITIVE IN YOUR EMAIL LAST BUT COULD NOT OPEN IT.

MARIO

| | | |
|---|---|---|
| Apr 18, 2018 | Lynn Linderman | 4-18-17 No dltf ever sent, still need corp change letter returned. |
| Apr 19, 2018 | Beth Hamilton | corp change letter for Conair Corporation pres 0 lic sent 04/19/2018 |
| Apr 25, 2018 | Larry Rifkin | DLTF Email Sent. |
| | | Issues with the transfer: Thu 4/26/2018 9:26 AM: Call me 40010 (when you get a chance) |
| | | Creatively Yours, |
| May 22, 2018 | Lynn Linderman | |
| | | Lynn Linderman |
| | | Licensing |
| May 23, 2018 | Lynn Linderman | 5-23-18 RCVD DLTF, EFILE TO RO, AWAITING PRESENTATION TO CONAIR CORP LL.25--TRAVA WEIGH |
| Jun 29, 2018 | Matthew Alwine | 06-29-18 PRES VR No Logo Final Exec Summary Ideation Sketch Signed Non Disc. SENT, CONAIR CORPORATION /Stefani Pavlicic --TRAVA WEIGH |
| Jun 29, 2018 | Matthew Alwine | WELCOME/WELCOME BACK CALL SCHEDULED |
| Jun 29, 2018 | Matthew Alwine | GOODBYE EMAIL SENT TO Larry Rifkin |
| | | UPDATE FILE - WELCOME CALL (completed) |

From: Vescio, Frank
Sent: Thursday, July 5, 2018 2:25 PM
To: marumberto@aol.com
Subject: Welcome to the Licensing Department!

Hi Mario,

This letter is a follow-up to our call. The presentation to CONAIR Corporation is underway.

It's important that you understand that each company has its own review procedure and there is no standard timetable for their decision on Trava-Weigh. While we may not get a decision right away, I will be updating you every 30 days. If you're not available when I call, I will leave you a message.

You should also be aware of the services we are providing. Your representation agreement includes some or all of the additional services listed below:

1. Mailing or emailing you about possible corporations to target
2. Covering all costs associated with shipment to and from a corporation for presentation.
3. Regularly updated appointment calls with the Licensing Department
4. Communication and correspondence with the targeted corporation by our Licensing Department regarding the project.
5. Drafting License Agreements by legal counsel (if requested by targeted company).
6. Introduce the presentation at tradeshows or at the targeted corporation's facility (if the opportunity presents itself).
7. Pricing out the product (if requested by the target corporation).
8. Implement at additional design enhancements to the product or packaging (if requested by the target corporation).
9. Provide additional product samples (if requested by the target corporation).
10. Working with the targeted corporation's manufacturing people (if requested).
11. Track royalty payments due by the targeted corporation (if royalties are due).

| | | |
|---|---|---|
| Jul 5, 2018 | Frank Vescio | |

Finally, it's very important that you honor the obligations agreed to in the confidentiality document you signed, as any contact with the targeted company may seriously hinder your presentation and adversely affect our ability to represent your product idea, and other people's product ideas, to that company. This procedure has been created as a result of specific incidents in the past when individuals have taken it upon themselves to badger a company with constant calls and emails. It is a necessary measure we must take to maintain a good working relationship with the company and ensure that the project we have created has been given every opportunity to be presented properly.

I will call you for our next scheduled update call on August 6th, 12:00PM (your time) 2018.

| | | |
|---|---|---|
| Oct 9, 2018 | Lynn Linderman | UPDATE: 10-9-18 **CONAIR** MA attempted to contact the company and left message with contact (Pavlicic) as a follow up to the presentation. LL 10--TRAVA WEIGH |
| Nov 12, 2018 | Frank Vescio | left a message in response to the clients email to Larry |

From: Mario Scorza [mailto:marumberto@aol.com]
Sent: Sunday, November 11, 2018 1:16 PM
To: Larry Rifkin
Subject:

Hi Larry
Hey dear friend! I cannot find the phone for Frank who is apparently my "go to guy" after you! Larry, I have received a document from patent office about "Missing Parts." Frank told me last time Davison has my TravaWeigh with Conair. Larry, it has been two years or longer and still nothing! I was at Bed, Bath, and Beyond yesterday to look for a scale for my own bathroom and found Conair has scales all over the shelves there. We are wondering why mine should not be there after all this

EXHIBIT 1

time. I would think Davison would apply to more than one vendor at once instead of waiting for Conair to respond, which could take years as it seems Frank is supposed to call on Dec 5th, but this patent notice is something I cannot wait for to find out. I did not want to bother you with it, Larry, but you are only one I have up there who I really know.
Larry, the patent notice is titled: Notice To File Missing Parts of Provisional Application. If you wish to refer this letter to Frank that is ok, just need to know something. I am 83 and guess you can see why I have such concerns.

Thank you and hope all is well with you

Mario Scorza
From: Vescio, Frank
Sent: Monday, December 3, 2018 7:23 AM
To: Mario Scorza
Subject: RE:

Mario, please remind me to discuss this with you when we speak on the 5th

---

From: Mario Scorza [mailto:marumberto@aol.com]
Sent: Sunday, December 2, 2018 11:16 AM
To: Vescio, Frank
Subject:

Hello Frank!
Just wanted to ask again about the statement I keep getting from the Patent Office about the Status of the Application. When I get these over the past two years I contact Larry, and now you, to determine if there is anything significant about this. Seems is not important so I do no pursue it any further. I have to assume from my inquiry Davison would advise if there was a need to take some action accordingly.
Best

Mario
From: Vescio, Frank
Sent: Thursday, December 13, 2018 6:12 AM
To: Mario Scorza
Subject: What's your Plan B?

Hi Mario,

As a follow-up to our call, we discussed an Inventomercial (IM). It's great to have a commercial of the product to accompany a presentation to targeted companies for them to review and also forward to their customers (retailers) for feedback because the IM commercial describes both the problem and solution (like those As Seen on TV commercials).

I've attached a link to an example of an IM commercial. The Inventomercial of the Meatballer The commercial is an example of the format a typical Inventomercial follows.

We also discussed a Multiple Company Campaign [MCC] service by where we contact up to 45 companies (over a 1 year period) with a confidential teaser about your idea and communicate (and disclose) information to only those companies that sign a Confidential Registration Form to hear more about an idea and see presentation material. We would provide you with any interested party responses (and offers) for your review. Our current fee to present an idea individually to 1 company at a time is $395.00. So, up to 45 companies could represent a total fee of over $17,000.00 doing it 1 company at a time.

If you decide to move forward with both the Inventomerical (IM) and the MCCA services, I can reduce the price of the IM by $500.00 to $1,995.00 (normally that fee is $2,495.00) and can reduce the price of the MCC service by $3,000.00 to $3,995.00 (normally that fee is $6,995.00). I'll forward you a proposal that outlines each service in detail.

Those that need to buy themselves some time with funding; put down a small $100.00 refundable retainer to lock in the savings and keep the file active in our system. You can do this on the Trava-Weigh - portable scale idea.

To take advantage of this offer, you can mail a check, wire the funds or complete the credit card information below when you reply to this email.

CARD TYPE (VISA, MasterCard or AMEX):
CARD NUMBER:
EXPIRATION DATE:
3 DIGIT CODE (on back of card):
CARD HOLDER NAME (as it appears on the card):

AMOUNT:

It's your decision. I'm ok either way, just let me know by December 18th, 2018 as the project will not qualify for this savings offer after that date.

I'll call you on December 14th at 11:30PM (your time) to discuss your Plan B.

| Date | Name | Description |
|---|---|---|
| Dec 3, 2018 | Frank Vescio | |
| Dec 13, 2018 | Frank Vescio | |
| Mar 25, 2019 | Judy Marchese | 03-25-19 REG SENT [Email], Sunbeam Corporation /Susan Stewart --TRAVA WEIGH |
| Mar 25, 2019 | Judy Marchese | 03-25-19 REG SENT [Email], Avery Weigh-Tronix LLC /Michelle Tozer --TRAVA WEIGH |
| Mar 25, 2019 | Judy Marchese | 03-25-19 REG SENT [Email], Fairbanks Scales Inc /Brad Grindstaff --TRAVA WEIGH |
| Mar 25, 2019 | Judy Marchese | 03-25-19 REG SENT [Email], Seca /Lyndsey Nunez --TRAVA WEIGH |
| Mar 25, 2019 | Judy Marchese | 03-25-19 REG SENT [Email], Taylor Precision Products Inc /Ronni Emrich --TRAVA WEIGH |
| Mar 25, 2019 | Judy Marchese | 03-25-19 REG SENT [Email], Mercury Luggage Manufacturing Company /Brett Burleigh --TRAVA WEIGH |

EXHIBIT 1

Defendant's Exhibit 6

| FEB 14, 2017 | Sales Email | **Couldn't Leave a Message** <br> Opened | Larry Rifkin |
| FEB 15, 2017 | Sales Email | **Benefits of Davison** <br> Opened | Larry Rifkin |
| FEB 17, 2017 | Sales Email | **Payment Receipt** <br> Opened | Davisonlink System <br> via rifkin.larry@davison.com |
| FEB 22, 2017 | Sales Email | **Provisional Application** <br> Opened | Davisonlink System <br> via rifkin.larry@davison.com |
| FEB 24, 2017 | Five9 - Manual | **End Call** | rifkin.larry |
| FEB 28, 2017 | Five9 - Manual | **End Call** | rifkin.larry |
| FEB 28, 2017 | Sales Email | **Inventionland One Hour Special** <br> Unopened | Larry Rifkin |
| FEB 28, 2017 | 1209565 Comment | **tracking # for mailing dvd box 9114 9014 9645 0970 0769 69** | Debra Altmare |
| MAR 7, 2017 | Five9 - Manual | **End Call** | rifkin.larry |
| MAR 7, 2017 | Sales Email | **Advice to Inventors** <br> Opened | Larry Rifkin |
| MAR 8, 2017 | Five9 - Manual | **End Call** | rifkin.larry |
| MAR 8, 2017 | Sales Email | **Davison Staff** <br> Opened | Larry Rifkin |
| MAR 14, 2017 | Sales Email | **Welcome to Inventionland** <br> Opened | Larry Rifkin |
| MAR 16, 2017 | Five9 - Manual | **End Call** | rifkin.larry |
| MAR 16, 2017 | Sales Email | **Client Product Coming to Life** <br> Opened | Larry Rifkin |
| MAR 22, 2017 | Sales Email | **Shapes and Sizes** <br> Opened | Larry Rifkin |
| MAR 27, 2017 | Five9 - Manual | **End Call** | rifkin.larry |
| MAR 27, 2017 | Sales Email | **Confirming a Scheduled Call** <br> Opened | Davisonlink System <br> via rifkin.larry@davison.com |
| MAR 27, 2017 | Sales Email | **NPSA Agreement** <br> Opened | Larry Rifkin |
| MAR 27, 2017 | Sales Email | **Tradeshows - Housewares** <br> Opened | Larry Rifkin |
| APR 4, 2017 | Five9 - Manual | **End Call** | rifkin.larry |
| APR 7, 2017 | Sales Email | **DTI - Better Tether** <br> Opened | Larry Rifkin |
| APR 11, 2017 | Five9 - Inbound | **Sent To Voicemail** | [None] |
| APR 14, 2017 | Five9 - Manual | **End Call** | rifkin.larry |
| APR 14, 2017 | Five9 - Manual | **End Call** | rifkin.larry |
| APR 14, 2017 | Five9 - Manual | **End Call** | rifkin.larry |
| APR 14, 2017 | Five9 - Manual | **End Call** | rifkin.larry |
| APR | Five9 - | **End Call** | rifkin.larry |

EXHIBIT 1

Defendant's Exhibit 6

DISCONNECT

"DON'T DISCUSS IDEAS OVER EMAIL"

PATENTING IDEA

IDEA RECORDER

VOICEMAIL NEEDS SETUP - LEAD

DAVISON INVENTING METHOD GUIDE

[ SEND CUSTOM EMAIL  |  SEND CUSTOM TEXT  |  TEXT UNSUBSCRIBE ]

| DATE | EMPLOYEE NAME | SUBJECT |
|---|---|---|
| DEC 10, 2015 9:56 AM | Lindsey Bergmann | Scheduling PD Presentation Message 1st Attempt |
| DEC 11, 2015 10:57 AM | Lindsey Bergmann | Scheduling PD Presentation Message 2nd Attempt |
| DEC 14, 2015 1:21 PM | Lindsey Bergmann | Scheduling PD Presentation Message 3rd Attempt |
| DEC 15, 2015 3:23 PM | Lindsey Bergmann | ISA No Response Attempt-Check Reveal |
| JAN 4, 2016 7:57 AM | Davisonlink System | 30 Day Touch |
| FEB 1, 2016 7:58 AM | Davisonlink System | 60 Day Touch |
| JAN 4, 2017 10:33 AM | Larry Rifkin | The Balancing Act (CCAST) (Auto) |
| JAN 9, 2017 7:44 AM | Davisonlink System | Confirming a Scheduled Call |
| JAN 9, 2017 4:57 PM | Larry Rifkin | Compare Davison |
| JAN 9, 2017 4:58 PM | Larry Rifkin | Mr D in the Stores |
| JAN 9, 2017 4:58 PM | Larry Rifkin | Tradeshows - National Hardware Show (Timeless) |
| JAN 9, 2017 4:58 PM | Larry Rifkin | CBS Early Show (Auto) |
| JAN 9, 2017 4:59 PM | Larry Rifkin | Your Secure Invention Proposal |
| JAN 9, 2017 5:00 PM | Larry Rifkin | Your Secure Invention Proposal - New Password |
| JAN 12, 2017 10:17 AM | Larry Rifkin | I Left you a Message, Please Call |
| JAN 12, 2017 10:17 AM | Larry Rifkin | Davison Commercial |
| JAN 12, 2017 12:02 PM | Larry Rifkin | Your Secure Invention Proposal - New Password |
| JAN 12, 2017 12:23 PM | Larry Rifkin | Your Secure Invention Proposal - New Password |
| JAN 12, 2017 12:28 PM | Larry Rifkin | Davison Products in Stores (Auto) |
| JAN 12, 2017 2:36 PM | Larry Rifkin | Your Secure Invention Proposal - New Password |
| JAN 12, 2017 3:17 PM | Larry Rifkin | See Our Products on TV (Auto) |
| JAN 17, 2017 7:11 AM | Larry Rifkin | Davison Newsletter (Auto) |
| JAN 19, 2017 5:00 PM | Davisonlink System | Payment Receipt |
| JAN 23, 2017 11:06 AM | Larry Rifkin | Bikeboard |
| JAN 24, 2017 5:01 PM | Davisonlink System | Payment Receipt |
| FEB 9, 2017 5:23 PM | Larry Rifkin | Tax Time 2017 |
| FEB 14, 2017 5:01 PM | Larry Rifkin | Couldn't Leave a Message |
| FEB 15, 2017 10:08 AM | Larry Rifkin | Benefits of Davison |
| FEB 17, 2017 5:05 PM | Davisonlink System | Payment Receipt |
| FEB 22, 2017 8:00 AM | Davisonlink System | Provisional Application |
| FEB 28, 2017 10:10 AM | Larry Rifkin | Inventionland One Hour Special |
| MAR 7, 2017 9:43 AM | Larry Rifkin | Advice to Inventors |
| MAR 8, 2017 2:22 PM | Larry Rifkin | Davison Staff |
| MAR 14, 2017 11:40 AM | Larry Rifkin | Welcome to Inventionland |
| MAR 16, 2017 10:13 AM | Larry Rifkin | Client Product Coming to Life |
| MAR 22, 2017 2:03 PM | Larry Rifkin | Shapes and Sizes |
| MAR 27, 2017 7:42 AM | Davisonlink System | Confirming a Scheduled Call |
| MAR 27, 2017 1:25 PM | Larry Rifkin | NPSA Agreement |
| MAR 27, 2017 1:27 PM | Larry Rifkin | Tradeshows - Housewares |
| APR 7, 2017 5:05 PM | Larry Rifkin | DTI - Better Tether |
| MAY 8, 2017 4:33 PM | Larry Rifkin | TheraPED |
| MAY 31, 2017 10:08 AM | Larry Rifkin | Send Attachment - Ideation Sketch |
| JUL 3, 2017 11:46 AM | Larry Rifkin | Out of Office - Reschedule Call |
| AUG 11, 2017 2:28 PM | Larry Rifkin | Received Your Email, Let's Discuss On the Phone |
| AUG 21, 2017 12:24 PM | Larry Rifkin | Back to Inventing |
| SEP 29, 2017 2:30 PM | Larry Rifkin | Send Virtual Package |
| OCT 10, 2017 6:29 AM | Larry Rifkin | CUSTOM EMAIL |
| MAR 12, 2018 10:53 AM | Larry Rifkin | Received Your Message |
| APR 13, 2018 7:20 AM | Sara Stewart | Send Attachment - Mario Scorza Corp Change Letter. |
| APR 18, 2018 9:38 AM | Larry Rifkin | Send Attachment - Additional Files |
| APR 18, 2018 11:45 AM | Nancy Heintz | Send Attachment - CONAIR CORP-3.PDF |
| MAY 22, 2018 10:07 AM | Larry Rifkin | Send Additional ISA |
| MAY 22, 2018 10:08 AM | Larry Rifkin | Send Additional ISA |
| DEC 14, 2018 1:44 PM | Frank Vescio | Back-end Agreement |
| DEC 19, 2018 9:46 AM | Frank Vescio | Inventomercial Agreement |
| FEB 12, 2019 11:20 AM | Frank Vescio | Send Attachment - Video |
| FEB 19, 2019 4:08 PM | Frank Vescio | Send Attachment - Video |
| MAR 18, 2020 6:13 AM | Frank Vescio | Payment Receipt |
| MAR 18, 2020 6:13 AM | Frank Vescio | Payment Receipt |
| MAR 18, 2020 6:13 AM | Frank Vescio | Payment Receipt |
| MAR 18, 2020 6:13 AM | Frank Vescio | Payment Receipt |
| APR 7, 2020 2:22 PM | Frank Vescio | Send Attachment - Video |

EXHIBIT 1

Defendant's Exhibit 6

| Date | Number | Type | Action | | Name |
|------|--------|------|--------|------|------|
| MAY 12, 2017 | 3143863 | NPSA INTERIM | **Schedule NPSA Interim** | | LARRY RIFKIN |
| | | *Non-System Call* | LAM<br>Need Paperwork<br>Was full pay<br><br>TRAVEL | | |
| JUN 5, 2017 | 3143863 | NPSA INTERIM | **Left Message - Machine** | | LARRY RIFKIN |
| | | *Non-System Call* | LM | | |
| JUN 7, 2017 | 3143863 | NPSA INTERIM | **Schedule NPSA Interim** | | LARRY RIFKIN |
| | | *Non-System Call* | Update - | | |
| JUN 18, 2017 | 3143863 | NPSA INTERIM | **Schedule NPSA Interim** | | LARRY RIFKIN |
| | | *Non-System Call* | Larry,<br><br>I am getting concerned that I do not hear from you for updates. Why?<br><br>Mario | | |
| JUL 3, 2017 | 3143863 | NPSA INTERIM | **Busy** | | LARRY RIFKIN |
| | | *Non-System Call* | Called in ... wants update | | |
| JUL 28, 2017 | 3143863 | NPSA INTERIM | **Busy** | | LARRY RIFKIN |
| | | *Non-System Call* | | | |
| AUG 11, 2017 | 3143863 | NPSA INTERIM | **Busy** | | LARRY RIFKIN |
| | | *Non-System Call* | Larry,<br><br>I have not heard from you are Davison in way too long. I am going to have to insist that I be better informed of the progress of the Trava-Weigh. Last I heard was from patent in a letter saying my patent had been rejected. If this was you would you not be alarmed???? If I do not hear from someone soon am going to have to seek remedy. The patent rejection alone is cause for great alarm.<br><br>Mario | | |
| AUG 11, 2017 | 3143863 | NPSA INTERIM | **Left Message - Machine** | | LARRY RIFKIN |
| | | *Non-System Call* | CALLED and LM | | |
| AUG 14, 2017 | 3143863 | NPSA INTERIM | **Busy** | | LARRY RIFKIN |
| | | *Non-System Call* | Edit address (Verify) | | |
| AUG 17, 2017 | 3143863 | VR FIRST ENHANCE | **Left Message - Machine** | | LARRY RIFKIN |
| | | *Non-System Call* | | | |
| AUG 21, 2017 | 3143863 | VR FIRST ENHANCE | **Left Message - Machine** | | LARRY RIFKIN |
| | | *Non-System Call* | CALL ME ..... | | |
| AUG 24, 2017 | 3143863 | VR FIRST ENHANCE | **Schedule Enhance** | | LARRY RIFKIN |
| | | *Non-System Call* | LM | | |
| SEP 22, 2017 | 3143863 | VR SECOND ENHANCE | **Schedule VR Release** | | LARRY RIFKIN |
| | | *Non-System Call* | REleased VR | | |
| SEP 22, 2017 | 3143863 | VR RELEASE | **Schedule VR Recall** | | LARRY RIFKIN |
| | | *Non-System Call* | He is still cleaning up his 2 homes from Hurricane HARVEY.<br>Sent VR ... Very Happy to hear. | | |
| SEP 29, 2017 | 3143863 | VR RECALL | **Did Not Receive** | | LARRY RIFKIN |
| | | | Didn't receive yet | | |
| OCT 10, 2017 | 3143863 | VR RECALL | **Did Not Receive** | | LARRY RIFKIN |
| | | *Non-System Call* | Sent Mario's email to Design Team and AdMin.<br>-----------------------------<br>Larry<br>Did you get my email asking if the designers of the trava-weigh had the scale go up to 350 lbs? It | | |

EXHIBIT 1
Defendant's Exhibit 6

☐ Catalog Page
☑ Sticker

# [    ]                    # [    ]

| | |
|---|---|
| **MATERIAL** | .030 Chipboard |
| **PACKAGE DIMENSIONS** <br> A x B x C x D | 10" x 10" with diagonal Sticker or hangtag - whichever hangs on to the fabric best |
| **SPECIAL FEATURES/INSTRUCTIONS** | |
| **A: NAME** <br> (e.g. Dog Buddy) | Trava-Weigh |
| **B: DESCRIPTIVE TEXT** | Portable Scale |
| **C: WHY WOULD I BUY THIS?** | |
| **D: LIST 1ST BULLET POINT** | Great for home and travel! |
| **D: LIST 2ND BULLET POINT** | Ultra thin scale easily stored in custom carrying case for portability |
| **D: LIST 3RD BULLET POINT** | Easy to read LCD display shows weight in lb or kg |
| **E: PATENT PENDING** | ☑ Appears on Package |
| **PACKAGE SKETCH** | |

Mark each text item and image using the corresponding letter (A, B, C, etc.) from the above list.



PRODUCT-IN-USE PHOTOS

SITES: DREAMSTIME PUNCHSTOCK GETTY IMAGES FOTOSEARCH SHUTTERSTOCK

**F IMAGE**

EXHIBIT 1

Defendant's Exhibit 6



☐ Box          ☐ Hanging Box          ☐ Header Card

☐ Clamshell          ☐ Blister Card          ☑ Hang Tag
                                                ☐ Catalog Page
                                                ☑ Sticker

#                    #

| | |
|---|---|
| **MATERIAL** | .030 Chipboard |
| **PACKAGE DIMENSIONS**<br>A x B x C x D | 10" x 10" with diagonal Sticker or hangtag - whichever hangs on to the fabric best |
| **SPECIAL FEATURES/INSTRUCTIONS** | |
| **A: NAME**<br>(e.g. Dog Buddy) | Trava-Weigh |
| **B: DESCRIPTIVE TEXT** | Portable Scale |
| **C: WHY WOULD I BUY THIS?** | |
| **D: LIST 1ST BULLET POINT** | Great for home and travel! |
| **D: LIST 2ND BULLET POINT** | Ultra thin scale easily stored in custom carrying case for portability |
| **D: LIST 3RD BULLET POINT** | Easy to read LCD display shows weight in lb or kg |
| **E: PATENT PENDING** | ☑ Appears on Package |
| **PACKAGE SKETCH**<br>Mark each text item and image using the corresponding letter (A, B, C, etc.) from the above list. | |

EXHIBIT 1
Defendant's Exhibit 6

☐ Catalog Page
☑ Sticker

\# [＿＿＿＿＿]        \# [＿＿＿＿＿]

| | |
|---|---|
| **MATERIAL** | .030 Chipboard |
| **PACKAGE DIMENSIONS**<br>A x B x C x D | 10" x 10" with diagonal Sticker or hangtag - whichever hangs on to the fabric best |
| **SPECIAL FEATURES/INSTRUCTIONS** | |
| **A: NAME**<br>(e.g. Dog Buddy) | Trava-Weigh |
| **B: DESCRIPTIVE TEXT** | Portable Scale |
| **C: WHY WOULD I BUY THIS?** | |
| **D: LIST 1ST BULLET POINT** | Great for home and travel! |
| **D: LIST 2ND BULLET POINT** | Ultra thin scale easily stored in custom carrying case for portability |
| **D: LIST 3RD BULLET POINT** | Easy to read LCD display shows weight in lb or kg |
| **E: PATENT PENDING** | ☑ Appears on Package |

**PACKAGE SKETCH**

Mark each text item and image using the corresponding letter (A, B, C, etc.) from the above list.



PRODUCT-IN-USE PHOTOS
SITES: DREAMSTIME PUNCHSTOCK GETTY IMAGES FOTOSEARCH SHUTTERSTOCK
**F IMAGE**

**EXHIBIT 1**

Defendant's Exhibit 6

☐ Catalog Page
☑ Sticker

# [            ]    # [            ]

| | |
|---|---|
| **MATERIAL** | .030 Chipboard |
| **PACKAGE DIMENSIONS** <br> A x B x C x D | 10" x 10" with diagonal Sticker or hangtag - whichever hangs on to the fabric best |
| **SPECIAL FEATURES/INSTRUCTIONS** | |
| **A: NAME** <br> (e.g. Dog Buddy) | Trava-Weigh |
| **B: DESCRIPTIVE TEXT** | Portable Scale |
| **C: WHY WOULD I BUY THIS?** | |
| **D: LIST 1ST BULLET POINT** | Great for home and travel! |
| **D: LIST 2ND BULLET POINT** | Ultra thin scale easily stored in custom carrying case for portability |
| **D: LIST 3RD BULLET POINT** | Easy to read LCD display shows weight in lb or kg |
| **E: PATENT PENDING** | ☑ Appears on Package |
| **PACKAGE SKETCH** | |

Mark each text item and image using the corresponding letter (A, B, C, etc.) from the above list.



PRODUCT-IN-USE PHOTOS

SITES: DREAMSTIME PUNCHSTOCK GETTY IMAGES FOTOSEARCH SHUTTERSTOCK

**F IMAGE**

EXHIBIT 1
Defendant's Exhibit 6

**DAVISON**

# Necessity of Product Sample Presentation Services

Davison views the production of a fully developed product sample including packaging that fits the brand of the targeted corporation to be integral to our development process.  It is our opinion the product samples are necessary before proceeding to the step of attempting to obtain a license agreement for a product with a corporation.  It is Davison's policy to require that a product sample be created prior to submitting the product idea to a corporation.  Davison does not represent that it is any particular corporation's policy to require that a product sample be created before a new product idea will be considered.  Should you not wish to purchase these services, you may still be able to secure a license, either on your own or with the assistance of another party, but Davison will refuse to work with you to develop your product idea.

Thank you and please call your Director of New Products as soon as you receive this information.

Sincerely,

*G. Davison*

G. Davison
Founder and CEO

Turning ideas into products    App. 478

EXHIBIT 1
Defendant's Exhibit 6

Mario Scorza

**TEXAS**

**DAVISON**
**595 ALPHA DRIVE**
**PITTSBURGH, PA 15238**


**THIS CONTRACT BETWEEN YOU AND AN INVENTION DEVELOPER IS REGULATED BY THE STATE OF TEXAS' REGULATION OF INVENTION DEVELOPMENT SERVICES ACT. YOU ARE NOT PERMITTED OR REQUIRED TO MAKE ANY PAYMENTS UNDER THIS CONTRACT UNTIL FOUR (4) WORKING DAYS AFTER YOU SIGN THIS CONTRACT AND RECEIVE A COMPLETED COPY OF IT.**

**IF YOU ASSIGN EVEN A PARTIAL INTEREST IN THE INVENTION TO THE INVENTION DEVELOPER, THE INVENTION DEVELOPER MAY HAVE THE RIGHT TO SELL OR DISPOSE OF THE INVENTION WITHOUT YOUR CONSENT AND MAY NOT HAVE TO SHARE THE PROFITS WITH YOU.**

**TOTAL NUMBER OF CUSTOMERS WHO HAVE CONTRACTED WITH THE INVENTION DEVELOPER SINCE 1989 IS ONE HUNDRED FIFTY THOUSAND NINE HUNDRED FOURTEEN (150,914). THE TOTAL NUMBER OF CUSTOMERS KNOWN BY THIS INVENTION DEVELOPER TO HAVE RECEIVED, BY VIRTUE OF THIS INVENTION DEVELOPER'S PERFORMANCE AN AMOUNT OF MONEY IN EXCESS OF THE AMOUNT PAID BY THE CUSTOMER TO THIS INVENTION DEVELOPER IS THIRTY-FIVE.**

**YOU ARE ENCOURAGED TO CONSULT WITH A QUALIFIED ATTORNEY BEFORE SIGNING THIS CONTRACT. BY PROCEEDING WITHOUT THE ADVICE OF A QUALIFIED ATTORNEY, YOU COULD LOSE ANY RIGHTS YOU MIGHT HAVE IN YOUR IDEA OR INVENTION.**

EXHIBIT 1
Defendant's Exhibit 6

Mario Scorza

## TEXAS

**DAVISON
595 ALPHA DRIVE
PITTSBURGH, PA 15238**

**THIS CONTRACT BETWEEN YOU AND AN INVENTION DEVELOPER IS REGULATED BY THE STATE OF TEXAS' REGULATION OF INVENTION DEVELOPMENT SERVICES ACT. YOU ARE NOT PERMITTED OR REQUIRED TO MAKE ANY PAYMENTS UNDER THIS CONTRACT UNTIL FOUR (4) WORKING DAYS AFTER YOU SIGN THIS CONTRACT AND RECEIVE A COMPLETED COPY OF IT.**

**IF YOU ASSIGN EVEN A PARTIAL INTEREST IN THE INVENTION TO THE INVENTION DEVELOPER, THE INVENTION DEVELOPER MAY HAVE THE RIGHT TO SELL OR DISPOSE OF THE INVENTION WITHOUT YOUR CONSENT AND MAY NOT HAVE TO SHARE THE PROFITS WITH YOU.**

**TOTAL NUMBER OF CUSTOMERS WHO HAVE CONTRACTED WITH THE INVENTION DEVELOPER SINCE 1989 IS ONE HUNDRED FIFTY THOUSAND NINE HUNDRED FOURTEEN (150,914). THE TOTAL NUMBER OF CUSTOMERS KNOWN BY THIS INVENTION DEVELOPER TO HAVE RECEIVED, BY VIRTUE OF THIS INVENTION DEVELOPER'S PERFORMANCE AN AMOUNT OF MONEY IN EXCESS OF THE AMOUNT PAID BY THE CUSTOMER TO THIS INVENTION DEVELOPER IS THIRTY-FIVE.**

**YOU ARE ENCOURAGED TO CONSULT WITH A QUALIFIED ATTORNEY BEFORE SIGNING THIS CONTRACT. BY PROCEEDING WITHOUT THE ADVICE OF A QUALIFIED ATTORNEY, YOU COULD LOSE ANY RIGHTS YOU MIGHT HAVE IN YOUR IDEA OR INVENTION.**

U.S. PTO
12/601218
03/16/2017
EXHIBIT 12
Defendant's Exhibit 0
02194 U.S. PTO
031617

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 1 of 2
This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. _____

### INVENTOR(S)

| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
|---|---|---|
| MARIO U. (SCORZA) | SCORZA | 612 W. Highland West, TX 76691 |
| | | |
| | | |
| | | |

Additional inventors are being named on the _None_ separately numbered sheets attached hereto.

### TITLE OF THE INVENTION (500 characters max):

weighing scale that is portable even in suitcase.

Direct all correspondence to:
[✓] The address corresponding to Customer Number: _____

**CORRESPONDENCE ADDRESS**

Mr Mario Scorza
612 W Highland St
West, TX 76691

OR
[ ] Firm or Individual Name

Address

| City | State | Zip |
|---|---|---|
| Country | Telephone | Email |

### ENCLOSED APPLICATION PARTS (check all that apply)

[ ] Application Data Sheet. See 37 CFR 1.76.
[ ] Drawing(s)  Number of Sheets ____
[ ] Specification (e.g., description of the invention)  Number of Pages ____
[ ] CD(s), Number of CDs ____
[ ] Other (specify) ____

**Fees Due:** Filing Fee of $260 ($130 for small entity) ($65 for micro entity). If the specification and drawings exceed 100 sheets of paper, an application size fee is also due, which is $400 ($200 for small entity) ($100 for micro entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

### METHOD OF PAYMENT OF THE FILING FEE AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT

[ ] Applicant asserts small entity status. See 37 CFR 1.27.
[ ] Applicant certifies micro entity status. See 37 CFR 1.29. Applicant must attach form PTO/SB/15A or B or equivalent.
[ ] A check or money order made payable to the *Director of the United States Patent and Trademark Office* is enclosed to cover the filing fee and application size fee (if applicable).   **TOTAL FEE AMOUNT ($)**
[ ] Payment by credit card. Form PTO-2038 is attached.
[ ] The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit Account Number: _____

### USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT
This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 10 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

App. 481

**EXHIBIT 2**
Defendant's Exhibit 6

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 2 of 2

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

[✓] No.

[ ] Yes, the invention was made by an agency of the U.S. Government. The U.S. Government agency name is: _____

_____

[ ] Yes, the invention was made under a contract with an agency of the U.S. Government. The name of the U.S. Government agency and Government contract number are: _____

_____

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

SIGNATURE *Marca Scorza*          DATE 2.22-17

TYPED OR PRINTED NAME *MARIO SCORZA*          REGISTRATION NO. _____
                                              (*if appropriate*)

TELEPHONE 254-715.0243          DOCKET NUMBER _____

EXHIBIT 2
Defendant's Exhibit 6

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.   Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**EXHIBIT 2**

Defendant's Exhibit 6

PATENT APPLICATION SERIAL NO._____

## U.S. DEPARTMENT OF COMMERCE
## PATENT AND TRADEMARK OFFICE
## <u>FEE RECORD SHEET</u>

03/17/2017 CCHAU1    00000009 62601218
01 FC:3005                          65.00 OP

PTO-1556
(5/87)

App. 484

**EXHIBIT 3**

**Defendant's Exhibit 6**



### UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/601,218 | | Mario U. Scorza | |

**CONFIRMATION NO. 6744**

Mario Scorza
612 W. Highland St.
West, TX 76691

**ABANDONMENT/TERMINATION LETTER**



*OC000000092489935*

Date Mailed: 06/30/2017

## NOTICE OF TERMINATION OF PROCEEDINGS UNDER 37 CFR 1.53(e)

Proceedings on the above-identified application number are **TERMINATED**.

The application did not meet the requirements of 37 CFR 1.53(b), (c), or (d) to be entitled to a filing date, and the filing error(s) specified in the Notice mailed on 03/31/2017 were not timely corrected *(37 CFR 1.53(e))*.

Any application filing fees paid in excess of $130.00 (handling fee) will be refunded or credited to your deposit account.

If a complete reply to the notice was previously filed by applicant within the time period set forth in the notice, applicant may request for reconsideration of the termination within 2 months from the mailing of this notice of termination by filing a petition accompanied by a true copy of the originally filed reply and the item(s) identified in one of the following:

1. A properly itemized date-stamped postcard receipt (see MPEP § 503); or

2. If the reply was filed via "Express Mail", (now "Priority Mail Express"), a submission satisfying the requirements of 37 CFR 1.10(e) including, for example, a copy of the mailing label showing the "date-in" (or "date accepted") (see MPEP § 513).

Any request for reconsideration should be directed to OPAP.

A copy of this notice <u>MUST</u> be returned with the reply.

Questions about the contents of this notice and the requirements it sets forth should be directed to the Office of Data Management, Application Assistance Unit, at **(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/ylueng/

App. 485

Defendant's Exhibit 6



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/601,218 | 03/16/2017 | Mario U. Scorza | |

Mario Scorza
612 W. Highland St.
West, TX 76691

**CONFIRMATION NO. 6744**
**FORMALITIES LETTER**


*OC000000090337833*

Date Mailed: 03/31/2017

## NOTICE OF INCOMPLETE PROVISIONAL APPLICATION

### FILED UNDER 37 CFR 1.53(c)

A filing date has NOT been accorded to the above-identified PROVISIONAL APPLICATION papers for the following reason(s) indicated below.

All of the items noted below **must** be submitted within **TWO MONTHS** of the date of this Notice, unless otherwise indicated, or the proceedings on the application will be terminated (37 CFR 1.53(e)). **Extensions of time under 37 CFR 1.136 are NOT available.**

The filing date will be the date of receipt of all items required below, unless otherwise indicated. Any assertions that the items required were submitted, or are not necessary for a filing date, must be by way of petition directed to the attention of the Office of Petitions accompanied by the petition fee set forth in 37 CFR 1.17(f). If the petition states that the application is entitled to a filing date, a request for a refund of the petition fee may be included in the petition.

- The specification is missing.
  *A complete specification as prescribed by 35 U.S.C. 112 is required.*

The required items noted below SHOULD be filed along with any items required above. The filing date of this provisional application will be the date of receipt of the items required above. If the basic filing fee or due amount is filed after the filing date accorded the application, the surcharge set forth in 37 CFR 1.16(g) is also required.

- The statutory basic filing fee is insufficient.

Applicant is cautioned that correction of the above items may cause the specification and drawings page count to exceed 100 pages. If the specification and drawings exceed 100 pages, applicant will need to submit the required application size fee.

### SUMMARY OF FEES DUE:

The fee(s) required within **TWO MONTHS** from the date of this Notice to avoid abandonment is/are itemized below. No entity status discount is in effect. If applicant is qualified for small entity status, a written assertion of small entity status must be submitted to establish small entity status. (See 37 CFR 1.27). If applicant is qualified for micro entity status, an acceptable Certification of Micro Entity Status must be submitted to establish micro entity status. (See 37 CFR 1.29 and forms PTO/SB/15A and 15B.)

App. 486

EXHIBIT 3

Defendant's Exhibit 6

• $ **260** basic filing fee.
• $( **65**) previous unapplied payment amount.
• $ **260** TOTAL FEE BALANCE DUE.

**Items Required To Avoid Processing Delays:**

Applicant is notified that the above-identified application contains the deficiencies noted below. No period for reply is set forth in this notice for correction of these deficiencies. However, if a deficiency relates to the inventor's oath or declaration, the applicant must file an oath or declaration in compliance with 37 CFR 1.63, or a substitute statement in compliance with 37 CFR 1.64, executed by or with respect to each actual inventor no later than the expiration of the time period set in the "Notice of Allowability" to avoid abandonment. See 37 CFR 1.53(f).

**This application, which was filed with an indication of micro entity status, fails to meet the requirements for establishing micro entity status because:**

• Certification of micro entity status is missing. (See 37 CFR 1.29 and forms PTO/SB/15A and 15B.)

If micro entity status is established in reply to this notice by filing an acceptable Certification of Micro Entity Status, the fees itemized in the SUMMARY OF FEES DUE section of this Notice will be reduced to reflect the 75% micro entity discount, and any previous payment amount may be applied to the discounted fees.

If applicant is not entitled to micro entity status under 37 CFR 1.29, applicant may still qualify for a 50% reduction of fees if small entity status can be established under 37 CFR 1.27.

Replies should be mailed to:

Mail Stop Missing Parts
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

Registered users of EFS-Web may alternatively submit their reply to this notice via EFS-Web, including a copy of this Notice and selecting the document description "Applicant response to Pre-Exam Formalities Notice". https://sportal.uspto.gov/authenticate/AuthenticateUserLocalEPF.html

For more information about EFS-Web please call the USPTO Electronic Business Center at 1-866-217-9197 or visit our website at http://www.uspto.gov/ebc.

If you are not using EFS-Web to submit your reply, you must include a copy of this notice.

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/awebb/
_____

App. 487

EXHIBIT 3
Defendant's Exhibit 0

U.S. PTO
62/601218
03/16/2017

02194  U.S. PTO
031617

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 1 of 2
This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. _____

### INVENTOR(S)

| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
|---|---|---|
| MARio U. (ScoRzA) | ScoRzA | 612 W. Highland WesT, TX 76691 |
| | | |
| | | |
| | | |

Additional inventors are being named on the ___None___ separately numbered sheets attached hereto.

### TITLE OF THE INVENTION (500 characters max):

weighing Scale That is PoRTAble even in Suitcase.

Direct all correspondence to:

☑ The address corresponding to Customer Number: [ ]

OR

☐ Firm or Individual Name

**CORRESPONDENCE ADDRESS**

Mr Mario Scorza
612 W Highland St
West, TX 76691

Address
| City | State | Zip |
|---|---|---|
| Country | Telephone | Email |

### ENCLOSED APPLICATION PARTS (check all that apply)

☐ Application Data Sheet. See 37 CFR 1.76.
☐ Drawing(s) *Number of Sheets* _____
☐ Specification (e.g., description of the invention) *Number of Pages* _____
☐ CD(s), Number of CDs _____
☐ Other (specify) _____

**Fees Due:** Filing Fee of $260 ($130 for small entity) ($65 for micro entity). If the specification and drawings exceed 100 sheets of paper, an application size fee is also due, which is $400 ($200 for small entity) ($100 for micro entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

### METHOD OF PAYMENT OF THE FILING FEE AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT

☐ Applicant asserts small entity status. See 37 CFR 1.27.
☐ Applicant certifies micro entity status. See 37 CFR 1.29.
    Applicant must attach form PTO/SB/15A or B or equivalent.
☐ A check or money order made payable to the *Director of the United States Patent and Trademark Office* is enclosed to cover the filing fee and application size fee (if applicable).
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit Account Number: _____

**TOTAL FEE AMOUNT ($)** [ ]

### USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 10 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

App. 488

**EXHIBIT 3**

Defendant's Exhibit 6

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 2 of 2

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

☑ No.

☐ Yes, the invention was made by an agency of the U.S. Government. The U.S. Government agency name is: _____

_____

☐ Yes, the invention was made under a contract with an agency of the U.S. Government. The name of the U.S. Government agency and Government contract number are: _____

_____

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

SIGNATURE *Marca Scorza*                    DATE 2.22-17

TYPED OR PRINTED NAME *MARIO SCORZA*        REGISTRATION NO. _____
                                            (if appropriate)

TELEPHONE 254-715.0243   DOCKET NUMBER _____

App. 489

EXHIBIT 3

Defendant's Exhibit 6

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.   Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EXHIBIT 3

Defendant's Exhibit 6

PATENT APPLICATION SERIAL NO._____

## U.S. DEPARTMENT OF COMMERCE
## PATENT AND TRADEMARK OFFICE
## <u>FEE RECORD SHEET</u>

03/17/2017 CCHAU1   00000009 62601218
01 FC:3005                    65.00 OP

PTO-1556
(5/87)

**EXHIBIT 3**

**Defendant's Exhibit 6**



### UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/710,055 | 02/08/2018 | Mario U. Scorza | |

Mario Scorza
341 Old Mill Creek Dr.
Waco, TX 76712-6448

**CONFIRMATION NO. 4515**
**FORMALITIES LETTER**

*OC000000103264977*

Date Mailed: 10/23/2018

## NOTICE TO FILE MISSING PARTS OF PROVISIONAL APPLICATION

### FILED UNDER 37 CFR 1.53(c)

#### *Filing Date Granted*

An application number and filing date have been accorded to this provisional application. The items indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items and pay any fees required below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

- The statutory basic filing fee is insufficient.
- Surcharge as set forth in 37 CFR 1.16(g) must be submitted.
  The surcharge is due for late submission of filing fee or cover sheet.

**SUMMARY OF FEES DUE:**

The fee(s) required within **TWO MONTHS** from the date of this Notice to avoid abandonment is/are itemized below. Small entity discount is in effect. If applicant is qualified for micro entity status, an acceptable Certification of Micro Entity Status must be submitted to establish micro entity status. (See 37 CFR 1.29 and forms PTO/SB/15A and 15B.)

- $ **140** basic filing fee.
- $ **30** surcharge.
- $( **65**) previous unapplied payment amount.
- $ **105** TOTAL FEE BALANCE DUE.

**Items Required To Avoid Processing Delays:**

Applicant is notified that the above-identified application contains the deficiencies noted below. No period for reply is set forth in this notice for correction of these deficiencies. However, if a deficiency relates to the inventor's oath or declaration, the applicant must file an oath or declaration in compliance with 37 CFR 1.63, or a substitute statement in compliance with 37 CFR 1.64, executed by or with respect to each actual inventor no later than the expiration of the time period set in the "Notice of Allowability" to avoid abandonment. See 37 CFR 1.53(f).

**This application, which was filed with an indication of micro entity status, fails to meet the requirements for establishing micro entity status because:**

- The certification of micro entity status is not signed by an authorized party under 37 CFR 1.33(b). (Authorized parties include a registered attorney or agent, the sole inventor identified as the applicant, or all the joint inventors identified as the applicant except that one joint inventor applicant may sign if appointed to prosecute

App. 492

EXHIBIT 3

Defendant's Exhibit 6

the application by all the other joint inventors.) Note that the name of the authorized party entered in the signature block of the micro entity certification must match any name given for the authorized party in the application file.

If micro entity status is established in reply to this notice by filing an acceptable Certification of Micro Entity Status, the fees itemized in the SUMMARY OF FEES DUE section of this Notice will be reduced to reflect the 75% micro entity discount, and any previous payment amount may be applied to the discounted fees.

If applicant is not entitled to micro entity status under 37 CFR 1.29, applicant may still qualify for a 50% reduction of fees if small entity status can be established under 37 CFR 1.27.

Replies must be received in the USPTO within the set time period or must include a proper Certificate of Mailing or Transmission under 37 CFR 1.8 with a mailing or transmission date within the set time period. For more information and a suggested format, see Form PTO/SB/92 and MPEP 512.

Replies should be mailed to:

Mail Stop Missing Parts
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

Registered users of EFS-Web may alternatively submit their reply to this notice via EFS-Web, including a copy of this Notice and selecting the document description "Applicant response to Pre-Exam Formalities Notice". https://sportal.uspto.gov/authenticate/AuthenticateUserLocalEPF.html

For more information about EFS-Web please call the USPTO Electronic Business Center at 1-866-217-9197 or visit our website at http://www.uspto.gov/ebc.

If you are not using EFS-Web to submit your reply, you must include a copy of this notice.

Questions about the contents of this notice and the requirements it sets forth should be directed to the Office of Data Management, Application Assistance Unit, at **(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/wtsige/

_____

App. 493

EXHIBIT 3

Defendant's Exhibit 6



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/710,055 | 02/08/2018 | Mario U. Scorza | |

**CONFIRMATION NO. 4515**

Mario Scorza
341 Old Mill Creek Dr.
Waco, TX 76712-6448

**WITHDRAWAL NOTICE**

*OC000000103264876*

Date Mailed: 10/23/2018

## Letter Regarding a New Notice and/or the Status of the Application

If a new notice or Filing Receipt is enclosed, applicant may disregard the previous notice mailed on 02/21/2018. The time period for reply runs from the mail date of the new notice. Within the time period for reply, applicant is required to file a reply in compliance with the requirements set forth in the new notice to avoid abandonment of the application.

Registered users of EFS-Web may alternatively submit their reply to this notice via EFS-Web. https://sportal.uspto.gov/authenticate/AuthenticateUserLocalEPF.html

For more information about EFS-Web please call the USPTO Electronic Business Center at **1-866-217-9197** or visit our website at http://www.uspto.gov/ebc.

If the reply is not filed electronically via EFS-Web, the reply must be accompanied by a copy of the new notice.

If the Office previously granted a petition to withdraw the holding of abandonment or a petition to revive under 37 CFR 1.137, the status of the application has been returned to pending status.

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/wtsige/

page 1 of 1

App. 494

EXHIBIT 3

Defendant's Exhibit 6

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 62/710,055 | 02/08/2018 | | 65 | | | |

**CONFIRMATION NO. 4515**

Mario Scorza
341 Old Mill Creek Dr.
Waco, TX 76712-6448

**FILING RECEIPT**



OC000000703264976

Date Mailed: 10/23/2018

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**

Mario U. Scorza, Waco, TX;

**Applicant(s)**

Mario U. Scorza, Waco, TX;

**Power of Attorney:** None

**Permission to Access Application via Priority Document Exchange:** No

**Permission to Access Search Results:** No

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

**If Required, Foreign Filing License Granted:** 02/21/2018

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 62/710,055**

**Projected Publication Date:** None, application is not eligible for pre-grant publication

**Non-Publication Request:** No

**Early Publication Request:** No
**\*\* SMALL ENTITY \*\***

page 1 of 3

App. 495

Defendant's Exhibit 6

**Title**

> This is a small portable hand-held scale that one can stand on to measure their weigh, can be used to take on cruise or anywhere from home

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

## LICENSE FOR FOREIGN FILING UNDER

### Title 35, United States Code, Section 184

### Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as

EXHIBIT 3

Defendant's Exhibit 6

set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

### *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

App. 497

EXHIBIT 3

Defendant's Exhibit 6

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/710,055 | 02/08/2018 | Mario U. Scorza | |

**CONFIRMATION NO. 4515**

Mario Scorza
341 Old Mill Creek Dr.
Waco, TX 76712-6448

**FORMALITIES LETTER**

*OC000000097544479*

Date Mailed: 02/21/2018

## NOTICE TO FILE MISSING PARTS OF PROVISIONAL APPLICATION

### FILED UNDER 37 CFR 1.53(c)

#### *Filing Date Granted*

An application number and filing date have been accorded to this provisional application. The items indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items and pay any fees required below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

- The statutory basic filing fee is insufficient.
- Surcharge as set forth in 37 CFR 1.16(g) must be submitted.
  The surcharge is due for late submission of filing fee or cover sheet.

**SUMMARY OF FEES DUE:**

The fee(s) required within **TWO MONTHS** from the date of this Notice to avoid abandonment is/are itemized below. Small entity discount is in effect. If applicant is qualified for micro entity status, an acceptable Certification of Micro Entity Status must be submitted to establish micro entity status. (See 37 CFR 1.29 and forms PTO/SB/15A and 15B.)

- $ **140** basic filing fee.
- $ **30** surcharge.
- $( **65**) previous unapplied payment amount.
- $ **105** TOTAL FEE BALANCE DUE.

**Items Required To Avoid Processing Delays:**

Applicant is notified that the above-identified application contains the deficiencies noted below. No period for reply is set forth in this notice for correction of these deficiencies. However, if a deficiency relates to the inventor's oath or declaration, the applicant must file an oath or declaration in compliance with 37 CFR 1.63, or a substitute statement in compliance with 37 CFR 1.64, executed by or with respect to each actual inventor no later than the expiration of the time period set in the "Notice of Allowability" to avoid abandonment. See 37 CFR 1.53(f).

**This application, which was filed with an indication of micro entity status, fails to meet the requirements for establishing micro entity status because:**

- The certification of micro entity status is unsigned. A certification of micro entity status must be signed by an authorized party under 37 CFR 1.33(b). (Authorized parties include a registered attorney or agent, the sole

page 1 of 2

App. 498

inventor identified as the applicant, or all the joint inventors identified as the applicant except that one joint inventor applicant may sign if appointed to prosecute the application by all the other joint inventors.)

If micro entity status is established in reply to this notice by filing an acceptable Certification of Micro Entity Status, the fees itemized in the SUMMARY OF FEES DUE section of this Notice will be reduced to reflect the 75% micro entity discount, and any previous payment amount may be applied to the discounted fees.

If applicant is not entitled to micro entity status under 37 CFR 1.29, applicant may still qualify for a 50% reduction of fees if small entity status can be established under 37 CFR 1.27.

Replies must be received in the USPTO within the set time period or must include a proper Certificate of Mailing or Transmission under 37 CFR 1.8 with a mailing or transmission date within the set time period. For more information and a suggested format, see Form PTO/SB/92 and MPEP 512.

Replies should be mailed to:

Mail Stop Missing Parts
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

Registered users of EFS-Web may alternatively submit their reply to this notice via EFS-Web, including a copy of this Notice and selecting the document description "Applicant response to Pre-Exam Formalities Notice". https://sportal.uspto.gov/authenticate/AuthenticateUserLocalEPF.html

For more information about EFS-Web please call the USPTO Electronic Business Center at 1-866-217-9197 or visit our website at http://www.uspto.gov/ebc.

If you are not using EFS-Web to submit your reply, you must include a copy of this notice.

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/ttran/
_____

**Defendant's Exhibit 6**



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 62/710,055 | 02/08/2018 | | 65 | | | |

**CONFIRMATION NO. 4515**

**FILING RECEIPT**

Mario Scorza
341 Old Mill Creek Dr.
Waco, TX 76712-6448


OC000000097544478

Date Mailed: 02/21/2018

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**

Mario U. Scorza, Waco, TX;

**Applicant(s)**

Mario U. Scorza, Waco, TX;

**Power of Attorney:** None

**Permission to Access Application via Priority Document Exchange:** No

**Permission to Access Search Results:** No

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

**If Required, Foreign Filing License Granted:** 02/21/2018

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 62/710,055**

**Projected Publication Date:** None, application is not eligible for pre-grant publication

**Non-Publication Request:** No

**Early Publication Request:** No
**\*\* SMALL ENTITY \*\***

page 1 of 3

App. 500

EXHIBIT 3

Defendant's Exhibit 6

**Title**

> This is a small portable hand-held scale that one can stand on to measure their weigh, can be used to take on cruise or anywhere from home

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

## LICENSE FOR FOREIGN FILING UNDER

### Title 35, United States Code, Section 184

### Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as

EXHIBIT 3

Defendant's Exhibit 6

set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

EXHIBIT 3
Defendant's Exhibit 6

U.S. PTO
62/710055
02/08/2018

02205   U.S. PTO
020818

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 1 of 2
This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. _____

### INVENTOR(S)

| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
|---|---|---|
| MARIO U. SCORZA | SCORZA | 341 OLD MILL CREEK DR, WOODWAY, TX (WACO) 76712 |
| | | |
| | | |
| | | |

Additional inventors are being named on the _____ separately numbered sheets attached hereto.

### TITLE OF THE INVENTION (500 characters max):

THIS IS A SMALL PORTABLE HAND-HELD SCALE THAT ONE CAN STAND ON TO MEASURE THEIR WEIGHT. CAN BE USED TO TAKE ON CRUISE OR ANY WHERE FROM HOME.

Direct all correspondence to:      **CORRESPONDENCE ADDRESS**

[ ] The address corresponding to Customer Number:      SAME AS ABOVE

**OR**

[ ] Firm or

Addre...      Mr Mario Scorza
             341 Old Mill Creek Dr
             Waco, TX  76712-6448      254-715-0243 cell

City ...                                               Zip

Count...                                 ...phone      Email

### ENCLOSED APPLICATION PARTS (check all that apply)

[ ] Application Data Sheet. See 37 CFR 1.76.          [ ] CD(s), Number of CDs _____
[X] Drawing(s)   Number of Sheets  8                  [ ] Other (specify) _____
[X] Specification (e.g., description of the invention)   Number of Pages  8

**Fees Due:** Filing Fee of $260 ($130 for small entity) ($65 for micro entity). If the specification and drawings exceed 100 sheets of paper, an application size fee is also due, which is $400 ($200 for small entity) ($100 for micro entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

### METHOD OF PAYMENT OF THE FILING FEE AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT

[X] Applicant asserts small entity status. See 37 CFR 1.27.
[X] Applicant certifies micro entity status. See 37 CFR 1.29.
    Applicant must attach form PTO/SB/15A or B or equivalent.
[X] A check or money order made payable to the *Director of the United States Patent
    and Trademark Office* is enclosed to cover the filing fee and application size fee (if applicable).
[ ] Payment by credit card. Form PTO-2038 is attached.
[ ] The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit
    Account Number: _____

$65.00

**TOTAL FEE AMOUNT ($)**

### USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT
This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 10 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**EXHIBIT 3**

*Defendant's Exhibit 6*

PTO/SB/16 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 2 of 2

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

☒ No.

☐ Yes, the invention was made by an agency of the U.S. Government. The U.S. Government agency name is: _____

_____

☐ Yes, the invention was made under a contract with an agency of the U.S. Government. The name of the U.S. Government agency and Government contract number are: _____

_____

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

SIGNATURE _Marco George_   DATE 2-5-18   ?

TYPED OR PRINTED NAME MARIO SCORZA   REGISTRATION NO. _____ ?
*(if appropriate)*

TELEPHONE 254-715-0243   DOCKET NUMBER _____ ?

IN THE EVENT OF MY BECOMING MENTALLY DEFICIENT OR DEATH MY DAUGHTER VALERIE ANN SALDANA WILL BE MY HEIR TO THE TRAVA-WEIGH.

VALERIE ANN SALDANA
LEAGUE CITY, TEXAS
832-407-0839

SIGNED _[signature]_

Defendant's Exhibit 6



Photo of Actual Prototype Product Sample

# TRAVA-WEIGH ™

## Portable Scale

### New Discovery!

Are you trying to keep track of your weight? It can be difficult to check your weight when traveling because hotels often do not have scales. Trava-Weigh™ is the scale you need wherever you go! It is a portable bathroom scale with a custom carrying bag. Great for home or travel! Easily transport this scale anywhere! This scale is portable, compact and lightweight. It can fit into luggage or carried separately. The scale has an easy to read LCD display and shows weight in pounds or kilograms. Trava-Weigh™- the best way to keep track of your weight wherever you go!

### How Is It Made?

Through many hours of design strategy implementation, we have accomplished our goal: a cost-effective and easy to manufacture product. It has a cut-and-sewn cordura cover, a cut-and-sewn hook and loop closure, a stamped styrene stiffener, and a cut-and-sewn nylon webbing handle.

A prototype product sample has been built, and Pro-E technical drawings are available.



EXHIBIT 3

Defendant's Exhibit 6

Defendant's Exhibit 6

EXHIBIT 3

FOR QUOTATION ONLY
Pro/ENGINEER

PAGE #:

| INDEX | PART NAME | QTY |
|-------|-----------|-----|
| 1 | STIFFENER-1 | 2 |
| 2 | STIFFENER-4 | 2 |
| 3 | STIFFENER-3 | 2 |
| 4 | STIFFENER-2 | 2 |
| 5 | HOOK | 4 |
| 6 | LOOP | 4 |
| 7 | HANDLE | 1 |
| 8 | COVER | 2 |

TITLE: TRAVA-WEIGH

SHEET SIZE: A | REVISION: 21-Jul-17 | MATERIAL: | MFG. PROCESS: | WALL THICKNESS (in.): | APPROX. WEIGHT (g): | COLOR: | QUANTITY: | DRAWN BY: SS | SCALE: 0.100



| | | | | | |
|---|---|---|---|---|---|
| STIFFENER-1 | STAMPED | 0.04 | WHITE | SS | |
| TITLE: | MFG. PROCESS: | WALL THICKNESS (in.): | COLOR: | DRAWN BY: | |
| A | 21-Jul-17 | STYRENE | 2 | 0.200 | |
| SHEET SIZE: | REVISION: | MATERIAL: | APPROX. WEIGHT (g): | QUANTITY: | SCALE: |

FOR QUOTATION ONLY
Pro/ENGINEER

1/8
PAGE #:

Defendant's Exhibit 6

EXHIBIT 3

FOR QUOTATION ONLY
Pro/ENGINEER

2/8
PAGE #:

11.38

1.25

| STIFFENER-4 | STAMPED | 0.04 | WHITE | SS |
|---|---|---|---|---|
| TITLE: | MFG. PROCESS: | WALL THICKNESS (in.): | COLOR: | DRAWN BY: |
| A | 21-Jul-17 | STYRENE | 2 | 0.300 |
| SHEET SIZE: | REVISION: | MATERIAL: | QUANTITY: | SCALE: |

Defendant's Exhibit 6

EXHIBIT 3



Defendant's Exhibit 6

EXHIBIT 3

App. 510

FOR QUOTATION ONLY
Pro/ENGINEER

|← 11.13 →|

1.00

Defendant's Exhibit 6

EXHIBIT 3

| STIFFENER-2 | STAMPED | 0.04 | WHITE | SS |
|---|---|---|---|---|
| TITLE: | MFG. PROCESS: | WALL THICKNESS (in.): | COLOR: | DRAWN BY: |
| A | 21-Jul-17 | STYRENE | 2 | 0.300 |
| SHEET SIZE: | REVISION: | MATERIAL: | QUANTITY: | SCALE: |

FOR QUOTATION ONLY
Pro/ENGINEER

.75

.75

| TITLE: HOOK | MFG. PROCESS: | | WALL THICKNESS (in.) | COLOR: BLACK | DRAWN BY: SS |
|---|---|---|---|---|---|
| SHEET SIZE: A | REVISION: 21-Jul-17 | MATERIAL: | APPROX. WEIGHT (g): | QUANTITY: 4 | SCALE: 2.000 |

Defendant's Exhibit 6

EXHIBIT 3

App. 512

FOR QUOTATION ONLY
Pro/ENGINEER

| TITLE: LOOP | MFG. PROCESS: | | WALL THICKNESS (in): | COLOR: BLACK | DRAWN BY: SS |
|---|---|---|---|---|---|
| SHEET SIZE: A | REVISION: 21-Jul-17 | MATERIAL: | APPROX. WEIGHT (g): | QUANTITY: 4 | SCALE: 2.000 |

Defendant's Exhibit 6

EXHIBIT 3

App. 513



Defendant's Exhibit 6

EXHIBIT 3



Defendant's Exhibit 6

EXHIBIT 3

App. 515

EXHIBIT 3

Doc Code: MES.GIB
Document Description: Certification of Micro Entity Status (Gross Income Basis)

PTO/SB/15A (03-13)

## CERTIFICATION OF MICRO ENTITY STATUS
### (GROSS INCOME BASIS)

| Application Number or Control Number (if applicable): | Patent Number (if applicable): |
|---|---|
| | |

| First Named Inventor: MARIO SCORZA | Title of Invention: TRAVA - Weigh |
|---|---|

The applicant hereby certifies the following—

(1) **SMALL ENTITY REQUIREMENT** - The applicant qualifies as a small entity as defined in 37 CFR 1.27.

(2) **APPLICATION FILING LIMIT** - Neither the applicant nor the inventor nor a joint inventor has been named as the inventor or a joint inventor on more than four previously filed U.S. patent applications, excluding provisional applications and international applications under the Patent Cooperation Treaty (PCT) for which the basic national fee under 37 CFR 1.492(a) was not paid, and also excluding patent applications for which the applicant has assigned all ownership rights or is obligated to assign all ownership rights as a result of the applicant's previous employment.

(3) **GROSS INCOME LIMIT ON APPLICANTS AND INVENTORS** - Neither the applicant nor the inventor nor a joint inventor, in the calendar year preceding the calendar year in which the applicable fee is being paid, had a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986 (26 U.S.C. 61(a)), exceeding the "Maximum Qualifying Gross Income" reported on the USPTO website at http://www.uspto.gov/patents/law/micro_entity.jsp which is equal to three times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census.

(4) **GROSS INCOME LIMIT ON PARTIES WITH AN "OWNERSHIP INTEREST"** - Neither the applicant nor the inventor nor a joint inventor has assigned, granted, or conveyed, nor is under an obligation by contract or law to assign, grant, or convey, a license or other ownership interest in the application concerned to an entity that, in the calendar year preceding the calendar year in which the applicable fee is being paid, had a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986, exceeding the "Maximum Qualifying Gross Income" reported on the USPTO website at http://www.uspto.gov/patents/law/micro_entity.jsp which is equal to three times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census.

| SIGNATURE by a party set forth in 37 CFR 1.33(b) | | | |
|---|---|---|---|
| Signature | *Marco Scorza* | | |
| Name | TRAVA - Weigh | | |
| Date 2-5-18 | Telephone 254-715-0243 | Registration No. | |

☑ There is more than one inventor and I am one of the inventors who are jointly identified as the applicant. Additional certification form(s) signed by the other joint inventor(s) are included with this form.

App. 516

EXHIBIT 3

Defendant's Exhibit 6

PATENT APPLICATION SERIAL NO._____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

02/09/2018 ZJUHAR1  00000012 62710055

01 FC:3005                                    65.00 OP

PTO-1556
(5/87)

'U.S. Government Printing Office: 2002- 489-267/69033

EXHIBIT 3

Document Code: IMIS

Defendant's Exhibit 6

## Notice of Fee Due

Application Number:  62710055 _____   Date:         2/8/2018 _____

Fees are due for the application or document dated 02/8/2018_____.  The
payment was not collectable for the reason indicated below.

**Note: If the fee due is for any of the filing fees, the surcharge for late payment of the
filing fees is now due as well.**

☑ Insufficient payment by check or money order.

☑ No authorization to charge a deposit account.

☐ Invalid deposit account number.

☐ User name not listed in deposit account _____ at _____:_____ (time).

☐ Insufficient funds in deposit account _____ at _____:_____ (time).

☐ Insufficient payment by credit card.

☐ Declined credit card _____:_____ (time).

Fee code(s) to be applied:          3005 _____          $70 _____

                                     3005 _____          $ 65 - _____

                                     _____              _____

                                     _____              _____

                                     _____              _____

Amount in holding fee code:          _____              $ _____

                                     1622/2622            $ _____

                                     1206/2206            $ _____

                                     1999                 $ _____

Total remaining due from applicant:                       $5 _____

RAM Operator____ZJ_____

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

## Defendant's Exhibit 7

Defendant's Exhibit 7

# BEFORE THE TRIBUNALS OF

# THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| MARIO SCORZA, | § | |
| *Claimant,* | § | |
| | § | |
| V. | § | NO. 01-21-0004-6369 |
| | § | |
| DAVISON DESIGN AND | § | |
| DEVELOPMENT, INC. | § | |
| *Respondent* | § | |

## CLAIMANT'S POST-HEARING BRIEF

## Table of Contents

I.   FACTS ............................................................................................................ 2

II.   CONTRACTUAL DUTY ............................................................................. 10

III.   DUTY OF CARE IN TORT ......................................................................... 11

IV.   CAUSES OF ACTION ................................................................................. 15

   A.  Breach of Contract ................................................................................. 15

   B.  Common Law Fraud .............................................................................. 15

   C.  Fraud By Concealment and Non-Disclosure/Omission ........................ 16

   D.  Negligent Misrepresentation ................................................................. 17

   E.  Fraud in the Inducement ........................................................................ 18

   F.  Common Law Negligence ..................................................................... 19

V.   PENNSYLVANIA UTPACPL ................................................................... 20

   A.  Applicability .......................................................................................... 20

   B.  Violations .............................................................................................. 21

   C.  Strict Liability ....................................................................................... 22

   D.  Damages & Trebled Damages ............................................................... 24

VI.   CONTRACTUAL DISCLAIMERS OF LIABILITY ................................. 25

VII.   DAMAGES .................................................................................................. 28

VIII.   CONCLUSION ............................................................................................ 30

Claimant, Mario Scorza, (hereafter "Scorza") contracted with Davison Development and Design, Inc. (hereafter "Davison") for services related to invention development, wherein several sequential agreements were entered into as to facilitate Claimant's introduction into the weight scale market between January 2017 and December 2020. Parties held an Arbitration Hearing on the Merits in January and February of 2023 and submit this post-hearing brief for consideration:

## I.    FACTS

At the conclusion of three (3) days of evidentiary hearings spanning over several weeks, including testimony from Mr. Scorza's patent expert, damages expert, and himself, as well as Davison's representatives, Davison remains recalcitrant and refuses to admit that even one of its willful, wonton, or negligent actions leads to even a modicum of liability producing not even an ounce of obligation to Mr. Scorza. In fact, despite an onslaught of overwhelming evidence, Davison is confident in its deftly "contracted for" impunity and bolsters itself through its documents of adhesion, which Davison believes absolves it of all past indiscretions and future transgressions. Simply, Davison has an unfounded belief that it can contract away from absolutely every possibility wherein Davison is culpable or has any responsibility to its clients – a departure from reality from which Davison has been handsomely rewarded.  Yet, the evidence provided, in addition to the documents Davison conveniently *cannot* provide, i.e., the nondisclosure agreements, undeniably proves that Davison's "products and services" are just smoke and mirrors.

Based on the factual evidence the following is clear:

1.  Davison authored, and irrefutably argues that its contracts that are iron clad and absolve Davison of all liabilities.

2.  Scorza entered into the following agreements:

    a.  "Pre-Development and Representation Agreement" ("Pre-Development Agreement") signed on or around January 12, 2017, for $795. Respondent

Hearing Exhibit (*hereinafter* "R") 3; Claimant Hearing Exhibit (*hereinafter* "Cl.") 48.

    b.  "New Product Sample Agreement" ("NPSA") signed on or around March 29, 2017, for $14,757. R. 7; Cl. 11.

    c.  "Multi Company Campaign Agreement" ("MCC") signed on or around December 14, 2018, for $3,995. R. 16; Cl. 49.

    d.  "Inventomercial Presentation Agreement" ("IPA") signed on or around December 19, 2018, for $1,495. R. 17; Cl. 44.

3. Davison had a contractual duty to Scorza to aid and instruct his inventive endeavors.

4. Davison emphasized the importance of obtaining patent rights by means of a provisional patent application in the Pre-Development Agreement and without a provisional patent application, Davison would not engage with potential target companies. R. 3.

5. Davison attempted to file the provisional applications twice, but *failed* to competently file Scorza's Provisional Patent Applications as follows:

    a.  First attempt was an application signed by Scorza on February 22, 2017, whereafter Scorza mailed an application to Davison for filing to the United States Patent and Trademark Office ("USPTO"); however, Davison **failed** to include the necessary parts as evidenced by the Office Action for Notice of Incomplete Provisional Application. Cl. 5 (First Provisional and Notice).

    b.  Second attempt was an application signed by Scorza on February 5, 2018, whereafter Scorza mailed the application to Davison for filing to the USPTO; however, Davison **failed** to include proper payment amount as evidenced by the Office Action for Notice to File Missing Parts of Provisional Application, a difference of **only** Five Dollars ($5). Cl. 6 (Second Provisional and Notice).

    c.  According to the USPTO Manual of Patent Examining Procedure (MPEP) § 601 (a)(4), "[T]he filing date of an application shall be the date on which a *specification*, with or without claims, is received in the United States Patent and Trademark Office." 35 U.S.C. 111 (b)). Here it is the case that Davison classifies and stores the

first attempt as "PATENT & FILING RECEIPT" and the second attempt as "CLIENT PATENT," but no official filing receipt was ever issued by the USPTO and a filing date was never afforded or granted to Scorza. Cl. 43, p. Davison_000073.

6. Davison's witness Frank Vescio ("Vescio") testified that Davison undertook the duty to file all provisional patent applications by submitting the application to the USPTO, along with a check for the necessary filing fee, on behalf of its clients.

7. Scorza testifies that he submitted all requested paperwork and payments to Davison and was informed by Larry Rifkin ("Rifkin") that his idea was a "Green Flag" and Mr. Rifkin commented that "there was nothing like it" and Scorza's idea was "good to go" unlike lots of other ideas which are deemed "red flags," meaning they do not go "very far." Cl. 30, p. Scorza_00061.

8. Through the testimony of patent expert Scott McBride ("Mr. McBride"), Mr. Scorza's patent rights were irreparably lost due to Davison's negligent mishandling of each patent filing and based on the actions of Davison, Davison was undoubtedly practicing patent law by mailing provisional patent applications to the USPTO with the filing fee; even if the application was incomplete, the actions by Davison to mail in the application constitutes practicing patent law. Furthermore, despite being given *actual* notice on multiple occasions by Scorza of the filing deficiencies, Davison failed to take any measures to correct the deficient and incomplete filings and protect Scorza's patent rights. Cl. 5, 6 & 12; R. 23.

9. Davison further emphasized the importance of confidentiality in the Pre-Development Agreement and other subsequent agreements, in the sense that Scorza should not communicate with any other parties regarding his invention the "Trava-Weigh." Cl. 45. Veciso Arb. Test., Feb. 1, 2023.

10. Davison held the exclusive right to communicate with target companies and divulged confidential invention information regarding the Trave-Weigh to multiple entities. Cl. 41, p. Davison_000042; R. 6; R. 23, p. Davison_000042.

4

11.  Davison marked the product sample renderings with the language "Patent Pending," with actual knowledge of its falsity. R. 8; Cl. 13.

12. Davison is unable to proffer to Scorza a single Non-Disclosure Agreement ("NDA") protecting the confidentiality of Scorza's invention to even one company in which "Video Reality Product Presentations" ("VRPP") were made and "Video Ideation Sketch" ("VIS") sent to. *See* Cl. 41, Davison_000042 & Davison_000048 (companies VRPP was made to: Sonashi, Cuisinart, Globe Food Equipment Company, Sumdex, Exceptional Products, Inc., Riverstone Industries, HAD Trading Corp and Delsey Luggage, Inc; and companies VIS were sent to: Delsey Luggage, Inc., HDS Trading Corp., Riverstone Industries, Exceptional Products, Inc., and Sumdex). Davison attempts to deceive this Tribunal into believing that NDA's were sent out to the above companies. It references unsigned form NDA agreements. **Absolutely no signed NDA's were ever offered into evidence, or even produced in response to Scorza's discovery requests. They do not exist.**  Like the patent applications, NDA's simply were not relevant to Davison's way of making money.

13. Through the testimony of patent expert Mr. McBride, Mr. Scorza's patent rights were barred by both (1) public disclosure and (2) an offer to sell, under Section 2152 of the MPEP defining 35 USC Section 102 requirements. Further, under USPTO mandated guidelines, *reduction to practice* started the one-year clock for filing a patent application, and failure to observe this resulted in Scorza losing his patent rights.

14. Through the testimony of damages expert, Dr. Kenneth Lehrer ("Dr. Lehrer"), the loss of the rights to the patent resulted in a loss of value to Mr. Scorza of about $3.45 million dollars over 10 years. In order to calculate the damages, Dr. Lehrer set the stage testifying that the best way to value a lost patent is through a model business enterprise producing and selling the invention.  Cl. 38, p. 4, 8-10.

It is clear from the factual evidence and testimony from Davison's own representative, Mr. Vescio that the negligence of Davison to observe its own self-directed and drafted clauses to competently and correctly file Claimant's Provisional Patent Application, on two (2) distinct

5

occasions; to correct Davison's negligent mishandling of patent filings; as well as disclosing confidential invention information to multiple target companies are the direct and immediate cause of Mario Scorza's economic and irreparable injury.

It is of upmost importance to make note that this is not the first time that Davison has committed this conduct. In fact, this is an established pattern, a well-oiled machine, a scam, that Davison has been maliciously practicing since 1989 and were prosecuted for by the Federal Trade Commission ("FTC") in Western District of Pennsylvania under "Project Mousetrap." The Judge issued a $26 million dollar judgment against Davison along with a finding of fact and conclusions. *See* Cl 17. Vescio during his testimony *wholeheartedly denies* all findings of fact and conclusions of law – stating that the Judge was "dead wrong" – and that none of the following actions, during his twenty plus years, carried out by Davison are true:

1. Reasonably Good Chance of Financial Gain - Based on the overall, common sense, net impression on a reasonable consumer, Davison falsely represent, both directly and by implication, that consumers who buy their services stand a reasonably good chance of realizing financial gain by: (a) representing that they are selective as to whom they offer services based on the quality, value, and/or originality of a consumer's idea; (b) representing that they have a genuine stake in the consumer's invention through royalties, when in fact, fees charged, and not royalties collected, are the main source of defendants' income; and (c) misrepresenting their track record.

2. Misrepresentation of Track Record - The overall, common sense, net impression on a reasonable consumer of Davison's track record overstates the reasonable possibility of financial gain.

3. Many Products are Profitable - Regardless of how Davison inflates its track record, there is no reasonable implication from Davison's overall marketing and sales materials that "many" consumers have made a profit as a result of using their services.

4. Profitability of Certain Products - While it is true that defendants never use the term "profitable" in reference to these particular products, based on the overall, common

6

sense, net impression, a reasonable consumer would equate such specific statements of successful sales and marketing with profit.

5. <u>Special Access to Corporations</u> - Based on the overall, common sense, net impression on a reasonable consumer Davison falsely represent that they have a vast network of corporations with whom they have ongoing, special relationships, and with whom they regularly negotiate successful licensing agreements. Pre-Complaint, Davison told consumers explicitly that they worked directly with manufacturers, had close personal contacts, and cut through the "red tape" and the "old boys' network" to obtain licenses for their clients. Although this may be technically true of a handful of smaller companies, Davison implied that they had such relationships with hundreds of *large*, nationally known companies, which they did not.

6. <u>Close Working Relationship</u> - Through the corporate montage, Davison implies relationships with companies that have not even registered with Davison as being willing to accept new product ideas from them.

7. <u>Necessity of Services</u> - Based on the overall, common sense, net impression on a reasonable consumer, Davison misrepresent that its invention marketing services are necessary for consumers to license their invention ideas to corporations. Davison explicitly states that its virtual reality/prototype product presentation portfolios will get the consumer's idea "taken seriously" and are a "necessity" when working with large corporations. Although a reasonable consumer expects a salesperson to portray his products in the best light possible and to try to convince the consumer that he is selling something that the consumer must have, Davison claims to have expertise and experience in licensing products to large corporations and uses this perceived position of superior knowledge over the consumer to convince the consumer that when a salesperson says that something is needed in order to proceed, it is.

8. <u>Executive Summary</u> - Based on the overall, common sense, net impression on a reasonable consumer Davison misrepresents that it prepares objective and expert analyses of the marketability of consumers' invention ideas.

7

Undoubtedly, the FTC ruling has not enjoined Davison's abhorrent activity but rather instructed Davison to artfully choose and finesse its words, hone its skills and more closely observe the demarcated path defined by the FTC to adhere to the strict letter of the FTC ruling, while entirely eviscerating the FTC's intent. Davison, along with the hefty fine of $26 million, was required to provide an Affirmative Disclosure Statement in a clear and conspicuous manner, but this statement does not evade the fact that Davison continues to play on the fine line drawn by the FTC. Cl. 16; Cl. 17. To date, Davison continues to create a situation of peril where Davison ultimately ends up bamboozling customers for money.

On the other hand, Dr. Lehrer provides an analysis of what Mr. Scorza's money would have gotten him if Davison adhered to its contracts, duty of care, filed the patent applications competently, instead of deceiving Mr. Scorza.

1. Dr. Lehrer refers to the enterprise model also as "The Theory of the Firm." Cl. 38, p. 8-10. "The value of the firm is the present value of the firm's expected future net cash flows," and there is no need to account for inflation, because the present value analysis was not discounted. *Id.*, p. 9. Dr. Lehrer Arb. Test., Jan. 19, 2023.

2. Dr. Lehrer unveiled that the personal scales market is a growing market in the United States and is currently valued at $670 million per year. Typical conservative market captures for new products in the consumer goods market would run in the 0.08% to 0.12% of the market. A price per unit in the $20-25 range would be appropriate for the new product, based on similar competitive products. Dr. Lehrer Arb. Test., Jan. 19, 2023.

3. Twenty-five years ago, the most appropriate business enterprise model for a patent or invention would be a firm that sold the product in a retail brick and mortar establishments. However, due to the internet retail revolution, the most typical business enterprise model today for a consumer good is to produce the good in China or a similar low-cost location and to sell them through an online retail platform, such as Amazon. Dr. Lehrer Arb. Test., Jan. 19, 2023.

App. 527

4.  Dr. Lehrer testified a future or hypothetical business is valued by means of a sensitivity analysis, also known as a Monte Carlo analysis - a sensitivity analysis based on a variation of a set of scenarios or the process of varying model input parameters over a reasonable range (range of uncertainty in values of the model's parameters) and observing the relative change in the model's response. Dr. Lehrer further testified that this method is often used for merger or acquisition fairness opinions when target companies feature a new product.  It is also used and found reliable in SEC filings, particularly those featuring forward looking statements; and Dr. Lehrer testified that he has previously performed Monte Carlo analyses that have been in used in merger and acquisition fairness opinions and SEC filings.

5.  Dr. Lehrer consulted with Amazon Co. and a customs broker and import-export attorney to appropriately model costs and expenses for his business enterprise model. He accounted for: cost of goods sold, manufacturing fees, an Amazon 10 year Retailer Plan; Amazon's commission per unit sold; container costs for import; harbor maintenance fees; tariffs; warehouse transport costs; Customs goods examination costs; customs brokerage fees; yearly import bond; demurrage; inspection fees; insurance; and miscellaneous costs.  Applying these expenses, Dr. Lehrer found the cost of goods sold in the 15% range, and the costs and expenses in the 30-33% of revenues, resulting in profits in the 47-50% of revenue range. Dr. Lehrer Arb. Test., Jan. 19, 2023.

6.  Dr. Lehrer's testimony proposed market capture numbers leads to a patent valuation of around $3.45 million dollars over 10 years based on an average of the provided scenarios:

    a.  A low range capture of 0.08% of the $670 million per year market would lead to revenues of $536,000/year or around $2.5 million of lost profits in 10 years.

    b.  A mid-range capture of 0.10% of the $670 million per year market would lead to revenues of $670,000/year or around $3.7 million of lost profits in 10 years.

    c.  A high-range capture of 0.12% of the $670 million per year market would lead to revenues of $840,000/year or around $4.1 million of lost profits in 10 years.

9

## II.    CONTRACTUAL DUTY

Under Pennsylvania law, a party to a contract has two duties: (1) a contractual duty and (2) a legal duty to act without negligence toward both the other party to the contract and third parties. *Weiser v. Bethlehem Steel Corp.*, 508 A.2d 1241, 1245 (Pa. Super. 1986).

First and foremost, in the Pre-Development Agreement, Davison established its own contractual obligation to file a Provisional Patent Application on behalf of Mr. Scorza. (Cl. 48, Davison_000332). Having taken this obligation upon itself, Davison has the additional responsibility to competently observe and accomplish the dictates of the "essential terms", in essence to conform to meet that duty, by substantially performing the agreed-upon task. This substantial performance is defined where: [I]n Pennsylvania, the equitable doctrine of substantial performance protects "those who have faithfully and honestly endeavored to perform their contracts in all material and substantial particulars, so that their right to compensation may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects." *Mort Co. v. Paul*, 76 A.2d 445, 447 (Pa. Super. Ct. 1950). Here, it is undoubtedly the case that no filing was ever granted, no rights were preserved, and no rights are retrievable, thus Mr. Scorza is forever damaged.

According to Davison's NPSA, Davison was contractually obligated to provide, both, a final product (with packaging) and to accept "all reasonable requests" which "are consistent with the goal of solving the problem in a simple and cost-effective manner." Cl. 22, SCORZA0002-0004. Neither was accomplished. Mr. Scorza, was never provided with any sort of product sample. Mr. Scorza only received computerized renderings, contrary to Davison's contractual obligation to develop and provide a physical product sample. Scorza Arb. Test., Feb. 18, 2023.

Further, and most telling, Davison failed to produce even an iota of assistance, even after multiple documented implorations and pleas, to attempt any remediation of Mr. Scorza's increasingly dire position. Cl. 12; R. 23.  Davison's breach of its contracts, combined with a failure to remedy, has undoubtedly caused direct harm to Mr. Scorza, including, but is not limited to, the complete annihilation of any possibility Mr. Scorza had of receiving patent rights due to Davison's deficient patent applications and wonton disregard for Mr. Scorzas perilous

position. Davison's inability to achieve the most rudimentary status of "Patent Pending" on either of Mr. Scorza's Provisional Patent Applications, as detailed in our Patent Expert Report, is just two examples of Respondent's ineptitude and callous disregard reflected in Davison's numerous exponentially consequential contractual breaches. Cl. 5 & 6.

### III.    DUTY OF CARE IN TORT

The primary element in a negligence cause of action is that the defendant owes a duty of care to the plaintiff. *See Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 280 (2005). The concept of duty in a tort setting can be intertwined with contractual notions of privity, as is the case here, where the task is to determine whether the relationship between the parties gives rise to a duty. *Id*. at 281.

The Supreme Court of Pennsylvania has held that the "determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (2000). This traditional approach to duty in tort can be used to show that Davison owed a duty to Mr. Scorza, which Davison subsequently breached, and failed to cure, despite Mr. Scorza's pleas for remediation and therefore caused immense damage over the course of several years – damage which continues to be wrought to this day.

First, as previously stated, Scorza contracted with Davison for services related to invention development, wherein several sequential agreements were entered into as to facilitate Mr. Scorza's introduction into the weight scale market between January 2017 and December 2020. These agreements and correlated communications that were based on Davison's negligently misleading and mischaracterized assertions unbeknownst to Mr. Scorza, clearly indicate a relationship existed between the two parties. Further, Mr. Scorza invested in and relied upon Davison's intentional misrepresentations of material facts germane to the parties' relationship, resulting in damages.

11

Second, on the question of the social utility of the conduct at issue, obviously patent research and development services play an important role in promoting the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive *right* to their respective writings and discoveries. U.S. Const. art. I, § 8, cl. 8. Purposively, this is the only use of the word "right" used by our Founding Fathers throughout the U.S. Constitution wherein the importance of such a right form the undergirding of our country's entire basis.  But, by the same token, given the important reliance placed upon such services, there is no reason to exempt such parties who take on a positive, contractual duty upon themselves to *attempt* to practice law and engage in successful patent filing services, successfully or otherwise, from the tort consequences of a negligent failure to perform those services in a competent fashion.

Third, Davison was aware that it put Mr. Scorza at risk of potential harm. Davison repeatedly informed Mr. Scorza of the importance of obtaining such patent rights and the need to keep his invention confidential. Cl. 45; Cl. 41, p. Davison_000042; R. 6; R. 23, p. Davison_000042. The risk to Mr. Scorza's patent rights was known to Davison and the loss and consequences of that loss were entirely foreseeable by Davison, where Davison was the harbinger of the ill and the custodian of Mr. Scorza's jeopardy. As evidenced by every argument and direct testimony made in these proceedings, Mr. Scorza earnestly believed that Davison was acting as a fiduciary who was going to aid him in achieving his longtime hopes and dreams. But unfortunately, Mr. Scorza was sorely mistaken because Davison led Mr. Scorza to believe it was acting in his interest, instead of advancing Mr. Scorza's objective of taking his invention to market.

Fourth, the consequence of imposing such a duty upon Davison to file a U.S. Provisional Patent Application c*ompetently and successfully* is neither unreasonable nor unduly burdensome where Davison itself contractually adopted not only the duty to file the application but undertook the corresponding obligation to accomplish that duty proficiently and correctly. While Davison could have just as easily placed the onus to file upon Mr. Scorza across its plethora of agreements' many sections of consents, mutual understandings and commitments, it did not. The present action seeks to merely hold Davison to its own self-imposed duty.

12

Finally, finding that an affirmative duty undoubtedly exists, and Davison is in breach thereof, serves the overall public interest by discouraging negligence among operators in the "invention help" space. Generally, by directly focusing on the actions of Davison and Davison's malfeasance, specifically, while not requiring any more of them than what was contractual bargained for or that which is required of the reasonable concern faced with foreseeability of harm in a tort paradigm applicable to all. Moreover, the unfair harm of taking one's hard-earned dollars, over twenty thousand of Mr. Scorza's dollars, with no results and no intention of ever satisfying Davison's contractual obligations screams that a solution be implemented to protect the overall public interest to ensure that society is not being robbed of their hard earnings or ingenuity.

The Supreme Court of Pennsylvania has observed that "[i]n scenarios involving an actor's affirmative conduct, he is generally 'under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act." *Seebold v. Prison Health Services, Inc.*, 57 A.3d 1232, 1246 (2012) (quoting Section 302 cmt. A of the Restatement (Second) of Torts). The Court explained that "[t]his duty appropriately undergirds the vast expanse of tort claims in which a defendant's affirmative, risk-causing conduct is in issue." *Id.* Generally, there is no duty to protect or rescue someone who is at risk on account of circumstances the defendant had no role in creating. However, when Davison's affirmative conduct of entering into a contract to file a provisional patent application and taking the action to mail said application to the USPTO it created the risk of financial and property loss for Mr. Scorza, a duty to protect and rescue was created. *Dittman v. UPMC*, 196 A.3d 1036, 1046 (2018) (holding that UPMC owed Employees a duty to exercise reasonable care to protect them against an unreasonable risk of harm arising out of an act UMPC required as a condition of employment). Here it is the case that Davison enriched themselves by exciting Mr. Scorza's hopes and dreams with false and inducing words. Further, Davison was derelict in its duty to Mr. Scorza, mishandling documents of great legal consequence and importance to Mr. Scorza which placed Mr. Scorza in a legal jeopardy affecting his patent rights completely and indefinitely and subsequently failed to rescue Mr. Scorza from the peril that Davison created (with actual notice

13

thereof). Ultimately, Davison induced Mr. Scorza to spend thousands of dollars out of the funds intended to be invested in his grandson's education and to sustain the life of his medically disabled daughter, leaving Mr. Scorza in a worse shape and condition. Scorza Arb. Test., Feb. 18, 2023.

Having established the primary element of a negligence claim, that Davison owed Scorza a duty, it can now be established that Davison breached its duty to correctly file a provisional patent by failing to include the most basic product description with its first provisional patent filing, and then failing to write a mere five dollar check to the USPTO to ensure acceptance of the second provisional patent filed on Mr. Scorza's behalf. *But for* Davison's incomplete provisional patent filings and its failure to remedy any errors therein, Mr. Scorza would have been able to obtain a provisional patent on his invention and subsequent USPTO bestowed patent rights, per Scott McBride. Cl. 5 & 6.

Davison also breached its duty to keep Mr. Scorza's information confidential by disclosing details of Mr. Scorza's invention to third parties under the guise that the invention was "patent pending". R. 8; Cl. 13. *But for* Davison's disclosure of Mr. Scorza's information to third parties, Mr. Scorza's information would have remained confidential and would have remained in patentable condition. Cl. 41, Davison_000042 & Davison_000048.

Mr. Scorza's damages resulting from Davison's complete disregard for Mr. Scorza's most basic requirements of confidentiality, inquiries and pleas for assistance, which Davison chose to ignore while continuing to entice and cajole Mr. Scorza for his continued financial input, include a complete squandering of Mr. Scorza's ideas, as evidenced by the testimony of Scott McBride. The years and days and hours that Mr. Scorza spent developing his idea was all for naught, as Davison's failure to observe contractual duties has murdered Scorza's ability to <u>ever</u> regain those patent rights or earn $3.4 million over a 10-year period, as Dr. Lehrer testified to. Lehrer Arb. Test., Feb. 19, 2023. Davison has so carelessly and brazenly allowed Scorza's intellectual property rights, as well as his dreams, to inexplicably and inexcusably die, all in the name of greed and profit.

14

### IV.   CAUSES OF ACTION

#### A.  Breach of Contract

Breach of Contract is established when there is: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and, (3) resultant damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 635 Pa. 427, 445, 137 A.3d 1247, 1258 (2016). Davison failed in its duty to uphold key sections of contracts drafted by Davison and entered into between Davison and Mr. Scorza.

Davison created its own contractual obligations to Mr. Scorza in the Pre-Development Agreement, as well as in the NPSA. (Cl. 48, Cl. 22). Davison's contractual obligation to file a Provisional Patent Application on behalf of Mr. Scorza was breached when it failed to use any due care to competently and correctly file Scorza's provisional patent on two separate occasions. Cl. 5 & 6. Likewise, Davison's contractual obligation to provide a physical prototype of Mr. Scorza's invention, along with packaging, was breached when Davison failed to deliver on its promises – which were essential terms of the NPSA. R. 7. After pocketing Mr. Scorza's money, Davison could not successfully file a provisional patent and only provided Scorza with a mere computerized rendering of the Trava-Weigh. Cl. 13. The breached promises are essential terms of each respective contract, the breach thereof resulting in irreparable damage to Mr. Scorza's intellectual property rights. McBride Arb. Test., Feb. 18, 2023.

#### B.  Common Law Fraud

Common Law Fraud requires (1) a misrepresentation; (2) a fraudulent utterance of it; (3) the maker's intent that the recipient be induced thereby to act; (4) the recipient's justifiable reliance on the misrepresentation; and (5) damage to the recipient proximately caused. *Lokay v. Lehigh Valley Co-op. Farmers, Inc*., 342 Pa.Super. 89, 96, 492 A.2d 405, 408 (1985).

Davison made material and false representations to Mr. Scorza that Davison *could* and *would* assist Mr. Scorza with the entire process of developing and finalizing Scorza's unique invention for commercialization, and that Davison had the requisite training, knowledge, and acumen to do so. For example, Davison represented it would file the patent application with the fee, but could

not even observe its own deficiency in filing the first application, or observe its promise to simply pay the micro entity filing fee to the USPTO for Scorza's second provisional patent filing. R. 7; Cl. 48, Davison_000332; Cl. 6.  Davison made fraudulent misrepresentations with actual knowledge of these misrepresentations with the intent of inducing Mr. Scorza to pay Davison over several years. Relying on Davison's false promises to help develop and sell Mr. Scorza's idea, Mr. Scorza made numerous payments that ultimately were systematically collected solely for the gain of Davison and for very little to no benefit to Mr. Scorza. Davison acted on the lucrative incentive to misinform Mr. Scorza, consciously engaging in profitable nonaction, benefiting directly from purposefully ignoring Mr. Scorza, knowing that Mr. Scorza would rely upon these actions (and nonactions) which Mr. Scorza did trust - to his detriment. Resulting in Mr. Scorza losing his patent rights and profits from the sale of the Trava-Weigh. McBride Arb. Test., Feb. 18, 2023; Lehrer Arb. Test., Feb. 19, 2023.

Disturbingly, Scorza is not the only, or the first, victim of Davison's schemes. In 2006 the FTC, in conjunction with the Pennsylvania Attorney General's Office under the FTC's Telemarketing Sales Rule, obtained a ruling ordering Davison to pay $26 million dollars for exploiting inventors hoping to "build a better mousetrap" or in other words, improving the world with new technology. Cl. 20. However, these punitive measures were not enough to deter Davison from undertaking more and more predatory contractual relationships with hopeful inventors and dreamers by honing its deceitful practices. Unfortunately, these dreamers who are induced by Davison end up with ideas, which were once potentially profitable, now bereft of <u>any</u> worth.

### C.  Fraud By Concealment and Non-Disclosure/Omission

Under Pennsylvania law, a plaintiff may assert a fraudulent concealment claim when the defendant concealed or intentionally prevented the plaintiff from discovering material information. *LEM 2Q, LLC v. Guar. Nat. Title Co.*, 144 A.3d 174, 181 n. 10 (Pa. Super. 2016); *Woodward v. Dietrich¸* 548 A.2d at 311-16.

Davison, upon discovery of its deficit provisional patent filings, failed to disclose any information to Mr. Scorza. When Scorza reached out to Davison with questions regarding notices from the USPTO detailing the deficit patent filings, Davison intentionally avoided acknowledging Scorza's questions and instead pitched new contractual agreements to further ensnare Mr. Scorza in its money grabs. Cl. 5, 6, and & 12; R. 23; Scorz Arb. Test., Feb. 18, 2023. Mr. Scorza was therefore deprived of facts – or otherwise fed intentionally vague, obfuscated, and vainglorious information – which would have been required to make an informed decision. Davison, in willfully defrauding Scorza, did not qualify any of its incomplete representations, did not observe the contractual duty owed to Mr. Scorza, and failed to disclose facts basic to its transactions on at least four occasions—January 12, 2017, March 29, 2017, December 14, 2018, and December 19, 2018. Cl. 3, 7, 16, and 17.

### D.  Negligent Misrepresentation

Under Pennsylvania law, a claim of negligent misrepresentation requires proof of the following elements: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon,* 729 A.2d 555, 561 (Pa. 1999).

Davison negligently misrepresented that it would file a provisional patent application on Mr. Scorza's behalf. *See* Cl. 48, Davison_000332). This misrepresentation was material to the transaction at hand because Davison *required* a provisional application to be filed prior to communication with potential companies for licensing purposes. *Id*. This misrepresentation was made falsely with recklessness as to its truth because Davison knew of the importance of having a patent application on file with the USPTO, as evidenced by the requirement to obtain one prior to moving forward with its services. Davison had the requisite intent to mislead Scorza into relying on the misrepresentation because it required Scorza to adhere to this provision, otherwise Davison would not proceed. Scorza justifiably relied on Davison's misrepresentation, as evidenced by Mr. Scorza's adherence to the agreements through payments, because he wanted

his idea to succeed. Scorza was injured by this misrepresentation through the irreparable loss of his intellectual property rights.

Davison made further negligent misrepresentations that it would keep Mr. Scorza's information confidential. This misrepresentation was material to the transaction at hand because Scorza's information was disclosed to another party, which completely invalidated Scorza's patent rights. Davison had assured Scorza that his information would be confidential, proving that the misrepresentation was made with knowledge of recklessness as to its truth and with the intent to mislead Scorza into relying on it because otherwise Scorza would not have contracted with Davison. Mr. Scorza justifiably relied on the misrepresentation because he entered into the relationship with Davison on the belief that Davison would confidentially maintain his invention rights and keep them from entering the public domain. Once again, Scorza was injured by this misrepresentation through the irreparable loss of his intellectual property rights.

### E.  Fraud in the Inducement

Under Pennsylvania law, plaintiffs are required to prove the following elements in a claim for fraud in the inducement: (1) a representation; (2) material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to its truth; (4) with intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury. *Broederdorf v. Bachelor*, 129 F.Supp.3d 182, 198 (E.D. Pa. 2015). Successfully pled, such contracts are voidable. *Giannone v. Ayne Institute*, 290 F.Supp.2d 553, 564 (E.D. Pa. 2003).

In terms of the material misrepresentations contained in the facts above, Davison did present material misrepresentations as to: (1) the quality of Davison's services, (2) Davison's licensing acumen, (3) Davison's understanding of Patents, (4) Davison's ability to competently and successfully file a US Provisional Patent Application, twice, (5) Davison's inability to discern the proper use of "Patent Pending", (6) Davison's understanding of confidentiality, (7) Davison's ability to hold confidential information confidential, (8) Davison's ability to procure and evidence a Non-Disclosure Agreement, (9) Davison's selectivity as to whom it offers

services, (10) Davison's genuine stake in the outcome of the invention and that royalties are a source of income, (11) Davison's fees being 99.999% tied to fees charged and not royalties, (12) Davison's track record, (13) Davison's success rate, (14) Davison-assisted products are many, (15) Davison-assisted products are profitable, (16) Davison has special company access, (17) Davison's ability to cut through "the red tape" and the "old boys' network, (18) Davison's "close working relationship" with companies, (19) the Executive Summary offering objectivity and "expert analysis" of the marketability of a product, (20) Davison not commenting on the potential success of a product through "red flag" and "green flag" language, and, most appropriate, (21) the necessity of Davison's services - all made falsely with actual knowledge of its falsity or recklessness as to its truth that intended to mislead Mr. Scorza, who justifiably relied upon such misrepresentations to his great disadvantage and irreparable harm, a loss of his patent rights and proposed market capture of around $3.45 million dollars over 10 years.

### F. Common Law Negligence

The elements of a cause of action in negligence are as follows: (1) a duty recognized by law, requiring the actor to conform to a certain standard with respect to the injured party; (2) a failure of the actor to conform to that standard; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage to the interests of another. *Felli v. Com., Dep't of Transp.*, 666 A.2d 775, 777 (Pa. Commw. Ct. 1995).

Davison owed Scorza a duty to correctly file a provisional patent and keep Mr. Scorza's information confidential. These duties were breached when Davison failed to properly file provisional patent application on behalf of Mr. Scorza on two occasions and disclosed Scorza's confidential information to third parties during the VRPPs and VISs. *See* Cl. 41, Davison_000042 & Davison_000048. *But for* Davison's breach, Mr. Scorza would have been able to obtain an allowed U.S. patent and his information would have remained confidential until this point. Mr. Scorza's damages resulting from Davison's breach include a complete squandering of Mr. Scorza's ideas, as evidenced by the testimony of Mr. McBride and Dr. Lehrer.

19

## V.    PENNSYLVANIA UTPACPL

The legislative intent in enacting the Pennsylvania Unfair Trade Practices & Consumer Protection Law ("UTPCPL") was to enhance the protection of the public from unfair or deceptive business practices.  *Gabriel v. O'Hara*, 368 Pa.Super. 383, 388 & n.6, 534 A.2d 488, 491 & n.6 (1987).  The principle enhancements of pre-existing common law protections included the codification of a list of practices designated as "unfair or deceptive" and therefore "unlawful" (73 Pa .Stat. §§ 201–2, 201–3), authorization of the Pennsylvania Attorney General to take several specific types of action to protect the citizenry from such practices (73 Pa. Stat. §§ 201–3.1 to 201–9.1), and authorizing a private cause of action by private parties for treble damages in certain circumstances (73 Pa. Stat. § 201–9.2).  The central underlying intent was fraud prevention, and the act must be construed liberally to effectuate that remedial intent.  *See Commonwealth v. Monumental Properties*, 459 Pa. 450, 329 A.2d 812, 815–17 (1974); *Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 393 Pa.Super. 339, 346, 574 A.2d 641, 644 (1990); *Gabriel v. O'Hara*, 534 A.2d at 491; *Culbreth v. Lawrence Miller, Inc.*, 328 Pa.Super. 374, 477 A.2d 491 (1984).

### A.  Applicability

The UTPCPL states that:

> Any person who purchases or leases goods or services **primarily for personal**, family or household **purposes** and thereby suffers any ascertainable loss of money or property, real or person, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act…

has standing to sue under the Act.  73 Pa. Stat. § 201-9.2(a) (emphasis added).  The list of applicable purposes is a disjunctive one ("personal, family **or** household purposes"), indicating that the statute applies to all personal purchases, all family purchases, and all household purchases.  Even a residential condominium association has been held to be a "person" under the statute, as it represents the individual owners.  *Valley Forge Towers*, 393 Pa.Super. 339, 347-48, 574 A.2d 641, 645.  For determination of "household purpose" applicability of the statute, the purpose of the purchase is the correct direction of analysis.  In that case, if the "sole motivation"

of the purchase is non-household, the purchase is non-household in nature. *Waldo v. N. Am. Van Lines, Inc.*, 669 F.Supp. 722, 726 (W.D. Pa. 1987).

All four contracts were entered into by Mario Scorza, individually. *See* R.3, 7, 16, & 17. None of the contracts were entered into by an entity, or even by Mario Scorza on behalf of, or for the benefit of, an entity. That the "services" were provided for Mario Scorza individually is simply not even in factual dispute. Furthermore, the applicant on both patent applications was Mario Scorza individually, not an entity. Cl. 5 & 6. The services were obtained for an individual, Mario Scorza, who individually contracted with Davison.

Davison has argued that its contract states that the services are not for personal use, and that boilerplate recitation in a consumer contract of adhesion insulates them for any liability under the UTPCPL. This is unsurprising, as it is essentially Davison's repeat argument, that its contracts protect them from all liability, no matter what they have done wrong. However, it is contrary to fact and unenforceable, as discussed in section VI, *infra*.

### B. Violations

The statute presents a list prohibited conduct:

> "Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:..
>
> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;…
>
> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;…
>
> (xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;…
>
> (xxi) *Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding*.

73 Pa. Stat. § 201-2(4)(*emphasis* on the catchall clause of the statute).

The various misrepresentations that were routinely made by Davison were discussed at length in the *FTC* ruling. Cl. 18. Scorza confirmed that many of the same misrepresentations were made to him as well, albeit in slightly altered terms. Scorza Testimony, Jan. 18, 2023.

However, Davison made several contractual misrepresentations and omissions that were ultimately fatal to Scorza's patent rights and account for the overwhelming majority of his damages: 1) it represented that it would "mail the [patent] application to the USPTO along with the micro entity filing fee, which is currently $65.00" Cl. 48, para. 6; 2) it failed to notify him that both his patent applications were in mortal danger, due it its own mistakes and malfeasance; 3) it represented that it would keep Scorza's valuable invention confidential, when it was actually sending out his invention details without signed non-disclosure agreements, resulting in the loss of all of his patent rights. These misrepresentations and complete malfeasance doomed Scorza's patent.

### C.  Strict Liability

Violations of the UTPCPL do *not* require intent to deceive, or even negligence, for liability to attach. As the Pennsylvania Supreme Court has made abundantly clear, the UTPCPL is a strict liability statute.

> "A plain language analysis of the relevant statutory provision leads inexorably to the conclusion that deceptive conduct under the CPL [UTPCPL] is not dependent in any respect upon proof of the actor's state of mind. The Superior Court's holding is consistent not only with the plain language of the CPL [UTPCPL], but also with our precedent holding that the CPL [UTPCPL] is a remedial statute that should be construed broadly in order to comport with the legislative will to eradicate unscrupulous business practices."

*Gregg v. Ameriprise Finan., Inc.*, 245 A.3d 637, 641, 2021 WL 607486 (Pa. Feb. 17, 2021), *citing Commonwealth by Creamer v. Monumental Props., Inc.*, 459 Pa. 450, 329 A.2d 812, 817 (1974).

The Pennsylvania Supreme Court held:

> "[A]ny deceptive conduct, "which creates a likelihood of confusion or of misunderstanding," is actionable under 73 P.S. § 201-2(4)(xxi), whether committed intentionally (as in a fraudulent misrepresentation), carelessly (as in a negligent misrepresentation), or with the utmost care (as in strict liability).

Whether a vendor's "conduct has the tendency or capacity to deceive ... is a lesser, more relaxed standard than that for fraud or negligent misrepresentation."  *TAP*, 36 A.3d at 1253. The only thing more relaxed than negligence—regarding a consumer's burden of proof—is strict liability."

*Gregg*, 195 A.3d at 939 [the Superior Court opinion].

"Like other strict liability offenses, liability for deceptive conduct under the CPL cannot be excused if consumers rely upon that conduct to their financial detriment. Representations made in the consumer context are within the exclusive control of the vendor:

[A commercial transaction] occurs in a designed setting entirely of the vendor's own creation via preplanned marketing schemes. Thus, vendors place themselves, by choosing where, when, and how they enter the market, in a much stronger position to comply fully with the [CPL] before soliciting or interacting with consumers. Vendors not only elect whether to enter a market, but, because "the market" is a fictional place, they have full volitional control over their conduct when in it.

The [CPL] is for consumer protection. It undoes the ills of sharp business dealings by vendors, who, as here, may be counseling consumers in very private, highly technical concerns. Like the Greggs, those consumers may be especially reliant upon a vendor's specialized skill, training, and experience in matters with which consumers have little or no expertise. Therefore, the legislature has placed the duty of [CPL] compliance squarely and solely on vendors; they are not to engage in deceitful conduct and have no legally cognizable excuse, if they do."

*Id*. at 939-40.   It is the vendor—not the consumer—that is charged with complying with the CPL, as the vendor is in a better position to determine whether the representation might be deceptive. Strict liability for such violations is consistent with the legislative mandate to eradicate the use of unfair and deceptive conduct in consumer transactions.  *Monumental*, at 815-16.

*Gregg v. Ameriprise Finan., Inc.*, 245 A.3d 637, 650 (the Pa. Supreme Court Opinion), *citing Commonwealth v. TAP Pharm. Products, Inc*., 36 A.3d 1197 (Pa. Cmwlth. 2011), *rev'd on other grounds*, 626 Pa. 1, 94 A.3d 350 (2014); *Gregg v. Ameriprise Finan.*, 195 A.3d 930, 936 (Pa. Super. 2018)(the Superior Court Opinion); *Commonwealth by Creamer v. Monumental Props., Inc.*, 459 Pa. 450, 329 A.2d 812, 817 (1974).

Davison will argue that it intended to correctly file the patent application.  It failed to file the first application correctly, resulting is loss of original filing date. It fumbled the ball yet another time by including the wrong fee (the fee had increased recently), and failing to ever send

23

in the additional $5.00 that could have saved the application.  Davison might argue that its state of mind was merely negligent during this sorry comedy of errors.  However, it does not matter.  Davison may have meant well, may have done it intentionally, or had no state of mind whatsoever, because it was so painfully clueless.  **However, it simply does not matter. Davison is liable as a matter of law under the statute.**

### D.  Damages & Trebled Damages

The UTPCPL permits plaintiffs to recover for "any ascertainable loss of money or property, real or personal."  73 Pa. Stat. § 201-9.2.

The Court found, as a matter of statutory construction, that a trial court's discretion to award treble damages under the UTPCPL should not be closely constrained by the common law requirements for punitive damages.  *Schwartz v. Rockey*, 593 Pa. 536, 557, 932 A.2d 885, 898 (Pa 2007).  A "consumer protection statute requiring awards of treble damages for violations is, in effect, a hybrid, with both punitive and remedial aspects, and therefore,…" "common-law requirements governing the award of punitive damages should not control."  *Schwartz*, 593 Pa. at 557, *citing Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397, 402 (1981).  The Pennsylvania Supreme Court holds that treble damages in UTPCPL cases should be awarded *more generously* than punitive damages.  A trial court may consider intentional or reckless wrongful conduct for which an award of treble damages would be remedial in nature when deciding whether to award treble damages.  *Schwartz*, 593 Pa. at 557.  No finding of outrageous conduct is needed for an award of trebled damages.  *Gadley v. Ellis*, Civ. No. 3:13-17, 2016 WL 1090654, at *3, 2016 U.S. Dist. LEXIS 35252 (W.D. Pa. Mar. 18, 2016)(*citing Schwartz v. Rockey*, 932 A.2d at 898; *see also Lindsley v. Am. Honda Motor Co.*, Civ. No. 16-941, 2017 WL 2930962, at *9-10 (E.D. Pa. Jul. 7, 2017)).  Under the UTPCPL, rather than punitive damages, the trial court has purely discretionary authority to award treble damages.  *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 401 (3d Cir. 2004). Here, the Tribunal has full authority and discretion to award treble damages to punish, as a matter of public policy, Davison's intentional and reckless wrongful conduct and is requested to do so.

24

Davison argues that Scorza's claims are barred under the "gist of the action" doctrine, that contractual duties cannot serve as the base for a tort claim, and that any tort claim is subsumed within a breach of contract claim.  *See* Respondent Pre-Hearing Brief, p. 5-6. However, the Pennsylvania Supreme Court held that the economic loss doctrine does not apply to UTPCPL claims.  Pennsylvania does not apply the economic loss doctrine where there is a "'statutory [as opposed to common law] basis to impose liability for economic losses." *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 604 Pa. 50, 985 A.2d 840, 842-43 (2009); *see also Earl v. NVR, Inc.*, 990 F.3d 310, 313 (3rd Cir. 2021); *Knight v. Springfield Hyundai*, 81 A.3d 940, 952 (Pa. Super. Ct. 2013).  "The UTPCPL does just that. It permits plaintiffs to recover for 'any ascertainable loss of money *or* property, real or personal.' 73 Pa. Cons. Stat. § 201-9.2 (emphasis added)." *Earl*, 990 F.3d at 313 (citations and emphasis in original).  The damages for Scorza's loss of all his patent rights are fully recoverable under the UTPCPL.

## VI.    CONTRACTUAL DISCLAIMERS OF LIABILITY

Davison attempts to rely upon a boiler plate contractual provision to escape all potential liability whatsoever.  Davison argues that the clause in question is a "limitation of damages" clause, citing no authority and making no legal arguments.  However, clauses that purport to contractually limit damages are exculpatory clauses by definition.  The legal test applies to any "exculpatory language." *Tayar v. Camelback Ski Corp., Inc.*, 616 Pa. 385, 47 A.3d 1190, 1196 (2012); *Topp Copy Products, Inc. v. Singletary*, 533 Pa. 468, 471, 626 A.2d 98, 99 (Pa. 1993). The clause simply states that "In no event will Davison be liable to Client for any consequential, exemplary, incidental or punitive damages, including lost opportunities or lost profits."  The clause purports to exculpate Davison for any consequential or incidental damages, including lost profits.  It also purports to exculpate against exemplary and punitive damages.

This begs the question, what other damages would there be flowing out of a contract of this nature?  The breach of a contract to develop an invention would only involve consequential or incidental damages, and possibly lost profits.  There are no other kinds of damages, other than those which have been purportedly disclaimed.  The clause is clearly an exculpatory clause and is disfavored at law.

"Those clauses are disfavored and must meet certain conditions to be enforceable. First, the clause must not contravene public policy. Second, the contract must relate solely to the private affairs of the contracting parties and not include a matter of public interest. Third, each party must be a free bargaining agent. In addition, an exculpatory or indemnity clause will still not be enforced unless it is clear that the beneficiary of the clause is being relieved of liability only for his/her own acts of negligence. The clause must be construed strictly and the contract must state the intention of the parties with the greatest particularity. Furthermore, any ambiguity must be construed against the party seeking immunity, and that party also has the burden of proving each of the prerequisites to enforcement."

*Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195 (3rd Cir. 1995), *citing Topp Copy*, 626 A.2d at 99.  Furthermore, the burden of establishing immunity is upon the party invoking protection under such a clause.  *Tayar*, 47 A.3d at 1196.

The law "abhors forfeitures and penalties and enforces them with the greatest reluctance when a proper case is presented."  *Acme Markets, Inc. v. Federal Armored Exp., Inc.*, 437 Pa.Super. 41, 48, 648 A.2d 1218, 1221 (1994), *quoting Fogel Refrigerator Co. v. Oteri*, 391 Pa. 188, 195, 137 A.2d 225, 231 (1958).

As Davison readily concedes, and indeed affirmatively argues, the clause purports to exculpate Davison from any liability whatsoever.  However, clauses that exculpate liability for gross negligence and higher levels of fault are void and against Pennsylvania public policy.  *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 20-21 (Pa. 2019), *citing Tayar*, 47 A.3d at 1203.  By Davison 's own arguments, the clause is void as against public policy.  The clause is unenforceable.

The clause also involves a matter of public interest.  As discussed, *supra*, the Texas Invention Development Services Act requires specific disclosures as to the success rate of the development services.  The disclosures were false and conflicted with those made on Davison's website.  As discussed, Davison's success in developing inventions was vanishingly small.  Davison's failure to make statutory disclosures involved a matter of public interest.  Furthermore, Pennsylvania has expressed public interest through the passage and recent

expansion of the UTPCPL into a strict liability standard. Accordingly, the exculpatory clauses are unenforceable.

The clause fails to address and does not explicitly disclaim any liability flowing out of its own negligence, gross negligence, recklessness, or intentional acts. To be enforceable, "the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties," that is to say, the clause must specifically establish which conduct is being disclaimed from liability. *Tayar*, 47 A.3d at 1196; *Topp Copy*, 626 A.2d at 99. The clause simply states the "The liability of the parties for any and all claims…" is limited. The clause fails to specify which levels of fault and what kinds of behavior are being disclaimed. The text of the language lacks any semblance of "greatest particularity," puts nothing "beyond doubt by express stipulation," and contains absolutely nothing but "words of general import." As such, the clause fails to meet the test for enforceability under Pennsylvania law. The clause is unenforceable.

Finally, Davison carries the burden of proof to establish that the exculpatory language is enforceable under Pennsylvania law, a burden that Davison does not and cannot meet. The clauses are simply unenforceable.

In Pennsylvania, exculpatory clauses are invalid under three conditions: "First, the clause must not contravene public policy. Secondly, the contract must be between persons relating entirely to their own private affairs and thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion." *Topp Copy*, 626 S.2d 98,99 (Pa. 1993).

"An adhesion contact is defined as a standard form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms." *Lytle v. CitiFinancial Servs., Inc.*, 810 A.2d 643, 658 (Pa. Super. 2002). When a party has no knowledge of the applicable industry, no chance to negotiate the terms of the contract, and no choice but to accept the terms and conditions, the terms become unenforceable terms of exculpatory adhesion. *Id*.

In addition to terms being unlawful exculpatory clauses, the terms are also unconscionable and void. In Pennsylvania, "a contract or term is unconscionable, and therefore

avoidable, where there is a lack of meaningful choice in the acceptance of the challenged provision [procedural unconscionability], and the provision unreasonably favors the party asserting it [substantive unconscionability].   *Salley v. Option One Mortgage Corp.*, 925 A.2d 115 (2007).  The highly vaunted contractual disclaimers of liability are also unconscionable and void.

## VII.   DAMAGES

Davison's breach of contract, torts, and violations of the UTPACPL led to the loss of Scorza's most valuable asset, his eminently patentable invention.  His damages are the value of the botched patent that can never be recovered, $3.4 million over a 10-year period.

Dr. Kenneth Lehrer, in his oral testimony and in his Initial Expert Report, testified that the best way to value lost patent rights is through a model business enterprise, producing and selling the invention.  Cl. 38, p. 4, 8-10.  Dr. Lehrer refers to the enterprise model also as "The Theory of the Firm."  *Id.*, p. 8-10.  "The value of the firm is the present value of the firm's expected future net cash flows."  *Id.*, p. 9.

Dr. Lehrer testified that, twenty-five (25) years ago, the most appropriate business enterprise model for a patent or invention would be a firm that sold the product in retail brick and mortar establishments.  However, due to the internet retail revolution, the most typical business enterprise model today for a consumer good is to produce the good in China, or a similar low-cost location, and to sell them through an online retail platform, such as Amazon.

Typically, a future or hypothetical business is valued by means of a sensitivity analysis, also known as a Monte Carlo analysis.  A sensitivity analysis is a variation on a set of scenarios or the process of varying model input parameters over a reasonable range (range of uncertainty in values of the model's parameters) and observing the relative change in the model's response. Typically, a business would be simulated by comparing several market share captures, typical for new businesses in the industry, and the size of the market for the industry.  Dr. Lehrer testified that this method is often used for merger or acquisition fairness opinions when target companies feature a new product.  It is also used and found reliable in SEC filings, particularly those featuring forward-looking statements.  Dr. Lehrer testified that he has previously performed

Monte Carlo analyses that have been in use in merger and acquisition fairness opinions and SEC filings.  Monte Carlo analyses are admissible under the Federal Rules of Evidence and have been found to satisfy the *Daubert* test.  *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 293-94 (5th Cir. 2010).

Dr. Lehrer testified that the personal scales market is a growing market in the United States and is currently valued at $670 million per year.  Typical conservative market captures for new products in the consumer goods market would run in the 0.08% to 0.12% of the market.  A price per unit in the $20-25 range would be appropriate for the new product, based on similar competitive products.

Dr. Lehrer testified that he consulted with Amazon Co., as well as with a customs broker and import-export attorney to appropriately model costs and expenses for his business enterprise model.  He accounted for: cost of goods sold, manufacturing fees, an Amazon 10 year Retailer Plan; Amazon's commission per unit sold; container costs for import; harbor maintenance fees; tariffs; warehouse transport costs; Customs goods examination costs, customs brokerage fees; yearly import bond; demurrage; inspection fees; insurance; and miscellaneous costs.  Applying these expenses, Dr. Lehrer found the cost of goods sold in the 15% range, and the costs and expenses in the 30-33% of revenues, resulting in profits in the 47-50% of revenue range.

Simply applying Dr. Lehrer's proposed market capture numbers lead to some proposed scenarios.  A low range capture of 0.08% of the $670 million per year market would lead to revenues of $536,000/year.  Over a 10-year product life cycle this would represent around $2.5 million in lost profits.  As Dr. Lehrer testified, he would not account for inflation, so as to not necessitate a discount to present value analysis.

Similarly, a mid-range number of market capture of 0.10% would lead to yearly revenues of $670,000, and total lost profits around $3.7 million.  A high range market capture of 0.12% would lead to yearly revenues of $804,000, and total lost profits of around $4.1 million.  Averaging these values leads to a patent valuation of around $3.45 million.  Weighted averages could also be calculated.

Scorza also seeks a return of the money that he paid to Davison in the amount of $21,042.25.  *See* Cl. 48, Idea Submission Agreement ($795.00); Cl. 11, New Product Sample Agreement ($14,757.25); Cl. 44, Inventomercial Agreement ($1495.00); Cl. 49, MCC Agreement ($3,995.00).

## VIII.    CONCLUSION

Davison deceived a man in his late 70's, relentlessly selling him useless contracts, sucking dry his life savings, which were intended to benefit his grandson's college education and his disabled daughter.  Ultimately, even worse for him, they were utterly incompetent at even the relatively minimal tasks that they did set out to do.  Davison botched his first patent application by failing to include the fee or the supporting documents.  They then failed to include the proper fee with the second application.  The application could have been saved by means of forwarding a simple $5.00 check to the USPTO in order to correct the monumental error.  Davison simply never bothered

However, Davison was never really in the business of obtaining patent right or royalties for their inventors.  Davison is in the business of selling contracts, from which it derives essentially all of its revenue.  When Scorza repeatedly begged Davison's help for what to do in response to repeated notices from the USPTO, Frank Vescio, whose motto was clearly "always be closing," ignored his requests and sold him two more useless contracts, sucking a few more thousand dollars from the hapless Scorza.  Meanwhile Scorza's patent application, and all his rights, died at the USPTO due to Davison's reckless disregard and utter malfeasance.

Claimant requests this Tribunal to restore the value of Scorza's lost patent rights.  Claimant requests any and all other relief, either at law or in equity, to which he may show himself justly entitled.

Defendant's Exhibit 7

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on the following parties and/or counsel pursuant to the applicable procedure on this 3rd day of March, 2023.

Scott D. Livingston
Sharon Durkin
George Crompton
Justin T. Barron


*/s/ Stacey L. Barnes*
Stacey L. Barnes

31

App. 550

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

## Defendant's Exhibit 8

Defendant's Exhibit 8

Mario Scorza

## TEXAS

**DAVISON**
**595 ALPHA DRIVE**
**PITTSBURGH, PA 15238**


**THIS CONTRACT BETWEEN YOU AND AN INVENTION DEVELOPER IS REGULATED BY THE STATE OF TEXAS' REGULATION OF INVENTION DEVELOPMENT SERVICES ACT. YOU ARE NOT PERMITTED OR REQUIRED TO MAKE ANY PAYMENTS UNDER THIS CONTRACT UNTIL FOUR (4) WORKING DAYS AFTER YOU SIGN THIS CONTRACT AND RECEIVE A COMPLETED COPY OF IT.**

**IF YOU ASSIGN EVEN A PARTIAL INTEREST IN THE INVENTION TO THE INVENTION DEVELOPER, THE INVENTION DEVELOPER MAY HAVE THE RIGHT TO SELL OR DISPOSE OF THE INVENTION WITHOUT YOUR CONSENT AND MAY NOT HAVE TO SHARE THE PROFITS WITH YOU.**

**TOTAL NUMBER OF CUSTOMERS WHO HAVE CONTRACTED WITH THE INVENTION DEVELOPER SINCE 1989 IS ONE HUNDRED FIFTY THOUSAND NINE HUNDRED FOURTEEN (150,914). THE TOTAL NUMBER OF CUSTOMERS KNOWN BY THIS INVENTION DEVELOPER TO HAVE RECEIVED, BY VIRTUE OF THIS INVENTION DEVELOPER'S PERFORMANCE AN AMOUNT OF MONEY IN EXCESS OF THE AMOUNT PAID BY THE CUSTOMER TO THIS INVENTION DEVELOPER IS THIRTY-FIVE.**

**YOU ARE ENCOURAGED TO CONSULT WITH A QUALIFIED ATTORNEY BEFORE SIGNING THIS CONTRACT. BY PROCEEDING WITHOUT THE ADVICE OF A QUALIFIED ATTORNEY, YOU COULD LOSE ANY RIGHTS YOU MIGHT HAVE IN YOUR IDEA OR INVENTION.**

Defendant's Exhibit 8

Mario Scorza

## TEXAS

**DAVISON**
**595 ALPHA DRIVE**
**PITTSBURGH, PA 15238**


**THIS CONTRACT BETWEEN YOU AND AN INVENTION DEVELOPER IS REGULATED BY THE STATE OF TEXAS' REGULATION OF INVENTION DEVELOPMENT SERVICES ACT. YOU ARE NOT PERMITTED OR REQUIRED TO MAKE ANY PAYMENTS UNDER THIS CONTRACT UNTIL FOUR (4) WORKING DAYS AFTER YOU SIGN THIS CONTRACT AND RECEIVE A COMPLETED COPY OF IT.**

**IF YOU ASSIGN EVEN A PARTIAL INTEREST IN THE INVENTION TO THE INVENTION DEVELOPER, THE INVENTION DEVELOPER MAY HAVE THE RIGHT TO SELL OR DISPOSE OF THE INVENTION WITHOUT YOUR CONSENT AND MAY NOT HAVE TO SHARE THE PROFITS WITH YOU.**

**TOTAL NUMBER OF CUSTOMERS WHO HAVE CONTRACTED WITH THE INVENTION DEVELOPER SINCE 1989 IS ONE HUNDRED FIFTY THOUSAND NINE HUNDRED FOURTEEN (150,914). THE TOTAL NUMBER OF CUSTOMERS KNOWN BY THIS INVENTION DEVELOPER TO HAVE RECEIVED, BY VIRTUE OF THIS INVENTION DEVELOPER'S PERFORMANCE AN AMOUNT OF MONEY IN EXCESS OF THE AMOUNT PAID BY THE CUSTOMER TO THIS INVENTION DEVELOPER IS THIRTY-FIVE.**

**YOU ARE ENCOURAGED TO CONSULT WITH A QUALIFIED ATTORNEY BEFORE SIGNING THIS CONTRACT. BY PROCEEDING WITHOUT THE ADVICE OF A QUALIFIED ATTORNEY, YOU COULD LOSE ANY RIGHTS YOU MIGHT HAVE IN YOUR IDEA OR INVENTION.**

Davison_000342

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

## Defendant's Exhibit 9



Defendant's Exhibit 9



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/710,055 | 02/08/2018 | Mario U. Scorza | |

**CONFIRMATION NO. 4515**

Mario Scorza
341 Old Mill Creek Dr.
Waco, TX 76712-6448

**FORMALITIES LETTER**

Date Mailed: 02/21/2018

# NOTICE TO FILE MISSING PARTS OF PROVISIONAL APPLICATION

## FILED UNDER 37 CFR 1.53(c)

### *Filing Date Granted*

An application number and filing date have been accorded to this provisional application. The items indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items and pay any fees required below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

• The statutory basic filing fee is insufficient.
• Surcharge as set forth in 37 CFR 1.16(g) must be submitted.
  The surcharge is due for late submission of filing fee or cover sheet.

## SUMMARY OF FEES DUE:

The fee(s) required within **TWO MONTHS** from the date of this Notice to avoid abandonment is/are itemized below. Small entity discount is in effect. If applicant is qualified for micro entity status, an acceptable Certification of Micro Entity Status must be submitted to establish micro entity status. (See 37 CFR 1.29 and forms PTO/SB/15A and 15B.)
• $ **140** basic filing fee.
• $ **30** surcharge.
• $( **65**) previous unapplied payment amount.
• $ **105** TOTAL FEE BALANCE DUE.

## Items Required To Avoid Processing Delays:

Applicant is notified that the above-identified application contains the deficiencies noted below. No period for reply is set forth in this notice for correction of these deficiencies. However, if a deficiency relates to the inventor's oath or declaration, the applicant must file an oath or declaration in compliance with 37 CFR 1.63, or a substitute statement in compliance with 37 CFR 1.64, executed by or with respect to each actual inventor no later than the expiration of the time period set in the "Notice of Allowability" to avoid abandonment. See 37 CFR 1.53(f).

**This application, which was filed with an indication of micro entity status, fails to meet the requirements for establishing micro entity status because:**

• The certification of micro entity status is unsigned. A certification of micro entity status must be signed by an authorized party under 37 CFR 1.33(b). (Authorized parties include a registered attorney or agent, the sole

Davison_000004

App. 555

Defendant's Exhibit 9

inventor identified as the applicant, or all the joint inventors identified as the applicant except that one joint inventor applicant may sign if appointed to prosecute the application by all the other joint inventors.)

If micro entity status is established in reply to this notice by filing an acceptable Certification of Micro Entity Status, the fees itemized in the SUMMARY OF FEES DUE section of this Notice will be reduced to reflect the 75% micro entity discount, and any previous payment amount may be applied to the discounted fees.

If applicant is not entitled to micro entity status under 37 CFR 1.29, applicant may still qualify for a 50% reduction of fees if small entity status can be established under 37 CFR 1.27.

Replies must be received in the USPTO within the set time period or must include a proper Certificate of Mailing or Transmission under 37 CFR 1.8 with a mailing or transmission date within the set time period. For more information and a suggested format, see Form PTO/SB/92 and MPEP 512.

Replies should be mailed to:

Mail Stop Missing Parts
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

Registered users of EFS-Web may alternatively submit their reply to this notice via EFS-Web, including a copy of this Notice and selecting the document description "Applicant response to Pre-Exam Formalities Notice". https://sportal.uspto.gov/authenticate/AuthenticateUserLocalEPF.html

For more information about EFS-Web please call the USPTO Electronic Business Center at 1-866-217-9197 or visit our website at http://www.uspto.gov/ebc.

If you are not using EFS-Web to submit your reply, you must include a copy of this notice.

Questions about the contents of this notice and the requirements it sets forth should be directed to the Office of Data Management, Application Assistance Unit, at **(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/ttran/

Davison_000005

App. 556

 UNITED STATES PATENT AND TRADEMARK OFFICE

Defendant's Exhibit 9

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 62/710,055 | 02/08/2018 | | 65 | | | |

**CONFIRMATION NO. 4515**

Mario Scorza
341 Old Mill Creek Dr.
Waco, TX 76712-6448

**FILING RECEIPT**


0C000000097544478

Date Mailed: 02/21/2018

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**

Mario U. Scorza, Waco, TX;

**Applicant(s)**

Mario U. Scorza, Waco, TX;

**Power of Attorney:** None

**Permission to Access Application via Priority Document Exchange:** No

**Permission to Access Search Results:** No

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

**If Required, Foreign Filing License Granted:** 02/21/2018

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 62/710,055**

**Projected Publication Date:** None, application is not eligible for pre-grant publication

**Non-Publication Request:** No

**Early Publication Request:** No
**\*\* SMALL ENTITY \*\***

page 1 of 3

Davison_000006

App. 557

**Title**

> This is a small portable hand-held scale that one can stand on to measure their weigh, can be used to take on cruise or anywhere from home

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

## LICENSE FOR FOREIGN FILING UNDER

### Title 35, United States Code, Section 184

### Title 37, Code of Federal Regulations, 5.11 & 5.15

#### GRANTED

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as

Davison_000007

App. 558

Defendant's Exhibit 9

set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

### NOT GRANTED

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

Davison_000008

Defendant's Exhibit 9

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 62/601,218 | | Mario U. Scorza | |

**CONFIRMATION NO. 6744**

**ABANDONMENT/TERMINATION LETTER**

Mario Scorza
612 W. Highland St.
West, TX 76691

*FORE*
*LARRY RIFKIN*
*WHAT IS THIS ???*

Date Mailed: 06/30/2017

## NOTICE OF TERMINATION OF PROCEEDINGS UNDER 37 CFR 1.53(e)

Proceedings on the above-identified application number are **TERMINATED.**

The application did not meet the requirements of 37 CFR 1.53(b), (c), or (d) to be entitled to a filing date, and the filing error(s) specified in the Notice mailed on 03/31/2017 were not timely corrected (37 CFR 1.53(e)).

Any application filing fees paid in excess of $130.00 (handling fee) will be refunded or credited to your deposit account.

If a complete reply to the notice was previously filed by applicant within the time period set forth in the notice, applicant may request for reconsideration of the termination within 2 months from the mailing of this notice of termination by filing a petition accompanied by a true copy of the originally filed reply and the item(s) identified in one of the following:

1. A properly itemized date-stamped postcard receipt (see MPEP § 503); or

2. If the reply was filed via "Express Mail", (now "Priority Mail Express"), a submission satisfying the requirements of 37 CFR 1.10(e) including, for example, a copy of the mailing label showing the "date-in" (or "date accepted") (see MPEP § 513).

Any request for reconsideration should be directed to OPAP.

A copy of this notice **MUST** be returned with the reply.

Questions about the contents of this notice and the requirements it sets forth should be directed to the Office of Data Management, Application Assistance Unit, at **(571) 272-4000 or (571) 272-4200 or 1-888-786-0101.**

/ylueng/

Davison_000029

App. 560

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

## Defendant's Exhibit 10

Davison Design & Development, Inc. v. Frison, Not Reported in Fed. Supp. (2018)
2018 WL 6324996

2018 WL 6324996
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

DAVISON DESIGN & DEVELOPMENT, INC., Plaintiff,

v.

Betty FRISON, Defendant.

2:17-cv-01468
|
Signed 12/04/2018

**Attorneys and Law Firms**

Anna Shabalov, J. Nicholas Ranjan, Sarah A. Bronder, David R. Osipovich, K&L Gates LLP, Pittsburgh, PA, for Plaintiff.

Daniel W. Ernsberger, Behrend & Ernsberger, Pittsburgh, PA, for Defendant.

**MEMORANDUM OPINION**

Joy Flowers Conti, Chief United States District Judge

### I. Introduction

**\*1** Plaintiff Davison Design & Development, Inc. ("Davison"), filed a complaint (ECF No. 1) to vacate or, in the alternative, modify an arbitration award dated August 10, 2017 (the "Award"), issued in favor of defendant Betty Frison ("Frison"). (ECF No. 1). Davison brings suit alleging that, under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ("FAA"), the arbitrator manifestly disregarded the law and exceeded his powers when entering the Award in Frison's favor and made a material miscalculation of damages owed pursuant to the Award. Presently before the court are the parties' cross-motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56(a). (ECF Nos. 25, 29). This court exercises subject-matter jurisdiction under 28 U.S.C. § 1331. For the reasons that follow, Davison's motion will be DENIED, and Frison's motion will be GRANTED.

### II. Factual and Procedural Background

Davison is an "invention-services company" or "invention promoter" subject to the provisions of the American Inventor's Protection Act of 1999, 35 U.S.C. § 297 ("AIPA"). (ECF No. 42 ¶ 1). Frison contacted Davison via the Internet on March 24, 2014, regarding a product idea – "something to dissolve tread in hair weaving." (ECF Nos. 38-3, at 5; 41 ¶ 4). Over the course of the next several months, the parties corresponded about this product idea and Davison presented Frison with a

*Defendant's Exhibit 10*

*Davison Design & Development, Inc. v. Frison, Not Reported in Fed. Supp. (2018)*

2018 WL 6324996

number of documents, including: (1) a Confidentiality Agreement; (2) a Pre-Development Representation Agreement ("Pre-Development Agreement"); and (3) an Integrated Product Rendering Presentation Agreement ("IPRPA"). (ECF No. 41 ¶ 5).

The parties' arguments center around the Pre-Development Agreement and the IPRPA and warranty disclaimers contained in both. The parties disagree about whether Frison signed the Pre-Development Agreement on March 31, 2014. Ahmed Arafat, the Chief Information Officer of 5D Services, LLC, which provides IT systems and support for Davison, declared that on March 31, 2014, seven days after Frison submitted her hair-tread idea to Davison, Frison accessed Davison's online portal and electronically signed the Pre-Development Agreement. (ECF No. 32-11 ¶¶ 1, 29). Conversely, Frison, in a sworn affidavit, testified that she never possessed an online log-on personal account with Davison and, thus, could not have electronically signed the agreement. (ECF No. 32-12 ¶¶ 5-6).[1] Nevertheless, Frison averred in her complaint that she made payments in accordance with the Pre-Development Agreement. (ECF Nos. 16-3 ¶¶ 26-29).

The Pre-Development Agreement contains the following provision:

> This Agreement shall be governed by the law of the Commonwealth of Pennsylvania and is deemed to be executed, entered into and performed in Pittsburgh, Pennsylvania. This agreement contains *the entire agreement* between the parties as it pertains to the attempt to have the product or design licensed or sold to a Licensee. This agreement may not be released, discharged, abandoned, changed, or modified in any manner except as provided herein or by separate instrument in writing signed by all parties.

**\*2** (ECF No. 43-5 at 29) (emphasis added). It also contains the following disclaimers:

> Section III(D): Client acknowledges that Davison has made no claim or warranty that Davison will be able to consummate a License Agreement, or find a Licensee willing to compensate Client for his or her product and/or design. Client acknowledges that Davison has not made any representations concerning the potential of Client's product to be marketed, licensed, patented or to make a profit for Client. Davison has not evaluated the Product; thus, its agreement to accept an interest in future potential payments due to Client is not a representation by Davison that the development of the Product will yield payments to Client....

> Section III(G)(6): Davison has made no oral or written representation of estimated or projected Client earnings.

(*Id.* at 29-30). There is no dispute, however, that Frison personally signed the IPRPA on July 14, 2014. (ECF No. 32-1). The IPRPA in the section titled, "Choice of Law; Arbitration; Cure" provides:

> A. This Agreement shall be governed by the *law of the Commonwealth of Pennsylvania* and is deemed to be executed, entered into and performed in Pittsburgh, Pennsylvania. For any dispute, the parties agree to seek to resolve the dispute through good faith negotiation. For any dispute not resolved through good faith negotiation, the parties agree that all disputes shall be resolved through arbitration before the American Arbitration Association ("AAA") in Pittsburgh, Pennsylvania using the Commercial Arbitration Rules in effect on the date that the claim is submitted to the AAA. Client agrees that any claim must be brought in an individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.

(*Id.* ¶¶ 4.A). The IPRPA does not contain a merger or integration clause. (*Id.*) It does, however, contain a provision that Davison, "do[es] not promise or guarantee any financial gain from the development of any new product." (*Id.* ¶ 3).

2018 WL 6324996

Frison ultimately paid $6,645.00 for various services to be performed by Davison. (ECF No. 41 ¶ 7). Frison's idea never came to fruition, and on or about May 5, 2017, she filed a complaint in arbitration. (ECF No. 38-3). In count I of the arbitration complaint, Frison claimed that Davison violated the AIPA when addressing Frison's likelihood of success by making "material false and fraudulent statements or representations and omissions of material fact ... and by their failure to make required disclosures." (*Id.* ¶ 66). In count II, Frison claimed that Davison was liable for fraudulent misrepresentation under Pennsylvania law because it "intentionally made the false statements and representations, including those which were implied by their omissions ... in reckless disregard of [Frison's] rights, and for the purpose of deceiving [Frison] and inducing [Frison] to purchase Davison's invention-promotion services." (*Id.* ¶ 105). According to Frison, Davison's income is derived almost solely from fees charged for services, not from royalties derived from the successful promotion or licensing of inventions.

**\*3** In the Award, the arbitrator found Davison liable under the AIPA and made the following findings:

> While [Davison] may have technically complied with all of the requirements of the American Inventors Protection Act, 35 U.S.C.A. § 297, "based upon the overall, common sense, net impression on a reasonable consumer, [Davison] falsely represented by implication, that consumers who buy their services stand a reasonably good chance of realizing financial gain." *F.T.C. vs. Davison, Inc.*, 431 F. Supp. 2d 548, 554 (W.D. Pa. 2006). Examples include but are not limited to (a) representative of [Davison] saying [Frison's] idea was "reasonable" when in fact that meant that the paperwork was completed properly, and the invention was not one of the prohibited types of inventions considered by Davison, (b) the 10% commission of all monies received by Davison on the sale or license of a product, when in fact, there is virtually no chance of any commission being paid; (c) [Frison's] idea, being handled by the "director of new products", not by just any employee, and (d) correspondence from the president of Davison.

(ECF No. 30-9, at 4). The arbitrator went on to award Frison double the amount that Frison paid to Davison for services – $13,209.00 – due to Davison's "deceptive actions," as well as $10,000.00 in "[r]easonable" attorney fees.[2] (*Id.*) The arbitrator denied Frison's claim for fraudulent misrepresentation under Pennsylvania law. (*Id.*)

On January 19, 2017, Davison filed a complaint challenging the Award in this court. (ECF No. 1). Frison filed her answer on April 10, 2018. (ECF No. 24). Cross-motions for summary judgment followed on April 27, 2018, in which Davison seeks vacatur of the Award and Frison seeks confirmation. (ECF Nos. 25, 29). The matter is fully briefed and ripe for disposition. (ECF Nos. 26-28, 30-49).

### III. Legal Standard

Summary judgment may only be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

Davison Design & Development, Inc. v. Frison, Not Reported in Fed. Supp. (2018)

2018 WL 6324996

150-51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

### IV. Discussion

**\*4** "There is a strong presumption under the Federal Arbitration Act in favor of enforcing arbitration awards." *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir. 2005) (internal citation omitted). "When parties move to confirm or vacate an arbitration award, 'the court's function in confirming or vacating a commercial arbitration award is severely limited.' " *Daugherty v. Wa. Square Sec., Inc.*, 271 F. Supp. 2d 681, 685-86 (W.D. Pa. 2003) (quoting *Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.*, 868 F.2d 52, 56 (3d Cir. 1989) ). A district court may vacate an arbitration award " 'only under [the] exceedingly narrow circumstances' listed in 9 U.S.C. § 10(a)." *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 251 (3d Cir. 2013) (quoting *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003) ). Section 10(a) provides:

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

### A. Timeliness of Federal Complaint

Frison contends that the instant action is untimely given that it was not filed within thirty days of the arbitration award as required under Pennsylvania law. (ECF No. 31, at 7-13). Conversely, Davison argues that because the FAA's three-month notice provision governs the timeliness of the motion, its complaint was timely filed in this court. (ECF No. 35, at 9-11). For the reasons that follow, Davison's complaint was timely filed because the parties did not expressly opt out of the FAA's procedures.

The FAA requires "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within *three months* after the award is filed or delivered." 9 U.S.C. § 12 (emphasis added). Pennsylvania's arbitration statute reads "application under [42 Pa. Con. Stat. § 7314(b) ] shall be made within 30 days after delivery of a copy of the award to the applicant." 42 Pa. Con. Stat. § 7314(b).

Davison Design & Development, Inc. v. Frison, Not Reported in Fed. Supp. (2018)
2018 WL 6324996

The applicable IPRPA provision reads: "Choice of Law; Arbitration; Cure"

A. This Agreement shall be governed by the *law of the Commonwealth of Pennsylvania* and is deemed to be executed, entered into and performed in Pittsburgh, Pennsylvania. For any dispute, the parties agree to seek to resolve the dispute through good faith negotiation. For any dispute not resolved through good faith negotiation, the parties agree that all disputes shall be resolved through arbitration before the American Arbitration Association ("AAA") in Pittsburgh, Pennsylvania using the Commercial Arbitration Rules in effect on the date that the claim is submitted to the AAA. Client agrees that any claim must be brought in an individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.

**\*5** (ECF No. 32-1 ¶¶ 4.A) (emphasis added). To opt out of the FAA procedures for vacatur and confirmation, the parties must clearly express their intent to do so and a general choice of law provision is insufficient to do so. *Oberwager v. McKechnie Ltd.*, 351 F. App'x 708, 710 (3d Cir. 2009); *see Lex v. Weinar*, Civil Act. No. 13–mc–96, 2015 WL 1455810, at \*2 (E.D. Pa. Mar. 31, 2015). A plain reading of the language of the contract demonstrates that the parties only intended for Pennsylvania law to govern the interpretation of the contract and that they did not intend to forego federal procedural rules. *See* (ECF No. 32-1 ¶¶ 4.A). Accordingly, the FAA's notice provision applies and Davison's complaint was timely filed.

**B. Manifest Disregard of the Law for Contract Interpretation**

In count I of its federal court complaint, Davison seeks vacatur of the Award, arguing that the arbitrator exceeded his powers and manifestly disregarded pertinent law. (ECF No. 1 ¶¶ 35-41). It is rare to disturb an arbitration award. *Freeman*, 709 F.3d at 251. A deferential standard of review applies, and this court must proceed under the assumption that the Award is enforceable. *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012). The bases for vacatur are exceedingly narrow and the record must evidence egregious departures from the parties' agreed upon arbitration. *Id.* "Manifest disregard" is not one of the grounds for vacatur listed in § 10(a) of the FAA. It is a judicially-created doctrine that is invoked to "vacate an arbitrator's decision [that] evidences a manifest disregard for the law rather than an erroneous interpretation of the law." *Goldman v. Citigroup Global Mkts Inc.*, 834 F.3d 242, 255 (3d Cir. 2016) (quoting *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003) ) (internal quotation and editorial marks omitted). Although there is a circuit split with respect to whether manifest disregard for the law remains a viable cause of action post *Hall Street Associates v. Mattel, Inc.*, 552 U.S. 576, 584 (2008), the Court of Appeals for the Third Circuit has not yet addressed this issue.[3] *See Goldman v. Citigroup Global Mkts. Inc.*, 834 F.3d 242, 256 n.13 (3d Cir. 2016) (explaining "[t]he continued validity of manifest disregard as a basis for vacating arbitration awards has been thrown into doubt"). Even assuming that it remains a viable cause of action in this circuit, Davison failed to meet its burden to prove that the arbitrator manifestly disregarded the law.

Davison argues that the arbitrator exhibited a "manifest disregard for the law" by ignoring the parol evidence rule and determining that Davison violated the AIPA. (ECF No. 26, at 11-15). Establishing a "manifest disregard" claim presents a "tremendous obstacle," because " 'if a court can find any line of argument that is legally plausible and supports the award then it must be confirmed.' " *Bellantuono v. ICAP Sec. USA, LLC*, 557 F. App'x 168, 174 (3d Cir. 2014) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995) ). Said another way, "there must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of an award." *News Am. Publn's, Inc. Daily Racing Form Div. v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir. 1990) (citing *NF & M Corp. v. United Steelworkers of Am.*, 524 F.2d 756, 760 (3d Cir. 1975) ). "As long as the arbitrator has arguably construed or applied the contract, the award must be enforced, regardless of the fact that a court is convinced that [the] arbitrator has committed a serious error." *Id.* at 24 (citing *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 38 (1987)

Davison Design & Development, Inc. v. Frison, Not Reported in Fed. Supp. (2018)

2018 WL 6324996

). Davison " 'bears the burden of proving that the [arbitrator was] fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it.' " *Id.* (quoting *Duferco v. Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003) ).

**\*6** Here, the arbitrator denied Frison's state law fraudulent misrepresentation claim and found liability on the part of Davison only her federal AIPA claim. In rendering his decision, the arbitrator did not explain why he ignored the warranty disclaimer in the IPRPA. In order to determine whether there is absolutely no support at all in the record justifying the arbitrator's determination, the court must first assess whether a disclaimer like the one found in the IPRPA is lawful and enforceable under the AIPA. If so, the question then becomes whether there was a contract between the parties and what the terms and conditions of that contract were.

   **1. Even if the warranty disclaimer found in the IPRPA was valid under state law, a finding by the arbitrator that the warranty disclaimer was unenforceable under the AIPA would not have been a manifest disregard for the law.**[4]
The arbitrator did not specifically explain why he determined that the warranty disclaimer in the IPRPA was unenforceable; nevertheless, in rendering the award, he stressed the AIPA's role in consumer protection and found that Davison had made false representations to Frison violating the act by implication.

The AIPA was designed to "protect inventors from invention promotion scams and the deceptive advertising related to them by authorizing the PTO to publicize complaints that it receives against invention promoters." *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 454 (4th Cir. 2004) (citing 145 Cong. Rec. S14521 (Nov. 10, 1999) ). Specifically, it reads:

   **(b) Civil action. --(1)** Any customer who enters into a contract with an invention promoter and who is found by a court to have been injured by any material false or fraudulent statement or representation, or any omission of material fact, by that invention promoter (or any agent, employee, director, officer, partner, or independent contractor of such invention promoter), or by the failure of that invention promoter to disclose such information as required under subsection (a), may recover in a civil action against the invention promoter (or the officers, directors, or partners of such invention promoter), in addition to reasonable costs and attorneys' fees--

   **(A)** the amount of actual damages incurred by the customer; or

   **(B)** at the election of the customer at any time before final judgment is rendered, statutory damages in a sum of not more than $5,000, as the court considers just.

   **(2)** Notwithstanding paragraph (1), in a case where the customer sustains the burden of proof, and the court finds, that the invention promoter intentionally misrepresented or omitted a material fact to such customer, or willfully failed to disclose such information as required under subsection (a), with the purpose of deceiving that customer, the court may increase damages to not more than three times the amount awarded, taking into account past complaints made against the invention promoter that resulted in regulatory sanctions or other corrective actions based on those records compiled by the Commissioner of Patents under subsection (d).

35 U.S.C. § 297(b).

No court has addressed whether parties can contract out of subsection (b) of the AIPA, and if the parties can opt out, what constitutes a valid disclaimer. *See F.T.C. v. Davison Assocs., Inc.*, 431 F. Supp. 2d 548, 561 (W.D. Pa. 2006) (explaining in an

App. 567

Davison Design & Development, Inc. v. Frison, Not Reported in Fed. Supp. (2018)

2018 WL 6324996

F.T.C. case that "[d]isclaimers or curative language must be 'sufficiently prominent and unambiguous' such that the overall net-impression of the communication becomes non-deceptive") (citation omitted). Certainly, given the fact that the AIPA is a consumer protection statute, there remains a very real question whether boilerplate disclaimers that are indistinguishable in font type from the remainder of the contract are sufficient to disclaim any promise or guarantee of financial gain. *See Knight v. Idea Buyer, LLC*, Case No. 2:16-cv-1175, 2017 WL 1838019, at *5 (S.D. Ohio May 8, 2017) (treating the AIPA as a statutory right rather than a contractual one). The court need not resolve the issue here today, as it cannot be said that the arbitrator manifestly disregarded the law when he refused to apply the legal disclaimer.

**\*7** "Manifest disregard for the law means more than mere legal error or misunderstanding[; r]ather, the decision must fly in the face of *clearly established legal precedent.*" *Silicon Power Corp. v. Gen. Elec. Zenith Controls, Inc.*, 661 F. Supp. 2d 524, 542 (E.D. Pa. 2009) (internal citation omitted) (emphasis added). As neither party located any binding precedent on this issue and the court was unable to find any, vacatur cannot be found on this basis. In other words, Davison did not show any applicable precedent to enforce a disclaimer of representations or warranties under the AIPA. Thus, the arbitrator did not manifestly disregard for the law.

**2. Even if boilerplate disclaimers like those included by Davison in the Pre-Development Agreement and IPRPA were lawful and enforceable under the AIPA, Davison still cannot vacate the award on the basis of manifest disregard for the law.**

At issue are the disclaimers in the Pre-Development Agreement and the IPRPA and whether parol evidence can be used to modify the express terms of the agreements. Davison argues that the arbitrator impermissibly considered parol evidence when he noted that (a) a representative of Davison informed Frison that her idea was reasonable, when in fact all that meant was that the paperwork was completed properly, and the invention was not one of the prohibited types of inventions considered by Davison; (b) Davison reserved a ten percent commission on all monies received by the sale or license of Frison's proposed product, when in fact there was virtually no chance of any commission being paid; (c) Frison's proposed product was being handled by the "director of new products", not by just any employee; and (d) Davison's president corresponded with Frison about her proposed product. Thus, Davison argues that the arbitrator manifestly disregarded controlling law, i.e., by considering parol evidence in violation of the parol evidence rule. (ECF No. 26, at 9-16).

With respect to the Pre-Development Agreement, Frison argues that it was never signed and the terms do not reflect a meeting of the minds. (ECF No. 37, at 5). The mere presence of a merger clause "does not prove that the writing itself was ever assented to or became operative as a contract." John Edward Murray Jr, Murray on Contracts, 439 (4th ed. 2001). Before the parol evidence rule can be invoked, there must be a contract. The offeror is the master of the offer and the offeror can limit the means of acceptance. *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 739 A.2d 133, 136-38 (Pa. 1999) (explaining "law of this Commonwealth makes clear that a contract is created where there is mutual assent to the terms of a contract by the parties with the capacity to contract"). The Pre-Development Agreement limits acceptance to the *execution of the agreement.* Specifically, Davison's obligations under the contract are only triggered "*after the execution of this* agreement by Client." (*Id.* at 27) (emphasis added). The Pre-Development Agreement also contains the provision, "IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, on behalf of themselves, their successors, representatives, heirs and assigns affix their hand and seal the day and date *next to their signature below.*" (*Id.* at 27) (emphasis added). Thus, the Pre-Development Agreement was a bilateral contract where both parties had performance obligations and, as such, could not be accepted unilaterally by performance only. *Stephan v. Waldron Elec. Heating & Cooling LLC*, 100 A.3d 660, 665 (Pa. Super. Ct. 2014).

Davison Design & Development, Inc. v. Frison, Not Reported in Fed. Supp. (2018)

2018 WL 6324996

---

**\*8** The arbitrator had competing affidavits before him. Frison testified that she never had an electronic account with Davison and, thus, could not have signed the Pre-Development Agreement. Conversely, the representative for Davison declared Frison signed the contract. Given Frison's affidavit, there was evidence from which the arbitrator could find that there was never a meeting of the minds between Davison and Frison with respect to the Pre-Development Agreement, a determination that would render its warranty and representation disclaimers inapplicable. Thus, the arbitrator cannot be said to have manifestly disregarded the law because there was sufficient evidence to support a finding that the Pre-Development Agreement was not a valid and enforceable contract.

With respect to the IPRPA, the parties agree that it is a valid contract and contains the following provision:

> It will take our staff approximately eight to ten weeks to complete these steps. Once finished, the Executive Summary, Integrated Product Rendering and Provisional Patent Application Materials will be sent to you immediately. Please remember that we do not promise or guarantee any financial gain from the development of any new product.

(ECF No. 32-1). Thus, there is an issue about whether parol evidence is admissible with respect to the IPRPA. "Pennsylvania's parol evidence rule mandates that when a written contract is clear and unequivocal, its meaning must be determined by its contents alone." *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 594 (3d Cir. 2009). The parol evidence rule applies where a contract is fully integrated, i.e., it "was intended by the parties to encompass the entire understanding between the parties." *SodexoMAGIC, LLC v. Drexel Univ.*, Civ. Act. No. 16-5144, 2018 WL 3659241, at \*15 (E.D. Pa. Aug. 2, 2018). "A merger or integration clause will serve as a strong indication that the contract is fully integrated, the intention of the parties is also a key consideration in a court's analysis." *Id.* Because there is no merger or integration clause and the parties had numerous discussions relating to multiple possible agreements, it cannot be said that the IPRPA was a final and definite expression of the parties' agreement. In addition, where there is an accusation of fraud in the inducement and the writing is not fully integrated, the parol evidence rule may not apply. *See Boehm v. Riversource Life Ins. Co.*, 117 A.3d 308, 326 (Pa. Super. Ct. 2015). Consequently, Davison failed to carry its substantial burden of showing a manifest disregard of the law. *See Bellantuono*, 557 F. App'x at 170.[5]

### C. Manifest Disregard of the Law for Damages and Fees[6]

**\*9** Davison attacks the propriety of the Award's damages and attorneys' fees in two ways. In count I of the complaint, it is argued that the arbitrator exceeded the scope of his powers under § 10(a)(4) of the FAA by failing to interpret – in any way – the contractual language pertaining to damages and fees, and by failing to cite any legal foundation for the Award. (ECF Nos. 1 ¶¶ 39-40; 26, at 15-16). In count II of its complaint, Davison alternatively argues that the Award should be modified pursuant to § 11(a) of the FAA due to the arbitrator's material miscalculation of the damages and attorney fees. (ECF No. 1 ¶¶ 42-48).

With respect to damages and fees available to a claimant under the AIPA, § 297(b)(1) provides:

> **(b) Civil Action.--(1)** Any customer who enters into a contract with an invention promoter and who is found by a court to have been injured by any material false or fraudulent statement or representation, or any omission of material fact, by that invention promoter (or any agent, employee, director, officer, partner, or independent contractor of such invention promoter), or by the failure of that invention promoter to disclose such information as required under subsection (a), may recover in a civil action against the invention promoter (or the officers, directors, or partners of such invention promoter), in addition to reasonable costs and *attorneys' fees*--

---

**(A)** the amount of actual damages incurred by the customer; or

**(B)** at the election of the customer at any time before final judgment is rendered, statutory damages in a sum of not more than $5,000, as the court considers just.

35 U.S.C. § 297(b)(1) (emphasis added). Section 297(b)(2) provides:

> [I]n a case where the customer sustains the burden of proof, and the court finds, that the invention promoter *intentionally misrepresented* or *omitted* a material fact to such customer, or willfully failed to disclose such information as required under subsection (a), *with the purpose of deceiving that customer*, the court may increase damages to not more than three times the amount awarded, taking into account past complaints made against the invention promoter that resulted in regulatory sanctions or other corrective actions based on those records compiled by the Commissioner of Patents under subsection (d).

35 U.S.C. § 297(b)(2) (emphasis added). The record before the court makes clear that Frison expended $6,645.00 for services performed by Davison. During the arbitration, Frison filed a fee petition requesting $46,528.79 in attorneys' fees and costs. (ECF No. 30-7). Davison submitted a brief questioning the legitimacy of many of the charges by Frison's attorney. (ECF No. 30-8). Specifically, Davison argued that the amount was too large considering the amount Frison actually paid for Davison's services; the petition covered all the time Frison's counsel spent working on the case and not just on the AIPA claims; Frison's counsel spent an unjustified amount of time on clerical tasks; and the petition sought compensation for unreasonable and unnecessary expenditures. (*Id.*) In the Award, the arbitrator found Davison liable for "the principal amount of $13,290.00 ($6,645 x 2 for Davison's deceptive actions against [Frison] ...)." (ECF No. 30-9, at 4). He also provided for "[r]easonable attorney's fees of $10,000.00." (*Id.*). There was no further discussion of the justification for either.

### 1) Damages

With respect to the adequacy of the arbitrator's explanation for purposes of § 10(a)(4) of the FAA, while the arbitrator's reasoning was sparse, he explicitly found that Davison violated § 297 of the AIPA. By increasing the damages by a factor of two – per the discretion afforded under § 297(b)(2) to increase damages by up to a factor of three where there is evidence of intentional misrepresentation – the arbitrator makes clear that he considered the conduct by Davison to be intentional. As the court already observed, "if a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Bellantuono*, 557 F. App'x at 174 (citation omitted). While the arbitrator's discussion is minimal, it is sufficient. Thus, the doubling of damages is not subject to vacatur under § 10(a)(4).

### 2) Fees

**\*10** Similarly, while the arbitrator did not provide specific reasoning for his award of attorneys' fees, the record contains Frison's fee petition for $46,528.79, comprised of approximately nine pages of billed hours. (ECF No. 30-7). Despite Frison's request, the arbitrator awarded only $10,000.00, which Davison criticizes as being "round" and "logically indefensible" but fails to suggest how it is logically indefensible or even what a reasonable amount would be. (ECF No. 26, at 12). "If a court is to vacate an arbitration award on the basis of a manifest disregard of the law, there must be some showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it." *Kulchinsky v. Ameriprise Fin.*, Civ. Act. No. 11-0319, 2011 WL 2745967, at \*7 (E.D. Pa. July 14, 2011) (quoting *O.R. Secs., Inc. v. Prof'l Planning Assocs., Inc.*, 857 F.2d 742, 747 (11th Cir. 1988) ). A "mere legal error or misunderstanding" is not enough. *Id.* (quoting *Silicon Power*

App. 570

Davison Design & Development, Inc. v. Frison, Not Reported in Fed. Supp. (2018)

2018 WL 6324996

*Corp. v. Gen. Elec. Zenith Controls, Inc.*, 661 F.Supp.2d 524, 542 (E.D. Pa. 2009) ). Before the arbitrator, Frison's counsel submitted evidence of its attorneys' fees in the form of a fee petition detailing the time spent and the hourly rate in preparation of its affirmative case. Davison responded to the petition before the arbitrator. (ECF No. 30-8, at 5). Even though the arbitrator did not provide the full reasoning behind his decision, this court cannot say there is no colorable justification for the arbitrator's decision or that it was "completely irrational". *See Andorra Servs. Inc. v. Venfleet, Ltd.*, 355 F. App'x 622, 629 (3d Cir. 2009). Accordingly, the attorneys' fee award will not be vacated under § 10(a)(4) of the FAA.

### D. Modification

Section 11(a) of the FAA provides that the court may modify or correct an award when "there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award." 9 U.S.C. § 11(a). Modification is "entirely discretionary and should 'promote justice between the parties.' " *Andorra Servs. Inc.*, 355 F. App'x at 628 (quoting 9 U.S.C. § 11). Davison's argument for modification is the same as Davison's argument for vacatur: that the Award did not explicitly state that Davison's false representations were intentional. (ECF No. 26, at 12-13). As discussed, however, the arbitrator specified that Davison's conduct violated § 297 of the AIPA, under which treble damages are appropriate when a misrepresentation or omission was intentional. The arbitrator then doubled the damages in accordance with § 297. The court finds that this is a sufficiently clear indication of the arbitrator's determination that Davison's conduct was intentional. The damages award will not be modified.

### V. Conclusion

Based upon the foregoing, Davison's motion for summary judgment (ECF No. 25) will be DENIED, and Frison's motion for summary judgment (ECF No. 29) will be GRANTED, to the extent that Frison seeks confirmation of the Award pursuant to 9 U.S.C. § 9.

An appropriate order will be entered.

### All Citations

Not Reported in Fed. Supp., 2018 WL 6324996

### Footnotes

[1]   Although Davison's Concise Statement of Additional Facts declares that Frison does not challenge the evidence that someone else may have used her computer to sign the agreement and Frison did not respond to that allegation, the evidence Davison cites in support of that allegation is Davison's own brief before the arbitrator. (ECF No. 36 ¶ 25).

[2]   At arbitration, Frison's requested $46,528.79 in attorneys' fees and costs. (ECF No. 30-7).

[3]   The Court of Appeals for the Third Circuit has yet to address whether manifest disregard for the law has survived *Hall Street Associates v. Mattel, Inc.*, 552 U.S. 576, 584 (2008). On October 24, 2018, it once again declined to resolve the issue. *Ross Dress for Less Inc. v. VIWP, L.P.*, No. 17-3145, 2018 WL 5291035, at *3 n.1 (3d Cir. Oct. 24,

Defendant's Exhibit 10

Davison Design & Development, Inc. v. Frison, Not Reported in Fed. Supp. (2018)

2018 WL 6324996

---

2018).

4     A warranty is "[a]n express or implied promise that something in furtherance of the contract is guaranteed by one of the contracting parties; esp., a seller's promise that the thing being sold is as represented or promised." *Warranty*, Black's Law Dictionary (10th ed. 2014). A disclaimer is "[a] renunciation of one's own legal right or claim." *Disclaimer*, Black's Law Dictionary (10th ed. 2014).

5     Contrary to Davison's assertion, manifest disregard and exceeding its powers are two separate bases for vacatur. *Ross Dress for Less Inc. v. VIWP, L.P.*, No. 17-3145, 2018 WL 5291035, at *2-3 (3d Cir. Oct. 24, 2018). "Courts should vacate an arbitration award [on the basis of excessive use of powers] if: (1) the form of the award cannot 'be rationally derived either from the agreement between the parties or from the parties submissions to the arbitrators' and (2) the terms of the award are 'completely irrational.' " *PMA Capital Ins. Co. v. Platinum Underwriters Berm., Ltd.*, 400 F. App'x 654, 655-56 (3d Cir. 2010) (quoting *Mut. Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.*, 868 F.2d 52, 56 (3d Cir. 1989) ). "Only if the arbitrator acts outside the scope of his contractually delegated authority— issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract—may a court overturn his determination." *Id.* at *2. As explained in Part "B", the arbitrator did not substitute his own views of economic justice and considered the agreement in issue and the AIPA. Like with manifest injustice, where the law is unsettled, the arbitrator cannot be said to have exceeded his authority. *Ross Dress for Less Inc.*, 2018 WL 5291035, at *3.

6     Similarly, the arbitrator did not exceed his authority when crafting an award for damages and fees. The Court of Appeals for the Third Circuit recently explained that an award may be vacated where it "is so completely irrational that it lacks support altogether." *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012). While manifest injustice and excessive use of powers present two distinct ways for vacatur, for purposes of this issue, the law is essentially the same. Thus, this court adopts its analysis in "(C)" and concludes that Davison failed to show an excessive use of powers.

---

**End of Document**            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

## Defendant's Exhibit 11

Defendant's Exhibit 11

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVIDSON DESIGN & DEVELOPMENT, INC., | § § | |
| *Plaintiff,* | § § | Civil Action No.: 2:23-cv-00644-MJH |
| v. | § § | *Honorable Marilyn J. Horan* |
| MARIO SCORZA, | § § | |
| *Defendant.* | § | |

## AFFIDAVIT OF STACEY L. BARNES IN SUPPORT OF DEFENDANT'S PETITION FOR ATTORNEYS' FEES AND COSTS OF THE LITIGATION

I, Stacey L. Barnes, am an adult citizen of the State of Texas and am competent to testify as to the following matters based upon personal knowledge.

1. My name is Stacey L. Barnes, I am of sound mind, over twenty-one (21) years of age, have never been convicted of a felony or misdemeanor involving moral turpitude, and am personally acquainted with the facts herein stated and they are true and correct. I am a Senior Attorney of Kearney, McWilliams & Davis, PLLC ("the Firm") with office located at 55 Waugh Drive, Houston, Texas 77007. I received my J.D. from the University of Houston in 1998.

2. Attached hereto as Exhibits are true and correct copies of the following:

| EXHIBIT NO. | CONTENTS |
|---|---|
| Exhibit 1 | CV of Stacey L. Barnes |
| Exhibit 2 | Firm Invoices |
| Exhibit 3 | Local Counsel Invoices |

3. For the past 24 years, my practice has consisted mainly of civil litigation and business transactions, including arbitration, commercial litigation, intellectual property and technology disputes, international business, as well as other civil trial matters. I am familiar with the types of fees, costs, and expenses incurred in complex, sophisticated matters such as this one.

4. I have been practicing continuously throughout the country in both state and federal courts, as well as before arbitration tribunals since 1998. I also have served as an arbitrator, as a member of AAA, ICDR and FINRA arbitration panels, in arbitrations seated across Texas and in other major U.S. cities. I am familiar with the level of practice, as well as the charges and the costs associated with the claims raised, in this and similar arbitration proceedings over this period of time. I am familiar with the rates charged in my locality, as well as in other major legal markets across the United States. As an attorney with over 24 years of experience, and as a Senior Attorney of Kearney, McWilliams & Davis, PLLC, I charge

$425.00 an hour for legal services of the nature relating to this matter. Our associate attorneys charge $215.00 - $450.00 an hour for legal services.

5. I serve as lead counsel for Defendant Mario Scorza (hereinafter "Defendant") in the above-captioned civil action. A true and correct copy of my CV is attached as **Exhibit 1**. The attached Exhibits to this response and opposition are true and correct copies of the Exhibits submitted and filed in the underlying arbitration.

6. Attached hereto as **Exhibit 2** are detailed invoices containing the time, work, and description of the work performed on this case by the Firm's attorneys or paralegals. The invoices contain the amount of time and description of the work performed for the actual billing entries created in the normal course of business by the Firm on or about the date of each invoice. The billing entries in the invoices were entered by Firm attorneys or paralegals contemporaneous with the date of entry.

7. I was assisted by other attorneys with lower billing rates in an effort to minimize fees. The rates of the Firm's attorneys working on the case ranged from $215.00 to $425.00 per hour. The Firm's attorneys and their rates are as follows:

| ATTORNEYS | INITIALS | TIMEFRAME | HOURLY RATE |
|---|---|---|---|
| Stacey L. Barnes | SLB | 04/20/23 – 08/23/23 | $425.00 |
| William "Trey" Yarbrough III | WCY | 05/01/22 – 08/23/23 | $450.00 |
| Vikesh N. Patel | VNP | 05/05/22 – 08/23/23 | $215.00 |
| LAW CLERKS | INITIALS | TIMEFRAME | HOURLY RATE |
| Monica Garza-Hovel | MGH | 08/22/23 – 08/23/23 | $150.00 |
| PARALEGALS | INITIALS | TIMEFRAME | HOURLY RATE |
| Shannon Frizzell | SVF | 06/01/23 – 08/23/23 | $160.00 |

This rate is consistent with the rates regularly charged and collected by the Firm for attorney and paralegal work in other comparable cases.

8. The rates charged reflect: the time, labor, novelty, difficulty, and skill required; the effect of working this case on other Firm employment; the fees charged in both this and other localities; the amount involved and results obtained; applicable time limitations; the nature and length of professional relationship; the experience, reputation, and ability of the lawyers; and the type of fee structure involved.

9. Litigation tasks were distributed according to the experience level of the attorneys, and our paralegal and other staff members were deployed appropriately. Some tasks required more than one attorney due to the complex nature of the legal issues or time constraints. However, Defendant's counsel were careful to avoid duplication.

10. Care was taken to include attorneys with lower billable rates to perform tasks commensurate with their experience such as research assignments, factual and legal

investigations, and drafting the first draft of certain pleadings, motions, correspondence, etc.

11. The hourly rates charged by the Firm's attorneys in this litigation are consistent with the rates regularly charged and collected by the Firm's attorneys in other comparable cases, as well as this locality and the locality of the seat of litigation.

12. I am familiar with the hourly rates for Houston, Texas and Pittsburgh, Pennsylvania area law firms comparable to the Firm. The Firm's attorneys are well-qualified, and their hourly rates are comparable to the prevailing market rates of attorneys practicing litigation and technology-related disputes in Houston. Based on my research and analysis of prevailing market rates in the community, as well as reviewing Pittsburgh firms for local counsel, the hourly rates charged by the Firm's attorneys and paralegal are moderately economical and less than the range of hourly rates charged by comparable attorneys in comparable cases. Rates at other firms in Houston or Pittsburgh for similar staffing are equal to or greater than the rates the Firm charged.

13. In connection with this litigation, the Firm performed all of the tasks reasonably necessary to successfully prosecute Defendant's claims in this matter. The fees, costs, and expenses the Firm billed Defendant in connection with this litigation are consistent with the Firm's ordinary and customary billing practices in similar lawsuits. The fees incurred by the Firm in this litigation are reasonable and are consistent with the fees regularly incurred and collected by the Firm in other comparable cases.

14. Other organizational and logistical matters, including the preparation of paper exhibits, the arrangement of accommodations, and the like were performed primarily by administrative or non-attorney staff.

15. The Firm has billed Defendant for attorney's fees in the amount of $16,965.50 through June 2023. Defendant has paid those fees and is expected to pay all future fees. Pending and unbilled charges including July and August total $1,217.00. We also project fees for the preparation of this response and supporting documents in the amount of $16,805.00. Total attorneys' fees for this matter are thus projected to be $34,987.50.

16. Our local counsel in Pennsylvania is Mr. John M. Meyers. Mr. Meyers has billed us and been paid in the amount of $693.00. A true and correct copy of Mr. Meyers' invoice is attached as **Exhibit 3**. Mr. Meyers informs us that he will also bill us $495.00, for his time in preparation of this response. The Defendant has paid the local counsel for his fees and will be expected to pay for future fees. Total fees for this local counsel will be $1,188.00.

17. The Firm seeks an award of litigation related costs totaling $36,385.50 as follows:

| *Costs/expenses related to the litigation* | |
|---|---|
| a. | Attorney's fees for Confirmation/Vacatur action | $16,965.50 |
| b. | Local Counsel fees billed and projected | $1,188.00 |
| c. | Court costs and expenses including pro hac vice application | $210.00 |

| | |
|---|---|
| d. Projected and/or unbilled attorney's fees | $18,022.00 |
| | **Total: $36,385.50** |

18. The Firm seeks an award of total fees and litigation related costs totaling **$36,385.50**. All the fees, costs and expenses incurred in this case were reasonable and necessary under the circumstances. The Firm did not mark-up any of the fees, costs, or expenses sought.

I SOLEMNLY SWEAR AND AFFIRM under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

Stacey L. Barnes

Sworn to and subscribed before me on the 23rd day of August, 2023 by Stacey L. Barnes.

Andrea Cavazos
My Commission Expires
3/3/2027
Notary ID 125481183

Notary Public for the State of Texas

Matter No. 25037-2

Page 4 of 4

**STACEY L. BARNES**
Kearney, McWilliams & Davis, PLLC
55 Waugh Dr., Suite 150
Houston, Texas 77007
United States of America

Tel.: +1-713-936-9620 x121
Fax: +1-832-413-5405
E-mail: sbarnes@kmd.law

## PROFILE

I am a litigation and transactional attorney, concentrating my practice in the area of international business law, general business representation, corporate law, commercial litigation and arbitration, and intellectual property law. As a transactional attorney, I counsel clients regarding a variety of business transactions, from basic entity formation, and shareholder agreements, to complex cross-border acquisitions or distribution and licensing agreements. As a litigator, I have experience with cases ranging from simple collection matters to patent and trademark infringement cases, international trade secret litigation, and breach of commercial contract cases. I have advised business clients on legal matters involving Canada, Mexico, St. Lucia, Italy, Germany, Great Britain, Ireland, France, Belgium, Netherlands, Luxembourg, Sweden, Malta, Russia, Central African Republic, Republic of the Congo, Ghana, Saudi Arabia, India, Malaysia, Singapore, South Korea and the United States.  I have worked for business law firms in Houston, Texas and Milan, Italy.  I am available for appointment as an arbitrator for commercial, international, securities, and intellectual property cases.

## WORK HISTORY

Kearney, McWilliams & Davis, PLLC, Houston, Texas – Partner, 2018 – present
University of Debrecen, Hungary – Visiting Professor, 2015-present

Partner, Lewis & Barnes, Houston, Texas, 2010-2018, Visiting Professor, University of Silesia, Poland, 2022 and 2018; Visiting Professor, Jagiellonian University, Poland, 2020; Visiting Professor, University of Pardubice, Czech Republic, 2016;   Adjunct Professor, South Texas College of Law, Houston, Texas, 2008-2014; Partner, Hanszen Laporte, Houston, Texas, 2007-10; Partner, Barnes & Associates, PLLC, Houston, Texas, 2003-07; Associate Attorney, Broemer & Associates, LLC, Houston, Texas, 2001-03; Associate Attorney/Law Clerk, London & Schaeffer, LLP, Houston, Texas, 1997-01; Law Clerk, Dobson & Pinci, Milano, Italy, 1996.

## EDUCATION & ACADEMIC

University of Debrecen, Hungary – Visiting Professor, 2015-present
Courses Taught: International Sales of Goods, International Arbitration

University of Silesia, Poland – Visiting Professor, 2022 and 2018
Courses Taught: International Sales of Goods, International Merger, Acquisition, and Joint Venture Arbitrations

Jagiellonian University, Poland – Visiting Professor, 2020
Courses Taught: Use of American Arbitration Rules in Europe

University of Pardubice, Czech Republic – Visiting Professor, 2016
Courses Taught: International Sales of Goods

South Texas College of Law – Distinguished Lecturer/Adjunct Professor, 2008-2014
Courses Taught: International Sales & Arbitration, Arbitration Law
Coach: South Texas College of Law Vis international commercial arbitration team; South Texas College of Law Polish Court of Arbitration international commercial arbitration team; South Texas College of Law securities arbitration team; South Texas College of Law domestic commercial arbitration team

University of Houston Law School - Juris Doctorate (J.D.), *cum laude*, 1998
University of Texas at Austin - Bachelor of Arts (B.A.), National Merit Scholar and NASA Fellowship Scholar, 1990

## BAR ADMISSION

- Supreme Court of Texas
- United States District Courts for the Northern, Western, Eastern and Southern Districts of Texas
- United States Court of International Trade
- United States Court of Appeals for the Fifth Circuit
- United States Court of Appeals for the Federal Circuit
- Appeared *pro hac vice* in state courts in Florida, Michigan and Montana, as well as United States District Courts for the Central District of California, District of Maryland, District of Utah, District of Wyoming, Southern District of Florida, and Eastern District of North Carolina

## ARBITRATOR EXPERIENCE

Member of the AAA Commercial, ICDR, ICC, European Centre for Dispute Resolution, FINRA, and City of Houston arbitration rosters. Served as single arbitrator, wing arbitrator, and chair of commercial arbitration panels. Arbitration subjects included international commercial loan collateralization, international shipping and logistics employee leasing, oilfield stimulation services, employment administrative services, real estate development projects, commercial real estate loans, professional services fees, government contracting, corporate governance, minority shareholder freeze out, corporate dissolution, business acquisition fraud, business acquisition representations and warranties, post-acquisition price adjustments, post-acquisition tax liability, commercial loan brokerage agreements, collateralized debt obligations, mutual fund administration, software service agreements, software royalties, breach of contract, breach of fiduciary

Defendant's Exhibit 11

duty, construction services, covenants not to compete, trade secrets, securities fraud, branch office contracts, and executive compensation cases. Served as chairman of arbitration panel for claims between two large international financial institutions for multiple acts of unfair competition, tortious interference with contract and violation of non-competition covenants.  Served as chairman of multiple international arbitration panels for claims involving securities options contracts and commercial loan securitization.

## ARBITRATION ADVOCACY EXPERIENCE

- Represented client in corporate dissolution of real estate company.
- Represented general contractor in multi-party international chemical plant construction arbitration.  Obtained favorable confidential settlement for client.
- Represented trademark holder in international trademark licensing arbitration. Obtained emergency arbitrator injunction against international infringement and interference with licensing rights.
- Represented purchaser in medical services post-acquisition price adjustment arbitration.  Obtained favorable settlement for client.
- Represented licensee in multi-party international software royalty arbitration proceeding.  Obtained settlement with Chinese sub-licensee paying the great majority of amount in dispute.
- Represented Internet communications client in corporate governance and minority shareholder buy-out arbitration.  Obtained favorable buy-out terms for client.
- Represented American investor in minority shareholder oppression arbitration proceeding against Canadian shareholder.  Obtained favorable award in arbitration and confirmed award in U.S. federal court, pursuant to the New York Convention.
- Successfully represented e-commerce client in unfair competition and Internet trade secret arbitration.  Obtained a dismissal of parallel suit in U.S. federal court seeking to enjoin the arbitration.
- Successfully appealed refusal to compel arbitration on behalf of manufactured housing client.  Texas state appellate court reversed the trial court and compelled arbitration under the U.S. Federal Arbitration Act.
- Represented financial services client in commercial arbitration proceedings for breach of fiduciary duty and unfair competition claims, including anti-suit injunction proceedings seeking to enjoin parallel lawsuits brought in violation of arbitration clause.

## LITIGATION ADVOCACY EXPERIENCE

- American litigation experience includes a variety of commercial and corporate topics, including breach of contract, stock options, securities fraud, litigation for corporate control, minority shareholder oppression, insurance coverage, pipeline services, international petroleum development, unfair competition, securities fraud, international nano-technology development, international trademark licensing, trademark infringement, patent infringement, and trade secrets.

Defendant's Exhibit 11

- Represented inventor and seller of lighting equipment in complex trademark and patent infringement suit seeking to shut down sales of client's new flagship product.  Obtained a settlement giving client ability to continue sales and a cessation of opposing party's trademark infringement.
- Represented importer of steel mill in federal court litigation regarding environmental import controls.  Obtained a TRO against the Department of Homeland Security's order requiring importing ship to return to port of origin.  Obtained a settlement giving client opportunity to successfully remedy issue and import the steel mill in question.
- Represented international honey importer in complex, multi-party litigation in federal court, involving over $100 million worth of claims for false designation of origin. Obtained a confidential settlement, with client paying smallest settlement of all defendants.
- Represented client in federal court litigation with formulation co-developer in trade secret, trademark, and international licensing dispute.  Obtained a TRO and injunction against international trademark infringement and interference with international licensees.  Obtained a settlement giving client ownership of all intellectual property in controversy.
- Represented client in federal court litigation involving trade secrets and copyright of geophysical oil and gas related software.  Counter-party sought to enjoin all North American and Chinese licensing of software.  Obtained a settlement giving client ownership of all technology at controversy.
- Represented investors in Texas state court litigation regarding Columbian petroleum development project.  Obtained a confidential settlement on behalf of clients.
- Represented investor in complex federal receivership proceedings involving hundreds of offshore asset protection entities
- Represented former licensee in a complex trademark dispute in U.S. federal court.  Obtained a confidential settlement allowing client to continue using all trademarks at issue.
- Represented client in international relocation employment contract dispute in Texas state court.  Obtained jury verdict in favor of client.
- Represented dietary supplement company in biochemical patent and trademark suit in U.S. federal court.  Obtained a halt of production of infringing product after a successful appeal to the U.S. Court of Appeals for the Federal Circuit.
- Obtained a dismissal of individual defendants in U.S. federal court litigation involving a beverage distributorship in Saudi Arabia.
- Represented oil services technology company in international trade secret litigation in Texas state court.  Obtained a dismissal of foreign patent infringement counterclaims and a confidential settlement in favor of client
- Represented defendant in trademark infringement suit in U.S. federal court.  Defeated a proposed injunction which would have halted a national new product rollout, and obtained a favorable settlement for client.
- Represented beverage company in trademark infringement suit in U.S. federal court.  Obtained a jury verdict of intentional infringement of client's trademarks and an injunction halting infringement.

- Obtained a dismissal of all claims involving international carriage of goods against a transportation corporate client in Texas state court.

## CORPORATE LAW EXPERIENCE

Transactional and corporate law experience includes negotiating, drafting and implementing a variety of international and domestic transactions, including joint ventures, mergers, asset and share acquisitions, corporate reorganizations, entity conversions, licensing and distribution agreements, branch office agreements, service agreements, finder's fee agreements, shareholder agreements, construction contracts, government contracting, international sales of goods and services, organizing American entities and subsidiaries for foreign businesses, corporate compliance matters for a publicly traded company, general counsel duties, as well as organization and corporate governance for limited liability companies, corporations, partnerships, limited partnerships, limited liability partnerships, professional corporations and professional associations.

## MEMBERSHIPS

- Member - Chartered Institute of Arbitrators (MCIArb)
- Houston Bar Association (Corporate Counsel and International Law sections)
- State Bar of Texas (Business Law and International Law sections)
- American Bar Association (Business Law, International Law and Intellectual Property Law sections)
- Member Advisory Board - South Texas College of Law - Frank Evans Center for Conflict Resolution
- Member Advisory Board - Institute for Transnational Arbitration
- Vis Moot Alumni Association
- Italy-America Chamber of Commerce
- German American Chamber of Commerce
- Turkish American Association for Business
- Houston Young Internationals Group - Former Board Member and President

## SPEAKING ENGAGEMENTS

- HBA International Section, Risk Management & Mitigation in Transnational Contracts, Houston, Texas, 2019
- HBA ADR Section, 10 Pitfalls in International Arbitration, Houston, Texas, 2019
- Texas CLE, Merger and Acquisitions Arbitrations, The Woodlands, Texas, 2018
- U.S.-China International Business Network: Chinese Judiciary Training, Principles of Arbitration in the United States, Houston Texas, 2015
- Tbilisi State University, Intensive International Arbitration Training, Tbilisi, Georgia, 2013
- TSU/NCADR ADR Conference, IBA Rules Regarding Evidence and Conflicts: The Basics, Pros, and Cons of Their Use, Tbilisi, Georgia, 2013
- Houston Bar Association, Contracts for the International Sales of Goods,

Houston, Texas, 2013
- EastWest Bank, Mediation, Arbitration, and Commercial Contracts, Houston, Texas, 2013
- International Section HBA, U.N. Convention on Contracts for the International Sales of Goods, Houston, Texas, 2013
- Center for International Legal Studies, Guidelines and Soft Law in International Arbitration, Salzburg, Austria, 2012
- Chartered Institute of Arbitrators YMG Meeting, Trends in International Arbitration - Presentation of Evidence, Dublin, Ireland, 2011
- NAFTA 2022 Meeting, Drafting Multi-Tier ADR Clauses, Houston, Texas, 2010

## LANGUAGES

English (native)
Italian (conversational)
Russian (working knowledge)
Spanish (working knowledge)

Defendant's Exhibit 11



## KEARNEY MCWILLIAMS & DAVIS
### ATTORNEYS AT LAW

Denver   Fort Worth   Houston   San Antonio   Sheridan
Ph: (713) 936-9620      www.KMD.law      Fax: (713) 936-9621

Checks preferred, scanned to admin@kmd.law or text/fax (713) 936-9622          Wire/ACH to "Inception Law" in USD$
Mail: 55 Waugh, Suite 150, Houston, TX 77007-6033                           Acct 586016183532; Routing 113000023; Wire 026009593
Zelle: Inception Law at payments@kmd.law                                     SWIFT BOFAUS3N, Bank of America, 222 Broadway, NYC, NY 10038
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

Mario Scorza                                                    April 30, 2023
2209 W. Bayshore Dr.                                                 25037-2
Palacios, TX 77465-1455
marumberto@aol.com

Re:    Arbitration Collections
       Mario Scorza

| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 04/20/23 | SLB | Receipt and review Petition to Vacate Award; conference regarding same. | 1.1 | $467.50 |
| 04/28/23 | SLB | Outline Motion to Confirm Award; legal research regarding ███████████ ███████████ | 2.8 | $1,190.00 |
| | | Hours: | 3.9 | |
| | | Total fees: | | $1,657.50 |

Attorney Summary

SLB        Stacey L Barnes                    3.9 hours at $425.00 per hour

---

**Billing Summary**

Previous balance                    $0.00
Payments & adjustments               0.00
Current fees & expenses            1,657.50

**Total now due**                  **$1,657.50**

Defendant's Exhibit 11

Matter No. 25037-2                                         April 30, 2023
Mario Scorza                                                       Page 2
Arbitration Collections

**Aged Balance**

|         | Current    | 31-60   | 61-90   | Over 90 | Total      |
|---------|------------|---------|---------|---------|------------|
| Fees    | $1,657.50  | $0.00   | $0.00   | $0.00   | $1,657.50  |
| Expenses| $0.00      | $0.00   | $0.00   | $0.00   | $0.00      |
| Total   | $1,657.50  | $0.00   | $0.00   | $0.00   | $1,657.50  |

**Charges To Date**

| Fees     | $1,657.50 |
|----------|-----------|
| Expenses | 0.00      |
| Total    | $1,657.50 |
| Payments | $0.00     |

Defendant's Exhibit 11



## KEARNEY MCWILLIAMS & DAVIS

### ATTORNEYS AT LAW

Denver   Fort Worth   Houston   San Antonio   Sheridan
Ph: (713) 936-9620     www.KMD.law     Fax: (713) 936-9621

Checks preferred, scanned to admin@kmd.law or text/fax (713) 936-9622
Mail: 55 Waugh, Suite 150, Houston, TX 77007-6033
Zelle: Inception Law at payments@kmd.law
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

Wire/ACH to "Inception Law" in USD$
Acct 586016183532; Routing 113000023; Wire 026009593
SWIFT BOFAUS3N, Bank of America, 222 Broadway, NYC, NY 10038

Mario Scorza
2209 W. Bayshore Dr.
Palacios, TX 77465-1455
marumberto@aol.com

May 31, 2023
25037-2

Re:   Arbitration Collections
        Mario Scorza

| Fees: | | | Hours | Amount |
|---|---|---|---|---|
| 05/01/23 | WCY | Meeting with SB and VP to discuss motion to vacate and MSJ | 0.5 | $225.00 |
| 05/05/23 | VNP | Research vacatur awards in the third circuit; Provide research to supervising attorney | 1.0 | $215.00 |
| 05/15/23 | VNP | Research on ▮▮▮▮ | 1.1 | $236.50 |
| 05/23/23 | WCY | Reviewing case law for Pennsylvania and the 3rd circuit | 0.7 | $315.00 |
| 05/25/23 | WCY | Reviewing B.L. Harbert Int'l, LLC v. Hercules Steel Co., 441 F.3d 905 (11th Cir. 2006) | 1.4 | $630.00 |
| 05/26/23 | WCY | Reviewing case law ▮▮▮▮ | 1.9 | $855.00 |
| 05/28/23 | WCY | Writing Answer to motion to vacate including public policy, abuse of the system, gaming the system, and requirement of sanctions | 0.9 | $405.00 |

Matter No. 25037-2                                          May 31, 2023
Mario Scorza                                                      Page 2
Arbitration Collections

| 05/29/23 | WCY | Writing 'Gaming the System' | 2.0 | $900.00 |
| 05/31/23 | WCY | Reviewing Frison in relation to the present matter; including appropriate citations | 1.1 | $495.00 |
| 05/31/23 | WCY | Reviewing file history ▇▇▇ ▇▇▇▇▇▇▇ | 1.2 | $540.00 |

|  |  | Hours: | 11.8 |  |
|  |  | Total fees: |  | $4,816.50 |

Attorney Summary

| WCY | William Yarbrough | 9.7 hours at $450.00 per hour |
| VNP | Vikesh Patel | 2.1 hours at $215.00 per hour |

## Billing Summary

| Previous balance | $1,657.50 |
| Payments & adjustments | 0.00 |
| Current fees & expenses | 4,816.50 |
| **Total now due** | **$6,474.00** |

## Aged Balance

|  | Current | 31-60 | 61-90 | Over 90 | Total |
|---|---|---|---|---|---|
| Fees | $6,474.00 | $0.00 | $0.00 | $0.00 | $6,474.00 |
| Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | $6,474.00 | $0.00 | $0.00 | $0.00 | $6,474.00 |

## Charges To Date

| Fees | $6,474.00 |
| Expenses | 0.00 |
| Total | $6,474.00 |
| Payments | $0.00 |

Defendant's Exhibit 11



# KEARNEY MCWILLIAMS & DAVIS
## ATTORNEYS AT LAW

Denver   Fort Worth   Houston   San Antonio   Sheridan
Ph: (713) 936-9620      www.KMD.law      Fax: (713) 936-9621

Checks preferred, scanned to admin@kmd.law or text/fax (713) 936-9622        Wire/ACH to "Inception Law" in USD$
Mail: 55 Waugh, Suite 150, Houston, TX 77007-6033                            Acct 586016183532; Routing 113000023; Wire 026009593
Zelle: Inception Law at payments@kmd.law                                     SWIFT BOFAUS3N, Bank of America, 222 Broadway, NYC, NY 10038
Bill.com ID: 0162733714595373, bill.com/network/kmdlaw

Mario Scorza                                                June 30, 2023
2209 W. Bayshore Dr.                                        25037-2
Palacios, TX 77465-1455
marumberto@aol.com

Re:   Arbitration Collections
      Mario Scorza

| **Fees:** | | | Hours | Amount |
|-----------|---|---|-------|--------|
| 06/01/23 | VNP | Conference regarding arbitration award and motion to vacate; Strategize response to motion | 1.0 | $215.00 |
| 06/01/23 | SVF | Review U.S. Western District Court of PA rules and procedures | 1.0 | $160.00 |
| 06/08/23 | SVF | Prepare and email fee agreement with PA counsel to client for signature | 0.2 | $32.00 |
| 06/08/23 | SLB | Arrange for local counsel retainer; telephone conference regarding same | 0.7 | $297.50 |
| 06/09/23 | WCY | Reviewing ████████ | 0.5 | $225.00 |
| 06/09/23 | SVF | Email PA attorney a copy of signed fee agreement | 0.1 | $16.00 |
| 06/09/23 | SVF | Research requirements for | 1.5 | $240.00 |

Defendant's Exhibit 11

Matter No. 25037-2                                                        June 30, 2023
Mario Scorza                                                                  Page 2
Arbitration Collections

|  |  | applications for admittance to PA Western District |  |  |
|---|---|---|---|---|
| 06/11/23 | WCY | Editing motion; providing public policy and counter-arbitration arguments; providing citations | 3.0 | $1,350.00 |
| 06/12/23 | SVF | Further coordination with attorneys to file motions for pro hac vice and reviewing local rules in further detail | 1.5 | $240.00 |
| 06/13/23 | SVF | Receipt and review of #7 Return of service; Calculate answer due date; review Register of Actions and confirm answer due date via PACER | 0.5 | $80.00 |
| 06/13/23 | SLB | Telephone conference regarding Answer Date | 0.3 | $127.50 |
| 06/20/23 | SVF | Draft timeline | 1.3 | $208.00 |
| 06/21/23 | WCY | Editing motion to dismiss; providing case references and citations; reviewing law reviews for supportive materials; including said materials | 2.1 | $945.00 |
| 06/22/23 | WCY | Reviewing and revising content; reviewing opposing counsels motion, legal basis and manipulation of the facts and applicable law; incorporating supportive and rebuttal materials | 2.0 | $900.00 |
| 06/22/23 | VNP | Review Davison's pleading; Outline response | 0.8 | $172.00 |
| 06/23/23 | VNP | Research and review case law regarding vacating awards, attorneys fees, and interest; Draft | 5.6 | $1,204.00 |

Defendant's Exhibit 11

Matter No. 25037-2                                                        June 30, 2023
Mario Scorza                                                                    Page 3
Arbitration Collections

| | | | | |
|---|---|---|---|---|
| | | sections regarding statutes and frivolous vacatur; Revise sections pertaining to manifest disregard for the law and attempt to game the system | | |
| 06/26/23 | WCY | Finalizing motion; reviewing results with VP | 1.3 | $585.00 |
| 06/27/23 | SLB | Prepare Answer; review Complaint for same | 0.7 | $297.50 |
| 06/28/23 | WCY | Completing Pacer/ECF; affirming affidavit content and filing | 1.0 | $450.00 |
| 06/28/23 | WCY | Reviewing answer, denials and admissions | 0.5 | $225.00 |
| 06/28/23 | SVF | Prepare filed answer for file and update pleadings index | 0.3 | $48.00 |
| 06/28/23 | SLB | Prepare, revise, and finalize Answer; forward to local counsel; correspondence regarding same | 2.4 | $1,020.00 |
| 06/29/23 | VNP | Obtain Certificate of Good Standing for Texas; Review Motion and Affidavit for Admission Pro Hac Vice; Fill out pacer application for admission to Pennsylvania Western District; File motion and affidavit with Western District of PA | 0.9 | $193.50 |
| 06/29/23 | SVF | Assist attorneys with final preparation of filing documents for Motions for Pro Hac Vice, notarize affidavits, prepare file stamped copies for file; Receipt, review and prepare #10 SCHEDULING ORDER for file, calendar deadlines and update task | 2.3 | $368.00 |

Defendant's Exhibit 11

Matter No. 25037-2                                              June 30, 2023
Mario Scorza                                                         Page 4
Arbitration Collections

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | list |  |  |
| 06/30/23 | SLB | File Pro hac Vice Applications for S. Barnes and V. Patel; revise materials for W. Yarbrough Application | 2.1 | $892.50 |
|  |  | Hours: | 33.6 |  |
|  |  | Total fees: |  | $10,491.50 |

Attorney Summary

| WCY | William Yarbrough | 10.4 hours at $450.00 per hour |
|---|---|---|
| SLB | Stacey L Barnes | 6.2 hours at $425.00 per hour |
| VNP | Vikesh Patel | 8.3 hours at $215.00 per hour |
| SVF | Shannon V Frizzell | 8.7 hours at $160.00 per hour |

**Expenses:**

| 06/29/23 | VNP | Western District Pro Hac Vice fee for Stacey Barnes, William Yarbrough, and Vikesh Patel | $210.00 |
|---|---|---|---|
|  |  | Total expenses: | $210.00 |

**Payments & Adjustments:**

| 07/25/23 | Check 1052 | $30.67 CR |
|---|---|---|
|  | Total payments & adjustments: | $30.67 CR |

---

**Billing Summary**

| Previous balance | $6,474.00 |
|---|---|
| Payments & adjustments | 30.67 CR |
| Current fees & expenses | 10,701.50 |
| **Total now due** | **$17,144.83** |

Defendant's Exhibit 11

Matter No. 25037-2                                          June 30, 2023
Mario Scorza                                                      Page 5
Arbitration Collections

**Aged Balance**

|           | Current     | 31-60       | 61-90    | Over 90  | Total       |
|-----------|-------------|-------------|----------|----------|-------------|
| Fees      | $15,308.00  | $1,626.83   | $0.00    | $0.00    | $16,934.83  |
| Expenses  | $210.00     | $0.00       | $0.00    | $0.00    | $210.00     |
| Total     | $15,518.00  | $1,626.83   | $0.00    | $0.00    | $17,144.83  |

**Charges To Date**

| Fees     | $16,965.50   |
|----------|--------------|
| Expenses | 210.00       |
| Total    | $17,175.50   |
| Payments | $30.67 CR    |

Defendant's Exhibit 11



ECKERT
S E A M A N S
ATTORNEYS AT LAW

Eckert Seamans Cherin & Mellott, LLC
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA 15219

TEL    412 566 6000
FAX    412 566 6099
www.eckertseamans.com

MATTER:        318626-00001

MARIO SCORZA
C/O STACEY BARNES, ESQ.
SR. ATTORNEY
KEARNEY, MCWILLIAMS & DAVIS, PLLC
55 WAUGH DRIVE, SUITE 150
HOUSTON, TX 77007

INVOICE:        1752062

JULY 11, 2023

PAYMENT DUE WITHIN 30 DAYS
OF INVOICE DATE

REGARDING:        DAVISON DESIGN AND DEVELOPMENT, INC.

TOTAL FEES FOR PROFESSIONAL
SERVICES THROUGH:                          06/30/23                          $693.00

**TOTAL BILL AMOUNT FOR INVOICE #   1752062**                                **$693.00**

PLEASE INCLUDE THE INVOICE # ON YOUR REMITTANCE AND MAIL TO:

ECKERT SEAMANS CHERIN & MELLOTT, LLC
P.O. BOX 643187
PITTSBURGH, PA 15264-3187
TELEPHONE 412/566-6000  FACSIMILE 412/566-6099
TAX I.D. #25-1056909

App. 593



**ECKERT**
S E A M A N S
AT TORNEYS AT LAW

Eckert Seamans Cherin & Mellott, LLC
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA 15219

TEL   412 566 6000
FAX   412 566 6099
www.eckertseamans.com

MARIO SCORZA                                          CLIENT:            318626
RE:   DAVISON DESIGN AND DEVELOPMENT, INC.            MATTER:      318626-00001
JULY 11, 2023                                         INVOICE:      1752062 JJM
PAGE   2

| DATE | ATTY | DESCRIPTION | HOURS |
|------|------|-------------|-------|
| 06/26/23 | JJM | EMAIL EXCHANGE WITH COUNSEL REGARDING FILING OF ANSWER; REVIEW COMPLAINT AND BRIEF REVIEW OF EXHIBITS TO COMPLAINT; REVIEW AND MAKE MINOR CORRECTIONS TO DRAFT ANSWER AND FILE WITH DISTRICT COURT; EMAIL TO COUNSEL, CONFIRMING FILING | 1.10 |
| 06/29/23 | JJM | DRAFT DISCLOSURE STATEMENT REQUIRED BY RULE, 7.1.(A)(2); EMAIL EXCHANGE WITH COUNSEL REGARDING CITIZENSHIP OF DEFENDANT; FILE DISCLOSURE | 0.30 |
| | | FEES: | 693.00 |

## TIME SUMMARY

| TIMEKEEPER | HOURS | RATE | AMOUNT |
|------------|-------|------|--------|
| JOHN J MYERS | 1.40 | 495.00 | 693.00 |

| TOTAL FEES FOR PROFESSIONAL SERVICES RENDERED THROUGH: | 06/30/23 | 1.40 | HRS | $693.00 |
|---|---|---|---|---|

**TOTAL BILL:**                                                        **$693.00**

App. 594

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVISON DESIGN & DEVELOPMENT, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 2:23-cv-00644-MJH |
| v. | ) ) | Honorable Marilyn J. Horan |
| MARIO SCORZA, | ) ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN PARTIAL OPPOSITION TO
DEFENDANT'S MOTION TO CONFIRM ARBITRATION AWARD**

Plaintiff Davison Design & Development, Inc. ("Davison") files this Response in Partial Opposition to Defendant's Motion to Confirm Arbitration Award ("Motion to Confirm").

**I.    The Award Should Be Partially Vacated or Modified**

Davison does not oppose the Motion to Confirm to the extent it seeks confirmation of the Arbitrator's Award of amounts other than attorneys' fees and costs, for the same reasons set forth in Davison's pending Motion to Vacate or Modify Arbitration Award (ECF 1) and its forthcoming Reply Brief (ECF 20, ¶ 3).

Specifically, the Arbitrator's Award awarded the following damages:

1.    $26,054.85 in monetary damages ($20,042.25 plus $6,012.60 in interest);

2.    $32,564.00 in AAA fee and Arbitrator compensation reimbursement; and

3.    $199,024.05 in attorneys' fees and costs.

ECF 1-8.

App. 595

Davison cannot in good faith oppose, and so does not oppose, confirmation of the Award with respect to items #1 and #2, totaling $58,618.85, "because of the generally deferential standard of review courts apply to the merits of private arbitral awards." ECF 1 (p. 14, ¶ 73); *see* 9 U.S.C. § 9 (stating that a "court must grant" an order confirming an arbitral award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title"); *PG Publ'g, Inc. v. Newspaper Guild of Pittsburgh*, 19 F.4th 308, 313 (3d Cir. 2021) ("A court must confirm an arbitration award unless it is vacated, modified, or corrected.").

Davison, however, has filed a motion to vacate the Award with respect to item #3, attorneys' fees and costs. ECF 1. Its Motion to Vacate on item #3 is still pending before the Court. Therefore, Davison opposes confirmation of the Award with respect to item #3, as to which item the Award should be vacated or modified as argued in the pending Motion to Vacate. *See* 9 U.S.C. §§ 9, 10(a)(4), 11(b).

Scorza seeks confirmation of "the primary amount of the Award," $225,078.90, which consists of $20,042.25 in monetary damages, $6,012.60 in interest, and $199,024.05 in attorneys' fees and costs. ECF 22 (p. 1, ¶ a); ECF 1-8. However, as part of his *ad hominem* attack on Davison that is more fully addressed in Davison's concurrently-filed Reply Brief, Scorza references and attaches to his Motion to Confirm what he calls the "Lehrer Expert Report" dated December 2022. ECF 21 (p. 3, ¶ 5 & n.3); ECF 21-4.

What Scorza neglects to tell the Court is that the Arbitrator, on Davison's motion, struck the "Lehrer Expert Report" from evidence, thereby precluding Dr.

Lehrer from testifying regarding that report, because of Scorza's nine-month delay in producing it on the eve of the hearing, which plainly prejudiced Davison. Ex. 1 hereto (Jan. 17, 2023 Preliminary Hearing & Scheduling Order #8). Scorza has not challenged the Arbitrator's decision to strike that report. The Court should not countenance Scorza's attempt to again prejudice Davison, this time in the eyes of the Court, as part of his counsel's campaign to smear Davison by relying on an irrelevant report the Arbitrator struck from the record.

## II.    Scorza Can Seek Pre- and Post-Judgment Interest

Scorza also seeks pre- and post-judgment interest. ECF 21 (p. 15, ¶ 42); ECF 22 (pp. 1-2, ¶ c). Under prevailing Third Circuit case law, Davison cannot in good faith oppose, and so does not oppose, Scorza's request for such interest, but it does oppose the amount of interest he seeks because what he seeks is not wholly consistent with that binding case law. *See Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 62-63 (3d Cir. 1986); *Rhino Servs., LLC v. DeAngelo Contracting Servs., LLC*, No. 21-3840, 2023 WL 5186254, at *5-7 (E.D. Pa. Aug. 11, 2023).

Pre-judgment interest. Scorza is entitled to pre-judgment interest at the rate of 6% per annum, 41 P.S. § 202, from the date of the Award (March 27, 2023) until the date of this Court's order, if any, partially confirming the award. *See Rhino Servs.*, 2023 WL 5186254, at *6 & n.8.

Post-judgment interest. Scorza is entitled to post-judgment interest at the rate specified in 28 U.S.C. § 1961—not that in 41 P.S. § 202, as Scorza contends—from the date of the Court's judgment, if any, partially confirming the Award. *See Sun Ship*, 785 F.2d at 62-63; *Rhino Servs.*, 2023 WL 5186254, at *7 & n.9.

App. 597

### III.    Scorza's Request for Attorneys' Fees Fails

Scorza's Motion to Confirm also seeks an award of attorneys' fees against Davison. ECF 21 (pp. 14-17, ¶¶ 34-46). That request is meritless.

The provisions of the Pennsylvania Revised Statutory Arbitration Act (the "Revised Act") which Scorza cites, 42 Pa.C.S. §§ 7321.23-7321.26, do not apply here, for two reasons. ECF 21 (pp. 15-16, ¶¶ 38-41).

First, the parties' agreements to arbitrate were made before July 1, 2019, the effective date of the Revised Act. ECF 1 (p. 3, ¶ 15); ECF 8 (p. 2, ¶ 15); 42 Pa.C.S. § 7321.4(b)(1); *Foster v. Nuffer*, 286 A.3d 279, 284 n.3 (Pa. Super. 2022). The parties have not agreed that the Revised Act applies. So, if not for the application of the FAA, the Uniform Arbitration Act (the "UAA")—not the Revised Act—would apply. 42 Pa.C.S. § 7321.4(b); *Foster*, 286 A.3d at 284 n.3. There is no provision in Subchapters A or B of the UAA similar to § 7321.26(c) authorizing a court to award fees. *See* 42 Pa.C.S. §§ 7301-7320 (Subchapter A), 7341-7342 (Subchapter B).

Second, Section 7321.26's language makes clear that it applies only in Pennsylvania state court, not federal court. *See id.* § 7321.26(c) (limiting its scope to "judicial proceeding[s] under" specified procedural sections of Pennsylvania's arbitration statutes). This is a federal judicial proceeding under the FAA, not a state proceeding under those referenced state law provisions. *See* 9 U.S.C. §§ 9-12; *cf. Jones v. Pencoyd Iron Works, Inc.*, No. 2:18-CV-4157, 2019 WL 6828609, at *2 (E.D. Pa. Dec. 13, 2019) (explaining why the Pennsylvania fee-shifting statute at 42 Pa.C.S. § 2503 does not apply in federal court).

Scorza's non-statutory arguments for fee-shifting also fail. ECF 21 (pp. 16-17, ¶¶ 43-46).

The Third Circuit rule in this context is that "[o]ne of the narrow exceptions to th[e American] rule is a finding that the losing party litigated in bad faith, vexatiously, or for oppressive reasons." *CPR Mgmt., S.A. v. Devon Park Bioventures, L.P.*, 463 F. Supp. 3d 525, 538-39 n.77 (E.D. Pa. 2020) (citing *Mobil Oil Corp. v. Indep. Oil Workers Union*, 69 F.2d 229, 305 (3d Cir. 1982)), *aff'd*, 19 F.4th 236 (3d Cir. 2021); *Kane Gas Light & Heating Co. v. Int'l Bhd. of Fireman & Oilers, Local 112*, 687 F.2d 673, 673 (3d Cir. 1982). "[T]he fact that [a party] challenged [an] arbitrator's award on the merits is not by itself sufficient to justify a grant of attorney's fees to the party seeking enforcement of the award." *Kane Gas*, 687 F.2d at 683; *Rack Eng'g Co. v. U.S. Steelworkers of Am.*, No. 90-246, 1990 WL 371773, at *5 (W.D. Pa. June 22, 1990) (adopting report and recommendation).

Scorza's citation to *B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905 (11th Cir. 2006), is inapposite. ECF 21 (p. 12, ¶ 29; p. 17, ¶ 46). The Eleventh Circuit's statements on which Scorza relies were simply that panel's musings about "idea[s] worth considering." *Id.* at 914. The Third Circuit has not considered or adopted those "idea[s]." *Franko v. Ameriprise Fin. Servs., Inc.*, No. 09-09, 2009 WL 1636054, at *8 (E.D. Pa. June 11, 2009). Assuming that court's "ideas" applied here, even the Eleventh Circuit in that case required a litigant to act "without an objectively reasonable belief [a challenge to an arbitral award] will prevail" and "without any real legal basis for doing so[.]" *B.L. Harbert*, 441 F.3d at 913-14.

5

Scorza does not come close to meeting that standard, or the binding Third Circuit standard, so his request for attorneys' fees fails.

Davison has not litigated in bad faith, vexatiously, or for oppressive reasons. It has challenged only one aspect of the Arbitrator's Award—its award of attorneys' fees and costs under statutory claims that Scorza never asserted or submitted to the Arbitrator. It has not challenged the rest of the Award, in express recognition of "the generally deferential standard of review courts apply to the merits of private arbitral awards." ECF 1 (p. 14, ¶ 73); *see supra* Parts I-II.

There is substantial authority supporting Davison's challenge. ECF 1 (pp. 9-15, ¶¶ 47-80); Davison's concurrently-filed Reply Brief. Notably, Scorza does not address the most relevant authorities, the *Matteson* line of cases, in its Response/ Motion to Confirm. ECF 21 (pp. 1-20).

Scorza also misrepresents *Frison* to suit his needs, as elaborated upon in Davison's concurrently-filed Reply Brief. If anything, that case and this one demonstrate that Davison acts judiciously and in accordance with the law in the rare case when it pursues its statutory right to challenge an arbitral award that is more than erroneous and meets the high standard warranting a motion to vacate. Even if Court ultimately disagrees with Davison's arguments for vacatur, that is not a valid basis to award fees to Scorza. *See Kane Gas*, 687 F.2d at 683.

Therefore, Scorza's request for attorneys' fees should be denied.

**IV.    Scorza's Request for Attorneys' Fees Is Unreasonable**

If, however, the Court somehow agrees that attorneys' fees are warranted, the amount of fees Scorza seeks is unreasonable, largely for the same reasons that his request for fees and costs in arbitration was unreasonable. *See* ECF 1-6 (pp. 4-9 of 42) ("The Requested Fees Are Unreasonable").

Scorza "has the burden to prove that [his fee] request is reasonable." *Clemens v. N.Y. Cent. Mut. Fire Ins. Co.*, 903 F.3d 396, 400 (3d Cir. 2018). "An attorney's showing of reasonableness must rest on evidence ***other than the attorney's own affidavits***." *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 595 (3d Cir. 2000) (emphasis added) (citing *Blum v. Stenson*, 465 U.S. 886, 895-96 n.11 (1984)); *Clemens*, 903 F.3d at 402. Where "billing attorneys d[o] not even submit their own affidavits identifying their usual billing rates or describing their levels of experience," it is "within the court's discretion" to "disallow any hours billed by those [] lawyers" because they "provided no information whatsoever on which [the court] could make a determination as to whether the requested hourly rate was reasonable." *Clemens*, 9093 F.3d at 402.

First, Scorza's request for attorneys' fees is supported by nothing "other than [one] attorney's own affidavit," *id.*—that of Attorney Barnes—nothing more, such as affidavits from other attorneys in the community or other documents supporting the claimed "reasonable rates" they seek. ECF 21-11 (pp. 2-22 of 22).

Second, only Mr. Barnes submitted an affidavit, yet it seeks to recover billings of 3 other attorneys. *Id.* There is simply nothing to sustain Scorza's burden

that the rates requested are reasonable. *See Clemens*, 903 F.3d at 402; *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 131 (3d Cir. 1999).

Third, almost one-half of the requested fee amount ($18,022.00 of the total requested $36,385.50) is for "[p]rojected and/or unbilled attorney's fees." ECF 21-11 (pp. 4-5 of 22, ¶ 17). Scorza has provided absolutely no support whatsoever for Davison to challenge, or for the Court to determine, the reasonable-ness of those "projected and/or unbilled" fees. *See Evans v. Port. Authority of N.Y. & N.J.*, 273 F.3d 346, 361 (3d Cir. 2001) (citing and quoting *Washington v. Phila. Cnty. Ct. of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir. 1996)); *Clemens*, 903 F.3d at 402.

This is not only an issue of lack of proof, but it demonstrates that Scorza's counsel has not "exclude[d] hours that are . . . otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Clemens*, 903 F.3d at 403 (cleaned up). Fee requests are "not the opening bid[s] in the quest for an award." *Id.* Scorza's counsel seeks to double the amount of fees actually incurred and billed, based on nothing more than that they are "projected and/or unbilled." Scorza's counsel cannot recover fees it never billed and that it may never bill.

## V.    Conclusion

Accordingly, Scorza's Motion to Confirm should be denied to the extent it seeks confirmation of the Arbitrator's Award of attorneys' fees and costs, and otherwise confirmed as set forth above. Scorza's request for attorneys' fees incurred in opposing Davison's Motion to Vacate should be denied.

App. 602

Respectfully submitted,

BARRON LAW OFFICE LLC

Date:  September 6, 2023          By:     */s/ Justin T. Barron*
                                          Justin T. Barron (PA I.D. No. 200394)
                                          P.O. Box 493
                                          Valencia, PA 16059
                                          (412) 334-6312
                                          jbarron@justinbarronlaw.com

9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVISON DESIGN & | ) | |
| DEVELOPMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:23-cv-00644-MJH |
| | ) | |
| v. | ) | Honorable Marilyn J. Horan |
| | ) | |
| MARIO SCORZA, | ) | |
| | ) | |
| Defendant. | ) | |

**Exhibit 1**

**January 17, 2023 Preliminary Hearing & Scheduling Order #8**

AMERICAN
ARBITRATION
ASSOCIATION®  |  INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

**Case Number: 01-21-0004-6369**

**Mario Scorza**
**-vs-**
**Davison Design & Development, Inc.**

## Preliminary Hearing and Scheduling Order #8

Respondent Davison Design & Development. Inc. ("Respondent") has filed a motion to strike the expert report of Dr. Kenneth Lehrer ("Dr. Lehrer") submitted by Claimant Mario Scoza ("Claimant") on December 17, 2022—only one month before the scheduled merits hearing in this arbitration. Dr. Lehrer previously submitted an expert report regarding Claimant's alleged damages on March 15, 202 in accordance with the agreed upon prehearing schedule. In connection with its motion to strike, Claimant also seeks sanctions in in the form of an award of attorney fees based on the fees incurred in preparing its motion to strike.

Claimant filed his response to Respondent's motion to strike on January 12, 2023. In his response, Claimant argues that Dr. Lehrer's December expert damages report is merely "a more detailed supplemental of [his] 'initial preliminary report.'" Claimant Br. 5. The Arbitrator disagrees. Dr. Lehrer's original report was only 15 pages in length while his more recent report is nearly 100 pages in length. Even more important, Dr. Lehrer's original report did not include any estimated damage figures while his more recent report is replete with such figures. Nowhere in his response does Claimant explain why he waited nine months after his deadline for submitting expert reports to serve Dr. Lehrer's final damages analysis on Respondent. Nor did Claimant seek leave to file a late report at any point during his nine month delay.

Dr. Lehrer's second report is not a more refinement of the analysis in his original report. His second report identifies for the first time potentially millions of dollars in damages allegedly suffered by

{A1763622.1}

Claimant from Respondent's conduct.  At this late juncture, Respondent plainly does not have adequate time to retain a rebuttal expert to respond to Dr. Lehrer's new damages analysis.  As a result of this prejudice, the Arbitrator grants Respondent's motion to strike Dr. Lehrer's second expert report.  He will be permitted to testify only to the opinions contained in his original report.  This ruling does not preclude Claimant from attempting to prove its damages through other means and evidence.

### Requested Subpoenas for Messrs. Frank Vescio and Larry Rifkin

Claimant has requested that I sign subpoenas requiring Messrs. Frank Vescio and Larry Rifkin to appear to testify at the merits hearing.  Mr. Vescio is still employed in some capacity by Respondent while Mr. Rifkin has not been employed by Respondent since December 2020.  Respondent principally opposes issuance of Mr. Vescio's subpoena because he plans to attend the hearing to testify on Respondent's behalf.  For this reason, I find there is no need at this time to subpoena Mr. Vescio to attend the hearing.  If Mr. Vescio decides not to attend the hearing, Respondent shall promptly notify the Arbitrator and Claimant's counsel of this change.  As for Mr. Rifkin's subpoena, Respondent points out that he is no longer employed or controlled by Respondent and, as such, it has no obligation to ensure his attendance at the hearing.  While the Arbitrator agrees that Respondent has no obligation to produce a former employee to testify at the hearing, that does not prelude Claimant from attempting on its own to serve the subpoena requiring Mr. Rifkin's attendance at the hearing.   Accordingly, I will sign the subpoena requiring Mr. Rifkin's attendance.

### Increase in Claim Amount

Claimant has informed the Arbitrator and the AAA that he wishes to increase the amount of his claim pursuant to AAA Commercial Rules R-6(a).  Respondent opposes this request and it has asked the Arbitrator not to consent to any increase in the claim amount.  But under R-6(a), a party "may at any time prior to the close of the hearing or by the date established by the arbitrator increase or decrease the amount of its claim."  Because the Arbitrator has not set a deadline for changes in the amount of any

claim or counterclaim, Claimant has a right to increase his claim amount until the close of the hearing subject to payment of the additional AAA administrative fees.  While R-6(b) requires the arbitrator's consent, that rule applies to changes involving a "new or different claim"—not a mere increase in the claim amount.


Dated: _January **17**, 2023_          Arbitrator Signature: _____

                                                     Scott D. Livingston

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVISON DESIGN             )
DEVELOPMENT, INC.,         )
                               )
        Plaintiff,        )   No. 2:23-cv-00644-MJH
                               )
    v.                  )   Honorable Marilyn J. Horan
                               )
MARIO SCORZA,            )
                               )
        Defendant.     )

## [PROPOSED] ORDER

AND NOW, this _____ day of _____, 2023, upon

consideration of Plaintiff's Motion to Vacate or Modify Arbitration Award (ECF 1)

("Motion to Vacate"), Defendant's Motion to Confirm Arbitration Award (ECF 21)

("Motion to Confirm"), and all submissions related thereto, it is hereby ORDERED:

1.     The Motion to Vacate is GRANTED IN PART and DENIED IN PART,

as follows:

        a.     The Award of Arbitrator dated March 27, 2023 ("Arbitration

        Award") is partially vacated with respect to its award of attorneys' fees

        and costs in the amount of $199,024.05.

        b.     In all other respects, the Motion to Vacate, including its

        alternative request for partial amendment of the Arbitration Award, is

        DENIED as moot.

2.     The Motion to Confirm is GRANTED IN PART and DENIED IN

PART, as follows:

a.      The Arbitration Award is confirmed with respect to its award of

damages, pre-Arbitration Award interest, and administrative fees and

compensation of the Arbitrator in the total amount of $58,618.85.

b.      The Court awards post-award, pre-judgment interest on

$58,618.85, to be calculated at the rate specified in 41 P.S. § 202 from

the date of the Arbitration Award to the date of this Order.

c.      The Court awards post-judgment interest on $58,618.85, to be

calculated at the rate specified in 28 U.S.C. § 1961 from the date of

this Order until the date of payment.

d.      In all other respects, the Motion to Confirm, including its

request for an award of attorneys' fees and costs against Plaintiff, is

DENIED.

3.      The Clerk of Court is directed to CLOSE this case.

                    BY THE COURT:


                    _____J.
                    Marilyn J. Horan
                    United States District Judge

2

App. 609

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVISON DESIGN & DEVELOPMENT, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 2:23-cv-00644-MJH |
| v. | ) ) | Honorable Marilyn J. Horan |
| MARIO SCORZA, | ) ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
MOTION TO VACATE OR MODIFY ARBITRATION AWARD**

Plaintiff Davison Design & Development, Inc. ("Davison") files this Reply Brief in Support of its Motion to Vacate or Modify Arbitration Award ("Motion").

**I.      The Arbitrator Exceeded His Powers in Awarding Fees and Costs**

Scorza's Response (ECF 21) is the epitome of an *ad hominem* attack. Instead of addressing the core issue head-on, Scorza's counsel demonizes Davison for having the temerity to exercise its statutory right to seek partial vacatur of the Award.

That core issue is this: "An arbitrator exceeds his authority when he awards damages on a claim not submitted by the parties to the arbitration panel." *Ergobilt, Inc. v. Neutral Posture Ergonomics, Inc.*, No. 3:97-CV-2548, 2002 WL 1489521, at *7-8 (N.D. Tex. July 9, 2002) (citations omitted); *see Matteson v. Ryder Sys., Inc.*, 99 F.3d 108, 112-14 (3d Cir. 1996).

That is precisely what the Arbitrator did here—he awarded damages (attorneys' fees and costs) to Scorza on claims not submitted by the parties to the Arbitrator (claims under the AIPA and the Texas Act).

Scorza does not address this issue head-on. Indeed, he does not even address *Matteson* or the other relevant case law confirming the *Matteson/Ergobilt* rule on which Davison's Motion is based. *See* ECF 1 (pp. 10-15, ¶¶ 50-80). Under *Matteson* and its progeny, the Arbitrator exceeded his powers in awarding attorneys' fees and costs on claims and arguments that Scorza never submitted to the Arbitrator.

Scorza did not submit a claim under the AIPA or the Texas Act to the Arbitrator. Scorza also did not submit an argument that he was entitled to attorneys' fees and costs under the AIPA or the Texas Act. Scorza, represented by competent counsel throughout, chose to limit his request for attorneys' fees and costs to the UTPCPL. So his claim for attorneys' fees and costs rose and fell with the success of his UTPCPL claim. The Arbitrator denied that claim, ECF 1-8 (denying "all of Claimant's other requests for relief"), yet still awarded him fees and costs, citing two statutes under which Scorza had never asserted a claim and which he had never argued as a basis for an award of fees and costs. The Arbitrator exceeded his powers, as the *Matteson* line of cases makes clear, so the Award should be partially vacated (or modified) by striking the award of fees and costs.

Scorza's Demand for Arbitration initiating the arbitration included no claims under the AIPA or the Texas Act. ECF 1-2 (pp. 2-11 of 21). It set forth 5 specifically enumerated causes of action: (1) breach of contract; (2) common law fraud; (3) UTPCPL; (4) fraud by non-disclosure; and (5) negligent misrepresentation. *Id.* (pp. 6-9 of 21, ¶¶ 11-24). In the section entitled "Damages," Scorza stated he sought punitive damages "alternatively to [his] claims for damages in association with [his]

UTPCPL cause[] of action." *Id.* (p. 11 of 21, ¶ 27). No cause of action under the AIPA or the Texas Act was asserted in the Demand. *Id.* (pp. 2-11 of 21).

Scorza admits that he never sought to amend, or amended, his Demand for Arbitration to include a claim under the Texas Act, or the AIPA, at any time prior to the close of the hearing. ECF 1 (p. 6, ¶ 28); ECF 8 (p. 3, ¶ 28).

Scorza makes the baseless statement that he "made a claim for breach of contract which cited [the Texas Act]." ECF 21 (pp. 9-10, ¶ 21). Scorza notably fails to provide any citation to the record where he supposedly made that claim. *Id.* He cannot do so because that statement is unsupportable: his Demand for Arbitration *did* include a claim for breach of contract, but that claim *did not* cite the Texas Act. ECF 1-2 (p. 6 of 21, ¶¶ 11-13). Paragraph 19 of the Demand cited the Texas Act. *Id.* (p. 9 of 12, ¶ 19). That paragraph, however, was part of Scorza's UTPCPL claim, *id.* (pp. 7-9 of 12, ¶¶ 17-20), and the Texas Act was cited only for the stated purpose of having purportedly "plac[ed] Davison on notice of having violated the similar tenets of the UTPCPL," *id.* (p. 9 of 12, ¶ 19).

Scorza asserted five specific causes of action in his Demand, and a claim under the Texas Act (or the AIPA) was simply not one of them. He chose to pursue a claim, including a claim for attorneys' fees and costs, under the UTPCPL instead.

Scorza makes the similarly baseless statement that he "made a claim for breach of contract which cited the AIPA." ECF 21 (p. 15 of 21, ¶ 39). Again, he provides no citation to the record in support. And again, that statement is simply false. Nowhere does the Demand for Arbitration include the acronym "AIPA" or any

App. 612

of its constituent parts. ECF 1-2 (pp. 2-11 of 21); *cf.* ECF 21 (pp. 1-20 of 20)

(repeatedly referencing the AIPA and defining it in a parenthetical).

Scorza claims that he "argued the applications [sic] of [the Texas Act] in his

Pre-Hearing Brief . . . ." ECF 21 (p. 9 of 20, ¶ 20). However, that brief reference,

which was made as part of his previously-asserted claim for negligent

misrepresentation, was not sufficient to assert a claim under the Texas Act. ECF

21-6 (pp. 12-14 of 88). As one court has very recently noted:

> . . . Slipping a statement into a pre-hearing brief, however, does not
> amend the pleadings or put a party, presuming that even if it were
> read, on legal notice that a party is being added or the claim is being
> amended; it is the same as springing the issue at the arbitration
> hearing.
>
> A pre-hearing brief addressing the party's position cannot add
> new parties or advance new claims in the proceeding. Rather, formal
> notice is required. Arbitration rules are loose, but not that loose;
> otherwise, the rules themselves would violate due process. . . .

*PennEnergy Res., LLC v. Winfield Res., LLC*, ___ A.3d ___, No. 464 WDA 2022, 2023

WL 4715191, at *10-11 (Pa. Super. July 25, 2023); *see also Mellon v. Travelers Ins.*

*Co.*, 406 A.2d 759, 761-62 (Pa. Super. 1979); *Skjellerup v. Toll Bros., Inc.*, No. 05-

80406, 2005 WL 8156060, at *4-6 (S.D. Fla. Oct. 18, 2005); AAA Comm'l Arb. Rule

R-6(b), quoted in ECF 1 (p. 6, ¶ 28 & n.11).[1]

---

[1] It is appropriate to look to Pennsylvania decisions in this context because "[t]he
standards of review under the FAA and the Pennsylvania Uniform Arbitration Act
are strikingly similar." *Trombetta v. Raymond James Fin. Servs., Inc.*, 907 A.2d
550, 564-65 (Pa. Super. 2006); *see also id.* at 565 n.9 ("not[ing] that [Pennsylvania's]
standards of review for statutory arbitration are quite similar to both the FAA
standards and our own common law standards"); *Commonwealth ex rel. Kane v.
Philip Morris USA, Inc.*, 114 A.3d 37, 58 (Pa. Cmwlth. 2015) (noting the "unifying
factor among every standard of review" under the FAA and Pennsylvania law).

Scorza slipping a brief reference to the Texas Act as part of his previously-asserted claim of negligent misrepresentation was not sufficient to put Davison on notice that he was submitting any such claim to the Arbitrator. Nor did it submit those claims to the Arbitrator for him to decide. *PennEnergy*, 2023 WL 4715191, at *10-11; *Mellon*, 406 A.2d at 761-62; *Skjellerup*, 2005 WL 8156060, at *4-6.

The parties' later filings, and the complete absence of reliance on or argument concerning the AIPA or the Texas Act, confirm that Scorza's brief reference to the Texas Act in his Demand for Arbitration and Pre-Hearing Brief was not intended to assert, nor was it perceived as having asserted, a claim under the Texas Act, or the AIPA.

Scorza's post-hearing Fee Petition, which the Arbitrator specifically directed to set forth the legal bases for his fee request, included ***no*** reference to the AIPA or the Texas Act. ECF 1-4 (pp. 2-3 of 71). Scorza expressly limited his claim to fees and costs to the UTPCPL. *Id.* Not even Scorza attempts to argue otherwise—he does not address the Fee Petition at all in his Response. ECF 21 (pp. 1-20).

Because Scorza's Fee Petition expressly limited his request for attorneys' fees and costs to the UTPCPL, Davison's Response did the same. ECF 1-6. It noted at the very outset of its Response that Scorza identified the UTPCPL "as the sole legal basis for his fee request." ECF 1-6 (p. 2 of 42). It then outlined why "[t]here [wa]s no legal basis under the UTPCPL to award Scorza any of his attorneys' fees and costs[.] . . ." *Id.* Davison did not address the AIPA or the Texas Act for the simple

_____

*PennEnergy* and *Mellon* are also fully consistent with *Matteson*, *Skjellerup*, and the other federal cases Davison cites at length here and in its Motion to Vacate.

reason that Scorza had not asserted such claims, prevailed on such claims, or cited or relied upon them in his Fee Petition. ECF 1-4 (pp. 2-3 of 71).

Scorza's Post-Hearing Brief also included ***no*** claims under the AIPA or the Texas Act. Scorza's Post-Hearing Brief included a Table of Contents setting forth 7 specifically enumerated causes of action: (1) breach of contract; (2) common law fraud; (3) fraud by concealment and non-disclosure/omission; (4) negligent misrepresentation; (5) fraud in the inducement; (6) common law negligence; and (7) the UTPCPL. ECF 1-5 (p. 2 of 32) (Table of Contents). The body of his Post-Hearing Brief addressed those 7 specifically enumerated causes of action, in the same order listed in the Table of Contents. *Id.* (pp. 16-25 of 32.) He argued he was entitled to damages because of "Davison's breach of contract, torts, and violations of the UTP[]CPL . . . ." *Id.* (p. 29 of 32). Notably absent is any reference to the AIPA or the Texas Act. *Id.*

Nowhere does his Post-Hearing Brief include the acronym "AIPA" or any of its constituent parts. *Id.* (pp. 2-32 of 32). There was one passing reference to the Texas Act in the Post-Hearing Brief, but like in his Demand for Arbitration, it was expressly made in support of his claim under the UTPCPL, and in a section of the Post-Hearing Brief (Section VI) addressing "contractual disclaimers of liability"— not the sections setting forth his causes of action (Section IV). *Id.* (pp. 26-28 of 32).

Such a fleeting reference to the Texas Act in his Post-Hearing Brief was insufficient to amend Scorza's claims to include a claim under the Texas Act, or to put Davison on notice that he was making such a claim and claiming entitlement to

6

fees and costs thereunder. *See Skjellerup*, 2005 WL 8156060, at *4-6; *PennEnergy*, 2023 WL 4715191, at *10-11. Indeed, only days before filing his Post-Hearing Brief, Scorza had filed his Fee Petition expressly limiting any claim to attorneys' fees and costs to the UTPCPL. ECF No. 1-4 (pp. 2-3 of 71).

In sum, Scorza's request for attorneys' fees and costs was expressly limited to the UTPCPL. That was the only statutory claim he chose to assert against Davison and of which Davison had notice. Scorza simply did not assert claims under the AIPA or the Texas Act. He asserted a claim under the UTPCPL only, and he expressly tied his argument for attorneys' fees and costs to the UTPCPL claim only. Significantly, the claim under the UTPCPL was denied by the Arbitrator. ECF 1-8.

As a result, Davison's submissions to the Arbitrator also did not address the AIPA or the Texas Act because claims under those statutes were not before the Arbitrator. ECF 1-6. Its submissions addressed only the claims Scorza had properly asserted through his unamended Demand for Arbitration. *See id.* (pp. 15-24 of 42). Had Scorza's post-hearing submissions purported to submit to the Arbitrator claims or a fee request under the AIPA or the Texas Act, Davison would have objected. He did not attempt do so, thus there was no need for Davison to so object.

The Arbitrator exceeded his powers in violation of the FAA. *See* 9 U.S.C. §§ 10(a)(4), 11(b); *Matteson*, 99 F.3d at 113-15. Therefore, that portion of the Final Award granting attorneys' fees and costs to Scorza must be stricken.

## II.    Scorza's Remaining Counterarguments Fail

Scorza's main argument against partial vacatur boils down to this: because he sought attorneys' fees at all, and because certain documents in evidence before

7

the Arbitrator referenced the Texas Act and the AIPA, the Arbitrator was free to award attorneys' fees and costs under "any or all" of those laws. *See, e.g.*, ECF 21 (p. 10, ¶ 22; pp. 11-12, ¶ 28; p. 16, ¶ 41).

Again, that completely ignores the *Matteson* line of cases, which Scorza never directly addresses, and Scorza's actual filings in arbitration. Scorza and his counsel chose to submit specific claims and arguments to the Arbitrator. He never asserted claims under the AIPA or the Texas Act. He never argued that they were entitled to fees and costs under those two statutes. Yet the Arbitrator awarded fees and costs under those two statutes anyway. The Arbitrator did exactly what longstanding law said he could not do: he awarded damages on a claim not submitted by the parties.

Not surprisingly, Scorza relies on cases emphasizing the deferential standard of review courts employ in challenges to arbitral awards. ECF 21 (pp. 7-10, ¶¶ 14-22). Davison acknowledges that standard. *See* ECF 1 (p. 14, ¶¶ 73-74). However, "[e]ffusively deferential language notwithstanding, the courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators." *Matteson*, 99 F.3d at 113. "Rare though they may be, there will be instances when it is appropriate for a court to vacate the decision of an arbitrator." *Id.* at 114. This is one such case. *See id.*

The complete irrationality standard Scorza cites is a sufficient, but not necessary, means of vacating an award. *See Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219-20 (3d Cir. 2012) ("An arbitrator oversteps these limits, and subjects his award to judicial vacatur under § 10(a)(4), when he decides an issue not

submitted to him, grants relief in a form that cannot be rationally derived from the parties' agreements and submissions, **or** issues an award that is so completely irrational that it lacks support altogether.") (emphasis added); *CPR Mgmt., S.A. v. Devon Park Bioventures, L.P.*, 19 F.4th 236, 246 (3d Cir. 2021) (quoting *Sutter* and noting that the instances warranting vacatur listed by *Sutter* are "example[s]" of ways to vacate); *U.S. ex rel. JRW Serv. Group, LLC v. New Age Dev. Group LLC*, No. 20-2055, 2023 WL 371395, at *2 (3d Cir. Jan. 24, 2023); *Matteson*, 99 F.3d at 112-14 (vacating arbitral award without addressing or requiring complete irrationality).

In any event, the Arbitrator's decision to award attorneys' fees and costs to Scorza based on claims and arguments that the parties never submitted was completely irrational, as it deprived Davison of its due process rights to present its case to the Arbitrator. *Matteson*, 99 F.3d at 112-14; *Muzin*, 91 F.3d at 994; *Skjellerup*, 2005 WL 8156060, at *4-6; *PennEnergy*, 2023 WL 4715191, at *10-11. Acting contrary to longstanding and foundational legal precepts designed to protect a party's due process rights is completely irrational. If it is not completely irrational, nothing is.

Indeed, the reasoning of *Matteson* and the cases cited above are implicitly based on the "principle of party presentation":

> [i]n our adversarial system of adjudication, in both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. As a general matter, our system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.

*United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (cleaned up) (citing and quoting *Greenlaw v. United States*, 554 U.S. 237 (2008)).

The D.C. Circuit recently noted the consequences of not abiding by this principle: "[i]t would wreak havoc . . . if judges were encouraged to sally forth each day looking for wrongs to right, taking it upon themselves to identify additional claims or inventive defenses never raised by the parties in the many cases brought before them." *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984, 994 (D.C. Cir. 2023) ("*Muzin*") (cleaned up) (quoting *Greenlaw*, 554 U.S. at 244).

Those consequences are exactly what occurred here. The Arbitrator asked the parties to address the legal bases for Scorza's request for attorneys' fees and costs. ECF 1-3. Scorza responded by arguing one—and only one—such basis: the UTPCPL. ECF 1-4 (pp. 2-3 of 71). He did ***not*** argue that the AIPA or the Texas Act provided a basis for awarding fees and costs. *Id.* Scorza, represented by competent counsel, never contended in his post-hearing submissions that he had asserted a claim to fees and costs—or a cause of action—under the AIPA or the Texas Act. ECF 1-4, 1-5. Because Scorza so limited his claims and arguments and did not purport to raise claims under the AIPA or the Texas Act, Davison's submissions were also so limited, and they did not address the AIPA or the Texas Act. ECF 1-6.

The Arbitrator, on his own authority and without notice to the parties, awarded Scorza attorneys' fees and costs under the AIPA and the Texas Act. ECF 1-8. The Arbitrator effectively crafted for Scorza claims under the AIPA and the Texas Act, as well as an unstated argument that Scorza was entitled to attorneys' fees

under those statutes. The Arbitrator thus exceeded his powers by undertaking a search for "wrongs to right, taking it upon [himself] to identify additional claims [for attorneys' fees and costs] . . . never raised by [Scorza and his counsel]." *Muzin*, 61 F.4th at 994; *see Matteson*, 99 F.3d at 113-15; *PennEnergy*, 2023 WL 4715191, at *10-11 (noting how an arbitrator acting as the Arbitrator did here deprives a party of basic due process protections afforded by law).

Scorza's argument on manifest disregard of the law is an irrelevant red herring. ECF 21 (pp. 10-12, ¶¶ 23-28.) Davison did not and does not make that argument, as should be obvious because those words appear nowhere in Davison's Motion. ECF 1 (pp. 1-15); *see* footnote 3 *infra*.

Scorza's counsel then unleashes the full barrage of their *ad hominem* attacks on Davison in a section entitled "Davison's Attempt to Game the System." ECF 21 (pp. 12-13, ¶¶ 29-33). To the extent the Court considers this argument at all,[2] it is meritless.

Scorza's counsel misrepresents *Frison* in making the spurious "Game the System" argument. The cases are significantly different.

As Judge Conti noted in *Frison*, "[i]n count I of the arbitration complaint, Frison claimed that Davison violated the AIPA . . . ." *Davison Design & Dev., Inc. v. Frison*, No. 2:17-cv-01468, 2018 WL 6324996, at *2 (W.D. Pa. Dec. 4, 2018) ("*Frison*

---

[2] "Personal attacks . . . are never appropriate in any court filing." *Lewis v. Delp Family Powder Coatings, Inc.*, No. 08-1365, 2010 WL 3672240, at *4 (W.D. Pa. Sept. 15, 2010); *Sparks v. Speedy Kleene Car Wash & Laundromat*, No. 2:19-cv-1286, 2020 WL 4207652, at *4-5 (W.D. Pa. July 22, 2020).

*I*"); *Davison Design & Dev., Inc. v. Frison*, 815 F. Appx. 659, 660 (3d Cir. 2020) ("*Frison III*") (Frison "pursued a claim under the [AIPA]" in arbitration). So the claimant in *Frison* expressly asserted a claim under the AIPA in her statement of claim—unlike Scorza. *See id.*

The arbitrator in *Frison* found in Frison's favor on the AIPA claim. In seeking vacatur or modification of the award, Davison argued the arbitrator exceeded his powers and manifestly disregarded the law "by  ignoring the parol evidence rule and determining that Davison violated the AIPA."[3] *Friston I*, 2018 WL 6324996, at *5; *id.* at *7, 9 (summarizing Davison's other arguments for vacating the award in *Frison*). Davison did ***not*** argue in *Frison* that the arbitrator exceeded his powers by awarding damages on a claim Frison had not submitted to the arbitrator, as it does here, again because the AIPA claim ***had*** been submitted to the arbitrator by Frison. *See id.* at *1-10.

Scorza, by contrast, did not assert a claim under the AIPA in his Demand for Arbitration or otherwise, as detailed at length above. For that reason, *Frison* did not involve the same *Matteson*/*Ergobilt* issue that is at issue here. *See Frison I*, 2018 WL 6324996; *Davison Design & Dev., Inc. v. Frison*, No. 2:17-cv-01468, 2019 WL 1745787 (W.D. Pa. Apr. 18, 2019) ("*Frison II*"); *Frison III*, 815 F. Appx. 659. *Frison* and this case raise different bases and arguments for vacatur.

---

[3] This is the real reason why Scorza's counsel includes a section on manifest disregard of the law in its Response, ECF 21 (pp. 10-12, ¶¶ 23-28), even though Davison never made that argument: to try to artificially tie this case to *Frison*. Davison made a manifest disregard of the law argument in *Frison*, but it does not do so here.

The Third Circuit in *Frison* did not, as Scorza's counsel falsely claims, "review[]" or "confirm[]" Judge Conti's decision declining to vacate the award and confirming it. ECF 21 (p. 2, ¶ 2; p. 14 ¶¶ 34-35; p. 15 ¶ 39). It was ***Frison*** who appealed to the Third Circuit after Judge Conti denied Frison's later request for attorneys' fees. *Frison II*, 2019 WL 1745787; *Frison III*, 815 F. Appx. at 660 (noting "Frison now appeals th[e] denial of attorneys' fees"). Davison ***did not appeal*** from Judge Conti's decision in *Frison I* denying its motion to vacate, so the Third Circuit did not "review[]" or "confirm[]" that decision. *See id.* When Judge Conti denied its motion to vacate, Davison forwent an appeal, contrary to Scorza's baseless statements to the contrary. *See id.*

Scorza's counsel misrepresents the proceedings in *Frison* because an accurate summary of that case, and an accurate comparison of that case to this one, shows the true fallacy of his counsel's *ad hominem* attacks on Davison and the lengths they will go to try to pursue those attacks. All *Frison* shows is that Davison had once previously exercised its statutory right to challenge an arbitral award on a different basis than is at issue before this Court now. *See* 9 U.S.C. § 10; *Mesa Power Group, LLC v. Gov't of Canada*, 255 F. Supp. 3d 175, 189-90 (D.D.C. 2017) ("[S]eeking vacatur alone is not an indication of bad faith—rather, it is simply an exercise of the losing party's rights.").

Here, Davison filed a motion to vacate a portion of an arbitral award on a legitimate basis that was not at issue in *Frison*. If anything, *Frison* and this case demonstrate that Davison acts judiciously and in accordance with the law in the

rare case when it pursues its statutory right to challenge an arbitral award that is more than erroneous and meets the high standards warranting the filing of a motion to vacate.

## III.    Conclusion

Accordingly, Davison's Motion to Vacate should be granted by partially vacating, or modifying, the Award by striking that portion of the Award granting attorneys' fees and costs to Scorza.[4]

Respectfully submitted,

BARRON LAW OFFICE LLC

Date:  September 6, 2023          By:     */s/ Justin T. Barron*
                                         Justin T. Barron (PA I.D. No. 200394)
                                         P.O. Box 493
                                         Valencia, PA 16059
                                         (412) 334-6312
                                         jbarron@justinbarronlaw.com

---

[4] Scorza does not oppose Davison's request that the Court partially vacate or modify the Award rather than remand for further arbitration proceedings. ECF 1 (p. 14, ¶¶ 72-76); ECF 21 (pp. 1-20).

## CERTIFICATION

I hereby certify that on August 19, 2024, I electronically filed this Appendix Volume 2 with the Clerk of Court using the Court's CM/ECF system. All counsel of record in this case are registered CM/ECF users, and service will be accomplished through that system.

Date: August 19, 2024

_s/ Justin T. Barron_
Justin T. Barron